UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:16-CR-220 (AWT) |
| | : | |
| v. | : | |
| | : | |
| DAVID DEMOS, | : | |
| | : | |
| Defendant. | : | March 3, 2017 |

**MEMORANDUM IN SUPPORT OF DAVID DEMOS'S
GROUP I MOTIONS TO DISMISS, TO STRIKE
AND FOR A BILL OF PARTICULARS AND
IDENTIFICATION OF *BRADY* MATERIAL**

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
666 Third Avenue
New York, NY 10007


Day Pitney LLP
One Canterbury Green
201 Broad Street
Stamford, CT 06901


March 3, 2017

On behalf of David Demos, we move to dismiss the indictment for facial insufficiency and, alternatively, to strike certain portions of the indictment as irrelevant but unfairly prejudicial.   We also move for an order requiring the government to provide particulars and to identify *Brady* material in its vast document production.   Under the Court's Scheduling Order, these are our Group I motions, with Group II (addressing other motions – including substantive and legal bases for dismissal – and discovery related motions) due on August 15, 2017.[1]

## INTRODUCTION

The six-count indictment against David Demos was returned in December 2016.   The United States Attorney's Office sought these six charges after three years of investigating David and after having brought two similar indictments against four other individuals – Jesse Litvak (who was recently acquitted on nine of ten counts at his trial before Chief Judge Janet C. Hall) and Ross Shapiro, Michael Gramins and Tyler Peters (who are awaiting trial in May before Judge Robert N. Chatigny), and informations against two other individuals.

Preliminarily, we note that the numerous errors and inconsistencies in this indictment seem to suggest a nonchalance in a proceeding that has dramatically altered the course of David Demos's life and career and will forever tar him, no matter the ultimate outcome.   We say this reluctantly, because we understand that the government has to juggle a good number of matters at any time and we all make errors.   But the number of these errors and the government's failure to correct them is disturbing, as is the government's statement in court at arraignment nearly three months ago, that it would be superseding to "clean up" these errors.   No superseding

---

[1]   The Group 1 dismissal motions essentially address defects on the face of the indictment.

indictment has been provided as of this brief. The government has stood pat in the face of obvious errors.[2]

For example, the current indictment against David expressly incorporates paragraphs 1-11 only for Counts 1-5 – not for Count 6. Those paragraphs describe who David is, the nature of the bonds he traded, who some of his counterparties were, and the nature of the trades he made. Similarly, the indictment expressly fails to incorporate paragraphs 12 and 13 for Counts 1-5. Those two paragraphs describe how dealers like Cantor Fitzgerald (David's employer) got paid and define the term "tick." Other inaccuracies include that fact that Counts 1 and 6 do not list the tranche that was traded – just the deal name – and those counts therefore do not adequately or accurately describe the instrument in question. In addition, the trade date on Count 3 appears to be incorrect. We have not moved to dismiss on these grounds because they are easily correctible but we reserve the right to do so should the government not act.

Putting aside these obvious errors, the indictment is woefully insufficient on its face and should be dismissed for several reasons.

*First,* a key issue in this case – materiality – has already been decided against the government in the *Litvak* prosecution by virtue of Litvak's acquittals on nine of ten charges (the tenth verdict does not change this fact, for various reasons described in detail below). As a result, the government should be precluded from relitigating that issue against David. *See Yeager v. United States*, 557 U.S. 110 (2009); *Ashe v. Swenson*, 397 U.S. 436 (1970).

*Second,* the indictment should be dismissed because it fails to properly allege which of the myriad statements it alludes to was false – an essential element of securities fraud.

---

[2]    The government also failed to meet the March 1, 2017 deadline for providing 404(b) notice.

*Third,* Counts 4 and 5, which involve two bonds sold at the same time to the same counterparty based on the same series of statements should be dismissed as multiplicitous. *See* Fed. R. Crim. P. 12(b)(3)(B)(ii).

Beyond the facial insufficiency of the indictment, certain language in the indictment is irrelevant yet highly prejudicial and should be stricken as surplusage. *See* Fed. R. Crim. P. 7(d). The indictment is replete with language that is "not relevant to the crime charged and [is] inflammatory and prejudicial." *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996).

In addition, the indictment fails to identify for David the information necessary for him to adequately prepare a defense. Therefore, the Court should order the government to provide a bill of particulars for each of the counts. *See* Fed. R. Crim. P. 7(f).

Finally, the government has an obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny to identify for David all exculpatory information in its possession.  To date the government has provided David with millions of pages of material in discovery.  And as the government well knows from its experience in the *Litvak* trial, among the troves of material it has provided are documents that constitute *Brady*.  Given the volume of discovery produced, the government must identify for us where that *Brady* material can be found.  *See, e.g.*, *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998).

## POINT ONE
## THE INDICTMENT IS FACIALLY INSUFFICIENT
## AND SHOULD BE DISMISSED

The indictment against David Demos should be dismissed, based on facial insufficiency, for several reasons.

By way of background, the bond transactions charged against David involve the sale or purchase by David, to or from counterparties that are Qualified Institutional Buyers or Investors[3] of subordinate tranche non-agency RMBS.  It is a market, as the Second Circuit recognized in *Litvak*, that is "high-specialized" and populated by sophisticated investors.[4]

David traded subordinate RMBS (subordinated to senior bonds, often the tranches that are the first to be subject to losses) with highly specialized and risk tolerant investors in a highly specialized and speculative market.  A good illustration of just how highly specialized and speculative comes from the web site of a prominent participant in the subordinate RMBS market (the alleged victim for Counts 4, 5 and 6):



---

[3]     QIBs are entities that do not include individuals and that are considered by the securities laws to require less protection than most public investors based, in part, on the total assets they have under management, as well as their experience and sophistication as investors.  *See* 17 CFR 230.144A; Regulation of Securities, SEC Answer Book, 5th ed. Q 1720.

[4]     In discussing the impact of the trial court's decision to exclude a defense expert, the *Litvak* Court noted (808 F.3d 160, 182 (2d Cir. 2015) that that expert's:

> proffered testimony could have educated the jury (which was likely only familiar, if at all, with securities traded on public exchanges) about the highly-specialized field of RMBS trading. Because RMBS lack an efficient, transparent secondary market through which value can be determined objectively, traders set the value of the security, and hence the price each is willing to accept as a seller or buyer, by engaging in "rigorous valuation procedures" involving the use of certain "analytical tools and methods." Joint App'x at 208.  Thus, firms trading RMBS rely upon sophisticated computer-pricing models, often developed by professionals with applied-mathematics backgrounds, to determine the subjective "value" of the securities.



   This indictment against David Demos charges him with six counts of securities fraud based on his allegedly misrepresenting pricing information to counterparties when negotiating the purchase or sale of these RMBS.

   The "victims" who were allegedly defrauded were highly successful, highly sophisticated hedge funds with billions of dollars in assets under management, and were Qualified Institutional Buyers with the aptitude, expertise, experience, and risk appetite to buy subordinate non-investment grade speculative RMBS securities.  As is clear from the discovery provided by the government (and the indictment is not contrary to this), the alleged prices discussed by David

were for transactions that carried great risk.[5]

What the indictment does not allege (because it cannot) is that David misrepresented any aspect of the bond itself – what it was, its underlying collateral, the total price the investor was paying or the data that the investor would feed into its analytical models to evaluate the future yields and profits reasonably anticipated by the owner of these specialized bonds under various conditions.  *In other words, everything related to the inherent value of the bonds in question was expressed with 100% accuracy.*  All material data points were accurately conveyed.

Instead, the essence of this indictment is that David, while negotiating the purchase or sale, allegedly provided arm's-length counterparties with pieces of information about pricing discussions David had with a third party about separate transactions.

The fact is that David's pricing representations were made to investors who knew and understood the following, all of which was either shown in *Litvak* or will be shown in our case, as the government's discovery production confirms.  The pricing information charged as securities frauds in this indictment could not and did not significantly alter the total mix of information on which the alleged victims made their decision to buy from or sell to David (the test for materiality under the Second Circuit standard stated in *Litvak* by Chief Judge Hall) because:

---

[5]      As an investor/government witness testified in *Litvak* (Tr. 542) (emphasis added):

    Q.      And when Jefferies acquires a bond, it bears the risk of what happens with that bond?
    A.      Yes.
    Q.      For example, if this other transaction falls through, that's Jefferies' problem?
    A.      Yes.
    Q.      That can happen?
    A.      Yes.
    *Q.      When Jefferies buys a bond, it owns it as a principal?*
    *A.      Yes.*
    *Q.      It can hold it or sell it?*
    *A.      Yes.*

- *Each investor* understood that David's interests were not aligned with theirs (indeed, were adverse, as they negotiated, principal to principal, across the table from each other with profit motives that were antagonistic to each other and an understanding that traders in David's position were entitled to seek as much money as they could without being required to disclose – and typically not disclosing – their markup and profit);

- *Each investor* understood that this kind of pricing information was typically *not* provided *at all* to them in deals of this kind (disclosure was not required), yet those deals invariably moved to conclusion without David's counterparty knowing his acquisition price or profit;

- *Each investor* viewed the pricing information targeted by this indictment skeptically, as would any reasonable investor in this market;[6]

- *Each investor* determined the total price he paid only after complex statistical analysis of a host of verifiable micro and macro data points (including characteristics of the collateral, loan documentation, geography, statistical analysis of the cash waterfall from the allocation of payments and losses)[7];

---

[6]     *Every investor called by the government in Litvak testified that he or she viewed information volunteered by traders with serious skepticism, including pricing information in the market.*  A good illustration is the sworn testimony of the government's prime witness in *Litvak,* Michael Canter of Alliance Bernstein, who was supposedly the first to "blow the whistle" on Litvak's conduct.  He testified that there is "a lot of false pricing information out and about in this market."  Tr. 426.  Similarly, Brian Norris of Invesco Advisors testified that "people intentionally put out misleading information in the market" so he naturally had "skepticism about volunteered information."  Tr. 794.

[7]     ███████████████████████████████████████████████████
███████████████████████████████████████████████
████████████

- *Each investor* did little or nothing to try to *independently* verify (*i.e.,* outside of David) the price David provided (they could have checked with other dealers, pricing services or reach out to other parties) because they were confident in their own valuation, satisfied with the prices they paid and did not want to incur execution or counterparty risk (a fear of losing the bond to another bidder by confronting David or seeking to re-negotiate at the time);[8]

- *Each investor* knew (and often verified) that they could not buy or sell, in the market at that time, the bond in question or a comparable bond at a better price than David's (they would have gone to a principal other than David, had they been able to);

- *Each investor* understood that the period when they were transacting with David was a period of rapid price increases, dwindling supply and immense demand, a buying frenzy (a "███████████" in 2012 according to Victim 1; a "███████" according to Victim 2) because of the discounts available and the potential short and long term profits that investors thought they could earn, further impelling them to execute at the transactable level stated in the chat (at USAO_CANTOR_000018 and SEC-DD-00003541); and

- *Each investor* understood that these bonds were good investments that traded within *a range* of prices and recognized that the bonds were so speculative that they had the potential to yield significant profits because they were trading at such

---

[8]    For example, as Victim 1 observed (Govt. Memo at USA_CANTOR_000018): "████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████"

deep discounts to par (cents on the dollar) in the transactions at issue in this indictment, further reducing any possible importance the investor would place on achieving a price below the ceiling in the range of acceptable prices established by the investor's model before the purchase or sale of the bond.[9]

This is the background for our Group I motions.  It is a background that so obviously indicates that this indictment does not state a case – a background that presumably led Judge Chatigny to state in *Shapiro* that, "the allegations of [that] indictment" were "marginally sufficient" and that the defense should speak further "by way of a motion to challenge the sufficiency of the evidence"; a background that led the *Litvak* jury to return nine acquittals out of ten counts (a tenth that clearly was erroneous).[10]

1. *Dismissal Ground One: The indictment should be dismissed because an element vital to each count – materiality – has been decided adversely to the government, and the doctrine of issue preclusion prohibits its relitigation in this case.*

The indictment should be dismissed because an essential element of all six charges – materiality – has been determined in favor of the defense in *Litvak*, and the prosecution had a full and fair opportunity to litigate that element.   Therefore, the government is precluded from relitigating this essential element in our case.

---

[9]     As the government conceded in *Litvak*:  "the analytics spit out a range of prices where you might be interested in a bond… .  That's just coming up with a budget.  That's just deciding, what's my ceiling? What's the price I don't want to buy higher than?  What's the most I want to pay for this thing?  And everyone agrees, that analytics, right, that budgeting, that all happens before you get to the negotiating table."  Tr. 1361.

[10]     As we explain below, the single guilty verdict out of ten charges (nine were acquittals) does not alter this point because, for a variety of reasons, it does not and cannot stand for the proposition that a *reasonable investor* could consider this information material.

Briefly, the nine acquittals in *Litvak* necessarily reflected the fact finder's determination, adverse to the government, that false and misleading statements about pricing in RMBS transactions are not and cannot be material to the reasonable investor in this highly specialized market.  That was the only element actually litigated in that case.

As every witness called by the government in *Litvak* confirmed, a reasonable investor in RMBS views pricing information of the kind volunteered by *Litvak* (or David or any other trader in this market) with "a grain of a salt" (language often used by the investors themselves and even David in his interactions with them).[11]  This skepticism eliminates the possibility that the information in question can or would be trusted enough to be material.  Because the prosecution lost there (the same prosecution that now seeks to try David), the issue cannot be relitigated and, accordingly, none of the six charges against David can be proven.

In addition, as the uncontroverted expert testimony from *Litvak* established (the defense called one expert, ultimately embraced by the government in its summation, and the government called none), whatever banter occurred in this market between traders like Litvak or David and their counterparties over price was known, universally, *not* to reflect what the trader made on the trade.  The words of the sole expert at *Litvak* are crystal clear (Tr. 1250):

> Q.   Does your view of how that investment process works
>      change if the broker-dealer does make a representation like,
>      I will work for 6 ticks?

---

[11]   The same holds true in our case: Victim 1 told the government that he "████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████" USAO_CANTOR_000019 and SEC-DD-00003131.

    A.      No. You know, the work for – broker-dealers made a lot of noise about what they were working for and, you know, they are doing this, they are doing that.  *And generally, if they said they were working for me, I suspected they might be working on me rather than for me to try get me to transact because they make money when we do a trade.*

(Emphasis added).

In other words, no investor was deceived into thinking that the profits of a trader like David or Litvak came from anywhere other than the difference between where that trader bought and sold a bond (his spread).

The doctrine of issue preclusion (a strain of collateral estoppel) derives from a line of Supreme Court cases stretching back to *Ashe v. Swenson,* 397 U.S. 436 (1970).  *See, e.g., Yeager v. United States,* 557 U.S. 110 (2009).  Where a jury has determined a fact or issue by virtue of its not guilty verdict on certain counts, the defendant may seek to preclude relitigation of similar counts in a subsequent prosecution.  A several step analysis shows why this doctrine applies in our case.

*First,* there must be a definitive finding on charges similar to the charges at issue in our case.  The nine *Litvak* acquittals mirror our charges.

The charges against Jesse Litvak were strikingly similar to those against David: securities fraud based on alleged misrepresentations concerning pricing information provided by a trader (Litvak or David), operating as an arm's-length principal in connection with the purchase or sale of RMBS bonds.   If anything, the charges against David rest on transactions in which the government will have a harder time proving materiality because David's charged trades were in the even more speculative subordinated bond market.

A recent statement by the government suggests that it shares this view as well.  In its recent motion opposing a motion to change the conditions of release in *Shapiro,* the government

acknowledged that both cases were linked by "analogous" theories but then sought to distinguish *Litvak* from *Shapiro* by citing three circumstances: the fact that in *Shapiro* (unlike in *Litvak*) (a) "cooperating co-conspirators" will testify; (b) "a wider-ranging conspiracy that includes the supervisor of the RMBS desk" was charged; and (c)  violations of the conspiracy statute and wire fraud statutes" were alleged.  Government's Response to Defendants' Motion to Modify Bail Conditions at 12*, United States v. Shapiro, No. 3:15-cr-155* (RNC) (D. Conn. Feb. 1, 2017).  We do not believe these three metrics are sufficient to distinguish *Shapiro* from *Litvak* on the issue of materiality, but even if they were, they only emphasize the similarity of our case to *Litvak* because on each of these government-cited metrics, our case and *Litvak* are the same.[12]

*Second,* the party against which the issue will be used must have had an opportunity to fully litigate the issue.  Although our client was obviously not involved in the *Litvak* trial, the party against whom the issue in question will be used – the United States of America – was (indeed, two of the very same prosecutors who tried *Litvak* are prosecuting our case).

*Third,* the court must be able to determine *from the record* that the issue in question was necessarily determined by the jury's decision to acquit.  As the Supreme Court recently counseled in *Bravo-Fernandez v. United States,* 137 S. Ct. 352, 359 (2016): "To identify what a jury in a previous trial necessarily decided, we instructed, a court must 'examine the record a prior proceeding, taking into account the pleadings, evidence, charge and other relevant matter.'" (quoting *Ashe v. Swenson,* 397 U.S. 436, 444 (1970)).  *See also United States v. Coughlin,* 610 F.3d 89 (D.C. Cir. 2010) (Garland, J.) (holding that where court can determine from the trial record that an acquittal necessarily resulted from the jury rejecting a particular

---

[12]      While there are evidentiary differences between *Litvak* and our case, those differences favor David on materiality (*e.g.,* as noted above, the bonds David sold were even more speculative, requiring even more sophistication, analysis and more risk tolerance on the part of the buyer and promised even larger returns).

element and that element is common to counts on which the jury hung, those counts cannot be retried).

Here, it is indisputable that only one element was truly contested at the *Litvak* trial: materiality.  Litvak's counsel's summation leaves no doubt on this score.  His summation occupied 54 pages of transcript, the entirety of which was spent on the testimony, actions and reactions of the counterparties who traded with Litvak.  That focus was (as Litvak's counsel made clear) relevant only to the second of four elements of securities fraud: materiality.  Litvak's counsel focused on (Tr. 1385-1439):

- the single expert called in that case (an expert who discussed how pricing information provided by a trader acting as an arm's-length principal, owing no fiduciary duty to his counterparty, is treated with utter skepticism);[13]

- the statements by the investors in *Litvak* – the government's own witnesses  – about their skepticism toward any information provided by dealers in these bond transactions;

- the false representations about pricing information and market color that these supposed victim-investors issued themselves; and

---

[13]     As the only expert to testify in *Litvak* made clear, when a trader like Litvak volunteers pricing information, it signifies nothing more than what the trader wants to be paid (Tr. 1248-49):

> Q. What if a dealer were to say, I bought this bond at 50.  How would reasonable RMBS investors understand that statement or view it, in your opinion?
>
> A. Well, if somebody says, well, I bought this bond at 50 and he knows that that's something that I want to buy, pretty much the only thing I can take from that that I know to be true is that he would like to get paid something more  than 50 for me to buy it.  So if I want to buy it, probably have to pay more than that, according to his view of the world.

- the enormous amount of due diligence RMBS investors do to verify information about the characteristics of the bonds (their collateral and structure) and analyze that information (in great contrast to their doing little to nothing to independently verify the pricing information provided by dealers like Litvak, David and others).

Litvak's counsel did not vary from this single theme.  As counsel concluded, if the case were about lying, "I wouldn't be standing here.  What it is about is whether [the government] ha[s] met beyond a reasonable doubt, the second element of securities fraud, materiality."  Tr. 1439.

*Fourth*, there must be no other aspect of the case in which the issue was decided that undercuts the conclusion that the jury necessarily decided the issue in question.  While issue preclusion cases often involve acquittals accompanied by deadlocked counts on comparable charges, our case presents a slightly different situation: the existence in *Litvak* of one guilty verdict among nine acquittals.

While deadlocked counts do not undercut the preclusive effect of convicted counts, a guilty verdict may.  *See United States v. Powell,* 469 U.S. 57 (1984).[14]  But the single guilty verdict in *Litvak*, in the midst of nine acquittals, does not negate the doctrine of issue preclusion here for three reasons.

<u>Reason One</u>:  there is good reason to believe that the single guilty verdict in *Litvak* should be reversed either by Chief Judge Hall or by the Second Circuit.  As Litvak's counsel has so ably

---

[14]    In *Powell*, the Court held that a defendant cannot show that an issue she seeks to preclude was actually decided by a prior jury "when the same jury returns irreconcilably inconsistent verdicts on the question she seeks to shield from reconsideration." *See Bravo-Fernandez*, 137 S. Ct. at 359.  The Court reasoned that an inconsistent verdict, unlike a deadlocked verdict, reflects a jury decision. *See Bravo-Fernandez*, 137 S. Ct. at 360 ("When a jury returns irreconcilably inconsistent verdicts, we said, one can glean no more than that "'either in the acquittal or the conviction the jury did not speak their real conclusions.'" (quoting *Powell*, 469 U.S. at 64 (quoting *Dunn*, 284 U. S. at 393))).  "Because a court would be at a loss to know which verdict the jury 'really meant,' we reasoned, principles of issue preclusion are not useful, for they are 'predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict.'" *Id.* (quoting *Powell*, 469 U.S. at 68).

pointed out in a post-trial motion for a judgment of acquittal, the single guilty verdict could only have resulted from the provably faulty testimony of the single investor whose trade with Litvak formed the basis for the charge and conviction.

The investor in question (Norris of Invesco) was allowed to testify to his *subjective* opinion that Litvak was *his agent*, owing him a fiduciary duty (this is crystal clear from his testimony).[15]  The investor did so despite black-letter law to the contrary, including the judge's instructions to the jury, and despite trading with Litvak in an arm's-length relationship and as a principal (*as the investor's own employer confirmed in writing*).  And it is equally clear that that single investor used this faulty "agency" construct as the basis for his conclusion that Litvak owed him a duty to tell the truth (*i.e.*, that Litvak was supposed to be working in the interest of that investor, instead of Litvak's own interests, despite this being an arm's-length transaction).

In other words, the investor *dropped his skepticism* toward Litvak's pricing information because he erroneously concluded that Litvak was acting as his *agent* in a BWIC (Bids Wanted In Competition).  The sole investor upon which the guilty verdict rested reached this idiosyncratic and subjective conclusion because he completely misunderstood what every other investor understood and practiced: utter skepticism toward the kind of information Litvak (or David) was charged with misrepresenting in their arm's-length relationship (the kind of information these alleged victim-investors misrepresented as well).  That normal skepticism is precisely what *every* government witness confirmed – even the witness on whom the guilty verdict rested – but he, unlike the other "reasonable" investors, deviated from this objective

---

[15]      The investor testified on redirect examination that he *abandoned* his normally skeptical attitude to pricing information provided by a counterparty because what Mr. Litvak told him was "not information that you take with a grain of salt," because "[Mr. Litvak was] supposed to be acting—he's supposed to be acting in my best interest and, you know, I accept what he tells me in that instance as the truth." Tr. 806-07.

standard because he unequivocally misunderstood his relationship to Litvak (as Chief Judge Hall's instructions made clear).

Reason Two:  even if the guilty verdict were to stand, it rests on testimony that would not be allowed in David's trial so its relevance to David's indictment would be negated.  As Chief Judge Hall instructed the *Litvak*  jury, the relationship between Litvak and his investors was one of principal to principal – *not* agent.  Tr. 1488-89.  Without the faulty testimony that led to the sole guilty verdict in *Litvak* (*i.e.,* testimony that normal skepticism was abandoned because the investor mistakenly believed he was entitled to rely on Litvak as his agent, looking out for the investor's best interest), the evidence will uniformly establish that there is *no* fiduciary duty in these transactions and that reasonable investors view pricing information provided by a trader in these specialized bonds at the time of the transactions in question with skepticism, making the pricing information in question indisputably immaterial (as it was to the investors underlying the nine acquittals).[16]

Reason Three:  even if this single verdict stands, *Powell* is no obstacle to issue preclusion in our case for another reason: because it does not diminish the clarity with which the jury spoke about the *objective* reasonable investor standard.  In *Powell*, the Supreme Court refused to apply issue preclusion because the jury's verdict was irrational; in reaching a clear compromise verdict, the jury "did not speak their real conclusions." 469 U.S. at 64.  The defendant there had been

---

[16]     A good illustration of the importance of this witness's faulty construct comes from another government witness in *Litvak* (Joel Wollman) – an investor who was the basis of an acquittal.  Wollman also expressed skepticism in his cross examination but unlike Norris, did not abandon that skepticism because, as he acknowledged, *in arm's-length transactions,* the trader is permitted to lie about certain facts.  As he answered the government's question on redirect (Tr. 996-97):

> Q.     Do you understand that when you are dealing with someone at arm's length, that they are allowed to lie to you about the price they paid for a bond?
> A.     It depends on the situation.
> Q.      …do you understand they are allowed to lie to you about the price they paid for a bond?
> A.     I don't know what the rules are.

convicted of using a telephone to facilitate drug trafficking, but was acquitted of engaging in drug trafficking so it was reasonable to conclude that the jury compromised and did not speak its real conclusions.

But in *Litvak*, the circumstances were far different.  Each count charged a different securities fraud that could stand on its own (typically, the alleged victim counterparty was different).  Unlike *Powell,* one count was not a means to commit another count.  So there was nothing *per se* irrationally inconsistent between the verdicts: the jury could have viewed the mindset of the investor in the guilty count differently from the mindset of the investors in the other nine counts.   And it is inconceivable that the acquittals were a result of some "compromise" or lenity by the jury when there were *nine* acquittals.

That means that the jury could rationally but mistakenly have rendered its ten verdicts. And when those ten verdicts are collectively viewed under the correct legal standard of an *objective* reasonable investor in this RMBS market, they necessarily reflect the view that an *objective* reasonable investor would not consider the pricing information in question to be material.  In rendering nine acquittals and only one guilty verdict, the jury essentially stated that the *subjective* view of one investor could determine materiality for *that* investor but not for the investors behind the other nine counts.  That was a mistake on the jury's part but that failure does not detract from the fact that had the jury applied the correct legal standard – the standard that Chief Judge Hall applied in *Litvak* and will be applied in our matter – the *Litvak* jury's verdict has resolved the issue in favor of Litvak and David.

Materiality, as Chief Judge Hall's instructions correctly conveyed, does *not* depend on the *subjective* view of any RMBS investor – especially where that subjective view rests on a complete misunderstanding of the investor's arm's-length relationship with the trader.  Instead, it

is an *objective* construct, built around the notion of what an *objective* reasonable investor would consider material in an arm's-length transaction.  As Chief Judge Hall instructed, materiality requires proof that "the misstated or omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available … to [ ] meaningfully affect a reasonable investor's consideration about whether to buy or sell and at what price" where that reasonable investor is a reasonable investor *in the RMBS market* (a reasonable investor who trades in this highly specialized arena of RMBS bonds which, in David's case, is even more specialized and unusual because he was trading subordinated tranches of those bonds).  Tr. 1498 (emphasis added).

Because the standard is objective, the standard is defined by what the industry as a whole expects.  Here, the jury's decision to acquit Litvak on nine transactions necessarily means that the jury determined that *the objective reasonable investor* would not consider the representations at issue in *Litvak* to be material.  The guilty verdict does not change that inevitable conclusion – it stands, instead, for the notion that because the jury was allowed to hear testimony about an investor's idiosyncratic belief that Litvak was his agent acting for his interests and not his own, it was erroneously positioned to substitute the *subjective* view of that single investor for the *objective* standard.  The objective reasonable investor does not, by definition, act with *selective skepticism* over pricing information; selectivity is at odds with an objective standard.

In the end, our issue is distinguishable from the one that foreclosed issue preclusion in *Powell.* The acquittals in *Litvak* established a reasonable investor standard in these kinds of trades that preclude a jury finding guilt in comparable trades, whether conducted by Litvak or someone else accused of comparable conduct.  Because materiality is an essential element of all

of the charges against David, those charges must be dismissed because litigation of this issue has been precluded by the guilty verdicts in *Litvak*.[17]

One final point: the fact that it is David Demos, not Jesse Litvak, who is seeking issue preclusion from the *Litvak* verdicts (*i.e.,* non-mutual issue preclusion) does not raise an insurmountable roadblock. While *Standefer v. United States,* 447 U.S. 10 (1980) clearly discourages the use of collateral estoppel in the typical non-mutual scenario, it did not announce an absolute rule.

The *Standefer* Court itself indicated this when it concluded its opinion with the lower court ruling that expressly stated that "we are thus inclined to reject, *at least as a general matter, a rule*" allowing non-mutual issue preclusion in criminal cases. In so ruling, the Court implied that its rule might have exceptions.[18]   447 U.S. at 25. *See United States v. Powell*, 469 U.S. 57,

---

[17]     Although not central to our argument, there may be an additional reason to question whether the single guilty verdict in *Litvak* should have any force. While inconsistent verdicts are still tolerated today, there is no question that circuit courts have struggled with the unfairness such toleration can create. Moreover, the *Powell* ruling denying issue preclusion stemmed from the doctrine of respect for inconsistent verdicts based on Justice Holmes's reasoning in *Dunn v. United States,* 284 U.S. 390 (1932). However, central to Justice Holmes's reasoning was the Court's contention that had one count charging a crime resulted in an acquittal, the government – without fear of *res judicata* – could have brought a second indictment charging a second crime to which the first crime was integral. As the *Powell* Court recognized, *Ashe v. Swenson* overturned that reasoning and effectively undermined the premise on which *Dunn* was written.

[18]     There are additional reasons to question the wisdom of broadly applying *Standefer* in situations like ours. *First,* the *Standefer*  Court, acknowledging the vitality of *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331 (1979) – decided only two years earlier – confirmed that non mutual estoppel was appropriate when the government was a litigant in one of the proceedings (there, an SEC matter). The paramount interest of the government in enforcing the criminal law was essential to the *Standefer* result yet it is difficult to distinguish between the government's interest (as a representative of the people) in criminal cases from its role enforcing the securities laws (especially when those securities laws are the basis for the prosecution, as they are in our matter). *Second,* the *Standefer* Court was concerned that in a criminal matter, the government may be restricted in its efforts to prove guilt in the first proceeding (where acquittals resulted) due to evidentiary rulings or suppression of evidence. That concern clearly does not pertain in our matter:  in *Litvak,* the government suffered no restrictions in its proof, for each investor testified freely and no evidence was suppressed.  *Third,* the verdicts that the defendant in *Standefer* sought to invoke as collateral estoppel were extremely inconsistent: acquittals for having received certain paid trips charged under one statute and convictions *for those same trips* charged under another.  In our matter, the verdicts can be completely reconciled based on the evidence in the case, as

19

66 n.7 (1984) ("In *Standefer…[u]nder those circumstances* [acquittal of principal, subsequent trial of individual who aided principal] we refused the protection of non-mutual collateral estoppel") (emphasis added); *United States v. O'Hara,* 960 F.2d 11, 14 (2d Cir. 1992) (*Standefer* held that prior acquittal did not preclude "later prosecution of a coconspirator or accomplice") . *See also Wortley v. State*, 695 S.W.2d 664, 666-67 (Tex. App. 1985) ("the Supreme Court in *Standefer* did not enunciate a general rule that nonmutual collateral estoppel was inapplicable in criminal cases; rather, the Court seemed to limit its holding to the circumstances of the *Standefer* case").

The unique circumstances of our case, described above, is one of those exceptions. Our matter merits an exception because, as mentioned, materiality is an *objective* standard based on the expectations of a *reasonable investor* in the highly-specialized RMBS bond market. Because the means of proving it rests with the testimony of the various investors and experts in this market and because in *Litvak* (i) all of the investors underlying *all ten* counts testified to their skepticism about the pricing information at issue in principal-to-principal transactions, and (ii) the only expert who testified unequivocally established that a reasonable investor treats verbal, unverified information provided by an arm's-length counterparty with "skepticism," the jury verdict has to stand for the notion that this pricing information is not "material" to any highly-sophisticated investor making investment decisions in this highly-specialized RMBS

described above. *Fourth,* the *Standefer* Court's concern that the government does not have pre-trial discovery in a criminal case is inapplicable as well because *Litvak* was a second trial where the government had very clear pre-trial disclosure of the defendant's expert testimony and, of course, detailed pre-trial knowledge of what its own witnesses would testify to, along with the ability to anticipate how its witnesses would be cross-examined and access to an immense trove of information it had subpoenaed from the entire industry.

market, that unverified verbal pricing information does not, and cannot, "significantly alter the total mix of information available" to those sophisticated investors.

*As the trial record of Litvak revealed, the government's proof of materiality in our case will be no different because it cannot be different:* the substance of the expert's testimony in *Litvak* was not challenged by the government and the investors underlying the ten counts gave the kind of testimony that the government had hoped they would (there was no impediment placed in the government's way) and which any reasonable investor in a principal-to-principal transaction must.  Because the proof elicited by the government established that the pricing information was not material in *Litvak* and the government's proof cannot and will not be different in this regard in our case, it would offend every fundamental notion of due process to allow the government to relitigate this issue.

2. *Dismissal Ground Two:  The indictment should be dismissed because it fails to allege the false statement and/or representation that are essential elements of each count.*

Rule 7 of the Federal Rules of Criminal Procedure expressly requires that an indictment "must be a plain, concise, and definite written statement *of the essential facts* constituting the offense charged."  Fed. R. Crim. P. 7(c)(1) (emphasis added).   Notably, the Rule does not state that a charge that simply tracks the law suffices.  Instead, the *essential facts* of the offense must be stated.  Any assertion that an indictment passes muster as long as it tracks the language of the statute is untenable.

While courts have shown a great deal of deference to the government when examining the adequacy of an indictment, that deference is not unlimited.  A good illustration of these limits is *United States v. Nance,* 533 F.2d 699, 701 (D.C. Cir. 1976), where the D.C. Circuit reversed guilty verdicts on wire fraud counts that "fail[ed] to specify the false representations" that the defendant allegedly made.  Tracking the language of the statute – even specifying the defrauded

counterparty, the date of the fraud and the amount – was not good enough.  *Cf. United States v. Trotta,* 525 F.2d 1096, 1100 (2d Cir. 1975) (upholding convictions for extortion under color of official right even where indictment did not specify the *quid pro quo* for the extorted payment because a *quid pro quo* "is not an essential element of the crime").

The indictment against David Demos fails this test.  It lists six charges at the end of 26 paragraphs (paragraphs that include quoted snippets from two allegedly illustrative electronic "chats") but in none of those charges is the alleged false representation or omission identified. All six counts must be dismissed.[19]

### 3.   *Dismissal Ground Three: Counts 4 and 5 should be dismissed as multiplicitous.*

Counts 4 and 5 plead two different bonds that were sold to the *same counterparty* in *the same* transaction based on the *same representations.*  They were a package deal: they traded at one price and were negotiated as one price.  Even the illustration pled by the government in paragraphs 20-22 treats them as one – alleging for both bonds that there was a single but unidentified misrepresentation in a conversation between David and the unnamed buyer in question where both bonds were negotiated and transacted at a single price.  Because § 78j(b) criminalizes the "manipulative device or contrivance," the government must plead these two transactions in one count.  *See United States v. Langford,* 946 F.2d 798, 803 (11th Cir. 1991) ("The allowable unit of prosecution under section 78j(b) is, therefore, the use of a manipulative device or contrivance, which, as clarified by the SEC in Rule 10b-5, does not have to be the complete scheme to defraud; rather, it can be any false statement of material fact in connection with a discrete purchase or sale of a security").  *Cf. United States v. Rigas,* 281 F. Supp. 2d, 660,

---

[19]      Although the indictment does provide two illustrations of David's alleged representations, the indictment does not state that those representations are, in fact, the basis for a particular count.  But even if they were the basis for two counts, their presence only emphasizes the absence of *any representation* for the remaining four counts.

667 (S.D.N.Y. 2003) (Sand, J.) (deeming multiple counts not to be multiplicitous because, while the various securities transactions were part of the same scheme, the sales of securities "involve[d] different buyers who were defrauded by various misrepresentations").

Thus, Counts 4 and 5 are multiplicitous and under Rule 7, both must be dismissed. *See id.* at 666 ("For purposes of a multiplicity analysis, the determinative issue is not whether the same conduct underlies separate counts, but whether the offense charged in one count is the same as the offense charged in another count").

**POINT TWO**
**THERE ARE NUMEROUS INSTANCES**
**OF IRRELEVANT AND PREJUDICIAL ALLEGATIONS THAT**
**SHOULD BE STRICKEN UNDER RULE 7 AS SURPLUSAGE**

Rule 7(d) allows the Court to strike surplusage from an indictment – information that is not relevant and is prejudicial. *See United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir. 1996) (court may strike indictment allegations that are "not relevant to the crime charged and are inflammatory and prejudicial").

The indictment contains the following irrelevant and prejudicial allegations that should be stricken under Rule 7(d).

*1. Paragraph #2: states that David was "terminated" by Cantor Fitzgerald.*

*First,* the circumstances under which David left Cantor Fitzgerald are irrelevant to this case (indeed, David left Cantor before Cantor or David was under investigation).

*Second,* David was not terminated in the conventional sense (and the government surely knows this because it has a copy of David's severance agreement, under which he received significant benefits). The government also presumably knows that David's employer, Cantor Fitzgerald, listed David's departure on the U-5 Form over which Cantor had total control,

23

without making *any reference to any negative conduct by David*.  This stands in stark contrast to the U-5's of people terminated for conduct comparable to what is charged against David.[20]

Finally, the word is highly prejudicial, implying to the trial jury that David's employer fired him upon learning of the conduct at issue in this case (which, again, is factually untrue).  It implies, incorrectly but to great effect, that a party other than the grand jury considered David's conduct to be seriously wrong.

*Solution:  the reference to David's departure from Cantor should therefore be stricken.*

*2. Paragraph #3:   states that residential mortgage backs securities (RMBS) are "securities," without noting that these securities are both highly complex and traded only by sophisticated counterparties.*

As noted earlier, David traded subordinate or mezzanine bonds, primarily non-investment grade often trading at deep discounts to par (and even pennies on the dollar) – the tranches that were often exposed to the first level of default (in fact, some actually were taking losses at the time they were traded).  These bonds had an even more limited audience because many highly sophisticated buyers were precluded from purchasing them.  They required more analytical and statistical credit workups than senior bonds that had investment grade ratings (as the earlier quotation from an SEC filing by one of the two alleged victims confirms).[21]   So David traded with parties willing to accept the greatest risk; mutual funds or insurance companies could not buy these bonds because of their risk mandates, rating requirements and other fund specific requirements.

---

[20]     When someone is terminated for an action related to his trading, the firm is obligated to disclose that fact.  An example is the U-5 for the following trader whose name we have not included but will provide should the Court ask:  "Allegations involving certain inaccurate communications to customers during the negotiation of residential mortgage-backed securities trades."

[21]     The SEC filing quoted earlier on pages 4-5 notes the highly specialized and speculative nature of these bonds:  "███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████"

Thus, to suggest to the jury that David was trading securities is wrong because it implies that the bonds in question resemble simple stocks and bonds traded by individual investors of any sophistication, which are governed by rules applicable in those markets).   The unfair prejudice is serious: the jury must determine materiality based on the sophistication of the alleged investor-victims (here, Qualified Institutional Buyers) and the complexity of the market (RMBS bonds trading with huge numbers of variables affecting their value), yet the statement that RMBS are "securities" implies to the jury that they could judge materiality by what a reasonable investor in securities (like themselves) would consider material.

*Solution:  The reference to RMBS as "securities" should be changed to "highly complex subordinated RMBS securities in a specialized niche of the market, traded by extremely sophisticated decision makers that possessed the requisite expertise and were permitted to take structural and credit risks not even all RMBS market participants could."*

> 3.  *Paragraph #5:  states that "Some of DEMOS's victims were affiliated or subsidiaries of recipients of funds from … the Government bailout plan…."*

This entire paragraph is irrelevant and highly prejudicial: the fact that one of the alleged victims in this case received TARP (bailout plan) funds has no bearing on the charges in this case, particularly where, as here, there is no allegation that TARP money was used in the specific RMBS transactions charged.   There is no charge alluding to the victimization of the federal government (nor could there be):  the materiality inquiry relates to a reasonable investor's mindset – an investor who, as mentioned above, traded these kinds of securities in this kind of market.  The federal government, including TARP, did not interact with David.[22]

---

[22]     As the prosecution is keenly aware, the Second Circuit reversed Litvak's conviction for a false statement to a federal agency and there, one of Litvak's alleged victims allegedly traded with monies directly provided by TARP.

Moreover, as the government's discovery confirms, the securities at issue in David's indictment were almost definitely not PPIP eligible and in the documents we have thus far reviewed, there does not appear to have been any allocation by the alleged victims to PPIP accounts. And none of the alleged victims are described as having any interaction with TARP or Treasury *with respect to the six bonds in this case*. The press release issued by the United States Attorney's Office confirmed this when it quoted the Inspector General of TARP as saying that the victims whom David allegedly defrauded "include the manager of a taxpayer provided-bailout fund" – notably omitting any mention that the funds used to buy the bonds in any of the six counts came out of a PPIP fund.

At the same time, this part of the indictment is incredibly prejudicial because it suggests that David's trades in 2012 somehow were linked to the financial crisis of 2007 (*i.e.,* five years earlier) and that David's counterparties were government funds when, in fact, his counterparties were typically private hedge funds that specialized in highly risky, esoteric investments (Qualified Institutional Buyers). In doing so, the government implies that David stole from the jurors because TARP was a Treasury funded program – that is, funded with the taxes paid by people like the jurors themselves – and bore some responsibility for the financial crisis that presumably affected the lives of nearly everyone now of age to sit as a juror.[23] This improper effort to tar David with the financial crisis is indisputable – as the government agents attached to this case stated on the SIGTARP website, "victims of this alleged scheme – which involved the same type of securities that were at the heart of the financial crisis – include the manager of a

---

[23]    We will be moving to preclude the government from any reference to TARP at trial as well.

taxpayer provided-bailout fund that was created to unlock frozen credit markets during that same crisis." www.sigtarp.gov/Press%20Releases/Cantor_Release.pdf

*Solution: the entire paragraph referencing TARP and the bailout plan should be deleted.*

*4. Paragraph 9: states that pension funds buy RMBS.*

David did not sell any of the bonds in question to any pension funds. In fact, his RMBS offerings (subordinate tranches) were generally too risky for those funds. Thus, their potential role is irrelevant to this case.

At the same time, their inclusion is highly prejudicial, getting jurors to think that their own monies were directly compromised by the conduct charged here.

*Solution: the words "pension funds" should be deleted.*

*5. Paragraph 10c: states that a BWIC list is similar to an auction in which the highest bid wins.*

A BWIC is not comparable to an auction because the highest bid does *not* always win: the seller of the bonds has discretion to sell to whomever he chooses. In fact, the highest bid does not always win the bond if that bidder does not meet reserve requirements imposed by the seller. The statement in Paragraph 10c is inaccurate and, therefore, irrelevant.

The prejudice from this description is clear as well: it implies that a seller (whether it be the seller from whom David buys the bond or David himself when he sells to another) has no discretion but automatically must pass through and act upon all bids. That implies that the seller does not have discretion over the transaction, which in turn implies that that there is no execution or counterparty risk when in fact, either side could step away from the transaction at any time.

*Solution: the phrase "It is similar to an auction, in which clients submit bids and the highest bid "wins" and buys the bond" should be deleted.*

> 6. *Paragraph #12a: states that a buyer or seller pays a "commission" to a "broker dealer" "for facilitating" a trade and Paragraphs ## 1, 9, 11, 12, and 13 use the term "broker-dealer" to describe David's position.*

These statements are not relevant because they convey an indisputably false impression: that David was the investor's agent, with a corresponding fiduciary duty of honesty. As the government knows from the *Litvak* trial, the relationship of someone in David's shoes to the investor buying from or selling to him is one of principal to principal only. That is how Judge Hall expressly instructed the jury in *Litvak,* despite the prosecution's efforts to elicit testimony and offer argument at odds with this indisputable fact. Indeed, the kind of trades charged in the indictment always had risk, unlike what happens when one serves as an agent. For example, when David's employer, Cantor Fitzgerald, purchased the bond, it incurred risk from that purchase for it was not required to sell this bond to the alleged victim. Indeed, as the securities laws make clear, by trading for Cantor's own account, David acted as a "dealer" for itself, not for others. *See* SEC Guide to Broker-Dealer Registration, at 5 (Apr. 2008) ("Unlike a broker, who acts as agent, a dealer acts as principal").

Similarly, the payment made by the alleged victims to Cantor on the charged trades that David handled is not a commission; it is, instead, a sum of money above the price that the investor chooses to pay to acquire the bond. This sum is included in the total price charged the buyer. As the government presumably knows from having examined the trade tickets in this and other cases, the trade tickets list, for price paid, the total paid by the investing buyer.

These inaccurate and irrelevant terms are hugely prejudicial. These terms will induce lay jurors, from having conducted real estate, stock or comparable transactions, to conclude that David's role was that of an agent whose duty was to his "client" or "customer" (as in a real estate transaction, for example). That is the common understanding of the term "commission." *See,*

*e.g., Merriam-Webster* (2016) ("Commission" is "a fee paid to an agent or employee…").   And that will cause a juror to believe that David owed the alleged victims a duty of candor on which they could and would rely (as one of the Litvak victims incorrectly or falsely testified in that case – the only victim to do so and the one on whom the sole guilty verdict was based).   That kind of conclusion promotes huge unfair prejudice by inducing jurors to think that David had some obligation (on which a reasonable investor could reasonably rely) when their principal to principal relationship excludes that possibility.

> *Solution: the word "commission" should be changed to "payment"; the terms "broker-dealer" should be changed to "dealer"; and the terms "facilitating" should be changed to "doing."*

> 7. *Paragraphs ## 15 and 26:  state that Mr. Demos made "untrue statements of material fact and omit[ted] to state material facts necessary in order to make the statements made … not misleading."*

As the government must concede, its theory of prosecution is that David affirmatively misrepresented his acquisition price, not that he omitted information necessary to make a representation truthful.   Moreover, to the extent the indictment pleads an omission as a stand-alone basis for liability, the indictment must plead a duty to speak (which it does not).   *See Chiarella v. United States,* 445 U.S. 222, 235 (1980); *United States v. Skelly,* 442 F.3d 94, 98 (2d Cir. 2006) ("Before the rigors of the criminal law may be imposed, the broker in question should reasonably be on notice that he has entered into a relationship with his customer that gives him heightened responsibilities").   *See also S.E.C. v. Mapp,* 2016 U.S. Dist. LEXIS 140141 (E.D. Tex. Oct. 7, 2016) (no securities fraud for failing to disclose compensation where there is no fiduciary duty to the investors).   The government did not and cannot do so because traders in

David's position do not have a fiduciary duty to their customers, who occupy a principal to principal relationship to each other.

This language is correspondingly prejudicial because it encourages the jury to consider, on its own, a theory for which there is no evidentiary support.

*Solution: the word "omission" in Counts 1-6 should be deleted.*

8. *Paragraph #16:  states that the "purpose of DEMOS's scheme was to enrich Cantor and himself" by taking "secret and unearned compensation from victims on RMBS trades."  Paragraph 23 states that DEMOS's actions provided "Cantor an extra and unearned profit…."*

These assertions are irrelevant for three reasons.

*First,* the notion that the compensation was unearned implies that Cantor was not entitled to the monies in question *even if* the alleged victim had been told.  That is false: for example, the compensation to Cantor (just like for its counterparties) came from the difference between the price Cantor paid for a bond and the price for which Cantor sold the bond (for the counterparty, its compensation came from the difference in prices between what it bought and sold the bond). That is *earned* compensation and *every alleged victim has stated that it is not entitled to know the profit that Cantor makes on these trades.*  So the compensation was earned profit.

*Second,* there was nothing "secret" about Cantor's compensation.  Secrecy implies that something is hidden, yet the fact is, as every government witness will confirm, an investor is not entitled to know the profit that Cantor was making on these trades and every investor will confirm this.  As a principal witness for the government confirmed when she testified in *Litvak,* Litvak's employer is "entitled to every cent of the profit it earns if it sells" a bond.  Tr. 542

*Third,* the compensation Cantor made on these trades is not an element of the charges, according to the government, which contends that securities fraud is proven whether or not a defendant sought to cause harm.

The unfair prejudice is equally clear: taking something in "secret" implies that David did something deliberately to hide something he otherwise had to disclose when he had no duty to disclose his profit.

*Solution: Paragraph 16 should be deleted or, at the very least, the words "secret and unearned" should be deleted and replaced by "undisclosed"; Paragraph #23's phrase "thereby providing Cantor an extra and unearned profit at the selling victim-customer's expense" should be deleted.*

9.  *Paragraph #17:  states that the scheme "caused victim-customers to sustain millions of dollars of losses."*

This is one of the most misleading and inaccurate (and therefore irrelevant) statements in the indictment for two reasons.

*First,* it implies that the counterparties sustained losses when, as the government knows, those counterparties likely reaped significant profits on each trade.  A good illustration is the trade charged in Count 1, where (according to the government's own memorandum) David bought the LXS ███████████ while the victim-seller purchased the bond ███████ ████████████ resulting in ███████████████████████ ███████ *See* USAO_CANTOR_000027. ████████████████████ ████████████████████████████████████ ██████████████████ ████████████████████████████ ███████████████████████████████████ ██████████████████████████████████ ███████████████████████████████████████████ at

USAO_CANTOR_000027.[24] ███████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

*Second,* if the government's point is that David's alleged conduct diminished the large gains the counterparties in these transactions made, there is no basis for that implication because it assumes that had the counterparty known David's acquisition price, the counterparty ultimately would have changed the final price it paid – an absurd notion based purely on speculation, not on any evidence (as the government should realize from the record in *Litvak*).

The unfair prejudice from a statement that indicates that the alleged victims suffered losses is correspondingly clear. And that prejudice is aggravated by the fact that the government (if its attitude in *Litvak* and *Shapiro* is any guide) will seek to preclude our offering evidence of

---

[24]    Count 1 ("the LXS" trade) represents ████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████

the profits made by these alleged victims.  Without the opportunity to offer those profits, the damage from this statement is incalculable.[25]

*Solution: the words "caused victim-customers to sustain millions of dollars of losses" should be deleted.*

> *10. Paragraph #25 states that David Demos "did not 'take the risk in the middle at 41-24,' as Demos misrepresented to Victim 2 [because] in truth and in fact, Demos knew that the Buyer was always willing to pay at least '44.125' (or 44-04), yielding an unearned profit…."*

There are a number of inaccuracies in this paragraph that highlight how misguided the theory behind this indictment is.  This paragraph is a microcosm of all that is wrong with this indictment.

*First,* it is simply inaccurate to say that the third party "Buyer" David was negotiating with was "always willing to pay [David] at least" 44.125.  These are not standing, binding bids: they can vanish in a second, the counterparty can change his mind at any point before the trade settles, and there is counterparty risk, as the government's own witness confirmed in *Litvak*.  *See* footnote 4, *supra*.  So it is terribly misleading to suggest (as the government has in this indictment and did at Litvak's trial) that the higher price that a trader like Litvak or David allegedly did not disclose was irrevocable and that, therefore, they faced no risk.

*Second*, when David stated in the electronic chat that he was willing to take the risk "in the middle" he was 100% accurate: ███████████████████

███ which is the price David paid the alleged victim − the price that caused the victim to gain. This is plainly stated in the chat on which the government relies.  The math does not lie.  Either

---

[25]     Notably, after the government's examination left the misimpression that the counterparty would have behaved differently had it known the price, Chief Judge Hall permitted Litvak's counsel to introduce the enormous profits made by the customer because of its probative value.  *See* Tr. 554.  The transaction charged in that case is similar to Count 1 in our case.

the government contends that the alleged victim knew of the higher undisclosed price (in which case, the alleged victim could not have been deceived into thinking that David had no higher price indications) or the alleged victim was not aware of that higher indication, in which case David took the risk "in the middle." The government cannot have it both ways.

*Third,* the language in this paragraph is deliberately worded to suggest that David's pricing information was designed to deceive the alleged victim when, as the testimony from similar alleged victims and an unopposed expert confirmed in *Litvak,* it is clear that this kind of pricing information was immaterial to their transactional decision making. The notion that David had an "unearned profit" is simply wrong: as the expert explained, every investor understands that David's profit is none of their business and results from the difference between what he buys a bond at and what he resells it for. If that is the definition of his profit *and* if, as every investor confirmed, the investor has no right to see into that margin, it is impossible for David's profit to be "unearned" and equally impossible for the investor to have been deceived by whatever he earned.

*Solution:  the sentence "DEMOS did not 'take the risk in the middle [at] 41-24,' as DEMOS misrepresented to Victim 2" and the entire second sentence should be deleted.*

### POINT THREE
### CERTAIN ASPECTS OF THE INDICTMENT
### REQUIRE THE GOVERNMENT TO PROVIDE PARTICULARS

A trial court has the discretion to order a bill of particulars. *See* Fed. R. Crim. P. 7(f). The "function of a bill of particulars is to provide the defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States v. Torres,* 901 F.2d 205, 234 (2d Cir. 1990). Moreover, "[p]articulars are warranted … where discovery is overwhelmingly extensive *and* the

government fails to designate which documents it intends to introduce and which documents are merely relevant to the defense." *United States v. Mahaffy,* 446 F. Supp. 2d 115, 119 (E.D.N.Y. 2006).   Being able "'to adequately prepare a defense'" and to avoid surprise at trial are essential. *United States v. Ganim,* 225 F. Supp. 2d 145, 156 (D. Conn. 2002) (quoting C. Wright, Federal Practice and Procedure: Criminal 3d §129, at 659-60).

As currently drafted, the indictment fails to specify the alleged false representations that the six charges are based on.   As noted earlier, we believe that this provides a reason to dismiss those charges.   But if they remain in this case, they should be fleshed out because the unstated false representations are the fulcrum for each securities fraud charge: there is no provable fraud without them.

Where fraud is alleged, courts have required the government to specify the claims or representations that the government will offer at trial as the basis for the fraud.   *See United States v. Bortnovsky,* 820 F.2d 572, 575 (2d Cir. 1987), which was cited more recently for the proposition that in fraud cases, "a bill of particulars may be appropriate where the indictment does not identify the specific documents and transaction the Government contends are fraudulent."   *United States v. Shteyman,* 2011 U.S. Dist. LEXIS 55202, at *10 (E.D.N.Y. May 23, 2011).   *See also United States v. Nachamie,* 91 F. Supp. 2d 565 (S.D.N.Y. 2000) (ordering particulars in health care fraud case).   *Cf. Mahaffy,* 446 F. Supp. 2d at 120 (denying particulars in securities fraud case where "in response to defendants' motion, the Government has turned over detailed information about the trades and the block orders that were related to those trades, as well as identified the documents that it intends to introduce as evidence of the Defendants' duties to their employers").

*Bortnovksy* and *Nachamie* are particularly apt.  In *Bortnovksy,* defendants were charged with submitting false insurance claims for claimed losses but the government failed to identify which claims it would seek to prove at trial.  Despite providing the defendants with only 4,000 documents in discovery – discovery that *included* the claims that the government ultimately sought to prove – the Circuit found that the government impermissibly shifted the burden of proof to the defense by not providing particulars:

> We conclude that appellants were hindered in preparing their defense by the district court's failure to compel the Government to reveal crucial information: the dates of the fake burglaries and the identity of the three fraudulent documents. Appellants were forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending.  In effect, the burden of proof impermissibly was shifted to appellants. While we commend the Government for cooperating in the turning over of documents prior to trial, we do not look with favor on the manner in which the Government conducted the prosecution.  The relevance of key events was shrouded in mystery at the commencement of and throughout the trial.  The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged.

820 F.2d at 574-75.

Similarly, in *Nachamie,* where the government produced in discovery over 200,000 documents relating to 2000 Medicare claims, the trial court ordered particulars specifying unnamed conspirators and the details of each allegedly false claim and false document.  91 F. Supp. 2d at 571 ("The teaching of *Bortnovsky* is particularly relevant here. The Government in this case has produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims. But it has not yet informed the defendants which of these claims were false and in what way they were false").

36

We are keenly aware that the Court retains a good deal of discretion in considering when particulars are appropriate.  *See United States v. Tramunti,* 513 F.2d 1087, 1113-14 (2d Cir. 1975).[26]  But we are faced with a very difficult task: with the government having turned over literally millions of pages of discovery and the potential for multiple transactions to be offered by the government at trial (the six charged and potentially additional transactions as 404(b) evidence, as the government has done in *Litvak* and is poised to do in *Shapiro*), we will be severely disadvantaged in our pretrial preparation and our ability to focus the jury on the government's failure to prove the elements of security fraud if we must wait until trial (and possibly summation) to learn what the government will contend was the basis for the alleged fraud.  *See United States v. Luna,* 3:05-CR-58 (SRU), 2006 U.S. Dist. LEXIS 28947, at *3 (D. Conn. May 9, 2006), *reconsideration denied in* 2006 WL 1668006 (D. Conn. May 17, 2006). Not only would we be severely disabled from addressing the assertions of the government's witnesses, but preparation of our experts will be impeded as well (they may opine on what reasonable investors buying risky subordinated tranches of bonds in the highly-specialized RMBS market expect in the transactions charged in this case).

We therefore ask that the prosecution be ordered to specify the following for each of the six counts against David Demos:

1. *What* device, scheme or artifice to defraud or untrue statement of fact or omission to state a fact is the basis for the Count?  In this respect, will the government be contending that the fraud charged in each count consists of an affirmative

---

[26]      In *Shapiro,* Judge Chatigny denied, without any written explanation, the request of the defendants for specification of the false representations.   In the current *Litvak* trial, there presumably was no need for particularization because the trial record from the first trial was replete with the detail of what the government sought to prove.

representation about Cantor's purchase or sales price, or a failure to disclose what Cantor was earning on the trade, or both, or something else?

2. *Who* made the device, scheme or artifice to defraud or untrue statement of fact or omission to state a fact?

3. *To whom* was the device, scheme or artifice to defraud or untrue statement of fact or omission to state a fact made?

4. *Where* was the device, scheme or artifice to defraud or untrue statement of fact or omission to state a fact made?

5. *When* was the device, scheme or artifice to defraud or untrue statement of fact or omission to state a fact made?

6. *Through what means or medium* was the device, scheme or artifice to defraud or untrue statement of fact or omission to state a fact made?

7. *How* was the device, scheme or artifice to defraud or untrue statement of fact or omission to state a fact misleading or a fraud or deceit upon the seller or purchaser in question?

8. *What decision* was affected by the device, scheme or artifice to defraud or untrue statement of fact or omission to state a fact?

9. *How* did the device, scheme or artifice to defraud or untrue statement of fact or omission to state a fact significantly alter the total mix of information regarding that decision?

In addition, we seek the following particulars in order to be able file appropriate motions in limine based on certain approaches the government took in the *Litvak* trial:

10. Designate which of the transactions in Counts 1-6 fit within the different kinds of trades described by the government in paragraph 10 of the indictment.

11. With respect to paragraphs ## 15 and 26:  which omissions did Mr. Demos make?

12. Based on paragraph #16: is the government contending that Mr. Demos intended to cause harm as a result of the device, scheme or artifice to defraud or untrue statement of fact or omission to state a fact?  We believe that the government has the burden of proving intent to harm under the securities fraud laws (as it does under the mail and wire fraud laws), even though the Second Circuit has cast doubt on this requirement.

13. Based on paragraph #17:  how much loss will the government contend each allegedly affected trade generated and on what basis does the government calculate that that loss would occur?

14. In paragraph #24h, is the allegation that David spoke with both Victims 2 *and 1* in that same event?

## POINT FOUR
## THE GOVERNMENT MUST DESCRIBE THE BRADY OR GIGLIO MATERIAL IN THE DISCOVERY IT HAS PRODUCED

In its December 22, 2016 discovery letter to us, the government wrote that it:

> know[s] of no specific instances of perjured testimony to be included in the Government's case, and [is] not aware of any material that is so clearly exculpatory or valuable for impeachment purposes that its utility to the defense can be recognized.  That said, the Government will provide the defense with substantially all of the documents that it has collected and agents' reports and notes of interviews conducted in the course of the investigation in the defendant [and of comparable documents collected and generated] … in the course of the Department of Justice's investigations into various fixed income broker-dealers other than Cantor Fitzgerald.  *Given this extraordinary level of disclosure by*

39

> *the Government, defendant's counsel may make its own assessment*
> *of what might fall with the relevant scope.*

(Emphasis added).

It is not enough for the government to provide us with millions of pages of material (as it has) and assert that it has discharged its Brady obligations to the extent any Brady material is contained in that discovery. *See, e.g., United States v. Hsia,* 24 F. Supp. 2d 14 (D.D.C. 1998) (despite the government producing 600,000 documents, "[t]o the extent that the government knows of any documents or statements that constitute *Brady* material, it must identify that material…); *United States v. Blankenship,* No. 5:14-cr-00244, 2015 U.S. Dist. LEXIS 76287, at *15-16 (S.D. W. Va. June 12, 2015) (court ordered government to "specifically designate any known *Brady* material" where government refused to identify such material in its production of 4 million pages of discovery). *Cf. United States v. Faux,* No 3:14-cr-28 (SRU), 2015 U.S. Dist. LEXIS 31527, at *17 (D. Conn. Mar. 16, 2015) (declining defense request that government identify *Brady* material where it was applied to the defendant's *own* "statements and documents").

The government has acknowledged that they are aware of their *Brady* obligations, and, if we understand how they dealt with this issue in *Litvak,* have designated as "hot" those documents that potentially qualify as *Brady* or *Giglio* material. But the relatively small size of that list causes us to reiterate our request. This is not the government's first exposure to this kind of material: it saw, in *Litvak,* how information of this kind – information reflecting alleged victim misconduct or expressions of their skepticism – could be used effectively by the defense.

Moreover, as the government knows from the Second Circuit's opinion in *Litvak,* any information obtained from Cantor Fitzgerald that reflects Cantor's endorsement of the conduct

alleged against David – either through express approval or silence in the face of that conduct – constitutes *Brady* as well.  As the Second Circuit observed (*Litvak,* 808 F.3d  at 188):

> Litvak sought to introduce evidence that, during the relevant time period, supervisors at Jefferies—including his supervisors—regularly approved of conduct identical to that with which Litvak was charged.... As Litvak's counsel stated at trial, this evidence would provide "a fair basis upon which to infer that when Mr. Litvak did the very same thing, . the supervisors saw and approved of [it] as standard operating procedure." Id. at 644.  Such an inference would support Litvak's attempt to introduce a reasonable doubt as to his intent to defraud, i.e., that he held an honest belief that his conduct was not improper or unlawful, a belief the jury may have found more plausible in light of his supervisors' approval of his colleagues' substantially similar behavior. While the District Court was correct that this evidence is less probative of Litvak's intent as the evidence regarding transactions in which he was directly involved (the first category), the District Court exceeded its allowable discretion in concluding that this testimony was not relevant…

Finally, we assume that the United States Attorney's Office has provided not only information within its office but also information possessed by the SEC (which initiated the investigation of Cantor Fitzgerald years ago) and, to the extent SIGTARP has been involved, information possessed by that office (or for that matter any comparable office as well).  If the United States Attorney's Office has not done this, we ask that the Court order it to do so.[27]

---

[27]     It is unclear whether the government has concluded its production (we recall the government indicating that it would so by mid-February) and we ask that you confirm whether you have done so.  We also have assumed that the United States Attorney's Office has extended its obligation to produce discovery (not just with respect to *Brady*) to the files of the SEC, SIGTARP and any other agency with which it worked on this investigation.  If this is not correct, we need to be told so that we can move for that additional production immediately.

## CONCLUSION

For the above reasons, we respectfully request that the indictment be dismissed and, in the alternative, surplusage be stricken, particulars granted and Brady material designated.

Respectfully submitted,

Peter Chavkin/Patrick Sharkey
For Mintz, Levin

Stanley Twardy, Jr./Daniel Wenner
For Day Pitney LLP