UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

United States District Court
District of Connecticut
FILED AT   NEW HAVEN
3-21 ____20 17
Roberta D. Tabora, Clerk
Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. 3:16CR220(AWT) |
| v. | : VIOLATIONS: |
| | : 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. |
| DAVID DEMOS | : 240.10b-5 (Securities Fraud) |

## SUPERSEDING INDICTMENT

The Grand Jury charges that at all times relevant to this Indictment:

### The Defendant

1. Defendant DAVID DEMOS ("DEMOS"), a resident of Connecticut, was a trader and managing director at Cantor Fitzgerald & Co. ("Cantor"), a broker-dealer registered with the Securities and Exchange Commission ("SEC") and a Financial Industry Regulatory Authority ("FINRA") member firm.

2. DEMOS was hired by Cantor in or about November 2011 and was terminated in or about February 2013.

3. DEMOS specialized in trading certain types of residential mortgage-backed securities ("RMBS"), which are securities within the meaning of the federal securities laws.

### The Victims

4. DEMOS's victims are known by the Grand Jury to have been certain of Cantor's customers, including but not limited to the institutions described in Paragraphs 7 and 8.

5. Some of DEMOS's victims were affiliated with or subsidiaries of recipients of funds from the United States Government's Troubled Asset Relief Program, the Government bailout plan created in 2009 in response to the financial crisis.

6. Salesperson S.R. was a salesperson at Cantor.

7. Ellington Financial, LLC ("Ellington") is an asset management firm and investment advisor headquartered in Connecticut.

8. Marathon Asset Management ("Marathon") is an asset management firm headquartered in New York, New York.

## Relevant Terms

9. RMBS are collections of mortgages and home equity loans, which are grouped together and sold as packages between and among banks, money managers, pension funds and others. Investors in RMBS receive payments on a monthly basis. Those payments are based on the extent to which homeowners, who had originally taken out the mortgages or loans, repaid their lenders. The payments to RMBS investors continue until the homeowners repay their mortgage debt, refinance or default. Unlike stocks that trade on the New York Stock Exchange or the NASDAQ, RMBS are not publicly traded on an exchange and pricing information is not publicly available. Instead, buyers and sellers of RMBS use broker-dealers, like Cantor, to execute individually negotiated transactions.

10. RMBS are typically sold in three ways:

   a. "Inventory" – An inventory sale is a sale from a broker-dealer's inventory, in which a broker-dealer like Cantor sells a bond that it has owned for a period of time;

   b. "Order" – An order is a sale in which the seller engages a broker-dealer like Cantor to seek a buyer, or the buyer engages the broker-dealer to seek a seller, for a particular bond;

   c. "BWIC/Bid List" – A "Bid List" or "BWIC" ("bids wanted in competition") is a sale in which the seller circulates a list of specific RMBS it is interested in selling to broker-dealers, so that the broker-dealers may seek a potential buyer willing to negotiate terms for the trade. It is similar to an auction, in which clients submit bids and the highest bid "wins" and buys the bond.

11. In each of the foregoing types of trades, the buyer and the seller do not know each other's identity and must communicate through the broker-dealer's traders and salespeople.

12. A broker-dealer profits from a trade in one of two ways:

   a. The buyer or seller makes an agreement with the broker-dealer to pay a commission to the broker-dealer for facilitating the trade. This agreement typically occurs in Order or BWIC trades, and is commonly referred to as a payment "on top."

      b. The broker-dealer and the buyer agree on a purchase price without reference to the price the broker-dealer paid to the seller; the difference between the amount the buyer paid to the broker-dealer and the amount the broker-dealer paid to the seller is the broker-dealer's profit. This is commonly referred to as an "all in" trade and, in this type of trade, the buyer does not know the broker-dealer's profit.

13. A "tick" is common price term in the industry. A tick refers to $1/32^{nd}$ of one percent of a bond's face value. For instance, if a broker-dealer buys a bond for 30.50 (meaning 30.50% of the current face value of the security), the price can be expressed as "30 and 16," "30 dollars and 16 ticks," or simply "30-16." If the broker-dealer then sells that bond for 32.625 (meaning 32.625% of the face value), the price can be expressed as "32 and 20," "32 dollars and 20 ticks," or "32-20."

COUNTS ONE through SIX
(Securities Fraud)

14. The allegations set forth in paragraphs 1 through 13 are hereby re-alleged and incorporated as though set forth in full herein.

The Scheme and Artifice

15. Between in or about November 2011 and February 2013, in the District of Connecticut and elsewhere, DEMOS, using means of interstate commerce—that is, electronic chats and emails—did knowingly and willfully use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, directly and indirectly to: (i) employ devices,

schemes and artifices to defraud; (ii) make untrue statements of material fact and omit to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon victims.

16. The purpose of DEMOS's scheme was to enrich Cantor and himself by using materially false and fraudulent misrepresentations and omissions to take secret and unearned compensation from victims on RMBS trades.

17. As a result of this scheme, DEMOS caused victims to sustain millions of dollars of losses.

18. DEMOS used electronic communications with victims, including email, instant messages, and electronic group "chats," to communicate false statements and misrepresentations with the intent and purpose of soliciting and negotiating fraudulent RMBS trades.

19. It was part of the scheme that DEMOS would defraud victims buying RMBS in bid list or order trades, where the buying victims agreed to buy an RMBS at a price equivalent to that which Cantor paid for the RMBS plus an "on top" commission, by falsely overstating the price that Cantor had agreed to pay to the selling customer in order to fraudulently induce the victims to pay a higher overall price, thereby providing Cantor an extra and unearned profit at the buying victims' expense.

20. For instance, on or about September 26, 2012, in execution of the above

scheme, DEMOS defrauded Ellington in connection with Cantor's purchase of CNF 2001-1 M1 and CNF 2001-2 M1 (together, "the CNF bonds") from an investment manager (the "Seller") and Cantor's sale of the CNF bonds to Ellington:

    a. At approximately 8:55 a.m., DEMOS communicated electronically with Ellington, stating that the CNF bonds were "a pkg think they can trade around 30."

    b. At approximately 8:56 a.m., Ellington communicated electronically with DEMOS, stating "Will take a look now."

    c. At approximately 9:34 a.m., Ellington communicated electronically with DEMOS, stating, "30-00 bid for package."

    d. At approximately 10:28 a.m., DEMOS communicated electronically with the Seller, bidding 29-16 for the CNF bonds.

    e. At approximately 10:30 a.m., the Seller communicated electronically with DEMOS, stating "Can't sell there would rather hold. 30-16 is a good fair level. Thanks for doing the work thg."

    f. At approximately 10:36 a.m., DEMOS communicated electronically with Ellington, falsely stating, "he responded 34-00 firm i showed 29-16 (before he offered firm), now 30-00 showing to him...yes i thought he was going to be gone all day...emailed...."

    g. At approximately 10:37 a.m., Ellington communicated electronically with DEMOS, stating, "Keep grinding...more than 10% is a big difference."

h. At approximately 10:39 a.m., the Seller communicated electronically with DEMOS, stating, "Come on. These are cheap. Cant find yield like this. Not trying to squeeze u but we have $50mm of new capital coming in on the 1st. What am I to do...:.10% stuff doesn't work? Rather hold. Really put best foot fwd with u."

i. At approximately 10:42 a.m., DEMOS communicated electronically with Ellington, falsely stating, "response this fair guy don't get mad @ him: 'Come on. These are cheap. Cant find yield like this. Not trying to squeeze u but we have $xxxmm of new capital coming in on the 1st. What am I to do...:.10% stuff doesn't work? Rather hold. Really putting best foot fwd with u @ 32-16.'"

j. At approximately 10:48 a.m., Ellington electronically communicated with DEMOS, stating, "So i'd have to be at 32-16 + how much?"

k. At approximately 10:48 a.m., DEMOS electronically communicated with Ellington, stating, "plus i don't know 6 tics pay me whatever."

l. At approximately 11:32 a.m., DEMOS electronically communicated with the Seller that Cantor would purchase the CNF bonds for 30-16.

m. At approximately 11:50 a.m., the Seller electronically communicated with DEMOS that the Seller was "going into service" and asked "30-16 works?"

n. At approximately 11:53 a.m., DEMOS electronically communicated

with Ellington, falsely stating, "he [the Seller] sent msg saying heading into svc but 32-16 i cld have that's it."

o. At approximately 12:07 p.m., DEMOS electronically communicated with Ellington, falsely stating, "WERE DONE @ 32-16" and "CAN SELL U @ 32-20."

21. The Seller did not sell the CNF bonds to Cantor for 32-16, as DEMOS repeatedly misrepresented to Ellington. In truth and in fact, DEMOS knew the Seller sold the CNF bonds to Cantor for 30-16.

22. Cantor's profit on this transaction was not four ticks, or approximately $4,600, as DEMOS represented to Ellington. In truth and in fact, as DEMOS knew, Cantor's profit was 68 ticks, or approximately $79,000.

23. It was also part of the scheme that DEMOS would defraud victims selling RMBS in bid list or order trades, where the selling victims understood that Cantor had negotiated a sale price for an RMBS with a buyer, DEMOS would and did falsely understate the price at which the buyer had agreed to purchase the RMBS in order to fraudulently induce the victims to sell the RMBS at a price lower than they otherwise would achieve, thereby providing Cantor an extra and unearned profit at the selling victims' expense.

24. For instance, on or about May 11, 2012, in execution of the above scheme, Demos defrauded Marathon in connection with Cantor's purchase of LXS 2005-5N 3A2 ("the LXS bond") from Marathon and Cantor's sale of the bond to an investment manager (the "Buyer"):

a. At approximately 2:49 p.m., Salesperson S.R. electronically communicated with DEMOS, stating that she was getting a bid on the LXS bond from the Buyer. At approximately 2:50 p.m. Salesperson S.R. electronically communicated with Demos, stating, "We offered the bonds to him at 45.5."

b. 2:51 p.m., Salesperson S.R. electronically communicated with DEMOS, stating that the Buyer "has a 43.75 bid" for the LXS bond and "has a little bit of room." DEMOS replied, "ok cool brb."

c. At approximately 2:57 p.m., DEMOS electronically communicated with Marathon, misrepresenting that the Buyer was bidding "40-16 . . . for ur 100mm," referring to the LXS bond, and "i told him no room u didnt really want to move . . . but im thrilled to give u the bid anyway."

d. At approximately 3:08 p.m., DEMOS electronically communicated with Marathon, misrepresenting that, "hes [the Buyer] barely getting to 41, still pushing."

e. At approximately 3:09 p.m., Salesperson S.R. electronically communicated with DEMOS, stating, "44.125 bid from [the Buyer]." DEMOS responded electronically, "that to us or pot [pay on top]." At approximately 3:10 p.m., Salesperson S.R. responded electronically, "That's to us."

f. At approximately 3:10 p.m., Marathon electronically communicated

- 9 -

      with DEMOS, stating, "Lets get something done Dave, net us 42 on the 100mm."

g. At approximately 3:11 p.m., DEMOS electronically communicated with Salesperson S.R., asking if she could get the Buyer, "to 44-16 all in?"

h. At approximately 3:19 p.m., DEMOS electronically communicated with Marathon, stating, "ill get him up if not ill take the risk in the middle 41-24…call me done." At approximately 3:21 p.m., after not hearing back from Marathon, DEMOS electronically communicated with Marathon, stating, "it worked ur scaring me come back to me don't want either of u mad @ me."

i. At approximately 3:22 p.m., Marathon electronically communicated with DEMOS stating, "So, 41.75 net to us? Im confused."

j. At approximately 3:23 p.m., DEMOS electronically communicated to Marathon stating "to u, yeah ill tell him u were going to yank and i had to take i think ill get it ill take the risk . . . i need to call him now before he gets freaked do i own them?"

k. At approximately 3:24 p.m., Marathon electronically communicated with DEMOS, stating, "Yes u r doen at 41.75."

l. At approximately 3:26 p.m., Salesperson S.R. electronically communicated with DEMOS stating, "44.5 bid from them."

m. At approximately 3:28 p.m., DEMOS responded to Salesperson S.R.,

"we sell 100mm LXS 2005-5N 3A2 @ 44-16."

25.     The Buyer was not "barely getting to 41" and DEMOS did not "take the risk in the middle [at] 41-24," as DEMOS misrepresented to Marathon. In truth and in fact, DEMOS knew that the Buyer was always willing to pay at least "44.125" (or 44-04) for the bond, yielding an unearned profit of at least 76 ticks, or approximately $630,000.

## Executions of the Scheme

26.     Beginning in approximately November 2011 and continuing until approximately February 2013, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, Defendant DAVID DEMOS knowingly and willfully, directly and indirectly, by the use of means and instrumentalities of interstate commerce and the mails, in connection with the purchase and sale of securities, to wit, the RMBS set forth below, would and did use and employ manipulative and deceptive devises and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (i) employing the aforementioned devices, schemes and artifices to defraud; (ii) making untrue statements of material facts and omitting to state material facts necessary to make the statement made not misleading in light of the circumstances under which they were made; and (iii) engaging in acts, practices and course of business that would and did operate as a fraud and deceit on purchasers and sellers of such securities as set forth below, each constituting a separate count of this Indictment:

| Count | Trade Date | Security |
|---|---|---|
| 1 | May 11, 2012 | LXS 2005-5N 3A2 |
| 2 | July 6, 2012 | AMSI 2003-8 M2 |
| 3 | June 29, 2012 | FFML 2005-FF12 M1 |
| 4 | September 26, 2012 | CNF 2001-1 M1 |
| 5 | September 26, 2012 | CNF 2001-2 M1 |
| 6 | January 4, 2013 | CSFB 2003-8 CB1 |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

A TRUE BILL

/s/
_____
FOREPERSON

UNITED STATES OF AMERICA

_____
DEIRDRE M. DALY
UNITED STATES ATTORNEY

_____
HEATHER L. CHERRY
ASSISTANT UNITED STATES ATTORNEY

_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY