## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : No. 3:16 CR 220 (AWT) |
| | : |
| v. | : |
| | : |
| DAVID S. DEMOS | : August 15, 2017 |
| | : |

## MEMORANDUM OF LAW IN SUPPORT OF
## DAVID DEMOS'S GROUP II MOTIONS TO DISMISS

# TABLE OF CONTENTS

**INTRODUCTION**   1

**POINT ONE**

**THE EVIDENCE IN THIS CASE IS INSUFFICIENT TO PROVE A CRIME**   15

*I.*   *Why, as a matter of law, the time is right for this motion.*   15

*II.*   *The insufficiency of the government's evidence.*   17

     **A. What we know for a fact from the *Litvak* and *Shapiro* trials:**   19

        *1. Reasonable investor-funds trading these securities were sophisticated and relied on extensive analyses, including computer modeling of objectively verified variables to determine the narrow range of prices within which a bond transactions was in the best interests of their investors.*   19

        *2. Reasonable investor-funds trading these securities were cynical about pricing information volunteered by a dealer, knowing that dealers lied, and the funds expected that this kind of false information was part of negotiation posturing.*   21

        *3. Reasonable investor-funds trading these securities typically traded without receiving **any** prior pricing information.*   24

        *4. Reasonable investor-funds trading these securities used independent pricing services, other dealers and most important, their own comparable transaction history to verify the price that they ultimately were prepared to pay (and could have gone to the owners of the bonds directly had they chosen to do so).*   25

        *5. Reasonable investor-funds trading these securities could have negotiated differently and did not do so.*   26

        *6. Reasonable investor-funds trading these securities profited massively.*   26

        *7. Reasonable investor-funds trading these securities would have done the same transaction at the same price again, even knowing the truth today.*   28

        *8. Reasonable investor-funds trading these securities knew that the dealer was trying to maximize his profit and owed the investor-fund no fiduciary duty.*   30

9. *Reasonable investor-funds trading these securities disseminated misleading, inaccurate or false price information to promote their own agenda in the market.*    30

10. *Reasonable investor-funds trading these securities made the decision about the value of a bond based on the all-in price, without regard to commissions.*    34

11. *None of the middle or back offices of the alleged victims (the offices settling these trades) asked David or Cantor Fitzgerald (David's employer) to provide confirmation of the pricing representations in question, as they would have done had the pricing representations been material to the decision-making of those funds.*    35

12. *The true victims of any material misrepresentations under the government's theory were not simply the investor-funds but also the tens of thousands (and often more) of investors each fund represented.*    36

**B. What we know for a fact about the evidence that the government will offer against David in David's trial:**    36

     1.    37
     2.    40
     3.    41

*III.*    *Where the evidence leads*    43

   **A. Materiality**    44

   **B. Intent**    50

**POINT TWO**

**THE GOVERNMENT CANNOT PROVE MATERIALITY AS A MATTER OF LAW**    56

     *1. The value of the bond must be affected, not negotiations.*    57

     *2. The impact of the misrepresentation was too small.*    62

**POINT THREE**

**APPLICATION OF THE SECURITIES FRAUD STATUTE HERE IS UNCONSTITUTIONAL**    65

   **A. Lack of Notice**    66

**B.  Arbitrary Enforcement**                                   76

**C.  The Rule of Lenity**                                      79

**POINT FOUR**

**THE SERIOUSNESS OF THE PROSECUTORIAL MISCONDUCT
IN THIS CASE REQUIRES DISMISSAL**                              80

*A.  The Law*                                                   82

*B.  The Misconduct*                                            82

  1.  Before the grand jury was convened:                       82

  2.  In the grand jury:                                        85

     *A.* ███████████████████████████████
          ████████████████████████
                                                                86

     *B.* ████████████████████████
          ██                                                    87

     *C.* ████████████████████████████████
          ████████████████████████████
                                                                89

        i.  ██████████████████████
            ██                                                  89

        ii. ██████████████████████
            ██                                                  91

        iii. ████████████████████
             █                                                  92

        iv. ██████████████████████
            █                                                   93

        v.  ████████████████████████
            █                                                   95

vi. ██████████████████████████ 96

vii. ████████████████████████████

███████████████████████████ 97

viii. ████████████████████ 98

3. <u>Post-indictment</u>: 100

4. <u>Similar conduct across other cases</u>: 101

**CONCLUSION** 103

# INTRODUCTION[1]

David Demos, a dealer in non-agency residential mortgage backed securities (RMBS bonds), was indicted in December 2016 for allegedly committing securities fraud. Admittedly, during the course of negotiations for these bonds, David misrepresented his prior purchase prices and potential sale prices. He did so in "principal" transactions – not as a broker or agent – with no corresponding fiduciary duties.

To establish its case, the government must prove beyond a reasonable doubt that David's misrepresentation was material to a reasonable investor in this sophisticated sector of trading: that the misrepresentation "would have assumed significance in the deliberations of a reasonable investor … significantly altering the total mix of available information" for that investor. *Shapiro* Jury Instructions, Tr. at 2650; 2651. And then it also must prove beyond a reasonable doubt that David acted with intent to defraud, "deliberately us[ing] deception to induce another to act to his detriment," and to do "something the law forbids" – and prove that he did not "h[o]ld an honest belief his actions were permissible." *Shapiro* Jury Instructions, Tr. at 2649; 2651.

The government cannot accomplish any of the above.

With respect to materiality, the reasonable investor in this sector (by definition highly sophisticated) could not possibly consider the misrepresentation to significantly alter the mix of information on which he decided. The significant information in their mix came from independently verifiable data and proprietary models that produced a price that they believed was in the best interests of their investors.

---

[1]     We apologize at the outset for submitting a lengthy brief. We recognize that every brief could be tightened, but with transcripts from three trials that went to verdict, an appeal, a grand jury transcript that provides exceptional insight into the government's approach to this case, and such an extraordinary amount of discovery material from so many different investigations into comparable conduct, the sheer citation of relevant material occupies an unusually large number of pages.

With respect to intent, as we will show, David knew that this industry was, as Judge Chatigny put it, "rife with misrepresentations" and he never received meaningful criticism of his trading practices. *Shapiro* Tr. at 2993-2994. He believed, in good faith, that the misrepresentations could not and did not significantly alter the mix of information on which his counterparties' decided to buy these bonds.

The traders facing David in these trades: (i) knew he was not telling the truth and still concluded the transaction; (ii) suspected he was not telling the truth but chose not to confront him because the falsely stated pricing information was not material to them, and negotiating harder was secondary to completing the transaction and not risking the loss of the transactional opportunity and/or the chance of doing business with David in the future; (iii) before even speaking to David, came to the table with an acceptable price in mind determined by models using independently verifiable inputs and proprietary forecasting models; (iv) were aware that the market was "rife with misrepresentations" that they were trained to discount (even routinely disseminating misleading and false pricing information themselves); and (v) deemed that information to be something they would have liked to have known (as opposed to information that significantly altered the mix of information on which they decided) when, years after these transactions took place, the government showed them records of transactions between David and third parties that preceded or proceeded their transactions with him.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ none of the investment-funds with which David transacted can say that it definitely would have negotiated harder or that negotiating harder would have changed the result; none can say that it would not have bought the same bond at the same price even knowing

2

the truth; and none can say that it did not have *complete* control over its own behavior, including where to bid, offer or transact. So did David, as they recognized, for he too was free to transact with anyone he wished and at the prices he believed appropriate, as any principal can.

All of this will be shown below in Point I through the prior testimony of the government's own witnesses and the discovery material provided to us by the government. To be clear, this is not an "everybody was doing it" defense. Instead, David's defense rests on the principles that one cannot intend to violate a law by lying when one knows that everyone expects one to lie and will discount that lie and that the information in question cannot be material to a reasonable RMBS investor during this period. That is the context of this market.

David's indictment followed the indictments of Jesse Litvak (who worked at Jefferies) and Ross Shapiro, Michael Gramins and Tyler Peters, who worked at Nomura. To our knowledge, the three indictments and the SEC settlements in the same period are the *first and only* time that the government had sought to attach liability, *civil or criminal*, to a non-agency RMBS traders' statements regarding prior purchase or future sales prices during negotiations.[2]

Thus, the three indictments are the first time the government sought to attach liability to actions that have been standard operating procedure throughout the industry since its inception in the early 1980s. No rules, no advisories, no enforcement actions.

---

[2]     There have been a total of three indictments and four related informations (cooperating witnesses) addressing this conduct, all of them filed in the District of Connecticut. It appears that the United States Department of Justice Fraud Section and/or the United States Attorney for the Southern District of New York declined prosecution in virtually indistinguishable matters. ███████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████ This result, shocking in a system that claims to be committed to doing justice, was repeated in other instances where Connecticut lacked venue (*i.e.*, other prosecutorial offices reviewed and declined prosecution in cases equivalent to those pursued by Connecticut). As we explain below in Point Four, this was not a matter of how to allocate scarce resources; it was an arbitrary, unfair and unconstitutional exercise of power by Connecticut.

3

The Connecticut United States Attorney's Office's decision to stride into this void was noted, with opprobrium, by Judge Robert Chatigny in the *Shapiro* case after he heard testimony to this effect. As he put it, the government appears to have decided to regulate by prosecution in a market that was routinely conducted through misrepresentations. *Shapiro* Tr. at 276.

Since David's indictment in December 2016, the landscape surrounding these misguided prosecutions has changed as dramatically as one could imagine, after the retrial of Litvak, the trial of three Nomura traders, additional civil "no admit/no deny" settlements, and rulings favorable to David in analogous cases. Each new event has underscored the inappropriateness of David's indictment, especially the trial testimony of the government's own witnesses, who have now defined the reasonable investor in this market and clarified what a reasonable investor would consider material.

*First*, since David's indictment, no prosecutor anywhere has charged anyone for this kind of conduct. In fact, there have been at least four additional *civil* settlements. *See* footnote 24, below.

*Second*, the *Litvak* trial in January 2017 ended up with nine *acquittals* out of ten charges.[3] The one conviction was based on the testimony of a single witness who, indisputably and incorrectly, testified that Litvak was his *agent* with corresponding fiduciary responsibilities for the witness's fund when, as the government concedes, professionals in Litvak's (and David's) position are principals only, without fiduciary obligations. *Shapiro* Tr. at 668. That is the law,

---

[3]     The *Litvak* trial was actually a retrial based on the government's steadfast refusal to allow the defense to put on expert testimony going to the heart of the materiality issue, along with other erroneous evidentiary rulings. That expert's testimony highlighted what the testimony of the trials confirms: "With such testimony before it, a jury could reasonably have found that misrepresentations by a dealer as to the price paid for certain RMBS would be immaterial to a counterparty that relies not on a 'market' price or the price at which prior trades took place, but instead on its own sophisticated valuation methods and computer model. The full context and circumstances in which RMBS are traded were undoubtedly relevant to the jury's determination of materiality." *United States v. Litvak*, 808 F.3d 160, 183 (2d Cir. 2015).

and the court impermissibly, and over objection, permitted the witness to testify incorrectly that he considered Litvak to be his agent with corresponding fiduciary responsibilities that Litvak *never* had. Moreover, this single conviction was based on a single witness who claimed that he abandoned his normal skepticism about a dealer's pricing statements because he was buying the bond in a "BWIC" – a public kind of sale (not an auction) in which bids are requested from a number of buyers – despite the fact that a BWIC conveys with it no greater fiduciary responsibility on the dealer's part, as the law and convention indisputably establish. In addition, the trial judge relied on evidence from the acquitted charges to save this single conviction.

*Third*, the *Shapiro* trial, which came next (May 2017), involved an effort to criminalize the pricing misrepresentations of three defendants that yielded only *one* conviction out of 27 charges. In that case, the one conviction was for conspiracy: there were zero convictions on any substantive count (despite the undisputed fact that the conspiracy's object was achieved). And the conspiracy conviction was returned against just one defendant, where the charges against the other two defendants in that same conspiracy produced an acquittal or no verdict. As Judge Chatigny put it when addressing the possibility that the prosecution might seek to publicize the verdict: "I don't think there's a lot to crow about here." Tr. at 3199.

In the wake of these two unfavorable outcomes that pointed out the flaws in the government's theory and in the government's view of how the RMBS market operates, the government continues to press its case against David, ignoring the verdicts and logic that lead to one conclusion only: trader pricing information misrepresentations are not "material" in the context of this RMBS market. In light of the abundant testimony of immateriality in the prior three trials and the comments of the presiding judge in *Shapiro*, the environment for doing so has gotten immeasurably worse. As we will discuss in great detail, what has emerged since David's

indictment is a clear view of the prototypical reasonable investor in the market and the prevailing market dynamic for negotiations in that market, highlighting the serious injustice of criminally pursuing him any further.

Briefly, *the verdicts* reflect an overwhelming consensus that the misrepresentations in question cannot be material because of the context of the RMBS market at that time. When judging materiality, the jury must decide what a reasonable investor in this highly specialized RMBS market (in these cases, a qualified institutional buyer (QIB) with many billions of dollars who can correctly distinguish the legal relationship he has with the counterparties he trades with, not a mom-and-pop investor) would consider material. This is an objective standard informed by the testimony of actual investors in this field. These trials have shown that QIBs like the alleged victims in David's case make investment decisions relying on independently verifiable information and complex software models, not external, volunteered price information. That price information does not significantly alter the mix of information on which the QIB decides whether to buy a bond and at what price.

In the wake of these verdicts, even the market is still left to guess which of the virtually indistinguishable "lies" told during negotiations by both sides cross the line. It is clear, arithmetically, that reasonable investors do not consider the information at issue to be material: 95% of the charges were deemed not to be criminal (and the single convictions in the *Litvak* retrial and *Shapiro* are riddled with serious issues).[4]

---

[4]     The government itself subscribes to this arithmetical notion – that an objective reasonable investor cannot hold a view that runs counter to the overwhelming majority of the investors queried on the subject. As the government argued in *Litvak*: "Now, there's a question about reasonable investors in here. The question is whether this would have been material, this information, to a reasonable investor. *And I would submit to you that you saw five living, breathing, walking reasonable investors take the stand in this case.*" Tr. at 1454. The government did not even call live witnesses for a number of the charges in *Litvak* and *Shapiro,* arguing instead that they had offered enough live witnesses on other counts to establish the standard for materiality *on any count.*

Thus, two distinct jury pools in this State have rejected the notion that a reasonable investor could consider pricing misrepresentations during negotiations for non-agency RMBS to affect the value of the purchased bond because their *predetermined* acceptable range in every instance gave them the room to buy even higher or sell even lower.

In addition, the evidence that has emerged from the prior trials and discovery materials (including the discovery produced to us) unequivocally shows that the misrepresentations in question were not material. Evidence vital to the government's case against David has been aired (including but not limited to testimony in *Shapiro* by Eric Marks – a key witness for *half of six charges* against David) and that evidence is woefully insufficient to support a guilty verdict. This was *not* a market where the counterparties blindly trusted what dealers like David were saying or believed they knew the profits those dealers were earning. The evidence demonstrates instead that the price statements in question were indistinguishable from standard puffery – affirmative statements that are not believed and are not material by definition.

Specifically, the following facts have now been established beyond *any* doubt as a result of these trials – facts that establish the mindset of the market in the period in question, a critical element of Judge Chatigny's instructions (Tr. at 2648):

1. The alleged victims of the representations at issue are unquestionably sophisticated consumers of RMBS who understand the potential of these bonds to appreciate and are skilled in the analysis of the collateral comprising these bonds and the various factors by which that collateral should be evaluated and the bond's valuation thereby determined. *Shapiro* Tr. at 2379.

2. Every one of the alleged victims of the representations is unquestionably cynical about the kind of pricing information at issue in these cases, having expressed this

view under oath. Indeed, the investor-fund victims testified that they expected unverified information to be potentially inaccurate, coming (as it was) from a dealer who was an *adverse* party in the negotiations – whose goal was to make as much as that dealer could. And further reflecting the cynicism these alleged victims had toward information provided by dealers that was not independently verified: these supposed victims themselves engaged in misrepresentations about their negotiating posture (both to David and market participants generally), and offered pricing inaccuracies too before, during and after transactions (*i.e.*, posturing or puffing on their side of the negotiations). *See, e.g., Shapiro* Tr. at 1174.

3. The *unverified* representations at issue related to bonds that each of the alleged victims ran through highly specialized computer models involving hundreds of verified variables to establish an appropriate range in which to buy or sell the bonds. In other words, every time the alleged victims bought a bond, they had previously applied highly advanced servers to mountains of data collected down to the individual loan level on millions of loans, using their proprietary software to determine the price range to purchase the bond and then executing the trade that their model confirmed was a price considered to be in the best interest of their investors. In fact, these investor-funds sought to distinguish themselves to potential investors by touting the virtues of their proprietary software. *Shapiro* Tr. at 2298.

4. The alleged victims of the representations at issue did not need and often did not have the price at which a dealer bought or sold this kind of bond, and decided to buy or sell a bond *without* the kind of pricing information that the government claims significantly altered the total mix of information. *Shapiro* Tr. at 2378-2379. For

pricing to be a significant part of the mix for a counterparty, that counterparty logically cannot trade without it yet here, they very often did.

5. To evaluate the wisdom of the price they ultimately paid or received, the alleged victims of the representations typically used independent pricing services and quotes from other dealers and relied on their own internal files that collected "color" (*i.e.,* verifiable prices where they bought or sold comparable bonds in a BWIC or through a dealer directly). These sources were verifiable and not adverse, unlike the pricing information provided by the principal to principal traders from whom they actually purchased a bond. *Shapiro* Tr. at 2372-2373.

6. Every bond was sold or bought at the price agreed upon. In addition, these investor-funds were not precluded from starting their negotiations at whatever level they chose. They had dozens of other dealers to choose from if they did not like David's pricing representations. Moreover, despite the illusion of a "wall" that the government has constructed as a way to suggest that the investor-funds did not know what "dealers had to pay or sell a bond for," it was actually the investor-funds who erected the wall by *choosing* not to deal directly with the owners of the bond or subsequent buyers, going through a dealer instead of a public bid process in order to conceal *their* identity and *their* trade data – all to exploit the market. *Shapiro* Tr. at 2351. In any event, if these billion dollar hedge funds cared, their internal offices, tasked with settling these transactions, could have made a request for prior purchase price data. They did not.

7. The value of every bond was in no way impacted by the representations at issue. The investor-fund based its projections of future cash flows from these bonds on an "all

9

in" price. Whether or not that final price included an "on top" commission, that "on top" amount played no role in evaluating the bond's value. Indeed, the decision-makers at these investor-funds (those who supervised the line traders with whom the dealer interacted) never cared about where negotiations started; they cared only about the end price. Those superiors were not even informed of the details of the negotiations. They were asked to approve the final price. *Shapiro* Tr. at 2382-2383.

8. Reasonable investor-funds in the RMBS market pull the trigger only when the transaction is at a price that is in their investors' best interests. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

9. The alleged victims of the representations at issue massively profited from these trades (which were after the financial crisis). The alleged victims sat atop the list of the top 100 large hedge funds (with over $1 billion in assets under management during the period these trades occurred) with the funds that traded these mortgages being the best performers overall. For example, Marathon's structured product fund – the investor-fund behind two of the six charges against David – catapulted to number 7, ████████████████████████████████████████████████████

████████████████████████████████████ Bloomberg, "The 100 Top-

10

Performing     Large     Hedge     Funds,"     (Jan.     1,     2013),
https://www.bloomberg.com/news/2013-01-03/the-100-top-performing-large-hedge-
funds.html.

10. The alleged victims of the representations at issue were, according to the government,
not just the buyer or seller funds on the other side of the transaction with David but
instead, the hundreds or thousands of investors in those funds, who were represented
by those funds (so the posited false representations were immaterial as a matter of
law). *Shapiro* Tr. at 2988.

These ten axioms govern this universe. They show that the government *cannot* meet its
burden of demonstrating that a reasonable investor's mix of information on which he decided to
buy the bonds in question was "significantly altered." And complicating the government's
burden further is the fact that it will require the investor-fund witnesses it calls to declare, *in
hindsight*, whether truthful representations about pricing were material in transactions that these
witnesses admit they barely remember (if remember at all).

All of this makes impossible a finding that David's misstatements on pricing were
material to reasonable investors as a matter of law and fact. But there is more.

The case against David rests on six charges. Half of those six charges are based on a
witness who testified at the *Shapiro* trial: Eric Marks of Ellington. Marks's testimony in
*Shapiro* resulted in an acquittal, showing that he was not materially affected, as do the memos of
his government interviews (memos that show that this witness told the government, pre-
indictment, that he was not materially affected). Finally, Marks, under oath, has stated clearly
that he would trade again tomorrow with the dealer who made the misrepresentations even after
learning that that dealer lied. *Shapiro* Tr. at 2430.

11

█████████████████

█████████████████

█████████████████

█████████████████

█████████████████

████████  His statements actually prove that pricing information in non-agency RMBS trading was considered puffery.

This leaves only three charges in our case. █████████████████

█████████████████

█████████████████

█████████████████

█████████████████

█████████████████

█████████████████

█████████████████

█████████████████

█████████████████

█████████████████

█████████████████

█████████████████

█████████████████

███████

---

[5] As they did numerous times, the government denied the grand jury this information, misleading them to conclude just the opposite. The government's misconduct is addressed in Point IV below.

Which brings our matter down to two charges involving Marathon Asset Management (a purchase and sale). Based on the axioms mentioned above that have emerged in the other trials, Marathon could not provide any better support for the government's position. ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████

Finally, it is notable that even knowing what was allegedly misrepresented, none of the alleged victims in David's case complained to David, his employer, or the government about being cheated on these trades or any others. They achieved their objectives, and ███████

████████████████████████████████████████████████████████████████

███████    *Shapiro*   Tr.   at   1015,   2312,   and   2410;   ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████    It was not until the government came to them years after these trades and encouraged them to view the information in a way helpful to the government's case that they determined that they *could* have negotiated differently – something they were always entitled to do if they felt the price they paid was too

high. By doing so, the government seeks to criminalize negotiations like these when, to our knowledge, that has never been done before.

This is the extraordinary context within which we now move to dismiss this case because the government's evidence is clear enough now, before trial, to demonstrate that it cannot prove any of the six charges beyond a reasonable doubt (*i.e.,* the "reasonable investor" is clear, as is the operation of this market). The context is so extraordinary that we are prepared to lay bare our defense of this case.

In addition, we move to dismiss because the alleged misrepresentations are immaterial as a matter of law under *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996) : (i) unverified pricing information from a counterparty trader operating at arm's length cannot significantly alter the total mix information on which the alleged victims decided, so that information did not influence the value of the security (as opposed to an influence on negotiations); and, alternatively (ii) the impact on the true victims of the alleged conduct is too small.

We also move to dismiss because the application of the securities fraud statute to David's conduct is unconstitutional where the statute's application was without adequate notice and invited arbitrary enforcement – especially where, had the regulators wanted to send a message to this market, they could and should have acted by regulation or comparable device and never did so.

Finally, we move to dismiss based on the prosecutorial misconduct in this case which, from pre-indictment through post-indictment, has been so significant (especially in the multiple ways that the grand jury was misled) that a dismissal is merited on that ground alone.

## POINT ONE
## THE EVIDENCE IN THIS CASE IS
## INSUFFICIENT TO PROVE A CRIME

We first move to dismiss the indictment because David's guilt cannot be proven beyond a reasonable doubt.

### I. *Why, as a matter of law, the time is right for this motion.*

Admittedly, it is rare for the defense to be in the position before trial to argue that the government's evidence is insufficient. The boilerplate response thrown back by the government is that the Court must accept the charge as pled if it tracks the statutory language.

Our case, however, is that rare exception to the rule *by the government's admission.*

The government has stated that we know its case and theories – they have been previewed for us in the trials of *Litvak* and *Shapiro* and we have the evidence in the discovery it provided us. As the government wrote:

> Given Demos's arguments in his motion to dismiss, it appears that he clearly understands the nature of the charge against him. Moreover, as noted in his motion, in *United States v. Litvak,* Demos has been given a preview of the Government's theory in a similar case...The connection between the *Litvak* and *Demos* cases is conceptual, in that they were both charged with similar crimes based on similar prosecution theories.

Govt. Memo in Opp. To Group I Motions at 21 fn. 12. In addition, the government has described its theory of prosecution in virtually identical terms in all three prior trials: that the dealer-defendant lied about his acquisition costs and, informed of true pricing representations, these investor-funds may have negotiated differently (even though they got what they paid for at a price they deemed appropriate). This also is presumably why the government has touted its having made available to us the discovery in all of the other investigations it undertook – a tacit admission that these cases are virtually the same at least on the materiality question.

Thus, by the government's admission, the three prior trials (*Shapiro* and the two in *Litvak*) addressing essentially the same core conduct – alleged misrepresentations made by a *dealer* to investor-funds in the course of negotiations – tell us clearly what the government's theories are and how they will try to prove them. That "preview" – repeated three times before now – combined with the proof specific to David that has been provided via discovery, including a portion of the grand jury presentation against David, leaves no doubt what the government will offer.

So ours is that rare case envisioned in *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998), where the Circuit observed: "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial [there, to satisfy the jurisdictional element of the offense], the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." In fact, the Circuit appears to encourage our pre-trial challenge: the "timing of the defendant's objection [to an indictment] is important to the level of scrutiny employed; a defendant who objects to the indictment before trial . . . is entitled to a more exacting review of the indictment than one who waits until after the trial to object." *United States v. Pirro,* 212 F.3d 86, 92 (2d Cir. 2000), sub appeal, 9 Fed. App'x 45 (2d Cir 2001). Moreover, the "formal consent of both parties [is] not [ ] required" for a court to undertake a pretrial determination of the sufficiency of the evidence. *Alfonso*, 143 F.3d at 777 n.7 (noting that such an exercise by the court may actually benefit the government, allowing it to immediately appeal an adverse ruling on the sufficiency question unlike after a later decision granting a motion to acquit).

Taking the government at its word, we know from the prior trials, a portion of the grand jury presentation in this case, and the discovery in this case that the government will offer

records of chats (electronic communications between David and the victims) in which David states inaccurate price information about his *prior* purchase price or potential *future* sales price. The government will then call a witness (or simply argue from the written chats without calling a witness) that the price David stated to the investor-fund was a lie and that the investor-fund, had it known the truth, may, could, or probably would have negotiated differently – despite those funds being in total control over their negotiations when they occurred, with the unqualified power to start or stop negotiations wherever and whenever they saw fit.

There will be nothing more than this and this testimony and evidence unequivocally does not support a finding of guilt. It rests on speculation, not facts. Thus, the time is right to decide this motion. The Court knows now what the government's case will consist of and it is woefully inadequate.[6]

## II.    *The insufficiency of the government's evidence.*

David is charged with six counts of securities fraud based on his interactions with three investor-funds: Marathon (Counts 1 and 2), DW (Count 3), and Ellington (Counts 4-6). The government is required to prove that those misrepresentations were material to the investor-fund in question and that he willfully (intentionally and knowingly) violated the law when he made the alleged misrepresentations.[7] The materiality determination is based on what a reasonable

---

[6]     Alternatively, the Court could view our sufficiency challenge as one addressing the impossibility of proving securities fraud based on the allegations in the indictment (that pricing misrepresentations like those alleged against David cannot be a securities fraud). *See United States v. Pirro*, 212 F.3d at 91-95 (2d Cir. 2000), where the indictment alleged that defendant Pirro had fraudulently failed to disclose an "ownership interest" on a tax return but the Court found that Pirro was not under a legal duty to disclose an "ownership interest," and the failure to charge a violation of a known legal duty to disclose the omitted fact rendered the count defective.

[7]     As we discuss later, we believe (based on the standard jury charge and instructions in these cases) that the intent element requires the government to prove not only that a defendant intentionally lied, but also that he knew the lie was material. We will discuss below in footnote 15 why a representation could be meaningful to David without it being material to his counterparty (*i.e.,* he did not make it to affect the value of the security).

investor, in this highly sophisticated, narrow market, would consider to be so meaningful that it would have significantly altered the mix of information on which that investor-fund reached its decision. As Judge Chatigny instructed in the *Shapiro* trial (Tr. at 2646-2649):

> The word "material" serves to distinguish certain statements of fact that a reasonable investor would likely view as significantly altering the total mix of available information from statements that would not be given weight by a reasonable investor. To be material, a false statement of fact must be of such importance that it could reasonably be expected to cause a reasonable investor to act or not act in some way with respect to the transaction at issue. For purposes of this case, a reasonable investor is an investor in the non-agency RMBS market. Accordingly, in determining whether an alleged misstatement was material, you must consider the matter from the standpoint of such a reasonable investor. To do that, you should consider the evidence relating to the sophistication of the investors in the non-agency RMBS market, their objectives, the information available to them, the analyses they employed, and the way the market worked.

> Accordingly, in deciding whether a false statement was material, ask whether, in the context of the operations of the non-agency RMBS market at the pertinent time as shown by the evidence, a reasonable investor would consider the statement at issue as significantly altering the total mix of information available or would discount the statement as unreliable.

Moreover, materiality is, as Judge Chatigny emphasized, an objective standard so that even if a particular investor-fund were to claim that the representation in question was material to it, that would not carry the day. Tr. at 2648-2649. The jury's determination must be based on a prototypical reasonable investor's view of unverified pricing statements offered in RMBS negotiations between sophisticated parties. As we show below, the evidence and verdicts in the prior cases have already established that the reasonable RMBS investor is one for whom these pricing statements are not material.

While the government will argue that prior verdicts do not preclude them from seeking to prove materiality anew in a subsequent case, that argument ignores the notion that the reasonable investor standard is objective and is based on the accumulated views of real investors – not the

whims or caprices of outliers in a new group of witnesses the government trots out. In fact, as we addressed in footnote 4, the government's argument is counter to logic *and* to its own approach in both the *Litvak* and *Shapiro* trials.

There are two sources against which the Court can evaluate whether the government can meet its heavy burden on the elements of materiality and intent: the evidence in the three prior trials *and* the discovery provided to us in this case concerning the three investor-funds on which the charges are based.

**A. What we know for a fact from the *Litvak* and *Shapiro* trials:**

The Court can be certain of the following from the evidence in the *Litvak* and *Shapiro* trials:

*1.     Reasonable investor-funds trading these securities were sophisticated and relied on extensive analyses, including computer modeling of objectively verified variables to determine the narrow range of prices within which a bond transaction was in the best interests of their investors.*

This is hugely important to our case because the sophistication of the alleged victim must be factored into the analysis according to the Circuit and Judge Chatigny. *Shapiro* Tr. at 2648; *United States v. Litvak*, 808 F.3d 160, 183 (2d Cir. 2015). While the government likes to say that the Second Circuit found that pricing lies told by dealers in the trading of non-agency RMBS are *per se* material, the Second Circuit did just the opposite. In *Litvak*, the Court determined that "misrepresentations by a dealer as to the price paid for certain RMBS *would be immaterial* to a counterparty that relies not on a 'market' price or the price at which prior trades took place, but instead on its own sophisticated valuation methods and computer model." *United States v. Litvak*, 808 F.3d at 183.

19



An excellent illustration of just how important modeling is to these investor-funds can be found in the testimony in *Shapiro* of Eric Marks of Ellington, a central witness in our case (as noted earlier, three of the six charges against David rest on his word). He testified as follows (Tr. at 2359-2362):

> Q. Does – does this mean Ellington has a database that covers more than a hundred million loans?
> A. I've never counted the loans, but we do have a database that tracks all the loan-level information. And based on this, it's probably over a hundred million.
> Q. Even without this line, you know it's a lot of loans, right?
> A. It's a lot of loans.
> Q. And do you see towards the top on the left, there's a reference to computations done in parallel on cluster of over 1,000 microprocessors?
> A. Yes.
> Q. What does that refer to?
> A. We have a lot of computers. I'm not sure specifically what the specifics are.
> Q. Below that, do you see under home price data, there's a reference to having data for over 5,000 zip codes?
> Q. I'd ask that we show that to the jury. And tell us, Mr. Marks, at the top of the page, it says: "Industry Leading Proprietary Analytics, Our Bottom-up Modeling Process."

As Marks observed, Ellington's models "drill down into each individual loan that comprises the collateral" – and there are thousands. *Shapiro* Tr. at 2360.



  *2. Reasonable investor-funds trading these securities were cynical about pricing information volunteered by a dealer, knowing that dealers lied, and the funds expected that this kind of false information was part of negotiation posturing.*

  The importance of the cynicism shared by every investor-fund called by the government (and those they did not call) is huge. One cannot be materially impacted by information that one suspects is false – that information, by definition, is unreliable.

  The government did not and does not recognize this but Judge Chatigny did. The following exchange surrounding a colloquy over jury instructions is instructive (Tr. at 2612):

> THE PROSECUTOR: I think our point was, you can regard
> something with suspicion – you can take something with a grain of
> salt, and it would still be significant in your deliberations.
> THE COURT: *Really.*

Emphasis added.

  Examples of the ubiquity of this belief are plentiful.[8] Take, for example, Marks's testimony in *Shapiro* (Tr. at 2375). It is crystal clear on this point:

---

[8] For every one of the eleven points in this section, we have cited examples but there are many more pieces of testimony and evidence in support.

Q. And you've understood, haven't you, since you first began trading back around 2008 in this market, that market participants may not be truthful all the time, right?

A. Yes. My supervisor was always warning me that people might say anything to convince you to pay more for a bond than you really should be.

Q. And this includes statements that would be made or potentially made in the course of negotiations, correct?

A. Yes.

Or government witness Harrison who testified (*Shapiro* Tr. at 1174):

Q. And yesterday, Mr. Petrillo showed you a chat in which you stated, in sum and substance, that someone lying to your face was like an hourly occurrence; do you remember that chat?

A. Yes.

Or WAMCO, which was the counterparty in three of the transactions in *Litvak*. 

Another government witness (Vladimir Lemin of Magnetar, a sizeable hedge fund) similarly testified in *Litvak* that (Tr. at 794, 796, 799):

Q. ... back in that time period, some six years ago, sometimes people intentionally put out misleading information in the market?

A. I believe so, yes.

Q. You were aware of that?

A. Yes.

Q. That's one of the reasons for your skepticism about volunteered information?

A. That's correct.

Q. In fact, you experienced situations where sellers in the RMBS have put out pricing information that's intentionally inaccurate?
A. I have experienced where sellers send to me?
Q. Yes....

Q. You are aware that that was a practice in this market during that time period?
A. Yes, I was aware that it does occur....

Q. And that's another reason why you are especially skeptical about volunteered information?
Q. And that's the type of volunteered information –
That's the type of false pricing volunteered information that you need to take with a grain of salt?
A. That's correct.
A. Yes....

Q. So you wouldn't be surprised if you see electronic chats that you have sent where you say "this supposedly traded at a certain amount," because you are skeptical?
A. That's correct, I would not be surprised, yes.
Q. You have done that from time to time?
A. Again, I don't specifically recall an instance, but it wouldn't surprise me.

The only government witness to testify at all three prior trials, Joel Wollman, was equally clear (*Shapiro* Tr. at 2220):

Q. Would it be fair to say that you are inherently skeptical when you approach negotiations in this industry?
A. Yes.
Q. And you know, for example, that counterparties in the RMBS market are sometimes not being completely truthful?
A. In certain regards, yes.
Q. And counterparties sitting across – you don't like that expression. Counterparties against whom you are negotiating spin information?
A. Yes.
Q. And they shade information in a way that might not be entirely truthful; you experienced that?
A. I have certainly experienced that, yes.

Finally, but along the same lines, the supposed victims were, themselves, pumping out false information. For example, investor-funds requested that dealers post false

color to the market (thereby influencing future trading), making it seem like they bought the bond at a higher price so that when they went to resell it, they would "deceive" the next buyer into thinking that the seller's cost was higher. *Litvak* Tr. at 425, 799-800.

> 3.    *Reasonable investor-funds trading these securities typically traded without receiving **any** prior pricing information.*

According to government witness Marks from Ellington, it was the norm for trades to occur without the dealer providing *any* prior pricing information (*Shapiro* Tr. at 2371):

> Q. Is it fair to say that in many, many cases you do trade with counterparties, with dealers, without having information about what their markup is on a particular trade?
> A. Yes, they are many times where I do not know the markup.
> Q. And many times you do not know the acquisition price to the dealer, for example?
> A. Correct.
> Q. And is it fair to say that it's pretty typical for traders who have been in the industry for a long time, traders working at dealers, cannot provide information about their markup or their acquisition price, is that fair?
> A. That's fairly fair, yes.
> Q. When you don't have this information about the dealer's markup or the dealer's acquisition price, or where the dealer could sell, resell a bond, you're still able to trade, right?
> A. Yes.
> Q. You're still able to fulfill your fiduciary duties to your investors, right?
> A. Yes.
> Q. And you're able to trade because you rely in large measure on your modeling and analytical work, correct?
> A. Yes, among other factors.



Aadil Abbas of Hartford Investment Management, another government witness central to the Shapiro trial, put it this way:

> Q. But isn't it also true that very often when you buy non-agency RMBS bonds, or at least some of the time that you buy bonds, you don't know what the dealer is paying for those bonds?
>
> A. That is correct.
>
> Q. And that doesn't stop you from being able to assess whether a bond is a good investment for you, for HIMCO, for HIMCO's investors, correct?
>
> A. That is correct.
>
> Q. That's a circumstance in which you rely on your analytics, correct?
>
> A. Correct.
>
> Q. Your Modeling?
>
> A. Yes.

Tr. at 1525.

 4.     *Reasonable investor-funds trading these securities used independent*

*pricing services, other dealers and most important, their own comparable transaction history to*

*verify the price that they ultimately were prepared to pay (and could have gone to the owners of*

*the bonds directly had they chosen to do so).*

 Ellington's Marks made this point best: that funds get a clear sense of the market

from independent, verified sources.

> Q. You also have access to market information through various sources, correct?
>
> A. Yes.
>
> Q. For example, you have access to information provided by other dealers, right?
>
> A. Yes.
>
> Q. And you have access to information provided by third-party pricing services, right?
>
> A. Yes.
>
> Q. You have information based on your own trading, isn't that right?
>
> A. Yes.
>
> Q. And BWICs that Ellington conducts, correct?
>
> A. Yes.

*Shapiro* Tr. at 2372.

25

5.      *Reasonable investor-funds trading these securities could have negotiated differently and did not do so.*

Even the witness who "blew the whistle" on Jesse Litvak, Michael Canter of Alliance Bernstein, had to admit (*Litvak* Tr. at 402):

> Q. You make an independent judgment about whether the total price you are going to pay is in the best interest of the fund?
> A. Yes.
> Q. And no matter what Jesse says to you, you have complete control over the total price that you are willing to pay?
> A. That's true.
> Q. You always have the right not to increase your bid, for example?
> Correct.
> Q. You always have the right to decrease your bid?
> A. I do.
> Q. You always have the right to walk away?
> A. Until we say done, yes.

Or, as government witness Lemin testified (Tr. at 730),

> Q. In those instances, you don't hesitate to walk away from the trade if the total price is not right for you?
> A. I do not.
> Q. You have done that plenty of times?
> A. Probably more than I decided to buy, unfortunately. More negotiations fall through and don't result in a transaction than those that result in a transaction.

6.      *Reasonable investor-funds trading these securities profited massively.*

The investor-funds trading these securities knew from extensive past experience how much money they would make, and those selling the bond to David (one of the six charges) knew precisely what their profit would be before they okayed the transaction.[9] As Eric Marks testified (Tr. at 2341-2342):

---

[9]      We are aware that the profits made on a transaction are not a defense, but here we discuss them because they provide an additional reason why the alleged victim disregarded the pricing representations

> Q. I think you mentioned that you invest in RMBS or you try to focus on RMBS that are sensitive to losses, is that right?
>
> A. Yes, that is where I, at least initially, focused most of my time. It's where you could *earn outsized returns*...
>
> Q. And does that mean that you were focusing generally on RMBS where there could be significant price movements in the price of those bonds?
>
> A. Yes, the bonds were trading at distressed levels, so often discount-dollar prices, and you could have large swings in price.
>
> Q. What sorts of swings in terms of the magnitude generally do these bonds have?
>
> A. On average?
>
> Q. Yeah.
>
> A. The bonds are so unique, you'd have to look at each one individually. There are some securities where, depending on your assumptions, you could see a price between 20 and 40, or it could vary – it could be a huge variability in some bonds.
>
> Q. What do you consider huge?
>
> A. We purchased bonds in the depths of the crisis at very low dollar prices, like around ten or so, that have recovered almost near par, so you could get some pretty extreme swings over time depending on assumptions.

Emphasis added. In other words, as Marks explained, investor-funds generate assumptions of future profitability, especially for the type of bonds David traded (mezzanine potential loss takers) right from the start and those assumptions are an integral part of their decision-making calculus. And as Marks pointed out, these kinds of bonds were trading at steep discounts with significant increases in price (and therefore profits) attaching to purchases made in 2012. *Shapiro* Tr. at 2342. This provided the investor-funds with compelling incentives to not let bond opportunities slip away.

---

and would not have allowed them to be a significant part of the mix of information on which he decided because these bonds were an opportunity that these investors did not want to jeopardize.

7.     *Reasonable investor-funds trading these securities would have done the same transaction at the same price again, even knowing the truth today.*

It is an inevitable inference from the statements by other investor-funds and the ones allegedly victimized in our case that they would have done the same transaction at the same price all over again, even knowing the truth about the representations or with no representation at all.   Their extensive sophisticated analytics, research and modeling were telling them that transacting at the price they paid was unquestionably good.   We understand that fraud does not require a change in the end result but here, the willingness to do these transactions again *confirms* how insignificant the misrepresentations were.





- Peter McMullin of Red Top stated "that he could not say the outcome of the trade would have been different if he had known there was a different purchase price; and that his independent judgment drove his decision." *See* Sentencing Memo on behalf of Litvak, at 23.

- Government witness Aadil Abbas testified: "let's say if I'm really in love with that bond, I'm looking at it, I'm like, 'Wow, this is still a great investment for me,' I could have potentially bought it," even knowing the truth. *Shapiro* Tr. at 1524.

- And even the whistleblower in *Litvak*, Canter, had to admit (Tr. at 410-411):

  Q.    The total price that AllianceBernstein paid on all three bonds was a price that your internal analytics told you was in the best interest of the fund?
  A.    Yes.
  Q.    The total price you paid for all three bonds was a price that your judgment told you was in the best interest of the fund?
  A.    Yes.
  Q.    Otherwise, you be wouldn't have bought them at these total prices?
  A.    Fair enough.

29

8.　　*Reasonable investor-funds trading these securities knew that the dealer was trying to maximize his profit and owed the investor-fund no fiduciary duty.*

As government witnesses Canter and Corso made clear in *Litvak,* the investor-fund (typically a highly sophisticated, billion dollar fund) knew that the dealer was trying to maximize his profit in the negotiations, at the expense of the investor-fund. Tr. at 411-414, 498. They are adversaries.

9.　　*Reasonable investor-funds trading these securities disseminated misleading, inaccurate or false price information to promote their own agenda in the market.*

As Marks observed in *Shapiro*, one shows "a bid [to] kind of feel out where you could actually buy the bonds." Tr. at 2300. This comment is extremely significant, underscoring how David used his bidding price as well: to signal the market.

The lying begins when the negotiations begin. Each of the alleged victims was dishonest in these kinds of negotiations. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

Joel Wollman (again, who testified for the government at all three trials and had spent a correspondingly large amount of time with them) similarly recalled (Tr. at 894):

> Q. With Mr. Steffa at RBS, you were agreeing with his analysis that you see a 10 percent yield at a price point of 58, correct?
> A. Yes.
> Q. That's different from what you told Jesse Litvak in Government's Exhibit 102 that we looked at on Friday, correct?
> A. Correct.
> Q. Because you told Jesse Litvak that you saw 10 percent yield at the price point of 57, right.

A.  Correct.

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████

Apparently oblivious to this, the prosecution repeatedly stressed (and will stress

again) that the dealers erect a wall between their investor-fund and the entity the dealer buys

from, taking full advantage of that wall to deceive their investor-funds. This picture was and will

be central to the government's case. But the truth is quite the opposite.

*First*, Marks himself debunked the notion that investor-funds could not and did

not know from whom dealers like David were buying. In saying that it was "rare to speak with

the other side of the trade," he admitted that direct discussions can occur and, as he pointed out,

there was no prohibition on direct discussions. It was out of choice and convenience that entities

like Ellington did not do so in order to keep the identity of counterparties "hidden from each

other" to help them offload their bonds. *Shapiro* Tr. at 2294, 2301, 2346. David did not control

to whom investor-funds spoke. Government witness Harrison put it this way (*Shapiro* Tr. at

1183):

> 13:44:42, you say, you sort of tell who the eleven thirty guy is:
> Eleven thirty guy, I call CT hedge fund, Connecticut hedge fund,
> but if that's too specific for you, you can just say ECHF, I don't
> love.  There's only one other HF I don't really like, and he had
> listed yesterday at ten.  I call him HVMLT 067 guy.

*Second*, it is the investor-funds who invite this wall and could get around it, had

they wanted to do so. Judge Chatigny recognized that in his colloquy with the prosecution (Tr.

at 2987-2988):

> THE COURT: Representatives of companies that benefit from the
> lack of transparency in the market, as was explained by a witness,

31

because it allows them to make huge sums of money on trades exploiting the lack of information about the price they paid. That's who we're talking about, Mr. [Prosecutor], we're not talking about widows and orphans.

THE PROSECUTOR: Your Honor, that's the defense argument. That money —

THE COURT: That's the testimony of the government's witnesses.

THE PROSECUTOR: Excuse me, Your Honor?

THE COURT: That's the testimony of the government's witnesses. I think it was Mr. Marks who said – I could be wrong – but I think it was Mr. Marks who said, yeah, we benefit from the lack of transparency.

Of course, Judge Chatigny was right and the prosecution was wrong. The testimony recalled by Judge Chatigny was clear as day (and, again, particularly significant for our matter because he relied on Eric Marks, central to half of our charges) (Tr. at 2345-2346):

> Q. You also mentioned, Mr. Marks – in connection with a question about whether you speak to other counterparties as opposed to going through a dealer, I think there was some discussion about it being Ellington firm policy not to speak to an another counterparty directly; do you recall that?
> A. Yes. We do not trade with other counterparties directly.
> Q. And I think you indicated that one of the reasons, correct me if I'm wrong, that you don't talk to other accounts is that it keeps your identity hidden in connection with a trade, is that right?
> A. That is one reason, yes.
> Q. And is it fair to say that Ellington would prefer to keep its identity hidden in connection with these sorts of trades?
> A. All else being equal, most of the time probably yes.
> Q. And why is that?
> A. We might not want other accounts to know what securities we are purchasing because we wouldn't want to have more competition in those securities.
> Q. Does keeping your identity hidden, does that sometimes assist you when you want to offload a position or acquire a significant position?
> A. It could potentially, although I can't think of a time when it actually affected us, but it could potentially. Let's say if we're in the news about having to return money to clients, we might be in a position where we are forced to sell securities. So if you're a forced seller and someone knows your identity, they would have an advantage over you.

Marks reiterated the same idea shortly thereafter, observing that the opacity of the

market was something that investor-funds liked *and took advantage of* (*Shapiro* Tr. at 2378-

2379):

> Q. Now, is it also your view that if you're a sophisticated, highly
> resourced investor – meaning, you know, you've got modeling
> capabilities and smart, you know, professionals working to analyze
> bonds – are you able to benefit from the lack of transparency in the
> market?
> A. Yes, that is definitely a benefit for us. We could identify
> securities that we thought were way undervalued and resell them
> later for a nice profit, whereas it would be more difficult to resell
> them higher if people had known where we purchased them.
> Q. So on the one hand, the fact that there is no full price
> transparency that tells you the prices at which other people in this
> market – the exact prices at which other – let me withdraw that.
> There's no full price transparency about the prices at which other
> market participants are buying and selling
> securities in this market, correct?
> A. Sorry, can you repeat that?
> Q. You don't have full transparency into the exact prices at which
> other market participants are trading in this, correct?
> A. Correct.
> Q. And sometimes you might like to know that information, it
> might be helpful to you to know that information, correct?
> A. Yes.
> Q. But it's also true that there are times when it's helpful to you
> that this market is a market in which people don't get to have that
> information, correct?
> A. Yes.
> Q. It helps you in selling at higher levels and buying at lower
> levels, correct?
> A. I would say it helps sophisticated, active investors at the
> expense of those that are not as sophisticated or active.
> Q. And fair to say that there are a lot of sophisticated
> investors in this market.
> A. Yes.

This truth had been staring the government in the face for quite a while. As the

defendants pointed out in the *Shapiro* case, the very chats on which the prosecution relied

showed that the investor-funds could find out (and often did) where the dealer was getting the

bond from. In other words, the chats offered by the government contain statements by the supposedly deceived investor-funds naming the entities from which the dealer was getting the bonds. And there are plenty more examples of this in the discovery.

For example, in the cross-examination of Zach Harrison of Putnam, defense counsel established the following (*Shapiro* Tr. at 1186):

> Q: You think the seller is writing to Gramins, right [Gramins being the dealer on trial]
> A: The prospective seller, I believe, yes.
> Q: And then at 18:53:46, you say : "WC doesn't like their lies being found out." WC is whom?
> A: Sometimes that meant PIMCO.

Then again (*Shapiro* Tr. at 1182):

> Q: And you refer to them [Ellington] in your chats periodically as Connecticut hedge fund or East Coast hedge fund?
> A; Yes
> Q: Periodically, you received information that Ellington was putting out through different dealers that you got information from, right?
> Q: I'm asking you if you periodically received information that you believed was coming from Ellington, although you got it through a dealer.
> A: Yes…

10. *Reasonable investor-funds trading these securities made the decision about the value of a bond based on the all-in price, without regard to commissions.*

The evaluation of a bond and the decision to buy it was not driven by anything other than the all-in price. If that price modeled within the range of acceptable prices, the bond was purchased. This is clear from the testimony of Eric Marks and the fact that the trade ticket confirming the transaction (the 10b-10 form) has no place for commission. It lists only the all-in price (*Shapiro* Tr. at 2382-2383):

> Q. And it's industry practice that a commission is just not included in these trade tickets, correct?

A. Correct.

Q. There is a note section where you can write anything in you want, right?

A. Yes.

Q. And in terms of P and L and calculation of these trades, you keep it – you track it as an all-in price, right?

A. Yes.

Q. And you're an accountant, right, by training?

A. Yes.

Q. And again, ultimately what is most important, as you testified, is that all-in price.

A. Most important with regards to what?

Q. Most important in terms of when you buy the bond, the most important thing is the all-in price.

A. Yes. When you purchase a security, that is what goes into your P and L, so it is the most important driver of your P and L.

*11. None of the middle or back offices of the alleged victims (the offices settling these trades) asked David or Cantor Fitzgerald (David's employer) to provide confirmation of the pricing representations in question, as they would have done had the pricing representations been material to the decision-making of those funds.*

An additional and powerful indication that the information in question was not material comes from the investor-funds themselves. *Not one* of those funds' middle or back offices (which settled these trades) asked Cantor Fitzgerald to supply confirmation of the background to the trade (including Cantor's acquisition price). If the backdrop to the transaction (as opposed to the nature of the bond itself) was so important, surely the back or middle offices of the alleged victims would have made some effort to request this information. They had ample time to do so (they spend days confirming the critical terms of the trade), because a discrepancy between firms on the material terms (e.g., accrued interest calculations) allows the trade to be broken. But the investor-funds never made such a request in any transaction, whether or not that transaction involved a pricing misrepresentation. By never making that request, the middle and back offices

35

– whose job was to verify these trades – demonstrated how irrelevant the negotiations were to these funds.

*12. The true victims of any material misrepresentation under the government's theory were not simply the investor-funds but also the tens of thousands (and often more) of investors each fund represented.*

As the prosecutor in *Shapiro* emphasized to the Court: "the question is: Are there victims? And I'm not suggesting Mr. Marks is not a victim, Mr. Abbas is not a victim. [But] the victims are the investors, the victims are the ones who actually own the money." Tr. at 2988. As we cautioned in our Group I Motions, now that the government has made this argument, the time is ripe for us to move to dismiss as a matter of law because these alleged "victims" (those whose money was at stake) numbered in the tens of thousands (and perhaps millions), making the monetary impact on the universe of victims too small to even quantify. Plus those alleged victims could not have negotiated differently (to the extent an impact on negotiations would suffice, which it does not) because they were not part of the negotiations.

**B. What we know for a fact about the evidence that the government will offer against David in David's trial:**

As mentioned, the government has provided a great deal of discovery in this case, including witness interviews. In addition, the witness on whom the government will rely for three of the six charges in this case has testified under oath in the *Shapiro* case and his testimony related to a single charge where the jury returned a not guilty verdict.

There is no doubt that the witnesses on whom the government will rely fall in line with the evidence from *Litvak* and *Shapiro* but go one step farther in a direction *favoring* David. Here is the evidence:

1.  Ellington Management

Three of the six charges against David relate to transactions with Ellington. The Ellington representative with whom David dealt, Eric Marks, is a known quantity and his testimony clearly exonerates David.

Marks testified at the *Shapiro* trial. As noted earlier, his testimony related to one charge (a charge on which the jury acquitted) and he provided striking testimony (recounted above) of how immaterial the pricing information was. ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

Marks's recollection is that he distrusted pricing information provided by a dealer, including David. He clearly voiced this in his *Shapiro* testimony (Tr. at 2377-2387):

> Q. And in fact, you have done transactions with dealers from time to time in which dealers will make a representation to you about their markup being at a certain level; that happens, right?
> A. Yes.
> Q. *And there are times in which dealers have made those sorts of representations to you in cases in which you didn't believe them, and you thought they were actually making more money than they were representing to you, correct?*
> *A. Yes.*
> Q. And you don't know exactly how much they're making because you don't have verification of the exact prices that they're buying at, correct?
> A. Correct....
> Q. And Mr. Kinderman still works with you?
> A. Yes.
> Q. He's still working in Connecticut, right?
> A. Yes.
> Q. And you talked a little bit about how he was always warning you?
> A. Yes.
> Q. About that people in this marketplace aren't always transparent or truthful when negotiating, right?

A. Yes.

Q. And he's the one – let me ask you this: You learned those things, such as that a dealer might want to maximize profit and shade information in their favor, right, from him?

A. Yes.

Q. You didn't read that in a book, right?

A. No, I did not read it in a book.

Q. That's not in your compliance manual at Ellington, right?

A. Right.

Q. And so because of that, you never shared every piece. You don't always share every piece of information in your mind with the dealer because you know that they could potentially use some of that information against you in negotiations, right?

A. Correct.

Q. you don't have confirmation of the exact prices at which the dealer is reselling the bond, correct?

A. Correct.

Q. And that's why you learned early on that you have to depend on your knowledge of the market which relates to trades that you do which gives you price levels that you can know, correct?

A. Yes.





And in *Shapiro* (Tr. at 2419), Marks testified that:

> I myself wouldn't share too much information with a broker because I'd be under the impression they would use it against me. So I wouldn't necessarily share my maximum amount to begin with. But even the amount I do show, I would expect him to hold something back just to have some wiggle room in the negotiation.

Marks further recalled in *Shapiro* that he knew what he wanted to pay for the bonds he bought before contacting a dealer like David, because every purchase fell within the range that his company's highly complex and sophisticated modeling produced. As he testified (Tr. at 2346):

> Q. But am I correct in understanding that your model serves a critical function in helping you determine the prices that you're willing to pay for bonds in the market?
> A. Yes. Our model is a very important factor in – basically every RMBS bond we look at, we run through our model to see what we think of a valuation at a given price.

This evidence is completely unsurprising: the bonds in question were particularly distressed RMBS, offered at a price well below par. Past experience had led companies like Ellington to know that the profits from these bonds were enormous (the bonds in Count 4-6 being no exception).

## 2. DW

A DW representative was involved in one trade with David. He has not testified before nor does it appear he was interviewed by the government – an approach that appears to occur when information is not helpful to the government's case. For example, in the *Litvak* and *Shapiro* trials, the government did not call witnesses to support certain charges, hoping to rely on the cold record of chats between the investor-fund and trader. In no instance where the government failed to call a witness did the jury in either case return a guilty verdict.[10]



---

[10]     In not calling witnesses, the government further confirmed the objective nature of the reasonable investor standard.



### 3. Marathon Asset Management

No one from Marathon testified at any of the three trials.

41

As government

witness Corso testified in *Litvak* (Tr. at 543-544):

> Q. At the time you were deciding to sell, you knew that York
> was carrying he bond on its books as a price of 54?
> A. Yes
> Q. That was a factor that played into this analysis –
> A. Yes
> Q. – about whether to sell and at that price?
> A. Yes.



## III. *Where the evidence leads*

There are two elements in this case that are contested at present: materiality and intent.

The evidence that the government cannot defeat falls far short on both elements.

---

[11]    The funds in this case came to David because of his skill in making them money especially with "risky" bonds. And he consistently delivered the liquidity these funds sought, another reason why the funds did not care whether he was telling the truth about his pricing discussions.

[12]    And unlike the other two investor-funds and other investors, Marathon had a special incentive to provide the US Attorney and its agents (which included TARP agents) what they wanted because Marathon was one of only nine companies chosen to receive billions of TARP bailout funds from Treasury requiring that it be correspondingly accessible to Treasury – the very institution for which the agents questioning Marathon worked.

## A. Materiality

The above evidence leaves no doubt that the alleged misrepresentations were not material.

*First*, individually and collectively, the above factors conclusively show that the government cannot prove beyond a reasonable doubt that the mix of information on which an investor-fund decided to transact was, or even could be, significantly altered. The fact that all of the investor-funds in question expected and understood that misrepresentations would be made like the ones underlying the charges in this case, is alone a complete answer on this element. And although it is not dispositive, the fact that the investor-funds would have made the same decision again, even knowing the truth (to buy the bond at the price they paid) is telling.

The critical fact is that these mortgage bonds produced monthly cash flows via principal and interest payments, every penny of which the investor-funds received, as they expected based on their models. This happened regardless of the negotiations over purchase or sale price. The value of those expected future cash flows was and is established by complex, sophisticated modeling that establishes that the price paid was within the range of acceptable/desired values; that value was confirmed again by the investor-funds' expert review of the relative value of the bond in question to the bonds they already held; it was confirmable yet again by independent pricing services that they could have employed; and confirmed yet again by their superiors' expert review. These are the independent processes that these billion dollar funds use before deploying millions of dollars.

*Second*, the government's burden is that much more unattainable because no witness can credibly state that a fact is material when that witness cannot remember the transaction. To the extent there is any question about this, it is worth focusing on the testimony in *Litvak from a*

*government witness*: that without remembering the specifics surrounding the effort to buy or sell a bond, it is impossible in hindsight to say that a particular piece of information would have been material. As Eric Marks pointed out:

> Q. And fair to say that essentially when you're answering the questions about what, if any, significance anything Mr. Peters said to you had at the time, it's a retrospective analysis, right? Meaning that first, you don't remember this in great detail, correct?
> A. Correct.
> Q. Second, you're having to put your mind back in a position that you were then, even though today you have far greater trading experience, right?
> A. Yes.

*Shapiro* Tr. at 2428.

One of the government's witnesses, Vladimir Lemin of Magnetar, similarly testified in the retrial in *Litvak*, that only by speculating could he evaluate what role, if any, this kind of representation played:

> Q. Okay. And if you don't remember a particular trade, it is impossible to identify all the factors that went into that trade?
> A. It's impossible to identify those weights that you referred to in your previous question and how important were the particular factors for this particular trade if I don't recall the trade.
> Q. You can't remember the relative importance of the factors for the trades, for example, that the Government asked you about?
> A. Yesterday?
> Q. Yes, sir.
> A. I do not remember those weights, no.
> Q. And to figure that out would require speculation and guesswork?
> *A. Since I don't have independent recollection, I guess I would have to resort to speculation, correct.*

Tr. at 704-705 (emphasis added). And making that "hindsight" evaluation even trickier for the government is the requirement – as Judge Chatigny emphasized – that the jury:

> assess whether a false statement was material in light of the norms and practices in the non-agency RMBS market that existed at the time of the transaction and not based on hindsight. A false statement might not have been material if, under then prevailing

> conventions in negotiation, a reasonable investor would have viewed the statement as mere sales talk in the nature of haggling with respect to which a party was not expected to be truthful.

Tr. at 2648-2649.

*Third,* even if an impact on negotiations theoretically could prove securities fraud (and as we show in Point II, that is not the law), the government cannot prove negotiations were actually impacted here. At most, negotiations *toward* the ultimate decision *may* have been affected (as certain victims have claimed, they may have negotiated harder), but even there, the operative word is "may" because these funds *always* controlled how they chose to negotiate (they never lost the power to lower a bid or simply walk away). And that cannot support a finding of materiality beyond a reasonable doubt.

1.　That kind of equivocal statement ███████████████████████████ ███████████████████████████ falls far short of proof of materiality beyond a reasonable doubt. As the Supreme Court made clear in *TSC Indus. v. Northway,* 426 U.S. 438, 445-46 (1976) when faced with proxy statement omissions whose materiality was established by a circuit court formulation that mistakenly allowed a jury to find materiality if the omissions "might" have influenced an investor's vote: a "might" standard was far too dangerous. *See Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1302 (2d Cir. 1973) (stating that "while the difference between 'might' and 'would' may seem gossamer, the former is too suggestive of mere possibility, however unlikely").

2.　It is truly unclear whether the negotiations would have been affected. In other words, even if an impact in negotiations, irrespective of where the price ended up, could satisfy the securities fraud statute, the government cannot prove an impact on negotiations here.

David's misrepresentations did not affect the way the firms chose to negotiate. ████████ ████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████.[13]   And nothing and no one forced the investor-fund to

negotiate the way it did (or forced them to deal with David).

Eric Marks, so central to our case, made this crystal clear in *Shapiro* (Tr. at 2351):

> Q. Now, in the course of negotiating with the dealer, fair to say
> you always had the right to raise your bid if you think it
> appropriate, correct?
> A. Yes.
> Q. You always have the right to lower your bid if you think it
> appropriate?
> A. Yes.
> Q. You always have the right to walk away, correct?
> A. Yes.
> Q. And in the same way that you have the ability to do all those
> things, so does the dealer, right?
> A. Yes.

---

13 ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Moreover, the reasonable investor-fund (like the funds in our case) do not hold out for every last dollar.
As Katherine Corso observed (*Litvak* Tr. at 524-525):

> Q. … And the first bullet point is do not
> wait for last dollar of gain. Do you see that?
> A. Yes.
> Q. What does that mean?
> A. It means to not try a top-tick the market when you
> sell.
> Q. Could you explain what you mean by that?
> A. Sorry. So if you are going to wait for the market
> to go up to sell something, you don't want to wait too long
> because you might miss your opportunity.
> Q. In other words, if you try to wait for every last
> penny you can get, you might lose out?
> A. Right.

Q. And you understand that if a dealer is looking to sell a certain size of a bond at a certain level, the dealer doesn't have to bring that opportunity to you, correct?
A. Correct.
Q. Dealers can decide to sell to other clients as opposed to selling to Ellington, correct?
A. Correct.

This testimony should have come as no surprise to the government:



3.      David was not the only game in town: the investor-fund could have decided to walk away from this bond and/or try to find the bond elsewhere or at another time. These investor-funds were *not* forced to deal with David, just as he was not required to deal with any of them. If they thought they could do better, they could, in effect, shop around to another dealer or just back away from the trade. David was not the only game in town.

4.      There is no indication that David would have entertained a lower offer. As the only expert to testify in *Litvak* explained (discussed below in footnote 15), the use of a misrepresented purchase or sale price was simply a way for the dealer to tell the investor-fund "I won't take less than this" without seeming to be intransigent. This was the language of trading at the time and, as the record makes clear, universally accepted as such.

*Fourth*, even if negotiations over price *potentially* could be the subject of a securities fraud and the government could prove *beyond a reasonable doubt* that negotiations were affected, the government would still fail here because the ultimate decision-makers at each of the

supposedly victimized institutions are not the desk traders with whom David interacted, and those superiors did not ask about, or were unaware of, the specifics of the negotiations. They gave their approvals based on the final, all-in price presented to them. ███████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████ As he testified in *Shapiro:*

> Q. But as long as you're checking in with Mr. Kinderman, he doesn't ask you questions like, did the counterparty say anything about getting squeezed or, you know, negotiation tactics, he wouldn't ask you things about that. He would want to know the price of the bond and the bond, right?
> A. When I deliver information to him, I present him with the bond, I tell him the bid I have shown. If it's a purchase scenario, I would show him the bid I have shown and the current best offer I've seen, and ask him for his opinion.

Tr. at 2388-2389.

In the end, the government cannot show that the fund would have negotiated differently, it cannot show that David would have budged from his bottom line price, it cannot show that the fund would have passed on the transaction if David had not budged. All three of these must be shown beyond a reasonable doubt to demonstrate that pricing information significantly altered the mix of information on which the funds developed their negotiation strategy. The proof, to the extent it bears on these three points, shows just the opposite: the alleged investor-fund victims all indicated that they may well have done the transaction again even knowing the truth (or not having any pricing representation at all) and did not want to lose the opportunity to obtain these massively profitable bonds when there was serious competition to buy them. While every adverse party in a negotiation/transaction would like to know as much as possible about the

counterparty's position, fraud, including securities fraud, does not attach to what an investor would like to know.

In short, the above facts and reasonable investor testimony from the government's own witnesses and the fact that the price paid for these bonds was within the range every investor-fund wanted and that obtaining the bond was more important than haggling over price, leave no doubt that the government cannot prove materiality here.[14]

### B. Intent

With respect to intent, industry participants like David did not know that making the misrepresentations was a potential violation of law. There are at least two reasons why, both of which are indisputable.

*First, as noted, the investor-funds with which David dealt knew that dealers and investor-funds provided inaccurate information constantly.* In other words, the record plainly shows that David inhabited a world that understood that investor-funds expected that dealers like him (indeed, virtually all market participants) would not offer truthful pricing information (including the price at which the dealer could obtain or sell a bond). Misrepresentations that went to one's negotiating position were a strategy that *both sides* constantly employed.

*Second,* as was explained at the *Shapiro* trial, bond trading is an apprenticeship where a new trader learns from those more senior who manage the trading desk and sit within earshot. So, for example, as government witness Alejandro Feely of Nomura testified (Tr. at 1932):

---

[14]    The government undoubtedly will contend, as it has in the past, that those analyses establish a range but do not dictate a price within that range. That answer is ineffective. First, the government's point is true of every transaction whether RMBS or not – every "buyer" comes to a transaction with a range in mind. So if the government were right, it would mean that misrepresentations always are material (a proposition that the Circuits have rejected). Second, the counterparties here intensely desired these exceptionally profitable bonds, *and* completely controlled how and where to negotiate (among many things), destroying the government's theory.

Q. Could you explain to us how you were not truthful?
A. I would sometimes engage in trades where I would lie about where I bought a bond or where I can sell a bond.
Q. Why would you lie about where you bought a bond or where you could sell a bond?
A. To make more money.
Q. Did you come up with this on your own?
A. No.
Q. How did you come up with this, Mr. Feely?
A. It was what I observed when I started trading and I was trained to trade.
Q. Who were you trained to trade by?
A. Mostly Ross Shapiro and Tyler Peters.

And government witness Jonathan Raiff (now head of global markets at Nomura) put it this way:

A: That this business is an apprenticeship: bond trading is, for lack of a better word, an apprenticeship business. There's no school where you go to learn to be a bond trader. You could learn various skill sets in college before you get there, but the actual how to trade bonds is something that you have to learn on the job. And so in that sense it's an apprenticeship. People start out as junior traders, move up to midlevel, and then senior traders and desk heads. And it's the job of senior traders to train more junior traders and so on.

Q. That's your understanding of how traders start in the industry and how they eventually move up, right?
A. Correct.
Q. And you talked a little bit about how traders learn the job.
I think you called it an apprenticeship, is that right?
A. Correct.
Q. And what's your understanding of how that works?
A. If anyone's ever heard the term of learning by osmosis, you learn by watching the people senior to you. In some cases you learn by being yelled at. In rare cases a senior trader may take time to explain to you exactly what you were supposed to have done. But that's why I refer to it is an apprenticeship business.

Tr. at 471, 492-493.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ In this landscape, misrepresentations like these were the rules of the game as long as misrepresentations about the collateral or the ultimate transaction price were not made.

Like these relatively inexperienced traders, David only started in the business five years before the trades in question. In fact, he entered the market years after Tyler Peters entered (the most junior defendant in Shapiro and the defendant completely acquitted in *Shapiro*), and a year *after* the government cooperator Feely. David did not manage his own book until only *the year before* these events: Cantor Fitzgerald was his first substantial position trading his own book. That training continued at Cantor (where the events in question occurred). And David's training was only reinforced by Cantor's silence in the face of his trades.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ Moreover, David (like any trader) expected that compliance and managers independently reviewed his chats (chats being the critical evidence on which the government relies in every one of these cases). ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████     ████████████████████████████

████████████████████████████████████████████████████ *(e.g.,* "[t]he

investigation of this matter revealed that members of Jefferies' management in the fixed income

division because aware that Jefferies employees were making misrepresentations to customers

and did nothing to stop it"). *Litvak* Government Press Release at https://www.justice.gov/usao-

ct/pr/former-rmbs-trader-convicted-securities-fraud-after-retrial).    All of this provides strong

confirmation that Cantor never meaningfully criticized David while he worked there.

    None of this is surprising. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

    In that context, the utter absence of any meaningful criticism of David's trading during or

after his employment, coupled with the consistent lack of understanding of what the Connecticut

United States Attorney's office considers unlawful, is undeniably meaningful.    A relatively

young trader like David (he had been trading his own book for roughly one year), in effect is an

apprentice to a larger organization, trying to absorb what his more senior colleagues tell him are

the rules of the road.    Cantor's behavior signaled to David that he was not doing anything wrong.

This was confirmed in the *Shapiro* trial by Caleb Chao, a trader at Nomura who began actively trading at the time David did (as well as Tyler Peters, who, as mentioned, was the defendant against whom the jury returned an acquittal on every count). As Chao stated, there was no reason to believe that the trading representations in question were illegal, must less discouraged in the industry:

> Q. But you agreed to – despite your initial reaction and surprise, you agreed to continue?
> A. Yes.
> Q. And you said that you understood it to be okay, based on what your bosses had shown you?
> A. I thought it was okay because I continued to see it on a regular basis.
> Q. Okay. On the Nomura RMBS desk?
> A. Yes.
> Q. Did you think about it in terms of lawfulness?
> A. I wasn't thinking about it in legal terms.....
> ....
>
> Q. I'm sorry, could you repeat that?
> A. It was brought up in multiple conversations.
> Q. Fair to say, it received a significant amount of attention?
> A. Yes.
> Q. And is it fair to say that it [the *Litvak* indictment] was the first time you ever heard that you could get into trouble for using the kinds of negotiating tactics that you've testified about here today?
> A. Yes.
> Q. And, in fact, until then, you didn't think that using those kinds of negotiating tactics was wrong, true?
> A. That's true.
> *Q. And you certainly didn't think that using those kinds of negotiating tactics could be a violation of the law, right?*
> *A. I wasn't thinking about that in legal terms.*
> *Q. But you didn't think it was wrong, correct?*
> *A. I didn't think it was wrong.*

Tr. at 1691, 1777-1778 (emphasis added).

Based on the above, notwithstanding the government's apparent view that lying is a crime (repeated at all three trials, meriting a strong rebuke from Judge Chatigny, as we discuss

under Point IV below), David had no reason to believe that his misrepresentations on price violated the law. And his conclusion was surely reasonable given how ubiquitous these kinds of misrepresentations were in this industry and the widespread acceptance of their occurrence. Judge Chatigny's observation during the *Shapiro* trial is powerful proof of this notion (Tr. at 2993-2994):

> It seems to me what the government is saying is this conduct is so egregious you don't need to prove that they knew it was illegal. Anyone would know this was egregious, but Mr. Chao [a government witness who traded at Nomura] didn't.... This case is not a simple case. It is undisputed that this market was rife with misrepresentations...you have people like Mr. Chao [a government witness who traded for Nomura] who didn't realize that what he was doing was a crime.[15]

---

[15]    Should the Court ask why, if David did not intend to cause the investor-fund with which he interacted to come to a decision based on false information, David chose to misrepresent pricing there are three reasons.

First, the answer, as confirmed by the sole expert called in any of the trials, Phillip (Buck) Burnaman in *Litvak,* is that the false representation of pricing served the *truthful* purpose of conveying to an investor-fund what David's bottom line was (the price he would not go below if the investor-fund wished to sell the bond). Instead of appearing intransigent and expressly insisting on this threshold, the pricing representations conveyed David's position in a less confrontational way. Burnaman, was asked "What if a dealer were to say, I bought this bond at 50. How would reasonable RMBS investors understand that statement or view it, in your opinion?" He answered, without being challenged: "A. Well, if somebody says, well, I bought this bond at 50 and he knows that that's something that I want to buy, pretty much the only thing I can take from that that I know to be true is that he would like to get paid something more than 50 for me to buy it. So if I want to buy it, probably have to pay more than that, according to his view of the world. Doesn't mean that I agree with his view of the world, but that's what he thinks or she thinks." Tr. at 1248-1249.

Second, even if David thought the misrepresentation was significant to him, that does not address whether he made the misrepresentation *intending* to violate the law or whether it was material *to the recipient.* Proof that David sought to profit from these transactions is not the inquiry *on materiality.* What matters is whether pricing representations were material to the counterparties who engaged in these arm's length, principal-to-principal transactions.

Third, as mentioned earlier, the fact that David may have cared to make this misrepresentation does not signify it was material to *the Fund.* His concerns and priorities in making a trade do not match or control theirs.

One final point. The jury instructions in *Shapiro* appear to require that the government prove that the defendant intentionally act *unlawfully*. Because it is not unlawful to simply lie, the intent element requires proof that the defendant intend to make a *material* misstatement. As Judge Chatigny instructed: "'Willfully' means to act with the intent *do something law forbids; that is, with a bad purpose to disobey or disregard the law.*" Tr. at 2649 (emphasis added).[16]

For the many reasons discussed above, there is no way that the government can prove that David knew that his misrepresentations were material to the counterparties he faced, as the actions and statements of these counterparties at the time confirm.

## POINT TWO
## THE GOVERNMENT CANNOT PROVE MATERIALITY
## AS A MATTER OF LAW

In rare circumstances, the government's theory of materiality is insufficient as a matter of law. The principle stems from the Second Circuit's decision in *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996).

*Feinman* established two principles: *first,* that a lie that does not affect the value of the item being purchased (the bond or security) is immaterial; and *second,* and independently, that a lie that only affects that value in a *de minimis* manner is immaterial. 84 F.3d at 540, 541. Here, both principles apply. While the raw dollar figure may not be *de minimis* to just the funds, the universe of victims is far wider, as the government concedes. And in that larger universe, the financial impact is spread out among numerous victims, with the impact on any one shareholder-victim is too small to quantify.

---

[16]  This point is reinforced by the standard Sand jury instruction (57-24), which distinguishes between knowledge that a statement is false, and willfulness, which requires proof that the defendant intended to do something "the law forbids, this is to say, with bad purpose either to disobey or to disregard the law." Because knowing one is lying can satisfy the knowledge requirement, there must be something more to satisfy the willfulness requirement: an intent to do something in violation of the securities laws (*i.e.* to disseminate a false material statement).

### 1. The value of the bond must be affected, not negotiations.

The evidence in *Litvak* and *Shapiro*, as well as the discovery in our case, leaves no doubt that, at best for the government, the investor-funds in question might have negotiated harder. And this is the theory on which the government will proceed: had the funds known, for example, that David could purchase the bond they sought at 1 point lower than he said, they might have or could have pursued their negotiations harder based on Cantor's profit margin. But as a matter of law, that is insufficient.

Where the value of the security – the heart of the bargain – is not affected, the misrepresentation cannot be material as a matter of law. The decision against which materiality is to be measured is the decision to do the bond transaction: "to act or not act in some way with respect to *the transaction* at issue"; to "assume[ ] significance in the *deliberations* of a reasonable investor." *Shapiro* Tr. at 2647 (emphasis added). As the Second Circuit required in *Ganino v. Citizens Utils.,* 228 F.3d 154, 161 (2d Cir. 2000), materiality requires an evaluation of what "a reasonable investor would have considered significant in making *investment decisions*." (Emphasis added).

The Second Circuit has found that a fact is material where the *value of the security* would be affected after reasonable and objective contemplation if the truth were disclosed. *See, e.g. Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 888 (2d Cir. 1972). In accordance with this principle, the Supreme Court articulated in *TSC Indus. v. Northway,* 426 U.S. 438 (1976), that an omitted fact is material where the reasonable shareholder would consider it material in determining how to vote. *Id.* at 449. The standard contemplates that the omitted fact must have assumed actual significance in the *decision or deliberation. Id.* It is also what Judge Hall charged in *Litvak* and Judge Chatigny emphasized in his instructions as well. *Litvak* Tr. at 1498;

*Shapiro* Tr. at 2661. It is what the government effectively admitted when it discussed *United States v. DeSantis*, 134 F.3d 760 (6th Cir. 1998), in response to a motion in *Litvak* concerning whether to import into securities fraud the intent to harm standard from mail fraud:

> Even assuming, arguendo, that DeSantis is correctly decided ... it holds that securities fraud requires proof that the misrepresentation was made for "the purpose of inducing the victim of the fraud *to part* with *property or undertake some action that he would not otherwise do* absent the misrepresentation or omission."

*Id.* at 764.[17]

And it is what the Circuit held in *Litvak* as well, when it found that the government had improperly charged Litvak with defrauding the Treasury Department: "Therefore, because the government adduced insufficient evidence for a rational jury to conclude that Litvak's misstatements were reasonably capable of *influencing a decision* of the Treasury, we reverse the District Court's judgment of conviction as to the fraud against the United States and making false statements charges (Counts 12-16)." (Emphasis added). Significantly, Treasury was in the position of the investors in the funds in our case – essentially passive investors, unaware of the negotiations or any other action by the dealer.

None of these rulings is surprising. In *Feinman,* for example, the Circuit found immaterial lies told to investor-funds to prevent them from learning transaction fees so they could not negotiate them. As the Court observed, cases where misrepresentations were held material involved information integral to the "deci[sion] whether or not to buy or sell stock...." *Feinman*, 84 F.3d at 541.

Just like *Feinman* (where dealers lied about the true costs of handling trades), David is accused of lying about the portion of the transaction cost that was going to his firm. But the

---

[17] In the Seventh Circuit's decision in *Weimert* (discussed at length under Point III) is to be given any force, it must mean this: that negotiations, even when affected, are not a sufficient basis for fraud.

investor in *Feinman* and here *knew the total price of the security they were buying and agreed to pay that price.* As discussed earlier, repeated testimony from investors in this market plainly and consistently established that investor-funds do not determine the value of a bond or whether it is an attractive long-term investment based on a dealer's acquisition cost but, instead, on the bond's anticipated returns, which are based on objectively confirmed and measurable metrics like the mortgages underlying the bond.

The Circuit's point in *Feinman* was not novel. It was foreshadowed by the very clear law established in the wire fraud context. Although wire fraud has an element that is not included in securities fraud (intent to harm), the wire fraud case law addressing materiality applies with equal force to the element of materiality in securities fraud here, as Judge Chatigny pointed out. Tr. at 2661 (referring jury to definition of materiality in securities fraud when instructing on wire fraud).

It is, therefore, instructive to review a central wire fraud decision in this Circuit – *United States v. Starr.* This decision is particularly insightful because it rejected the notion that a defendant's use of "costs" to enhance its own profits can be material because the *total price* (a price that included those costs) was precisely what the alleged victim agreed upon and paid. *See United States v. Starr,* 816 F.2d 94 (2d Cir. 1987).

In *Starr,* the seller lied about the portion of the price he intended to use to cover costs, surreptitiously taking that cost-related money for himself. "In fact, defendants appropriated a portion of the fees for themselves." *United States v. Davis,* 2017 U.S. Dist. LEXIS 122643 at *35 (S.D.N.Y. August 3, 2017) (describing *Starr*). The Circuit rejected the fraud verdict because it found that the buyer received the product that he thought he was getting at the *total price* he paid. He received "exactly what he paid for." *Starr,* 816 F.2d at 100. Where the alleged victim

receives the economic value of the transaction, lies cloaking the defendant's true intent concerning the breakdown of that economic value between its profits and its costs to others are considered insufficient to support a fraud verdict.

As in *Feinman*, the buyer in *Starr* could have claimed that had he known that a portion of his payment was going for costs, not to the seller, he would have negotiated harder to strike a more favorable price. But as in *Feinman* that was not enough for the Second Circuit. From the Court's standpoint, the buyer got what he paid for – all he could complain about is what part of what he paid went where.

The analogy to our case is clear. It is inconceivable that the government could sustain the position that an investor-fund was defrauded under the securities law where it knew that its payment was not going toward the dealer's costs but, instead, toward the dealer's profits – just as in *Starr*.

The most powerful statement of this principle comes from *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) which addressed whether negotiations that are skewed by misrepresentations can provide the basis for a fraud charge where the alleged victim obtains what it bargained for. Where the investor-fund gets what it wanted, the fact that it was induced to obtain it during negotiations where the seller misrepresented its position is irrelevant. As Judge Chatigny put it, the government must prove the counterparty was "deprived... of the benefit of the bargain." Tr. at 2648.

The Seventh Circuit unequivocally held in *United States v. Weimert*, inaccuracies in negotiations are not criminal:

> Buyers and sellers negotiate prices and other terms. To state the obvious, they will often try to mislead the other party about the prices and terms they are willing to accept. Such deceptions are not criminal....

> The better answer is that negotiating parties, and certainly the sophisticated businessmen in this case, do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior. Deception about negotiating positions about reserve prices and other terms and their relative importance should not be considered material for purposes of mail and wire fraud statutes....

*Weimert, supra* at 358.

This principle is hardly surprising: in negotiations over cars, compensation, and a spectrum too broad to specify (including RMBS bonds), both sides take liberties to misrepresent their positions and were that conduct punishable, commerce in this country would grind to a halt. Wishing one had more information in negotiations is never enough, as the *Weimert* Court made clear. Otherwise, puffery would constitute a crime, which it plainly does not. The principle is especially apt for this RMBS market and these transactions because there was a lack of transparency in pricing in the market, sought by and supported by all participants in the market (like Marks), and as the government knows from its investigation, it was not David alone who admittedly misrepresented price information during negotiations. It was a market "rife with misrepresentations" that expected voluntarily conveyed, unverifiable information to be self-serving, misleading, inaccurate, imprecise, and false. *Shapiro* Tr. at 2993-2994.

<p style="text-align:center">*       *       *</p>

In short, the mix of information underlying the decision in this case (*not the negotiations toward that decision*) is what must be significantly altered as a matter of law. That is not consistent with the government's theory and the government has chosen to proceed in a legally unsupportable manner because it cannot prove (as discussed in Point I) that the decision to buy or sell was materially affected by the misrepresentations in this case.

2. *The impact of the misrepresentation was too small.*

Even if true representations about price had been disclosed and even if the investor-fund could have obtained the bond for a price closer to the true pricing information, the gap was too small to be material as a matter of law to any one shareholder-investor. As the Second Circuit observed in *Feinman,* the impact of even $4 per trade (on trades valued at a fraction of the RMBS transactions) was not legally significant enough to be material. Here, the relative impact was far less than pennies on the dollar.

The government makes two speculative assumptions that are clearly wrong: *first*, that the investor-fund would have paid what the dealer paid – ridiculous speculation with no basis in fact, [redacted][18] and *second*, that the "victim" affected by the allegedly higher pricing was solely the investment firm as opposed to a universe that included that firm's investors – again, as mentioned, a view that ignores the totality of the victim universe *the government* created.

As to the first assumption, [redacted]. As discussed earlier, other investors in the market sounded the same note: that it was far from certain that the truth would have prompted a harder negotiating stance because the key for them is obtaining a potentially profitable bond within the

---

18 [redacted]

price range established by their models and independent analyses. See *e.g. Litvak* Tr. at 524-525. To risk losing a well-priced bond in this period (a period when the market was fundamentally cheap with historic returns for these very funds) in an effort to extract every penny was something that these investors sought to avoid.

Wholly apart from a dealer in RMBS not having a fiduciary duty to his counterparty, counterparties (like Putnam and QVT, alleged victims in the Shapiro and Litvak cases, respectively) did not view best execution as a policy that required them to get the best price they could. █████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

As to the second assumption: even assuming that the full extent of the gap between (i) where the dealer's purchase price truly started, and (ii) where he represented it started, accrued to the investor-fund (as mentioned, both speculative and absurd), the investor-fund was not the *total entity* affected. Instead, the investor-fund was a fund composed of assets in which there were thousands (and possibly millions) of individual investors. While we submit that no one was harmed (*i.e.*, the fund and its investors handsomely profited from these distressed transactions), even under the government's theory, the impact of any harm was so diffuse as to be unquantifiable and must therefore be immaterial.

This concept is not our invention: it was stated by the United States Attorney and Court in Litvak's sentencing and by the government itself in its closing argument in *Shapiro*. In all

three instances, it was clear that the Court and government considered the party most harmed by Litvak's conduct to be the investor in the fund that was negotiating for and which purchased the bond – not just the fund itself: "That $6.3 million came out of pension funds. It came out of municipal pension funds. It came out of firefighter's, police officer's, teacher's pension funds. That's where the money came from. It came from charitable endowments."[19] *Litvak* Sentencing Tr. at 102.

In this context, the impact is miniscule. Take for example Ellington. Today, the largest investor in that fund is Fidelity's Real Estate Income Fund, which has a 3.55% stake with a market value of $18.87 million and presumably tens of thousands of investors. "Ellington Financial LLC (EFC)," *Yahoo Finance* at https://finance.yahoo.com/quote/EFC/holders?ltr=1. It is a $5.5 billion fund and its investment in Ellington is around one-third of 1% of its holdings. "Fidelity Real Estate Income Fund," *Fidelity* at https://fundresearch.fidelity.com/mutual-funds/summary/316389865. That tiny percentage is then shared across a huge number of investors. This is a matter of public record. So is the stake of Ellington's largest institutional investor, Wellington. It has $1 trillion under management, owns 14% of Ellington Financial, which accounts for 0.2% of its funds' assets across over 2,150 clients, who themselves have countless investors none of whom were involved in the fund's decision to invest, much less the negotiations that led to that decision.[20] Ellington Financial LLC (EFC), *Yahoo Finance* at

---

[19]     Although this was made clear in other cases, no defendant (to our knowledge) has pointed out (as we do below) that the impact of any loss must be spread out among the total number of victims.

[20]     The brochure of Wellington, Ellington's largest institutional investor today, notes: "We serve an extremely diverse mix of investors located in over 55 countries. Our clients include defined benefit and defined contribution plans, financial intermediaries, wealth managers, endowments, foundations, insurance companies, central banks and sovereign institutions, and private investment offices."

https://finance.yahoo.com/quote/EFC/holders?ltr=1; "About Us: Facts and Figures," *Wellington Management Company* at https://www.wellington.com/en/facts-and-figures.

Under any definition (and clearly the Circuit's in *Feinman*), that is immaterial as a matter of law.[21]

## POINT THREE
## APPLICATION OF THE SECURITIES FRAUD STATUTE HERE
## IS UNCONSTITUTIONAL

The Constitution requires that a statute provide ample notice of the conduct it prohibits. Where it does not do that – where it leaves an individual to guess whether his conduct is within the statute's ambit or where it encourages arbitrary enforcement – it is unconstitutional as applied. As the Supreme Court made clear in *Kolender v. Lawson*, 461 U.S. 352, 357 (1983), to satisfy the Fifth Amendment's due process requirements, a penal statute must:

> Define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.

The Second Circuit's formulation is equally clear:

> When the challenge is vagueness as-applied, there is a two-part test: a court must first determine whether the statute give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provide[s] explicit standards for those who apply it...[O]ne whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness.

---

[21] The Circuit denied the applicability of the *de minimis* holding in *Feinman* to the circumstances in *Litvak* but to our knowledge, no one argued that the true affected party is not solely the investment fund but its investors (a universe for which the government argued months ago). As the Court in *Feinman* stated, competition is the way to cure these marginal behaviors and here the same is true: the allegedly victimized investor-funds can bid with whomever they want. Because the investor-fund's focus is the all-in price (that is the price on the settlement documents; that is the price by which they model these securities), that price is known and there is no question that they can compete for a better price in the market with that knowledge.

*United States v. Nadi*, 996 F.2d 548, 550 (2d. Cir. 1993) (internal citations and quotations omitted).

As we show below, even today, market participants are left to guess where the line is drawn.

## A. Lack of Notice

These general principles have prompted two noteworthy unconstitutional-as-applied dismissals.

In a decision based on a factual scenario remarkably close to what we have here, a court found a criminal statute prohibiting manipulation to be unconstitutional-as-applied because the term "artificial price" had never been defined and was too uncertain. *United States v. Radley*, 659 F.Supp.2d 803 (S.D. Tex. 2009). In language that could just as easily be applied to David, the Court observed that:

> [M]ost of the government's arguments regarding price artificiality center on the implications created by reference to deception and questionable motives. While these implications can be used to impeach a party's credibility, the actions which support the implications are not actually illegal. While they could be capitalized on in front of a jury, they do not support an indictment, which must plead unquestionably criminal acts.

*United States v. Saathoff*, 708 F.Supp.2d 1020, 1034 (S.D.Cal., 2010), sounded the same theme. There, municipal officials, who were also members of the city's pension fund board of directors or held positions as the administrator or general counsel for the city pension fund, were charged with honest services mail and wire fraud based on their alleged failure to disclose conflicts of interest while voting as board members for the city's pension fund. The *Saathoff* Court observed that:

> Because the alleged criminal acts here are so far removed from the heartland of dishonest services cases, defendants would be denied their

> Fifth and Sixth Amendment rights to fair notice should a trial be permitted and their liberty interests be jeopardized.
>
> Although the honest services statute is not unconstitutionally vague on its face according to current circuit precedent, it is vague *as applied* to these defendants....

Emphasis in original. *Saathoff* is particularly instructive because it urged special caution in applying ambiguous statutes to conduct that is outside the heartland of the law, as David's conduct is, at best, here. 708 F. Supp.2d at 1034.

Here, these principles leave no doubt that it would be unconstitutional to apply the securities fraud statute to David's conduct. At no time during the two-decade period before the *Litvak* indictment was there a single criminal action, civil action or even regulatory action to address the proper standard for disseminating pricing information in the trading of RMBS.[22] This is precisely the scenario discussed only days ago by the Seventh Circuit in *United States v. Coscia*, No. 16-3017, 2017 U.S. App. LEXIS 14508 (7th Cir. Aug. 7, 2017).

As the *Coscia* Court first pointed out, the lack of prior guidance was decisive in *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996), where the Circuit held that a defendant was not on reasonable notice because the SEC "was aware that brokerage firms were evading the substance of [the Rule]" and, knowing that, issued only one consent order (considered inadequate guidance by the court) before seeking to apply the rule to the defendant. Despite this knowledge "the Commission took no steps to advise the public that it believed the practice was questionable...."

---

[22] The recent FINRA proposal that dealer mark ups be disclosed provides another good illustration of how sophisticated this market is and how investor-funds who participate in it are not even considered by regulators to require protection because they know far more *on their own* about what significantly alters the total mix of information. *See* FINRA Regulatory Notice 17-24. Until now, these mark ups were considered so secondary to even retail investors that their disclosure in writing was not deemed necessary. Now, five years after *Litvak* was indicted, FINRA has acted and even then, only to protect non institutional investor-funds and even they are not deemed to need projection when buying securitized products!

*Id.* The Seventh Circuit noted that *Upton* was entirely unlike *Coscia*, where Congress enacted a statute that directly addressed any potential ambiguity in the law by expressly outlawing the practice in question (there, spoofing). *Coscia, supra* at *19.

If inadequate guidance was sufficient to undermine a *civil* proceeding, it necessarily undermines the more strictly construed application of a criminal statute. And *Upton* presented a scenario far better for the government than ours: there, the government began investigating the practice years before charging Upton and even established a Committee to see how to clarify the rule before Upton was charged. Despite those actions and the publicly available consent order, the defendant was still considered to be deprived of adequate notice. *Upton*, 75 F.3d at 97. And here, incredible as it may seem, the United States Attorney, the SEC and FINRA have done even less, failing to enact a rule or publicly offer a consent order with respect to an RMBS trader's pricing statements during negotiations.

This same concern struck Judge Chatigny in *Shapiro*. After hearing testimony from a government witness that nobody had been prosecuted for making misrepresentations about costs in the more than 20 years since residential mortgage-back securities began trading, Judge Chatigny stated (Tr. at 276):

> Because to me that's fundamental. If the regulators believe that an area needs to be better regulated…the way to do that is to publish regulations for comment and get feedback and give people notice, not to that is to say "Well, let's pick a couple of people and prosecute them, and then everybody will know where the line is if we win, if we win."

Judge Chatigny's admonition mirrored what the Supreme Court said, nearly 50 years ago in a case involving the materiality of proxy representations, that if the SEC thought this kind of

disclosure so important, it could "enact a rule specifically requiring the disclosure."[23] *TSC*, 426
U.S. at 463.

There was insufficient clarity in this case, as the facts and circumstances demonstrate.
The rules governing this kind of trading – especially the propriety of negotiations in this arena –
were non-existent. Indeed, even the slate of supposedly "reasonable" investors and cooperators
who testified for the government, produced none who stated (to our knowledge) that he knew
before the *Litvak* indictment that price negotiation tactics in the sale of non-agency RMBS could
be punished under the law. In fact, just the opposite.

Joel Wollman is a particularly striking illustration. Wollman is arguably the RMBS
trader who has spent the most time working with the government (he testified in all three prior
trials). Yet even he had no clue about the rules governing pricing lies in negotiations. As he put
it in the *Litvak* retrial in 2017:

> Q. Do you understand that when you are dealing with someone at
> arm's length, that they are allowed to lie to you about the price
> they paid for a bond?
> A. It depends on the situation.
> Q. How about when that person is a broker-dealer, if you are
> dealing with a broker-dealer in what you understand to be an
> arm's-length transaction, do you understand they are allowed to lie
> to you about the price they paid for a bond?
> A. *I don't know what the rules are.*

Tr. at 996-97 (emphasis added).

The testimony of Jonathan Raiff (who worked as a supervisor at Nomura and is now head

of global markets) mirrored Wollman's (Tr. at 558-569):

> Q. Mr. Raiff – you testified about a compliance session that
> occurred in February 2013. Do you recall that?
> A. I do.

---

[23]     Judge Chatigny currently has before him motions to dismiss the one conviction and the handful of counts on which the jury hung.

Q. That compliance training session followed the indictment of Jesse Litvak, right?

A. That's correct.

Q. You had never – Withdrawn. As far as you know, nobody had ever been indicted before Jesse Litvak for statements made in negotiations with QIBs about what the dealers cost was or the price at which a dealer could buy or sell a RMBS bond, correct?

A. That's correct.

Q. By the way, for how long has RMBS been traded?

A. Non-agency mortgage securities? I could be a little bit off on the year, but I'm going to say 1986 or 1987 I think were the first securitizations.

Q. And Mr. Litvak was indicted in January of 2013?

A. A few years later.

Q. A few decades later, correct?

A. A few decades later.

Q. And prior to Mr. Litvak's indictment, as far as you're aware, no regulatory agency has brought enforcement action against an individual such as Jesse Litvak for making misrepresentations about his cost or about where he could sell a bond in negotiations with sophisticated QIB counterparties?

A. That's to my knowledge correct.

Q. So from 1986 or '87 until the indictment of Jesse Litvak in 2013, no enforcement action by a regulatory agency or criminal charges for the conduct at issue in the Litvak indictment, correct?

A. To my knowledge, no.

Q. If there were no enforcement actions or criminal actions relating to the conduct at issue in the Litvak case prior to Litvak's indictment, during the 30 years in which RMBS was traded prior to the Litvak indictment, Nomura would not have held a compliance session to talk about such developments, correct?

A. I think that's correct.

These witnesses were echoed by other witnesses in *Shapiro*, when former trader Chao (another witness called by the government) testified that the *Litvak* indictment was "shocking" – a development that was the first signal that the practices in question might be a crime. Putnam's Harrison said the same (*Shapiro* Tr. at 1219):

A. There could be other situations where [lying] it would be acceptable.

Q. Can you explain to me another situation where it would be acceptable?

A. There could be a situation which I was employing a trading strategy, or considering a trading strategy and if someone in the marketplace asked me if I was conducted certain sales or attempting certain sales or purchases, I may be left with a choice of lying to that person if I thought it was in the best interest of protecting my client's interests.

Q. So you might do that if it's protecting your client's interest, you might say something that's not true, correct?

A. Yes.

Indeed, after the verdict in the first trial of *Litvak* (where Litvak was convicted of all counts), the United States Attorney stated that:

> Victim investors included pension funds for teachers, firefighters, police offers, and other state or municipal employees, as well as taxpayer-provided bailout funds that helped our nation to recover from the 2008 financial meltdown. *This sentence serves as a warning bell to those who risk engaging in such corrupt practices.* We hope that this prosecution will act as a forceful disincentive to market participants tempted to commit securities fraud.

https://www.justice.gov/usao-ct/pr/former-rmbs-trader-sentenced-prison (emphasis added). In so stating, the government conveyed to the market that the *Litvak* prosecution was a wake-up call that the conduct in question *was a crime* – that those who thought otherwise were now on notice. As the United States Attorney's press release continued: "'Today's sentencing sends a clear message that lying in the already opaque markets of mortgage backed securities to drive up prices for the sake of profits is a crime that will result in years in federal prison,' said Christy Romero, Special Inspector General for TARP (SIGTARP)."

If the Litvak convictions and sentence were a "warning bell," that bell was rung *18-23 months after* David's trades (and query whether the Circuit reversal then unrung that bell). This statement is tantamount to a government admission that the state of the industry radically

changed only after the *Litvak* prosecution and it cannot obscure the fact that its star witnesses are *still* unable to discern precisely how – an inability only made worse by the fact that only two out of 37 charges in the *Litvak* retrial and *Shapiro* produced convictions and those two should be reversed. It is also significant that even after *Litvak,* two highly experienced law firms could not determine whether transactions like these violated the law, another fact suggesting how unfair it is to apply the securities fraud to this kind of conduct. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

Even in the course of these prosecutions, the government exacerbated the ambiguity surrounding the application of the securities fraud statute to RMBS trading.

*First*, it did so when it objected in *Shapiro* to the defendants' use of regulatory violations committed by a government witness (Harrison of Putnam) to impeach that witness. ████

████████████████████████████████████████

████████████████████████████████████████ As the prosecution indicated, Harrison's violation of the rules was not like the defendants in *Shapiro* because he was not a broker; he simply bought for the investor-fund – as if that distinction could somehow explain why his conduct was not "criminal" and theirs was.

*Second*, the government contributed to the lack of clarity in this area by how it resolved various cases involving precisely the same kinds of misrepresentations.[24] The number of SEC and FINRA settlements, spanning a wide swath of the dealer segment, make two things clear: (i) they dramatized the arbitrariness with which David has been treated (as several civilly resolved cases involved alleged losses greater than those alleged against David, with the only distinguishing feature being that the matters that settled without criminal charges had no connection to Connecticut); and (ii) they demonstrated by their volume that the use of false pricing information was the rule, not the exception.

Indeed, the best proof of how constitutionally defective the application of the securities law to David may come from the Seventh Circuit's decision in *Weimert*. Even today, because of *Weimert,* the industry cannot know in advance which of its negotiating tactics are criminal and which are not. As the Seventh Circuit cautioned in *Weimert* (819 F.3d at 358): "We know of no other case in which a court has found that deceptive statements about negotiating positions amounted to a scheme to defraud under the mail or wire fraud statutes."

The Seventh Circuit drew a sharp line between negotiations and decisions to buy, and there is no reason to think that a dealer should know today that the U.S. Attorney's offices in this country would seek to cross that line and blur the distinction in the process. As mentioned, while Connecticut appears to think all lies are crimes, that is not the law and where a lie about price

---

[24] *See, e.g.,* Complaint, *SEC v. Kee Chan,* Exchange Act Release No. 23848, 2017 WL 2062861 (S.D.N.Y. May 15, 2017); Complaint, *SEC v. James H. Im,* 2017 WL 2062863 (S.D.N.Y. May 15, 2017); Order Instituting Proceedings, *In the Matter of Nicholas M. Bonacci,* Exchange Act Release No. 78932, 2016 WL 5369311 (Sept. 26, 2016); Order Instituting Proceedings, *In the Matter of Edwin K. Chin,* Exchange Act Release No. 78585, 2016 WL 4363882 (Aug. 16, 2016); FINRA Letter of Acceptance, Waiver and Consent, Kevin Blaney, No. 20160499622-01; SEC Administrative Proceeding, Yoon Seok Lee and David Wong, File No. 3-17953; 3-17954; 3-17955, Exchange Act Release No. 80562 (May 1, 2017).

occurs in negotiations (as opposed to a lie about the product that is being purchased or how that product will be used), notice is lacking.

*Third*, had the signs been clear before the prosecution, surely prophylactic instructions already would have been in place inside the dealer firms in this industry. The entire industry quite reasonably accepted that misrepresentations were the norm and at David's employer Cantor, no meaningful critique or criticism was leveled at David despite the trades he conducted and the way he conducted them. To the contrary, he was lauded for his work. It was only after the *Litvak* indictment (as the United States Attorney pointed out), that dealers in David's position (including David) were notified that price misrepresentations could be considered a crime.

The response of these institutions to *Litvak* is unmistakably telling. For example:





The facts of this case are now often discussed in industry compliance trainings – as the government itself made clear. *See* Robert Gearty & Chris Dolmetsch, *Nomura Warned Against Lying After Jefferies Trader Charged*, Bloomberg News (Apr. 6, 2016, 10:33 PM) (reporting on statements by government at hearing).[26]   Yet even here – in the wake of the verdicts and testimony – it is arguably less clear than ever.

Finally, the government tries to remedy this fatal defect in two ways, claiming everyone knows a lie violates the law and/or by citing the manuals from the institutions where these dealers worked. But lying is not a crime as every judge associated with these cases has made clear. The prosecutors try to ignore this, claiming repeatedly – even in trial – that lying is the

---

[25]    This point was made by Litvak's counsel in their Sentencing Memorandum. Some of the other points in this brief were initially made by counsel in *Litvak* and *Shapiro* as well.

[26]


The jurors' questions reflect a widely shared view crystallized more recently in a New York Times article on August 4, 2017 titled "A Lie Might Not Always Be a Crime," by Peter Henning.

crime and everyone knows that one cannot lie. But Judge Hall took issue with that statement and that statement violated Judge Chatigny's explicit instructions as well. *Shapiro* Tr. at 2989. As Judge Hall said: if the government were right, we all would be in jail (herself included) because lying is only a crime when material. *Litvak* Appeal J.A. Vol II at 789.

Relying on manuals is no better. These manuals at best admonished that misrepresentations be avoided but did not declare which misrepresentations or when a misrepresentation would violate the criminal law or the equally unclear securities laws that were written long before this market even existed. They simply discouraged dishonesty in dealings with the outside world but said nothing about the materiality of these pricing statements under the securities fraud law.

### B. Arbitrary Enforcement

The above proof of lack of notice alone demonstrates that the securities fraud statute would be unconstitutional-as-applied here. But there is an additional circumstance, recognized by case law, that further proves the unconstitutionality of applying the securities fraud statute to David: its ambiguity has invited arbitrary enforcement.

The history of David's prosecution is a textbook example of arbitrary enforcement. *See Kolender*, 461 U.S. at 357. Were it not for our inability to link his prosecution to some unconstitutional motive, we would be moving to dismiss for selective prosecution. But the absence of an unconstitutional motive cannot obscure the fact that the charges brought against him are as arbitrary an exercise of power as one could imagine.

Here are the facts: David was the fifth prosecution of this kind brought in the United States. This stands true today. All five prosecutions were brought in Connecticut. Contemporaneously, a number of dealers in David's position who engaged in conduct that was

demonstrably more egregious were *not* prosecuted. Those whose matters did not have venue in Connecticut presumably were reviewed by the United States Department of Justice's Fraud Section in Washington, D.C. and/or by the United States Attorney for the Southern District of New York.

None of those other cases – none – resulted in criminal charges. The number of settlements alone is a shocking reminder of how selective Connecticut has been. The impact of the alleged misconduct settled by regulatory action (with the SEC) is unquestionably indistinguishable from David's (if not worse): two Barclays traders settled administratively without any criminal charges for trading losses that topped $15 million – a number larger than David's. SEC Administrative Proceeding of 5/1/2017.

The settlement of SEC allegations against a former employee of Goldman Sachs provides a startling illustration. The one government entity with knowledge of David's conduct and the conduct of that Goldman trader evaluated David's conduct to be *less* serious than that trader's. Yet that trader was not prosecuted and David was. In that trader's case, the settlement required disgorgement of $200,000. SEC Order of 8/16/2016 at 11.

All of this leads inescapably to one conclusion: that Connecticut has wielded its discretion in an arbitrary manner. And Connecticut's efforts to justify that arbitrariness as a resource allocation decision (that its line drawing is like one district pursuing a tax cheat that another chooses not to pursue) does not hold water. Govt. Sentencing Memo, Doc. #530 at 27. It is one thing for one district to pursue a tax cheat when another district might not do so because it chooses to spend its resources elsewhere. In that scenario, both districts have pursued tax

cheats. But it is quite another thing for there to be *no prosecutions of any RMBS actor in any other district besides Connecticut* (despite the fact that the overwhelming number of individuals charged civilly or administratively conducted their transactions outside of Connecticut), and for there to be no explanation why Main Justice or the Southern District of New York determined to conserve their substantially greater prosecutorial resources as the reason they have not acted (their interview memos, which reflect the immateriality of the misrepresentations, may present the most logical explanation). ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

In other words, it is clear that only dealers with a connection to Connecticut have been charged because *only* that office thinks these activities should be treated in the criminal justice system. And given the lack of notice to people in David's shoes (including even today, where traders cannot determine what is criminal and what is not) and the lack of action everywhere else against putative defendants at least as "culpable" (if not more so), the conclusion that Connecticut has acted arbitrarily is unavoidable.[27] This is another reflection of the

---

[27]     Even today, when Connecticut continues to pursue these cases as obvious transgressions of law, the industry is baffled where the line between legality and illegality lies: "Federal prosecutors have said the Litvak prosecution, and others like it, are making the bond market safer for ordinary investors. Traders aren't so sure. A lot of give-and-take goes into trading debt securities such as mortgage bonds and complex structured products, which tend to change hands in bespoke deals. Often, prices are whatever traders say they are. Which is why some traders are effectively going underground. You'd never believe how much information is shared these days at broker dinners," said one trader who recently retired. https://www.bloomberg.com/news/articles/2017-05-05/lies-traders-tell-new-trial-new-worry-in-mortgage-bond-circles.

unconstitutionality of applying this statute here because the statue's vagueness permits and encourages such arbitrary enforcement. [28]

### C. The Rule of Lenity

To the extent a criminal statute's reach is ambiguous, the rule of lenity requires that it be narrowly construed. *See, United States v. Bass*, 404 U.S. 336, 347 (1971) (noting that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity"); *Skilling v. United States*, 561 U.S. 358, 365 (2010) ("resist[ing] the Government's less constrained construction of [the honest services fraud statute] absent Congress' clear instruction otherwise"). Although vagueness challenges apply to both civil and criminal statutes, criminal statutes are subject to more stringent scrutiny "because the consequences of imprecision [in civil cases] are qualitatively less severe." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* 455 U.S. 489, 498-99 (1982); *see also Barenblatt v. United States*, 360 U.S. 109, 137 (1959) ("For obvious reasons, the standard of certainty required in criminal statutes is more exacting than in noncriminal statutes. This is simply because it would be unthinkable to convict a man for violating a law he could not understand").

Any ambiguity in this statute's application – even if not sufficient to justify an unconstitutional-as-applied argument – must be construed against the government. The time honored principle of lenity requires as much. *See United States v. Granderson,* 511 U.S. 39, 54 (1994) (lenity appropriate "where text, structure, and history fail to establish that the Government's position is unambiguously correct"). This rule should preclude the application of this statute to David's conduct as well.

---

[28]     It should not escape notice that blatant misrepresentations about the quality of the actual security being sold by major institutions during the financial crisis (the security being the vehicle from which the RMBS in this case came) were not deemed criminal by a single prosecutorial authority, adding further comfort to those trading RMBS during the post-crisis environment.

*     *     *

In the end, the judiciary's refusal to apply a statute to a defendant does not depend on what the government or the court thinks of the conduct. As the Supreme Court recently made clear in *McDonnell v. United States,* the defendant's receipt of extravagant gifts and large amounts of money does not "typify normal political interaction...." 136 S.Ct. 2355, 2372 (2016). The application of the statute in question is precisely what the Supreme Court condemned in *McDonnell*: a statute whose application to his conduct would leave "ordinary people [unable to] understand what conduct is prohibited" – a statute that "encourage[s] arbitrary and discriminatory enforcement." *Id.* at 2373. And, as the Supreme Court said, the Court "cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *Id.*

### POINT FOUR
### THE SERIOUSNESS OF THE PROSECUTORIAL MISCONDUCT
### IN THIS CASE REQUIRES DISMISSAL

Our final motion – to dismiss the indictment based on the breadth and seriousness of the prosecutorial misconduct in this case – provides an independent reason to dismiss.

The misconduct of the United States Attorney's Office started pre-indictment in its investigation of him, when the prosecution conducted incomplete interviews ████████████ ████████████████████████████████████████████████ The misconduct continued through the grand jury presentation, ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ The prosecution's misconduct even continued post-indictment in the failures of

the government to timely produce certain items, and then explaining their failures in ways that echoed their explanations in other RMBS cases.

Misconduct is always prejudicial but in this case, it was especially poisonous to David because of how the grand jury presentation was conducted.

In the end, the government's approach to David cannot be reconciled with the words highlighted on the Department of Justice's website: "to enforce the law and defend the interests of the United States according to the law … and to ensure *fair* and *impartial* administration of justice for all Americans." This is that rare case that violates the legendary principle authored by the legendary Justice Robert Jackson in "The Federal Prosecutor":

> The prosecutor has more control over life, liberty, and reputation, than any other person in America…. The qualities of a good prosecutor are as elusive and as impossible to define as those which mark a gentleman. And those who need to be told would not understand it anyway. A sensitiveness to fair play and sportsmanship is perhaps the best protection against the abuse of power, and the citizen's safety lies in the prosecutor who tempers zeal with human kindness, *who seeks truth and not victims*, who serves the law and not factional purposes, and who approaches his task with humility.

24 *J. Am. Judicature Soc'y* 18 (1940) (Address delivered at the Second Annual Conference of United States Attorneys, April 1, 1940) (emphasis added).

*A.  The Law*

We understand that prosecutorial misconduct is typically rejected as a ground to dismiss an indictment.  But where the misconduct is so broad and serious, courts will act.  An indictment may be dismissed for prejudice when a prosecutor misleads or misinforms the jury or when the misconduct is "so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process." *United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990) (quoting *Bank of N.S. v. United States*, 487 U.S. 250, 259).

Our case is similar to *United States v. Hogan*, 712 F.2d 757, 759 (2d Cir. 1983), where the Circuit's ruling led to the dismissal of an indictment post-trial because the prosecutor presented extensive hearsay and double hearsay before the grand jury.  The court explained that:

> A prosecutor may not make statements or argue in manner calculated to inflame the grand jury unfairly against an accused. . . .Taking advantage of his special position of trust, the AUSA impaired the grand jury's integrity as an independent body. Thus, based on the particular facts of this case, we believe that the indictment below must be dismissed....

The prosecution's behavior in the grand jury was part of a larger mosaic of misconduct that fatally tainted this case.

*B.  The Misconduct*

As mentioned, the misconduct in this case is significant and repeated, and reflects an approach that cannot be adequately remedied without the serious sanction of dismissal with prejudice.

    1.  <u>Before the grand jury was convened:</u>





2. <u>In the grand jury</u>:

The prosecution's misconduct continued in the grand jury presentation in three notable

areas. ██████████████████████████████████████████████████████████████



████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████



[29]      To be clear, we are not accusing the prosecution of intentionally subverting the law. The government's motivation is irrelevant where the grand jury process has been so dramatically affected.

86









ii. 



iii.

The truth is (as the chats themselves revealed during the *Shapiro* trial ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, these investor-funds had numerous ways to find out the identity of the party on the other side of the wall and often did so. In this supposedly opaque market, they can and do ask. For example, the sole expert called in all three trials, Buck Burnaman, testified:

> Q. Do investors also talk to other market participants as part of their job?
> A. As part of their job, did you say? The sound in here is a little tough. Yes. You are in the industry. You talk to market participants. There's basically two kinds of market participants that I talk to regularly and everyone else I know did the same. The two kinds of participants are broker-dealers, they're your counterparties. Those are the people who you are trading with. The other market participants are your competitors, the people who invest in the same type of security you invest with. You talk to your competitors because it is a good source of information, because they are your competitors. Over the years, you get to know them, some of them, and you develop relationships that may be beneficial in terms of getting information.

*Litvak* Tr. at 1244-1245. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮







v.

vi.

vii. 

viii. ███████████████████████████████████████████████████

[31]



3. <u>Post-indictment</u>:

The post-indictment conduct of the prosecution was more of the same. ████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████

This inadvertently withheld grand jury transcript revealed the seriously misleading actions by the prosecution in the grand jury, catalogued above. The transcript omission is

curiously analogous to other omissions in similar cases. The same prosecutor's office claimed it inadvertently lost, and could not recreate, a number of pages of a document the defense considered significant in the *Litvak* trial – a claim that Judge Hall found difficult to believe. As Judge Hall remarked (*Litvak* Pretrial Hearing of 11/30/16 at 48):

> THE COURT: But I mean – I did take a statistics course 47 years ago, and I continue to be puzzled by chance and probability, but it is mind boggling to me that in that process you drop 18 pages in the middle, and those 18 happen to correspond to complete documents which happen to be the separation agreement. I mean, the chances of all of that happening serendipitously are like one in a million.
> THE COURT: You realize what that does? It makes me and certainly the defense, I would assume, wonder what else has been dropped that we can't explain. It just happened, Judge. Shucks. Golly gee.

Finally, even in its failure to adhere to this Court's scheduling order, the government has been less than fair. When it missed the 404(b) deadline, it belatedly declared that its evidence of other bond sales was not 404(b) but evidence of *unrelated* transactions that it considered *part* of the charges. As a legal matter, that cannot be justified (there was no conspiracy charge in this case) and this sleight of hand becomes even more egregious when one considers that the prosecution knew that the entire purpose of our seeking 404(b) notice early (to which the prosecution agreed) was to learn what, if anything, the government planned to offer concerning trades not listed in the indictment.

4. Similar conduct across other cases:

The United States Attorney's behavior in our matter continues a trend set in the other cases of this kind. In *Litvak,* as just mentioned, the United States Attorney lost critical pages, explaining that loss as accidental – an explanation that Judge Hall found incredible. Similarly, despite paying lip service to the principle that dealers and investor-funds with which they transact are on a principal-to-principal footing with no corresponding fiduciary duties, the

government compared dealers to "real estate agents" all throughout Litvak's first trial and appeal (*Litvak* J.A. at 894-896) – a blatant attempt to cause the jury to mistakenly import the fiduciary responsibilities that exist in that sector but have no place in ours.[32]

Even worse, however, was the government persistence in arguing to the jury in *Litvak* and *Shapiro* – despite repeated rulings against it – that a lie was enough to justify a conviction. The prosecutor argued to the jury in closing in Litvak's retrial – the point where the prosecution's statements are most powerful – that:

> Good morning ladies and gentlemen. Jesse Litvak worked in a sophisticated market. But what he did was simple. He lied so he could make more money. He wasn't happy with the amount of profits he was making on his RMBS bond trades. So he lied to increase those profits. That's not a negotiating tactic. That's a crime. It is called securities fraud.

Tr. at 1353.

Then in *Shapiro*, the prosecutor argued:

> So all the questions you have to answer when you go back into the jury room to deliberate, everything you need to figure out, all the questions you have to answer in this case boil down to one question: [a prosecutor colleague] gave you two, I'm going to bring it down a little further. I'm going to give you *one: Did the defendants lie to take money?"*

*Shapiro* Tr. at 2941. The prosecutor repeated this incorrect legal standard over and over again. *See id.* at 2941:23-24 ("If they lied to take people's money, that is intent, that is their intent to

---

[32]    Litvak's defense counsel pointed out in his reply brief for bail pending appeal (bail was granted on the first appeal) other errors: (i) the government's response on the single convicted count was to say that the alleged victim "deemed Mr. Litvak's misstatement 'important' in hindsight. *See* Opp. 10-11. As this Court has clarified, however, "while importance is undoubtedly a *necessary* element of materiality, importance and materiality are not synonymous." *City of Pontiac Policemen's and Firemen's Retirement System* v. *UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014)"; and (ii) while the government says it has "always acknowledged" Mr. Litvak's role as a principal in the relevant trades (Opp. 6 n.4) the government compared Mr. Litvak to a real-estate agent at the first trial; tried to do so again during oral argument in the first appeal; and ultimately was forced to concede its error before this Court. *See Litvak,* 808 F.3d at 187 n.32."

defraud people"); *id*. at 2942:5-6 ("So if they lied to take money, if your answer is yes, you know what the answers to this case are."); *id*. at 12942:10-11 ("when you lie to take money in the purchase and sale of securities, that's securities fraud").

In response, Judge Chatigny blistered the prosecution in the following words:

> With regard to willfulness, I don't know if [the prosecutor] intended to differ with me and in effect take it upon himself to overrule me on what the law provides. I don't need to assess that. But I do understand the defendants' position that this is what it seemed to be. The government is entitled to argue as it wishes, but it's not entitled to in effect contradict me on my statement of the law, particularly when, as I have explained more than once, the willfulness element of securities fraud poses a real challenge for a Court trying to instruct a jury.

*Shapiro* Tr. at 2989.

All of these actions betray a prosecution that is focused on convicting, not doing justice. How else can one explain the litany of errors? To paraphrase Judge Hall, the statistical likelihood that one of these errors could occur accidentally is low; the likelihood that all of these errors accidentally occurred in one proceeding is zero.[33]

## CONCLUSION

We are at a stage very different from when we first started this case. We now have the benefit of three prior trials, relatively new case law, and massive government generated investigative materials ███████████████████████████████████████████████████.

████████████████████████████████████████████████████████████████████

████████████

---

[33]    We believe that the indictment should be dismissed based on the totality of this misconduct, but at the very least hope the Court will require the government to release to us the entire transcript of the grand jury proceeding. There is surely good reason to question whether the government properly instructed the grand jury given the above facts *and* how the government violated Judge Chatigny's instructions in *Shapiro.*

We now know from prior trials that the government will continually claim that lying is bad and violates the criminal law and/or that such a lie is material when an investor-fund might (or at best would) have negotiated harder. But the government continues to ignore the incontrovertible consistent testimony from investor-funds that the misrepresentations do not significantly alter the mix and information by which the value of a security they bought was determined. In every instance, investor-funds reject, are trained to discount or ignore, or are at least inherently skeptical of what dealers and other market participants (like David) say about price and in every instance they received precisely what they wanted at the price they agreed to pay.

We also know that the statute under which David was charged cannot be satisfied as a matter of law because the bond's value was not impacted and/or the impact on each purported victim is too small. And we know that the statute under which David was indicted was unconstitutionally applied to him because it lacked adequate notice of the prohibited conduct and invited arbitrary enforcement.

Finally, we know now that the investigation and the grand jury presentation were impermissibly conducted at nearly every turn.

This court should not give the government a fourth opportunity to try to vindicate their theory.[34] It should be obvious to the government by now that if it wants to implement changes in this industry, lawmakers and/or regulators need to work with industry participants to produce rules that clearly provide guidance about which circumstances make pricing statements in non-agency RMBS negotiations punishable as violations of law, instead of proceeding the way they

---

[34] The one conviction in Litvak is on appeal, and Judge Chatigny is currently reviewing a motion to reverse the one conviction in Shapiro and preclude the retrial of three hung counts.

have thus far, wrecking lives in the process and leaving the market to guess – even today – what it can and cannot say in the course of negotiations.

Respectfully submitted,

DAVID DEMOS

By: _____

Jose Baez
The Baez Law Firm
40 SW 13th Street, Suite 901
Miami, FL  33130
(305) 999-5111
jose@baezlawfirm.com

George J. Leontire
The Baez Law Firm
66 N. Second Street
New Bedford, MA  02108
(855) 223-9080
george@baezlawfirm.com

Ronald S. Sullivan, Jr.
6 Everett Street
Cambridge, MA  02138
(617) 496-4777
prof.ron.sullivan@gmail.com
*Pro hac admission pending*

Peter A. Chavkin (PHV08660)
Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
Chrysler Center
666 Third Avenue
New York, NY  10017
(212) 692-6231
pchavkin@mintz.com

Patrick J. Sharkey (CT00654)
Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
One Financial Center
Boston, MA  02111
(617) 348-1819
pjsharkey@mintz.com

Stanley A. Twardy, Jr. (ct05096)
Day Pitney LLP
One Canterbury Green
201 Broad Street
Stamford, Connecticut 06901
(203) 977-7300
satwardy@daypitney.com

Daniel E. Wenner (ct27852)
Day Pitney LLP
242 Trumbull Street
Hartford, Connecticut 06103
(860) 275-0100
dwenner@daypitney.com

His Attorneys

70756041