# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:16 CR 220 (AWT) |
| | : | |
| v. | : | |
| | : | |
| DAVID S. DEMOS | : | October 13, 2017 |
| | : | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DAVID DEMOS'S GROUP II MOTIONS TO DISMISS**

The government's response ("Grp II Opp.") is notable for its failure to substantively address virtually all of the arguments we made in our Group II Memorandum ("Demos Grp II"), instead choosing to invoke boilerplate responses that essentially urge the Court to ignore our arguments. In doing so, the government ignores the extraordinary circumstances of this case – one where the government has confirmed that its theory of prosecution is similar to its theory in nearly identical cases in this district and where it has turned over to us the very evidence it has amassed purportedly in support of its charges.

## POINT I: THE CHARGES CANNOT BE PROVEN

### A. *This motion is not premature*

The government first says that our motion is premature because the government has not set forth its proof. The government appears to ignore what it has said repeatedly before.

The government has previously stated to this Court that David has seen a preview of the case against him.[1] Govt. Mem. in Opp. to Group I Motion ("Grp I Opp.") 21 fn 12. While the government claims that it merely summarized the Indictment, a more detailed read of the government's opposition to our Group I Motion provides repeated examples where the government explains the documentary and testimonial evidence that it will use. For example, the government stated:

- In opposing our Group I motions: its "testimonial evidence will be that bid list trades are similar to, and sometimes referred to by RMBS traders, as auctions ..."). Grp I Opp. 17.

- In response to the bill of particulars: "...any additional information in the government's possession about a trade, bond, or victim is equally available to the defense ... [in]

---

[1]     In response to Defendant Demos argument for a bill of particulars, the government states: "[g]iven Demos's arguments in his motion to dismiss, it appears that he clearly understands the nature of the charge against him. Moreover, as noted in his motion, in *US v. Litvak*, Demos has been given a preview of the Government's theory in a similar case." Grp I Opp. at 21 fn 12 (ECF 51).

documents collected in the course of this investigation and numerous other investigations into similar conduct at other broker-dealers." Grp I Opp. at 25.[2]

- In response to striking the word "termination": "[t]his allegation is consistent with the evidence, which the government expects will include testimony by other Cantor employees, as well as certain Cantor business records...." *Id.* at 14.

- In response to striking the reference to TARP: "[they] will prove that the RMBS market, while not widely known, is an important one, and as such, is supported by federal funds and policed by federal agencies like the Special Inspector General for the Troubled Asset Relief Program (SIGTARP) and the Securities and Exchange Commission (SEC) . . .." but that "[they have] no intention of arguing that jurors were victims of or harmed by the charged fraud, as Demos needlessly worries." *Id.* at 15-16.

- In response to striking "victims ... sustain[ed] millions of dollars of losses": "...[the documents and testimony] will show that Demos used his scheme to deprive victims of millions of dollars to which their investors were entitled. The government has the burden of proving . . . the materiality of Demos's lies...whether the misrepresented information would have been significant to an objective investor." *Id.* at 19.

- In response to striking "omit": (*id.* at 18):

> in the allegations regarding Count One, Demos is charged with having made affirmative misrepresentations to a RMBS seller (Marathon Asset Management) in electronic communications at 3:08p.m. ('hes [the buyer] barely getting to 41') and 3:19 p.m. ('ill take the risk in the middle at 42-24'). Superseding Indictment ¶¶ 24(d) & (h). But Demos also answered a question from Marathon at 3:23 p.m. which was premised on the false information he had previously provided, which then resulted in Marathon

---

[2] The government also stated that "Demos has a Superseding Indictment that lays out the alleged securities fraud scheme in detail and provides a thorough description of three of the six charged executions of the scheme, as well substantially all of the documents collected or created in the course of this and numerous other investigations." Grp I Opp. at 26.

selling its RMBS to Cantor at an artificially deflated price. *Id.* at ¶¶ 24 (i)-(k). While Demos did not lie in this last communication, he failed to correct the false information that he had previously provided and thus misled Marathon.

- In response to striking "secret" or "unearned" the government stated (*id.* at 19):

  [t]he Government's theory of the case is that Demos took it upon himself to accurately disclose his profits. He chose not to negotiate directly against his victims, but instead portray himself as a middleman who was passing RMBS through to his victims at Cantor's price plus a small agreed-upon commission. By lying about Cantor's price, he is alleged to have inflated victims' purchase prices and deflated their sale prices, all so Cantor (and he) could take more money from his unwitting victims.

- In response to striking that "[t]he Buyer was not 'barely getting to 41' and DEMOS did not 'take the risk in the middle'" the government stated "[it] intends to offer Demos's own contemporaneous electronic communications in which he lied, Cantor's business records that reveal the truth of the matter, and testimony concerning the events of this trade." *Id.* at 20.

It also cannot escape notice that the chief government witness in David's case – an investor on which half of the six charges against David are based – has testified and been interviewed repeatedly by the government and his statements are a matter of record.[3] *See* Demos Grp II at 11-12 (ECF 73), *Shapiro* Tr. at 2288-2433, ████████████

████████████

In short, while the government claims that it has not told us or the Court the essence of its case, it has not hinted how its evidence will differ from the discovery it has provided and the way it has used those statements in prior trials and in David's grand jury. The government has given the equivalent of a "full proffer" of the essence of its case, as *United States v. Alfonso* presumably intended. 143 F.3d 772, 776–77 (2d Cir. 1998).

---

[3]     The other two victims for the charged trades have been interviewed as well, as the discovery production reflects.

*B. The evidence shows that a jury cannot convict beyond a reasonable doubt.*

Since we filed our Group II Memorandum, the government has articulated its theory of

the case in the most concrete and narrow terms it has yet offered. In its recently filed brief in the

*Litvak* appeal, the government observed:

> Litvak also misstates the Government's case when he claims "its theory has
> been that Mr. Litvak's misstatements were material because the
> counterparties would have negotiated harder if they had known the
> truth"... *While undoubtedly true, the Government did not rely on such
> evidence to prove materiality....The Government's legal theory, on the
> other hand, has been that there is a substantial likelihood that a
> reasonable RMBS investor would find misrepresented price information
> that causes it and its investors financial injury to be important in making
> an investment decision. Vilar,* 729 F.3d at 89.

Govt. Br. in *United States v. Litvak,* 17-1464 (2d Cir. Oct. 10, 2017), at 42-43 (ECF 67)

(emphasis added) (citations and footnote omitted).

By so arguing, the government will be trying David's case (as discussed, it has repeatedly

stated that the theory in *Litvak* is similar to the theory in our case) on the notion that pricing

information caused sufficient investor injury that was "important" in making an investment

decision, not the negotiation process.[4] The evidence established in the *Litvak* and *Shapiro* trials

and the discovery in our case conclusively demonstrate that this theory cannot be proven beyond

a reasonable doubt.

---

[4] The government finally appears to have conceded that the alleged misrepresentation must be material to the *investment decision*, not the negotiation process alone. In doing so, it essentially recognizes that, as Judge Chatigny charged: the misrepresentation has to materially alter the benefit of the bargain. *Shapiro* Tr. at 2648. Moreover, and in any event, there is no reason to think that negotiations would have been conducted differently (Demos Grp II at 62-63) – that they were not compelled to offer what they offered, even could have sought the bond from another dealer, cannot say that their negotiation strategy was affected or that the end price was affected. As Marks plainly conveyed to the government:

4

*First,* in so arguing, the government conflates "important" with the standard that governs materiality in every case of this kind: whether the information "significantly altered the 'total mix' of information" on which the decision was made. *See, e.g., Basic v. Levinson,* 485 U.S. 224, 231 (1988); Judge Chatigny instructions at *Shapiro* Tr. at 2647. It is *not* whether the information in question would be relevant, or might be preferred. *See United States v. Rigas,* 490 F.3d 208, 234 (2d Cir. 2007).

*Second,* the notion that pricing could significantly alter the total mix of information is provably wrong *in the market operating here.* And the "total mix" standard requires that the misrepresentation be considered *in context,* not isolation. As this Court observed: "When considering the misleading nature of a statement, the key question the court must ask is 'whether defendants' representations, taken together and in context, would have mislead a reasonable investor[.]" *In Re World Wrestling Entmt,* 180 F. Supp. 3d 157, 177 (D. Conn. 2016) (dismissing portions of civil complaint where materiality of statements could not be shown based on the *total mix of information*).[5] It is real world context, not some metaphysical possibility, which controls. *United States v. Litvak,* 808 F.3d 160, 172-73 (2d Cir. 2015).

In context, the pricing misrepresentations at issue here clearly cannot be proven material beyond a reasonable doubt. The government completely ignores the evidence we catalogued in our opening brief, saying instead that we had "cherry-picked" that catalogue without explaining how so or what the non-cherry picked evidence would say. Grp II Opp. at 3. Its failure to do so means that *if* we have not cherry-picked this evidence, the government cannot prevail.

Pricing misstatements could never significantly alter the total mix of information for a reasonable investor in the higher specialized RMBS market where the alleged victims in this case

---

[5] Although that decision addressed a civil complaint, the standard for measuring materiality is precisely the same.

touted their reliance on "models," "proprietary research and analytics" and their "disciplined and analytical approach … [to] value these assets." *See, e.g.,* Ellington Form 10K SEC Filing at 5. We will not repeat the 14 irrefutable points established in prior similar trials and the vast discovery in this case. Together, they establish that this market is populated by some of the most sophisticated hedge fund QIBs in the world that (i) make calculated transaction decisions based on mathematical analytics using verified knowable inputs; (ii) use their own independent knowledge; (ii) greet dealer pricing with professional cynicism; (iii) did these transactions because the price was in their models' range; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ outsized

returns.[6] It is indisputably *not* a market populated by buyers and sellers who allow unverified information from dealers who have no fiduciary duty to them to significantly alter the mix of information on which they decide to invest. The norms of this market leave no room for pricing information to be material. Demos Grp II Memo at 4-11.

This is not speculative – it is the voice of the victims in our case. For example, Victim 2, Ellington's Marks (Counts 4-6), admitted at trial that he knew that dealers made misrepresentations and did not expect complete candor:

> Q. And in fact, you have done transactions with dealers from time to time in which dealers will make a representation to you about their markup being at a certain level; that happens, right?
> A. Yes.

---

[6] *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮ *Shapiro* Tr. at 2341-2342. According to Bruce Richards, the founder and manager of Marathon (Counts 1 and 2) and a former MBS trader himself, investors should participate in his post-crisis Structured Products "vulture" fund because "this is one of the most significant distressed opportunities the markets have ever seen….When markets are most distressed, we should be deploying capital." www.institutionalinvestor.com/Article/1873818/hedge-funds-maraathon-men.html#

6

> Q. And there are times in which dealers have made those sorts of representations to you in cases in which you didn't believe them, and you thought they were actually making more money than they were representing to you, correct?
> A. Yes...
> Q. And that's why you learned early on that you have to depend on your knowledge of the market which relates to trades that you do which gives you price levels that you can know, correct?
> A. Yes.

*Shapiro* Tr. at 2377. Marks also told the government that his boss was "always warning him" that "people in this marketplace aren't always transparent and truthful when negotiating" and "that a dealer might want to maximize profit and shade information in their favor." *Shapiro* Tr. at 2387. ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████[7] *See*

Demos Grp II Memo at 40-41, ███████████████████████ In other words, pricing information did not change their decision to buy these bonds at the prices they paid.

Indeed, in the very chats on which the government will rely (in fact, in prior trials, the government has sought to prove certain charges solely through the chats without calling the alleged victim), ██████████████████████████████████████████████



---

[7]     This is not unique to our case: Zachary Harrison of Putnam (the most prominent victim in *Shapiro*) confirmed that having RMBS dealers lie to his face was "like an hourly occurrence" (*Shapiro* Tr. at 1174).

To paraphrase the Seventh Circuit, where price is always the subject of negotiation and the relationship of the parties is arms-length, "sophisticated businessmen" – and there is no more sophisticated businessman than a QIB – "do not expect complete candor."

Moreover, a movement of price within a pre-determined acceptable range may not even theoretically significantly alter the total mix because it reflects the movement of a single independent variable in a transaction where there are literally thousands of other more significant variables already evaluated before a counterparty approaches David, making its role at best nothing more than a metaphysical speculation (especially where, as here, the alleged victims do not recall the dynamics of the transactions). *See Litvak,* 808 F. 3d at 172-73.[8]

The government cannot avoid the power of these facts by insinuating, as it has here and in other trials, that the alleged victims had some special right to rely on David as fiduciary and a corresponding legal obligation to act in the victim's best interest. Grp II Opp. at 89-90. ■

■ The grave danger of that approach was spelled out by the Circuit in Litvak's appeal – that a jury could be led to:

> easily have misconstrued the nature of the transactions at issue, believing (mistakenly, according to [Litvak expert] Menchel) that Jefferies's profits were commissions paid for Litvak's facilitation of the transactions, rather than ordinary profits earned in a standard buyer-seller context. The nature of Litvak's relationship with the alleged victims formed the context in

---

[8]     As noted, the government's theory further assumes that it can elicit reactions to pricing information in hindsight when the alleged victims typically do not recall these transactions and are impermissibly being asked to speculate today what may have been material years ago in an entirely different context.

> which the jury had to consider whether the portfolio managers and traders
> who testified reflected the views of a reasonable investor.

*United States v. Litvak*, 808 F3d at 187. Notably, the one conviction in *Litvak* was based on a

customer who incorrectly distinguished between principal and agent trades (claiming Litvak was

his agent from whom he expected a duty). *Litvak* App. Br. at 41. Equally inappropriate is the

government's refrain that "lies" alone are obviously wrong so they must be against the law. Grp

II Opp. at 75-76.

Finally, the government has said nothing about the other element we contest other than to

call our argument premature: the absence of intent where these kinds of negotiation tactics were

accepted *industry-wide* and part of the acknowledged fabric of RMBS transactions. As the

former Chief of the SEC's Complex Financial Instruments Unit – a man who supervised *all* of

these matters while at the SEC (including David's) – stated in reference to these cases:

> These cases have had a seismic impact on the market for trading of
> complex bonds, which, despite its enormous size, *had historically flown
> under the regulatory radar*. Over the past several years, the government
> actions have acted *as a shock to the system, forcing into the daylight
> aggressive sales tactics that had become an ingrained part of market
> culture and a driver of significant profits for individual traders and their
> firms.* .... Last, and as possibly demonstrated by the Second Circuit's ruling
> on the Litvak appeal, when criminal consequences arise from *long-
> accepted marketplace conduct,* the case law may develop in a way that is
> generally unfavorable for the government.

Osnato and Kelly, *SEC's Emerging Enforcement Priorities in the Bond Markets,* Law 360 (July

18, 2017) (emphasis added) (Tab A).

and there has been testimony in the other cases that superiors

consistently approved of this conduct (*see Shapiro* Tr. at 1932, 1691) – hugely important, as the

Circuit made clear in *Litvak.* 808 F.3d at 189-90. In response, the government remains silent.

9

In short, it is clear now, pretrial, that these misrepresentations could not be material.[9]

## POINT II: THE INDICTMENT IS INSUFFICIENT AS A MATTER OF LAW

Where alleged misstatements are " 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,' a court may find the misstatements immaterial as a matter of law." *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540-41 (2d Cir. 1996). The government responds by stating that the Circuit has already ruled in *Litvak* these representations can violate the securities fraud law and that the decision in *Feinman* does not control. Both are wrong.

*First,* the Circuit ruled that *on the record before it* in the first *Litvak* trial, a securities fraud violation could be found. That record did not contain so much of the evidence developed in our discovery, in Litvak's retrial (including an expert) and in *Shapiro* (in each trial, all but one charge led to an acquittal). These subsequent facts show that no reasonable investor could consider this kind of information material in the context of *this* market, dominated by insatiable demand, price model dependence and distrust of dealer-provided pricing information. Moreover, in the *Litvak* appeal, the Circuit made clear that future challenges could be viable and even held that these very misstatements could be found immaterial as a matter of law. 808 F.3d at 175.

*Second,* the government concedes that a *Feinman*-like situation would be immaterial as a matter of law. Grp II Opp. at 6. And while our case involves RMBS trades, not retail stock trades, it fits *Feinman* perfectly. The undisclosed component of the trades made by ordinary equity investors in *Feinman* (the purported amount of the total that went to "costs") did not

---

[9]     Although perhaps not determinative. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10

change the overall price paid by the customer. It went to the representor's profit and was "not a material misrepresentation." *Feinman v. Dean Witter,* 84 F.3d 539, 542 (2d Cir. 1996).

Moreover, the Circuit's suggestion that *Feinman* could be cured by competition is equally applicable here: no one commanded any alleged victim to deal with David. He was just one of a number of possible outlets for the RMBS, so competition could cure any issues here as well, ████████████████████████████████████████████████████████

Finally, in *Feinman*, the amount of hidden costs was considered too small to be material as a matter of law and the same is true here. Relatively speaking, the misrepresented costs in *Feinman* were a far larger proportion of the total cost paid by the alleged victim than is true here. Moreover, in our case, when the purported injury is spread among all potential victims (*i.e.,* a huge universe of investors in the funds with which the trade was made and who the government references whenever it can), the impact is miniscule. In fact, the circumstances of an RMBS trade are even more favorable than those in *Feinman*, because the broker commissions paid by retail investors are capped while the profits of principal traders in RMBS, like David, are not.

## POINT III: THE INDICTMENT IS UNCONSTITUTIONAL AS APPLIED

There is no apparent issue over the controlling law. The government's response essentially states, instead, that no one could be confused about the terms of the securities laws because they expressly prohibit deceit. Grp II Opp. at 8. But the government's argument that the words of the securities statute are understandable misses the mark: our argument is that the *application of those words* to our facts could not be known in advance.[10] Even today, after the *Litvak* and *Shapiro* cases, no reasonable person in this industry can be confident where the line

---

[10]     We hope the Court will consider that lack of clarity in this area is further demonstrated by the jury verdicts: 35 out of 37 counts in *Litvak* and *Shapiro* resulted in not guilty or hung verdicts.

11

will be drawn concerning negotiation conduct, as we pointed out in our main brief. Demos Grp II at 76-78.

As background, it is critical to remember that 10b-5 (the basis for these charges) was not designed for sophisticated investors like the alleged QIB victims in this case; the Act:

> was conceived with the *stock market* in mind and was 'designed to protect investors against manipulation of stock prices.'…The RMBS market developed four decades after Section 10(b) was enacted … [and is] dominated by … QIBS. A QIB is, among other things, an entity that 'in the aggregate owns and invest on a discretionary basis at least $100 million in securities of [unaffiliated] issuers…Such entities are, in the words of Congress, 'sophisticated investors capable of protecting themselves… [and have] very little in common with the ordinary investor in the stock market….

*United States v. Litvak,* 17-1464 (2d Cir. Aug. 24, 2017) at 39, ECF 51 (emphasis added). So the notion propounded by the government – that the securities laws must be agile enough to deal with unanticipated frauds – is misleading. And agility is not license to create new rules whenever the prosecution wishes. This is especially apt where neither the SEC nor the individual investor funds has required that profits be limited or even disclosed in these trades. To the contrary, the participants in this RMBS marketplace have acknowledged in testimony and by their behavior over decades that they are all trying to maximize their profits, in arms-length transactions, at their counterparts' expense. *See, e.g.,* Confirmation of Transactions, Securities Exchange Release No. 33743, 56 S.E.C. Docket 558, at 3 (Mar. 9, 1994) ("[c]ommentators argued against adoption of mark-up disclosure for riskless principal debt" because, among other reasons, *"the amount of a mark-up was not material to investors"*).

Nor should it escape notice that government-called witnesses testified under oath that they were unaware that the securities fraud rules applied to negotiations in this area of trading – raising even more serious questions (including by Judge Chatigny) about the propriety of

regulating through prosecution. *See Shapiro* Tr. at 276. Thus, it comes as little surprise that the former chief of the SEC's Complex Financial Instruments Unit, who supervised these cases made clear that the efforts of U.S. Attorneys to get out in front of the SEC, instead of waiting for the SEC to develop the field, "has led to criminal investigations that begin before evidence of serious misconduct has surfaced....[T]he race to commence investigations has acted to undermine the traditional role of the SEC in bringing its regulatory expertise to bear on complex market practices." Osnato and Kelly, *SEC's Emerging Enforcement Priorities in the Bond Markets,* Law 360 (July 18, 2017) (emphasis added) (Tab A). Treasury's recent critique of CFPB actions against banks in the wake of the financial crisis) sounds a similar note.[11]

In short, there were literally no actions, administrative or other, or even investigations of conduct like the conduct charged here before it was prosecuted (an extremely important fact in the Second Circuit's opinion in *Upton,* as the Seventh Circuit recently noted); the case law on negotiations has forcefully and recently held that misrepresentations that do not affect the value of the item purchased are not criminal (*see* Demos Grp II at 57-62); every investment bank was caught unaware as they implemented corrective programs only after Litvak's indictment (*See* Grp. II Memo at 74-75); and one government witness after another testified he was unaware that the securities laws applied to these RMBS negotiations at the time (a fact that struck Judge Chatigny). *See Shapiro* Tr. at 2993-2994.

---

[11] Treasury observed that "Excessive reliance on enforcement actions … [is a] practice [that] forecloses the opportunity for public comment and deprives regulated parties of fair notice concerning the rules to which they must conform their conduct. The CFPB has brought a range of enforcement actions that allege violations of law for practices that are common among financial services providers and that had not previously raised concerns among other regulators. The CFPB brings such actions despite not having promulgated rules banning the targeted practice or issued guidance that it considered the practice contrary to law..." *A Financial System That Creates Economic Opportunities for Banks and Credit Unions.* www.treasury.gov/press-center/press-releases/Documents/A%20Financial%20System.pdf (82)

In these circumstances, a person in David's shoes would not know that his conduct violated the law where (as discussed above) he worked in an industry that encouraged the activity in question and in which sophisticated counterparties were cynical about dealer-provided pricing information and counterparties were not obliged to discern dealer profits and did not factor those profits into their modeling, and actively worked to preclude rules that would have required disclosure of mark-ups. All of this was essentially ignored by the government.

Finally, the government's response to the record of arbitrary enforcement (a factor that underscores the unconstitutionality of applying these laws here) is to say that finite resources explain why Connecticut has brought these cases. But that is no answer to the fact that Connecticut is the *only* jurisdiction to prosecute these cases and Main Justice and the Southern District of New York (historically far more experienced and prolific on matters of securities fraud) ████████████████████████████████████████████████

████████████████████████████████ This is not a matter where other districts have acted previously and chosen not to act now; they have chosen not to act at all. Connecticut is the only district in the nation to apply the securities laws to this highly specialized, previously unguided sector.[12]

---

[12]     The government took a similarly dismissive approach to the two precedents we cited where dismissals were granted, claiming that those cases did not address the securities provisions charged here. But that is no answer: though *Saathoff* involved the much criticized honest services provision in §1346, the court there assumed – as the government appears to argue here – that the words of that statute requiring public officials to perform their services honestly is a "reasonable, if not obvious, legal requirement." In *Saathoff*, the politician-defendant's alleged conflict of interest was not only well known but, more importantly, accepted by certain local and state authorities. The point there and here is whether an ordinary citizen could know that *the words of a criminal statute would apply to his conduct.* Where negotiating tactics like the ones for which David has been charged have been known and accepted for decades as a natural part of the landscape in the sophisticated context described earlier and dealers and their even more sophisticated QIB counterparties were at arms-length, understanding that each was focused on maximizing his profits (not his counterparty's) and cynical of each other, dealers like David could not have known that they would be criminalized.

14

In short, it was not at all clear that the securities laws prohibit this conduct, implicating the Due Process Clause. There is more than reasonable doubt that the criminal law attaches to misrepresentations in negotiations in this market that relate to information a recipient might like or, in hindsight, might consider relevant where that information does not affect the value of the item being transacted. ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████ Of course, it is not and never has been.

## POINT IV: SYSTEMATIC ERRORS FATALLY INFECTED THIS CASE

The government's primary response to our challenge to its grand jury errors is to say, in essence, that we have misrepresented what they did, that they are not obliged to exhaust all investigative techniques or offer exculpatory evidence, that courts rarely can exercise supervisory authority over the investigative/grand jury process, and that the government is not required to summarize its trial proof. Grp II Opp. at 16-18. But these are not our arguments.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████ And while not precisely the facts of *United States v. Hogan*, 712 F.2d 757, 759 (2d

---

[13]     In the one instance the government cited, our brief mistakenly offered an incomplete quote that contained an additional line. We have had the facts rechecked and filed a corrected brief, and none of the changes affect a single argument made in our brief.

Cir. 1983) (a case we relied on that the government did not even mention), the totality of the errors here invites its application. [14]

We hope the Court will review the entire grand jury transcript (including the final instructions that the government implied cured any potential problem) and the government interview memoranda we have cited in full. Although the government claims that we have misrepresented the facts in our opening brief, the government does not say how except with respect to a particular quote (a quote that was inaccurate but its inaccuracy did not affect our point). We believe that a review of these materials will confirm that the grand jury presentation was unacceptably skewed.



*First,*

*Second,*

*Third,*

---

[14] As a threshold matter, we want to emphasize something we said in our opening brief: we are not challenging the integrity or intent of any prosecutor or the office that has brought this case. Instead, our point is that the cumulative effect of the errors we believe were made tainted the grand jury presentation to such an extent that dismissal is necessary.

*Fourth,* as noted, the government does not respond to any of the grand jury errors we pointed out other than ██████████████████████████ We assume that is because they cannot effectively answer them. ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████



*See also*

*at Tab C.*

---
15

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████ Again, it does not matter whether the government intended to err – it is

the impact of those errors that matters.

*Fifth,* ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███

*Sixth,* ████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████ when the Second Circuit had ruled in

Litvak's appeal that charges based on deceiving those government investors could not stand.

*United States v. Litvak*, 808 F3d at 172-174. ████████████████████████████████

*Seventh,* ████████████████████████████████████████████████

████████████████ As Judge Chatigny put it: "you must assess whether a false statement was material in light of the norms and practices in the non-agency RMBS market *that existed at the time of the transaction,* and not based on hindsight." *Shapiro* Tr. at 2648-2649 (emphasis added).

If we are wrong in our characterizations (as the government suggests without once saying how), then our misconduct point is wrong and should be rejected. But if we are right, then we suggest that the government has not acted as its own manuals require: that "[t]he prosecutor must recognize that the grand jury is an independent body, whose functions include not only the investigation of crime and the initiation of criminal prosecution but also the protection of the citizenry from unfounded criminal charges...." www.justice.gov/usam/usam-9-11000-grand-jury. Though not legally binding, these manuals help indicate the seriousness of the errors here.

In the end, the cumulative effect of the government's actions ████████████████

## CONCLUSION

For the above reasons, as well as the many more discussed in our opening brief, we respectfully request that this indictment be dismissed.

Respectfully submitted,

DAVID DEMOS

By: _Peter Ch_____

Jose Baez
The Baez Law Firm
40 SW 13th Street, Suite 901
Miami, FL 33130
(305) 999-5111
jose@baezlawfirm.com

George J. Leontire
The Baez Law Firm
66 N. Second Street
New Bedford, MA 02108
(855) 223-9080
george@baezlawfirm.com

Ronald S. Sullivan, Jr.
6 Everett Street
Cambridge, MA 02138
(617) 496-4777
prof.ron.sullivan@gmail.com

Peter A. Chavkin (PHV08660)
Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
666 Third Avenue
New York, NY 10017
(212) 692-6231
pchavkin@mintz.com

Patrick J. Sharkey (CT00654)
Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
Boston, MA 02111
(617) 348-1819
pjsharkey@mintz.com

Michael L. Chambers, Jr. (ct28580)
100 Wells Street, Suite 2C
Hartford, Connecticut 06103
(860) 231-9535
chamberslegalservices@gmail.com

His Attorneys