## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:16-CR-220 (AWT) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID DEMOS, | : | |
| | : | |
| Defendant. | : | December 11, 2017 |

## MEMORANDUM OF LAW IN SUPPORT OF DAVID DEMOS'S MOTION FOR PRE- TRIAL RETURN OF DOCUMENTS UNDER RULE 17(c)(l)

Defendant David Demos respectfully submits this memorandum in support of his motion requesting the Court to issue a subpoena to Cantor Fitzgerald, L.P. ("Cantor"), under Federal Rule of Criminal Procedure 17(c)(l) for the pre-trial production of documents in Cantor's control. A copy of the subpoena is attached as Exhibit A to the motion.

### I.       The Standard For Evaluating Rule 17(c) Subpoenas

The Supreme Court in *Nixon* established a four-part test for evaluating Rule 17 subpoenas: (1) the records must be evidentiary and relevant; (2) the records must be not otherwise reasonably procurable in advance of trial; (3) reasonable trial preparation requires that the records be produced in advance to avoid delay; and (4) the records must be sought in good faith, not as a fishing expedition. This standard has been the subject of discussion by several courts in this Circuit, prompting those courts to suggest that for subpoenas issued to non-governmental parties, the test should be simpler: whether the sought material is material to the defense and not unduly oppressive to the producing party.[1]

---

[1]       In *United States v. Nixon,* 418 U.S. 683, 699-700 (1974), the Supreme Court noted that the *Bowman Dairy* ruling might not apply to a subpoena issued to third-party custodian witnesses, leaving that question open. *Nixon,* 418 U.S. at 699, n.12. These district judges (including Judges Shira Scheindlin, Lewis Kaplan and Richard

Under either standard, the subpoena for Cantor is appropriate. Like the subpoenas issued in the comparable cases of *United States v. Litvak,* 3:13-cr-19 (JCH) and *United States v. Shapiro,* 3:15-cr-155 (RNC) and approved by Chief Judge Janet Hall and Judge Robert Chatigny, the Cantor subpoena targets information which we have good faith to believe exists based on Cantor's FINRA obligations and our client's history at Cantor.[2]

## II.    Factual Background

As was set forth in greater detail in the Memorandum of Law in support of Defendant Demo's Group I motions, David Demos worked at Cantor for the entire period that is the focus of this indictment (late 2011 to early 2013). David traded subordinate or mezzanine Residential Mortgage Backed Securities ("RMBS") bonds, with highly specialized and extremely risk tolerant investors, in a highly specialized and speculative market where the "reasonable investor" (an objective standard for judging materiality of the misrepresentation — a required element of securities fraud) is always skeptical of statements related to price.[3]

David is charged with providing certain pricing misinformation during negotiations, for transactions at arm's-length. However, that information was not material: in every trade, the counterparties bought or sold the exact bond at exactly the agreed-upon price, which was within a range of prices determined by the counterparties based on their sophisticated

---

Holwell) have questioned whether the *Nixon* standard makes any sense when the party receiving the subpoena is not the government because a primary reason to restrict Rule 17 subpoenas is the concern that they not be used to swallow Rule 16's carefully crafted limitations on what the defense may seek *from the government.*

[2]    The subpoenas in *Litvak* and *Shapiro* targeted counterparty information that addressed the lack of materiality of the alleged misrepresentations - a subject on which our next subpoenas will focus. The current subpoena to Cantor Fitzgerald targets evidence from David's employer that addresses both intent and materiality.

[3]    As Chief Judge Hall instructed in *Litvak:* "The securities fraud statute does not, however, prohibit misstatements or omissions that would be minor, trivial or unimportant to a reasonable investor....[A] false statement cannot be material if it constitutes mere puffing or sales talk that would not in the view of a ... reasonable investor significantly alter the total mix of information available in making an investment decision." Tr. 1498-99.

proprietary modeling and their analysis of mountains of data they were willing to pay. Therefore, it was a price that clearly met the counterparty hedge fund's investment parameters and value/pricing objectives at the time of the trade.

The indictment does not allege that David misrepresented any aspect of the bond itself like the attributes of its collateral, the total price the investor was paying, or the data the investor would feed into its analytical models to evaluate the future yields and profits reasonably anticipated by the owner of these specialized bonds under various conditions. *In other words, everything related to the inherent value of the bonds in question was expressed with 100% accuracy.* All material data points were accurately conveyed.

Instead, the essence of this indictment is that David, while negotiating the purchase or sale, allegedly provided arm's-length counterparties with inaccurate pricing information. This kind of information is often misrepresented in RMBS transactions and counterparties who often misrepresent that or comparable information themselves typically regard it with serious skepticism. And David allegedly did so with counterparties who (i) were extremely sophisticated multi-billion dollar hedge funds (each was a qualified institutional buyer under Rule 501 of the SEC's Regulation D); (ii) had highly complex modeling that statistically analyzed hundreds of objective variables; (iii) apparently did little or nothing to independently verify the pricing information David mentioned; (iv) knew that their interests were not aligned with his (they understood that David was trying to maximize his profits); (v) typically concluded deals with David and others without the kind of external pricing information charged in the indictment *(i.e.,* routinely saw that kind of information as non-material); and (vi) repeatedly expressed their skepticism over information volunteered by people in David's

shoes (indeed, they themselves often misrepresented related data before, during and/or after transactions).

### III.     The Basis For The Subpoena

The subpoena requests information integral to Defendant Demos's defense. It seeks relevant admissible information, for production that is necessary prior to trial, which cannot otherwise be obtained without a subpoena. Moreover, the subpoena is not a backdoor attempt at a fishing expedition or an attempt to circumvent the strictures of Rule 16 or 18 U.S.C. § 3500.

*First, it seeks relevant, admissible information.* As mentioned, all of the transactions in question occurred while David was employed by Cantor. The period covered by the indictment was essentially David's first experience running his own trading book. David worked under the supervision of Cantor's Compliance Department and Cantor's more senior and experienced personnel. And Cantor was obliged under FINRA Rules to review trades like David's (and in fact did so, as the discovery material provided by the government confirms).

In order to establish the violation of the securities laws alleged in the indictment, the government must prove four elements. One of those elements is intent: that the defendant intentionally, knowingly and *with intent to defraud* made the alleged misrepresentations in question. A second element is that the alleged misrepresentations be material to the alleged victim, an objective standard that centers on whether the alleged misrepresentation significantly altered the total mix of information on which the alleged victim would make its decision to buy the RMBS security at the price it did. To quote Chief Judge Hall's jury charge in *Litvak* (Tr. 1498):

> [t]o, quote, significantly alter the total mix of information available means to...
> meaningfully affect a reasonable investor's consideration about whether to

buy or sell and at what price.... In other words, in order to be material, the false statement or omitted fact must have been of such importance that it could reasonably be expected to cause or induce a reasonable investor to act or not act with respect to the transaction at issue.

As we disclosed to the government under the scheduling order, David plans to contest intent and materiality. Toward that end, we will contend that he acted in good faith, reasonably believing that the negotiation strategy and tactics he used were known to his superiors at Cantor and Cantor's Compliance department were internally approved and, therefore, his employer considered his behavior immaterial.[4] The behavior was ubiquitous in the market, as demonstrated by the discovery provided by the United States Attorney's Office to us, which confirms that it alone conducted investigations of at least eight separate financial institutions for this very conduct and several other investigations were conducted by federal agencies and self-regulatory organizations outside of this district (those investigations inexplicably resulting solely in suspensions or termination without further repercussions, or in civil or regulatory proceedings without any criminal charge, despite the fact that in a significant number of those cases, the conduct in question there was arguably more serious than what is charged here).

This is why the information we request in this subpoena to Cantor is so necessary; indeed, it matches precisely what the Second Circuit held in *United States v. Litvak,* 808 F.3d 160, 190 (2d Cir. 2015):

> As Litvak's counsel stated at trial, this evidence would provide "a fair basis upon which to infer that when Mr. Litvak did the very same thing ... the supervisors saw and approved of [it] as standard operating procedure." (citation omitted). Such an inference would support Litvak's attempt to introduce a reasonable doubt as to his intent to defraud, *i.e.,* that he held an honest belief that his conduct was not improper or unlawful, a belief the jury may have found more plausible in light of his supervisors' approval of his colleagues'

---

[4]     As the United States Attorney's Office is aware, even after it began the investigation and Cantor reviewed David's conduct, Cantor found nothing "much of interest."

substantially similar behavior... *see United States v. Brandt,* 196 F.2d 653,657 (2d Cir. 1952) ("since [good faith] may be only inferentially proven, no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh" its relevance (internal citation omitted)); *see also United States v. Colloraji,* 876 F.2d 303, 305 (2d Cir. 1989) (same).

*Second, production pre-trial is necessary.* The information in question will require a good deal of analysis and likely further investigation and interviews. It will also be important to the preparation of Defendant Demos's expert witness.

*Third, the information cannot be obtained without a subpoena.* The information we seek is Cantor's property.

*Fourth, this is not a fishing expedition nor is it an effort to circumvent the strictures of Rule 16 or 18 U.S.C. § 3500.* The subpoena is directed at non-party Cantor Fitzgerald for documents they generated or which David himself generated while he worked there. And we have good reason to believe those documents exist: FINRA Rules require Cantor's Compliance Department to review trades like the ones David undertook (and, as mentioned, the discovery provided by the government confirms that Cantor in fact did so right from the start). Moreover, the notion that David believed his conduct was approved by Cantor is far from speculative: David was not counseled or reprimanded by Cantor with respect to his trading, and he received a substantial severance payment when he left Cantor (indeed, the U-5 form Cantor filed upon David's departure did not list any issues for his separation).

*Fifth, the subpoena is not unduly burdensome to Cantor.* Cantor is a highly regulated company that has been the subject of the United States Attorney's investigation for years. Moreover, the documents in question are ones that Cantor presumably was legally obliged to maintain. The production we seek is far from extraordinary.

## IV.    A Fuller Legal Discussion

It is noteworthy that *Nixon* imposed a four-pronged matrix, yet Rule l7's express language requires nothing more than a subpoena that is not unreasonable and oppressive. Accordingly, several courts in this Circuit have questioned the applicability of *Nixon* to subpoenas issued to non-government third parties in criminal cases. Those courts have reduced the four *Nixon* factors to two requirements: (1) that the documents be "material" to the defense and (2) that the request not be "unreasonable or oppressive." *See United States v. Stein,* 488 F. Supp. 2d 350, 366 (S.D.N.Y. 2007) (Kaplan, J.); *United States v. Rajaratnam,* 753 F. Supp. 2d 317, 321 n. l (S.D.N.Y. 2011) (Holwell, J.); *United States v. Nachamie,* 91 F. Supp. 2d 552, 561-64 (S.D.N.Y. 2000) (Scheindlin, J.); *United States v. Tucker,* 249 F.R.D. 58, 66 and n.54 (S.D.N.Y. 2008) (Scheindlin, J.).

The *Stein* Court was especially direct about the unfairness of reading strict requirements into Rule 17, first noting that the simple repetition of a familiar principle should not be allowed to "obscure its origins and thus lead to mindless application in circumstances to which the principle never was intended to apply" - a caution repeated approvingly by Judge Holwell in *Rajaratnam.* 488 F. Supp 2d at 365. As Judge Holwell added: "a 'material to the defense' standard would also make it far easier to reconcile the article of faith that parties in civil actions may resort to nearly unbounded discovery." *Rajaratnam,* 753 F. Supp. 2d at 321, n. l

Although Judge Droney, in *United States v. Ferguson,* 2007 U.S. Dist. LEXIS 70786, at *11-12 (D. Conn. 2007), indicated that no judge had definitively rejected the *Nixon* standard, the observations by each of these four esteemed judges make clear that *Nixon* may be inappropriate where a subpoena was issued to a non-government party and where, more

generally, a defendant's right to obtain discovery is extremely limited compared to the government's right in a criminal case and even a defendant's right in a civil matter.

At the very least, these decisions arguably counsel district judges to exercise their discretion more liberally when evaluating a Rule 17 subpoena. Where a subpoena does not ask for the kind of material restricted by Rule 16 or 18 U.S.C. §3500, there is a strong argument that anything else that is reasonably relevant is appropriate. Judge Chatigny's remarks in *Shapiro* are notable in this regard:

> I'm reluctant to preclude the defendants from gaining access to materials that might be admissible. Rule 17 is supposed to restrict subpoenas to specifically identify information that is almost certainly going to be admissible, but I don't think that the rule is written to tie a judge's hands, nor do I think it intends to do that when, as **in** this case, the Judge can't be sure how things are going to look down the road.  In other words, I don't think that in order to approve the issuance of a Rule 17 subpoena a judge has to say "this is admissible and it will be admitted," and that issue is taken care of at the same moment that the judge approves the subpoena. I think instead that if there is a logical reason to think that the information sought would be admissible, then in my judgment, the judge should err on the side of approving the subpoena.

*United States v. Shapiro,* Tr. 9/2/16 at 35.

Nevertheless, because the subpoena to Cantor Fitzgerald fits comfortably within the four- pronged *Nixon* test, our discussion is organized under that rubric.

### A.  The documents requested are relevant and  evidentiary.

David's "good faith" while transacting with customers is a complete defense to the charges - so evidence of that good faith is, arguably, some of the most relevant evidence imaginable. *United States v. Litvak,* 808 F.3d at 188-190; *Pennsylvania v. Ritchie,* 480 U.S. 39, 56 (1987) (Rule 17(c)(1) is an essential tool to enable the defendant to present evidence that might convince the jury to acquit). All of the documents requested from Cantor relate to one

central concept: that Cantor's actions and inactions conveyed to David that he was acting appropriately and/or that investors considered his actions were lawful and immaterial.

Specifically, David's good faith and materiality defenses will be immeasurably boosted by documents that show that:

- his RMBS trades were actively reviewed by Cantor (and what from those trades were reviewed, including the electronic "chats" in which the alleged misrepresentations were made)[5] and that Cantor did not consider his behavior to merit a negative response - *Requests 1-11, 14-20;*[6] and

- there were certain actions by Cantor that are consistent with the notion that Cantor approved of David's alleged conduct - *Requests  12-13*.

Requests for David's interactions with his superiors and Cantor's Compliance Department are comparable to what Judge Scheindlin upheld in *United States v. Nachamie,* where defendants subpoenaed all communications with seven individuals and billing services

---

[5]     Cantor was required by FINRA Regulations to review communications by David with counterparties and to supervise his trading, stating, among other  things:

(4) Review of Correspondence and Internal Communications.

The supervisory procedures required by this paragraph (b) shall include procedures for the review of incoming and outgoing written (including electronic) correspondence and internal communications relating to the member's investment banking or securities business ... The supervisory procedures must require the member's review of: (A) incoming and outgoing written (including electronic) correspondence to properly identify and handle in accordance with firm procedures, customer complaints, instructions, funds and securities, and communications that are of a subject matter that require review under FINRA rules and federal securities laws. FINRA Rule 3110 (2015).

[6]     Although an entity's submission to the government during negotiations over a plea or a non-prosecution agreement may be subject to certain privileges and confidentiality, when they are relevant to a defense and where they are requested as part of trial preparation, access to them may be granted. *Compare Nixon,* 418 U.S. at 71 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."), *with United States v. Libby,* 432 F. Supp. 2d 26, 38 (D.D.C. 2006) ("[W]hen a person is almost certain to testify as a witness at trial and there is an indication of what that testimony will be, then pre-trial production is appropriate."), *and United States v. Tucker,* 249 F.R.D. 58, 66 (S.D.N.Y. 2008) ("Impeachment of the cooperators is clearly material to [the defendant's] defense.)." Here, the United States Attorney's office has placed *all* Cantor employees connected to the transactions at issue - including its Compliance function - on a list of individuals with whom David may not have any contact, strongly suggesting that they will be  witnesses.

relating to patients for whom the government claimed the defendants submitted false bills: "[t]he requested records ... are relevant to the issues of knowledge and intent, because they reveal the work done by [the billing company defendant] on an ongoing and regular basis, or the work done by similarly situated billing companies, or the interaction between the doctors, the billers, and the alleged co-conspirators." 91 F. Supp. 2d at 563.

One final point: the requests for Cantor's submissions to any governmental agency, including the United States Attorney, do not inappropriately encroach upon the plea negotiation process. As Judge Lewis Kaplan observed in *United States v. Stein:* "there is no blanket foreclosure of discovery of communications made during plea negotiations. The question again comes down to whether there is any real 'indication that the pretrial disclosure of the disputed evidence would ... enable[] the defendant[s] significantly to alter the quantum of proof in [their] favor.'" 488 F. Supp. 2d at 358 (brackets in original). Similarly, there is no blanket preclusion for attorney-client or work product privileged documents. As a federal court in the Eastern District of New York held:

> In certain cases, a criminal defendant's constitutional right to present a defense may outweigh a third party's right to assert privilege. *See* Fed. R. Evid. 501 *("Except as otherwise required by the Constitution of the United States ...)....* Where a criminal defendant seeks to subpoena work product, he can overcome the privilege by demonstrating, as in the civil context, a "substantial need" for the requested items and that he "cannot, without undue hardship, obtain their substantial equivalent by other means."

*United States v. Weisberg,* No. 08-CR-347 (NGG) (RML), 2011 U.S. Dist. LEXIS 7221, at *12- 13 (E.D.N.Y. Apr. 2011) (Garaufis, J.)

Here, we can confidently state that where David's trading was conducted while he was employed by Cantor and where Cantor is obliged, as a FINRA entity, to review the trading activity of its traders (especially traders with frequent high profit margins), there can be little

doubt that in its communications with the government, Cantor addressed the very issue that directly affects two of the elements of securities fraud in this case.[7]

Finally, the requested information is evidentiary. The requested documents are Cantor business records - records made and kept in the course of a regularly conducted business activity *(e.g.,* emails, compliance documents, memoranda). *See* Fed. R. Evid. 803(6); *Nachamie,* 91 F. Supp. 2d at 564 ("Because the documents primarily seek business records, they are at this early stage likely to be admissible at trial").

B. *The documents are not otherwise obtainable reasonably in advance of trial by the exercise of due diligence.*

The documents in question are the property of Cantor. Cantor is adverse to David (in fact, it has opposed his request for indemnification). Short of a subpoena, we know of no other way to get these documents. And there is no reason to believe that any of this material will be turned over by the government under the current scheduling order: although we have just barely scratched the surface of the massive amounts of material turned over by the government, none of what we requested appears to be in the category of discovery designated as "hot" by the government, and there is no reason to believe that the government requested any of this material from Cantor (and if it did, it should point us to it within the discovery production that numbers in the tens of millions of pages).

C. *We cannot properly prepare for trial without production in advance of trial (thus, failure to obtain such inspection may tend to unreasonably delay the trial).*

---

[7] In addition, Cantor employees are likely witnesses at trial and these documents are potentially "material evidence that could be crucial to that cross-examination." *Tucker,* 249 F.R.D. at 67. While pre-trial discovery in aid of impeachment is not a typical ground for a Rule 17 subpoena, there are exceptions where the prior statements of a likely government witness are numerous and providing them at trial will occasion "unreasonable trial delay." *Id* at 67, n.56.

The documents in question are central to the good faith defense, which relates to one of the four essential elements that the government must prove beyond a reasonable doubt. We need to understand precisely what Cantor did to review David's conduct, what Cantor should have done (if it did not do so), and what employees in David's position reasonably would have expected Cantor to do. In addition, Cantor's supervisory actions need to be evaluated by experts. For example, an expert may well consider a comparison between the obligations imposed on Cantor by FINRA rules and what Cantor actually did. Finally, forcing Cantor to respond pre- trial will enable the Court to decide *before trial* any issues Cantor (or the government on its behalf) may raise.

> ### D. The application is made in good faith and is not intended as a general "fishing expedition."

This subpoena has been drawn in the hope of finding something we have a good faith basis for believing exists. And it has not been drawn to burden Cantor. To the contrary, as mentioned, FINRA rules, David's history at Cantor and industry practice provide a sound basis for his believing that he was acting appropriately and that his behavior was immaterial to his counterparties. FINRA rules expressly require Cantor's Compliance Department to review David's trading and David's trading behavior was brought to the attention of his superiors - all without negative repercussion.

Moreover, our requests are as narrow (and arguably narrower) than the ones approved in *United States v. Rajaratnam,* an insider trading case where the defendant subpoenaed the alleged tipper for all documents "reflecting [his] communications" with the defendant and other allegedly tipped individuals, and any record of things of value given by the tipper. 753 F. Supp. 2d at 322. The *Rajaratnam* requests were quite general: there was no specific communication or thing of value identified in the subpoena or a time limitation to the request. Nevertheless, the Court held

that neither request constituted a fishing expedition. As Judge Holwell so aptly noted in *Rajaratnam,* "in the context of a subpoena to a third party to whom Rule 16 does not apply, requiring the defendant to specify precisely the documents he wants without knowing what they are borders on rendering Rule 17 a nullity." *Id.* at 321, n.l.

Similarly, the *Weisberg* Court upheld a request for the billing files and meeting records of several attorneys, noting that "[a]s for the specificity requirement, it is true that Weisberg has not pointed to specific billing or meeting records that will support the defense. However, a defendant need not have prior knowledge of specific documents to meet the specificity requirement of Rule 17(c).... Weisberg's request is sufficiently narrowly focused on a group of records likely to contain helpful documents, and thus he cannot be said to be engaging in a 'fishing expedition.'" *Weisberg,* 2011 WL 1327689 at *19-20.

> ### E. In addition to satisfying the Nixon standard, the requests are neither unreasonable nor oppressive.

This fifth requirement stems from the express language of Rule 17(c). The FINRA rules require Cantor to maintain many of these documents. In addition, we understand that Cantor has been cooperating with the United States Attorney's Office and the SEC for the past several years.[8] It may be that Cantor already has been asked to search for and produce documents in several of these categories but even if it has not, Cantor is a heavily regulated financial services entity that undoubtedly has to provide information to regulators, investors and litigants on a regular basis.

The fact that certain requests may call for reports commissioned by Cantor but delivered to regulatory authorities or the government does not encroach on the attorney-client privilege. These internal investigative reports, where turned over to the government, lose their potential

attorney-client privilege and should be a trove of information about the interactions of others approving David's conduct and what Cantor did about David's alleged misconduct.

Finally, the time period covered by the Subpoenas is limited to the period around David's hiring by Cantor through the present (with the exception of Requests 12 and 13, calling for items - Cantor's position with FINRA on matters directly relevant to this case and its issuance of disclaimers - that could have been created before David was hired). In addition, our requests specify the Cantor employees whose communications need to be searched and, notably, we have identified only those employees likely to have interacted with David's superiors or Cantor's Compliance Department concerning David's trading behavior.

### V.      Conclusion

For the above reasons, we respectfully request that the Court issue the Rule 17(c) subpoena to Cantor and order the production of the requested documents pre-trial.


Respectfully submitted,

DAVID DEMOS

By:   /s/ George Leontire

Jose Baez
The Baez Law Firm
40 SW 13th Street, Suite 901
Miami, FL 33130
(305) 999-5111
jose@baezlawfirm.com

George Leontire
The Baez Law Firm
66 N. Second Street
New Bedford, MA  02108
(855) 223-9080
george@baezlawfirm.com

Ronald S. Sullivan, Jr.
6 Everett Street
Cambridge, MA 02138
(617) 496-4777
prof.ron.sullivan@gmail.com

Peter A. Chavkin (PHV08660)
Mintz Levin Cohn Ferris Glovsky and
Popeo, P.C.
Chrysler Center
666 Third Avenue
New York, NY 10017
(212) 692-6231
pchavkin@mintz.com

Patrick J. Sharkey (CT00654)
Mintz Levin Cohn Ferris Glovsky and
Popeo, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1819
pjsharkey@mintz.com

– and –

Michael L. Chambers, Jr. (CT28580)
100 Wells Street, Suite 2C
Hartford, CT 06103
(860) 231-9535
chamberslegalservices@gmail.com

His Attorneys