# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:16-CR-220 (AWT) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID DEMOS, | : | |
| | : | |
| Defendant. | : | December 11, 2017 |

## MEMORANDUM OF LAW IN SUPPORT OF DAVID DEMOS'S MOTION FOR PRE- TRIAL RETURN OF DOCUMENTS UNDER RULE 17(c)(l)

Defendant David Demos respectfully submits this memorandum in support of his motion requesting the Court to issue subpoenas to the counterparties on the traded bonds, in Defendant Demos's Superseding Indictment, pursuant to Federal Rule of Criminal Procedure 17(c)(l), which provides for the pre-trial production of documents in the counterparties control. Each subpoena bears a return date of January 11, 2018, which is in advance of trial. A copy of each subpoena is attached as follows: **Exhibit A** to Marathon Asset Management ("Marathon"), counterparty on count one and two; **Exhibit B** to DW Partners, LP ("DW"), counterparty on count three; and **Exhibit C** to Ellington Management Group, LLC ("Ellington"), counterparty on count four, five, and six. As specified below, these subpoenas conform to the standards of Rule 17(c)(1) and therefore early return is warranted to facilitate trial preparation.

The Superseding Indictment alleges that Defendant Demos committed securities fraud by making "materially false and fraudulent misrepresentations and omissions" in the course of negotiations with professional investment managers and hedge funds, for the purpose of taking "secret and unearned compensation." *See Superseding Indictment* at ¶ 16. Moreover,

the Superseding Indictment alleges that Defendant Demos "would defraud victims buying RMBS in bid list or other trades" by "falsely overstat[ing] the price that Cantor had actually paid in order to fraudulently induce the victim-customers to pay a higher overall price." *Id.* at ¶ 19. There are no allegations that Defendant Demos misrepresented the underlying characteristics of the RMBS bonds at issue, or that the counterparties were misled about the final price they agreed to for the execution of the trades.

The documents and materials requested below can be categorized into three separate groups, for convenience and ease of analysis.

- Category one documents and materials request information concerning the counterparties knowledge of the price of the RMBS bonds traded and will provide evidence concerning two elements of the offense charged: (1) materiality and (2) intent. *See* **Exhibit A ¶¶** 1-18; **Exhibit B ¶¶** 1-15; **Exhibit C ¶¶** 1-17.

- Category two documents and materials focus on information concerning the investment processes utilized by the counterparties as applicable to the RMBS bond market, and including both outwardly published marketing materials and internally published training and compliance materials which the counterparties utilized to inform on their investment processes, and will provide evidence concerning the critical element of the offense charged: (1) materiality. *See* **Exhibit A ¶¶** 19-26; **Exhibit B ¶¶** 16-23; **Exhibit C ¶¶** 18-25.

- Category three documents and materials request information concerning communications and statements made by counterparties, in addition to market conduct of the counterparties, and will provide evidence concerning two elements of the offense charged: (1) materiality and (2) intent. In addition, group three documents

would directly contradict the Government's contention that misrepresentations were not commonplace in the RMBS market, and demonstrate that the reasonable RMBS trader was aware that the market, during this period, was rife with misrepresentations. *See* **Exhibit A ¶¶** 27-28; **Exhibit B ¶¶** 24-25; **Exhibit C ¶¶** 26-27.

All three categories of information are relevant to elements of the offense charged, are expected to be admissible as business records, and are specifically described, in each of the Exhibits attached to the motion, before the Court.

## ARGUMENT

### I.      The Standard for Evaluating Rule 17(c) Subpoenas

Federal Rule of Criminal Procedure Rule 17 governs the use of subpoenas in criminal cases, subsection (c) specifically provides for the issuance of subpoenas for documentary evidence and allows this Court to order pretrial return of subpoenaed materials. "A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered into evidence."  Fed. R. Crim. P. 17(c)(1). Rule 17 establishes "a liberal policy for the production, inspection and use" of evidentiary materials in federal criminal cases.  *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951).  The Rule enables a party to obtain and inspect evidentiary material prior to trial.  *See United States v. Gel Spice Co.*, 601 F. Supp. 1214, 1224 (E.D.N.Y. 1984).  And, enforcement of 17(c) subpoenas is within the sound discretion of the district court. *United States v. Ferguson*, No. CRIM. 3:06-CR-137 (CFD), 2007 WL 2815068, at *2 (D. Conn. Sept. 26, 2007) (citing *United States v. Nixon*, 418 U.S. 683, 702 (1974)).

An order for pre-trial production of documents is appropriate if the party requesting the materials establishes that the documents sought are (1) relevant, (2) potentially admissible, and (3) specific. *Nixon*, 418 U.S. at 700. Moreover, the Supreme Court in *Nixon* established underlying considerations including: "(1) [whether] the documents are evidentiary and relevant; (2) [whether] they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) [whether] the party cannot properly prepare for trial without such production … and [whether] the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) [whether] the application is made in good faith and is not intended as a general 'fishing expedition.'" *Ferguson*, 2007 WL 2815068, at *2 (quoting *Nixon*, 418 U.S. at 699).

The documents and materials requested are similar to the subpoenas issued in the comparable cases of *United States v. Litvak,* 3:13-CR-019 (JCH) and *United States v. Shapiro,* 3:15-CR-155 (RNC) that were approved by Chief Judge Janet Hall and Judge Robert Chatigny. *See* e.g. Trial Tr. for *Litvak* at 505:16-508:24; 519:12-525:13 (testimony of Katherine Corso regarding offering documents and PowerPoints [e.g. Defense Ex. 2114] used by New York Capital to solicit investment funds). Moreover, the counterparty subpoenas target information which Defendant Demos has good faith to believe exists, based on established FINRA obligations, the common practice in the non-agency RMBS market, and the specific business practices of major dealers in non-agency RMBS. Indeed, the subpoenas in *Litvak* and *Shapiro* also targeted specific counterparty bond financials, investment processes, and communications that addressed both the elements of materiality and intent.

## II.     The Basis for Category One Documents and Materials: Bond Financials

Defendant Demos seeks documents and materials, from other non-agency RMBS dealers, that were counterparties, in this case, that relate to the information the non-agency RMBS dealers

had both before and after the executed trades. The evidence will reflect the assessments of the non-agency RMBS sophisticated investors that were counterparties to Defendant Demos, demonstrate the volatility of price in the RMBS market, and establish that the RMBS market was rife with wide bid-ask spreads and various trade execution prices. These requests readily meet the Rule 17(c)(1) standard.

> a.  *The Category One Documents are Relevant Because They Relate to the Offenses Charged in the Indictment*

For purposes of Rule 17(c)(1), the relevance test is satisfied if there is a "rational inference that at least part of the [materials] relate to the offenses charged in the indictment." *United States v. Nixon*, 418 U.S. 683, 700 (1974). The requested materials directly address the materiality of the alleged misrepresentations in this case, as related to the bonds traded in the indictment, and include the following: settlement documents; real time analytical reports, models, inputs, and valuation runs; price marking prior to purchase; "Matcher" or existing price information prior to purchase; monthly marks for the bonds, or existing positions in the CUSIP; bond prospectuses, PSA term sheets, and deal documents; calls of the bond made by the counterparties; loan valuations; RMBS Representations and Warranties settlements or litigation; communications between Marathon and any trustee, INTEX, or other broker-dealer; verifications of bond-acquisition price information provided by Demos; counterparties bid file and trade blotter; BWICs that Demos bid on; counterparties attempts to sell the bonds, or purchase the bonds from another dealer; and identification of the investors and their ownership percentage, in the fund, who acquired ownership of the bonds. *See* **Exhibit A ¶¶** 1-18; **Exhibit B ¶¶** 1-15; **Exhibit C ¶¶** 1-17.

This evidence will reflect the varying assessments of non-agency RMBS value by the sophisticated investor counterparties, demonstrate the price volatility of the non-agency RMBS market, and illustrate the wide bid-ask spreads and variant trade execution prices.

### i.   Settlement Documents, Bond Prospectuses, PSA Terms Sheets, and Related Deal Documents

Underlying transaction documents are material to investors because they identify the terms of the pooling of the RMBS. Therefore, settlement documents, bond prospectuses, pooling and servicing agreement ("PSA term sheet"), and related deal documents will show specific information unique to the RMBS for each of the executed trades. Settlement documents are those documents that reflect final characteristics of the bonds after the trades were executed. Bond prospectuses provide the specific information of the underlying securities that are subsumed within the RMBS. A bond prospectus is a formal filing with the United States Securities and Exchange Commission that provides detailed information about the bond issuer, the terms of the agreement between the bond issuer and the bond holder, and the characteristics of the bond. Investors use the prospectus to assess risk and evaluate earnings potential, prior to purchasing the bond. Moreover, investors look to the prospectus for other information about risk, such as the bond issuer's liquidity and performance. A PSA term sheet governs the transfer of the loans into the trust, the management of the trust, the service of the loans, and the issuance of securities to investors. This document is the backbone of the transaction, and is drafted based on negotiations between the parties to the transaction where the underlying assets are pooled into the RMBS. Documents which demonstrate the components of the underlying RMBS are highly probative of the value determination made by reasonable, sophisticated RMBS investors who made investment decisions in the RMBS market, during this time period.

### ii.   Models, Analytical Reports, Inputs, Valuation Runs, and Loan Valuations

Counterparties are sophisticated institutional investors and use their own proprietary models to determine a price range within which they are willing to purchase the specific bond. Counterparty analytical modelling constitutes evidence of materiality. In *United States v. Litvak,*

the Court of Appeals for the Second Circuit, held that evidence regarding the sophisticated valuation methods used by parties in the RMBS market is relevant to materiality. *See Litvak*, 808 F.3d at 181-84. Documents which demonstrate the components and inputs to the models, information used by the models, and the resulting model outputs are highly probative of the value determinations made by reasonable sophisticated RMBS investors who made investment decisions in the RMBS market, during this period. Therefore, these analytical reports, models, inputs, and valuation runs constitute essential evidence of materiality.

### iii.  Price Marking, "Matcher," and Monthly Marks for the Bonds or Existing Positions in the CUSIP

Price marking and "Matcher" or existing price information will show the price information that each counterparty had available to it prior to purchase of the bond. Price marking is the practice by RMBS broker-dealers in which they internally record the price and positions of individual RMBS. This practice is essential for RMBS broker-dealers because the RMBS market itself does not provide publicly available information on the value of the RMBS. Investors of RMBS will internally mark prices, compare matcher, or related bonds price information, and monthly marks in their determination of price, prior to purchasing a RMBS. This information is material to RMBS investors in their decision to purchase a RMBS, because it is highly probative of the value determinations that are made by reasonable, sophisticated RMBS investors, who made investment decisions in the RMBS market, during this time period.

### iv.  Counterparties Bid File and Trade Blotter

The counterparties bid file is an internal document that is used to record and rank bids received from broker-dealers. Often the market participant conducting a BWIC, or bid wanted in competition, will then disclose a cover bid to other market participants to further inform on negotiating future transactions. The counterparties trade blotter is the document that reflects the

counterparties actual purchase and sale price of the RMBS. The counterparties RMBS desk also likely maintains a market color database—which compiles trade, price and bid cover data, for the purposes of future reference, when they are evaluating a specific non-agency RMBS, or a RMBS comparable in vintage, composition, or other features. The bid file documents, what "color" or information the counterparty received and recorded, and the trade blotter is necessary to verify the actual purchase and sale prices in subsequent trades. Documents which indicate what information the counterparties had prior to negotiation, during negotiation, and after the final trade is executed (for the purpose of use in other trades of comparable RMBS) is highly probative of the value determination made by reasonable, sophisticated RMBS investors who made investment decisions in the RMBS market, during this time period.

**v.      Calls of the Bond and RMBS Representations and Warranties Settlements and Litigation**

Investors regularly examine the bond prospectus for call provisions. If a bond is callable, and has been called, that means the issuer has called the bond earlier than the maturity date and would therefore subject the bond to early repayment of the principal. Because call provisions protect investors from early calls for a specified period of time, the calls of the bonds in Defendant Demos charged trades would directly impact the risk, and the rate at which the bond was originally purchased by the counterparties. RMBS representations and warranties are identified in the PSA, and include provisions regarding loan file delivery, cures of material breaches of representations and warranties, and cures of material document defects. The failure of a loan seller to cure a material breach of a representation or warranty, or a material document defect can result in the repurchase of the related loan by the seller. When the material breach or material document defect is not cured, the loan seller will often be required to repurchase the loan. Calls of the bond and representations and warranties, including any settlement of representation and warranties, or

related litigation, is highly material to investors because it can result in the investors loss of the bond, and is therefore highly probative of value determinations made by reasonable, sophisticated RMBS investors who made investment decisions in the RMBS market, during this time period.

> **vi.** **Verifications of Bond-Acquisition Price Information Provided by Demos and Attempts to Sell or Purchase the Bonds From Another Dealer**

Hedge funds, investment banks, asset managers, central banks, regulators, rating agencies, and insurance companies utilize outside companies to provide independent sources of credit derivative pricing. Companies that deliver these services provide pricing across a variety of instrument types, including illiquid securities. Initial valuations are often sourced from industry practitioners and FINRA. Pricing methodology is based on models which are specific to the instrument type and available observable data. The reliance on independent data, valuations and trade processing by counterparties is therefore highly probative of value determinations made by reasonable, sophisticated RMBS investors, who made investment decisions in the RMBS market, during this time period.

Moreover, attempts to sell or purchase the bonds from other dealers is highly probative of value determination because it demonstrates what price and value information was available to the reasonable sophisticated RMBS investors, who were making investment decisions in the RMBS market at this time.

> **vii.** **Counterparties BWICs that Demos Bid On**

In the non-agency RMBS market bond holders often engage in BWICs, or bids wanted in competition, when seeking to sell their RMBS. The counterparty lists the non-agency RMBS they want to receive bids on from other counterparties, and then potential buyers submit bids, through their dealer. The BWIC could result in the bond holder selecting a buyer and completing a

transaction. In addition, counterparties use the bids received to have information on the value of the non-agency RMBS involved in the BWIC, as these bids reflect prices around which sophisticated participants are willing to transact. Therefore, the counterparties BWICs that Defendant Demos bid on are directly relevant to materiality, because they are highly probative of value determinations made by reasonable, sophisticated RMBS investors who made investment decisions in the RMBS market, during this time period.

### viii.   Communications Between Marathon and Pooling Transaction Trustees, INTEX, or Other Broker-Dealers

In the typical asset-backed securities transaction, the seller assembles and describes a pool of financial assists. The seller establishes the structure for the pool of mortgages, drafts the documents for the transaction, and selects a servicer and a trustee for the pooling transaction. The key value of the tranches within the deal depends on complex characteristics of the underlying mortgage pool. Intex is the preeminent company that created modelling for cashflow outputs based on the underlying mortgage pool's characteristics. Intex models all structural features including loss allocations, triggers, prepayment penalty allocations, and interest-rate hedges. Intex is the industry standard, and investors utilize Intex to assess mortgage-backed securities. It functions by allowing the investor to choose the particular mortgage-backed security, and enter its price in addition to figures for prepayment speed, default rate, and loss severity (the proportion of the debt that cannot be recovered when the borrower defaults). Within approximately 30 seconds, Intex provides the yield of the security, the month-by-month future interest payments and principal repayments, including when shortfalls and losses will occur. Intex functions off of the underlying mortgage characteristics, and if the underlying mortgage characteristics, like the deal structure, have been completed improperly, or erroneously, the holder of the security would need to

communicate with the Trustee of the pooled assets, and Intex to correct the underlying information. Any communications that Marathon had, regarding the bonds in the indictment, with the Trustee or Intex regarding the bond being mismodeled is directly relevant to materiality because a mismodeled bond is subject to losses as a result of erroneous modeling, and therefore these conversations are highly probative of value determinations made by reasonable, sophisticated RMBS investors who made investment decisions in the RMBS market, during this time period.

### ix. Identification of the Investors and Their Ownership Percentages in the Counterparties Fund That Acquired Ownership of the Bonds

Counterparties Marathon, DW, and Ellington are hedge funds, which pool money from investors and invest it in securities, like non-agency RMBS, CMBS, CLOs, and other asset-backed securities, mortgage and credit related derivatives, consumer loans, corporate debt, and equity securities. Generally, hedge funds invest in high yield junior tranches of non-agency RMBS, which are riskier because they experience losses earlier. Typically, investment in a hedge fund is available only to wealthier investors who can afford the fees of high yield-high risk hedge fund investment and the risks associated with this investment strategy. Under Federal Securities laws, for individuals to invest in a hedge fund, they generally must be an accredited investor, which means they must have a minimum level of income or assets. In addition, investors in hedge funds are also sophisticated investors, who understand leveraging through options, futures contracts and other derivatives, in order to boost returns. Losses suffered by counterparty hedge funds also result in losses to the underlying sophisticated investors in the hedge fund. The identification of the type of investor, and their percentage of ownership in the acquired bonds is highly probative to determine who were the victims of Defendant Demos alleged criminal market conduct.

### b. *The Category One Documents Are Admissible Because They Very Likely Fall Within the Exception to Hearsay for Business Records*

The information requested in category one primarily seeks business records and therefore would likely satisfy the business records exception to the hearsay rule. *United States v. Nachamie*, 91 F. Supp. 2d 552, 564 (S.D.N.Y. 2000) ("Because the documents primarily seek business records, they are at this early stage likely to be admissible at trial."). Based on his experience in the market, Defendant Demos knows the documents requested in category one are created and maintained in the ordinary course of business for asset and investment managers. Indeed, in *United States v. Shapiro*, Nomura, a dealer in non-agency RMBS, maintained these types of records (trade blotters, market color databases, price databases, etc.). *See United States v. Shapiro*, 3:15-CR-155 (RNC). Moreover, the internal records kept by the counterparties substituted in most instances for publicly available market pricing which does not exist in the RMBS market. Finally, the requests in category one also include formal submissions to the Securities and Exchange Commission, as a necessity of participation in the pooling and sale of RMBS. Therefore, because the requests seek documents and materials that are business records, they qualify under the business records exception to hearsay, and therefore be admissible.

> ### c. The Category One Document Requests Are Proper Because They Request Specific Documents and Materials Known To A High Degree of Likelihood To Be Maintained By the Parties To Be Subpoenaed

To meet the third prong, as described by *United States v. Nixon*, Defendants have limited the requests in several ways. First, all of the requests are limited by time period, to information from October or November 2011 to February 2013, which is equivalent to the time period as specified in Defendant Demos indictment. Second, all of the requests have been drafted to describe with specificity what the request seeks, and underwent several rounds of revision, after discussion in good faith with the Government. The requests use specific industry known words and references, synonyms, and a definition section for regularly

referenced terms. Third, as related to specific requests the information is nearly always limited to documents and materials which relate to the specific bonds that were traded with Defendant Demos and listed on his indictment. The only requests that seek information beyond the bonds on the indictment include the following: the request for the bid file; the matcher or existing positions; the monthly marks for existing position in the CUSIP; and the trade blotter which includes comparable bonds in vintage. These requests go beyond the bonds on the indictment because these documents and materials informed on the price information available to the reasonable investor, who made the investment decision to purchase the bond. Finally, the items listed in category one are narrowly targeted to a number of documents that can be easily searched for and retrieved by the counterparties, therefore satisfying the specificity element of *Nixon*.

**II.      The Basis for Category Two Documents and Materials: Investment Process**

Defendant Demos seeks documents and materials from other non-agency RMBS dealers, who were counterparties, in this case, that relate to the investment processes the non-agency RMBS dealers were following at the time. The evidence will reflect what information these sophisticated counterparties distributed to their investors and their employees. The counterparties are financial institutions that manage and invest billions of dollars. To attract investors, the counterparties distribute a variety of marketing materials describing their investment practices. Moreover, they distributed specific information on their employee's duties to the financial institution and the investors, in addition to describing their internal investment practices.  These requests readily meet the Rule 17(c)(1) standard.

> *a.   The Category Two Documents and Materials Are Relevant Because They Relate To The Offenses Charged In The Indictment*

For purposes of Rule 17(c)(1), the relevance test is satisfied if there is a "rational inference that at least part of the [materials] relate to the offenses charged in the indictment." *Nixon*, 418 U.S. at 700. The requested materials directly address the materiality of the alleged misrepresentations in this case, and include the following: the internal structure and identify of personnel who allocated capital into the RMBS market; the definition, requirements, or attributes of "best execution" and training materials and compliance manuals; reliance on internal models including public filings and marketing materials; disclaimer communications; marketing materials including pitch books, PowerPoints, one pagers, etc. that describe their services and business methods and reliance on proprietary models/analytics; investor letters; descriptions of business owned that offered additional insight into the mortgage market; and any settlements or litigation regarding Representations and Warranties litigation for structured products. *See* **Exhibit A ¶¶ 19-26**; **Exhibit B ¶¶ 16-23**; **Exhibit C ¶¶ 18-25**.

A highly contested element of the charges against Defendant Demos is materiality. To prove the charges against Defendant Demos, the Government must show that the he made misrepresentations during negotiations, and that these misrepresentations would have been material to an objective, reasonable investor in the RMBS market. The indictment references three financial institutions that the Government alleges were victims of Defendant Demos's conduct: Marathon Asset Management, DW Partners LP, and Ellington Management Group, LLC. Moreover, on December 29, 2016, the Government provided to Defendant Demos a list of victims and witnesses, to which he was prohibited from contacting, other than through counsel. The list included eighteen institutions, and prohibited contact with anyone involved in fixed income departments, and legal or compliance departments. The investment processes used the highly sophisticated funds and institutions, as described in the requested documents in category two, is

directly relevant to materiality. The more complex, detailed, and sophisticated the process used by the alleged victim institutions and counterparties to determine the process they were willing to pay for a RMBS, the less significant in the total mix of information would be the market conduct of Defendant Demos—essentially sales chatter.

Investment process documents and materials were utilized in *United States v. Litvak*, 3:13-CR-019 (JCH) and *United States v. Shapiro*, 3:15-CR-155 (RNC) to establish the investment process of the counterparties in each of these cases. Defendants in these cases used offering documents, promotional documents, and internal training and compliance documents to establish the investment processes of the investors and the absence of significance of statements made by counterparties during negotiation for the executed trades. These documents are directly relevant to the critical issue of materiality in this case, and therefore, the first requirement of *Nixon* is satisfied.

> b. *The Category Two Documents and Materials Are Admissible Because They Very Likely Fall Within the Exception to Hearsay for Business Records*

The information requested in category two primarily seeks business records of the counterparties investment process therefore are admissible under the business records exception to the hearsay rule. *See, e.g., United States v. Nachamie*, 91 F. Supp. 2d 552, 564 (S.D.N.Y. 2000) ("Because the documents primarily seek business records, they are at this early stage likely to be admissible at trial."). Based on his experience in the market, Defendant Demos believes the documents requested in category two are kept in the ordinary course of business, for the investment firm to describe the investment funds and investment opportunities available to investors. Moreover, the counterparties would regularly create and distribute these promotional materials, like pitch books, Powerpoints, etc., to convince investors to invest in their entity. Similarly, the training materials, "best execution" policies, and compliance manuals were created and used in the ordinary course of business to inform employees on the investment processes and procedures to

be utilized on behalf of the entity. Finally, several of these documents were admitted as evidence in *Litvak* and *Shapiro*. *See e.g., Litvak* at 505:16-508:24; 519:12-525:13 (testimony of Katherine Corso regarding offering documents and PowerPoints [e.g. Defense Ex. 2114] used by New York Capital to solicit investment funds). Therefore, because the documents primarily seek business records, they should satisfy the business records exception to hearsay, and are likely admissible.

> c.   *The Category One Document Requests Are Proper Because They Request Specific Documents and Materials Known To A High Degree of Likelihood To Be Maintained By the Parties To Be Subpoenaed*

To satisfy the third prong of *Nixon* requiring specificity with respect to the documents sought, Defendant Demos has limited the scope of the requests. First, all the requests are limited to the years covered by the indictment, and only include information from October or November, 2011 to February, 2013. Second, they request documents and materials that related to RMBS or any subsectors within RMBS. The request in category two do not relate to investment funds focusing on other types of securities, or other types of securitized asset-backed investments. Finally, the requests are drafted with specific language, utilizing synonyms, and descriptions such that the counterparties are not burdened by having to produce a massive amount of marketing and promotional materials. Upon information and belief, based on the production of related materials in *Litvak* and *Shapiro*, Defendant Demos expects the volume of the production from Category Two to be relatively small. Therefore, because the requests are specific, the third requirement of *Nixon* is satisfied.

## III.   The Basis for Category Three Documents and Materials: Communications

Defendant Demos seeks documents and materials from other non-agency RMBS dealers, who were counterparties, in this case, that relate to the information the non-agency RMBS dealers had both before and after the executed trades. The evidence will reflect the assessments of the non-

agency RMBS sophisticated investors who were counterparties to Defendant Demos, demonstrate the volatility of price in the RMBS market, and establish that the RMBS market was rife with wide bid-ask spreads and various trade execution prices. These requests readily meet the Rule 17(c)(1) standard.

> a. *The Category Three Documents and Materials are Relevant Because They Relate to the Offenses Charged in the Indictment*

For purposes of Rule 17(c)(1), the relevance test is satisfied if there is a "rational inference that at least part of the [materials] relate to the offenses charged in the indictment." *Nixon*, 418 U.S. at 700. The requested materials directly address the materiality of the alleged misrepresentations in this case, as related to the bonds traded in the indictment, and include: communications between the counterparty and Cantor Fitzgerald, Defendant Demos employer, regarding the bonds; and communications between counterparty and any other person or entity, regarding the bonds. *See* **Exhibit A** ¶¶ 27-28; **Exhibit B** ¶¶ 24-25; **Exhibit C** ¶¶ 26-27.

Communications between the counterparties and Defendant Demos's employer and representatives are directly relevant to the charges. Moreover, communications between the counterparty and another broker-dealer, regarding the bonds, would be directly relevant to the charges. Therefore, the first requirement of *Nixon* is satisfied because there is a "rational inference that at least part of the [materials] relate to the offenses charge in the indictment." *Nixon*, 418 U.S. at 700. Moreover, even in the event the communications produce impeachment materials, the requests are still proper. *Nixon* does not prohibit evidence in Rule 17(c) subpoena from use as impeachment material—it holds that impeachment generally cannot be the only "valid potential evidentiary use[]" for the materials. *Id.* at 702. Based on this language, Courts have held that "[i]mpeachment materials may be the proper subject of a subpoena." *United States v. Carollo*, No. 10 CR 654 HB, 2012 WL 1195194, at *2 (S.D.N.Y.

Apr. 9, 2012). The materials sought are strongly related to the charges against Defendant Demos, and even if the requests produce impeachment materials, the requests still satisfy the first requirement of the *Nixon* test.

       b.  *The Category Three Documents and Materials Are Admissible Because They Very Likely Fall Within the Exception to Hearsay for Business Records*

The information requested in category three primarily seeks communications made and kept in the ordinary course of business and therefore would likely easily satisfy the business records exception to the hearsay rule. *See, e.g., United States v. Nachamie*, 91 F. Supp. 2d 552, 564 (S.D.N.Y. 2000) ("Because the documents primarily seek business records, they are at this early stage likely to be admissible at trial."). Indeed, the communications are part of the books and records that counterparties must retain as a matter of law. *See* 17 C.F.R. § 240.17a-4(a) (requiring preservation of records for a period of not less than six years, the first two in an easily accessible place). Therefore, because the requests primarily seek business records, which the counterparties are required to maintain, they should satisfy the business records exception to hearsay, and are admissible.

       c.  *The Category Three Documents and Materials Requests Are Proper Because They Request Specific Documents and Materials Known To A High Degree of Likelihood To Be Maintained By the Parties To Be Subpoenaed*

To meet the third part of the *Nixon* test, requiring reasonable specificity with respect to documents sought, Defendant Demos requests documents that the counterparties must retain as a matter of law, and therefore, the counterparties should easily be able to locate and produce the requested materials. The counterparties have likely preserved these communications in an easily searchable format, in light of applicable law, and potentially as a part of separate investigations into trading practices at the counterparties own desks. Moreover, the requests for communications are drafted with specificity because they seek communications related to the bonds in Defendant

Demos indictment. Therefore, because the requests are specific, the third requirement of *Nixon* is satisfied.

**IV.    The Documents and Materials Are Not Otherwise Available, Defendant Demos Cannot Properly Prepare for Trial Without Them, and Application for These Documents and Materials is Made in Good Faith and Not a "Fishing Expedition"**

Pre-trial production of the documents and materials is appropriate. Defendant Demos seeks pre-trial production to permit the evaluation of the above-described documents and materials in advance of trial by Defendant Demos and his designated experts. The production of the documents and materials specified above, from the counterparties in this case, would not be an unreasonable burden because a majority of the documents and materials are communications, documents, and materials that are required business records. Moreover, the requests are not burdensome because the requests seek information which can be produced by downloading spreadsheets, communications, or documents maintained in the ordinary course of business. Access to the data in advance of trial will facilitate trial preparation.

  *a.    The Requests Are Not Otherwise Procurable Reasonably in Advance of Trial Because The Documents and Materials are Business Records Maintained by the Counterparties*

The documents and materials requested are not otherwise procurable in advance of trial because they are business records, kept and maintained by the counterparties. Defendant Demos has no reasonable means to obtain these materials but through a subpoena because as business records, these materials are held as confidential records by the counterparties. Moreover, several of the documents and materials requested would typically be treated as confidential and therefore only distributed to specified sets of investors, employees, and/or counterparty personnel. Therefore, because they are not otherwise procurable reasonably in advance of trial, the requests are appropriate.

### b.  *Defendant Demos Cannot Properly Prepare For Trial Without Such Production*

Defendant Demos cannot properly prepare for trial without production of the above described documents and materials. Indeed, to properly prepare for trial, Defendant Demos needs sufficient time to review the documents and materials requested. The documents and materials represent complex, multifaceted, and intricate bond financials, investment processes, and communications in the RMBS market, which will require sufficient time for assessment. In other words, Defendant Demos does not expect that the production will be voluminous, but does anticipate that production of these documents and materials will produce dense information that necessarily requires analysis. Moreover, Defendant Demos anticipates that his designated experts will review the documents and materials, to prepare for trial, and then utilize the documents during trial. Therefore, production of the documents and materials requested in advance of trial will facilitate trial preparation.

### c.  *The Application For These Documents and Materials is Made in Good Faith and Not as a General Fishing Expedition*

The application for the documents and materials described above is made in good faith and is not a general fishing expedition. The documents and materials requested are not overbroad and have been drafted and redrafted after discussions with the Government. Indeed, these requests seek identified evidence that Defendant Demos has good faith basis to believe exists. Though the production sought, does seek documents and materials of entities who are not technically parties to Defendant Demos case, the documents and materials request evidence that will be of consequence to a determination in this case.

## **CONCLUSION**

For the above reasons, we respectfully request that the Court issue the Rule 17(c) subpoena

to Cantor and order the production of the requested documents pre-trial.

Respectfully submitted,


DAVID DEMOS

By:  _/s/ George Leontire___


Jose Baez
The Baez Law Firm
40 SW 13th Street, Suite 901
Miami, FL 33130
(305) 999-5111
jose@baezlawfirm.com

George Leontire
The Baez Law Firm
66 N. Second Street
New Bedford, MA  02108
(855) 223-9080
george@baezlawfirm.com

Ronald S. Sullivan, Jr.
6 Everett Street
Cambridge, MA 02138
(617) 496-4777
prof.ron.sullivan@gmail.com

Peter A. Chavkin (PHV08660)
Mintz Levin Cohn Ferris Glovsky and
Popeo, P.C.
Chrysler Center
666 Third Avenue
New York, NY 10017
(212) 692-6231
pchavkin@mintz.com

Patrick J. Sharkey (CT00654)
Mintz Levin Cohn Ferris Glovsky and
Popeo, P.C.

One Financial Center
Boston, MA 02111
(617) 348-1819
pjsharkey@mintz.com

– and –

Michael L. Chambers, Jr. (CT28580)
100 Wells Street, Suite 2C
Hartford, CT 06103
(860)231-9535
chamberslegalservices@gmail.com

His Attorneys