UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:16CR220 (AWT) |
| | : | |
| v. | : | |
| | : | |
| DAVID DEMOS | : | January 12, 2018 |

## GOVERNMENT'S MOTION IN LIMINE TO
## PRECLUDE EVIDENCE OR ARGUMENT BLAMING VICTIMS

The Government respectfully requests that the Court issue an order precluding the

defendant David Demos from introducing evidence or arguing that victims defrauded in this case

were gullible or negligent in entering into fraudulent securities transactions with Demos, that any

lack of reasonableness or due diligence by the victims provides a defense to Demos's conduct, or

that a reasonable investor would have detected Demos's fraud.  The Second Circuit has joined

the majority of circuits in holding that a victim's conduct does not provide a defense to a

criminal fraud charge.

## BACKGROUND

At trial, the Government will call representatives from several investment funds and

managers to whom Demos made material misrepresentations.  These victims will testify about,

among other things, the misrepresentations made by Demos and how those misrepresentations

caused them to agree to enter into bond transactions at fraudulently inflated (or, when selling,

deflated) prices.

The Government anticipates that defendant will elicit "blame the victim" evidence—

whether by cross-examining these victims or through expert testimony—based on his November

9, 2017 letter regarding potential expert witnesses ("Notice," attached as Ex. 1 hereto).  There,

defendant suggested that, in the context of the RMBS marketplace, a defrauded victim is by

definition unreasonable and that only unreasonable investors would fail to take steps to prevent from being made victims.

For instance, defendant's Notice states that Frank J. Fabozzi, Ph.D. will testify as follows:

- "[I]if an investor could not independently verify information provided to it by a dealer during the course of negotiations over the purchase or sale of an RMBS, the counterparty investor would not be reasonable in relying on such information in making its investment decision, and that reasonable investors in the RMBS market do not rely on such information in making investment decisions.  Notice at 6 (emphasis supplied).

- [I]t would be a breach of the counterparties' fiduciary duties to their own investors to rely on such representations in making a decision whether to purchase an RMBS and, if so, at what price."  *Id.* (emphasis supplied).

- [A]n investor in the non-agency RMBS market…would not be acting reasonably and satisfying its fiduciary duties if it made its investment decision on non-verifiable information from the dealer such as whether the bond being negotiated was being sold out of the dealer's inventory, the price the dealer paid to acquire the security or how much profit the dealer is earning.  *Id.* at 7 (emphasis supplied).

These passages make clear that defendant intends to use Dr. Fabozzi's testimony to advance an argument that anyone victimized by Demos is necessarily unreasonable and nothing important to them can be material.

## ARGUMENT

The well-established law of this Circuit is that a defendant may not blame a victim for the victim's own negligence or lack of caution.  Demos, therefore, is not entitled to offer testimony

or argument that a particular victim acted negligently or gullibly in agreeing to a particular trade, or that, by definition, a "reasonable investor" avoids being victimized in a fraudulent trade.[1]

It is not a defense to fraud to "blame the victim" for their negligence or a lack of caution, just as it is no defense to burglary charges that the victim left his door unlocked. *United States v. Thomas*, 377 F.3d 232, 242 (2d Cir. 2004) (explaining that the purpose of the federal fraud statutes is "not to grant permission to take advantage of the stupid or careless"); *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) (agreeing with "[t]he majority of circuits to address the issue[, which have held] that a victim's lack of sophistication is not relevant to the intent element of mail or wire fraud"); *United States v. Isola*, 548 F. App'x 723, 725 (2d Cir. 2013) (summary order) (holding "evidence of a particular lender's unreasonableness is irrelevant to the materiality of [the defendant's] false statements because materiality is an objective question").

In *Thomas*, defense counsel attempted to cross-examine a representative of the defrauded victim entity about his purported lack of caution and diligence in dealing with the defendant. Then-District Court Judge Raggi questioned the propriety of this line of questioning at sidebar, asked defense counsel to move on, and instructed the jury on the point. *Id.* at 240-41. On appeal, the defendant argued that the victim's "vigilance (or lack thereof) was relevant because courts have described a scheme to defraud as one 'reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *Id.* at 241. The Second Circuit rejected that formulation, writing that "the 'unreasonable victim' argument misapprehends the function of the

---

[1] To be clear, a defendant is entitled to elicit evidence—including from expert witnesses—"to rebut the alleged victims' testimony that [certain] misstatements were important to them, or otherwise counter the government's argument that a reasonable investor would have found [such] statements material." *United States v. Litvak*, 808 F.3d 160, 183 (2d Cir. 2015). The question of whether an objective reasonable investor would consider certain information important in reaching an investment decision is distinct from the impermissible defense that a particular victim is unreasonable and to blame for allowing himself to be deceived.

ordinary prudence standard," which relates to the element of fraudulent intent.  *Id.* at 242-43.  As

the Second Circuit explained:

> The role of the ordinary prudence and comprehension standard is to
> assure that the defendant's conduct was calculated to deceive, not to
> grant permission to take advantage of the stupid or careless. . . .
> Thus, the standard is a tool the jury may utilize to gauge the
> defendant's intent and is helpful in situations in which the
> defendant's intent to deceive may be unclear.  For example, if the
> defendant asserts that he was merely joking, that the statements were
> mere puffery, or that the statements were merely sharp business
> dealing, evidence that the statements would have deceived a person
> of ordinary prudence and comprehension is evidence that defendant
> actually intended to deceive.

*Id.* at 242-43.  After canvassing the nearly uniform law rejecting a defense based on a victim's

unreasonableness or negligence,[2] the Second Circuit emphasized that "the victim's gullibility . . .

is not relevant to the inquiry as to whether the defendants were properly convicted."  *Id.* at 243-

44.  Thus, the Second Circuit has declined to "invit[e] con men to prey on people of below-

---

[2] Including the following:  *Neder v. United States*, 527 U.S. 1, 24-25 (1999) (concept of
justifiable reliance "plainly [has] no place in the federal fraud statutes"); *United States v. Gray*,
367 F.3d 1263, 1269-71 (11th Cir. 2004) (rejecting argument that mail fraud statute does not
reach material false representations if reasonable person would not have acted upon them);
*United States v. Coffman*, 94 F.3d 330, 333-34 (7th Cir. 1996) (Posner, J.) (rejecting
"unreasonable victim argument"; ordinary prudence standard helps the jury determine if
defendant had fraudulent intent and helps distinguish between sharp dealing and fraud); *United
States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to
discover a fraudulent scheme is not a defense to criminal conduct."); *United States v. Drake*, 932
F.2d 861, 864 (10th Cir. 1991) ("To accept Drake's argument would require us to hold that a
party who fully intends to deceive a victim may avoid criminal liability by designing a scheme
sufficiently unusual that the law would deem it unbelievable by a reasonably prudent person.");
*United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980) ("The victim's negligence in not a
defense to criminal conduct."); *Linden v. United States*, 254 F.2d 560, 567-68 (4th Cir.1958)
(scheme to defraud was reasonably calculated to deceive persons of ordinary prudence and
comprehension even when victims were careless because form was designed not to be read
carefully).  *See also United States v. Callipari*, 368 F.3d 22, 37 (1st Cir. 2004), vacated on other
grounds, 543 U.S. 1098 (2005) ("The court was well within its discretion to exclude evidence
suggesting that [the victim], rather than [the defendant] and his co-conspirators, was to blame for
the loss.").

average judgment or intelligence, who are anyway the biggest targets of such criminals and hence the people most needful of the law's protection." *Id.*

In this case, the main disputed issues are whether the price information that Demos misrepresented would have been important to an objectively reasonable investor (*i.e.*, materiality) and whether Demos acted with the intent to defraud. Claims that the victims were negligent, or not reasonably cautious, or should have done more due diligence to avoid being defrauded, or that only an unreasonable investor would have failed to detect Demos's fraud, are irrelevant. *Thomas*, 377 F.3d at 243 (victim's gullibility irrelevant); *Amico*, 486 F.3d at 780 (victim's lack of sophistication not relevant to fraudulent intent);[3] *Isola*, 548 F. App'x at 725 (victim's unreasonableness irrelevant to materiality of false statements).[4] As the Second Circuit has said, "We refuse to accept the notion that the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim." *Thomas*, 377 F.3d at 243 (quotation marks and citation omitted).

Given its lack of relevance, evidence that the victims should have acted differently to avoid fraudulent trades with Demos—particularly when delivered as an expert's *ipse dixit*—is substantially more prejudicial than probative. Allowing defendant to explore on cross-examination or through expert testimony whether victims should have taken more or better preventative measures to avoid being defrauded introduces to the jury the unacceptable

---

[3] *See also United States v. Davis*, 226 F.3d 346, 358-59 (5th Cir. 2000); *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000); *Coyle*, 63 F.3d at 1244 (3d Cir. 1995); *United States v. Biesiadecki*, 933 F.2d 539, 544 (7th Cir. 1991); *United States v. Maxwell*, 920 F.2d 1028, 1036 (D.C. Cir. 1990); *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980).

[4] *See also United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (Easterbrook, J., writing in False Claims Act case, "laws against fraud protect the gullible and the careless— perhaps especially the gullible and the careless—and could not serve that function if proof of materiality depended on establishing that the recipient of the statement would have protected his own interests.").

possibility that Demos's victims are at fault because they fell for his fraud.  In a decision

rejecting this an "unreasonable victim" argument as grounds for a motion to dismiss, Judge

Marrero in the Southern District of New York anticipated the very defense that the Government

anticipates that Demos is trying to make at trial:

> Shifting the emphasis of the relevant probe to whether the victim
> acted reasonably, and whether objectively a person of ordinary
> prudence and comprehension would have been deceived by a given
> scheme, necessarily invites a distracting evidentiary debate entailing
> inquiry into which of the targeted victims acted reasonably and
> which did not, and into the reasons why or why not.

*United States v. Falkowitz*, 214 F. Supp. 2d 365, 381 (S.D.N.Y. 2002) (denying motion to

dismiss conspiracy, mail fraud and wire fraud charges).  Defendant should not be permitted to

put his victims on trial for negligence because the federal fraud statutes exist to protect "[t]hose

who are gullible, as well as those who are skeptical."  *Biesiadecki*, 933 F.2d at 544.

## CONCLUSION

The Court should issue an order precluding the defense from introducing evidence or

arguing that victims defrauded in this case were gullible or negligent in entering into fraudulent

securities transactions with Demos, that any lack of reasonableness or due diligence by the

victims provides a defense to Demos's conduct, or that a reasonable investor would not have

been deceived by Demos's fraud.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY


_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov
HEATHER L. CHERRY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv07037
heather.cherry@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2018, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's CM/ECF System.


_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY

# EXHIBIT 1



## THE
## BAEZ
### LAW FIRM
#### TRIAL LAWYERS

November 9, 2017

John Jefferies, Esq.
Heather L. Cherry, Esq.
David Novick, Esq.                          **BY EXPRESS MAIL AND EMAIL**
Assistant United States Attorneys
United States Attorney's Office
District of Connecticut
157 Church Street, 25th Floor
New Haven, CT 06510

 *Re: United States v. Demos, No. 3:16-CR-00220 (AWT) (D. Conn.)*

Dear Counsel:

     Defendant David Demos submits this letter, pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C)(i), to provide a summary of the testimony that Frank J. Fabozzi, Ph.D. and Marc Menchel may give at trial if a defense case is presented.

     This summary of testimony is provided without prejudice to the Defendant's rights to amend, supplement, or otherwise modify this disclosure depending on, among other things, whether the government designates any experts in its case in chief, the nature and scope of any such experts' testimony and opinions, the testimony and exhibits to be offered by the government in its case in chief, and/or the receipt of documents or other evidence from the government or third parties prior to trial.

     Per our discussion today, it is my understanding that you will object to our right of reservation to supplement or otherwise modify this disclosure as indicated above.  Accordingly, I intend to address your objection with the Court during our telephone conversation today at 4:30PM.

**Frank J. Fabozzi, Ph.D.**

a.    Qualifications:

     Frank J. Fabozzi has over 40 years of industry and academic experience, has authored hundreds of articles and other scholarly works, and is a widely recognized authority

☐ **6 Beacon Street**                    ☑ **66 N. Second Street**
Boston, MA 02108                          New Bedford, MA 02740

PH: 855-223-9080 | FX: 508-207-9747
www.baezlawfirm.com

BOSTON       MIAMI       NEW BEDFORD       ORLANDO



in the areas of structured finance, fixed-income securities, and portfolio management. He is Professor of Finance at EDHEC Business School, and Senior Scientific Adviser and co-head of the fixed-income research program at the EDHEC-Risk Institute.[1] Dr. Fabozzi is also a Teaching Fellow in Executive Programs at the Yale School of Management.

For the 2016-2017 academic year, Dr. Fabozzi is a visiting professor in the Department of Operations Research and Financial Engineering at Princeton University. In the Spring 2016 semester, he held the same visiting professor position and taught a graduate course in quantitative asset management. From 2014 to 2015, Dr. Fabozzi was Visiting Fellow for the Department of Operations Research and Financial Engineering at Princeton University, and for the 2013-2014 academic year was the James Wei Visiting Professor in Entrepreneurship in Princeton's School of Engineering and Applied Science. Prior to that, from 1994 through 2011, Dr. Fabozzi held multiple professorial positions in finance at the Yale University School of Management. From July 2003 to June 2011, Dr. Fabozzi served on the Advisory Council for the Department of Operations Research and Financial Engineering at Princeton University. From 1986 to1992, he was a Visiting Professor of Finance in the MIT Sloan School of Management. In addition, Dr. Fabozzi has held professorships in finance and economics at Hofstra University, Queens College (CUNY), Lafayette College, and Fordham University.

Dr. Fabozzi has authored or co-authored several books relating to mortgage- backed securities, including Fixed Income *Analysis for the Chartered Financial Analysts Program*, which is required reading for Levels I and II of the Chartered Financial Analyst ("CFA") Program examination.

Dr. Fabozzi is the editor of the *Journal of Portfolio Management* and an associate editor of several other journals related to structured finance and the trading and valuation of fixed-income securities. He is the editor of *The Handbook of Fixed Income Securities*, a definitive and trusted resource in the world of fixed-income investing, and *The Handbook of Mortgage-Backed Securities*.

Relevant chapters of books authored or edited by Dr. Fabozzi include:

- Frank J. Fabozzi, *Bond Markets, Analysis and Strategies*, Ninth Edition (Prentice Hall, 2016).
  - o   Ch. 13 (Non-Agency Residential Mortgage Back Securities)
  - o   Ch. 19 (Analysis of Residential Mortgage-Backed Securities)
- Frank J. Fabozzi, Anand K. Bhattacharya, and William S. Berliner, *Mortgage-Backed Securities: Products, Structuring, and Analytical Techniques*, Second Edition (John Wiley & Son, 2011).
  - o   Ch. 2 (Overview of the Mortgage-Backed Securities Market)
  - o   Ch. 4 (Prepayments and Factors Influencing the Return of Principal)

[1] 1 EDHEC is a French institution of higher learning, known as a "grande ecole" with campuses in France, London and Singapore.

2



- o   Ch. 8 (Structuring Private Label CMOs)
- o   Ch. 9 (Structuring of Mortgage ABS Deals)
- o   Ch. 10 (Techniques for Valuing MBS)
- o   Ch. 13 (Analysis of Non-Agency MBS)
- Frank J. Fabozzi, Fixed Income *Analysis for the Chartered Financial Analysts Program*, Second Edition (Frank J. Fabozzi Associates, 2004).
  - o   Ch. 10 (Mortgage-Backed Sector of the Bond Market)
  - o   Ch. 12 (Valuing Mortgage-Backed and Asset-Backed Securities)
- Frank J. Fabozzi, *Selected Topics in Bond Portfolio Management* (Frank J. Fabozzi Associates, 1997)
  - o   Ch. 12 (A User's Guide to Buy-Side Bond Trading)

Dr. Fabozzi frequently consults for and presents on topics in fixed income securities and portfolio management to government agencies. This has included, among others, the U.S. Securities and Exchange Commission, U.S. Department of Justice, Federal Home Loan Bank of Atlanta, Federal Reserve Board, Federal Home Loan Bank of New York, as well as major financial institutions. Dr. Fabozzi has been a trustee for a complex of funds sponsored by BlackRock Inc. (the closed-end funds) since its inception in 1988. He also served for two years as a trustee for the BlackRock Inc. equity-liquidity funds complex. He was previously a trustee for the Guardian family of open-end funds and variable annuities.

Dr. Fabozzi has been retained by participants on the buy- and sell-sides of the bond market to provide training to traders, salespeople, and portfolio managers regarding how RMBS work, and proper bond analysis and valuation. In some instances, Dr. Fabozzi has been retained to help establish sales and trading desks at a broker-dealer or asset manager. These engagements have involved more than 30 firms on the buy-side and the sell-side, including, among others, Bear Stearns, Alex Brown, Fannie Mae, Smith Barney, M&T Bank, Standard & Poor's, Freddie Mac, Bank of America, Piper Jaffray, Barclays Merrill Lynch, FHLB of New York, JP Morgan, Paribas, and Paine Webber.

Dr. Fabozzi has testified as an expert witness in various cases, including on behalf of the U.S. Department of Justice and the U.S. Securities and Exchange Commission.

In 2002, Dr. Fabozzi was inducted into the Fixed Income Analysts Society Hall of Fame, which recognizes lifetime achievements of outstanding practitioners in the advancement of the analysis of fixed-income securities and portfolios.  In 2015, Dr. Fabozzi was awarded the James R. Vertin Award by the CFA Institute, in acknowledgement of his contributions to the profession of investment management. In 2007, he received the C. Stewart Sheppard Award from the CFA Institute for his leadership and education efforts in the investment management profession.

Dr. Fabozzi graduated from City College of New York with a B.A. and M.A. in Economics in 1970. Dr. Fabozzi obtained his doctorate in economics from the Graduate Center of the City University of New York in 1972. He earned the designation of Chartered Financial Analyst in 1977 and Certified Public Accountant in 1982. Dr. Fabozzi received an Honorary Doctorate of Humane Letter from Nova Southeastern University in June 1994.


————THE————
BAEZ
——LAW FIRM——
TRIAL LAWYERS

b.  Summary of Opinions and Bases: It is anticipated that Dr. Fabozzi, if called as a witness, would testify, all based on his education, training and experience,2 as to his opinion on the following issues:

i.  Explanation of RMBS. How RMBS are structured, how they perform, and how they are evaluated as investments, including specifically during the time period covered by the Superseding Indictment (the "Indictment"), when RMBS were viewed as distressed assets. What a non-agency RMBS is and how its expected value to an investor is driven by assumptions about the underlying mortgage pool and other factors such as default rates, recovery rates, prepayment rates, housing market conditions, and geographical factors. Dr. Fabozzi may opine that investors use these variables to construct models, predict a bond's yield, and ultimately determine a range of reasonable prices for the bond. Dr. Fabozzi may summarize certain examples of these models, including such as those expected to be produced by third parties.

Specifically, Dr. Fabozzi may explain to the jury the various components of these models (e.g., default rates, recovery rates, pre-payment rates, delinquency rates, etc.), and how those inputs are used to generate a price range for a given RMBS.

ii.  Specifically, Dr. Fabozzi would testify that, based on the variables identified above, such as default rates, recovery rates, prepayment rates, etc., the counterparties who prepared these models used them to determine a price range at which they would either buy or sell a specific RMBS and that they relied on these models and other information, such as price information provided by other dealers and third-party marking vendors, to make those investment decisions.

iii.  The RMBS Market. The structure and unique features of the non- agency RMBS market, and, in particular, the market as it existed during the time period relevant to the Indictment.  The market was and remains generally opaque and illiquid, and during periods of market stress, such as the period relevant to the Indictment, investors executed non-agency RMBS transactions within a wide price range, and expected non-agency RMBS transactions to be executed within a wide price range. Dr. Fabozzi may opine that in an illiquid and opaque market, dealers perform a valuable service by creating a market, providing liquidity to sellers, and providing financing for buyers. Dr. Fabozzi would also opine that, despite the generally opaque nature of the RMBS market, market participants such as the counterparties identified in the Indictment, had access to multiple sources of RMBS pricing information, including information provided by dealers; the counterparty's prior marks-to-market on such bonds; marks-to-market and valuations of comparable bonds, including those held by the counterparty itself, which may be obtained from a variety of sources including third-party marking vendors and other RMBS dealers; general market trends; discussions with other market participants; lists of bonds offered for sale; the characteristics of the bond itself; and industry research.



iv.    The non-agency RMBS market is dominated by sophisticated institutional investors, such as hedge funds and large asset managers, who invest heavily in research, modeling, and other kinds of qualitative and quantitative analytics. These institutional investors hire professionals from the world's top universities and graduate schools, many of whom have advanced degrees in finance and mathematics. It was not unusual for buy-side RMBS investors to hire traders and/or portfolio managers with previous experience working at sell-side RMBS dealers. Reasonable investors in this market conduct rigorous, independent research, analysis, and due diligence, including making a determination of the price range in which the investor would or would not buy RMBS, before entering the market to buy or sell non-agency RMBS, specifically, the type of analysis reflected in paragraph (b)(i).

v.    <u>Relationship between Investors and Traders</u>. Dr. Fabozzi may describe the structure of the non-agency RMBS market and the nature of the relationship between traders and investors in this market. Specifically, he may describe the difference between agency and principal trades and the manner in which dealers earn a profit through their trading activities (i.e., by earning a spread between the prices at which they buy and sell RMBS).

vi.    In the RMBS market, trades are done on a principal-to-principal basis, as reflected in the trade confirmations for the RMBS transactions referenced in the Indictment. These are arms- length transactions between sophisticated parties whose economic interests are in direct conflict with one another. Dealers are exposed, to varying degrees, to considerable risks in these principal-to-principal transactions, including investment risk, default risk, consummation risk, and the risk that negotiations may simply be unsuccessful, whether they are buying or selling RMBS for their own inventory, or attempting to contemporaneously buy RMBS from one counterparty and sell them to another counterparty. These risks are made more significant because of the high dollar amounts of the RMBS that are typically traded.

vii.    Dealers owe no duty of "best execution" to their counterparties in principal-to-principal trades in the non-agency RMBS market. The dealer has no obligation to disclose its acquisition price or profit in principal-to-principal trades of non-agency RMBS. In principal-to- principal trades, the dealer's profit on a trade consists of the difference between the prices at which the firm purchases and sells a bond, which prices incorporate any mark-up on the bond in issue. There are no separate commissions. The trade confirmations produced in this case illustrate Dr. Fabozzi's opinions regarding the principal-to-principal nature of these trades.

viii.    <u>Analysis of Counterparty Models</u>. Dr. Fabozzi may opine about the high level of complexity of certain financial models used by buy-side firms, the high level of importance placed on the output of these models by buy-side investors when those investors evaluate non-agency RMBS, the large number of assumptions and variables used in the models, and the relative sensitivity of the models to changes in those assumptions.

5



ix.     Dr. Fabozzi may opine about the relative complexity of the financial models used by certain buy-side investors versus the financial models employed by Cantor Fitzgerald and David Demos. Many institutional investors on the buy-side invested more heavily and devoted more resources to modeling than Cantor Fitzgerald and David Demos. Institutional investors with highly-sophisticated models frequently had an informational and analytical advantage over Cantor Fitzgerald and David Demos in terms of their ability to evaluate non-agency RMBS.

x.      Process that Non-Agency RMBS Investors Use to Make Investment Decisions. The manner in which sophisticated investors in the non-agency RMBS market make decisions about whether to buy, sell, or hold a bond, including the role of proprietary modeling in the decision-making process, as well as other relevant market information, and how reasonable investors go about acquiring, compiling, evaluating and verifying such information. Dr. Fabozzi may opine that once a counterparty has determined that a non-agency RMBS is a suitable candidate for inclusion in its portfolio, the model becomes the most important driver of the counterparty's investment decision. In addition to the model, other relevant information includes the counterparty's marks-to-market on such bonds; the counterparty's marks-to-market and valuations of comparable bonds, including those held by the counterparty itself, which may be obtained from a variety of sources including third-party marking vendors and other RMBS dealers; general market trends; discussions with other market participants; lists of bonds offered for sale; the characteristics of the bond itself; and industry research. A reasonable investor, such as the sophisticated counterparties identified in the Indictment, would give little, if any, weight to statements made by a dealer in the course of negotiations, including the dealer's representations about the price at which the dealer previously purchased the RMBS, whether the RMBS was being sold from the dealer's inventory, or whether the dealer was transacting with a buyer or seller on the other side. Dr. Fabozzi may opine that, if an investor could not independently verify information provided to it by a dealer during the course of negotiations over the purchase or sale of an RMBS, the counterparty investor would not be reasonable in relying on such information in making its investment decision, and that reasonable investors in the RMBS market do not rely on such information in making investment decisions. Dr. Fabozzi may opine that it would be a breach of the counterparties' fiduciary duties to their own investors to rely on such representations in making a decision whether to purchase an RMBS and, if so, at what price. As an economic matter, the dealer's profit as a principal on a given trade has no effect on the future cash flows from the bond. The cash flows are dictated by the performance of the underlying collateral, namely the prepayment, default, and severity rates associated with the mortgage pool.

xi.     The market roles of investors and dealers and what information they typically exchange. Specifically, in principal-to-principal trades like the non-agency RMBS trades between Cantor Fitzgerald and various counterparties referenced in the Indictment, the parties engage in arms-length negotiations, and each party is acting in its own economic interests, not the economic

6



interests of the party on the other side of the transaction. Consequently, reasonable investors in the non-agency RMBS market treat unverifiable information with skepticism. The counterparty's unverified acquisition price would not affect a reasonable investor's decision about whether to purchase a non-agency RMBS and at what price. The investor would also rely on its own valuation of the bond, instead of a single unverified purchase price in making its investment decision. For example, an investor in the non- agency RMBS market would act reasonably in relying on a dealer's representations about verifiable information about a given RMBS, such as the specific CUSIP number of an RMBS bond under negotiation, the collateral securing the bond, the current face or original face amount, or the rating, but would not be acting reasonably and satisfying its fiduciary duties if it made its investment decision on non-verifiable information from the dealer such as whether the bond being negotiated was being sold out of the dealer's inventory, the price the dealer paid to acquire the security or how much profit the dealer is earning.

xii.  <u>Range of Prices Paid for Non-Agency RMBS</u>. Since non-agency RMBS were viewed as distressed assets during the time period covered by the superseding Indictment, reasonable investors were willing to pay, and did pay, a range of prices for the same RMBS during the same periods of time. Dr. Fabozzi may opine that reasonable investors did not have a single price they were willing to pay for a bond. This is demonstrated by the fact that investors paid different prices for the same bond within a reasonably compressed period of time. Dr. Fabozzi may further explain, based on his review of documents obtained by Defendants and third party Defendants during discovery, the amount of profit or loss realized by the counterparties identified in the Indictment through their prior or subsequent trades of the RMBS they bought from or sold to Cantor Fitzgerald. Dr. Fabozzi may also utilize mark-to-market information for certain RMBS bonds obtained from investors during discovery to opine about amount of profit or loss realized by the counterparties.

xiii. <u>Marking to Market</u>. Dr. Fabozzi may opine about the importance to buy-side money managers of marking on the RMBS in their portfolio. Marks-to-market are used by buy-side  money managers to assign current  market values to RMBS  in their  portfolio.  Institutional investors on the buy-side devote significant resources to ensuring that their marks are accurate, using internal resources, as well as third-party dealers and pricing services. Dr. Fabozzi may opine that marking is a critical factor in an institutional investor's determination of the value of a bond. Dr. Fabozzi may opine that marking is a critical factor for an institutional investor when it determines the price or range of prices at which it may be willing to sell a bond, or add to a position in a bond it already owns.



**Marc Menchel**

a.     Qualifications:

*September 2012 to Present, Principal, Menchel Consulting LLC*

Founder of a firm designed to engage in non-legal expert consulting services such as: expert witness; strategic consultancy during the pendency of a regulatory problem, examination, or disciplinary proceeding; oversight for remedial undertakings in response to a regulator matter; or guidance as to the sufficiency of compliance programs in response to regulatory requirements.

*May 2002 to May 2012, General Counsel, Executive Vice President, FINRA*

General Counsel of the largest U.S. securities self-regulatory organization, based in Washington, D.C. and New York. Management responsibility for the Office of General Counsel (OGC), which is comprised of 45 staff members including 25 attorneys and a $10 million annual budget. OGC is divided among the Appellate Group, Regulatory Groups, and the Ahead of the Curve Group (ATC Group). The Appellate Group serves as counsel to the National Adjudicatory Council (the appellate body for disciplinary proceedings) and writes all FINRA appellate decisions and appears as FINRA's counsel on all appellate briefs submitted to the SEC; the Regulatory Group is charged with determining FINRA regulatory policy both in conjunction with and independently from the operating divisions of FINRA, preparing, filing, and shepherding all rule filings with the SEC, issuing Regulatory Notices, interpretive guidance, and other publications dealing with FINRA policy, providing a liaison function to all standing committees of FINRA, and providing counsel and policy guidance to all operating departments of FINRA and senior management. The General Counsel regularly presents on regulatory matters and rule proposals to the FINRA Board of Governors and represents and speaks on behalf of FINRA at national and international securities forums, panels, and conferences throughout the year.

Achievements include creation of the mission statement and operating protocols of the ATC Group in May 2002 for the purpose of identifying nascent regulatory issues with potential pernicious and wide-ranging impact (the ATC Group has identified over 50 regulatory topic areas and the program has been emulated by the SEC and NYSE); development of sweeping rule amendments across a broad topical spectrum including th areas of supervisory control, CEO certification of compliance processes, debt mark-up, quality of market rules for the unlisted OTC market, transparency and dissemination protocols for debt instruments, new securities issuance, variable annuity sales, business continuity planning, limit and participation in various FINRA task forces on mutual funds breakpoints and account transfer issues; policy statements on best execution in bonds, obligations attached to the sale of non-conventional instruments, retail participation in hedge funds, and investment issues pertaining to the sale of structured and new products.



*July 1995 to March 2002, Director and Corporate Secretary, Executive Vice President and General Counsel, Member of the Board of Directors, Tucker Anthony Incorporated*

General Counsel of a Boston based broker-dealer, investment bank and investment adviser. Overall management responsibility for the firm's legal and compliance departments staffed by five attorneys, nine compliance/registration professionals, and four support staff. Position entailed broad direct legal responsibilities beyond the management of professionals and the departments. Responsibilities included the determination of legal and compliance policy concerning all aspects of the firm's business; providing counsel in the following areas: investment/merchant banking, broker-dealer and investment advisory matters, capital markets, operations, regulatory capital issues, and personnel matters; the supervision and management of outside counsel for all matters; handling regulatory matters before the SEC and the self- regulatory organizations; and directing the conduct of firm litigation.

Achievements during this period included legal management and due diligence in the buyout of the parent company (Freedom Securities Corporation) from John Hancock Mutual Life Insurance Company; negotiation and implementation of conversion from self-clearing firm to introducing broker; legal and regulatory counsel and management of the private placement of a firm sponsored private-equity fund (a fund of select and top performing venture capital and private-equity funds); responsibility for a range of legal matters regarding the initial public offering of the parent company, Freedom Securities (listed on the NYSE); and complete restructuring and enhancement of firm compliance and trading polices.

*January 1991 to June 1995, Senior Vice President and International Counsel, Prudential Securities Incorporated*

Chief international legal officer, based in London (and subsequently New York), and responsible for supervision of legal and compliance departments located in London, Paris, Hong Kong, and Melbourne. Duties included responsibility for the oversight of significant international litigation; acting as corporate secretary and counsel to the futures, foreign exchange, money broker and equity broker subsidiaries; providing counsel to branch offices throughout Europe, South America, Asia, and Australia; oversight of regulatory matters in all locations; providing counsel on capital market issues, regulatory capital matters, and matters pertaining to the provision of financial services generally.

Chief achievement during this period was the establishment of a private bank (based in Luxembourg) with EC-wide passport privileges during the period (1991 to 1992 and following) that the Banking Directive was first implemented and the Financial Services and Capital Adequacy Directives were pending (which added significant difficulties to the implementation of this project because of an uncertain and shifting legal and political environment). Project included directing and managing counsel in various countries and in-depth negotiation with various central banks including the IML in Luxembourg, The Bank of England, and the U.S. Federal Reserve Board.



THE
BAEZ
— LAW FIRM —
TRIAL LAWYERS

*April 1990 to December 1991, Vice President and Compliance Officer, Prudential-Bache Securities (UK) Incorporated*

Chief legal and compliance officer, based in London, for the UK subsidiary of rudential Securities Incorporated and its affiliated futures, foreign exchange, money broker, and equity broker companies. Responsibility for all UK and applicable U.S. regulatory matters; UK capital market issues; European litigation; UK property matters; provision of counsel relative to branch and operational inquiries; and UK corporate matters. Served as a member of the UK investment banking commitment committee. Wrote the UK compliance manual based on AFBD and TSA (later updated for SFA) regulations (these were the UK self-regulatory organizations prior to the advent of the FSA). Developed surveillance program for Eurobond and foreign exchange trading.

*September 1989 to March 1990, Vice President and Associate General Counsel, Prudential Securities Incorporated*

Served as counsel to the Correspondent Clearing Division, Bank Certificate of Deposit Division, Precious Metals Division and general corporate area of the firm. Duties involved negotiating and drafting legal agreements and providing counsel based on the regulatory and legal requirements applicable to each of these areas.

*November 1986 to August 1989, Vice President and Associate General Counsel, Thomson McKinnon Securities Incorporated*

Duties included the negotiation of the firm's leasehold agreements throughout the United States and Europe; drafting of contracts; review and drafting of documentation attendant to the firm's capital market transactions and registered commodity pool offerings; management of significant litigation; preparation of pleadings and appearing on behalf of the firm in arbitrations; and representation of the firm and various employees before the SEC and self-regulatory organizations. Worked extensively on asset sale of firm's clearing operation to ADP and eventual asset sale of remainder of business to Prudential Securities.

*January 1983 to October 1986, Vice President and Deputy Director of Compliance, Thomson McKinnon Securities Incorporated*

Directly managed and supervised a staff of 40 compliance professionals including five attorneys. Was primarily responsible for resolving and representing the firm before all principal U.S. regulatory bodies. Managed complex litigation with outside counsel. Wrote compliance manual. Provided counsel to the banking, institutional, trading, and retail areas of the firm.

*August 1980 to December 1982, Compliance Officer, Thomson McKinnon Securities Incorporated*

Responsibilities included handling customer complaints and correspondence; responding to regulatory inquiries; processing special securities transactions (Rule 144); managing outside counsel and litigation; preparation of pleadings in arbitration,



research, and response to general broker-dealer trading and retail issues.

*Professional Affiliation*

Past member of the Executive Committee of the Securities Industry Association, Compliance and Legal Division (SIACL). Received the SIACL President's award as Regulator of the Year in 2006.

*Professional Qualification*

Member of The New York State Bar

*Education*

Syracuse University College of Law – J.D., 1980

Davidson College – B.A., 1977

b.     Summary of Opinions and Bases Therefore: Mr. Menchel holds each of the following opinions and is prepared to offer them if called to testify. Except where otherwise noted, Mr. Menchel's opinions are based on his experience in the industry and his exposure to the regulatory regime governing the industry. In particular, Mr. Menchel gained expertise in the topics outlined below through his work as General Counsel of FINRA from May 2002 to May 2012, and, prior to that, his work included directing compliance for a broker-dealer. All subsequent references to Mr. Menchel's "education, training, and experience" refer to the education, training, and experience he gained in these positions.

1.   Securities Industry Terminology and Practices: Based upon his education, training, and experience, Mr. Menchel may offer his expert opinion on the meaning of certain terms relevant to RMBS trading, and related industry practices that are used in the indictment, including:

**a.** A broker-dealer is a securities firm that is in the business of buying and selling securities. "Broker" refers to a broker-dealer effecting securities transactions, in an agency capacity for others. When acting as agent, broker-dealers charge a commission to their customers. "Dealer" refers to a broker-dealer acting as "principal," which means buying securities for and selling from its own account. When acting as a principal, a broker-dealer is compensated through mark-ups or mark-downs – or profit – embedded in the price of the security. No commission is charged when a broker-dealer acts as principal. In the institutional fixed income market, principal trades are viewed as arms-length transactions between counterparties whose interests diverge and who owe no fiduciary duties to each other. That view is codified in the FINRA mark-up rule that applies to non-investment grade fixed income instruments that trade between dealers and qualified institutional buyers (QIBs).

**b.** Furthermore, when acting as a principal and negotiating with QIBs over the purchase of RMBS, a dealer has no customer responsibilities to the QIB regarding

11



price. Therefore, the dealer has no obligation to bid an amount conveyed by a potential buyer to the seller. There is no FINRA Rule that prohibits this practice.

2.   The indictment's references to "commissions" are misplaced. Cantor Fitzgerald charged no commissions on any of the trades referenced in the indictment. The term "commission" applies when a broker-dealer is acting in the capacity of agent and are virtually unheard of in the fixed-income market (which includes RMBS). Rather, examination of the relevant trade tickets and confirmations indicates that Cantor Fitzgerald, acting as principal and trading for its own account, earned profit by selling RMBS bonds to counterparties at prices higher than its acquisition costs. Cantor Fitzgerald was not receiving any other remuneration or charging any other fee for the execution of principal transactions.

3.   The terms "all-in" and "on-top" in paragraphs 12(a), 12(b) and 19 of the indictment are not terms that are derived from, or recognized by, securities industry regulation. Rather, they are jargon used by market participants as part of a price negotiation. Strictly speaking, all trades with a broker-dealer acting as principal are "all in" because when an agreement is reached, the deal is always memorialized as one price to the customer for a quantity of a bond. There are no other separate fees or charges for the transaction.

4.   Trade confirmations reflect this "all in" understanding. As governed by SEC Rule 10b-10, which was promulgated under the anti-fraud provisions of the federal securities laws, in the context of fixed income transactions, a broker-dealer, when acting in the capacity of principal on a fixed income transaction, is under no duty to disclose its cost or the amount of mark-up that it charges on the sale of a bond. Consistent with applicable disclosure requirements, when acting as principal, dealers in debt securities do not disclose their costs or mark-ups. For illustration, Mr. Menchel may review numerous trade confirmations that Cantor Fitzgerald provided to customers including those referenced in the indictment. Among other aspects of the confirmations, Mr. Menchel may observe that the dealer's cost is not disclosed and no commission is charged.

5.   Mr. Menchel may also review the rationale for this regulatory regime, and opine that an attempt to change the rules to require dealers to disclose mark-ups failed because bond market participants – on both the "sell" side and the "buy" side did not want full disclosure. He may opine that, based on his subsequent discussions with market participants, market participants had no interest in reviving this proposal because they concluded that additional disclosure was not needed, given the sophistication of investors in this market. The aborted attempt to require full disclosure was proposed by the SEC in Securities Exchange Act Release No. 33743. As General Counsel of FINRA, Mr. Menchel was later involved in discussions about changing the regulatory regime to provide for greater disclosure. He met with industry groups who expressed their opinion that market participants did not want the disclosure of markups. These industry participants explained that RMBS buyers and sellers price bonds based on the bond's characteristics, without reference to the size of the markup. Industry participants also pointed out that all transactions in this market are arms-length transactions, where parties determine an appropriate price for themselves. Based on these discussions and his experience interacting with market



participants during his time at FINRA generally, Mr. Menchel may opine that institutional bond market participants such as investment funds, hedge funds, and pension funds do not regard disclosure of a dealer's costs or profits as important; rather institutional bond buyers focus on total price and yield, which necessarily take into account any embedded profit in the price quoted by a dealer, and are equipped to evaluate the fairness of a price and negotiate accordingly.

6.   Mr. Menchel may opine that the size of mark-ups on the transactions referenced in the indictment is not grounded in any regulatory guidance. There is no rule that places a specific limit on the mark-ups that may be charged on transactions addressed in FINRA Rule 2121.02.

7.   Mr. Menchel may opine that the best execution principle of buy and sell side firms, to the extent it refers to a broker-dealer's duty of best execution to a counter-party , is commonly not defined solely in relation to price. "Best execution" is a term that encompasses three concepts: speed of execution, certainty of execution, and price. Institutional market participants routinely choose to execute with brokerage firms that offer the best execution in terms of the size of the negotiated order without regard to getting the lowest price at which a particular bond may trade at a given time. This concept is correctly noted in the Cantor Fitzgerald Written Supervisory Procedures, 2011, at 308 (DOJ-DD-00000087.) "Given the sophistication of the customer, the complexity of ABS and its price modeling conventions, buyers and sellers of ABS have priorities of certainty and timeliness rather than the highest offer/lowest bid. Given the aforementioned factors, the Firm satisfies its best execution obligations by satisfying the customer's priorities of certainty of execution and timeliness."

8.   Mr. Menchel may opine that broker-dealers owe a duty of "best execution" to "customers" (as "customers" is defined in the applicable FINRA regulations). In the stock market, where the markets are transparent, this duty is more straightforward and easier to apply. A brokerage firm has to route held market orders to the market where it has the highest likelihood of achieving the best price. Thus, instead of simply filling an order at the firm's quoted price, it must check around to other markets and route the order accordingly. In some segments of the bond market, including the RMBS market in during the period covered in the indictment, there was no consolidated or listed market and no ready access to all market participants. There were no alternative exchanges or electronic trading platforms. The fact that the bond markets are negotiated, not order driven, lack robust pre-trade price discovery mechanisms, and lack electronic access to firm quotes, assessing best execution in real time, let alone after the fact, is a much different process for a bond dealer than for an equity dealer. A bond dealer does not have the same pre-trade point of quote discovery that an equity dealer has in seeking to obtain best execution and in reviewing executions after the fact to determine if, in fact, best execution was achieved.

9.   In any event, the duty of best execution is inapplicable to the situation in which a broker-dealer is transacting with a Qualified Institutional Buyer ("QIB") in non-investment grade bonds. The duty of best execution is subsumed by the QIB exemption for non-investment grade bonds as set forth in FINRA Rule 2121.02 as that exception in effect puts broker- dealers and their QIB customers in the role of

13



arms-length counter-parties as to the pricing of non-investment grand bonds. Cantor Fitzgerald and Mr. Demos had no duty to offer better prices to its counter-party, or otherwise assist that counter-party in executing at a better price. Rather, Cantor Fitzgerald and Mr. Demos were free to negotiate any price with a QIB, irrespective of profit earned on the trade. The whole point of the QIB exemption is that the sophistication of the QIB in negotiating the transaction is the sole check on the price of the transaction. By definition, "the QIB has the capacity to evaluate independently the investment risk and in fact is exercising independent judgment in deciding to enter into the transaction." FINRA Rule 2121.02(b)(9). The fact that a QIB is not a customer in this context has several implications:

§ There is no limit on the size of the dealer's markup.

§ The best execution duty does not apply.

In sum: in transactions involving QIBs and non-investment grade debt securities, each side is of the transaction is an arm's length counterparty to the other. There are no regulations that govern counterparty dealings per se because the securities regulatory scheme does not impose duties to counterparties as opposed to customers.

10.   From the buy-side perspective, there is a different duty of best execution: that of he investment manager to his clients to get the most favorable price for his client under the circumstances. This is typically done by comparing price quotes from many dealers and negotiating that price with one or more dealers. Again, price is not the sole consideration. Speed, certainty, and other factors with respect to a transaction of institutional size may also be relevant, as well as relationships that an investment manager may have with brokerage firms that may benefit its client.

**a**. A buy-side account is not required to transact with a particular broker. Nothing that Mr. Demos did prevented any buyer from checking prices at other broker-dealers. Given the fiduciary duties these sophisticated buy-side professional investment firms owed their clients, which are assumed to have been fully adhered to, there is nothing that Mr. Demos did that caused his counter-parties to transact with Cantor Fitzgerald at prices higher than the prices available from other firms unless it was in the interest of these buy-side firms to do so. If lower prices were available, the buy-side accounts likely would have traded away from Cantor Fitzgerald. The fact that the buy side account chose to transact with Cantor Fitzgerald indicates that Cantor Fitzgerald in all likelihood had the best price (or only price) for a transaction of the size in the market at the time.

**b**. From the buy-side account's perspective, one could only say that the price component of a trade execution was poor in terms of a comparison to what was available from other broker-dealers. If the price negotiated was the only price available in the market there would be no basis to conclude that the execution was poor and that the price should have been better.

11.   Importance of Broker-Dealer Compliance Function: Based upon Mr. Menchel's extensive experience in the securities industry and as a securities regulator, Mr. Menchel may explain that dealers typically have compliance programs designed to



TRIAL LAWYERS

ensure that personnel comply with governing laws and regulations. Mr. Menchel may opine that:

**a**. Internal compliance training is important in brokerage firms. Through training, the compliance function at a broker-dealer distills the securities industry's many rules to provide clarity to brokers, traders, and sales representatives on how to conduct themselves. Internally within a firm, the interpretation of the compliance staff on what is permissible is very important and is appropriately understood by the employees of that firm as authoritative.

**b.**    Cantor Fitzgerald's review of Bloomberg chats between Mr. Demos and customers and the review of final execution pricing would have allowed (and should have caused) Cantor Fitzgerald to raise any issues of impropriety in the transactions, cited in the indictment, with Mr. Demos.

12.   Trade Specific Opinions: Mr. Menchel may offer the opinion that each of Demos' counterparties to the charged trades is a QIB.

Sincerely,

George J. Leontire
GJL/cb

cc:     Honorable Alvin W. Thompson
        Jose Baez, Esq.
        Ronald S. Sullivan, Esq.
        Michael L. Chambers, Jr., Esq.
        Peter A. Chavkin, Esq.
        Patrick J. Sharkey, Esq.