UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:16CR220 (AWT) |
| | : | |
| v. | : | |
| | : | |
| DAVID DEMOS | : | March 19, 2018 |

## GOVERNMENT'S MOTION TO ADMIT UNCHARGED TRADES AS "OTHER CRIMES" EVIDENCE UNDER F.R.E 404(B)

The United States respectfully requests that the Court admit under Fed. Rule Evid. 404(b) documents and testimony concerning uncharged RMBS trades in which the defendant David Demos made misrepresentations and admissions that tend to establish the elements of the charged securities fraud.

## BACKGROUND

Demos was indicted on December 7, 2016. Pursuant to its discovery obligations, in December 2016 and February 2017, the Government provided Demos with, *inter alia*, a list of 18 victim/witnesses that might testify in its case-in-chief and the documents in its possession relating to the approximately 60 trades containing misrepresentations similar to those charged in the Indictment.

In February 2017, the Court issued a scheduling order, which set March 1, 2017 as the date the Government was to provide Rule 404(b) notice to the defendant. Both parties anticipated that at trial the Government would offer evidence concerning misrepresentations in trades other than those charged.[1] Because the Government mistakenly assumed that the uncharged trade evidence

---

[1] The Government was permitted to offer this as evidence of the charged scheme in the prior *Litvak* trials, and one of the reasons Demos argued that he needed 18 months to prepare for trial was the volume of similar act evidence. *See* Jan. 9, 2017 Defense Ltr. to Chambers.

would be admitted as direct evidence of Demos's scheme to defraud, it did not identify the 60 uncharged trades as 404(b) evidence, writing to defense counsel that "[t]he Government will certainly introduce evidence in its case-in chief concerning the defendant's acts, misrepresentations and omissions in connection with bond transactions not referenced in the Indictment which were part of the charged scheme to defraud." To avoid any possibility of surprise, the Government also promised to provide Demos "with a list of any uncharged trades that it intends to offer as part of the charged scheme on December 1, 2017, when the parties exchange witness and exhibit lists."

On April 21, 2017, Demos filed a motion to preclude the Government from offering the uncharged trade evidence because it failed to provide 404(b) notice on March 1, 2017. *See* Mem. of Law [doc. # 59] at 8-12. On May 12, 2017, the Government responded, arguing that the uncharged trade evidence was direct evidence of the alleged scheme. *See* Gov't Opp. [doc. # 64] at 7-12. That motion remains pending.

On December 1, 2017, more than four months before trial, the Government gave the defense notice that it intended to offer evidence of just eight (out of the 60) uncharged trades. Specifically, the Government's exhibit list included all 57 documents it expects to offer with respect to these trades, with each trade separately numbered (*e.g.*, the documents for the first uncharged trade are number GX 700-707, the next is 710-715, etc.).

On January 12, 2018, Demos filed a motion *in limine* that again sought to preclude the Government from offering any evidence of uncharged trades. *See* Def. Mot. [doc. # 143]. As of that date, Demos had been in possession of the documents related to the 60 possible uncharged trades for approximately a year and had known which eight specific uncharged trades the Government intended to raise at trial for five weeks. In its opposition, the Government reiterated

its argument that this was direct evidence of Demos's scheme to defraud, and therefore 404(b) notice was unnecessary under the rules. But even if the Court disagreed, the Government noted that this evidence of Demos's motive, opportunity, intent, preparation, plan, knowledge, and absence of mistake should still be admitted because Demos had been given "reasonable notice" of the "general nature" of the evidence as required by Rule 404(b)(2)(A).

At the March 12, 2018 hearing on the parties' motions *in limine*, the Court expressed its view that the uncharged trade evidence would likely not be admissible as direct evidence of the charged counts of securities fraud. Given the importance of this evidence to the Government's case, the Government sought leave to file this motion seeking to admit the uncharged evidence pursuant to Rule 404(b). Earlier today, the Court precluded the Government's uncharged trades as direct evidence, and reserved pending the parties' briefing on the question of whether it is admissible under Rule 404(b).

## APPLICABLE LAW

Evidence of other acts may be introduced pursuant to Fed. R. Evid. 404(b). The Rule provides, in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b). The district court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b). *United States v. Brady*, 26 F.3d 282, 286 (2d Cir. 1994). In general, evidence is admissible under Rule 404(b) "if (1) it is introduced for a proper purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value, and (4) it is admitted with a limited instruction if requested." *United States v.*

*Rutkoske*, 506 F.3d 170, 177 (2d Cir. 2007) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1998)).

The Second Circuit has adopted an "inclusionary approach" that permits the admission of other crimes or acts for "any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test." *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994). For example, the Second Circuit has held "other crimes" evidence is admissible to prove state of mind. *United States v. Edwards*, 342 F.3d 168, 176, 180 (2d Cir. 2003). Corroboration of Government witnesses is another appropriate, non-propensity purpose for admitting other acts evidence. *United States v. Scott*, 677 F.3d 72, 81 (2d Cir. 2012) ("We have 'consistently held [other act evidence] admissible to corroborate crucial prosecution testimony.'") (alteration in original).

While any evidence, including that offered under Rule 404(b), is subject to the balancing test set forth in Rule 403, the Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" that the charged crimes should not be deemed unfairly prejudicial. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

Rule 404(b) also requires that "upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial." Fed. R. Evid. 404(b). The purpose of Rule 404(b)'s notice requirement is "to reduce surprise and promote early resolution" of any challenge to admissibility of the proffered evidence. *Id.*, Advisory Committee Notes, 1991 Amendment. What constitutes reasonable notice depends on the circumstances of the case. Notice is typically provided no more

than two to three weeks before trial. *United States v. Nachamie*, 91 F.Supp.2d 565, 577 (S.D.N.Y. 2000). However, a longer period may be appropriate so that "the Defendant has time to object to the evidence and the Court has adequate time to decide an objection." *Id*.

## ARGUMENT

On December 15, 2017, the Government significantly narrowed the potential scope of this trial by giving Demos notice of the eight uncharged trades (out of a possible 60) that it intends to introduce at trial. As the Government previously argued, these trades could be admitted as direct evidence of the scheme to defraud alleged in the Superseding Indictment. However, these trades are also admissible pursuant to Rule 404(b): they are relevant evidence that serves a proper purpose; their prejudicial effect does not substantially outweigh their probative value; and Demos has had reasonable notice of them.

## I.      THE UNCHARGED TRADES ARE RELEVANT AND OFFERED FOR A PROPER PURPOSE

Evidence of the eight uncharged trades at issue is unlike the usual "other crimes" evidence offered by the Government under 404(b). Here, the Government does not intend to offer evidence in its case-in-chief about Demos's prior criminal history, which is unrelated to the charged securities fraud. Rather, the Government seeks to offer evidence of additional instances in which Demos made misrepresentations about the purchase or sale price of the bond, just as he did in the charged counts. These trades occurred during the same time period alleged in the Superseding Indictment, and many of the eight uncharged trades involve the same victims as the trades in the Superseding Indictment.

With respect to the timing of the Government's introduction of evidence under Rule 404(b), the Second Circuit has held that "as a general rule, the offer of evidence to prove the defendant's intent or knowledge should await the conclusion of the defendant's case. However,

where it is apparent that intent will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief." *United States v. Pitre*, 960 F.2d 1119, 1120 (2d Cir. 1992). Demos previously argued in his motion in *limine* that intent is not in dispute, insofar as he "does not contest that he intended to make misrepresentations in the course of negotiations." Def. Mem. of Law [doc. # 144] at 10-11. But Demos goes on to indicate that he does contest "*mens rea*" or "criminal intent," and argues that 404(b) evidence is inadmissible to prove such intent. The Government is unaware of any cases that parse 404(b) in such a way, and Demos cites none. In fact, 404(b) evidence has been ruled admissible in other cases to prove willfulness. *See, e.g., United States v. Morillo-Vidal*, 547 F. App'x 29, 31 (2d Cir. 2013) (challenged evidence admissible under 404(b) because "[i]t established that Cartagena had traveled to Los Angeles with Seyfried to deliver proceeds from a drug transaction, and that Cartagena's involvement was voluntary and willful."); *United States v. Bok*, 156 F.3d 157, 165 (2d Cir. 1998) (in tax fraud case, "a defendant's past taxpaying record is admissible to prove willfulness circumstantially."). If Demos does not intend to contest willfulness, then he should say so unambiguously; otherwise, the Court should permit the Government to use in its case-in-chief circumstantial evidence that tends to establish "that he had an awareness of the general wrongfulness of his conduct," *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010).

To help demonstrate the ways in which this evidence tends to establish Demos's motive, opportunity, intent, knowledge, and absence of mistake—as well as materiality—what follows is a brief description of each uncharged trade.[2]

---

[2] If the Court wishes, the Government can provide the referenced Government exhibits.

1.      **HVMLT 2005-9 traded on 12/6/2011**

Marathon Asset Management ("Marathon"), the victim in Counts 1 and 2 of the Superseding Indictment, was the victim of Demos's misrepresentation in this trade. In Count 2, Demos lied to Ed Cong, an employee of Marathon, about the price at which Cantor purchased a bond. In this uncharged trade, Demos once again lied to Cong via electronic chat, stating that he "bot [the bond] at 21-24" when he actually purchased it at 21-00. The Government anticipates proving this trade with testimony and documents, potentially including GX 700-707.

During the negotiation, Cong asked Demos if he used his initial bid of 21.5, to which Demos falsely responded that he had. Gov't Ex. 703. Demos said that he was "PUSHING HIM," meaning that Demos was trying to convince the seller to lower his offer, and told Cong "ive got u." *Id.* Near the end of the negotiation, Cong asked Demos, "Can you just buy as cheap as possible, will pay on top. . . . Up to 22." *Id.* Six seconds later, Demos responded "ok cool trying always sorry," then 63 seconds later falsely told Cong that he "bot it at 21-24 u have 2 tic[3] cvr [cover][4]." Not knowing that Demos had actually purchased the bond at 21-00 (and that the supposed 21-22 cover bid by a competitor was also invented), Cong agreed to pay Demos's acquisition price of 21-24 plus eight additional ticks as compensation. *Id.*

The Government would offer evidence of this trade for non-propensity purposes. *First*, it is probative of Demos's opportunity for making misrepresentations, insofar as it demonstrates that he can take advantage of the informational imbalance and relationship between himself and his victim. Demos made several statements to induce Cong to believe that Demos was acting as an intermediary in the trade (*i.e.*, that the negotiation was between Cong and the seller), when in fact

---

[3] A "tick" or "tic" is a common price term in the industry that refers to 1/32nd of one percent of a bond's current face value. In this example, if a broker-dealer buys a bond for 21-24, the price of the bond in dollars is 21.75% of the current face value of the bond.

[4] The cover is the runner-up or second-best bid.

he was actually negotiating against Cong. Cong paid Demos eight ticks for this service, which he added to what he believed was Cantor's purchase price. *Second*, this trade tends to establish that Cong acted as a reasonable investor. Cong's and Demos's relationship consisted of more than a single charged trade, which was not the only time Cong relied on Demos's false statements. Additional uncharged trades will help the jury understand why Cong was using Demos's misrepresentations in price negotiations. And *third*, this trade is probative of Demos's motive and intent to defraud. In this instance, Demos's lie increased Cantor's profit by 24 ticks or approximately $71,000. The jury can infer from this evidence that Demos would not expect Marathon to pay that much extra if it had known the truth, and that Demos knew that he was behaving wrongfully by lying to get Marathon to do so.

### 2.     FFML 2006-FFA traded on 1/31/2012

DW Investments, the victim in Count 3 of the Superseding Indictment, is also the victim in this trade. Demos lied to George Konaris, an employee of DW Investments, stating that he thinks he "can buy [the bond] outright now @ 18" when in truth, he knew he could buy the bond for 16-26. Gov't Exs. 712, 713. The Government's potential exhibits concerning this trade are currently numbered GX 710-715.

This is one of many trades involving Kai Zhu, a salesman at Cantor Fitzgerald, who communicated with the seller of the bond and with Demos. Demos's statements to Zhu are offered for non-propensity purposes. *First*, Demos's statements show his motive. For example, Demos tells Zhu that he made "max on ffml," "made max margin . . . for u and me," "we make ~ 200,000," Gov't Ex. 712, demonstrating that Demos's compensation was on his mind and had a direct connection to his trading profits. *Second*, Demos's statements to Zhu are probative of opportunity, intent, and materiality. For example, Demos told Zhu after the trade that the seller must not "post" or distribute "color" about the sale price of the bond to other broker-dealers, stating that "[the

buyer] [has] room if u can buy the bond there and no post color." *Id.* Demos encouraged and took advantage of the lack of transparency in the RMBS market to successfully trick his victims and execute his scheme to defraud. If the RMBS market had learned the true purchase price (or even just had information that the seller had traded the bond for less than 18), Demos would not have been able to deceive DW into paying an extra 30 ticks on the trade. In short, Demos's communication with Zhu helps establish that Demos understood that accurate information impacts purchase price and so would be material to a reasonable investor, specifically DW, and that he was intentionally taking steps he knew to be wrongful to conceal his misrepresentation.

The chat between Demos and Konaris will also corroborate evidence that RMBS trades are not always priced on an "all-in" basis, regardless of how the purchase price is expressed on the trade ticket. In fact, this is one of many examples of a victim adding ticks to Cantor's alleged purchase price to compensate Demos for intermediating the trade. Knowing that DW was starting from the false premise that he had provided ("think can buy outright now @ 18"), Demos agreed to what DW thought was an additional 8-tick payment. The evidence also demonstrates that Konaris was reasonable to incorporate the pricing information provided by Demos in his decision to agree to buy at a certain price, and that Demos's statements were not mere sales talk or puffery about an extraneous factor. Indeed, the evidence demonstrates the purportedly straightforward nature of the dialogue between Demos and Konaris, where price was the only thing discussed.

### 3. HVMLT 2005-2 traded on 2/22/2012

In this trade, Demos again lied to Cong of Marathon, stating that he bought the bond at 29 when, in truth, he bought the bond for 28-08, a difference of 24 ticks. Demos's lie earned Cantor an additional approximately $72,000 in profit. This trade also involved the Cantor salesman Kai Zhu. The Government's potential exhibits concerning this trade are currently numbered GX 720-729.

This trade is probative of intent and materiality. Similar to the FFML trade described above, Demos asked Zhu not to send color to other salespeople at Cantor or to George Smith, Demos's boss. Gov't Ex. 726. The day after the trade, Demos reiterated to Zhu, "No post on this bond for sure." Gov't Ex. 727. Kiran Manda, who worked for Demos, sent Zhu a separate email stating: "PLEASE DO NOT SHARE THIS INFO WITH ANYONE – not even other sales people at Cantor. Thanks!" Gov't Ex. 722. Demos knew it was imperative that the market not learn of Cantor's true purchase price, so that Marathon could not detect Demos's lie. At the time, Demos misrepresented to Marathon that he purchased the bond for 29, and in reliance on that information, it agreed to pay Demos an additional four ticks of compensation. Demos knew that if Marathon learned Cantor actually bought the bond for 28-08 and was therefore making 28 ticks instead of four ticks, Marathon would not have agreed to that trade.

### 4.    GSAMP 2006-S3 traded on 2/23/2012

In this trade, Demos once again lied to DW, stating that he bought the bond at 8-01 when, in truth, he bought it at 7-18. By lying, Demos was able to net Cantor an additional $62,000 in unearned profit. The Government's potential exhibits concerning this trade are currently numbered GX 730-737.

The statements made during the negotiation of this trade are offered for the non-propensity purposes of proving opportunity, materiality and intent. *First*, the chat between Demos and Andrew Ulmer of DW demonstrates the relationship Demos purported to have with his customers. Demos, referring to the possibility that Cantor might compete with a customer in a bid list (or auction) and thus drive up the purchase price of a bond, told Ulmer that he was "here to work for u guys." Gov't Ex. 734. Compared to the misrepresentations that Demos was simultaneously making to DW in this and other RMBS trades, Demos's attempt to gain DW's trust is probative of his ability to take advantage of his superior information, his long-term plan to deceive DW in

RMBS trades, the materiality of the pricing information he misrepresented, and the inference that Demos knew his conduct was wrongful. Demos intends to argue that it was unreasonable for his customers to believe his statements, yet Demos's own words here suggests otherwise.

*Second*, in this trade, George Konaris, also of DW, believed he was negotiating a pay on top trade, in which Demos was intermediating between DW and the seller for a specifically negotiated amount of compensation. Demos told Konaris, that he purchased the bond at 8-01 and "can keep on ice if u want or u can have as pre-vacation present." Gov't Ex. 735. Konaris responded that he would take the bond and asked what he should pay Demos. *Id.* Demos responded, "4-8 cool dude . . . 4 thru 8 tics," meaning that DW would pay Cantor's purported purchase price plus an additional amount between 4 and 8 ticks. Rather than paying the highest possible amount (8 ticks), Konaris offered to pay 6 ticks, which Demos accepted. This shows both that a reasonable investor would have no choice but to believe Demos's lies about his purchase price, and that even 2 ticks was significant. The context and straightforwardness of Demos's lies are evidence that he intended them to be believed and that that they were material.

### 5.    BSMF 2006-SL1 traded on 3/21/2012

In this trade, DW paid 47-16 for the bond, six points higher than Cantor's purchase price. This is another trade that involved Kai Zhu. The trade is offered for non-propensity purposes. The Government's potential exhibits concerning this trade are currently numbered GX 740-745.

*First*, the statements made by Demos to Zhu are probative of opportunity, intent, and materiality. Demos made clear to Zhu that if any information about the sale price was disseminated in the market, Cantor's ability to make a large profit on the trade would be threatened. Gov't Ex. 743. For example, Demos specifically asked Zhu, "will ppl know the order lvl?" *Id.* Zhu responded "no," and Demos replied, "ok bc then our bidder will know." *Id.* As discussed above, in similar

trades, Demos knew that if DW learned that Cantor purchased the bond at 41-16, DW would not willingly agree to purchase it from Demos for 47-16.

*Second*, Demos's statements to the buyer, Andrew Ulmer (DW), are probative of materiality. Like in other chats, Demos statements were intended create the illusion that he was working with Ulmer, rather than against him. Here, Demos told Ulmer, who was on vacation, that he should go ski and Demos would "protect and circle back where ur topped and as soon as we have feedback from asia." Gov't Ex. 744. Demos later told Ulmer that he will "txt when more color coming in so u can be w fam." *Id.* And then Demos shared with Ulmer that "were in the hunt" and "im pushing them really hard were going to buy some bonds." *Id.* Finally, two minutes after Demos learned Cantor had purchased the bond at 41-16, he misrepresented to Ulmer that "bsmf sounds like 2 pts" and "bsmf 48 we can buy will try to get back." *Id.* After the trade was complete, Demos told Ulmer with respect to other trades, that they would "talk in am[,] im still doing some work for u…." *Id.* These statements put into context a reasonable investor's reliance on Demos's misrepresentations.

And *third*, the trade evidence will educate the jury as to how the RMBS market actually worked. For instance, this trade is evidence that price discovery was nearly impossible for Demos's customers, particularly when he was able to convince a seller not to share even general information with others. It was this lack of market transparency that allowed Demos to successfully defraud his customers. Like in other charged and uncharged trades, Demos took advantage of the information disparity between him and his victims, pretending to share truthful information to aid in pricing decisions, while actually misleading them in order to increase Cantor's profits.

### 6.    BSABS 2004-HE2 traded on 7/24/2012

In this trade, Demos made misrepresentations to the seller, while another Cantor salesperson, Matthew Mancuso, may have misled a buyer about Cantor's purchase price. The trade

is especially probative of intent. The Government's potential exhibits concerning this trade are currently numbered GX 750-755.

Initially, in an electronic chat, Demos lied to Mancuso about Cantor's purchase price, telling him that he bot the bonds at 79-28, when in truth he purchased them for 77-16. Gov't Ex. 752. Just seconds later, Demos asked Mancuso to call him and Mancuso replied "calling." *Id*. It can be inferred from the rest of the electronic chat that Demos told Mancuso that Cantor purchased the bonds for less than 79-28. Significantly, Demos chose not to share this information in an electronic chat. After delivering false information to his own customer, Mancuso wrote to Demos, "Make sure [the seller] covers our butts when he sends out vcolor [sic]--- maybe just says traded." *Id.* Demos responded, "guy . . . this me . . . seriously" and eventually shared that the seller would post only that the bond sold at "vh [very high] 70s." *Id*.

Here, Demos took advantage of the information disparity in the marketplace, demonstrating that he believed his customers would not trade at the prices he wanted if they had accurate information about the purchase and sale prices. Furthermore, this evidence tends to establish that Demos took steps to avoid detection of his conduct by Cantor's compliance department, which could review chats but not phone calls.

### 7.    FHLT 2005-1 M6 traded on 1/16/2013

In this trade, Demos mislead the buyer, TIG Advisors, into believing that Cantor purchased the bond for 29.13, when in truth, Cantor bought the bond for 27-16. This trade is probative of intent. The Government's potential exhibits concerning this trade are currently numbered GX 760-763.

Similar to some of the other uncharged trades, in this trade, the spread between the seller's and buyer's prices was very wide, making it imperative that the price information not be disclosed to the broader market. And like other uncharged trades, Demos sought to stop the seller from

posting information about the trade, telling the Cantor salesperson communicating with the seller, "nooo post" GX763. Again, Demos took advantage of the opacity of the market, knowing that information inequality allowed him to mislead the buyer about Cantor's purchase to make additional profit.

### 8. SASC 2006-S4 traded on 1/17/2013

In this trade with DW, Demos lied to George Konaris, stating that Cantor purchased the bond at 25-10; in truth, Cantor purchased the bond for 24-10. Konaris offered to purchase the bond from Cantor for 25-18, paying Demos eight ticks for the trade. Kai Zhu is involved in this trade, communicating directly with the seller and Demos. The Government's potential exhibits concerning this trade are currently numbered GX 760-764.

This trade is probative of intent and materiality. Specifically, like other uncharged trades involving Zhu, the margin between the seller's and buyer's prices was very wide, making it imperative that price information not leak out. Demos told Zhu, "no post on color . . . cant have ppl know where traded . . . no color out on these . . . ok no post" Gov't Ex. 773. Relying on the opacity of the RMBS marketplace, Demos managed to keep his lie hidden from DW and trick Konaris into paying an extra 40, rather than 8, ticks.

## II. UNCHARGED TRADE EVIDENCE IS NOT UNDULY PREJUDICIAL

There is no basis to exclude the uncharged trade evidence under Rule 403. *First*, the proffered evidence is highly probative of the charged crimes, and is particularly valuable circumstantial evidence of opportunity, intent, and materiality. *Second*, the evidence is "not especially worse or shocking than the transactions charged"; indeed, these uncharged trades are similar to the charged trades. *See United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010) (evidence regarding uncharged support for jihad is admissible because it is "no more inflammatory than the charges alleged in the indictment"); *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir.

1992) (in narcotics case, evidence of prior narcotics transactions admitted where other acts evidence "did not involve conduct any more sensational or disturbing that the crimes with which [the appellants were] charged") (citation omitted). And *third*, if the defense requests it, the Court may minimize any minimal risk of unfair prejudice through a limiting instruction to the jury explaining the proper purpose for the uncharged trades evidence.

## III.     REASONABLE NOTICE HAS BEEN PROVIDED TO DEFENDANT

Notwithstanding its erroneous understanding that the uncharged trades were admissible as direct evidence of the charged crime, the Government has provided Demos with adequate notice of the uncharged trade evidence. Demos previously argued that the uncharged trade evidence should be precluded because the Government did not state on March 1, 2017 that it would seek to admit this evidence under 404(b). While technically true, the Government did put Demos on notice that it would seek to introduce this evidence (albeit under a mistaken evidentiary theory) and provided him with timely information that has allowed him to appropriately prepare for trial. Thus, any defect in the Government's notice has not prejudiced Demos.

*First*, since this case was indicted on December 7, 2016, Demos was aware that the Government intended to offer evidence of additional trades not charged in the indictment. *Second*, by January 2017, Demos had a list of the 18 potential testifying victims and documents of all 60 possible uncharged trades. *Third*, on March 6, 2017—five days after the 404(b) deadline—Demos knew that the Government intended to offer additional trades as evidence of his scheme to defraud. And *fourth*, on December 1, 2017, more than four months before trial, Demos knew which eight uncharged trades the Government would use in its case-in-chief. Taken together, this constitutes the requisite "reasonable notice of the general nature" of the "other crimes" evidence that the Government now seeks to offer under 404(b).

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court allow the Government to offer evidence of the eight uncharged trades under 404(b).

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

_____/s/_____
HEATHER L. CHERRY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv07037
heather.cherry@usdoj.gov
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.


/s/

HEATHER L. CHERRY
ASSISTANT UNITED STATES ATTORNEY