UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


– – – – – – – – – – – – – – – – x

UNITED STATES OF AMERICA          3:16CR00220(AWT)

      vs.

DAVID DEMOS
                    HARTFORD, CONNECTICUT
          Defendant     APRIL 23, 2018

– – – – – – – – – – – – – – – – x



**<u>JURY TRIAL</u>**

**<u>VOLUME I</u>**



  BEFORE:

       HON. ALVIN W. THOMPSON, U.S.D.J.

          and a Jury of Twelve



Corinna F. Thompson, RPR
Official Court Reporter

1
## TABLE OF CONTENTS

2
WITNESS            DIRECT     CROSS     REDIRECT     RECROSS

3
SEAN MOSSMAN

4
  BY MS. CHERRY:          72

5
  BY MR. SULLIVAN:                  97

6
EDWARD CONG

7
  BY MR. FRANCIS:        103

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2      APPEARANCES:

3          FOR THE GOVERNMENT:

4              OFFICE OF THE UNITED STATES ATTORNEY
               915 Lafayette Boulevard,  Room 309
5              Bridgeport,  Connecticut 06604
               BY:  HEATHER CHERRY, AUSA
6
               OFFICE OF THE UNITED STATES ATTORNEY
7              157 Church Street
               New Haven, Connecticut  06510
8              BY:  JONATHAN N. FRANCIS, AUSA

9          FOR THE DEFENDANT:

10             THE BAEZ LAW FIRM
               40 SW 13th Street
11             Suite 901
               Miami, Florida  33130
12             BY:  JOSE BAEZ, ESQ.

13             LEONTIRE & ASSOCIATES
               66 North Second Street
14             New Bedford, Massachusetts  02108
               BY:  GEORGE J. LEONTIRE, ESQ.
15                  FELICIA LEE CARBONI, ESQ.

16             HARVARD LAW SCHOOL CRIMINAL JUSTICE INSTITUTE
               6 Everett Street
17             Suite 5116
               Cambridge, Massachusetts  02138
18             BY:  RONALD S. SULLIVAN, JR., ESQ.

19             QUINN, EMANUEL, URQUHART & SULLIVAN
               51 Madison Avenue
20             22nd floor
               New York, New York  10010
21             BY:  ALEX SPIRO, ESQ.

22             LAW OFFICE OF MICHAEL CHAMBERS, JR.
               100 Wells Street    Suite 2C
23             Hartford, Connecticut  06103
               BY:  MICHAEL LINCOLN CHAMBERS, JR., ESQ.

24

25

1                           9:17 AM

2              THE COURT:  Good morning.  Please be seated.

3              There are a couple of preliminary things to

4    discuss.  I understand there's an issue with respect to

5    a demonstrative exhibit the defense is going to use

6    during opening.  Can I get a copy of that, or is it that

7    big thing.

8              MR. BAEZ:  It's this.

9              THE COURT:  Can you turn it around so I can

10   see it.

11             MR. BAEZ:  Yes, sir.

12             THE COURT:  Okay.  Thank you.

13             And the most important thing to me, at least,

14   is a concern with respect to jurors.  As you know, we

15   have four alternates.  I have had issues with respect to

16   three jurors.  I have two jurors who are telling me they

17   will experience financial hardship.  I wanted to make

18   sure everyone was here before I took any steps to excuse

19   anybody.  I have an additional juror who's able to serve

20   but has a personal matter that would make it impossible

21   for the juror to be here tomorrow.

22             I think to protect the juror's privacy, I'll

23   just show counsel this letter at the sidebar off the

24   record.

25                   (Discussion at sidebar off the record.)

1          THE COURT:  I expected to lose one juror.  I'm

2     not shocked that I lost two.  My reaction is that the

3     most appropriate thing to do is to excuse the two people

4     who will be here fretting about the fact that they're

5     not getting paid, and to not proceed tomorrow so we

6     don't lose an additional juror.  And then we'd be

7     proceeding with two alternates.

8          Counsel have any reaction?

9          MR. BAEZ:  Not from the defense.

10          MR. FRANCIS:  The government thinks that's the

11     right way to go, Judge.

12          THE COURT:  Thank you.

13          So I'm going to excuse those jurors.  Their

14     numbers at jury selection were 389 and 403.  I told my

15     law clerk to go over and tell them they are free to

16     leave.  They've been kept in the jury assembly room.

17     And then I'll let the jury know we'll not proceed

18     tomorrow.

19          Let's talk about the concern with respect to

20     the demonstrative exhibit.  What's the concern?

21          MR. FRANCIS:  So I think it's broader than

22     that, Judge.  About seven minutes ago the defense showed

23     us what they are intending to show the jury during

24     opening.  This was -- the large demonstrative was part

25     of it, and then Mr. Baez also has other things.  We've

1       seen at least some of them.  He has others we haven't

2       seen.  Some of those are exhibits.

3              I don't think it's appropriate for the defense

4       to show what it hopes will be the evidence in the case

5       to the jurors.  Some of them I'm not sure are admissible

6       exhibits.  Also, many of them I'm not sure will actually

7       ever come in as exhibits.

8              So that's one part of it.

9              With respect to the documents we haven't seen

10      or the demonstratives we haven't seen, our objection is

11      we haven't seen them so we don't know.

12             With respect, if I may, Judge, to the large

13      demonstratives, some of the things that are on here may

14      or may not be true, but because we haven't had a chance

15      to -- we just found out about it, I don't know that it's

16      a fact that in 1981 the RMBS market was created.  I'm

17      not sure the relevance of it.  I'm not sure it's a fact

18      that Mr. Demos began -- according to Mr. Baez, Mr. Demos

19      began trading in RMBS.  I'm not sure what the basis for

20      that would be to tell the jury.  And it's miss-numbered,

21      the counts.  There is no Count Three any more because

22      Your Honor granted our motion to dismiss it.  It's

23      actually Counts One, Two, Four, Five and Six.  And I

24      think crossing out the three and substituting a four

25      basically just flags for the jury that a count was

1    dismissed which is prejudicial.

2         And then if -- there's a long gap, and I

3    suppose that's the point of the chart, before Mr. Demos

4    was indicted.  That's factual, and we know that to be

5    true, so that's not our objection.  We have fair notice.

6    But we do think it's important the Court know that if

7    they are going to make this argument, one of the

8    reasons -- I think it opens the door potentially to

9    Demos's -- the fact of Mr. Demos's proffers.  Because

10   one of the reasons for the very long delay was because

11   we were sent on a wild goose chase by Mr. Demos during

12   his proffers.  I don't think -- basically, I think it

13   opens a can of worms.

14        If we had a draft of it, we maybe could have

15   worked out some the language, the things like the count

16   numbers; but because we just saw it, we weren't able to

17   do any of that.

18        THE COURT:  Let me short circuit this.  The

19   way I handle demonstrative exhibits or any exhibits

20   during opening statements is, if they're not shared with

21   counsel beforehand, that's a problem, because I can't

22   un-ring the bell if something inappropriate is done.

23   And putting something up in a picture or with a chart

24   makes it hard for me to have the jurors follow my

25   instruction that opening statements are not argument.

1            So to the extent we have demonstratives that

2     haven't been shared, does the government have any?

3            MR. FRANCIS:  We shared ours with the defense,

4     and they have no objection.

5            THE COURT:  I'm not going to have the jury sit

6     back there while we spend time talking about

7     demonstrative exhibits.

8            To the extent that there are statements that

9     want to be made as to evidence that's going to be

10    offered by the defense, I will rely on counsel

11    proceeding in good faith.

12           MR. BAEZ:  If I can respond briefly, Judge.

13           First off, yes, everything that we have, I

14    have a good-faith basis that we believe this is what the

15    evidence will show.  I'm well within the bounds in that

16    regard.

17           I think counsel's arguments are, I would,

18    since it's early, say a misleading, but they are very

19    misleading.  I reached out to counsel on Friday, said,

20    Hey, let's exchange exhibits.

21           He responded, Can we do it this weekend.

22           I said, I haven't gotten them done yet.  The

23    fact of the matter is, we have not.

24           He told you, they disclosed theirs to us.  I

25    walked in the courtroom and just saw his e-mail about

1    when they turned them over.  So they turned them over

2    this morning, yet he fails to tell you that.

3              I think now, I have to be on guard with these

4    types of things with counsel, but --

5              THE COURT:  Well, are you telling me you can't

6    say if you have objections to the government's

7    demonstrative?

8              MR. BAEZ:  I don't have any objections to

9    them.  I believe they are well within the bounds of

10   ethical bounds, and if that's what they think the

11   evidence --

12             THE COURT:  What other demonstrative do you

13   have?

14             MR. BAEZ:  I just have one slide that I

15   haven't shown him, and that was because it was just

16   being fixed and it's just been e-mailed to me.

17             THE COURT:  Let's look at it now.  We have a

18   couple minutes.

19             MR. BAEZ:  It's one sentence on willful

20   intent.

21             THE COURT:  Is it a statement of the law?

22             MR. BAEZ:  Yes.

23             MR. FRANCIS:  Is it all right, Your Honor?

24             THE COURT:  Yes, please.

25                  (Pause.)

 1                MR. FRANCIS:  I'd like to see them all, Your

 2      Honor.  I think there is more than just the one.

 3                THE COURT:  I thought there was --

 4                MR. FRANCIS:  What the proposal is, is a

 5      statement of the law that's inaccurate under Kaiser.

 6      Why don't you e-mail it to my law clerk, and we will --

 7      I'll have her print it out.

 8                MR. LEONTIRE:  Can we give it to you on a

 9      drive?

10                THE COURT:  Yes.

11                Maybe what I'll do is take a short break after

12      I do the preliminary charge.  I was planning to go

13      straight to the openings, but I'll take a short break

14      and look at that.

15                     (Pause.)

16                THE COURT:  We're bringing in the jury now.

17                Can we turn that chart back the other way?

18                MR. BAEZ:  Yes.

19                     (Whereupon, the jury entered the

20      courtroom.)

21                THE COURT:  Good morning, ladies and

22      gentlemen.  Please be seated everyone.

23                I'll have the folks in the front row move

24      closer to the front of courtroom.  I think we'll

25      probably put seven in each row so you're closer to the

1    witnesses, but we'll do that when we break.

2                 Good morning, members of jury.

3                 THE JURY:  Good morning.

4                 THE COURT:  Before we begin our proceedings

5    today, I am going to ask the courtroom deputy to swear

6    in the jury.

7                 THE CLERK:  Please raise your right hand.

8                 You do solemnly swear that you will consider

9    the matters at issue between the United States and the

10   defendants according to the law as the judge shall

11   instruct you based upon the evidence presented in court,

12   and that you will render a true and just verdict.

13   During the course of the trial and until you have

14   announced your verdict in court you will speak nothing

15   to anyone of the case now before the court nor shall you

16   permit any person to speak to you concerning the same.

17   After your verdict has been announced in court you will

18   speak to no one concerning the deliberations or vote of

19   the jury or any individual juror other than yourself

20   unless the presiding judge gives you permission to do

21   so.

22                 So help you God or you do so affirm?

23                 THE JURY:  I do.

24                 THE CLERK:  Thank you.

25                 THE COURT:  Ladies and gentlemen, at this time

1    the courtroom deputy is going to give you notepads for

2    you to use, if you should care to use one.

3                    (Pause.)

4                    THE COURT:  Members of the jury, we are about

5    to begin the trial of the case about which you heard

6    some basic information during the process of jury

7    selection.  Before the trial commences, however, there

8    are certain details and instructions that you need to

9    help you better understand what will be happening during

10   the trial and how you should conduct yourselves.

11                   First of all, our trial days will run from

12   9:30 to 4:30.  Each morning you should plan to arrive in

13   the jury room at least 15 minutes before court is

14   scheduled to begin so that even if you are delayed, you

15   are here in time for the start of the day's proceedings.

16   We will have a schedule for breaks, and it will be

17   posted in the jury room.

18                   I think you've been informed that we will not

19   have court tomorrow.  We will not have court tomorrow

20   because there's a member of the jury who has an

21   important matter that needs to be attended to.

22                   As you may recall, the name of this case is

23   United States of America versus David Demos.  At this

24   time I'm going to ask counsel to remind you who they are

25   and who's at counsel table with them and anybody else

1    that they want to identify for you.

2              Mr. Francis.

3              MR. FRANCIS:  Good morning, ladies and

4    gentlemen.

5              THE JURY:  Good morning.

6              MR. FRANCIS:  My name is Jonathan Francis.

7    I'm an Assistant United States Attorney.  That means I

8    am a prosecutor in the case against David Demos.

9    Another prosecutor in my office is Heather Cherry.  You

10   heard from her during jury selection.  This gentleman is

11   SIGTARP.  That's the Office the Special Inspector

12   General for the Troubled Asset Relief Program, which is

13   a mouthful, but it's a branch of Treasury.  He's a

14   treasury agent.  His name is James O'Connor.  He's a

15   case agent in the case.

16              You're going to see people coming in and out

17   of the courtroom.  They helped us with the investigation

18   of the case.  All the way to the left is Robert Marston,

19   who is an investigator with the U.S. Attorney's Office.

20   In the middle is Damian Platosh.  He's an FBI special

21   agent.  And finally, John McGowan, he's a paralegal in

22   the U.S. Attorney's Office.

23              THE COURT:  Thank you.

24              Mr. Baez.

25              MR. BAEZ:  Good morning.  My name is

1    Jose Baez, and I have the privilege of representing

2    David Demos.  This is David.

3              THE JURY:  Good morning.

4              MR. BAEZ:  In addition, assisting me in this

5    case will be Ronald Sullivan.  He will be a trial

6    counsel along with Alex Spiro.

7              We have quite a few names here, and I'm sure

8    it will be difficult for you to remember, but these are

9    the main people that you're going to hear from

10   throughout the course of this case and that will

11   actually be working before you.

12             Thank you.

13             THE COURT:  Thank you.

14             Now, ladies and gentlemen, you may recall that

15   at the conclusion of the jury selection process I gave

16   you several instructions, namely, not to come to any

17   conclusions about the case until you are instructed to

18   do so; not to discuss the case amongst yourselves or

19   with anyone else; not to have any contact with any of

20   the parties, attorneys or witnesses; and not to read,

21   watch or listen to anything in the media or anywhere

22   else about this case or any similar matter or any of the

23   people or entities involved in this trial.

24             Is there any member of the jury who's

25   concerned about whether he or she may have inadvertently

1   failed to comply with any of these instructions?

2              If so, please raise your hand and we'll just

3   talk about it.

4              (No response.)

5              THE COURT:  Ladies and gentlemen, my purpose

6   in reviewing these points with you is twofold:

7              First, I must confirm that each member of the

8   jury has followed the Court's instructions since jury

9   selection.

10             Second, I do want to emphasize how important

11  it is that you continue to follow these instructions

12  throughout the course of the trial and until you have

13  completed your service in this case.

14             The strict compliance by every member of the

15  jury with these instructions is the only way that the

16  parties can be sure that the jury's verdict in this case

17  will be based solely on the evidence that is presented

18  here in the courtroom.

19             I want to talk with you about the role of the

20  jury.

21             Your role as jurors in this case is to find

22  and determine the facts.  You are the sole judges of the

23  facts.  I will decide all questions of law which may

24  arise during this trial.  And before you retire to

25  deliberate, I will instruct you as to the law you must

1    follow during your deliberations.

2            Because you will be called upon to determine

3    the facts of this case, you should carefully examine the

4    testimony and other evidence presented for your

5    consideration.  Please keep in mind that I will instruct

6    you at the end of the trial concerning how you should

7    evaluate the credibility or believability of each

8    witness and the weight to be given to his or her

9    testimony.

10           You must keep an open mind during this trial.

11   During the trial you are to neither form nor express any

12   opinion about the case to anyone until you have heard

13   and considered all of the testimony and other evidence,

14   and my instructions to you on the applicable law.

15           While the trial is in progress, you must not

16   discuss the case in any manner amongst yourselves or

17   with anyone else, nor should you permit anyone to

18   discuss it in your presence.

19           In addition, you should not read, watch or

20   listen to anything in the media or anywhere else related

21   to the trial or any similar matter, or any of the people

22   or entities involved in this case.  My instructions

23   include discussing or being exposed to any such

24   information via the internet, including social

25   networking websites such as Twitter, Facebook, Myspace

1    and the other 500 that are out there.  The parties will

2    not have received a fair trial if you consider anything

3    other than the evidence admitted here in the courtroom.

4         Now, each member of the jury has promised that

5    he or she will be a fair and impartial juror.  If any

6    member of the jury becomes aware of a lack of fairness

7    or becomes aware of any partiality or bias on his or her

8    part, that person should make that state of mind known

9    to the Court right away.

10         I want to talk with you about rulings by the

11   Court.

12         From time to time during the trial I may be

13   called upon to make rulings of law on objections or

14   motions made by the attorneys.  It is the duty of an

15   attorney to object when testimony or other evidence

16   which the attorney believes is not admissible is offered

17   for your consideration.  You should not be influenced by

18   the objection or by my ruling on it.  You should not

19   infer or conclude from any ruling or comment I may make

20   that I have any opinion on the merits of the case

21   favoring one side or the other.

22         If I sustain an objection to a question that

23   goes unanswered by the witness, you should not draw any

24   conclusion from the question itself or speculate as to

25   what the answer might have been.

1            Sometimes a witness may answer a question

2     before I have ruled on an objection.  In that case, I

3     may instruct you to disregard the witness's answer.  If

4     I do so instruct you, you must act as if the question

5     objected to was never answered.

6            If the objection is overruled or denied, or I

7     say the question is allowed or something like that, this

8     means you should treat the answer to the question like

9     any other answer.

10           In addition, in some instances evidence may be

11    admitted for a limited purpose only.  If I instruct you

12    that an item of evidence has been admitted for a limited

13    purpose, you must consider it only for that limited

14    purpose and for no other purpose.

15           Now, on occasion when there's a sidebar, I ask

16    lawyers to come up to the bench or the sidebar over here

17    to give me their reasons for the objection out of your

18    hearing or to confer with me regarding certain questions

19    of law or procedure.  This is to avoid the necessity of

20    your leaving the courtroom and the delay that this would

21    entail.

22           Please be patient with us during any such

23    delays.  We try to keep these occasions to a minimum by

24    discussing in advance any issues that we can foresee,

25    but you should understand that any such interruptions

1      are necessary in order to enable you to do your job

2      properly.  We would be discussing things that I would be

3      telling you that you must disregard entirely, and if you

4      have not heard them it will be easier for you to

5      disregard them.

6              Now, on some occasions in a trial like this, I

7      do excuse the jury from the courtroom for the same

8      reason.

9              Now, it is possible that during the course of

10     the trial I may ask questions of witnesses in order to

11     bring out points not then fully conveyed in the

12     testimony.  If I think, for instance, that the witness

13     didn't understand the question or there just hasn't been

14     a meeting of the minds as to what the question is, I may

15     ask a question just to confirm myself that the two

16     parties understand each other.

17             Please do not assume that I hold any opinion

18     on the matters to which my questions may be related.

19     And also, please remember that you, as jurors, are at

20     liberty to disregard all comments of the Court in

21     arriving at your own findings as to the facts in this

22     case.

23             I now want to talk with you about evidence.

24             You must consider only the evidence or lack of

25     evidence in deciding this case.  The evidence from which

1    you are to decide what the facts are comes in three

2    forms:

3              First, there is the sworn testimony of

4    witnesses, both on direct and cross-examination.

5              Second, there are the exhibits that will be

6    received into the trial record.

7              And, third, there may be stipulations by the

8    parties or judicially noticed facts.

9              Now, certain things are not evidence and are

10   not to be considered as such:

11             First, arguments or statements by lawyers are

12   not evidence.  They are designed and permitted to give

13   the lawyers the opportunity to tell you how they think

14   you should evaluate the evidence.

15             Second, the questions to the witnesses are not

16   evidence.  I instructed you earlier, in substance, that

17   my questions and comments are not evidence.  Let me also

18   emphasize that a lawyer's question is not evidence.

19   While you must at times consider a lawyer's question to

20   give content and meaning to the witness's answer, it is

21   the witness's answer that is evidence.

22             At times a lawyer may incorporate into a

23   question a statement which assumes certain facts to be

24   true and then asks the witness if the statement is true.

25   If the witness denies the truth of a statement, and if

1    there is no evidence in the record proving that the

2    assumed fact is true, then you may not consider the fact

3    to be true simply because it was contained in the

4    lawyer's question.  In short, questions are not

5    evidence; answers are.

6           Third, objections and arguments are not

7    evidence.

8           Fourth, testimony that is excluded, stricken

9    or that you are instructed to disregard is not evidence

10   and must be disregarded.  And if I give you a limiting

11   instruction as to evidence, you must follow that

12   limiting instruction.

13          Also, exhibits that are marked for

14   identification but not admitted are not evidence.

15          Fifth, anything you may see or hear outside

16   the courtroom is not evidence and must be disregarded

17   entirely.

18          Now I want to talk with you about kinds of

19   evidence as opposed to forms of evidence.  And there are

20   two kinds of evidence, direct and circumstantial.

21          Direct evidence is direct proof of a fact,

22   such as testimony of an eyewitness about what the

23   witness saw or heard or did.

24          Circumstantial evidence is proof of one or

25   more facts from which you could infer the existence of

1    another, even though there was no direct proof as to

2    that fact.

3            The word "infer" or the expression "to draw an

4    inference" means to find a fact exists even though it

5    has not been proven directly.  The word "infer" or the

6    expression "to draw an inference" means to find that a

7    fact exists based on proof of another fact.

8            By way of example, if you wake up in the

9    morning and see that the street and sidewalks are wet,

10   you may find from that fact that it rained during the

11   night.  In other words, the fact of rain is an inference

12   that could be drawn from circumstantial evidence, i.e.,

13   the presence of water on the street and sidewalk.

14           Direct evidence of rain, on the other hand, of

15   course, would be an actual observation of raindrops

16   coming down from the sky.

17           Now, an inference may be drawn only if it is

18   reasonable and logical, not if it is speculative.  You

19   are allowed to draw logical inferences from facts that

20   you find to have been proven, but you may not go outside

21   of the evidence to find the facts, nor to resort to

22   guesswork or conjecture.

23           While you may draw conclusions from proven

24   facts, you may not draw inferences from their

25   inferences.  And to aid you in better understanding this

1    point, in the rain example I just used, while you could

2    infer from the wet ground that it had rained, you could

3    not infer that there were 2 inches of rain without more

4    evidence.  In other words, you should be careful to

5    avoid resorting to speculation, conjecture or guesswork

6    to determine critical facts in this case.

7            At the end of the case I will give you further

8    instructions on the matters I am now touching on, but

9    have in mind that you may consider both kinds of

10   evidence.  You may indeed consider circumstantial

11   evidence as well as direct evidence, and it is for you

12   to decide how much weight, if any, to give to either.

13           Next I want to talk with you about witnesses.

14           The credibility of witnesses and the weight to

15   be given their testimony are matters that are

16   particularly and solely within your province.  No fact

17   is, of course, to be determined simply by the number of

18   witnesses testifying for or against it.  It is the

19   quality, not the quantity, of testimony which controls.

20           In weighing the testimony of a witness, you

21   should consider his or her appearance on the stand.  You

22   should try to size him or her up.  You should have in

23   mind all those little circumstances which point to

24   truthfulness or untruthfulness.

25           You should consider any possible bias or

1    prejudice the witness may have, whether for or against

2    the government or the defendant; his or her interest or

3    lack of interest of whatever sort in the outcome of the

4    trial; and his or her ability to observe facts correctly

5    and to remember and relate them truthfully and

6    accurately.

7          You should test the evidence he or she gives

8    by your own knowledge of human nature and of the motives

9    which influence and control human action.  If any facts

10   are admitted or otherwise proven to you, you may well

11   bring them into relation with the witness's testimony

12   and see if they fit together with it.

13         In short, you are to bring to bear upon your

14   assessment of a witness's testimony the same

15   considerations and use the same sound judgments and

16   common sense you apply to the questions of truth and

17   veracity which daily present themselves in the ordinary

18   affairs of life.

19         I want to talk with you about a few procedural

20   points.

21         First, at the end of the trial you will have

22   to make your decision based on what you recall of the

23   evidence.  Although the court reporter is taking down

24   these proceedings, you will not have with you a written

25   transcript with which to consult.  And although it can

1   be done, you would find it difficult and time-consuming

2   for the court reporter to locate and read back lengthy

3   testimony.  Thus, I urge you to pay very close attention

4   to the testimony as it is given to you.

5           Second, during the course of the trial you may

6   cross paths with the attorneys or the parties or

7   witnesses in or around the courthouse.  You should avoid

8   talking to the attorneys, the parties and the witnesses

9   and anyone associated with them during the trial.

10          Similarly, please do not be offended when the

11  attorneys, parties and witnesses do not talk to you or

12  when they seem to avoid you.  They are merely doing what

13  they should do to avoid even the appearance of improper

14  contact with any member of the jury.

15          At times you may be asked to avoid certain

16  areas of the courthouse the attorneys or parties or

17  witnesses are using so we can minimize the degree to

18  which you cross paths with them.

19          Finally, if you do have any conversations with

20  any of the attorneys or parties or the witnesses, or

21  anyone associated with them, please tell the courtroom

22  deputy at once.

23          Third, let me tell you how this trial will be

24  structured.

25          First, counsel will give opening statements,

1    which are not evidence.

2            Then the government will present witnesses,

3    and the lawyers for the defendant may cross-examine

4    them.

5            Following the government's case, the lawyers

6    for the defendant may or may not present witnesses.  And

7    if witnesses are presented, the prosecutors may

8    cross-examine them.

9            Then it is possible that there may be what we

10   call "rebuttal witnesses."

11           After all the evidence is in, the attorneys

12   will present their closing arguments to summarize and

13   interpret the evidence for you and I will then instruct

14   you on the law.

15           If more than 12 members of the jury remain, we

16   will identify alternate jurors who will remain under

17   court order in case we need them to replace a

18   deliberating juror until the jury has been discharged.

19   Then 12 of you will retire to deliberate and come to

20   unanimous verdicts.

21           I want to emphasize some special aspects of

22   criminal cases, and these are some basic rules that you

23   must keep in mind:

24           First, you should understand that the

25   indictment is simply a charge by the government to begin

1    a case, and that it is not in any sense evidence of the

2    allegations or statements it contains.  The defendant

3    has pled not guilty to the indictment and is presumed

4    innocent unless the jury unanimously finds that the

5    government has proved the defendant's guilt beyond a

6    reasonable doubt.

7           Second, the indictment in this case involves a

8    number of counts.  You must consider each count of the

9    indictment separately, and you will be required to

10   return a separate verdict for each count in which the

11   defendant is charged.  The verdict on any count should

12   not control your decision as to any other count.

13          Third, after the government has presented

14   evidence, the defendant may present evidence, but he is

15   not required to do so.  The burden or obligation is

16   always on the government to prove each and every element

17   of the offenses charged beyond a reasonable doubt.  The

18   law never imposes on a defendant in a criminal case the

19   burden of calling any witnesses, presenting any exhibits

20   or introducing any evidence.  No inference whatsoever

21   may be drawn from a defendant's election not to call

22   witnesses or present exhibits, or the election of a

23   defendant not to testify.  A defendant is presumed to be

24   innocent of the charges.

25          Fourth, the government has the burden or

1    obligation to prove each of the essential elements of

2    the crimes charged in the indictment beyond a reasonable

3    doubt.  I will give you further instructions on this

4    point later, but bear in mind that in this respect a

5    criminal case is different from a civil case.

6             Let me say a word about note taking.

7             It is very important to all of us that you

8    achieve as high a level of understanding as possible

9    with respect to what occurs here.  For that reason you

10   have been furnished with notepads for your use if you

11   care to use them.  Please remember when you retire to

12   deliberate, however, that if a fellow juror claims that

13   a certain fact exists because he or she has it written

14   down in his or her notepad, it is your own recollection

15   that must control.

16            Also, please be very careful not to take notes

17   to the exclusion of listening to and observing the

18   witnesses.

19            Finally, at the end of each day's session,

20   please remember to leave your notepads in the jury room;

21   and also, you should never leave them here in the

22   courtroom.

23            Thank you for your attention to these

24   instructions.  We're going to take a brief break now.

25   We'll deviate from the schedule at this time just

1    because we're getting started.  When you come back,

2    you'll hear the opening statements of counsel, which I

3    remind you are not evidence.

4              We'll let you go next door for five or ten

5    minutes, and then we'll come back.

6                   (Whereupon, the jury left the courtroom.)

7              THE COURT:  Please be seated, everyone.

8              I did have a chance to flip through the

9    slides.  The objection with respect to the demonstrative

10   with respect to willful intent is sustained.

11             The instruction on "willfully" is that it

12   means to act with the intent to do something the law

13   forbids, that is, with a bad purpose, to disobey or

14   disregard the law.  The demonstrative says the

15   government must prove that the defendant knew his

16   conduct was unlawful.  That's materially different and

17   incorrect.

18             As to the other -- has the government looked

19   at the rest?

20             MR. FRANCIS:  I just had a chance to flip

21   through them while Your Honor was instructing the jury.

22             THE COURT:  Do you have an objection or do you

23   have concerns?

24             MR. FRANCIS:  I think, in general, the defense

25   shouldn't be showing exhibits that haven't been

1    admitted.  They shouldn't be publishing exhibits, which

2    I believe is what the bulk of everything except the

3    first and last slide are.

4            I'm not sure that there's anything about these

5    exhibits.  We're not going to put these in.  If the

6    defense intends to admit these exhibits, I will accept a

7    good-faith representation that they are what they look

8    like, which is they're relevant to the trades in the

9    case, but since I haven't had a chance to match them up

10   to anything.

11           THE COURT:  Mr. Baez, is this what -- these

12   are exhibits you intend to put into evidence?

13           MR. BAEZ:  We do, yes, Your Honor.

14           Now, the other thing, I guess so Your Honor

15   knows, one of them is Ellington's model.

16           THE COURT:  I don't need to know.

17           MR. BAEZ:  I'm not going to be reading from

18   them.  It's really just a visual aid.

19           THE COURT:  I don't need the details.  All I

20   need to know is it's something that's going to go into

21   evidence.

22           MR. BAEZ:  I believe it will --

23           THE COURT:  Okay.

24           MR. BAEZ:  -- or some form of it.

25           THE COURT:  Fine.

1          MR. FRANCIS:  Your Honor, with respect to the

2     first slide, the words on the page are fine, I think,

3     but I suspect that "materiality" and "intent to commit a

4     crime" are going to be accompanied by some oral

5     instruction to the jury about what those terms mean.

6          I don't want to be rude.  I know it's

7     disfavored to object during openings, but we will object

8     to anything we think intrudes on the Court's function of

9     instructing the jury, particularly because I just have

10    reason to believe that we don't think the instruction

11    the defense would give is necessarily correct.

12          THE COURT:  This is what I will do:  Are both

13    sides going to make some reference to the elements of

14    the offense?

15          MR. FRANCIS:  No, Your Honor.

16          THE COURT:  No for the government.

17          MR. FRANCIS:  We think that's Your Honor's

18    job.

19          MR. BAEZ:  Whatever I say about the law I will

20    preface with, "The Court is going to instruct you."

21          THE COURT:  I will -- when I tell the jurors

22    they're about to hear the openings statements, I will

23    just tell them that there may be some references to the

24    law, and I want to make sure they understand that I will

25    be instructing them on the law.

1          MR. FRANCIS:  That's fine, Your Honor.

2          I will say, the government may come back to

3     you.  We've had this happen in other trials where, in

4     opening, the instruction on the law from the defense is

5     so wrong that it -- we require something from Your Honor

6     just to say it needs to be disregarded specifically,

7     particularly because of this "intent" thing, it's sort

8     of out there.  So I have concerns.

9          THE COURT:  If that comes up, I will address

10    it.

11         MR. FRANCIS:  Thank you.

12         MR. BAEZ:  And we're changing our slide to

13    what Your Honor just said that you will be instructing

14    the jury on.

15         MR. FRANCIS:  I still have an objection to

16    that, Your Honor.  I don't think they should be putting

17    on a slide what Your Honor's instruction will be at the

18    end.

19         THE COURT:  I don't mind, because I will be

20    telling the jury that I'm going to be instructing them

21    on the law.

22         MR. FRANCIS:  Could we have a moment just to

23    get the electronics working?

24         THE COURT:  Sure.  People can feel free to

25    stretch and I will rest.

```
 1                   (Whereupon, a recess followed.)

 2              THE COURT:  Please be seated, everyone.

 3              With respect to the large demonstrative, we

 4    just don't have time to make the appropriate changes.

 5              MR. BAEZ:  That's fine.

 6              Your Honor, I do have a question.

 7              THE COURT:  Yes.

 8              MR. BAEZ:  I believe the Court did mention to

 9    the jury that Mr. Demos was charged with six counts of

10    securities fraud during jury selection.  I just want to

11    know how the Court wanted me to --

12              THE COURT:  Ignore that.

13              MR. BAEZ:  Okay.

14              THE COURT:  I think I said eight.

15              MR. BAEZ:  I thought you said six.

16              MR. FRANCIS:  Six.

17              THE COURT:  Six?  Sorry.

18              Just talk about what's in the case.

19              MR. BAEZ:  Okay.  All right.

20              So there is no Count Three?

21              THE COURT:  No.  Just ignore it.  Who knows

22    what will happen by the end of trial.  All they are

23    concerned about is what I tell them to consider once we

24    get to the charge and the closings.

25              So are we ready to bring the jury in?
```

1           MR. LEONTIRE:  Judge, can we have one minute?

2    We're not able to connect up for some reason.

3           MR. FRANCIS:  The government is ready.  We

4    could take another break in between openings.

5           THE COURT:  Who's trying to connect?

6           MR. BAEZ:  One of the options we can do to

7    move it is, after the government's opening, if we can

8    have a minute while they're -- I guess the jury is at

9    ease.

10          THE COURT:  Sure.  Then the court reporter can

11   rest.  If we need to have it set up.

12          MR. BAEZ:  I don't think we need to have them

13   leave.

14          THE COURT:  Yes.

15          Okay.  We'll bring the jury in.

16          MR. FRANCIS:  Your Honor, could I get some

17   space?  I'm not set up anymore.

18          THE COURT:  Okay.

19          MR. FRANCIS:  Your Honor, whatever just

20   happened there, our computer is no longer working -- or

21   the system is no longer working for our computer.

22                  (Whereupon, the jury entered the

23   courtroom.)

24          THE COURT:  Please be seated, everyone.

25          Ladies and gentlemen, you're about to hear

1   opening statements from both sides.  I remind you that

2   opening statements are not evidence.  Also, if counsel

3   happen to refer to the law during their opening

4   statements, I remind you that I will be instructing you

5   on the law at the end of the case, and you should follow

6   my instructions on the law regardless of what you hear

7   from counsel.

8              Mr. Francis.

9              MR. FRANCIS:  Thank you, Your Honor.

10             Can everyone see that on their screens?

11             THE JURY:  Yes.

12             MR. FRANCIS:  Thank you.

13             Ladies and gentlemen, the defendant, David

14  Demos, he lied to his customers to steal their money.

15  He was a trader at a -- he was bond trader at a

16  broker-dealer called Cantor Fitzgerald.

17             A broker-dealer sits in between buyers and

18  sellers and they get bond trades done.  They connect

19  buyers and sellers and get trades done.

20             The crime the defendant committed as a bond

21  trader was simple:  He would lie to his customers about

22  bond prices.  He knew that was important information to

23  his customers and he knew it was wrong to lie about it.

24  He knew it was wrong to lie about so he tried to hide

25  what he was doing from them.

1    The purpose for that deception was to convince

2    buying customers to pay higher prices and convince

3    selling customers to pay lower prices because he got to

4    keep the difference for Cantor.  And Mr. Demos, his

5    contract with Cantor paid him a percentage of the

6    profits on his trades.  So by lying, he made his trades

7    more profitable for Cantor, and more profits for Cantor

8    meant more money for the defendant.

9    And because he did that, he stands charged

10   with five counts of securities fraud.  Each count is for

11   a separate fraudulent trade.  These trades occurred in

12   2012 and 2013.  And the evidence will show that in each

13   of those five trades the defendant lied to his customers

14   about price.  He lied about something that was important

15   to them.  He lied even though he knew it was wrong, and

16   he lied to make more money for Cantor and himself.

17   Now, let me take a few moments.  In this

18   courtroom you are going to hear a lot about bonds and

19   bond trading, so let me preview some of that.

20   The word "bond," that's just an IOU.  If I use

21   that word, "bond," that's just an IOU.  The bond you're

22   going to hear about the most, the security you're going

23   to hear about the most, is an RMBS bond.  RMBS is an

24   acronym.  It stands for "residential mortgage-backed

25   securities."

1          Now, for now, it would probably be enough if

2     you took away that an RMBS is a security that gets

3     bought and sold by investors.  But as I said, you're

4     going to hear a lot about RMBS, so let me tell you a

5     little bit more.

6          You'll hear that an RMBS is formed by bundling

7     together hundreds or thousands of home mortgages, and

8     then pieces of that bundle can be sold off to investors,

9     and the investors get paid based on the monthly mortgage

10    payments that get made.  People in the bundle who pay

11    their monthly mortgages, some of that money goes to the

12    investors who hold that bond.

13         You'll hear that investors would buy and sell

14    these RMBS bonds.  They would trade them.  Those

15    investors, they're typically not people.  They are big

16    sophisticated businesses, investment managers or hedge

17    funds.

18         Now, as I said, this case is about trading

19    RMBS bonds, but the market for trading RMBS bonds is

20    very different than the stock market that you might know

21    something about.  So it's not -- it's different than if

22    you wanted to buy stock in GE or United Technologies or

23    something like that.  You can't just open up the paper

24    or go to a website and find out, what's the price of

25    this RMBS bond.  And they don't trade on an exchange, so

1    there is no –– like the New York Stock Exchange or

2    NASDAQ, that doesn't exist for RMBS bonds.

3            Each RMBS bond is unique, and sometimes these

4    bonds don't trade very often.  So if an investor wants

5    to buy or sell an RMBS bond, there's only one way to

6    make that happen, and that's to get involved with a

7    broker–dealer, for instance, Cantor Fitzgerald, where

8    the defendant worked.

9            As I said before, a broker–dealer's job is to

10   sit in between buyers and sellers and get trades done.

11   Sometimes Cantor would buy an RMBS from the seller and

12   then hold it for a few hours and then sell it to the

13   buyer.  But most of the trades you're going to hear

14   about in this case, Cantor would buy from the seller and

15   sell to the buyer, just like that.

16            Now, in each trade it is a fact that Cantor

17   would buy the bond from the seller and sell it to the

18   buyer.  That is the way it works.  That is what a

19   broker–dealer does.  But a broker–dealer isn't just a

20   middleman for the bond.  It's also a middleman for

21   information.  It's like there's a wall between buyers

22   and sellers when a trade is being negotiated.  They

23   don't talk to each other.  They can't negotiate

24   directly.  In fact, most times they don't even know who

25   each other are.

1          But the broker-dealer sits on top of that

2     wall.  And in the trades at issue in this case, the

3     defendant sat on top of that wall.  He saw both sides of

4     the negotiation, both sides of the trade.  All the

5     negotiations you'll see run through Mr. Demos.

6          When it came to prices and price information,

7     he had it all.  Sometimes he would share some of that

8     information with other people at Cantor, but the buyers

9     and sellers, they only knew what Mr. Demos wanted them

10     to know.

11          As I said, those buyers and sellers, they're

12     big, sophisticated businesses, hedge funds.  But they

13     were investing on behalf of other entities, other

14     sophisticated institutional investors.  And in one case,

15     they were -- one of them was investing on behalf of the

16     United States, the Treasury.

17          These customers of Mr. Demos's, these victims

18     of Mr. Demos, they had computers and smart people

19     evaluating RMBS bonds, trying to figure out what is the

20     best investment opportunity for our investors.  But for

21     all their sophistication and all their computer models,

22     when it came time to negotiate, to actually buy or sell

23     a bond, they were at the mercy of their broker-dealer;

24     and in the five trades at issue in this case, they were

25     at the mercy of David Demos.

1         And he took advantage of that situation.  He

2    lied, causing buyers to pay more and sellers to take

3    less.  He kept the difference for Cantor because it

4    meant more money for him.

5         Now, as I said, you're going to hear this case

6    is about bond trading.  The way these bonds get traded,

7    it has its own language, particularly about price.  Let

8    me tell you a little bit about that.

9         Prices are a percent.  Prices are a percent.

10   Let me walk you through an example and you'll see what I

11   mean.

12        Let's say you start with a bond with the value

13   of the mortgages in the bundle is a million dollars.

14   And then you might see that it's being talked about

15   trading at a price of 50.  So that means 50 percent or

16   50 cents on the dollar.  Well, 50 percent of a million,

17   that's $500,000.  So if you want to buy that bond, you

18   need $500,000 cash money, but $500,000.

19        So that's percent or percentage points.

20   Sometimes they're called points.  But they trade in

21   smaller increments, smaller than points, smaller units,

22   and those are called ticks.

23        There are 32 ticks in each point.  One tick

24   equals 1/32 of a point, or 1/32 of a penny on the

25   dollar.  So if one tick is 1/32, then 8 ticks, that's a

1    quarter-point; 16 ticks, that's half a point; 24 ticks

2    would be 3/4 of a point.  Those are common increments

3    you'll see in the case.

4         You're going to see in the exhibits that the

5    defendant and his victims were negotiating for the price

6    of bonds.  And that can be written in a document in a

7    couple of different ways.  I'm going to run through that

8    quickly.

9         Let's say we're talking about this bond,

10   someone's talking about a bond buying at a price of

11   50 points and 16 ticks.  I don't think you're going to

12   see an instance where someone takes the time to write

13   that out.  Instead you will often see it written 50-16.

14   Means the same thing.  When you hear from the witnesses,

15   they might say that as 50 and 16, which is all the same

16   thing as 50.5, which you might see.  Sometimes these

17   prices are in decimals, but when they're in ticks,

18   that's how it's written.

19        Now, these are small increments, a percentage

20   point or a tick.  These are big, big bonds so there are

21   very large amounts of money at stake.

22        Now, let me give you a preview of some of the

23   evidence you're going to hear that will prove the

24   defendant committed securities fraud in these five

25   instances.  I said the government will prove that the

1    defendant lied about prices.

2          How will we do that?  Well, I also said some

3    of the evidence will be the defendant's own words.  So

4    we're going to show you electronic chats and electronic

5    messages that Mr. Demos was having with his victims,

6    words that Mr. Demos wrote to his victims.

7          You'll see his exact words.  And because these

8    are time stamped, you'll be able to tell what was the

9    exact time he was writing those words.  So that's what

10   Mr. Demos was saying to his victims.  But the government

11   is also going to show you other electronic chats and

12   messages and documents from the exact same time that

13   will prove that the defendant was lying to his victims.

14   He was lying to buyers about prices Cantor had paid.

15          When he was doing that, we're going to show

16   you what's really going on with the seller.  He was

17   lying to selling victims about the price that Cantor was

18   getting a buyer to pay.  And when he was doing that,

19   we're going to show you what was really going on between

20   Mr. Demos and the buyer.  So you'll be able to see what

21   the victims couldn't at the time.  You'll be able to see

22   how Mr. Demos was lying to them.

23          We're also going to bring you a witness, our

24   first witness.  He's going to explain some of these

25   electronic chats and messages and how they work, why you

1    can trust them, why you can rely upon them.

2            Now, the second thing I said was that this

3    information the defendant was lying about was important,

4    and by lying he cheated his customers.

5            Well, how is the government going to prove

6    that?

7            Well, there's lots and lots of exhibits, these

8    electronic chats and messages where the defendant and

9    his victims are negotiating principally about price.

10   But we're also going to call the victims in the five

11   trades.  They'll tell you that price was important; that

12   this was not just the typical posturing in a

13   negotiation.  They'll tell you that Mr. Demos's lies

14   mattered in these five trades; that they used his false

15   information; that it affected price and hurt their

16   investors.

17           The third thing I said was that the defendant

18   committed this scheme to make himself money.  And to

19   prove that, the government will bring you a witness from

20   Cantor and show you Mr. Demos's contract.  You'll see

21   that he was paid a percentage of his profits as a bonus.

22   You'll see the contract.  We will have that witness

23   explain how it worked.  But you're also going to see

24   other documents that show that Mr. Demos could track his

25   profit day by day.

1           And the fourth thing I said was the government

2   would prove the defendant knew it was wrong to lie and

3   cheat his customers.

4           How will we prove what was in Mr. Demos's

5   head?

6           Well, first, this is a highly regulated

7   industry.  You need to be licensed to be a bond trader

8   at Cantor Fitzgerald.  Mr. Demos was licensed.  He had

9   to pass an exam.  You'll hear from the compliance

10  officer, or one of the compliance officers at Cantor,

11  and he'll tell you it was wrong to lie to customers;

12  that there are rules and regulations in that industry

13  that prohibited lying to customers; and that Cantor had

14  policies and manuals prohibiting that kind of conduct.

15  And you'll see documents that prove that Mr. Demos knew

16  about those policies and manuals; that he read them;

17  that he said that he had read them.

18          And the third thing we are going to do to

19  prove Mr. Demos knew it was wrong to lie, we're going to

20  show you what he did to try to hide his lies.

21          Now, let me walk you through a few of the

22  trades, a few examples, and show you how the defendant's

23  fraud worked.

24          The first example is from Count Two.  You have

25  the buyer and the seller and Mr. Demos, who can see both

1   sides of the negotiation.  The defendant's victim in

2   this trade was a hedge fund or investment manager called

3   Marathon.  And they were trying to buy a bond, so they

4   were the buyer.

5          Now, like anyone buying anything, they wanted

6   to save money if they could and pay the lowest price

7   possible, the cheapest price possible.  Marathon was

8   negotiating with the seller for this bond through

9   Mr. Demos.  And here's how he took advantage of it:

10          The seller agreed to sell the bond at a price

11   of 65 and 24, 65 and 3/4.  The defendant knew that, but

12   Marathon didn't.  The defendant learned the seller was

13   selling at a price of 65 and 3/4.

14          Seventy seconds later he lied to Marathon.

15   What he told Marathon was that the seller had agreed to

16   a price of 66 and 14 ticks.  What's in yellow in front

17   of you, ladies and gentlemen.  Those are Mr. Demos's own

18   words.

19          The difference between the two numbers on the

20   screen between where Cantor actually bought the bond and

21   where Mr. Demos falsely told Marathon they are buying

22   the bond, that's 22 ticks.  Marathon agreed to pay

23   Cantor for Mr. Demos's work, but they only agreed to pay

24   6 ticks.  You may hear that called "pay on top."  That

25   just means that Marathon and the seller agreed to a

1    price for the bond and then Marathon agreed to add

2    something on top, in this case 6 ticks, for Cantor's

3    work.  It's usually between 2 and 12 ticks in trades of

4    this sort and in this trade Marathon agreed to 65.

5             But by lying, the defendant managed to get an

6    extra 22 ticks for Cantor.  That's more than three and a

7    half times what he had legitimately earned on that

8    trade.  Like I said, these are large amounts of money at

9    stake.  These are big bonds.  This was a $900,000 deal,

10   so that 22-tick lie that the defendant told Marathon,

11   that was worth more than $40,000.

12            So you're going to see this.  This is a

13   recurring theme.  The way the fraud worked is Mr. Demos

14   learned important pricing information.  In this trade,

15   70 seconds later, he lied about it to Marathon to

16   convince them to pay extra.  By doing that, he made

17   Cantor more than $40,000 in extra profits, and more

18   profit for Cantor meant more money for Mr. Demos.

19            That's Count Two.

20            Next example is from Counts Four and Five of

21   the indictment.  It's two bonds.  It's two counts

22   because it's two bonds being negotiated at the same

23   time.  In these trades the victim was a Greenwich hedge

24   fund called Ellington that was buying a bond -- or

25   buying two bonds.  Mr. Demos was acting as the

1    go-between between Ellington and the seller.

2            The seller was asking 30 and a half on each of

3    these two bonds, but Mr. Demos wanted Ellington to pay

4    more.  He wanted them to pay 32 and a half; 32 and a

5    half, not 30 and a half, 2 points more.  Here's how he

6    got them to do it:

7            First, he took an e-mail he was having with

8    the seller and he showed it to Ellington.  But before he

9    showed it to them, he changed it.  He altered the e-mail

10   and he added in a fake price of 32 and a half.  We're

11   going to show you the e-mail he had with Ellington and

12   we're going to show you how he changed it before he

13   showed -- the e-mail he had with the seller and show you

14   how he changed it before he showed it to Ellington.

15           But he kept going.  He told Ellington, after

16   he knew that the seller was willing to sell or had sold

17   at a price of 30 and a half, he wrote to Ellington his

18   own words, 32 and a half was the price that Cantor was

19   paying.  That was only two minutes' difference, ladies

20   and gentlemen.  There were two minutes between the time

21   he learned the truth and he lied about it.

22           So that's the first time he lied to them about

23   the price directly, but then he doubled down on it.  He

24   wrote to them, We're done at 32 and a half.  Those are

25   all Mr. Demos's own words.

1          Now, the difference between the lie and the

2    truth in these two trades was 2 points.  2 points is

3    64 ticks.  But it's 2 points on each bond, so you really

4    have to double it.  It's 128 ticks.  Ellington agreed to

5    pay 4 ticks on each of these trades, so double that to

6    8.

7          The difference between what Mr. Demos was

8    entitled to, what he had earned, and what he took was

9    16 times, 16 times more than he had legitimately earned.

10   That's what he took by lying.

11         Once again, these are big bonds.  Put them

12   together, these two bonds, a million dollars they cost

13   Ellington.  So that 128 ticks of lies, that was worth

14   more than $75,000 on these two trades.

15         Now, that was a bit more complicated than the

16   first one, but it's the same theme.  Mr. Demos learned

17   something important, this price information.  In this

18   case, two minutes go by and he lies about it to

19   Ellington, and by doing that, he made Cantor more than

20   $75,000 in extra profits.  And more profits for Cantor

21   meant more money for Mr. Demos.

22         Final example, this is from Count One of the

23   indictment.

24         In this trade the victim is Marathon again.

25   But instead of buying a bond, now it's selling.  Like

1    anyone selling anything, Marathon wants to get the

2    highest price it can.

3           In this trade, Mr. Demos learned that the

4    buyer was willing to pay a price of 43.75; 43 and 3/4.

5    In the lingo of the industry, it was bidding 43 and 3/4.

6    But six minutes later, that's not what Mr. Demos told

7    Marathon.  He lied to them.  What he told them was that

8    the buyer only had a 40-and-a-half bid.  Because of

9    that, Marathon, the seller, agreed to reduce its price.

10          Now, the difference between the lie and the

11   truth here is 3 and 1/4 points, or 104 ticks.  This is a

12   very, very large bond.  This was a $26 million deal.  So

13   that 104-tick lie, the difference between what the buyer

14   was really bidding and what Mr. Demos said they were

15   bidding, in this trade that was worth more than

16   $845,000.

17          So it's just a mirror image of what we saw in

18   those other two examples.  Mr. Demos learned important

19   information.  In this instance six minutes go by.  He

20   lied about it to Marathon to get them to sell at a

21   cheaper price.  By doing it, he made extra profits for

22   Cantor.  And more profit for Cantor means more money for

23   Mr. Demos.

24          Now, I have previewed only some of the

25   evidence you will hear in this courtroom.  You're going

```
1    to get to see and hear it all.  You will see and hear

2    the witnesses.  You will read the exhibits, the

3    documents.  And after you have all the evidence in this

4    case, the government will have a chance to address you

5    once more.  And at that time we will ask you to return a

6    just verdict.  We will ask you to find David Demos

7    guilty of securities fraud.

8              Thank you for your attention.

9              Thank you, Your Honor.

10             THE COURT:  Thank you, Mr. Francis.

11             Ladies and gentlemen, we'll need time for the

12   defense to set up its computer.

13                  (Pause.)

14             THE COURT:  Whenever you're ready.

15             MR. BAEZ:  May it please the Court,

16   Mr. Francis, Ms. Cherry.

17             Good morning, ladies and gentlemen.

18             THE JURY:  Good morning.

19             MR. BAEZ:  I have got to clear up something

20   immediately from the very beginning, and that's what

21   I've been anxiously waiting to do; and that is that

22   there are no losses in this case.  Absolutely none.

23   These victims that the government has mentioned to you

24   are profiteers, not victims.  In each and every count in

25   this case they made millions.
```

1            The other thing I think you need to know that

2      will be abundantly clear, and as I mentioned this during

3      jury selection, is that these transactions were

4      principal to principal, which means that David was

5      purchasing these bonds and selling them as a dealer.

6            Now, you're going to hear "broker," "dealer,"

7      used interchangeably, but the thing that you have to

8      remember as it relates to all five of these counts,

9      David was acting as a dealer, which means they would

10     purchase the bonds, take a risk because each transaction

11     has three days to settle.

12            So if one of these buyers decides after a day

13     or two, I don't want it, the person left holding these

14     multi-million dollar bonds is Cantor Fitzgerald, and by

15     way, of course, David Demos.  So they take a risk, and

16     there's a markup for that risk.

17            And that's the thing you have to look at in

18     the entire framework as we begin discussing this case,

19     because I don't think that was mentioned to you this

20     morning.  And I think those are critical facts that

21     you'll find useful in your deliberations.

22            Now, in order to get to these losses, the

23     government is going to have to refer to hypotheticals.

24     They're going to ask you to go to hypothetical land to

25     come up with these numbers that Mr. Francis just rolled

1    out to you.  And the reason for that, ladies and

2    gentlemen, is you have to remember three things:

3              In order for these buyers to get these bonds

4    cheaper, David has to agree to sell them cheaper.  And

5    there's no way that the government's going to be able to

6    go inside of David's head, open it up and tell you

7    exactly the price he would have sold it for.  So that's

8    critical.  What a thing is worth is up to the person

9    that's selling it, not necessarily how much you're

10   buying it for.

11             As I mentioned to you before during jury

12   selection, these are all hypotheticals, but this is a

13   principal-to-principal transaction.  And in order to

14   come up with these losses, you're going to have to

15   speculate and imagine this hypothetical about the fact

16   that David may or may not have sold these bonds for that

17   amount.

18             Remember what Judge Thompson told you this

19   morning about speculation, guesswork and conjecture.

20   That is what the law will forbid you from doing.  That

21   is not what the government must prove when they lay out

22   their case.  They can't ask you to go to hypothetical

23   land, and that's exactly the journey that you will be

24   asked to be taking.

25             Now, Mr. Francis mentioned something about

1     lying to steal their money.  Well, that's simply not the

2     case here.  The situation with these bonds is, there are

3     three things that you have to remember during the course

4     of this trial:

5                One, would David have sold it cheaper?

6                Now, one of things you'll learn throughout the

7     course of the evidence in this case is that these bonds

8     were hot.  Everybody wanted them.  They were flying off

9     the shelves because these hedge funds were taking

10    advantage of the housing market crash.  And they wanted

11    to take advantage and buy these bonds at 30 percent,

12    40 percent, 60 percent on the dollar.

13               So they're buying them at a huge discount and

14    they know, they think they're going to rebound; and

15    they're projecting it with these models that they use,

16    these highly sophisticated models.

17               What you have to understand about these

18    profiteers, because I don't call them victims, these

19    profiteers will come in and tell you about these

20    sophisticated models.  These hedge funds don't get

21    investors to invest $20 million in their hedge fund by

22    just saying, "Trust us, we're good guys."

23               No.  They talk about how sophisticated they

24    are as investors.  They have think tanks and these

25    computer models that will tell them exactly how these

1    bonds are going to perform, what the rate of default

2    they anticipate being of these mortgages, all of these

3    different calculations that they run through.  They're

4    going to go through all of this -- and I'll explain that

5    in just a second -- but they're going to talk about all

6    of these things and tell you specifically right down to

7    the range of price that they're willing to pay.

8         If it's above their price, all the sales talk

9    in the world by David ain't going to get them to buy it,

10   period.  If it's in their range, they're going to buy

11   it, because they know it's a deal and they're going to

12   make millions, like they did in this case.

13        So as I mentioned, these are the three things

14   that you should remember:  Would David have sold it for

15   less?

16        The next thing is the materiality.  Now,

17   materiality, ladies and gentlemen, is kind of what

18   you're going to hear a lot of when the judge instructs

19   you on the law.  I'll rely completely -- I want you all

20   to rely completely on what the judge tells you.  But

21   basically I'm going to break it down into its simplest

22   form; and that is that under the law, in order to

23   convict someone of securities fraud, there must be a

24   material misrepresentation.

25        What does that tell you?

1              It means you can make misrepresentations,

2      which means lies, but they can't be material.  You can

3      lie, but you can't lie big.  That's the rudimentary

4      explanation of it all.

5              So where does this all come to play?

6              Well, these sophisticated investors, their

7      models, their computer models and how they go through

8      all of this to come up with that figure, that is what --

9      those are material things.

10             David never lied about prices of bonds that he

11     was selling them for.  He lied about what the other

12     person was selling them for, but not what he was selling

13     them for.

14             When the transaction came through, it was done

15     on a contract, not over a handshake.  They don't trade

16     multi-million dollars of bonds and say, Hey, give me a

17     fist bump.

18             No.  They actually go through a settlement

19     process.  And those prices that David told them they

20     were paying for these bonds, that was exactly the price

21     that they paid, not a penny more.

22             So these are the other things.  I'm going to

23     go through materiality in just a moment, but the intent

24     to commit a crime is huge.  And I will submit to you,

25     ladies and gentlemen, it is an impossibility for you to

1    see that David had the intent at any time to willfully

2    commit this crime.  I'll explain that in a minute, but

3    first I want to talk a little bit about materiality.

4             These bonds, these computer models, basically

5    you're going to see that the investors and these hedge

6    funds go through all -- they promote this as a

7    proprietary software, proprietary analytics.

8             They say to their investors, "Invest your

9    millions of dollars with us because we have the smartest

10   people in the world who will break down mortgage data,

11   break down the economy, break down all kinds of things.

12            And I'm not going to -- trust me, a lot of

13   this will be quite intimidating, and I'm not going to

14   attempt to explain it all to you, but you're going to

15   hear about it.  And what I want you to know and

16   understand is the complexity of it all.  These are their

17   charts that they analyze and that they look at and the

18   data they pull out before ever coming up with a price,

19   before ever reaching out and talking to David.

20            David may say to them, "Look, I've got this

21   bond for sale," but before they're interested in

22   bidding, they go back and look at whether it's something

23   they want to invest in.  And then they go through all

24   these charts and analytics and then make a decision:

25   "Okay, this is the range we want to pay."

1           Now it's what does David want to sell it for?

2    Because Cantor Fitzgerald, whenever they buy a bond,

3    even if it's done simultaneously, that three days, that

4    three days puts them at risk and they can change it at

5    any time.

6           So as you can see, these are all the analytics

7    that they'll go through as they look at things.  And

8    they're quite substantial.  This isn't cheap sales talk.

9    They aren't exchanging multimillions of dollars by just,

10   "Hey, I'm buying it for this amount; you can have it for

11   this amount and give me the service charge," because

12   that's what we're talking about when we talk about these

13   ticks, basically an added service charge.

14          Now, after they go through all of these

15   analytics, this is a plethora of information that they

16   go through.

17          One of the things that Mr. Francis told you,

18   he mentioned this.  Do you recall that graph?  He told

19   you about this wall that exists.  But what he didn't

20   tell you is why that wall exists.  And that's how this

21   case is going to unfold before you, ladies and

22   gentlemen.  You'll hear something, but you got to hear

23   the rest of the story.

24          The reason this wall exists is because hedge

25   funds thrive in secrecy.  They don't want the

1    competition knowing what bonds they're investing in and

2    how much they're paying for them.  So they have -- so

3    these dealers, kind of like a car dealer, have been set

4    up so as to protect the privacy of the information.

5           You're going to hear that they even tried to

6    pass legislation or some regulations to be able to know

7    what bonds are being traded for but the hedge funds

8    didn't want it.  And that's because if Hedge Fund A is

9    interested in these bonds and they're buying one and

10   they realize that's a good investment, let's buy some

11   more.  But if the prices are then publicized, all these

12   other hedge funds are going to jump on board and take

13   all their other bonds and there's not going to be any

14   more money for them to make.

15          So the multimillions of dollars won't be there

16   for them to make if they disclose this information.  So

17   this wall is a self-imposed wall, ladies and gentlemen.

18          This is incredibly -- I don't know if somehow

19   you thought the system was set up that way because of

20   the dealers.  No, it's set up that way because the hedge

21   funds want it that way.

22          I remember when I was a kid growing up I used

23   to see these commercials.  They'd be in a restaurant and

24   someone would say, "My broker is EF Hutton and EF Hutton

25   says," and the whole room goes silent.  That's because

1    everyone knows that information is money.

2          And these hedge funds don't want to give money

3    away.  They don't want to give all that proprietary

4    software that I just showed you, all of that stuff, they

5    don't want to share that with anyone.  That's how they

6    get these huge institutions to lend them money,

7    including the government.  "Hey, come invest with us

8    because we're the smartest, we've got the most complex

9    ways of verifying information, not relying on unverified

10   information."

11         I'll tell you, you're not going to hear a

12   single piece of evidence that these investors went --

13   these hedge funds went to their investors and said,

14   "We're going to make you money by listening to what

15   David says.  My dealer is David Demos and David Demos

16   says ..."

17         You're not going to hear anything like that

18   because it's absurd.  That's not the way the hedge funds

19   operate, these multibillion-dollar hedge funds.

20         I will ask you, ladies and gentlemen, to

21   remember the five, the five counts that we're here to

22   look at.  You're going to hear a lot of noise.  You're

23   going to hear about office manuals.  You're going to

24   hear about all these other different things.  We're here

25   to discuss five specific counts, each one devastating,

1      each one federal crimes.  We're not hear for any other

2      types of violations or anything like that.  We're

3      specifically here for federal crimes.

4              Now, one of the other reasons that you'll know

5      that what David was telling was not important, as

6      Mr. Francis pointed out to you, they never asked him.

7      These hedge funds, throughout all these charts, they

8      never asked him, "What did you pay for it, for these

9      bonds?"

10             And there's not going to be any internal

11     e-mails between the hedge funds that shows that they

12     actually considered it.

13             And the kicker is, they never went and

14     verified it.  They have the ability to go and verify it

15     afterwards.  They never did that.  That's the reason --

16     the reason is, they had their range.  So long as they

17     bought the stuff within that range, they were happy with

18     their investments.

19             Ladies and gentlemen, they're still happy with

20     their investments.  These five counts, on Count One, the

21     hedge fund made $1,782,884.91, and that was them selling

22     the bond to David.  This was a bad bond and they knew

23     it.  They sold it to David and David saved their pants.

24     They're very happy with the fact they sold it.

25             Count Two, $2,315,003.89.

1           Counts Four and Five, $869,422.57.

2           Count Six -- or I should say the fifth count,

3      $736,839.23.

4           Not a single one of them went to the police.

5      Not a single one with of them filed any complaints.  Not

6      a single one of them is suing Cantor Fitzgerald for

7      these losses as victims.  This is business.  This is big

8      business.  When someone loses money over fraud, they go

9      sue.  They take them to court.  None of these people

10     have done that.  And the reason is, is they're happy

11     with that.

12          Now, you may be asking yourself:  Why?

13          You heard Mr. Francis mention SIGTARP.  This

14     is a unique investigative body that starts to go around

15     and investigate specific things, specific types of

16     crimes to justify its existence.

17          Now, nothing is more juicier -- nothing is

18     juicier than a Wall Street trader.  The last thing I

19     told you I was going to cover with you was intent.  One

20     of the things you should know is that the statute that

21     David's being charged with was enacted in 1934.  That

22     was -- 1934 was the Great Depression.  The Security

23     Exchange Commission was started.  The average price of a

24     home was under $6,000.

25          In 1981, is when RMBS began.  Ronald Reagan

1    was president.  David Demos was born in 1981.  That's

2    when this market began.

3          David Demos started working with RMBS in 2007,

4    for a different financial investor at that time.

5          And then all of these counts are 2012 to 2013.

6    There's one January 4th of 2013.

7          A significant thing happens three weeks after

8    this last trade, and that is that SIGTARP makes its

9    first arrest ever for these types of transactions.

10          So ladies and gentlemen, what you have to

11    conclude is that somehow, hypothetically, David Demos is

12    a swami, a fortuneteller, or something, to know that

13    this is illegal.  It's kind of like you're playing

14    football professionally and three weeks later the police

15    come and arrest you for tackling someone and calling

16    that assault and battery.

17          From 1981, when this market began, to

18    January 28, 2013, not a single arrest ever occurred for

19    this type of conduct.  Nothing.

20          The last trade -- all of these transactions

21    are basically in 2012 and one three weeks earlier.

22          That's not fair.  And you're going to find

23    that; that that's just not right.  And that will tell

24    you and show you that David, it's impossible for David

25    to have reached the willful level.  They have to prove

1    to the exclusion of every reasonable doubt that David

2    had a willful intent to break the law.

3              The last thing I want to bring up to you is

4    when the government comes knocking on your door, and as

5    you evaluate these witnesses, please remember that when

6    the government and the police come to you, the Treasury

7    department, it's a lot better to be sitting in this

8    chair than it is to be sitting in that chair

9    (indicating).

10             You're going to hear from hedge funds and

11   other people; but remember, when you come in this chair,

12   you get to walk out that door.  You get your life.  You

13   walk on and you go on with your life as soon as this is

14   over.  And this chair (indicating) brings uncertainty.

15   This chair brings the destruction of your future, your

16   potential liberty, your family.

17             These may be hypothetical losses to the

18   government.  This is no hypothetical family.  The pain

19   that they're suffering and what they're going through

20   because the government came knocking on their door, that

21   they decided one day, three weeks after the last

22   transaction, that this was illegal conduct, they came

23   and destroyed David Demos's life.

24             At the end of this case, ladies and gentlemen,

25   this is what it all boils down to:  Sales haggling back

1      and forth that was relatively insignificant to these

2      investors who all made millions.

3              Could they have made more money?

4              Yeah, if David had agreed to sell to them for

5      that amount.  But this is America.  You get to profit.

6      If you're at risk and you're in business, there's a

7      Wall Street office of Cantor Fitzgerald.  They've got

8      offices here in Connecticut, in Asia.  They have

9      employees to pay.  They're not here to do this for table

10     scraps.

11             But when the government comes calling, ladies

12     and gentlemen, it's a scary thing.  I'll ask you to

13     remember the stakes on each and every one of these

14     counts, because this is real to David Demos, not a

15     hypothetical.  This is real to each and every member of

16     his family who's here today.  These are lives that will

17     be destroyed unless you can follow the law and ensure

18     that justice is done here.

19             At the conclusion of this case, ladies and

20     gentlemen, I'm going to come to you.  I'm going to ask

21     you all individually and collectively to find David

22     Demos not guilty.  You can't give him his reputation

23     back.  You can't give him his life's savings back.  You

24     can't undo the pain that they've been through.  But you

25     can at least let him go on with his life.

1          Thank you.

2          THE COURT:  Thank you, Mr. Baez.

3          We're going to take our morning break now,

4    ladies and gentlemen.  We'll take a 20-minute break and

5    then come back.  Then we'll stay on our regular schedule

6    and take our lunch break at 12:30.

7          The jury will be excused.

8              (Whereupon, the jury left the courtroom.)

9          THE COURT:  Please be seated, everyone.

10         Thank you.

11         There's one thing I didn't have time to

12   mention this morning.  I do have a practice, when we

13   have exhibits admitted for a limited purpose, of

14   flagging those exhibits.  If we're going to be having

15   hard copies of those documents, I usually have either a

16   sticker or a stamp that says, "limited purpose only,"

17   just as a reminder for the jury.  If we're going to give

18   a list to the jurors, anything that's admitted for a

19   limited purpose, we'll flag that on that list too.  So

20   counsel can keep that in mind.  I don't know how it's

21   going to work mechanically, but I'll leave it to you all

22   to make sure we have that covered.

23         I think if you had a chance to look the

24   rulings I sent out yesterday, I did mention that I'm

25   continuing to look at the government's exhibits with

1    respect to the uncharged trades.  I'm working on

2    drafting up a limiting instruction, but I do want to

3    look at as much as I can on the question of materiality

4    before we get to any of those exhibits.

5              Are we getting any of those right away?

6              MR. FRANCIS:  Not with the first witness but

7    with the second, and it will be the first trade we go

8    through.

9              THE COURT:  I'll have a draft of a limiting

10   instruction for you all over lunchtime then.

11             MR. FRANCIS:  Thank you.

12             THE COURT:  Mr. Baez, did you say you had

13   something that you wanted to mention?

14             Mr. Spiro?

15             MR. SPIRO:  Yes.  Thank you, Judge.

16             I appreciate you bringing up the 404(b) issue.

17   We wanted to be heard, given some new facts and

18   circumstances on that issue, and I'm glad Your Honor

19   brought that up.

20             THE COURT:  I didn't bring it up to discuss.

21             MR. SPIRO:  I understand that, Judge.

22             THE COURT:  I'm sorry.  We're taking our

23   break.  We'll talk about it at the end of the day.

24             MR. SPIRO:  Well, I'd like to be heard before

25   the witness testifies as to those exhibits.

1          THE COURT:  What's your point briefly?

2          MR. SPIRO:  Yes, Judge.

3          Obviously, in the time between when Your Honor

4    ruled and today, DW, which is the purported victim in

5    Count Three, is no longer a witness in this case, it

6    does not seem.  And obviously, what the Court may not be

7    aware of, in fact, is that the reason that DW is no

8    longer a purported victim in this case is because of

9    statements that they made to the government about

10   whether or not they believe these issues to be material.

11         And the facts are that Your Honor relied

12   heavily, one would assume -- since half of the

13   information before the Court when they made their

14   decision was DW trades -- on that information in making

15   that ruling and that decision.

16         What I would like to have an opportunity to do

17   is recast that application that the government

18   originally made in light of what we now know today.

19         In addition, the Court, while considering the

20   prejudice to the defense, I also just want to point out,

21   as the Court is aware -- and it somewhat seems

22   independent but it's crucial here -- ordered Marathon to

23   turn over certain documents via subpoena after the

24   404(b) ruling as to those trades.  We received those

25   documents last night.  They're heavily redacted,

1    incomplete.  So it really does prejudice the defense to

2    at least not be heard on those outstanding issues

3    because we're sort of stuck.

4              THE COURT:  On which outstanding issues?

5              MR. SPIRO:  The 404(b) issue.

6              THE COURT:  You've been heard on the 404(b)

7    issue, and it does not affect my analysis that DW is no

8    longer in the case as a victim.

9              I don't understand the import of that from

10   your perspective.

11             MR. SPIRO:  Will the Court entertain further

12   argument now, or can we bring it up before Marathon

13   testifies?

14             THE COURT:  When is Marathon testifying?

15             MR. FRANCIS:  If we stay to the schedule,

16   we'll break at 12:30, so we won't get into the trade

17   until after lunch.

18             THE COURT:  Okay.  Do you have a comment,

19   Mr. Francis, on this point?

20             MR. FRANCIS:  I do.  I know Your Honor wants

21   to take a break.

22             I disagree with Mr. Spiro's speculation about

23   why the government dropped Count Three with respect to

24   Marathon.  Their subpoena, they wanted a 17(c), and I

25   don't think they got it.  So instead they got regular

1     return of these documents.

2          I'm not sure why that affects Your Honor's

3     ruling that introducing these exhibits, this trade, to

4     show as circumstantial evidence of the defendant's

5     intent, what that has to do with anything.

6          THE COURT:  I'm not either.  I just don't see

7     the connection.

8          MR. SPIRO:  If I may now, Judge, I will tell

9     the Court that -- I assume that the Court looked at the

10    eight trades that were before the Court in the totality

11    of the circumstances at the time and deemed that the

12    404(b) ruling that the Court made was fair, given all of

13    those circumstances.  I'm telling the Court that four of

14    the trades that Your Honor relied upon in making that

15    decision should be questioned.

16         Now, the government is saying that I'm

17    speculating as to the reason DW isn't being called.

18    What the Court doesn't know is, we received a 302 and

19    certain statements --

20         THE COURT:  Why does it matter that four of

21    the trades related to DW?  The evidence is being offered

22    to go to the second and -- well, the third element of

23    securities fraud and to motive.  That doesn't change

24    that analysis.  It doesn't change my analysis with

25    respect to unfair prejudice either.  It's still highly

1    probative evidence.

2              MR. SPIRO:  I think this is going to be a

3    longer conversation.

4              THE COURT:  No, it's not.  You can brief it,

5    but I think this was fully briefed.  I'm not going to

6    stop and reargue things that have already been argued

7    based on speculation that it somehow changes my analysis

8    when it doesn't.

9              We'll take our break.

10              (Whereupon, a recess followed.)

11              THE COURT:  Please be seated, everyone.

12              Is the defense going to be getting to --

13    there's a government notice of objection to certain

14    defense exhibits, Document 313.

15              Has the defense had an opportunity to look at

16    that yet?

17              MR. SULLIVAN:  I've not, Your Honor.  When did

18    it come in?

19              THE COURT:  It was filed April 22.

20              Are you going to be getting to any of those

21    exhibits in the next couple of days?

22              MR. SULLIVAN:  Yeah, I did.  I'm sorry, Your

23    Honor.  What was the question?

24              THE COURT:  Are you going to be getting to any

25    of those exhibits in the next couple of days?

1           MR. SULLIVAN:  I don't think so.

2           THE COURT:  Just let me know.

3           MR. SULLIVAN:  We'll let you know.

4           THE COURT:  You can file something in writing

5    by tomorrow, end of the day tomorrow.

6           MR. SULLIVAN:  Very well.

7           THE COURT:  Good.

8                (Pause.)

9           THE COURT:  Ready to go?  Okay.

10           So we'll bring the jury in and we'll go till

11    12:30 and then we'll be back on schedule.

12                (Whereupon, the jury entered the

13    courtroom.)

14           THE COURT:  Please be seated, everyone.

15           Looks like we're ready for our first witness.

16           MS. CHERRY:  Your Honor, the government calls

17    Sean Mossman.

18

19

20

21

22

23

24

25

```
 1                        SEAN MOSSMAN,

 2              called as a witness, having been first duly

 3              sworn or affirmed, was examined and testified

 4              as follows:

 5

 6              THE CLERK:  Please state your name and spell

 7    your last name for the record.

 8              THE WITNESS:  Sean Mossman, M-O-S-S-M-A-N.

 9              THE CLERK:  And indicate the town and state in

10    which you live or work.

11              THE WITNESS:  I live in Brooklyn, New York.

12              THE CLERK:  Thank you.

13

14                    DIRECT EXAMINATION

15    BY MS. CHERRY:

16    Q.   Good morning, Mr. Mossman.

17    A.   Good morning.

18    Q.   If you could tell the jury where you currently

19    work.

20    A.   I currently work for Bloomberg LP in New York.

21    Q.   And if you can let the jury know, what is your

22    educational background?

23    A.   I earned a Bachelor's in computer science from

24    Carnegie Melon.

25    Q.   At Bloomberg, what is Bloomberg LP?
```

1    A.    We're a technology firm that provides software

2    solutions primarily to financial professionals.

3    Q.    What's your current job at Bloomberg?

4    A.    I currently am a manager of the Bloomberg Vault

5    engineering team.

6    Q.    And what's Bloomberg Vault engineering team?

7    A.    The engineering team is responsible for building

8    the software products, coding and the like.  Bloomberg

9    Vault is a product for archiving communications and

10    related data.

11    Q.    I think we'll come back to the Bloomberg Vault in a

12    few minutes, but before that, how long have you worked

13    at Bloomberg?

14    A.    I've been at Bloomberg for 14 years.

15    Q.    Before you worked on Bloomberg Vault product, what

16    positions did you hold at Bloomberg?

17    A.    I was the manager for the engineering team

18    responsible for Instant Bloomberg.  I was a team lead in

19    that team, a software developer.  And prior to that I

20    was a software developer on a handful of other teams in

21    the company.

22    Q.    So you mentioned Instant Bloomberg.  Can you tell

23    the jury, what is Instant Bloomberg?

24    A.    It's a chat product that is part of the Bloomberg

25    Professional offering, also referred to as the Bloomberg

1    Terminal.

2    Q.   What do you mean by "chat product"?

3    A.   It's a communications platform that allows our

4    users to exchange messages back and forth in a chat

5    interface.

6    Q.   How do users get access to Instant Bloomberg?

7    A.   It's included as part of the Bloomberg Professional

8    Service subscription.  So when they sign into that

9    product they have access to the chat product as well.

10             THE COURT:  I would suggest that we slow down

11   with both the questions and the answers so people have

12   time to process what's being said.

13             MS. CHERRY:  Of course, Your Honor.  Sorry.

14   BY MS. CHERRY:

15   Q.   Are you familiar with the way with which Instant

16   Bloomberg worked in the 2011-2013 time frame?

17   A.   I am, yes.

18   Q.   How are you familiar?

19   A.   In that time period I would have been a member of

20   the team, the engineering team responsible for the chat

21   product.

22   Q.   So in that time period, 2011-2013, did you need to

23   be at your work computer to use this Instant Bloomberg

24   chat function?

25   A.   No.

1    Q.   How else can you access Instant Bloomberg?

2    A.   We have a number of ways to log on to the service.

3    In addition to being at a computer at work that has the

4    product installed, we offer something called Bloomberg

5    Anywhere, which allows you to log in via a website.  We

6    also developed mobile applications for a variety of

7    platforms.

8    Q.   What do you mean by a variety of platforms?

9    A.   Typically the iPhone and Android platforms, among a

10   few less popular ones as well.

11   Q.   Are there different types of Instant Bloombergs,

12   different types of chats?

13   A.   Yes, there are.

14   Q.   Can you tell the jury, what are the types of chats?

15   A.   The two most common are transient chats and

16   persistent chats.

17   Q.   So if you can tell the jury, what is a persistent

18   chat?

19   A.   A persistent chat is one which is created by an

20   individual signed into the service, given a name,

21   optionally a description; and then other members are

22   invited into it to participate in the conversation.

23   Q.   How does one create a persistent chat?

24   A.   Anyone can create it as part of the application.

25   There is a facility within the application to create a

1    new chat.

2    Q.   And then you said there's a transient chat; is that

3    right?

4    A.   Yes.

5    Q.   So what's a transient chat?

6    A.   A transient chat is created usually with one other

7    individual.  It's not given a name and it really only

8    lives for the duration of that conversation, usually one

9    day.

10   Q.   Maybe you can just describe to the jury sort of how

11   does a persistent chat and a transient chat different?

12   A.   A persistent chat from the time it's created will

13   remain as part of your application.  So when you come in

14   the next morning or the following week, it persists.

15   It's for long-running conversations.

16        A transient chat is usually a conversation between

17   individuals, the conversation happens, and then when

18   that chat is completed and both users have logged out

19   it's done.

20   Q.   In these chats, in persistent chats, can multiple

21   people be in the chat at the same time?

22   A.   Yes, they can.

23   Q.   And is that the same for these transient chats?

24   A.   Transient chats can also consist of multiple

25   people, yes.

1    Q.   And can the user be in multiple chats at the same

2    time?

3    A.   Yes, they can.

4    Q.   So maybe you can explain to the jury, what will the

5    user generally see on their screen?

6    A.   It would depend on how they have their settings

7    configured, but, in general, you would log in and you

8    would see a list of chats down one side.  And were you

9    to click on one of those chats, you would see the chat

10   content on the right, which would include anything said

11   in the chat and an entry to type in your own message.

12   Q.   And if the user is in one chat but he also has

13   another chat open, would people in the second chat know

14   what was going on in the first chat?

15   A.   No.

16   Q.   When a user is in a chat and they're posting a

17   message to the chat, how does someone know that a

18   message has been posted?

19   A.   There are a number of different options for how you

20   want to be notified.  You may see a pop-up on your

21   desktop.  You might hear a sound.  You might see

22   flashing on some part of your screen to indicate there's

23   a new message.

24        MS. CHERRY:  At this time, Your Honor, I'd

25   like to offer Government's Exhibit 102.

1          MR. SULLIVAN:  At this point there's been no

2     foundation laid, Your Honor.

3          THE COURT:  Do you want to lay a foundation,

4     Ms. Cherry.

5          MS. CHERRY:  I can do that, Your Honor.

6          May I have a moment, Your Honor?

7          THE COURT:  You may.

8               (Pause.)

9     BY MS. CHERRY:

10    Q.  Do you see this exhibit on your screen,

11    Mr. Mossman?

12    A.  I do, yes.

13    Q.  Are you familiar with this exhibit?  Without saying

14    what it is, are you familiar with this exhibit?  You can

15    tell what it is?

16    A.  Yes, I can.

17    Q.  And is it related to what we've been talking about?

18    A.  It would seem to be, yes.

19    Q.  What is it?

20    A.  It would appear to be a transcript of an Instant

21    Bloomberg conversation.

22         MS. CHERRY:  Are you satisfied?

23         MR. SULLIVAN:  Your Honor, we object on

24    hearsay grounds.  There's been no foundation laid for an

25    exception to that for admissibility.

1          MS. CHERRY:  So, Your Honor, within these

2     chats are statements of Mr. Demos.

3               THE COURT:  Objection overruled.

4               MS. CHERRY:  Thank you.

5               THE COURT:  Government 102 is admitted.

6               MS. CHERRY:  And I'll blow it up.

7               Can you all see that?

8               THE JURY:  Yes.

9     BY MS. CHERRY:

10    Q.   Mr. Mossman, can you again tell the jury what this

11    is, what this is document is?

12    A.   This would look to be a transcript of an Instant

13    Bloomberg conversation.

14    Q.   And can you identify what kind of chat it is?  You

15    talked about two chats before.

16    A.   Yes.  This would appear to be a persistent chat.

17    Q.   And how do you know that?

18    A.   The bottom line in your blown-up section references

19    a room ID.  It starts with P-C-H-A-T, which is a

20    indicator we use for a persistent chat.

21    Q.   Is that what I just highlighted?

22    A.   Yes.

23    Q.   And room ID, what is a room ID?

24    A.   It's a unique identifier that the system creates to

25    track a particular room.

1  Q.   And does –– in a persistent chat, does the room ID

2  change from day to day?

3  A.   No, it does not.

4  Q.   Is this document in the same format that a user

5  would see on their screen?

6  A.   No, it's not.

7  Q.   How is it different?

8  A.   The user sees an interface that includes the chat,

9  the conversation, but this is not the same appearance.

10  Q.   You see, I've just highlighted conversation start

11  time?

12  A.   Yes.

13  Q.   What is the conversation start time?

14  A.   It would seem to be the beginning of this

15  particular piece of transcript.

16  Q.   And do you see what –– what time does this chat

17  begin?

18  A.   It says it is May 10, 2012, 4:25:31 UTC.

19  Q.   Are you familiar with UTC?

20  A.   Yes, I am.

21  Q.   Can you tell the jury what UTC is?

22  A.   You UTC is an abbreviation for Universal

23  Coordinated Time.  It's a way to reference a time

24  without having to deal with a time zone or a daylight

25  savings time.

1   Q.   Does it appear that this chat is in UTC time?

2   A.   Yes, it would appear that way.

3   Q.   Does Bloomberg give users the option of what time

4   zone they would be using?

5   A.   I'm sorry.  Could you clarify that.

6   Q.   Sure.  Do times show up on a user's interface when

7   they are in a chat?

8   A.   Yes.  They are displayed in the chat interface.

9   Q.   Would it necessarily be UTC time?

10  A.   No.  The user can choose what time they want to

11  have displayed.

12  Q.   If we go back up, it says "participants," and then

13  there's a list of participants.

14       Do you see that?

15  A.   Yes, I do.

16  Q.   What are participants?

17  A.   Those are the users that are part of this

18  persistent chat transcript.

19  Q.   If we keep scrolling down, you see it says at

20  4:25:31 UTC, Andy Springer exited.

21       Do you see that?

22  A.   Yes, I do.

23  Q.   What does "exited" mean?

24  A.   Exited would indicate that the user has left the

25  room somehow.

1    Q.    What does "leave the room" mean?

2    A.    It could mean that they chose to close the room on

3    their interface.  It could also mean that they signed

4    out of the service.

5    Q.    Right below it, at 11:07:12 UTC, it says

6    Bill Biggart entered.

7          Do you see that?

8    A.    Yes.

9    Q.    What does "entered" mean?

10   A.    That means that the chat room was opened on the

11   user's interface.

12   Q.    If I keep scrolling down, do you see there's a

13   disclaimer?

14   A.    Yes, I do.

15   Q.    Back in 2011-2013, how would the disclaimer appear

16   in someone's -- on someone's screen, someone's

17   interface?

18   A.    The application has gone through evolution over

19   time, of course.  You may have seen it as an icon that

20   you could click on to view the person's disclaimers.  It

21   also may have been displayed elsewhere in the UI just as

22   text.

23   Q.    Would it show up next to or underneath somebody's

24   name?

25   A.    In various parts of the UI, yes, it may have.

1    Q.    Do you see right here, at the bottom of the page,

2    at 12:31:35 it says, "Andy Springer viewed history"?

3    A.    Yes, I see it.

4    Q.    Can you tell the jury what "viewed history" means?

5    A.    That is an event that we record to indicate that a

6    segment of transcript was prepared and put on a user's

7    screen.

8    Q.    On 5/10/2012, the time says 21:20:56 UTC.

9          Do you see that, Mr. Mossman?

10   A.    I do see that, yes.

11   Q.    Is that military time?

12   A.    Yes, that would be military time.

13   Q.    And then it continues, "David Demos posted, So you

14   know, Stuart, Andy, I'm working tirelessly for you."

15         In this context what does "posted" mean?

16   A.    That means that the user prepared this message,

17   probably by typing it, and then hit "enter" to submit it

18   to the chat room.

19   Q.    I'm going to show you Government's Exhibit 712.

20         Can you see that, Mr. Mossman?

21   A.    Yes, I can.

22   Q.    For identifications purposes,

23   Government's Exhibit 712, what is this document?

24   A.    This would also appear to be a transcript of an

25   Instant Bloomberg conversation.

1    Q.   And who are the participants?

2    A.   I'm sorry, I can't quite see.  If you could enlarge

3    it.   Thank you.

4         It appears to be Kai Zhu and David Demos.

5              MS. CHERRY:  I would like to offer

6    Exhibit 712.

7              MR. SULLIVAN:  Objection, Your Honor.  If it's

8    being offered pursuant to 803(6), no foundation has been

9    met.  If it's being offered for a demonstrative, again,

10   no foundation has been laid for its use and that would

11   limit the use of the document as well.

12             THE COURT:  I don't think it's being offered

13   based on the questions that were asked.  I think it's

14   being offered because Mr. Demos was a participant.

15             Objection overruled.

16             MS. CHERRY:  Thank you, Your Honor.

17             THE COURT:  I did understand that correctly,

18   Ms. Cherry?

19             MS. CHERRY:  Yes.

20   BY MS. CHERRY:

21   Q.   So, Mr. Mossman, we just talked about persistent

22   chats.  What kind of chat is this?

23   A.   This would appear to be a transient chat.

24   Q.   And how do you know that?

25   A.   There is a room ID listed at the bottom there, and

1    it begins with C–H–A–T, which is a prefix we use for a

2    transient chat.

3    Q.   And again, in a transient chat, what does

4    "participants" mean?

5    A.   Those would be the users that were a part of this

6    chat.

7    Q.   I'm just going to move to page 9 of the exhibit and

8    highlight the top.

9         Can a user paste something into a chat?

10   A.   Yes, they can.

11   Q.   And if a user was pasting another chat from another

12   chat room into a chat and a time zone showed up, would

13   it necessarily be the same time zone that was showing up

14   on the user's interface, if you follow?

15   A.   If they had copied it out of another chat, it would

16   reflect whatever time they were displaying in the

17   interface.

18   Q.   In the other chat?

19   A.   In the other chat.

20   Q.   Because they're just copying it?

21   A.   Correct.

22   Q.   It's like a picture almost?

23   A.   No.  We don't do an image.  It would be text.

24   Q.   It would be text.  Thank you.

25        I'm going to show you Government's Exhibit 705 for

1    identification purposes.

2         Do you see this, Mr. Mossman?

3    A.   I do, yes.

4    Q.   What is this?

5    A.   This would look to be a copy of a Bloomberg

6    message.

7    Q.   And is it -- who's it from?

8    A.   It is from a Bloomberg user, dsdemos@bloomberg.net.

9              MS. CHERRY:  Your Honor, at this time I'd like

10   to offer Government's Exhibit 705.

11             MR. SULLIVAN:  Same objections.

12             THE COURT:  Could you be more specific since

13   you've made several?

14             MR. SULLIVAN:  Now the basis is admission by

15   party opponent.  Anything else is hearsay.

16             THE COURT:  I was looking at this to see

17   whether this is Mr. -- is this a statement by Mr. Demos?

18             MS. CHERRY:  I think so, yes, Your Honor.

19             THE COURT:  Just direct my attention to where

20   his statement appears.

21             MS. CHERRY:  Well, the body of the text is the

22   statement by Mr. Demos.

23             THE COURT:  I'm looking for -- maybe you

24   can -- this statement here (indicating)?

25             MS. CHERRY:  Yes.  And it's throughout

1    Mr. Demos.

2              THE COURT:  What number is this?

3              MS. CHERRY:  Your Honor, it's

4    Government's Exhibit 705.

5              THE COURT:  It would help if I had the right

6    document.  Hold on.

7              Okay.

8              Government's Exhibit 705 is admitted.

9              MS. CHERRY:  Thank you, Your Honor.

10   BY MS. CHERRY:

11   Q.   Mr. Mossman, are you familiar with Bloomberg

12   messages?

13   A.   I am, yes.

14   Q.   What are Bloomberg messages?

15   A.   Bloomberg messages are the e-mail application that

16   is offered as part of the Bloomberg Professional

17   Service.

18   Q.   And who can exchange Bloomberg messages?

19   A.   Anyone who has a Bloomberg Professional Service

20   account.

21   Q.   Can you send Bloomberg messages to non-Bloomberg

22   e-mail accounts?

23   A.   Yes, you can.

24   Q.   And if somebody in New York sent a Bloomberg

25   message to someone else, how would it be transmitted?

1    A.   It would first be transmitted to one of our data

2    centers.  It would be replicated to our other data

3    center and it would be sent out to the intended

4    recipient from one of those data centers.

5    Q.   And where are those data centers?

6    A.   One is in New Jersey and one is in New York.

7    Q.   I'm sorry, I didn't ask you this earlier for

8    Bloomberg Instant -- Instant Bloomberg chats.

9         If you're sitting at your computer and you type

10   something and you post it, how does it get transmitted

11   so that everyone in the user group, or the chat room, I

12   guess, can see it?

13   A.   It follows the same sequence.  It would be

14   transmitted to one of the data centers, replicated

15   between them and then distributed to each of the

16   participants of the chat room from one of those data

17   centers.

18            MS. CHERRY:  Your Honor, may I have one

19   moment?

20            THE COURT:  Actually, it's just about time for

21   our lunch break so why don't we take our lunch break

22   now.

23            MS. CHERRY:  Thank you, Your Honor.

24            THE COURT:  We'll let the jurors be excused.

25                 (Whereupon, the jury left the courtroom.)

1          (Whereupon, a recess followed.)

2          THE COURT:  Please be seated everyone.

3          Before we bring the jury in, I want to mention

4    one thing.

5          Yes, Mr. Baez?

6          MR. BAEZ:  I just want to mention one thing.

7    It's not relevant to this witness, but it might be

8    relevant to other witnesses.

9          I've seen from past trials that the government

10   likes to ask a specific leading question, and rather

11   than continue to object, I'd like to have a standing

12   objection, and I would love a ruling on it.

13         If the government asks, "would that be

14   important to you," quite frankly it's a leading

15   question, we would object to it, and we would ask for a

16   standing objection on that issue.

17         MR. FRANCIS:  I thought Your Honor ruled on

18   this.

19         If I may have one second?

20             (Off the record.)

21         MR. FRANCIS:  So I think the ruling was that

22   we were entitled to ask is guilt, assuming hypotheticals

23   as we do in almost every fraud case, if you had known

24   this, what would you have done, if you had known that,

25   would that have been important, those kinds of

1      questions.  I'm not sure why Mr. Baez would ask --

2                  THE COURT:  The objection is overruled.

3                  Also part of it was it's leading.

4                  I did --

5                  MR. BAEZ:  Can I -- I'm sorry, I didn't mean

6      to interrupt you, Your Honor.

7                  Just for clarification, if they just come

8      right out and ask, "is that important to you," that is

9      clearly a leading question.

10                 THE COURT:  Depends on the context.

11                 MR. BAEZ:  Got it.

12                 THE COURT:  In some instances, leading

13     questions are appropriate in order to properly develop

14     the testimony.  That's what Rule 611 says.

15                 I did send out a draft of the limiting

16     instruction.  I did have a question.  You'll see that I

17     did finish my analysis on materiality, if you've read

18     it.  And in the third, no, fourth paragraph, there are

19     different formulations of that third sentence, and I put

20     in brackets what was in the last one I used.  "Nor may

21     you consider such evidence of proof that," and then

22     "defendant has a criminal personality or a bad

23     character."  There are different ways of saying that and

24     the defense may have a preference for saying it in some

25     other way.

1           And then in the paragraph that begins at the

2     bottom of the first page, the second line I put the

3     words "or conduct" in brackets.  I think conduct is sort

4     of the standard language in the jury charge, so that's

5     why I have it there.  But if there's an agreement to

6     take it out, I'll take it out.

7           I guess I have a question as to when will be

8     the most appropriate time to give this limiting

9     instruction.  I assume I'll have to give it more than

10    once.  We did get into that 700 series of exhibits, but

11    it seemed to me we were doing that for the purpose of

12    having the jury understand how these Bloomberg chats and

13    things work.

14          So I don't think every time we pick up one of

15    those documents, we want to give the instruction, but

16    when we get to the substance of what they're being

17    offered for, I think we should give the instruction each

18    time.

19          The jurors don't have a list of bond numbers

20    in front of them like I do, so we'll have to figure out

21    the best way to make sure the jury understands when

22    things are being offered for a limited purpose.

23          I'll let counsel talk about that and we can

24    cover it at the end of the day.

25          MR. FRANCIS:  Your Honor, it might actually be

1    relevant today with the next witness.

2              THE COURT:  I thought so.

3              MR. FRANCIS:  The first trade I do will be the

4    700, 700 through 709, or something like that.  That's

5    one trade.  That is a 404(b) trade.

6              THE COURT:  I think at that time you can say

7    you're about to ask some questions about a trade that's

8    not one of the trades charged in the indictment and

9    you'd like me to give a limiting instruction.

10             MR. FRANCIS:  I'm happy to flag for Your

11   Honor.  I'm not sure I want to --

12             THE COURT:  You can tell us that you're giving

13   it and I will give the limiting instruction.

14             MR. FRANCIS:  Thank you.

15             THE COURT:  I believe the defense has

16   requested it, or at least I promised them they'd get it.

17             We'll bring the jury in.

18             You don't want to emphasize to the jury how

19   fair you're being?

20                  (Whereupon, the jury entered the

21   courtroom.)

22             THE COURT:  Please be seated everyone.

23             THE CLERK:  You are reminded you're still

24   under oath.

25             THE WITNESS:  Thank you.

1          MS. CHERRY:  May it please the Court.

2          THE COURT:  Please do.

3    BY MS. CHERRY:

4    Q.   Good afternoon, Mr. Mossman.

5    A.   Good afternoon.

6    Q.   When we last were speaking, we were talking about

7    Government's Exhibit 705.  Can you just refresh the jury

8    as to what kind of document this is?

9    A.   This would look to be a copy of a Bloomberg

10   message.

11   Q.   And again, what's a Bloomberg message?

12   A.   It's an e-mail exchange over the Bloomberg

13   professional service.

14   Q.   And how is it different from the Bloomberg chats

15   that we were looking at earlier?

16   A.   The instant Bloomberg application is more like --

17   it's a messaging application where you exchange usually

18   short messages back and forth.  Bloomberg message is

19   more like e-mail.  You tend to compose an e-mail and

20   then send it in its entirety.

21          MS. CHERRY:  Your Honor, at this time, I want

22   to offer a stipulation concerning time stamps.  It's

23   entitled "Stipulation Concerning Time Stamps."  Court

24   Exhibit 1.

25          MR. SULLIVAN:  Without objection.

1          THE COURT:  Maybe we should mark it as Joint

2     Exhibit 1 as opposed to Court Exhibit 1.

3          MS. CHERRY:  Fine, Your Honor.  Thank you.

4     BY MS. CHERRY:

5     Q.   I'm just going to note for the record that Number 1

6     of this stipulation reads that for any Bloomberg message

7     or e-mail that is currently marked as Government's

8     Exhibit, for instance, Government's Exhibit 204, 304 and

9     403, the time displayed in the header of that document

10    is in Coordinated Universal Time.

11         Is that the header, Mr. Mossman?

12    A.   Yes, it is.

13    Q.   I'm just going to go back for a second to

14    Government's Exhibit 102.

15         Again, what is this document?

16    A.   This would look to be an instant Bloomberg

17    transcript.

18    Q.   If I go back to the stipulation, you can see

19    number 2 says "For any instant Bloomberg or IB or chat

20    that's currently marked as Government's Exhibit, for

21    instance Government's Exhibit 102 and 202, the time

22    displayed in the body of the document is also in

23    coordinated universal time.  The jury may disregard the

24    time and date information in the header at the top of

25    these exhibits."

1          If I go back to this exhibit, you see the first

2     line that I've highlighted, 5/10/2012, 4:25:31?

3     A.    I do.

4     Q.    The 4:25:31, what time is that in?

5     A.    That's in UTC.

6     Q.    And then one last thing to note on the stipulation

7     is just a chart that converts UTC time to Connecticut

8     time.  You can see the adjustment, depending on daylight

9     savings is minus five hours or minus four hours.

10         Before the lunch break, Mr. Mossman, you talked

11    about data centers.

12    A.    Yes.

13    Q.    Can you tell the jury again what are data centers?

14    A.    Data centers are a physical location for our

15    computing resources, whether that's servers or storage,

16    various types of hardware.

17    Q.    And so is data stored at these data centers?

18    A.    Yes, it is.

19    Q.    Bloomberg Vault data?

20    A.    Yes.

21    Q.    Can you tell the jury exactly what Bloomberg Vault

22    is?

23    A.    Bloomberg Vault is an offering that we have that

24    allows a client of ours to store data, whether it's

25    communications data or trade data, anything that might

1    be subject to regulatory requirements.

2    Q.   And would the Bloomberg chats we just looked at,

3    would that be stored in the Bloomberg Vault?

4    A.   We do store a copy of chat transcripts in the

5    vault, yes.

6    Q.   What about the Bloomberg messages?

7    A.   We also store Bloomberg messages.

8    Q.   And once you're storing this data in the Bloomberg

9    Vault, can it be altered?

10   A.   No.  The storage technology we use for the vault

11   cannot be altered.

12   Q.   Why is that?

13   A.   It's a particular type of technology called WORM

14   storage.

15   Q.   Maybe you can tell the jury, what is WORM storage?

16   A.   WORM, it's an acronym for write once read many.

17   Q.   What does that mean in layman's terms?

18   A.   It means that we write the data once, and then once

19   it's written to the storage mechanism, it can't be

20   deleted or rewritten.  It can only be read.

21              MS. CHERRY:  May I have a moment, Your Honor?

22              THE COURT:  You may.

23                   (Pause)

24              MS. CHERRY:  No further questions.

25              THE COURT:  Cross-examination?

1           MR. SULLIVAN:  Yes, Your Honor.

2           MS. CHERRY:  I'm sorry, I missed what you

3     said.

4           THE COURT:  Cross-examination; and the answer

5     was yes.

6           MR. SULLIVAN:  Yes, Your Honor.

7

8                    CROSS-EXAMINATION

9     BY MR. SULLIVAN:

10    Q.   Mr. Mossman, let's talk about these chats.

11         So these Bloomberg chats are not the only way that

12    traders can talk to each other, right?

13    A.   Certainly not, no.

14    Q.   Right.  I mean, in all of your years of experience,

15    you never heard of a law that says you may only use

16    Bloomberg chats to negotiate trades.  That's certainly

17    not the case?

18    A.   I'm not aware of any such law, no.

19    Q.   As far as you know, they can pick up the telephone

20    and negotiate with each other, right?

21    A.   I'm not entirely familiar with what traders are

22    allowed to use.

23    Q.   They can go to Dunkin' Donuts around the corner and

24    talk to each other.  Nothing prohibits them from talking

25    to each other, right?

1    A.   I would assume so, yes.

2    Q.   They could execute a deal on their work computer,

3    right?

4    A.   I would assume so.

5    Q.   Now, in opening, the government said that this

6    industry is a highly regulated industry; you would agree

7    with that characterization, wouldn't you?

8    A.   I'm not really a legal professional, but I do know

9    that there are certain regulations that apply to the

10    industry.

11    Q.   And one of the ways that your product helps

12    companies comply with the regulations is that the chats

13    have the ability to be monitored, correct?

14    A.   I'm not sure I understand what you mean by that.

15    Q.   Well, a subscriber, a company can look at these

16    chats?

17    A.   Yes.

18    Q.   So it's your understanding that a manager on a

19    desk, for instance, can look at an individual trader's

20    chats?

21    A.   I'm aware that we do offer the ability for a

22    company to retrieve these chats.  I cannot speak to who

23    has access to that.

24    Q.   Okay.  So the company -- you can say that companies

25    do have access to the traders' chats?

1    A.    Yes.

2    Q.    So, for example, if Mr. Demos worked for Cantor

3    Fitzgerald, somebody at Cantor Fitzgerald had access to

4    these chats?

5    A.    I can't say with any certainty what access they may

6    or may not have had.  Our product would potentially make

7    it available.

8    Q.    Now, in addition to the ability for a company to

9    monitor the chats, these chats also are stored?

10   A.    I'm sorry, was that a question?

11   Q.    Or archived?

12   A.    Yes.

13   Q.    That's the vault you were talking about?

14   A.    Correct.

15   Q.    So these chats aren't like -- help me understand

16   this.  When you store these things it's not like a

17   product like Snap Chat, somebody types something in and

18   then it disappears in 30 seconds, correct?

19   A.    I'm actually not familiar with Snap Chat.  Sorry.

20   Q.    It's not one of these products where the message

21   that types in just disappears?

22   A.    No.

23   Q.    It goes to this vault.

24   A.    Yes.

25   Q.    And it's maintained in this vault?

1    A.    Correct.

2    Q.    It's maintained for a long time?

3    A.    I'm sorry?

4    Q.    It's maintained for a long time?

5    A.    Yes.

6    Q.    There's also the ability, as you testified to, to

7    view histories, right?

8    A.    That is correct.

9    Q.    And when your products offer the ability for a

10   company to monitor the chats, they can also look at

11   these histories, correct?

12   A.    The feature I was describing earlier is different;

13   but, yes.

14   Q.    Yes?

15   A.    Companies do have access to look at the historical

16   content.

17   Q.    Companies do have access to look at the historical

18   content.

19         So if you, Mr. Mossman, wanted to hide something

20   from the whole world, your product is not a good place

21   to do it, is it?

22   A.    I don't think so, no.

23   Q.    Because you've got the vault, right?

24   A.    Yes, we have the vault.

25   Q.    And you provide access, right?

1   A.   Yes, we do.

2   Q.   Now, let's talk about the data centers.

3        It is true that the government never asked you to

4   do a computer forensic analysis of any particular chat,

5   correct?

6   A.   I'm not aware if they did or did not.

7   Q.   You'd know.  They would have asked you.

8   A.   Myself, personally.  No.

9   Q.   Yes.

10  A.   No, they did not.

11  Q.   They never asked you to say the exhibit is gone,

12  but, you know, 102.  That was one of the exhibits you

13  looked at.  They never said, trace this exhibit from

14  where it started to where it ended up, this specific

15  exhibit.  Never asked you to do that?

16  A.   No, they didn't.

17  Q.   You testified, to make sure I get this right, you

18  testified about how this route were, your words were,

19  "usually works," correct?

20  A.   I'm not entirely sure I know what testimony you're

21  referring to.

22  Q.   When you talked about how data went from the user

23  to one of these data centers.

24  A.   Yes.

25  Q.   And your words were, "this is how it usually

1    works"?

2    A.   Yes.

3    Q.   Now, the government never asked you to investigate

4    specifically whether Mr. Demos's chats went from, say,

5    New York to New York or New York to New Jersey.  They

6    never asked you to do that?

7    A.   No, they did not.

8            MR. SULLIVAN:  No further questions.

9            MS. CHERRY:  Nothing further, Your Honor.

10           THE COURT:  Thank you, sir.  You may step

11   down.

12           THE WITNESS:  Thank you, Your Honor.

13              (Whereupon, the witness was excused.)

14           MR. FRANCIS:  Your Honor the government calls

15   Edward Cong to the stand.

16

17

18

19

20

21

22

23

24

25

```
 1                          EDWARD CONG,
 2                 called as a witness, having been first duly
 3                 sworn or affirmed, was examined and testified
 4                 as follows:
 5
 6                 THE CLERK:  Please state your name and spell
 7      your last name for the record.
 8                 THE WITNESS:  Edward Cong, C-O-N-G.
 9                 THE CLERK:  And indicate the town and state in
10      which you live or work.
11                 THE WITNESS:  New York, New York.
12                 THE COURT:  Please be seated, sir.
13
14                       DIRECT EXAMINATION
15      BY MR. FRANCIS:
16      Q.   Good afternoon, Mr. Cong.
17      A.   Good afternoon.
18      Q.   So can you please tell the jury where you work?
19      A.   I work in Marathon Asset Management.
20      Q.   What is Marathon Asset Management?
21      A.   Marathon Asset Management is an investment manager
22      based in New York.
23      Q.   Sorry, you went a little fast.  Can you say that
24      again?
25      A.   It's an investment manager based in New York.
```

1    Q.   And I'm just going to call it Marathon, is that all

2    right?

3    A.   That's fine.

4    Q.   How long have you been with Marathon?

5    A.   Since 2006.  So 12 years.

6         THE COURT:  One second.

7              (Discussion off the record)

8    BY MR. FRANCIS:

9    Q.   What do you do for Marathon?

10   A.   I am an employee in the structured credit group in

11   Marathon.

12   Q.   What's your position?

13   A.   Currently principal.

14   Q.   So what does that mean?

15   A.   So I currently co-run the business, the structured

16   credit business at Marathon.

17   Q.   Explain for us what is this structured credit

18   business?

19   A.   Sure.  So the structured credit business is, I

20   guess you could divide it into a few different parts.

21        Generally it's a business that focuses on

22   securities or investments that are backed by various

23   types of loans, including residential mortgages,

24   commercial mortgages, consumer loans, things of that

25   nature.

1    Q.   So at any point in your job at Marathon since 2006,

2    were you trading RMBS bonds?

3    A.   I was.

4    Q.   Tell us when was that time?

5    A.   I don't recall the exact time when I started

6    trading.  I joined Marathon in 2006, and I was trading

7    kind of in the period in question.

8    Q.   Okay.  So how about from 2011 to 2013, was part of

9    your job trading RMBS bonds then?

10   A.   It was.

11   Q.   So I'm going to ask you some questions about RMBS

12   bonds, all right?

13   A.   Sure.

14   Q.   First of all, what does it stand for?

15   A.   RMBS stands for residential mortgage backed

16   security.

17   Q.   And could you explain for us in layman's terms,

18   what is an RMBS?

19   A.   So an RMBS is an investment where payments from

20   mortgages, so a borrower makes a payment, and what

21   happens is those payments get pooled by a company called

22   a servicer.  Those payments are subsequently distributed

23   to bondholders.

24   Q.   Okay.  So RMBS is a kind of bond?

25   A.   Yes.

1    Q.    We'll probably talk more about RMBS.  Let's finish

2    with you.

3          Where did you work before you were at Marathon?

4    A.    Citigroup.

5    Q.    What were you doing for Citigroup?

6    A.    I was in investment banking.

7    Q.    Explain for us what were you doing as an investment

8    banker?

9    A.    So generally I was helping to structure these types

10   of transactions, specifically related to student loans.

11   Q.    So where did you go to school?

12         I'm sorry, in between school and Citigroup you had

13   another job; what was that?

14   A.    I had a short stint at a company called MSCI.

15   Q.    Was that in the finance field?

16   A.    It was.

17   Q.    And where did you go to school?

18   A.    Princeton University.

19   Q.    And what did you major in at Princeton?

20   A.    Operations research and financial engineering.

21   Q.    So let's go back to Marathon.

22         How big is it?

23   A.    Marathon is about 150 employees.

24   Q.    And how much money is Marathon in charge of?

25   A.    Marathon currently manages a little over

1    $14 billion.

2    Q.   $14 billion?

3    A.   Correct.

4    Q.   And so tell us, who invests in -- not specific

5    names -- but who invests in Marathon?

6    A.   I would say a variety of institutional investors.

7    Q.   Do Marathon's employees invest in Marathon's bonds?

8    A.   Some do, yes.

9    Q.   Do you?

10   A.   I am invested, yes.

11   Q.   So why does -- what's in it for an investor to give

12   money to Marathon rather than just handling it

13   themselves?

14   A.   Generally investors, you know, are looking for the

15   best rate of return that they can achieve, and they

16   would employ Marathon because of Marathon's

17   qualifications.

18   Q.   Okay.  So when an investor gives you their money,

19   what is Marathon attempting to accomplish?

20   A.   Sorry, could you repeat the question?

21   Q.   When an investor gives Marathon its money, what is

22   Marathon trying to accomplish with that money?

23   A.   So Marathon is attempting to achieve the best rate

24   of return on that money.

25   Q.   At one point was one of Marathon's investors the

1    United States, the treasury?

2    A.    It was.

3    Q.    Can you explain to the jury how it came to be the

4    United States Treasury was investing in Marathon?

5    A.    So the U.S. Treasury instituted a program called

6    PPIP.  It's the Private Public Investment Partnership,

7    and they chose Marathon to be one of its managers.

8    Q.    So how did Marathon convince the treasury that it

9    should be one of its managers?

10   A.    So at the time of the PPIP application, I actually

11   wasn't part of -- deeply intimate with that process.

12   Q.    I'm sorry, you're going a little fast.  And the

13   acronyms are particularly tough.

14        So at the time of the --

15   A.    PPIP application.

16   Q.    Thank you.  I cut you off.

17   A.    I wasn't intimately part of the application

18   process.

19   Q.    Are you aware whether or not Marathon had to

20   compete against other investment managers to get money

21   from treasury?

22   A.    We did have to compete, yes.

23   Q.    Can you tell us how many other managers were trying

24   to convince treasury to give them money?

25   A.    There were dozens of managers.

1    Q.   And Marathon was selected, you said?

2    A.   Correct.

3    Q.   And how much money did treasury invest in Marathon?

4    A.   It was approximately 450 million.

5    Q.   And were there restrictions on what Marathon could

6    do with the treasury's money?

7    A.   Certainly from an investment perspective, there

8    were some restrictions, yes.

9    Q.   Explain to us at a high level what kind of

10   restrictions?

11   A.   So one restriction that was -- I guess one of the

12   main restrictions was that we can only invest in

13   investments or securities that were formerly senior

14   securities.

15   Q.   I don't want to skip too far ahead.  But at some

16   point did you do business with Mr. Demos?

17   A.   Yes, I did.

18   Q.   And that involved RMBS bonds?

19   A.   Correct.

20   Q.   And was the kind of bonds that Mr. Demos was

21   trading with Marathon, were some of those the kind of

22   securities that Marathon was investing, was allowed to

23   invest in for treasury?

24   A.   Yes, they were.

25   Q.   Did treasury impose any reporting requirements on

1    Marathon?

2    A.    There were some, yes.

3    Q.    Can you explain sort of at a high level what those

4    were?

5    A.    Just from my perspective, we were asked to prepare

6    quarterly reports, updates.

7    Q.    Quarterly reports and updates about what?

8    A.    About the portfolio and some of the characteristics

9    of the portfolio.

10   Q.    And was one of the characteristics how it was

11   performing?

12   A.    I believe so.

13   Q.    What was Marathon's goal with respect to treasury's

14   money that it acquired through the PPIP program?

15   A.    So the treasury's investment was alongside

16   Marathon's own investors.  So both of the goals are to

17   achieve the highest rate of return.

18   Q.    When you say "return" can you, what is return?

19   A.    Profit.

20   Q.    So let's talk about how RMBS bonds trade.  You've

21   had experience in that?

22   A.    Correct.

23   Q.    Okay.  So can you explain for us how the RMBS

24   trading market is different than the stock market?

25   A.    So the RMBS trading market is an over-the-counter

1    market; there's no central exchange.

2    Q.   So where does Marathon go to find what the price of

3    an RMBS bond is in the market?

4    A.   There's no central place to find that.

5    Q.   So how does Marathon get a trade done?

6    A.   Generally through broker-dealer.

7    Q.   What is the role of a broker-dealer in the RMBS

8    market generally?

9    A.   So the broker-dealer facilitates trades in the RMBS

10   market.

11   Q.   So when you say "facilitates trades," break that

12   down for us.  How does that work?

13   A.   Generally the RMBS trades, they have to clear or

14   settle through broker-dealers.  And so that's kind of

15   the basic kind of construct.

16   Q.   How about the negotiations?  That's how they clear.

17   How about the negotiations?  What role does a

18   broker-dealer play in that when Marathon is doing

19   trades?

20   A.   In some cases, some transactions, the broker-dealer

21   is the middleman or central party between buyer and

22   seller.

23   Q.   Okay.  So you said "in some transactions."  Why

24   don't you tell us:  What are the transactions where a

25   broker-dealer isn't the middleman.

1   A.   So it's possible that the broker-dealer owns the

2   security themselves and it's possible that Marathon

3   would buy that security or investment directly from the

4   broker-dealer.

5   Q.   Okay.  In those instances where you are buying a

6   bond directly from a broker-dealer, who is Marathon

7   negotiating against?

8   A.   The broker-dealer.

9   Q.   So then let's talk about the instances when the

10  broker-dealer is acting as the middleman, who is

11  Marathon negotiating against?

12  A.   In that case, we would be negotiating versus the

13  seller or the buyer of the security.

14  Q.   When you're the buyer, you're negotiating against

15  the --

16  A.   Against the seller.

17  Q.   And when you're the seller, you're negotiating

18  against?

19  A.   The buyer.

20  Q.   Let's talk about, we'll take one instance, where

21  Marathon is buying in these questions.  And all my

22  questions are about this time period 2011 to 2013, okay?

23  Just in case I forget to say that.

24       When Marathon Asset Management was buying a bond,

25  how would it communicate with the seller?

1    A.    We would not communicate with the seller.

2    Q.    Who would you communicate with?

3    A.    The broker-dealer.

4    Q.    Why not?  Why didn't you communicate directly with

5    the seller?

6    A.    So we did not know the identity of the seller

7    generally.

8    Q.    So I want to move on, I want to talk a little bit

9    about pricing.

10         We're going to look at some actual trades, but I

11   just want to get some basic facts down.

12         What were the units or increments that RMBS trade

13   in?

14   A.    So the kind of generally accepted, one of the

15   smaller units, was ticks, which is a fraction, 1/32.

16   Q.    A fraction of what?

17   A.    A fraction of a dollar of price.

18   Q.    So is that the same thing as saying a percentage

19   point?

20   A.    Percentage point, correct.

21   Q.    Is that the smallest increment, a tick, 1/32, is

22   that the smallest increment you've ever seen bonds trade

23   in?

24   A.    In some cases they would trade for smaller than

25   that.  Sometimes half a tick was possible.

1    Q.   Okay, so even smaller than a tick, a half a tick.

2    A.   Right.

3    Q.   So how would that be written?

4    A.   That's a plus.

5    Q.   That's a plus sign?

6    A.   Right.

7    Q.   Would sometimes -- are you familiar with bonds

8    trading and being priced not in ticks but in decimals?

9    A.   That happened on occasion as well, yes.

10   Q.   So let's talk about Marathon's investment process.

11        How would Marathon decide what RMBS bonds to invest

12   in?

13   A.   So generally we're trying to effectuate the

14   investment objectives of our clients.  So what we're

15   looking to do is to find the investments in the market

16   that achieve a high rate of return and in kind of

17   conjunction or in relation to how we've described our

18   investment process to our clients.

19   Q.   I imagine a lot of people in the market are trying

20   to make money.  So what was Marathon's process for

21   figuring out which RMBS would do that?

22   A.   It was a few things that came together.  One was

23   the model that we ran.  And of course we also kept track

24   of transactions in the market and general kind of

25   pricing levels.

1   Q.   Okay.  So let's talk about the model you referred

2   to.

3       Explain to us what does a model mean when you say

4   that?

5   A.   So a model is effectively a tool.  It allows us to

6   take an investment and project forward potential future

7   outcomes for that investment.

8   Q.   So let's be even a little more basic.  You don't

9   mean model airplane.  So explain to us, like, where is

10  the model?

11  A.   So the model is, you can view it as a piece of

12  software.  It's run on Marathon's internal computer

13  system.

14  Q.   And so what is -- I'm going to skip to the end and

15  then come back.

16      What is the output of Marathon's model?

17  A.   So generally the model -- if you can imagine the

18  model has a lot of inputs, including one major input is

19  the state of the economy, projections on future

20  performance of the economy.  And so this investment --

21  these investments are affected by things of that nature.

22      The output of the models, effectively how the bond

23  looks, kind of what the investment looks like under

24  different scenarios of the model -- or the economy.

25  Sorry.

1    Q.    You used the word "input."  Explain for us, what

2    does it mean that your putting inputs into the model?

3    A.    So inputs would be effectively -- the model is

4    basically -- it's a central point.  You put in inputs

5    things like what you expect home prices to do in the

6    future, things like different borrowing profiles.  For

7    example, things like their FICO score, their loan to

8    values on their mortgages and homes.  Those things are

9    effectively the inputs of the model.

10   Q.    So are those, things like what you expect the

11   economy to do, is that a fact you can go find, like look

12   up, what is the economy going to do?

13   A.    That is not.  It is not.

14   Q.    Where is Marathon getting that information to put

15   into its model?

16   A.    So those would be inputs from the investment team.

17   Q.    I'm sorry?

18   A.    Those would be inputs made by the investment team.

19   Q.    Okay.  You were talking about FICO scores of the

20   borrower.  Who's the borrower in our story of an RMBS

21   bond?

22   A.    The borrower is a homeowner who has a mortgage.

23   Q.    And how many mortgages are -- what are we talking

24   about?  How many mortgages are you looking at in an RMBS

25   bond when you're analyzing it?

1    A.    There's not one answer to that.  It could be one,

2    or it could be thousands.

3    Q.    Now, are you able, is Marathon able to look and --

4    want to take a second to get water?  I know it's tricky.

5          Is Marathon able to -- was Marathon able to find

6    out information about individual borrowers and their

7    homes and their mortgages?

8    A.    We were able to find, yes, information about

9    individual borrowers but not personal information.

10   Q.    So where is Marathon getting this information about

11   borrowers from?

12   A.    So there was a kind of a central database called

13   loan performance.

14   Q.    And, like, how does Marathon have access to that?

15   A.    So loan performance is a, I guess you could call

16   it, a subscription service.  So we paid for their data.

17   Q.    Why are you doing this?  Why is Marathon interested

18   in the characteristics of the people who have mortgages?

19   A.    So the future projected performance of any specific

20   borrower has potential impact on the potential cash flow

21   of the investments.

22   Q.    When you say cash flow, what does that mean?

23   A.    So cash flow would effectively be payments that the

24   borrowers make and the servicer collects.

25   Q.    What's the impact -- if people pay their mortgages,

1    and Marathon owns the RMBS bond, is that good or bad for

2    Marathon?

3    A.    So generally if -- there's a direct impact -- if a

4    borrower defaults, it's generally bad for the

5    investment.  And then if the borrower repays, then it's

6    generally good.

7    Q.    So after you've run this model, and you said -- I

8    asked you about the outputs.  What does the output of

9    your model tell you about the price when you're looking

10   to buy a bond?

11   A.    So the output of the model, like I was saying

12   earlier, the output of the model is that it tells you

13   about what the investment looks like under different

14   scenarios.

15        What we generally do is take the output of the

16   model and, I guess, line it up, put it side by side with

17   various prices.  Because with those two combined, you

18   can get a sense of what the investment return could be

19   on a forward looking basis.

20   Q.    Does a model result in -- does the model tell you

21   this is the one price that Marathon should pay for a

22   bond?

23   A.    It does not.

24   Q.    What does it tell you about price?

25   A.    It kind of generally informs at a certain price

1    what the investment looks like.

2    Q.    Did Marathon -- to what extent was Marathon using

3    the model to sort of set its ceiling on price?

4    A.    So the model generally did not set ceilings or

5    determine price in any sort of firm manner.

6    Q.    So then how do you use it?  Like, how does it

7    impact the price that Marathon is eventually willing to

8    pay for a bond?

9    A.    So what it does is once a price is inputted, for

10   example, you have a price, it can tell you what the

11   potential return of the bond could be.

12   Q.    Could the model tell you what price a bond was

13   available at in the market?

14   A.    It could not.

15   Q.    Could Marathon's model predict if you buy the bond

16   now you'll be able to sell it in the future at a certain

17   price?

18   A.    It could not.

19   Q.    Could the model predict how much money Marathon's

20   investors would get if you bought the bonds under all

21   the circumstances?

22   A.    No, it could not.

23   Q.    Are you familiar with the term "exit price"?

24   A.    I am.

25   Q.    Explain for us, what's an exit price?

1    A.   So an exit price would generally be the sell price

2    or the sale price of an investment.

3    Q.   So if you're looking to buy a bond, what did the

4    model tell you about the future exit price?

5    A.   It didn't really tell us much about that.

6    Q.   I mean, it doesn't tell you much.  What does it

7    tell you?

8    A.   If we wanted to ourselves kind of think about what

9    the potential return could be, we could kind of enter an

10   exit price and the model could calculate the potential

11   return, but it didn't really inform us on what the exit

12   price could be.

13   Q.   Under that scenario when Marathon puts in an exit

14   price, would that be a fact?

15   A.   No.

16   Q.   What would it be?

17   A.   It's a projection or prediction on our part.

18   Q.   Was Marathon's model, we talked a lot about it, is

19   it publicly available?

20   A.   It is not.

21   Q.   Why not?

22   A.   We consider it a proprietary.  Part of your

23   investment process.

24   Q.   What does that mean, it's proprietary?

25   A.   It means we don't share it with our competitors.

1    Q.   Why is it important that it not be shared with your

2    competitors?

3    A.   The model is a compilation of a lot of our thoughts

4    and our investment thoughts and philosophies effectively

5    codified.  So that's why.

6    Q.   So is the model -- we've talked so much about

7    this -- can it make trades?

8    A.   It cannot.

9    Q.   Is it artificially intelligent?

10   A.   It is not.

11   Q.   So who makes the trades at Marathon?

12   A.   The traders do.

13   Q.   Let's talk about this time period, 2011 to 2013.

14   How many -- was Cantor using broker-dealers to do RMBS

15   bond trades?

16        Sorry, strike that.  I got all bollocksed up.

17        Was Marathon using broker-dealers to make RMBS bond

18   trades?

19   A.   We were, yes.

20   Q.   Was one of them Cantor Fitzgerald?

21   A.   Yes.

22   Q.   How many broker-dealers -- I'm asking for an

23   approximation of how many broker-dealers was Marathon

24   dealing with in RMBS bond trades?

25   A.   I don't recall the exact number.  It was dozens.

1   Q.   And how would Marathon decide which, of all the

2   broker-dealers, it would do business with?

3   A.   So generally we looked for specialists in the type

4   of bonds that we were invested in.

5   Q.   Was Mr. Demos a specialist in a particular kind of

6   RMBS?

7   A.   He was.

8   Q.   What kind was that?

9   A.   Generally mezzanine and subordinate.

10  Q.   So since you said it, could you just, at a very

11  high level, explain for us what that means, to be

12  mezzanine and subordinate RMBSs?

13  A.   So these investments are generally tranched or

14  split up, and they're tranched or split up by something

15  called seniority.  So the more senior the investment is,

16  the less likely it is to absorb losses or write-downs.

17       So if you kind of view the investment kind of

18  split, kind of senior, mezzanine, kind of middle.

19  Subordinate would be kind of the bottom.  So the least

20  senior, the most subordinate would be the most likely to

21  take the loss.

22  Q.   Take a loss if what?

23  A.   If the borrowers -- if the mortgage borrowers

24  stopped paying or economic conditions turned around.

25  Q.   Did you prefer to work with broker-dealers who you

1    could trust?

2    A.   Yes.

3    Q.   At the time did you think that Mr. Demos was a

4    broker-dealer that you could trust?

5              MR. BAEZ:  Objection.  Calls for speculation.

6              THE COURT:  Overruled.

7    A.   We did.

8    BY MR. FRANCIS:

9    Q.   After Marathon decides that it is interested in

10   buying a particular RMBS bond -- first of all, let me

11   back up.

12        In a particular day at Marathon back then, how

13   would Marathon know what bonds were available to

14   purchase?

15   A.   So there were a few different avenues.  One was

16   something called a BWIC.  That stands for bids wanted in

17   comp.  That's effectively and option.

18   Q.   I'm sorry bids wanted in --

19   A.   In competition.

20        And also the various broker-dealers would also send

21   out -- often send out a list of their holdings.  It's

22   called an inventory list.  So they would send out what

23   they own.

24   Q.   I'm sorry, was that two ways?

25   A.   Yes.

1    Q.    BWICs and inventory lists?

2    A.    Then there was a third way.  We call it orders.

3          So orders would be effectively specific buyers or

4    sellers who are looking to transact.  So that would be

5    other investment managers like Marathon.

6    Q.    In order of magnitude, how many bonds would

7    Marathon be seeing in a day?

8    A.    It's actually hard to say.  Probably could have

9    been billions per day.

10   Q.    Sorry?

11   A.    Could have been billions per day.

12   Q.    Billions of --

13   A.    In terms of size of the bonds that were available

14   to purchase.

15   Q.    So that's billions of dollars?

16   A.    Correct.

17   Q.    So how many different -- let me phrase it

18   differently then.

19         How many trades, potential bonds to trade, would

20   Marathon be evaluating in a day?  Order of magnitude.

21   A.    At least dozens.  Could have been hundreds in some

22   cases.

23   Q.    So after Marathon would go through its evaluation

24   process and decide to pursue a particular bond, what was

25   the role of a broker-dealer like Mr. Demos?

1    A.   Sorry, can you repeat the question?

2    Q.   Sure.  After Marathon would go through its

3    evaluation process and decide to pursue a particular

4    bond for sale, what was the role of a broker-dealer?

5    A.   Which of three different paths are you specifically

6    referring to?

7    Q.   Okay.  So let's talk about instances of let's say

8    auctions, for instance.

9         I'm sorry, let's start with orders, the last one

10   you talked about, I think, was orders you said?

11   A.   Correct.

12   Q.   So what's the role of a broker-dealer if Marathon

13   decides it wants to pursue a bond that's being sold in

14   an order situation?

15   A.   So we would generally negotiate with the

16   broker-dealer, or through the broker-dealer with the

17   other investment manager.

18   Q.   Who's the other investment manager in that answer?

19   A.   Could be any other investor in this sector, in the

20   RMBS sector.

21   Q.   Are they the ones selling the bond?

22   A.   They could be; or buying on order.

23   Q.   So the first one you talked about, these auctions,

24   BWICs.  What's the role of a broker-dealer if Marathon

25   decides it wants to pursue a bond in a BWIC?

1    A.    So the broker-dealer would assemble or aggregate

2    bids from its various clients and submit a bid to the

3    seller -- the auction -- the seller running the auction.

4    Q.    And then the third one you said was broker-dealer

5    selling from its own inventory?

6    A.    Correct.

7    Q.    And who is the broker-dealer acting as the

8    middleman for that trade?

9    A.    They're not.  They're acting on their own account.

10   Q.    So let's take the first one, orders.

11         When you were negotiating, what were the terms of

12   the deal that were up for negotiation in an order?

13   A.    Generally the size of the bond, the price, and

14   potentially a settlement date.

15   Q.    So explain for us what a settlement date is.

16   A.    Settlement date would be when the cash and

17   certificate actually change hands.

18   Q.    Okay.  So you said certificate; is that the bond?

19   A.    It is, yes.  The investment, yeah.

20   Q.    So how long -- how does that work?  Explain the

21   process between negotiating a trade and the settlement?

22   A.    So generally there's a date called the trade date.

23   That's the date on which the terms of the transaction

24   are agreed upon.  And then that's memorialized with

25   something called the trade ticket.

1        And then three days after that, there's a process

2    called settlement where the cash and the investment or

3    certificate are actually exchanged.

4    Q.   So during those three days, Marathon can just walk

5    away?

6    A.   So in my experience, we've never -- at least in my

7    experience -- walked away from a transaction after the

8    trade date.

9    Q.   So when, in your experience, is a trade final?

10        MR. BAEZ:  Objection, Judge.  That last

11   question was -- that last answer was nonresponsive to

12   the question.

13        THE COURT:  Overruled.

14   BY MR. FRANCIS:

15   Q.   My question was -- want me to repeat it?

16   A.   Please.

17   Q.   In your experience, when was a trade final?

18   A.   From my perspective, as soon as -- on the trade

19   date or trade time date, the transaction was final.

20   Q.   Are you familiar with the phrase "best execution"?

21   A.   I am.

22   Q.   Can you give us your understanding of what that

23   means?

24   A.   So best execution is a concept where we are looking

25   to -- for example, if we're buying an investment, to buy

1    an investment at the lowest transactional price.

2        But we do have to consider services that a

3    broker-dealer may provide, for example, research or, you

4    know, asset research or structural expertise, things of

5    that nature.

6    Q.   So why is price relevant to Marathon in buying RMBS

7    bonds?

8    A.   So price generally, the lower the price, the higher

9    the return for our investors.

10   Q.   So I want to ask you some questions about how

11   broker-dealers made money on your trades, okay?

12       In these orders and BWICs when, say, Mr. Demos is

13   acting as a middleman, how would he get compensated for

14   that work?

15   A.   So he could get compensated with a commission.

16   Q.   So explain for us what that is.

17   A.   Commission is just a fee for brokering the

18   transaction.

19   Q.   Are you familiar with the expression "pay on top"?

20   A.   Yes, I am.

21   Q.   Explain for the jury, please, what pay on top

22   means.

23   A.   So basically when the transaction price is agreed

24   upon by the buyer and seller, there's a concept where

25   if -- for example, if we're buying, we would pay a

1    little bit more than that transaction price in order to

2    compensate a broker-dealer for that investment or that

3    transaction.

4    Q.   And when you were compensating a broker-dealer in

5    that way, who would decide how much extra you would add

6    to the transaction price?

7    A.   So we at Marathon had the ultimate decision on

8    that.

9    Q.   Was that a negotiated number, how much to add on

10   top?

11   A.   The dealer in some cases may request something.

12   We -- generally at the end of day, we set that number.

13   Q.   How would Marathon decide how much to pay on top to

14   a broker-dealer like Mr. Demos in a trade?

15   A.   We generally, for different types of securities,

16   had kind of standard amounts that we paid.

17   Q.   And so give us an idea.  What was the range that

18   was typical back then?

19   A.   So kind of in the units that we discussed earlier,

20   ticks for mezzanine or subordinate security, it could be

21   eight ticks.

22   Q.   Are you familiar with the phrase "all in price"?

23   A.   Yes.

24   Q.   Explain for us what an all in price was.

25   A.   So at the end of the day, the all in price would be

1    effectively, let's just call it –– call it a fully

2    loaded price.  Basically the price that Marathon would

3    be paying for the bond inclusive of commission.

4    Q.   So in that instance, would Marathon negotiate with

5    the buyer-seller to add something on top to the purchase

6    price of the bond?

7    A.   We would not.

8    Q.   So does it ever happen that Marathon liked a bond,

9    wanted to buy it and wasn't able to?

10   A.   Sure.

11   Q.   Why would that be?

12        If Marathon likes the bond and wants to buy it, why

13   don't they just buy it?

14   A.   Could be for a variety of reasons.

15        It's possible the price was more than we were

16   willing to pay or the size was not optimal for our

17   investment portfolios.

18   Q.   I mean, why not just pay more?

19   A.   So the higher the –– the more we paid, the lower

20   the return would be.

21   Q.   The return to who?

22   A.   For our investors.

23        MR. FRANCIS:  Your Honor, I'd like to ––

24   BY MR. FRANCIS:

25   Q.   Mr. Cong, I'm going to ask you some questions about

1      a trade from December 6, 2011.  It's not one of the

2      trades that's charged -- one of the five trades charged

3      in the indictment.

4          I think Your Honor said you had an instruction for

5      the jury.

6                    THE COURT:  I do have a limiting instruction.

7                    MR. SULLIVAN:  Thank you, Your Honor.

8                    THE COURT:  Okay.

9                    Members of the jury, at this time I want to

10     give you a limiting instruction.

11                   The charges in the superseding indictment are

12     based on conduct related to trades in five securities.

13     The government will offer evidence concerning conduct

14     related to trades in addition to those that are the

15     subject of the indictment.  This conduct is not the

16     conduct charged in the indictment.  Rather, the

17     government contends that this other conduct supports a

18     showing that the defendant engaged in the charged

19     conduct.  In that connection, I instruct you that the

20     defendant is not on trial for engaging in this alleged

21     other conduct.

22                   Accordingly, evidence of the alleged other

23     conduct is not a substitute for proof that the defendant

24     committed the charged offenses, nor may you consider

25     such evidence as proof that the defendant has a criminal

1    personality or bad character.  The evidence of the

2    alleged other conduct is being admitted for more limited

3    purposes, and if you choose to credit this evidence, you

4    must consider it only for those limited purposes.

5         The second element of the offense requires

6    that the statement or conduct at issue related to a fact

7    that would be material to a reasonable investor in the

8    non-agency RMBS market.  You may consider evidence with

9    respect to this alleged other conduct with respect to

10   this second element of the offense.

11        With respect to the third element of the

12   offense, if you determine that the defendant committed

13   acts charged in the indictment and committed some or all

14   of the alleged other conduct as well, then you may, but

15   you need not, draw an inference that in doing the acts

16   charged in the indictment, the defendant acted

17   willfully, knowingly and with intent to defraud.

18        In addition, you may consider evidence with

19   respect to the alleged other conduct with respect to the

20   issue of whether the defendant had a motive to commit

21   the charged offenses.

22        Evidence with respect to this alleged other

23   conduct may not be considered by you for any other

24   purpose.  Specifically, you may not use this evidence to

25   conclude that because the defendant engaged in the other

1    alleged conduct, he must also have committed the acts

2    charged in the indictment.

3            Does anybody need me to repeat that?

4            I suspect I will be repeating it for you

5    periodically.

6            Okay.

7            MR. FRANCIS:  Thank you, Your Honor.

8            Your Honor the government moves to admit

9    Government's Exhibit 700 and 701.

10            THE COURT:  Government's Exhibit 700 and 701

11   are admitted.

12   BY MR. FRANCIS:

13   Q.  Mr. Cong, I'm going to pull up

14   Government's Exhibit 701 first.

15        Screen working?  You all can see it?  Great.

16        So can you see it on your screen, Mr. Cong?

17   A.  Yes.

18   Q.  If you need me to blow anything up or probably make

19   anything smaller, if you wanted me, to let me know and I

20   can do that.

21        What kind of document are we looking at in

22   Government's Exhibit 701?

23   A.  This is an accepted Bloomberg trade ticket.

24   Q.  What's the function of an accepted trade ticket in

25   the market?

1    A.    It's the consummation document of a trade.

2    Q.    Can you tell us what is the bond that's being

3    traded in this trade ticket?

4    A.    HVMLT 2005-9 B3.

5    Q.    Okay.  So that string you just read, I'd like to

6    break that down.

7          What does the HVMLT part of that mean?

8    A.    So that stands for Harbor View Mortgage Loan Trust.

9    Q.    What does Harbor View have to do with this bond?

10   A.    So Harbor View is an entity that's the issuer of

11   this bond.

12   Q.    They created it in the first place?

13   A.    Yeah.  Legally, they are, yes.

14   Q.    How about the second part, 2005, what does that

15   signify in the name of this bond?

16   A.    That stands for the year of issuance.

17   Q.    And then following that is dash nine; what does

18   that show you?

19   A.    So that generally is -- so that number is generally

20   sequentially assigned to these transactions.  So

21   probably this was the ninth transaction of 2005.

22   Q.    How about the B3 2?

23   A.    So I think the 2 is -- I'm not sure -- I think the

24   2 is a coupon.

25   Q.    I see.

1    A.   The B3 then --

2    Q.   Remove that question and I'll ask a better one.

3    A.   Okay.

4    Q.   What's the B3?

5    A.   So B3 was the classification or kind of name of the

6    tranche, and it gave in some cases, in most cases

7    actually, it gave you a sense of where it stood in that

8    senior mezzanine subordinate capital structure we were

9    talking about earlier.

10   Q.   What's the date that this trade occurred at?

11   A.   The trade date was December 6, 2011.

12   Q.   And how big a bond was this?

13   A.   $9.5 million.

14   Q.   And what was the price that this trade was

15   happening at?

16   A.   Twenty-two cents on the dollar.

17   Q.   And from Cantor's perspective, is this a buy or a

18   sell?

19   A.   This is a sell.

20   Q.   And who's buying the bond?

21   A.   Marathon Asset Management.

22   Q.   That's you?

23   A.   Correct.

24   Q.   Your firm?

25   A.   My firm, yes.

1    Q.   I'm going to that one, and shrink that one, and

2    pull up 700 so we can read it.

3         Is that big enough or still too small?

4         Mr. Cong, is it good enough for you?  Can you read

5    it?

6    A.   Yes.

7    Q.   Are you we talking about the same -- is this trade

8    ticket for the same bond?

9    A.   Yes.

10   Q.   Same trade date?

11   A.   Correct.

12   Q.   Same size?

13   A.   Yes.

14   Q.   From Cantor's perspective, is this a buy or a sell?

15   A.   This would be a buy.

16   Q.   And what price was Cantor paying for this bond?

17   A.   Twenty-one dollars.

18   Q.   I'm sorry.  I missed one.

19        And who was Cantor buying from?

20   A.   Citi Master Allocation.

21   Q.   So with these two trade tickets, what happens with

22   the HVMLT bond?  I'm going to summarize it as HVMLT,

23   okay?

24        What happens with that bond on December 6, 2011 for

25   Cantor?

1    A.    Cantor purchased it at 21 and sold it at 22.

2    Q.    Purchased it from who?

3    A.    From Citi Master Allocation.

4    Q.    And sold it to who?

5    A.    Marathon Asset Management at 22.

6            MR. FRANCIS:  Your Honor, I'd like to

7    introduce Government's Exhibit 703.

8            THE COURT:  703 is admitted.

9            We're due for our break at 2:50.  You can

10   either go past that or you can have us take a break

11   early.

12           MR. FRANCIS:  I don't want to try anyone's

13   bladder.  Why don't we go a couple minutes early, if

14   it's okay with Your Honor, and then we can do this as

15   one document all in at one time.

16           THE COURT:  We'll take our recess.

17           We'll take a 20-minute break, ladies and

18   gentlemen.

19                 (Whereupon, the jury left the courtroom.)

20                 (Whereupon, a recess followed.)

21           THE COURT:  We'll have our witness retake the

22   stand, if he's here.

23           We'll bring the jury in.

24           MR. FRANCIS:  Your Honor I'm going to be

25   offering Government's Exhibit 703, 802 and 708.

1    Mr. Baez says the defense has no objections.

2            If you'd like, I can offer them in the

3    presence of the jury.  I'm not sure of your preference,

4    how you want me to proceed.

5            THE COURT:  I don't have a preference.  703

6    has come in, I thought.

7            MR. FRANCIS:  That is possible.

8            THE COURT:  I thought 702 might have.  Let me

9    check my notes.

10           MR. FRANCIS:  I had 705.

11           MR. BAEZ:  I do have one issue, Judge.

12           THE COURT:  I have 102.

13           MR. BAEZ:  I have one brief issue, Judge.

14           The terms being used to describe Cantor

15   Fitzgerald, the broker-dealer.  Based on your pretrial

16   rulings -- I've been kind of letting it go, but --

17               (Whereupon, the jury entered the

18   courtroom.)

19           THE CLERK:  You're reminded that you're still

20   under oath.

21           THE WITNESS:  Yes.

22           MR. FRANCIS:  May I inquire, Your Honor?

23           THE COURT:  You may.

24   BY MR. FRANCIS:

25   Q.   Mr. Cong, are you ready?

1    A.    Yes.

2    Q.    I was about to move to a different document, but

3    before I do that, what's up on the screen is

4    Government's Exhibit 700.  I showed you this before.

5    This was the Cantor Fitzgerald buy ticket from Citi.

6          A couple things.

7          I asked you what the size is.  I believe you said

8    9.5 million?

9    A.    Correct.

10   Q.    So on the ticket, it reads 9500 and then M in

11   parentheses; what does that signify?

12   A.    So one M would be in thousands.

13   Q.    So it's times a thousand?

14   A.    Times a thousand.

15   Q.    Okay.  And then I showed you this document here in

16   court.

17         Back in December 6, 2012, did you see this

18   document, this trade ticket?

19   A.    No, we did not.

20   Q.    Was it -- did you have access to it?  Was it posted

21   somewhere?

22   A.    No.

23   Q.    Is there a central repository for trade tickets?

24         For instance, if you're a Bloomberg subscriber,

25   were you able to put it up and see what price Mr. Demos

1    and Cantor paid for this bond?

2    A.   There is not.

3            MR. FRANCIS:  Your Honor, I'd like to

4    introduce Government's Exhibit 703.

5            THE COURT:  We'll pause for the courtroom

6    deputy to get set up.

7            Is 703 admitted?

8                (Pause)

9            THE COURT:  Government's Exhibit 703 is

10   admitted.

11           MR. FRANCIS:  Apologies, Your Honor.  I'm

12   having a little technical difficulty.

13   BY MR. FRANCIS:

14   Q.   Mr. Cong, in front of you is

15   Government's Exhibit 703.  Are you familiar with this

16   kind of document?

17   A.   Yes.

18   Q.   Tell us what it is.

19   A.   This is the transcript of a Bloomberg chat.

20   Q.   How did you use Bloomberg chat in your business

21   back in 2011?

22   A.   We used it much as we did e-mail for negotiations

23   and such.

24   Q.   What is the date on this particular chat?

25   A.   December 6, 2011.

1    Q.    And who are the participants in it?

2    A.    Myself and Mr. Demos.

3    Q.    If I can, I'm going to scroll down here.

4          Who started this chat?

5    A.    Mr. Demos invited me to this chat.

6    Q.    And at 18:25:39 UTC, Mr. Demos wrote, let's do this

7    at 2:00 p.m., exclamation point, exclamation point.

8          What do you understand Mr. Demos to have been

9    writing?

10   A.    So he was likely referring to an auction that was

11   happening at 2:00 p.m.

12   Q.    Why do you think that?

13   A.    These auctions generally had preset times.

14   Q.    And then you asked a question in response.  What

15   was that?

16   A.    What are you thinking on these HVMLTs?

17   Q.    So is the question you are asking when you ask

18   Mr. Demos what are you thinking about a bond?

19   A.    I'm asking his thoughts on where he thinks those

20   bonds might transact or trade.

21   Q.    Why would Mr. Demos's thoughts on that be relevant

22   to you?

23   A.    Mr. Demos was an expert specialist in these type of

24   investments.

25   Q.    Mr. Demos's response was, I've got retail behind my

1    talk with L20s.

2         The jury is going to see a bunch of chats, but this

3    is the first one we're sort of going through, so let's

4    take a second and sort of unpack the lingo.

5         I've got retail behind my talk with the L20s.  Can

6    you sort of translate "retail behind my talk" for us?

7    A.   So price talk is something that was generally a lot

8    of times distributed along with these auctions.

9    Q.   By whom?

10   A.   By a broker-dealer like Cantor Fitzgerald.

11        What these price thoughts were effectively -- kind

12   of provided some guidance on where the bond may

13   transact.

14        I've got retail.  I'm presuming that means that

15   Mr. Demos has another bid or another client who's behind

16   his talk.  I don't know what his talk was.  With the low

17   20s would be 21, 22, that sort of range.

18   Q.   Is L20s low 20s?

19   A.   Yes.

20   Q.   And is that sort of like an industry standard or

21   abbreviation, L in front of a number for low?

22   A.   Yes.

23   Q.   So, for instance, is there high 20s?

24   A.   Yes.

25   Q.   And how does that get abbreviated?

1    A.   H20s.

2    Q.   And what are some other common abbreviations that

3    people use to talk about range of prices?

4    A.   Low mid, mid, mid high.

5    Q.   Seven seconds later, Mr. Demos continued, Ed, I own

6    this seller.

7         So you're Ed.  What do you understand Mr. Demos to

8    be saying when he writes, I own this seller.

9    A.   He probably has a good relationship with the

10   seller.

11   Q.   And then 14 seconds after that he types, I'm

12   telling you, this is a list to bid all with me.  I'll

13   get you lucid color on everything.

14        What do you understand Mr. Demos to be saying?

15   A.   That we, if we chose to try to buy one of these

16   bonds at auction, that we furnish our bid through

17   Mr. Demos and, you know, during these auctions, it's an

18   auction process, and so the auction process, sometimes

19   it can be helpful to know where you stand in terms of

20   are you the highest or are you second highest, things of

21   that nature.

22   Q.   When you say an auction process, once you've put in

23   your bid in an auction, would you have a chance to

24   improve your bid or bid again?

25   A.   Sometimes, yes.

1   Q.   And so what does Mr. Demos writing, I'll get you

2   lucid color on everything, what relation does that have

3   to the auction process?

4   A.   Beyond what I said earlier, I'm not sure.

5   Q.   He'll give you feedback?

6   A.   Yeah.  Feedback on where we stand in the auction

7   process.

8   Q.   And "color," is that a common term?

9   A.   Yes.

10  Q.   You respond something about, didn't love that RASC

11  bond.

12       Is that a different bond than the HVMLT bond that

13  we're talking about?

14  A.   Yes, it is.

15  Q.   And then you ask a question at 19:11:23.  What's

16  that question?

17  A.   Can you take a 21.5 bid?

18  Q.   So first of all, what's a bid?

19  A.   I guess you could call it a proposal to purchase a

20  bond?

21  Q.   Why are you asking Mr. Demos if he can take your 21

22  and a half bid?

23  A.   So Mr. Demos and Cantor had a lot of different

24  clients like Marathon.  As I mentioned, they would

25  aggregate bids for these auctions and submit the highest

1    bid that they had.

2          So it's possible that there was another investment

3    manager like Marathon that had a higher bid than us, and

4    in that case, he could not take our bid.

5    Q.   So you're asking, is mine the highest bid you have?

6    A.   Yes.

7    Q.   Mr. Demos writes, you're topping by a few.  What do

8    you interpret that to mean?

9    A.   Likely a few ticks.

10   Q.   And how about the "topping" part?

11   A.   Meaning we are the highest bid.

12   Q.   And then at 19:12:26 you ask another question.

13   What's that?

14   A.   Okay.  So you're using 21.5?

15   Q.   Why are you asking that question again?

16   A.   It's possible that another bidder came in higher

17   again.  So just reconfirming that.

18   Q.   And what does Mr. Demos -- how does he answer you?

19   A.   Yeah.  Twenty-one behind.

20   Q.   What bid do you understand Mr. Demos -- whose bid

21   do you understand Mr. Demos is using?

22   A.   Ours, Marathon's.

23   Q.   Of what price?

24   A.   21.5.

25   Q.   And so what does it mean for Mr. Demos to be using

1  that bid?

2  A.  To be submitting that bid.

3  Q.  To?

4  A.  To the seller.

5  Q.  Jumping down to 19:27:04, you ask another question.

6  What's that?

7  A.  Can you keep me posted on the HVMLTs?

8  Q.  What are you asking Mr. Demos to do for you?

9  A.  To let us know where we stand.

10  Q.  And why is that important to you?

11  A.  Again, just to -- auctions are fluid processes, we

12  wanted to make sure if we had to improve, we were ready.

13  Q.  Two seconds later, you write, like those.

14      Did Mr. Demos agree to keep you posted on the

15  HVMLTs?

16  A.  Yes.

17  Q.  So at 19:51:52, Mr. Demos writes, in all caps,

18  pushing him.  Who do you understand "him" to be?

19  A.  The seller.

20  Q.  I'm going to try and put two documents up and

21  navigate between the two of them side by side.

22      So we don't lose our place, I'm going to drop an

23  arrow here, this red arrow on the left, so I know where

24  we left off.

25      With me, Mr. Cong?

1    A.    Yes.

2    Q.    On the right I'm going to pull up

3    Government's Exhibit 702.  I understand on the right

4    it's too small to read.

5         I blew up the top of it.  You can see kind of like

6    motion lines that show what I'm blowing up.

7         So I'm blowing up the document on the right, 702.

8         This is another one of those instant Bloomberg chat

9    transcripts?

10   A.    Yes.

11   Q.    Does it cover December 6, 2011, the time we were

12   just looking at?

13   A.    Yes, it does.

14   Q.    Who are the participants in this chat?

15   A.    Andrew Watts and Mr. Demos.

16   Q.    Not you?

17   A.    No.

18   Q.    Did you have access to this chat or transcript of

19   it back in 2011?

20   A.    We did not.

21   Q.    And if you remember back to

22   Government's Exhibit 700, the trade ticket, who was the

23   seller of the HVMLT bond?

24   A.    Citi -- I forget the -- Master Allocation.

25   Something like that.

1    Q.    Where does Mr. Watts work?

2    A.    Citigroup Global Markets.

3    Q.    So we left off at 19:51:52 in your chat.

4          So let's find out, let's scroll down and see what's

5    going on in Mr. Demos's chat with Citi at the same time.

6          At the bottom about four minutes later, Mr. Watts

7    from Citi writes something to Mr. Demos.  What did he

8    write?

9    A.    You buy HVMLT at 21.

10   Q.    And then if I keep scrolling on to the next page,

11   if I can get both on at the same time, how did Mr. Demos

12   respond at 19:55:31?

13   A.    Thanks.  No post.  I'm going to try to make some

14   money.

15   Q.    So can you tell us, in your market, what does it

16   mean to post?

17   A.    Post would be to, generally to disseminate color

18   about a bond transaction.

19   Q.    And color means what?

20   A.    Price information.

21   Q.    If you keep scrolling down, ten seconds later

22   Mr. Watts says, okay.  And David Demos writes, CVR.

23          What do you understand CVR to be?

24   A.    That stands for cover.

25   Q.    Is that pretty standard, CVR for cover?

1    A.   Yes.

2    Q.   I don't think we've heard that.  Why don't you

3    explain to the jury, what's cover in your market?

4    A.   So cover is generally the second highest bid.

5    Q.   Then Mr. Watts responds, 20 and two ticks, right?

6    A.   Yes.

7    Q.   So let's go back to your chat, Mr. Demos (sic).

8         Sorry.

9              MR. FRANCIS:  Your Honor, if I could have one

10   second?  It doesn't look the same on my screen as it

11   does on everyone else's.

12                  (Pause)

13   BY MR. FRANCIS:

14   Q.   So let's look at what was going on seven minutes

15   later in your chat with Mr. Demos.

16        At 20:02:16 UTC, what did Mr. Demos write to you?

17   A.   Twenty-two we can buy.

18   Q.   You respond:  MM.  Is that like the sound "mmm"?

19   A.   Likely it was.

20   Q.   Does it stand for anything?

21   A.   I think it was probably me thinking in text.

22   Q.   And then you have a question.  What's your

23   question?

24   A.   Twenty-two to you?

25   Q.   What are you asking Mr. Demos with that question,

1    22 to you?

2    A.    I'm asking him if that is the purchase price of

3    Cantor Fitzgerald from the seller.

4    Q.    Why does that matter?

5    A.    That would be the transaction price off of which we

6    would pay on top.

7    Q.    And what does Mr. Demos say in response?

8          Let me get that back, if I can.

9          What does Mr. Demos say in response?

10   A.    Twenty-two to seller.

11   Q.    So what do you understand Mr. Demos, how was he

12   answering your question?

13   A.    So he was confirming that the seller was receiving

14   22 from Cantor.

15   Q.    Was that true?

16   A.    Just based on the trade tickets, no.

17   Q.    How about based on the chat we just looked at,

18   Mr. Demos's chat with Citi.

19   A.    That as well.

20   Q.    At the time, did you believe Mr. Demos when he told

21   you that Cantor was paying 22 for this bond?

22   A.    We did.

23   Q.    Mr. Demos continued in the chat writing, We may be

24   able to get lower, but he offered.  I can call him.  I

25   was trying to buy another.

1    And then you ask a question.  What was your

2    question?

3    A.   Can you just buy as cheap as possible.  Will pay on

4    top.

5    Q.   So at this point, who do you understand owns this

6    bond?

7    A.   So at this point the seller, Citi still owns the

8    bond.

9    Q.   Who do you think you're negotiating against at this

10   point?

11   A.   The seller.

12   Q.   So when you ask the question of Mr. Demos, Can you

13   buy as cheap as possible, what are you asking him to do?

14   A.   Effectively to optimize the price.

15       I believe we started at 21.5, and to try to buy

16   below the $22 price that he had just referenced.

17   Q.   Why would Marathon want that?

18   A.   Again, just buying at a lower price means higher

19   returns.

20   Q.   And why would it be in Mr. Demos's interest to

21   agree to do that for you?

22   A.   Mr. Demos -- we would want to potentially do more

23   business with Marathon, and as one of Cantor and

24   Mr. Demos's clients, it would make us happier to buy a

25   bond at a lower price.

1    Q.   You wrote, Will pay on top up to 22.

2         And then if I keep scrolling, did Mr. Demos agree

3    to do that for you?

4    A.   It appears, yes.

5    Q.   What did he write?

6    A.   Okay, cool.  Trying always.  Sorry.

7    Q.   Did you believe Mr. Demos when he said he was

8    trying?

9    A.   I did.

10   Q.   And then after that, Mr. Demos wrote -- the

11   computer doesn't want to cooperate -- but Mr. Demos

12   wrote, Bought it at 21-24.  You have two tick cover.

13        So what price was Mr. Demos telling you that Cantor

14   bought this bond at?

15   A.   Twenty-one and 24 ticks.

16   Q.   And who was getting that 21 and 24 tick price,

17   according to Mr. Demos?

18   A.   The seller.

19   Q.   Did you believe him when he told you that?

20   A.   We did.

21   Q.   Was that information about the price that Cantor

22   was paying for this bond important to you?

23             MR. BAEZ:  Objection.

24             THE COURT:  Overruled.

25   A.   It was.

1    BY MR. FRANCIS:

2    Q.   Did it affect what you did next?

3    A.   Yes.

4    Q.   So what did you do in response to Mr. Demos telling

5    you that?

6    A.   We paid him an eight tick commission.

7    Q.   Is that what that means, when you write sweet?

8            MR. BAEZ:  Objection, Judge, move to strike.

9            THE COURT:  Are you moving to strike the

10   answer that was just given?

11           MR. BAEZ:  Yes.

12           THE COURT:  Overruled.  Or denied.

13   BY MR. FRANCIS:

14   Q.   Is that the significance when you wrote, Sweet,

15   let's write ticket at 22?

16   A.   Yes.

17   Q.   So because this is the first trade we've gone

18   through, I just want to make sure it's clear.

19       What's the difference in price between the 21-24

20   price that Mr. Demos at Cantor was paying and this 22

21   price that you are telling him to write the ticket at?

22   A.   Eight ticks.

23   Q.   And so why are you agreeing to pay more than

24   Cantor's purchase price?

25   A.   It's payment for Mr. Demos and his role in the

1    transaction.

2    Q.   I'm sorry.  His what?

3    A.   Role.

4    Q.   Role.  Thank you.

5         And did you expect Mr. Demos to be lying to you

6    about Cantor's purchase price?

7    A.   We did not.

8    Q.   How about you personally, Mr. Cong, did you expect

9    him to lie to you?

10   A.   I did not.

11   Q.   At the time, if you had known that Mr. Demos had

12   negotiated to purchase this bond from Citi at a price of

13   21, not 21 and three quarters, would that have mattered

14   to you?

15             MR. BAEZ:  Objection.  Calls for speculation.

16             THE COURT:  Overruled.

17   A.   Yes.

18   BY MR. FRANCIS:

19   Q.   Can you please explain to the jury why it would

20   matter to you?

21   A.   We ended up paying a higher price on the

22   investment.

23   Q.   Who's money paid for that higher price?

24   A.   So generally all of these funds are our investors'

25   funds.

1    Q.   If you had found out that Mr. Demos lied to you

2    about the price Cantor was paying for that bond, what

3    would you have done?

4    A.   We would have requested a -- the trade ticket be

5    rewritten at a new price.

6    Q.   And what would that new price have been?

7    A.   Likely eight ticks above Cantor's purchase price.

8    Q.   Would it have been important to you to know in this

9    trade that Marathon wasn't paying eight ticks for

10   Mr. Demos's work but was paying 32 ticks?

11   A.   Generally in the context of purchasing securities

12   at a lower price, yes.

13   Q.   So what was the effect of Mr. Demos's lie on

14   Marathon's investors?

15   A.   We ended up paying a higher price for the bond.

16   Q.   If I ask you to calculate the difference between

17   the Cantor's actual purchase price of 21 and the price

18   Mr. Demos was paying, 21-24 -- first let's do it the

19   easy way -- how many ticks is that?

20   A.   That's 24 ticks.

21   Q.   If you wanted to convert 24 ticks in this trade

22   into dollars, in words, first explain to us, how do you

23   do that math?

24   A.   So 24 ticks is 24 divided by 32.  That 24, that

25   fraction, divided by 32 is applied to 1 percent.  So

1    basically 24 divided by 32 is 3/4s.  So this is 3/4's of

2    one percent.

3    Q.   And so 3/4s of one percent of what?

4    A.   Of the size of the bond.

5    Q.   And so if I –– if I pulled up

6    Government's Exhibit 701 –– I'm not sure I can pull up

7    Government's Exhibit 701.

8         I apologize, Your Honor.  I'm having a tough time

9    with the computer.

10        So this is the trade ticket, your trade ticket with

11   Cantor for this bond.

12        Where on this would we find the current value of

13   this bond?

14   A.   That would be on the right side towards the middle,

15   right next to current face.

16   Q.   Is that what I've circled right there, that current

17   face number?

18   A.   Yes.

19   Q.   What is it?

20   A.   $6,787,673.82.

21        MR. FRANCIS:  Your Honor, may I approach the

22   witness with a calculator?

23        THE COURT:  You may.

24   BY MR. FRANCIS:

25   Q.   Sorry, Mr. Cong, I meant to leave that for you at

1    the break.

2        Can you do that math and tell us the dollar value

3    of the 24 ticks on this trade?

4    A.   $50,907.55.

5    Q.   Thank you.

6            THE COURT:  So I don't forget, the courtroom

7    deputy has advised me that I didn't actually say on the

8    record that 702 is admitted.  So we'll make that clear.

9            MR. FRANCIS:  That's my fault.

10           THE COURT:  I was talking about 102 and I

11   forgot to say that 702 was admitted.

12   BY MR. FRANCIS:

13   Q.   So, Mr. Cong, now that you know that Mr. Demos lied

14   to you in this HVMLT trade back in December of 2011 --

15   first let me ask the question.

16       When did you come to learn that Mr. Demos had lied

17   to you in this trade?

18   A.   I believe it was the first time we met with the

19   government.  I forget when that was.  It was a few years

20   ago.

21   Q.   Marathon didn't figure it out on its own?

22   A.   We did not.

23   Q.   Why not?

24   A.   We didn't have access to the other side of the

25   trade between Citigroup and Cantor.

1    Q.   So now that you know that Mr. Demos lied to you

2    when you were buying this bond, can you explain for the

3    jury under what circumstances you would do business with

4    him again?

5    A.   So I think that we would have not actively seeked

6    (sic) out his advice and services in relation to

7    purchases.

8         I would say that if it was in our investors' best

9    interest, we may engage in a transaction with him, or

10   may have.

11   Q.   If you had an alternative, would you have done --

12   would you do business with Mr. Demos again?

13   A.   Again, I think we would actively have not seeked

14   out his advice and guidance on buys.  So we would

15   probably have gone to another broker-dealer.

16            MR. FRANCIS:  Your Honor, I'm just putting 703

17   up on the screen again.

18   BY MR. FRANCIS:

19   Q.   What time is the end of this chat between you and

20   Mr. Demos?

21   A.   20:25:21.

22   Q.   Okay.  I'd like to show you

23   Government's Exhibit 708.

24        This is another one of these chats.  What's the

25   date on it?

1   A.   This is between December 6, 2011 and December 7,

2   2011.

3   Q.   Who are the participants?

4   A.   Myself and Mr. Demos.

5   Q.   So this is the -- it starts on the same date as the

6   trade we were just looking at?

7   A.   Correct.

8   Q.   So we left off at that chat.  The other chat ended

9   at 20:25.  So let me scroll down to 22:40:27.  So this

10  is two hours and 15 minutes later.

11      Mr. Demos writes to you, I have more, 6,650,000 of

12  the same HVMLT bond; is that right?

13  A.   Yes.

14  Q.   At 24, man, that bond is cheap.

15      And then he continues, This market is awesome.

16  What do you write in response?

17  A.   It is cheap.

18  Q.   And you keep going.

19  A.   But you know where we're at.

20  Q.   He writes, Ha-ha.

21      And what do you write?

22  A.   21.24 and then corrected it to 21 and 24 ticks.

23  Q.   And how about after that?

24  A.   Gotta maintain discipline.

25  Q.   And then you finish off, Everything is cheap.

1        So what's that 21 and 24 price?

2   A.   It is our transaction price or the transaction

3   price that we paid on top of with Cantor.

4   Q.   From the chat we were just looking at, the HVMLT

5   trade?

6   A.   Correct.

7   Q.   What does it mean when you write, Gotta maintain

8   discipline?

9   A.   In this context, it likely means we just paid 21

10  and 24 ticks for a bond.  So for the same bond, we

11  should pay that price again.

12  Q.   Why does that matter?

13  A.   The lower the price, the higher the returns.

14           MR. FRANCIS:  Your Honor, I'm going to move to

15  a new trade.  It's the trade charged in Count two of the

16  indictment.

17           THE COURT:  Is 708 a full exhibit?

18           MR. FRANCIS:  I don't think you --

19           THE COURT:  I didn't say 708, so 708 is

20  admitted.

21           I think I lost track of those numbers.  Sorry.

22           MR. FRANCIS:  Thank you, Judge.

23  BY MR. FRANCIS:

24  Q.   I'm going to warn you, Mr. Cong, this trade is a

25  little longer.  I'm not sure we'll be able to finish it,

1    but I'll do my best I can.

2              MR. FRANCIS:  Your Honor, I would like to

3    introduce Exhibits 200 and 201.

4              MR. BAEZ:  No objection.

5              THE COURT:  Government's Exhibit 200 and 201

6    are admitted.

7    BY MR. FRANCIS:

8    Q.   Can anyone read these or are they still too small?

9         Mr. Cong, can you read them?

10   A.   These are really small.

11   Q.   I'll do them one at a time then.

12        Let's start with 200.

13        Better?

14   A.   Yes.

15   Q.   Great.

16        What bond are we talking about here?

17   A.   AMSI 2003-8 M2.

18   Q.   You said AMSI.  I'm just going to call it the AMSI

19   bond, okay?

20   A.   Okay.

21   Q.   What is the date of that trade?

22   A.   July 6, 2012.

23   Q.   Is this, from Cantor's perspective, buying or

24   selling?

25   A.   This is a buy.

1    Q.    And how much of this bond is it buying?

2    A.    30,895,000.

3    Q.    At what price?

4    A.    Sixty-four and 24 ticks.

5    Q.    I'm sorry?

6    A.    Sixty-five and 24 ticks, excuse me.

7    Q.    Who is Cantor buying from?

8    A.    UBS Financial Services, Incorporated.

9          Let's pull up the other one,

10   Government's Exhibit 201.

11   Q.    Same bond?

12   A.    Yes.

13   Q.    Same date?

14   A.    Yes.

15   Q.    Same size?

16   A.    Yes.

17   Q.    Who's buying?

18   A.    Marathon Asset Management.

19   Q.    And what price is Marathon paying for the AMSI

20   bond?

21   A.    Sixty-six and 20 ticks.

22          MR. FRANCIS:  Your Honor the government would

23   like to introduce Government's Exhibit 207.

24          THE COURT:  Government's Exhibit 207 is

25   admitted.

1    BY MR. FRANCIS:

2    Q.   It's another chat.  What's the -- does the date of

3    this chat cover the date of that AMSI trade?

4    A.   Yes.

5    Q.   And who are the participants in this chat?

6    A.   Andy Springer, myself, Stuart Goldberg, Bill

7    Biggart and David Demos.

8    Q.   Let's go through those names.  Andy Springer, where

9    does he work?

10   A.   He works at Marathon.

11   Q.   What's he do there?

12   A.   He was my boss and he's a senior member at

13   Marathon.

14   Q.   You're Ed Cong.

15        How about Stuart Goldberg, who's he?

16   A.   He was Andy's partner, so also my boss and a senior

17   member at Marathon Asset Management.

18   Q.   How about Bill Biggart?

19   A.   He was our sales coverage at Cantor Fitzgerald.

20   Q.   What does that mean, sales coverage?

21   A.   He worked on kind of the client relationship aspect

22   of the relationship.

23   Q.   So he worked for Cantor?

24   A.   Yes.

25   Q.   Okay.  And then Mr. Demos we know.

1        So let's go to the last page.  What's the date of

2   that last comment?

3   A.   July 3, 2012.

4   Q.   Does Mr. Demos raise the -- or mention the AMSI

5   bond?

6   A.   I think the highlight is not coming up on

7   Mr. Demos's comment.

8   Q.   Sorry.  Apologies everyone.

9        Sorry I'm fighting with the computer.

10       Now you see, is Mr. Demos on July 3 raising the

11  AMSI bond with you?

12  A.   Yes, he is.

13  Q.   That's the one from the trade tickets?

14  A.   Yes.

15  Q.   So this chat covered more than one day, right?

16  A.   Yeah, it did.

17  Q.   I'm jumping ahead to page 7.  What's the date of

18  Mr. Demos's statement that I've highlighted?

19  A.   July 5, 2012.

20  Q.   And does he make reference to the AMSI bond again?

21  A.   Yes, he does.

22  Q.   And just because it might come up later, do you see

23  the DNT there?  Can you just tell us what that stands

24  for?

25  A.   That stands for did not trade.

1    Q.    Go to the next page.  I'm going to go to 18:35:48.

2          What do you write to Mr. Demos?

3    A.    Demos, have a 64 bid for you on AMSI 2003 – 8M 2.

4    Q.    How does Mr. Demos respond with respect to the AMSI

5    bond?

6    A.    Okay.  Let me see what I can do on AMSI.

7    Q.    And you write, Okay, thanks.

8          What role did you understand Mr. Demos and Cantor

9    to be acting in here?

10   A.    We believed he was taking our bid and submitting it

11   to the seller.

12   Q.    So who did you believe you were negotiating against

13   at the time?

14   A.    The seller.

15   Q.    I'm going to scroll down to 18:48:43.  You write,

16   Get us the AMSI, exclamation point.

17         What are you asking Mr. Demos to do?

18   A.    To work with the seller and try to negotiate a

19   purchase for us.

20   Q.    If we scroll down to 18:51:16, Mr. Demos writes:

21   AMSI, he, quote, just left for oral surgery, quote,

22   he'll be back in tomorrow.

23         You write, That's no excuse.

24         Mr. Demos writes, I called him on cell.  Think he

25   was in chair, lazy bastard he is.

1          Are you and Mr. Demos goofing around about the

2     seller?

3     A.    Correct.

4     Q.    So what's the state of this trade as of the end of

5     the day on the 5th?

6     A.    It's unresolved.

7     Q.    I'm going to take 207 and put it on the left.

8              MR. FRANCIS:  And Your Honor, I'd like to

9     introduce Government's Exhibit 202.

10             THE COURT:  Government's Exhibit 202 is

11    admitted.

12             MR. BAEZ:  May I have just a moment, Judge?

13             THE COURT:  Certainly.  We'll pause.

14                (Pause.)

15             MR. BAEZ:  We would have an objection on this

16    one, other than the admission by party opponent, this

17    witness is not a participant.

18             THE COURT:  Overruled.

19    BY MR. FRANCIS:

20    Q.    On the left is 207, your chat with Mr. Demos, and

21    on the right is 202.

22          This is another chat.

23          Does this cover the July 6, 2012 date of the AMSI

24    trade?

25    A.    It does.

1    Q.    And who are the participants in this chat?

2    A.    Randee Paston, Kiran Manda, David Demos, Eri

3    Furukawa.

4    Q.    Where do Paston, Manda, Furukawa and Demos work?

5    A.    According to this document.  They all worked at

6    Cantor Fitzgerald.

7    Q.    What is Randee Paston?  What's her job?

8    A.    I believe she was in sales.

9    Q.    And Kiran Manda.

10   A.    Actually I don't recall what role he played at

11   Cantor.

12   Q.    And do you know Eri Furukawa?

13   A.    I do not.

14   Q.    Are you in this chat?

15   A.    I'm not.

16   Q.    Is anyone from Marathon?

17   A.    No.

18   Q.    Did you know about this chat back in July of 2012?

19   A.    We did not.

20   Q.    So I want to draw your attention to July 6, 2012 at

21   12:21:33.

22         That big enough to read, Mr. Cong?

23   A.    Yes.

24   Q.    Ms. Paston writes, UBS person is in.

25         Who was the seller of the AMSI bond?

1    A.    UBS.

2    Q.    Ms. Paston continues, So wondering if you have that

3    63.50 bid on the AMSI bond still, and any thoughts on

4    the GSAMP.

5          Mr. Demos responded, Show him 63.  Get a big

6    counter.

7          Do you see that?

8    A.    Yes.

9    Q.    If I scroll down, I can give you a little more.

10         Ms. Paston writes, I may risk him, say nothing to

11   do, forget about the order, slash, and he will take it

12   back.  Just telling you this is how he is.

13         Mr. Demos responds, Tell him 63.5.  That's through

14   where he had it offered previously.

15              MR. BAEZ:  I'm going to object.  Is counsel

16   going to ask a question or just read these into

17   evidence?

18              THE COURT:  I think he's formulating the

19   question.

20   BY MR. FRANCIS:

21   Q.    Mr. Cong, do you see where I'm reading?

22         I'm going on to the next page.  Did you see where I

23   was reading before?

24   A.    As you were scrolling?

25   Q.    Yes.  Do you see that?

1    A.   Yes.

2    Q.   Continues on the next page, Mr. Demos writes, Get

3    him to sell there.  What is this guy doing?

4        Did I read that correctly?

5    A.   Yes.

6    Q.   So let's go back to your chat with Mr. Demos and

7    look at July 6 at 13:08.

8        What did Mr. Demos write to you?

9    A.   Don't worry.  I'm working on AMSI.

10    Q.   So is the AMSI trade still a possibility?

11    A.   Yes.

12    Q.   If I go back to 202, which is the Cantor chat, I'm

13    going to pull up 13:12:29.  That's where I want to

14    direct your attention.  What does Ms. Paston write about

15    a counter?

16    A.   Not annoying.  Getting you a counter.

17    Q.   Mr. Demos responded, 65 is a good LVL.

18        Is that a common abbreviation in the market?

19    A.   Yes.  It stands for level.

20    Q.   What does level mean?

21    A.   In this context it's the equivalent to price.

22    Q.   Mr. Demos continues, 64.

23        And then Ms. Paston says something about LIBOR and

24    Barclays.

25        And then at 13:12:55, what does Mr. Demos write

1    there?

2    A.    If he comes back --

3    Q.    I'm sorry, I moved it.

4          There you go.

5    A.    I'm not working his bonds anymore.

6    Q.    Keep scrolling.  What does Ms. Paston write at the

7    top of the next page?

8    A.    I showed 63.5.

9    Q.    If I jump ahead to page 10 and pull up 13:22, what

10   does Ms. Paston predict is going to happen?

11   A.    He will counter with 66 and 24 ticks.

12   Q.    Let me go back to your chat with Mr. Demos.

13         Pull up 13:34:46.

14         What does Mr. Demos tell you is the counter on the

15   AMSI?

16   A.    Sixty-seven dollars.

17   Q.    He continues:  Annoying.  Sorry it's not lower.

18         If I keep scrolling --

19             MR. BAEZ:  Judge, I apologize for

20   interrupting.  All counsel is doing is reading the chats

21   itself.  He's not asking the witness questions.

22             THE COURT:  Same ruling.  Overruled.

23   BY MR. FRANCIS:

24   Q.    What do you write to Mr. Demos at 13:40:38 UTC?

25   A.    Sixty-four and 16 counter.  Shouldn't I have pulled

1   the initial bid a little back given the macro?

2   Q.   So what's a counter?

3   A.   That's subsequent -- in this case, a subsequent

4   bid.

5   Q.   You make reference to pulling the initial bid a

6   little back.  What would that mean?

7   A.   It appears that on this particular day, perhaps the

8   stock market was down or things were not so optimistic.

9   Q.   And is that the reference to the macro?

10  A.   Yes.

11  Q.   That's what that means?

12  A.   Yes.

13  Q.   If I keep scrolling down, at 13:43:18, Mr. Demos

14  writes:  Let me push him on that front, I did before he

15  countered.

16      Who do you understand "him" to be?

17  A.   The seller.

18  Q.   And you write:  You're the man.  Thanks.

19      So let's leave that, your chat with Mr. Demos, and

20  so that I don't lose my spot, I'm going to leave a red

21  arrow there.

22      I'm going to go back to the Cantor chat, which is

23  202, and I'm pulling up 13:49:48.

24      What does Mr. Demos write to Ms. Paston?

25  A.   Sixty-four dollars, but that's about it.

1    Q.    She says, It's going in now.

2          I'm going to scroll down to 14:06:03.  What does

3    Ms. Paston write?

4    A.    66.5.

5    Q.    Let's leave that and go back to your chat where I

6    left the red arrow.

7          Pick it up at 14:11:23.

8          Mr. Demos writes:  66-16.

9          So jumping back and forth, let's sort of review

10   here.

11         What's the state of play on this bond negotiation?

12   A.    The bond is offered at 66 and a half, I believe,

13   from UBS.  Our bid is 64 and 24 ticks.

14   Q.    There is an 18 minute gap there, and you write:

15   Painful.  And then what do you write?

16   A.    I'm sorry, we were at 64 and a half.  I was reading

17   this.

18         So we improved to 64 and 24.

19   Q.    So now you're at 64 and 24?

20   A.    Correct.

21   Q.    And the seller is at 66 and a half?

22   A.    Correct.

23   Q.    And then Mr. Demos writes:  Okay, BRB.

24         Is that a common --

25   A.    Be right back.

1    Q.   Be right back.  I'll get best.

2         What do you understand Mr. Demos to be telling you

3    he is going to do?

4    A.   He is going to discuss with the seller and get an

5    understanding from the seller on the lowest level at

6    which he would sell the bond.

7    Q.   If we come back to the Cantor chat and pick it up a

8    minute later, what does Ms. Paston write at 14:30:29?

9    A.   Sixty-four and eight ticks.

10   Q.   Mr. Demos writes:  Okay.  Buy the bond PLS.

11        Is that "please"?

12   A.   Yes.

13   Q.   I'm going to jump ahead to 15:11:42.  What does

14   Ms. Paston say to Mr. Demos?

15   A.   Sixty-six and eight ticks is his best.  He thinks

16   too much up side.  This is very annoying b/c, because, I

17   know there is not another better bid in the market.

18             MR. FRANCIS:  Your Honor, I'd like to

19   introduce Government's Exhibit 208.

20             MR. BAEZ:  No objection.

21             THE COURT:  Government's Exhibit 208 is

22   admitted.

23   BY MR. FRANCIS:

24   Q.   So I'm going to put 208 on top.  I'm going to

25   replace 207 with 208.  It's another chat.

1       Does this cover the time period right after where

2   we were just looking at?

3   A.   It covers that same day.  I lost track of the

4   times.

5   Q.   The last thing I highlighted was 15:11:42.

6   A.   So this would be after that, yes.

7   Q.   Who are the participants in this chat?

8   A.   Myself and David Demos.

9   Q.   And why did you go from a group chat to a

10  one-on-one chat with Mr. Demos?

11  A.   He invited me to a one-on-one chat.

12  Q.   So what did Mr. Demos write to you at 16:21:11?

13  A.   I'm at the 203 number.  In my header if you need

14  me.  I'm on desk in Darien.

15  Q.   Where is Marathon's office?

16  A.   New York City.

17  Q.   Where did you live in 2012?

18  A.   New York City.

19  Q.   If I keep scrolling down.  I'm going to go back to

20  the Cantor chat, 202.

21       The last thing I highlighted in your one-on-one

22  chat was at 16:21.  I'm going to pick this up at

23  16:23:15.

24       You see Mr. Demos makes reference to the AMSI bond

25  we're talking about to Ms. Paston?

1    A.    Yes.

2    Q.    And then what price does he tell Ms. Paston to get

3    it done?

4    A.    Sixty-five and half or 65 and 16.

5    Q.    If I jump ahead to 16:37:20, what price does

6    Ms. Paston tell Mr. Demos the seller needs?

7    A.    He said he needs 66.

8    Q.    Mr. Demos responds:  Just buy the FCKN thing.  And

9    then says a price of what?

10   A.    Sixty-five and 24 ticks.

11   Q.    And then Mr. Demos writes:  Ask him if he can pay

12   us.  I don't know.  Just buy it.  Let me know.  I can't

13   leave guy hanging.

14        So let's go from there back to your one-on-one chat

15   with Mr. Demos started, 208.

16        If we look at 16:39:16, what does Mr. Demos write

17   to you there?

18   A.    We're going to get, I don't have done from him yet.

19   He's going to pay me two ticks, I think.  I don't really

20   care 2V4, be right back.

21   Q.    What's the significance of a word "done" in

22   negotiating an RMBS trade?

23   A.    Done typically represents when a price has been

24   agreed upon between the buyer and the seller.

25   Q.    When Mr. Demos wrote, I don't have done from him

1   yet.  He's going to pay me.  Who do you understand "him"

2   ands "he" to be a reference to there?

3   A.   The seller.

4   Q.   And what do you understand Mr. Demos is saying in

5   this part about he's going to pay me two ticks, I think?

6   A.   That the, literally, the seller was going to pay

7   him two ticks.

8   Q.   And how about the, I don't really care 2V4.

9   A.   I mean, the 2V4 would reference ticks.  I'm not

10   sure what he was --

11   Q.   Do you understand "V" to be two versus four?

12   A.   Two ticks versus four ticks.

13   Q.   And what did you respond?

14   A.   K, let us know.  Will pay you a few as well.

15   Q.   And Mr. Demos writes:  Just waiting for done,

16   correct?

17   A.   Yes.

18   Q.   So that's at 16:43:15.

19        Let's go back to the Cantor chat and see what is

20   going on nine seconds after that.  That would be

21   16:43:24.

22        What does Ms. Paston write to Mr. Demos?

23   A.   AMSI 2003-8 M2.  Those characters next to it is a

24   CUSIP.  That's an identifier, an official identifier for

25   the bond.  $30,895,000.

1        The 67559 that was cut off was probably the current

2   face, the current size of the bond.

3        You buy 65 and 24 ticks.

4   Q.   And then two seconds later.

5   A.   Done.

6   Q.   So what prize is Ms. Paston telling Mr. Demos at

7   that time that Cantor is paying for the AMSI bond?

8   A.   Sixty-five and 24.

9   Q.   Let's go back to your one-on-one chat with

10  Mr. Demos.  This is one minute and ten seconds or

11  seventy seconds later.

12       What price does Mr. Demos tell you Cantor is paying

13  for the AMSI bond?

14  A.   Sixty-six and 14 ticks.

15  Q.   Did you believe him when he told you that?

16  A.   I did.

17  Q.   I'm going to replace 208 and go back to 207 and

18  finish this up.

19       This is three minutes and 19 seconds later.

20       What price does Mr. Demos say Cantor is selling to

21  Marathon for the AMSI bond?

22  A.   Sixty-six and 20 ticks.

23  Q.   And then if I scroll down -- well, I can't.

24       But if we look a little lower, you agree at

25  17:17:34, Yep, thanks for AMSI trade.

1        Do you see that?

2    A.   Yes.

3    Q.   So why are you –– why would Marathon pay more than

4    what it thought Cantor's purchase price was on this

5    trade?

6    A.   That was the pay on top kind of framework that we

7    described earlier where we decide on Cantor and

8    Mr. Demos's fee or commission.

9    Q.   And so what price did Marathon think Cantor was

10   buying this bond at?

11   A.   Sixty-six and 14 ticks.

12   Q.   And if you had known that Cantor was really buying

13   this bond at a price of 65 and 24, would that have

14   mattered to you?

15   A.   Yes, it would have.

16   Q.   And how did you use that price, untrue purchase

17   price, that fake purchase price, how did you use that?

18   A.   So we used the 66 and 14 purchase price as a base

19   off of which we set the commission.

20   Q.   For a trade like this, was a 28 tick compensation

21   for Cantor, would that have been typical?

22   A.   From my perspective, it would not have been for

23   this size of investment.

24   Q.   Would you ever have knowingly paid on this size

25   investment, paid that much on top?

1    A.   For this type of transaction, no.

2    Q.   So the difference between these two numbers is --

3    between where Cantor actually purchased it and where

4    Mr. Demos told you he purchased it is 22 ticks; is that

5    right?

6              MR. BAEZ:  Objection; asked and answered three

7    times.

8              MR. FRANCIS:  Setting up the next question.

9              THE COURT:  Why don't we do that in the

10   morning.

11             MR. FRANCIS:  That would be fine.

12             THE COURT:  It's 4:30, almost 4:31.

13             MR. FRANCIS:  Wednesday morning, Your Honor.

14             THE COURT:  Wednesday morning.

15             You can step down, sir.

16             I just want to remind the jurors about the

17   instruction I gave you this morning.  I won't repeat

18   them all since I just gave them to you this morning.

19             I'd like to thank you for your hard work today

20   and we'll see you Wednesday morning and we'll bring you

21   in at 9:30.

22             The jury is excused.

23                 (Whereupon, the jury left the courtroom.)

24             THE COURT:  Please be seated everyone.

25             I did notice a word I had written sort of not

1    very well when I was doing this limiting instruction.  I

2    think counsel got the updated version of the limiting

3    instruction.  The word "conclusion" instead of

4    "showing."

5              MS. CHERRY:  Yes, Your Honor.

6              THE COURT:  I guess I have a question about

7    exhibits.

8              I got the government's objection to the

9    defendants' exhibits.  Are there objections that the

10   defense has to the government's exhibits?  There seem to

11   be.

12             It's my practice to get a list of the

13   objections.  If I forgot to tell you that at the final

14   pretrial conference, I apologize.

15             MR. BAEZ:  I will double check, but I can tell

16   you I certainly did not -- and I apologize, I'm not

17   familiar with Your Honor's procedure -- but I certainly

18   was objecting in the sense of standard evidentiary

19   objections such as hearsay, admitting texts and chats

20   where the witness is not a party to.  And those expanded

21   conversations and those expanded statements by other

22   parties that are making these statements are being --

23             THE COURT:  Well, let me ask this:  I ruled on

24   admissibility of the exhibit.  The exhibit was

25   admissible.  If you want a limiting instruction, you

1    should ask for one.

2             So that's why I say if you have objections,

3    give me a chart by the end of the day tomorrow saying

4    these are your objections to the government's exhibits,

5    then I'll know.

6             I didn't understand.

7             MR. BAEZ:  Sure.

8             THE COURT:  I didn't understand.  I'm ruling

9    it's either in or it's out.  That's my ruling.  Then

10   when you make these other elliptical statements, I don't

11   know what you're asking for.  It was unclear what you

12   were trying to accomplish.

13            MR. BAEZ:  I understand.

14            THE COURT:  If what you're saying is that for

15   the chat where Mr. Demos was a party and the witness was

16   not a party, you're objecting to the statements of the

17   other party coming in because they're not an admission,

18   the document comes in, but those other statements come

19   in, they could just be for a limited purpose, namely, to

20   put Mr. Demos's statements in context or for some other

21   purpose.

22            But if you want a limiting instruction like

23   that, you should ask that.  But the reason I didn't take

24   it to be that way, because the same thing is true for

25   the other exhibits where the witness is testifying is a

1    party to the conversation.

2            MR. BAEZ:  I understand the Court's

3    understanding of that.

4            The thing that I took issue with was that

5    Mr. Francis was just reading through the chats.

6            THE COURT:  Let me --

7            MR. BAEZ:  Not asking him any questions.

8            THE COURT:  Let me address that.  Let me

9    address that.

10           I find it very difficult if Mr. Francis was to

11   just jump to points on the page to follow where he was.

12   My thought process in evaluating what he was doing was,

13   was he making it possible for me to follow where he was

14   going on the document.  He did.

15           I'm a lot more familiar with these documents

16   than the jurors are, and I think doing that was helpful

17   in terms of having the jury, me and the witness keep

18   track of where we are; and it was the most efficient way

19   to do it.

20           MR. BAEZ:  But in the process of, he's

21   admitting inadmissible hearsay is my issue.  And there

22   are statements that are prejudicial to my client made by

23   these other parties that there's no questions being

24   asked.  That's the issue.

25           THE COURT:  So to the extent you want a

1     limiting instruction for those documents, go through,

2     give me a list of the documents to which you have an

3     objection or you want a limiting instruction.

4             I said during the final pretrial conference, I

5     think, if you want a limiting instruction, give me

6     drafts of limiting instructions.

7             MR. BAEZ:  Understood.  I apologize.

8             THE COURT:  I'd like to have those

9     objections -- you've got a whole group of people --

10    3:00 tomorrow.

11            MR. BAEZ:  Yes.

12            THE COURT:  Does the government have any

13    objections to other exhibits?

14            MR. FRANCIS:  Yes, probably.

15            In two days we only managed to get through are

16    sort of the relevance and obvious 403 objections.  Four

17    hundred seventy-eight exhibits, it's a lot.  So we

18    probably will have additional ones, likely in the nature

19    of hearsay.  We're just trying to unpack them all.

20            We'll update our list, though.  We just wanted

21    to get the relevance ones out there as soon as possible

22    so that we wouldn't be fighting about it in front of the

23    jury.

24            THE COURT:  Let's do this:  Let's tell the

25    defense which exhibits you'll be using on Wednesday and

1    they can focus on those.  Then the defense can give the

2    government a heads-up as to what exhibits they'll be

3    using on Wednesday.  Until people have gotten to go

4    through the whole list, we'll make sure that everybody

5    knows what exhibits are going to be used the following

6    day.

7              MR. FRANCIS:  Great, thank you.

8              THE COURT:  It is 4:30.  So who will be the

9    other witnesses for the government, if anybody, on

10   Wednesday?

11             MR. FRANCIS:  Is it Goldberg from Marathon?

12   And Chris Bayer from Cantor.  And I think that will get

13   us through the whole day, but we'll look at our

14   outlines, and if we don't think we'll finish, we'll make

15   sure we know who's after that.

16             THE COURT:  Mr. Baez did raise a concern

17   related to one of the motions in limine I think it was.

18             MR. BAEZ:  Commissions and --

19             THE COURT:  Broker-dealer.

20             MR. BAEZ:  Broker-dealer.

21             MR. FRANCIS:  So I didn't use the word

22   commission.  I've stricken it from my vocabulary, but

23   the witnesses sure do.

24             THE COURT:  I did not prohibit witnesses.  I

25   said expert witnesses and counsel in that ruling.

1              MR. FRANCIS:  That was our understanding.

2              I apologize if -- I was using broker-dealer,

3    and I thought I was being careful.  I'll stop using it

4    all together and I'll just refer to Cantor.

5              At this point I think the jury knows what

6    Cantor is, so I don't think I need to be generic

7    anymore.

8              THE COURT:  Okay.

9              MR. BAEZ:  The reason I was objecting of

10   course is counsel's met with this witness on multiple

11   occasions.  He could have been instructed on the Court's

12   ruling.

13             MR. FRANCIS:  We did, Your Honor, instruct him

14   on the Court's ruling.

15             MR. BAEZ:  So if there's future issues, to

16   avoid this, I'd like to make sure that the witnesses are

17   being told of that.

18             THE COURT:  Well, my ruling only required it

19   with respect to expert witnesses and counsel.

20             MR. BAEZ:  Very well.

21             THE COURT:  Didn't require it with respect to

22   witnesses.

23             MR. BAEZ:  Understood.

24             THE COURT:  Anything else?

25             MR. LEONTIRE:  Your Honor, just so I'm clear,

1    we had discussion and we talked about providing exhibits

2    to each other as we go along.

3              The government has filed a fairly long list of

4    objections.  I thought initially you wanted us to file

5    an answer to all those by tomorrow at 3:00, and I'm not

6    sure if we're now doing it on a day-by-day basis.

7              THE COURT:  I guess to the extent that you

8    have an objection, I'd like a response right away.

9    Because I have to -- I mean, you all point out, there

10   are long lists of exhibits.  I have to look at them and

11   decide.

12             MR. LEONTIRE:  Then we have to make all our

13   objections to theirs and they need to respond to all of

14   ours by tomorrow at 3:00.

15             We just got this long list.

16             THE COURT:  We'll just have a 24-hour rule.

17             MR. LEONTIRE:  Perfect.

18             THE COURT:  Once you get the objection,

19   respond within 24 hours.

20             MR. LEONTIRE:  Thank you.

21             THE COURT:  We won't impose that for what you

22   got last night though.  We'll have a weekend carve-out.

23   How's that?

24             Anything else?

25             MR. BAEZ:  Nothing from the defense.

1              THE COURT:  So I think counsel should plan on

2      being here by 9:00 on Wednesday just in case we have

3      things to discuss.

4              MR. BAEZ:  Yes, sir.

5              THE COURT:  Thank you very much.

6                  (Proceedings adjourned at 4:40 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3              UNITED STATES V DAVID DEMOS

4                   3:16CR00220(AWT)

5

6

7          I, Corinna F. Thompson, RPR, Official Court

8   Reporter for the United States District Court for the

9   District of Connecticut, do hereby certify that the

10  foregoing pages, pages 1 - 187, are a true and accurate

11  transcription of my shorthand notes taken in the

12  aforementioned matter on April 23, 2018, to the best of

13  my skill and ability.

14

15

16

17

18          /s/_____

19          CORINNA F. THOMPSON, RPR
            Official Court Reporter
            450 Main Street, Room #225
20          Hartford, Connecticut 06103
               (860) 547-0580

21

22

23

24

25