UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


– – – – – – – – – – – – – – – – x

UNITED STATES OF AMERICA          3:16CR00220(AWT)

       vs.

DAVID DEMOS
                   HARTFORD, CONNECTICUT
         Defendant    APRIL 25, 2018

– – – – – – – – – – – – – – – – x


**JURY TRIAL**

**VOLUME II**


BEFORE:

      HON. ALVIN W. THOMPSON, U.S.D.J.

         and a Jury of Twelve


Corinna F. Thompson, RPR
Official Court Reporter

APPEARANCES:


    FOR THE GOVERNMENT:

        OFFICE OF THE UNITED STATES ATTORNEY
        915 Lafayette Boulevard,  Room 309
        Bridgeport,  Connecticut 06604
        BY:  HEATHER CHERRY, AUSA

        OFFICE OF THE UNITED STATES ATTORNEY
        157 Church Street
        New Haven, Connecticut  06510
        BY:  JONATHAN N. FRANCIS, AUSA

    FOR THE DEFENDANT:

        THE BAEZ LAW FIRM
        40 SW 13th Street
        Suite 901
        Miami, Florida  33130
        BY:  JOSE BAEZ, ESQ.

        LEONTIRE & ASSOCIATES
        66 North Second Street
        New Bedford, Massachusetts  02108
        BY:  GEORGE J. LEONTIRE, ESQ.
            FELICIA LEE CARBONI, ESQ.

        HARVARD LAW SCHOOL CRIMINAL JUSTICE INSTITUTE
        6 Everett Street
        Suite 5116
        Cambridge, Massachusetts  02138
        BY:  RONALD S. SULLIVAN, JR., ESQ.

        QUINN, EMANUEL, URQUHART & SULLIVAN
        51 Madison Avenue
        22nd floor
        New York, New York  10010
        BY:  ALEX SPIRO, ESQ.

        LAW OFFICE OF MICHAEL CHAMBERS, JR.
        100 Wells Street    Suite 2C
        Hartford, Connecticut  06103
        BY:  MICHAEL LINCOLN CHAMBERS, JR., ESQ.

1                          **TABLE OF CONTENTS**

2    WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

3    EDWARD CONG

4      BY MR. FRANCIS:    218                  337

5      BY MR. BAEZ:                 232                      361

6      BY MR. FRANCIS:                          376

7    STUART GOLDBERG

8      BY MS. CHERRY:     377

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            8:50 AM

2              THE COURT:  Good morning.  Please be seated.

3              Our IT guy was here at 8:30, and nobody was

4    here to meet him.  He was going to help in hooking up

5    something.

6                   (Pause.)

7              THE COURT:  I guess we have a number of things

8    to discuss with respect to exhibits.  I did review most

9    of what I got yesterday evening.  Let me just mention a

10   couple of things, then we can talk about what counsel

11   want to discuss.

12             The defense objections were docketed as

13   Document Number 324.  I'm striking the third paragraph

14   of the standing objection.  It just says the defense

15   requests that documents be appropriately redacted.  I

16   can't have a standing objection that documents need to

17   be appropriately redacted.  The proper way to deal with

18   objections with respect to redactions is to give the

19   other side your proposed redactions, and then if there's

20   a disagreement I rule on it.  This is not an appropriate

21   way to raise the issue of redactions.

22             With respect to the second paragraph at the

23   top of page 2, the paragraph that makes reference to

24   exhibits listing, quote, "broker commission" -- hold on

25   one second.

1          Document Number 258 is my ruling on the

2    defendant's motion in limine.  Document Number 151 with

3    respect to reference to the defendant as an agent or as

4    having a fiduciary duty, Page 4 of that ruling has a

5    paragraph that says –– well, it's preceded by a sentence

6    that says that counsel and expert witnesses will not be

7    permitted to use the terms "broker" and "commission"

8    when discussing the dealer's trading activity.

9          And the next paragraph reads, "This order is

10   not being extended to nonexpert witnesses, however,

11   because the Court concludes it would be too difficult

12   for them to alter their natural testimony, given the

13   usage of these terms in the industry and it appears in

14   documentary evidence.  However, the Court will rely on

15   counsel to frame questions properly and to develop

16   testimony so that the jury is not misled."

17         So I've addressed that issue already.  Your

18   objection is preserved.

19         We have had a couple of exhibits that have

20   already come in.  There's been examination about them.

21   The jurors have taken notes.  In addition to not being

22   consistent with my prior ruling, it's a bit untimely in

23   the context of this trial.  And having seen the

24   documents now, I think it would be confusing to the

25   jurors to just delete that portion of the documents, and

1      we should not be altering the documents with something

2      that's not there.  So that objection is preserved.

3                  What else do we have to discuss?

4                  Let me just mention one other thing.

5                  Just so you all know what it looks like, we

6      have a stamp that we're going to use for documents for a

7      limited purpose.  This is it, if you want to see what it

8      says.  It will be on the courtroom deputy's desk.

9                  And I did also -- although it seems the

10     defense may be making a decision not to ask for a

11     limited purpose instruction with respect to documents

12     that come in and put the defendant's statements in

13     context, I did work out some language just in case there

14     is a request.  If I can figure out which pad I put it

15     into, I will share it with you.

16                 I still have questions about what the scope

17     would be, but I would say, The statements by other

18     participants are being offered for a limited purpose

19     only.  That limited purpose is to provide the context

20     for the statements made by the defendant.  There's

21     introductory language, but that's the substance of what

22     it would be if requested.

23                 So what else do we have?

24                 MR. LEONTIRE:  Your Honor, I know you just

25     ruled on the issue of commission.  I just need to

1    explain one thing.

2              Those tickets have nothing to do with the

3    commission of David.  Those are internal Cantor tickets,

4    and they are referencing commissions to salespeople.

5    And the concern is that the jury is going to think that

6    has something to do with the commission to David.  It

7    has absolutely no connection with David Demos when the

8    internal Cantor ticket mentions broker commission.

9    That's for the salespeople within Cantor, not David

10   Demos.

11             THE COURT:  I understood that.

12             MR. LEONTIRE:  Okay.  Just so we're clear.

13   Thank you.

14             THE COURT:  What else do we have to discuss?

15             MR. FRANCIS:  So I just want to be clear.  The

16   defense has objected to all our documents that are

17   electronic, which are all our documents.  Are they going

18   to -- are we going to be hashing this out document by

19   document, or are we done with that, because we are going

20   to keep using them.  We don't want to understand that

21   they have a standing objection and they understand that

22   they don't, or vice versa, and then the record is

23   unclear.

24             THE COURT:  I think they have a standing

25   objection.

1          MR. FRANCIS:  That's fine.

2          THE COURT:  Their objection is hearsay.

3          What's the government -- most of these cases

4    that I've had, either counsel have worked out an

5    agreement or the government either brings a custodian of

6    records or there's some certification that establishes

7    that it's a business record.

8          MR. FRANCIS:  Right.  I don't think any of

9    that is necessary here.  My only interest --

10          THE COURT:  Why is that not necessary here?

11          MR. FRANCIS:  I think we've agreed on

12    authenticity.  No one's arguing that these are business

13    records.  So really, we're only offering admissions of

14    the defendant and in the surrounding context that go to

15    his state of mind.  So I don't think we need a witness

16    to establish that Mr. Demos is speaking in the document.

17          THE COURT:  What about the trade tickets?

18          MR. FRANCIS:  We've stipulated to the fact

19    that they are admissible as business records.

20          THE COURT:  You have --

21          MR. FRANCIS:  I'm sorry.  You're right with

22    respect to trade tickets.  I'm sorry.  We didn't read

23    that one into the record.  We submitted it to -- we just

24    filed it.

25          THE COURT:  Okay.

1          MR. FRANCIS:  The only reason I raise this is

2     I don't want the record later on to be unclear whether

3     or not they had a standing objection.  I now understand

4     your ruling to be they do, and so we will proceed that

5     way.

6          THE COURT:  Just to be clear, so there's not

7     any confusion, we have Document 324.  I've addressed the

8     standing objection and the paragraph with respect to

9     broker commissions.  I have not addressed the other

10     objections.

11          MR. FRANCIS:  Understood.

12          THE COURT:  And in striking the language with

13     respect to redactions, my intent was to convey that

14     otherwise the defendant has a standing objection, as set

15     forth in that first five paragraphs of Document 324.

16     That includes the class of electronic documents the

17     government intends to admit.

18          What is in that class other than Bloomberg

19     chats?

20          MR. FRANCIS:  There's Bloomberg chats and

21     messages --

22          THE COURT:  Messages.

23          MR. FRANCIS:  -- these trade tickets, and

24     there's also some Outlook e-mails.  Just another

25     variety.

1          THE COURT:  Has there been a stipulation that

2     the e-mails are business records?  I assume not.

3          MR. FRANCIS:  There has not.  We are only

4     offering -- the government is only intending to offer, I

5     believe, admissions of Mr. Demos.

6          THE COURT:  Well, there is one e-mail that was

7     on the list for today that the defense objected to.  It

8     was an e-mail about Mr. Demos, and I think the defense

9     objection was that it could not come in through

10    Mr. Bayer.  Hold on.  Let me find that.

11         MR. SULLIVAN:  Document 14.

12         THE COURT:  Fourteen.  The document is not

13    admissible through Mr. Bayer.

14         MR. FRANCIS:  I'm not sure what Mr. Bayer has

15    to do with anything.  We're not offering that document

16    for the truth.  It's an instruction.  It is an

17    instruction from one person to another person at Cantor

18    to do something, in this case to set up a trading book

19    for Mr. Demos.

20         The only reason that's relevant is --

21         THE COURT:  I understand why it would be

22    relevant.

23         MR. FRANCIS:  We're not offering that for the

24    truth, Your Honor.

25         THE COURT:  Okay.

1            MR. FRANCIS:  And Mr. Bayer is able to

2    identify it.

3            THE COURT:  So what other issues do we have?

4            MR. FRANCIS:  Well, the defense has raised --

5    sorry.  The defense has told us they intend to use a

6    number of documents today that we've objected to,

7    including they have some demonstratives that we haven't

8    seen yet that they would like to use, which we

9    understand to be excerpts of documents, some of which we

10   objected to.  So we thought it would be useful to

11   discuss all of those before.

12           THE COURT:  Where are the demonstratives?

13           MR. SULLIVAN:  They're here, Your Honor.

14           MR. BAEZ:  I'm looking at them for the first

15   time to.

16           MR. SULLIVAN:  I was going to say, Your Honor,

17   we also have the list of the remaining documents for

18   today that we haven't -- some of which we haven't

19   discussed.

20           To the extent Your Honor wants a

21   representation with respect to Government's Exhibit 14,

22   I'm prepared to do that as well.  We'll proceed in

23   whatever order Your Honor wants.

24           THE COURT:  Why don't you comment on

25   Government 14 now.

 1            MR. SULLIVAN:  On 14, all I would say is

 2   because a document is relevant does not mean it is

 3   per se admissible.  There still has to be a competent

 4   witness through which the document comes in.  As I

 5   understand, neither of their witnesses is a custodian of

 6   record who could provide a sufficient foundation for

 7   admission, to be able to identify the document at most

 8   can bring it in as a demonstrative but not as

 9   substantive evidence.

10            THE COURT:  My understanding of the defense

11   objection, if I'm remembering correctly, is that

12   Document 14, Government's Exhibit 14 is an e-mail

13   message the sender, recipients of which were not -- none

14   of them are witnesses going to be here who can say,

15   "Yes, this is an e-mail to me"; is that correct?

16            MR. SULLIVAN:  Correct.

17            THE COURT:  So that's a problem with the

18   foundation.

19            MR. SULLIVAN:  Court's indulgence.

20                 (Off the record.)

21            MR. SULLIVAN:  We're not arguing about

22   authenticity, only admissibility.

23            MR. FRANCIS:  I'm sorry.  Before --

24            THE COURT:  You're really arguing about

25   whether there's a foundation.

1          MR. SULLIVAN:  Exactly, just a foundation.

2          MR. FRANCIS:  So this is a little frustrating,

3    Your Honor, and maybe it's just the nature of the

4    defense team.  We've discussed this document with one of

5    the defense attorneys yesterday.  If they had told us

6    they wanted us to bring a witness just to say this is an

7    e-mail that came from Cantor's e-mail server, we could

8    do that.  But if we're going to proceed that way, we've

9    discussed these issues and I thought they were resolved.

10   For them to come up again --

11         THE COURT:  Who did you discuss it with?

12         MR. FRANCIS:  Mr. Spiro.

13         THE COURT:  Mr. Spiro?

14         MR. FRANCIS:  And I don't blame Mr. Spiro.

15   I'm just -- I'm not sure there's communication.

16         MR. SPIRO:  Yes, Judge.  There was a little

17   bit of confusion when we switched from Bloomberg to

18   e-mail.  There wasn't a separate stipulation done that

19   necessarily takes into account every document.

20         We've consulted with our client and he informs

21   me that, I can tell the Court that, yes, we did have

22   that discussion and we don't have any problem -- they

23   don't have to call a witness from Cantor to establish

24   that that is a document that was produced by Cantor in

25   the ordinary course and that it is authentic.

1             THE COURT:  But the objection is foundation.

2             MR. SPIRO:  Just a moment.

3                 (Off the record.)

4             MR. SPIRO:  So we would not have an objection

5     to that exhibit.

6             THE COURT:  All right.  So that will come in.

7             I guess one thing I did have a question about

8     was the objections to 105 and 606, if I have the correct

9     ones.  Let me see if I can double-check that.  606, it

10    says excluded as total compensation.  When I looked at

11    those two documents I didn't see -- I didn't see total

12    compensation on there.  Obviously, you all are more

13    familiar with the documents than I am.

14            Let me turn to 105.  What does that objection

15    mean?

16            MR. SULLIVAN:  Let me just find the document,

17    Your Honor.

18            THE COURT:  Sure.

19            MR. SULLIVAN:  Thank you, Your Honor.

20            There are a couple of objections with respect

21    to this.  So this document doesn't describe monies paid

22    to Mr. Demos.  Rather, it describes monies paid to the

23    sales team at Cantor.  This is not income to Mr. Demos.

24    It's money which goes to his sales team as a function of

25    a trade.  So we object because the document is

1    misleading in the sense that if it goes back to the jury

2    it is suggestive.

3               THE COURT:  Let me ask Mr. Francis or

4    Ms. Cherry, what's this being offered for?

5               MS. CHERRY:  Well, this document is -- and

6    we'll have Mr. Bayer talk about this document and each

7    column specifically.  So he will correctly explain --

8               THE COURT:  My real question is, does this

9    translate through to the bonus?

10              MS. CHERRY:  Eventually it does, yes.  This is

11   a P&L of Mr. Demos's MEZZ book.

12              THE COURT:  How eventually?

13              MS. CHERRY:  If you look at the realized and

14   unrealized columns --

15              THE COURT:  On the document itself, which

16   translates into his bonus?  Okay.

17              MR. SULLIVAN:  We absolutely disagree with

18   that, Your Honor, that it doesn't show that.  Indeed,

19   this shows the P&L for the day at Cantor.  It doesn't

20   even break down to the specific trades that he's charged

21   with, and that is misleading.  That's one.

22              Second, Your Honor, what I expect the

23   government to do is say that Mr. Demos gets a percentage

24   of this as a function of his contract.  But they can't,

25   through this document, even establish exactly what that

1    number is.

2              So the first reason is because it doesn't cull

3    out from the document the specific trade.  This is an

4    aggregate number.

5              Second, in Mr. Demos's contract -- and this is

6    Exhibit 1, Your Honor, I'm looking at the second page of

7    Exhibit 1 -- it's clear that Mr. Demos's profits is

8    that -- one formulation is the number that he -- the

9    amount that goes to the sales team.  He gets a function

10   of that, a percentage of that, less -- and I'm quoting

11   page 2 --

12             THE COURT:  Can I just ask though?

13             MR. SULLIVAN:  Yes.

14             THE COURT:  I mean, this is document here, is

15   it something that was kept at the company or something

16   that went into using -- finding out what numbers

17   eventually were used to get to the bonuses provided for

18   in the contract?

19             MS. CHERRY:  Yes, Your Honor.

20             THE COURT:  Then it's admissible.  It's not

21   misleading.  It just doesn't tell the whole story.

22   There's a difference.

23             MR. SULLIVAN:  It is a difference.  I would

24   say it's more consistent with Your Honor's rain example.

25   You can infer that he got something, but you can't infer

1    that he got -- that there was 2 inches of rain.  You

2    can't infer --

3              THE COURT:  And I'm sure this will be brought

4    out on direct and cross-examination.  So we've addressed

5    the total compensation objection.

6              I have a question about another --

7              MR. SULLIVAN:  If Your Honor permits, I'd like

8    to make a record on this.

9              THE COURT:  You can file something, okay?

10   I've heard you and I've analyzed it.  I don't need to

11   hear another five minutes.

12             MR. SULLIVAN:  Thirty seconds.

13             So I understand the Court not permitting me to

14   make a record?

15             THE COURT:  No.  I'm telling you, you can make

16   it in writing.  I got things in writing.  I asked the

17   questions.  You answered my questions.  You told me that

18   you thought it was misleading.  I've asked a question as

19   to whether it goes into -- the numbers that go into

20   determining his bonus.  The answer is yes.

21             MR. SULLIVAN:  The prejudice is the witness

22   will testify without the Court hearing the additional

23   reason why.

24             THE COURT:  What's the additional reason?

25             MR. SULLIVAN:  The contract says that this

1    number is, quote, less sales --

2              THE COURT:  You told me what the contract said

3    and I read the contract last night.  Let's go to the

4    paragraph you're talking about, because that's the

5    exhibit I'd like to discuss.

6              Is it Exhibit 1 we're talking about?

7              MR. SULLIVAN:  Correct.

8              THE COURT:  So what paragraph?

9              MR. SULLIVAN:  (b), or Subsection (b).

10             THE COURT:  You mean Subsection 1(b)?  3(b)?

11             MR. SULLIVAN:  3(b).

12             THE COURT:  Okay.

13             MR. SULLIVAN:  I'm looking at trading profits

14   as an example, where the calculation is less sales

15   credit, the cost of carry, cash capital adjustments,

16   including, but not limited to legal fees, charges for

17   other costs and expenses.

18             Nowhere in Exhibit 105 do those costs come

19   out, and the government has not provided any documents

20   to show that calculation.  This is the additional basis

21   for our claim that it's misleading.  It's just, if they

22   just take 10 percent, that's the wrong number.

23             THE COURT:  Okay.  Thank you.

24             There also, I think, was an objection to

25   Number 1 and 2, I believe, everything other than the

1   section on bonuses and Mr. Demos's signature.

2            MR. SULLIVAN:  Correct.

3            THE COURT:  What's the government's position

4   on that?

5            MS. CHERRY:  Your Honor, I don't think --

6   we think that document should be redacted.  We do intend

7   to read into the record other parts of the document that

8   we think are applicable.

9            THE COURT:  What's the defense's basis for the

10  objection?

11           MR. SULLIVAN:  Your Honor's order of 3/19/18,

12  with respect to total compensation, one paragraph in

13  here discusses Mr. Demos's total compensation.

14           THE COURT:  Aren't the numbers deleted?

15           MR. SULLIVAN:  Not on the copy I have, unless

16  I have an old copy.

17           THE COURT:  I'm looking at

18  Government's Exhibit 1, Section 3(a).  It says the

19  company shall pay to employee a gross salary of blank.

20           MR. SULLIVAN:  I have the numbers here.  Maybe

21  this is an old document.  I apologize if that's the

22  case.

23           THE COURT:  All right.

24           MR. SULLIVAN:  In the official copy it's

25  deleted?

1          MS. CHERRY:  Your Honor, the copy we will be

2     showing to the witness and the jury will have no

3     numbers.  It will be redacted.

4          THE COURT:  Did each side give the other a

5     copy of what they gave me?

6          MS. CHERRY:  We did provide the defense a

7     copy.

8          THE COURT:  We should be looking at those

9     copies.  So that addresses that.

10          And Number 2, was that the same thing?  That

11     also is redacted.  It just has percentages on it.  It

12     has something under payout in the middle, and then

13     gross, net trading, sales.

14          MR. SULLIVAN:  If it's redacted we have no

15     objection.

16          THE COURT:  Okay.  Thank you.

17          MR. FRANCIS:  Your Honor, the lineup, for your

18     information, is Mr. Cong is still on direct from

19     Marathon.  He'll be followed by another Marathon

20     witness, Mr. Goldberg, and then we'll get to Mr. Bayer.

21     I don't think we will actually even be to these

22     documents with Mr. Bayer until probably around or after

23     lunch.  So I want to make sure we have time to address

24     the defense's documents they are intending to be using,

25     presumably with the Marathon witnesses.

1          THE COURT:  We have ten minutes so let's talk

2    about that now.

3          MR. FRANCIS:  Excellent.

4          MR. SULLIVAN:  Just so the is record clear, we

5    have other objections.  I assume we'll be able to get to

6    those later with respect to the Bayer documents.

7          THE COURT:  We've talked about 1, 2, 14.

8          MR. SULLIVAN:  Correct.

9          THE COURT:  We talked about 105 and 606.

10   20 and 106 are chats?

11         MR. SULLIVAN:  Correct.

12         THE COURT:  And I think -- I forget what 100

13   and 101 are.  Let me just check.

14         MS. CHERRY:  Those are trade tickets, Your

15   Honor.

16         THE COURT:  Those are trading tickets.  We've

17   resolved that.  So what I have left then is -- I'm not

18   sure actually.  What's left?

19         MR. SULLIVAN:  We have 106, Your Honor --

20         THE COURT:  Okay.

21         MR. SULLIVAN:  -- which is a chat, and I'm not

22   sure -- the question is relevant is one objection to

23   this chat.

24         THE COURT:  Okay.

25         MR. SULLIVAN:  It's a chat between Mr. Demos

1    and Kiran Manda.

2              THE COURT:  You want to address that now?

3              MS. CHERRY:  I can address that now, Your

4    Honor.

5              There is a section of this document between

6    Mr. Manda and Mr. Demos where they are discussing the

7    bond in Count One, the LXS bond, including the P&L for

8    that bond and how they are going to split that bond

9    between the two salespeople.  It also ties into

10   Document 105, which is the P&L sheet that we were just

11   looking at a moment ago.

12             THE COURT:  That satisfies me.

13             MR. SULLIVAN:  Well, we would object to

14   anything outside of that, Your Honor.  And again, we

15   maintain the objection with respect to the total P&L.

16   So I can do it at the time or now, but ask that the

17   document be redacted outside of --

18             THE COURT:  Why don't you prepare some

19   proposed redactions for the government.

20             MR. SULLIVAN:  Very well, Your Honor.

21             THE COURT:  Okay.  And give me a copy.  And so

22   it's easy to deal with this, let's give me also -- well,

23   give me a copy of the proposed redactions and I'll make

24   my own copy of the document itself.  That's 106.

25             MS. CHERRY:  Your Honor, just one more thing

1    about that document.  Excuse me.  I think earlier in the

2    chat there was a reference to Darien, Connecticut.  So

3    we're just using it for venue and interstate.

4            THE COURT:  Do we have to --

5            MR. SULLIVAN:  We would object to that as

6    well --

7            THE COURT:  Sure.

8            MR. SULLIVAN:  -- but I'll prepare a

9    redaction.

10           THE COURT:  Thank you.

11           MR. SULLIVAN:  The only other was Document 20.

12   Same basis, Your Honor.

13           MR. FRANCIS:  Your Honor, could I suggest we

14   save that one for later and get to the Marathon

15   documents?

16           THE COURT:  Yes.

17           MR. FRANCIS:  Thanks.

18           THE COURT:  It's the same objection, right,

19   Mr. Sullivan?

20           MR. SULLIVAN:  It's relevance, and also I

21   think it may be misleading, depending on what the

22   government is offering it for.  I've not been advised on

23   what they're offering it for, but --

24           THE COURT:  I'll let you all chat in ten

25   seconds.

1          MS. CHERRY:  I just wanted to be clear, we

2    alerted the defense as to the purpose of this document

3    yesterday.

4          THE COURT:  Who did you talk to?

5          MS. CHERRY:  Mr. Spiro.

6          THE COURT:  Okay.  So you all can confer.

7          Let's get to some of the defense exhibits.  I

8    don't want to come up short of time to deal with the

9    government objections to those, so --

10         MR. SULLIVAN:  Very well, Your Honor.

11         MR. FRANCIS:  I'll be happy to do it in

12   whatever order the defense thinks they're going to use

13   them.

14         THE COURT:  Let me ask this:  I made an

15   assumption, and maybe I shouldn't have, that the order

16   might be the order in which they were listed.

17         Is that not the case or is it the case?

18         MR. SULLIVAN:  I'm sorry?

19         THE COURT:  This is the e-mail that was sent

20   by the defense last night.  Ms. Carboni sent it.

21         MR. SULLIVAN:  Oh, yes, yes.

22         THE COURT:  It listed documents starting with

23   166 going down to 504.  Are they going to be used in

24   that order?

25         MR. SULLIVAN:  Mr. Spiro is going to address

1    these issues.

2              MR. SPIRO:  No, Your Honor.  My understanding

3    is they will not be used in that order.  It will depend

4    on the cross-examination that Mr. Baez is doing.

5              THE COURT:  So you don't know in what order

6    they'll be used at this point?

7              MR. SPIRO:  Correct.

8              THE COURT:  So we'll start at the top then.

9              MR. FRANCIS:  May I suggest we do the ones

10   that came at 11:59 p.m. last night, whatever is on the

11   charts, because those seem like the ones that are going

12   to be most prominent, so I figure they're almost

13   definitely going to use those.

14             THE COURT:  All right.  Sure.

15             MR. FRANCIS:  The first one was Defense

16   Exhibit 3.

17             MR. BAEZ:  If I can have just a moment, Judge.

18             THE COURT:  What is your objection?

19             MR. FRANCIS:  It's a document that Mr. Demos

20   is not on, and so it's hearsay.  And we can't figure out

21   what the non-hearsay basis or the exception to the

22   hearsay rule would be.

23             MR. BAEZ:  I'm trying to figure out where the

24   list is.

25             I can make this representation:  I'm not going

1    to show the jury anything that –– any hearsay or

2    anything that's inadmissible.  So prior to me publishing

3    anything, I will be asking the Court's permission.

4              THE COURT:  So you're going to just play it by

5    ear and see if you lay a foundation that I'm –– you're

6    going to see if I'm persuaded you've laid a foundation?

7              MR. BAEZ:  Here's the thing:  All of these, a

8    majority, I would say about 90 percent of these, have

9    already been admitted through direct examination.  These

10   exhibits are blown–up parts of the text that's already

11   been discussed in direct examination.

12             THE COURT:  What about the other 10 percent,

13   will they be admitted before?

14             MR. BAEZ:  Yes.

15             MR. FRANCIS:  Are these secret?  Can we see

16   them?

17             MR. BAEZ:  Yeah.  Come on over.

18             MR. FRANCIS:  This process is a little broken.

19   I know they're not doing these out in the hall, so

20   someone had to go to Kinko's or e–mail them around, and

21   then we don't get to see it until they come into court.

22   It's almost designed to create a situation where we

23   don't get a chance to even verify that it's right.

24             MR. BAEZ:  There's no design in anything.

25   We're looking at them for the very first time.  We order

1    them late at night and they get here early in the

2    morning.

3            THE COURT:  Why don't we just take a look at

4    them now.

5            MR. FRANCIS:  Also, most of these documents,

6    Judge, have not been admitted already.

7            MR. BAEZ:  The ones I am going to -- whatever

8    is not admitted I'll get admitted.  And if I don't get

9    it admitted, they can object and I won't publish.

10           THE COURT:  They won't be used.

11           MR. BAEZ:  I'm not in the habit of flashing

12   papers in front of the jury.

13           THE COURT:  I think the government should

14   have -- I mean, I assume there's a smaller copy of these

15   available?

16           MR. LEONTIRE:  Judge, we notified the

17   government last night what we were doing with these

18   charts, and we told them they would be blowup pieces --

19   let me finish, Judge -- of the chats that we gave them

20   last night.  We didn't get these till what time?  11:00.

21           THE COURT:  That's not where I'm going.

22           Let me say, first of all, if one side or the

23   other wants to blow up something to emphasize it, I

24   don't see what's wrong with that.

25           MR. LEONTIRE:  That's all we did.

1          THE COURT:  Okay.  But it has to be something

2     that's in evidence and it has to be accurate.  So in

3     order -- and I think the other side is always entitled

4     to look at it before it's put up in front of the jury

5     and we have a debate over whether it's accurate or not.

6          MR. BAEZ:  Just so we're clear --

7          THE COURT:  Let's get copies to the other

8     side, a small printout of it, so we can have a

9     determination outside the presence of the jury if

10    there's an issue as to accuracy.

11          MR. LEONTIRE:  I understand.

12          THE COURT:  That's all I'm saying.

13          MR. FRANCIS:  Thank you, Judge.  That's all we

14    want.

15          THE COURT:  I don't need to know.  Just get

16    the copies.  Then if there's an issue with respect to

17    accuracy -- give me a copy, too, in case there's an

18    issue, and then we can address it.

19          MR. FRANCIS:  Judge, I understand what

20    Mr. Baez is saying, and I appreciate the fact that he

21    doesn't intend to publish inadmissible evidence, but the

22    reason we flagged, we went through the process of

23    flagging all the documents we had objections to, some of

24    these objections, they're going to need to proffer

25    relevance and we don't want them doing that in front of

1    the jury.  We don't want to give them an opportunity to

2    make a closing argument just because we object to a

3    document.

4            THE COURT:  I don't take long arguments on

5    objections.  That's not going to happen.

6            MR. FRANCIS:  Great.

7            THE COURT:  Why don't we let the jury know

8    we'll come in, in five minutes.  Everybody can get ready

9    to go and we'll pick up with our witness.

10           MR. FRANCIS:  Thank you.

11           THE COURT:  We'll take a five-minute break.

12               (Whereupon, a recess followed.)

13           THE COURT:  We're ready to bring in the jury.

14           Is our witness here?

15           MR. FRANCIS:  Your Honor, I've told the

16   defense, a copy of Government's Exhibit 201 and a

17   calculator I put on the witness stand just to move it

18   along.

19           THE COURT:  Okay.

20               (Whereupon, the jury entered the

21   courtroom.)

22           THE COURT:  Good morning, ladies and

23   gentlemen.

24           THE JURY:  Good morning.

25           THE COURT:  Please be seated everyone.

1           We'll have our witness retake the stand.

2                    EDWARD CONG,

3           called as a witness, having been previously

4           duly sworn or affirmed, was examined and

5           testified as follows:

6

7           THE CLERK:  You're reminded you're still under

8    oath.

9           Restate your name for the record.

10          THE WITNESS:  Edward Cong, C-O-N-G.

11          THE CLERK:  Thank you.

12

13                 CONTINUED DIRECT EXAMINATION

14   BY MR. FRANCIS:

15   Q.   Good morning, everyone.

16        Mr. Cong, are you all set?

17   A.   Yes.

18   Q.   Great.

19        So when we left off we were talking about a

20   particular trade.

21        You work where?

22   A.   Marathon Asset Management.

23   Q.   And we were talking about the AMSI bonds, A-M-S-I.

24   That's the bond -- that's the trade charged in Count Two

25   of the indictment.

1          Do you remember that?

2     A.   Yes.

3     Q.   Great.

4          I'm not going to go through it all again, of

5     course.  Let's just get caught up to where we were when

6     we left off.

7          I'm putting up on the screen

8     Government's Exhibit 202, which is in evidence.

9               MR. FRANCIS:  Everyone's screens are working?

10              THE JURY:  Yes.

11              MR. FRANCIS:  Great.

12    BY MR. FRANCIS:

13    Q.   And yours, Mr. Cong?

14    A.   Yes.

15    Q.   So let's just refresh ourselves.  This is one of

16    these Bloomberg chats.

17         And where did the participants in this chat work?

18    A.   They all work at Cantor Fitzgerald.

19    Q.   One of them is Mr. Demos, and the other one I've

20    highlighted, Ms. Paston, I believe you said her role was

21    sales?

22    A.   Correct.

23    Q.   And then I'm going to skip in this document to

24    something we looked at on Monday.

25         Apologize.  Apparently I didn't.

1        There.

2        We saw this, but to refresh us, what did Ms. Paston

3    write at 12:21:33 UTC?

4    A.   UBS person is in.  So wondering if you have that

5    63.5 bid on the AMSI bonds still.

6    Q.   And that was, she was writing to -- who replied to

7    her?

8    A.   Mr. Demos.

9    Q.   Who was the seller of the AMSI bond?

10   A.   UBS.

11            MR. BAEZ:  Your Honor, I apologize.

12            Mr. Francis, I don't mind picking up on the

13   last area that we were at, but to do the whole afternoon

14   that we had again on Monday, we would object to that.

15            MR. FRANCIS:  No problem.  I'm going to the

16   exact place we left off.

17            MR. BAEZ:  This is far from where we left off.

18   This was covered at least an hour or so before we left

19   off.

20            THE COURT:  I'll extend the same latitude to

21   counsel for both sides.

22            MR. FRANCIS:  Thank you.

23   BY MR. FRANCIS:

24   Q.   So Mr. Cong, what I've done here is I've put two

25   documents on the screen.  On the top is

1    Government's Exhibit 202, which is that Cantor chat, and

2    on the bottom is Government's Exhibit 208, which was the

3    one-on-one chat we were looking at between you and

4    Mr. Demos.

5        Let's just pick up where we left off.  16:38:32 --

6    or right before we left off.  16:38:32, what did

7    Mr. Demos write to Ms. Paston?

8    A.   Let me know.  I can't leave guy hanging.

9    Q.   And then less than a minute later, what did he

10   write to you?

11   A.   We're going to get.  I don't have done from him

12   yet.  He's going to pay me two ticks.  I don't think I

13   don't really care 2V4.  Be right back.

14   Q.   We talked about that, two versus four and paying

15   two ticks.

16       You responded a few minutes later, three minutes

17   later, what did you respond?

18   A.   K, let us know.  We will pay you a few as well.

19   Q.   In that same minute, at 16:42:59, Mr. Demos wrote

20   to Ms. Paston, Own.

21       And then a few seconds later, 16 seconds later,

22   what did Mr. Demos say to you?

23   A.   Just waiting for done.

24   Q.   If we go to up, what did Ms. Paston write to

25   Mr. Demos nine seconds after that?

1    A.   AMSI 2003-8 M2, you buy 65-24.

2    Q.   And then two seconds later?

3    A.   Done.

4    Q.   What did Mr. Demos say to you 68 seconds after

5    that?

6    A.   AMSI 2003-8 M2, we own 66 and 14.

7    Q.   And how did you use the information that Mr. Demos

8    gave you that Cantor bought the bond at 66 and 14?

9              MR. BAEZ:  Objection, Judge.  Leading.

10             THE COURT:  Sustained.

11             MR. FRANCIS:  I'm sorry.

12   BY MR. FRANCIS:

13   Q.   How did you use that information?

14   A.   We utilized that as the price off of which we set

15   the final transaction price, including commission.

16   Q.   How much did you add to that transaction price to

17   compensate Mr. Demos and Cantor for their work?

18   A.   Six ticks.

19             MR. BAEZ:  Objection, Judge.  Leading.

20             THE COURT:  Sustained.

21   BY MR. FRANCIS:

22   Q.   How much -- what was the purpose of adding money on

23   top to the transaction price?

24   A.   The purpose was to compensate Mr. Demos for his

25   work.

1    Q.   And how much did you compensate Mr. Demos for his

2    work?

3    A.   Six ticks.

4    Q.   Was that something that you agreed on with

5    Mr. Demos?

6    A.   That's something that we set.

7    Q.   To whom?

8    A.   We decided at Marathon on six ticks.

9    Q.   Who did you tell you were paying six ticks to?

10   A.   Mr. Demos.

11   Q.   And if you had known the truth, would you have --

12   I'm sorry.  What was the final price that Marathon paid?

13   A.   Sixty-six and twenty ticks.

14   Q.   If you had known the truth about Cantor's

15   acquisition price, would you have paid -- agreed to pay

16   66 and 20 ticks?

17              MR. BAEZ:  Objection.  Calls for speculation.

18              THE COURT:  Overruled.

19              THE WITNESS:  We would have set the

20   acquisition price and commission on top of what the

21   actual price was, 65 and 24.

22   BY MR. FRANCIS:

23   Q.   What's the difference between the actual

24   transaction price and what Mr. Demos told you was the

25   transaction price?

1    A.    Twenty-two ticks.

2    Q.    Now, we did this for the first bond we looked at,

3    that HVMLT bond.  I'm going to ask you to do it again.

4    Just explain to us how you translate 22 ticks in this

5    trade into dollars.

6    A.    So you just take 22/32, and that's the fraction of

7    1 percent, and multiply that times the size of the

8    position or the trade.

9    Q.    Where would you find the size of the position of

10   the trade?

11   A.    On the trade ticket.

12   Q.    Okay.  I left you a copy of

13   Government's Exhibit 201, which we've already seen.

14   Could you just tell the jury, what was the value of the

15   size of the position on that date?

16   A.    Approximately $6.377 million.

17   Q.    I've also left you a calculator.  Would you tell us

18   what the dollar value of the 22-tick difference between

19   Cantor's actual acquisition price and what Mr. Demos

20   told you was the acquisition price is in dollars?

21   A.    $43,843.

22   Q.    Thank you.  You can put the calculator down.

23   Thanks.

24           MR. FRANCIS:  Your Honor, the government would

25   move to admit Government's Exhibit 206.

1      THE COURT:  Government's Exhibit 206 is

2   admitted.

3   BY MR. FRANCIS:

4   Q.   Mr. Cong, this is another chat.  Can you tell us,

5   does this cover the same day we were just looking at,

6   July 6, 2012?

7   A.   Yes.

8   Q.   And who are the participants in this chat?

9   A.   Kiran Manda and David Demos.

10  Q.   And just remind us, we know Mr. Demos works for

11  Cantor.  Where does Mr. Manda work?

12  A.   Cantor Fitzgerald as well.

13  Q.   I'd like to draw your attention to the date and

14  time stamp, July 6, 2012, at 16:48:49.

15      Does Mr. Demos instruct Mr. Manda to do something

16  here?

17  A.   Yes.

18  Q.   So it starts off, Sell to Marathon, and then that's

19  the AMSI bond after that, right?

20  A.   Correct.

21  Q.   And then at 66-20, then what does he write that

22  I've highlighted to Mr. Manda?

23  A.   Can you send Mr. Cong a BXT notice buy and sell PX,

24  which stands for "price."

25  Q.   What is a BXT notice that Mr. Demos is asking

1    Mr. Manda to send to you?

2    A.   BXT stands for a buy ticket in Bloomberg.

3    Q.   So explain to the jury how that gets used in an

4    RMBS trade.

5    A.   That would be used to generate a trade

6    confirmation.

7    Q.   And what happens to the -- how are trade

8    confirmations used in trades?

9    A.   They're used to memorialize them.

10   Q.   And are those typically exchanged between Marathon

11   and a broker-dealer when it's doing a trade?

12   A.   Yes, they are.

13   Q.   And you said -- I'm sorry.  I only did the BXT

14   notice.  And then, Buy and sell PX.  Is PX a --

15   A.   That's price.

16   Q.   Mr. Manda responded, Okay, and then he asked a

17   question.

18        What was the question that Mr. Manda asked

19   Mr. Demos?

20   A.   You want me to give him the buy level as well?

21   Q.   And then he continued.

22   A.   Wanted to be clear before sending him that info.

23   Sending him the sell TXT now.

24   Q.   What is a buy level in the RMBS market?

25   A.   It's a price.

1    Q.   And in the AMSI bond trade that we've been looking

2    at over the two days of court, who was Cantor paying the

3    buy level to?

4    A.   So I can only speculate that he's talking about the

5    buy level from UBS.

6              MR. BAEZ:  Objection, Judge.

7              THE COURT:  Sustained.

8              MR. FRANCIS:  Sorry, Judge.

9              MR. BAEZ:  Move to strike.

10             THE COURT:  Motion granted.

11   BY MR. FRANCIS:

12   Q.   Did you know the price at this time that Cantor had

13   paid for the AMSI bond?

14   A.   I did not.

15   Q.   And that end part says, Wanted to be clear before

16   sending him that info.  Sending him the sell TXT now.

17        We did BXT.  What's "sell TXT"?

18   A.   That's a sell ticket.

19   Q.   In response to that question, Mr. Demos said, No.

20   What.

21        And then Mr. Manda, it appears, quotes from

22   Mr. Demos's earlier message.

23        Do you see what I've highlighted?

24   A.   Yes.

25   Q.   And that matches up to what appears above at

1    16:48:49?

2    A.    Right.

3    Q.    Mr. Demos responds, No.   Stop.

4          And then what does Mr. Manda say?

5    A.    Okay, that's what I thought.

6    Q.    And then he writes, So clarifying.   And what does

7    he clarify?

8    A.    Sent Ed a SXT.   Waiting for his confirmation.

9    Q.    And Mr. Demos says, Cool.

10         So did it happen that on July 6, 2012, anyone from

11   Cantor sent you what the price, the actual price that it

12   was paying to UBS for the AMSI bond?

13   A.    We knew the price to be 66 and 14 ticks.

14   Q.    What do you now know it to be?

15   A.    Sixty-five and 24 ticks.

16   Q.    So back in July 6, 2012, did anyone from Cantor

17   tell you that real information?

18   A.    No.

19   Q.    Not Mr. Manda?

20   A.    No.

21   Q.    When did you learn the true information about the

22   price that Cantor paid?

23   A.    I forget when that was, but it was a few years ago.

24   2015 maybe.

25   Q.    Who told you?

1    A.    The government.

2    Q.    That's us?

3    A.    Yes.

4    Q.    So what would have happened if Mr. Manda had sent

5    you the true information about what Cantor was paying

6    back in July of 2012?

7    A.    We would have asked for a revised ticket to reflect

8    that price.

9    Q.    So I started off by asking you back then, if you

10   trusted Mr. Demos.  Now that you know what we've walked

11   through here, do you still trust Mr. Demos?

12   A.    In this context, no.

13   Q.    I'm just going to scroll down in this document.

14   There are a few more things I want to touch on.

15        Mr. Demos is asking a question at 16:53:49.  What's

16   that question?

17   A.    What's P&L?

18   Q.    What's P&L in your industry?

19   A.    It stands for profit and loss.

20   Q.    What does Mr. Manda respond?

21   A.    90K – 15K CS = 75K.

22   Q.    Mr. Demos responds, Annoying.  Okay.

23        There's another reference -- Mr. Manda says more

24   things to Mr. Demos about tickets, and then there's a

25   reference to you or, Ed confirmed.

1        Do you see that?

2    A.   Yes.

3    Q.   And then starting at 17:10:04, Mr. Manda writes to

4    Mr. Demos.  What does he write?

5    A.   David, Bill is asking about where we bought and

6    stuff.  You want to talk to him?

7    Q.   Who was the sales coverage for Marathon at Cantor?

8    A.   Bill Biggart.

9    Q.   Mr. Demos responds at 17:10:21, Yeah, just direct

10   him to me.

11       Do you see that?

12   A.   Yes.

13   Q.   He says, He's fine, and then he gives an

14   instruction to Mr. Manda.  What does he instruct

15   Mr. Manda to do?

16   A.   You can pay him full.

17   Q.   Mr. Manda was apparently typing in the wrong window

18   and says, Okay, will do, and then, We'll pay up full on

19   this to both.

20       And then Mr. Demos writes something in response.

21   What does he say?

22   A.   Cool.  No money for me.  Money for everyone else.

23   Q.   And how does Mr. Manda respond?

24   A.   I really doubt that.  If you worked this hard to

25   get something done, there are always more and bigger

1    things to follow.

2    Q.   And then eight seconds later he continues?

3    A.   This is mainly to please the client.

4    Q.   And then a little smiley emoticon.

5         Mr. Demos writes, What about me and you?  Ha.

6         How does Mr. Manda finish this?

7    A.   Hopefully Marathon will do a lot more with us.

8              MR. FRANCIS:  May I have one moment to

9    consult, Your Honor?

10             THE COURT:  You may.

11             MR. FRANCIS:  Mr. Cong, I have no further

12   questions.  Thank you.

13             MR. BAEZ:  Your Honor, I may need a minute to

14   set up.

15             THE COURT:  Take your time.

16             MR. BAEZ:  Thank you, sir.

17             MR. FRANCIS:  Your Honor, I see Mr. Baez has

18   demonstratives.  If we could get those beforehand.

19             MR. BAEZ:  Then I'll need a minute to e-mail

20   them to him.

21             THE COURT:  Take your time.

22             I thought we were moving these.

23             MR. BAEZ:  I was going to show them to him

24   prior to publishing them to the jury.

25             THE COURT:  I thought the easel was going to

1    be over here.

2              Send me a copy of what you're sending to him

3    too, and then I won't need to see the easel.

4              (Pause.)

5              MR. BAEZ:  Your Honor, just to move things

6    along, I'm going to have my tech person go and do them

7    from over there.  I won't be displaying any

8    demonstratives.  In the meantime, once he sends them,

9    he'll connect this for what we need later.

10             THE COURT:  Sure.  Okay.  Thank you.

11             MR. BAEZ:  May it please the Court?

12             THE COURT:  Yes, whenever you're ready.

13             MR. BAEZ:  Mr. Francis, Ms. Cherry.

14             Good morning, ladies and gentlemen.

15             THE JURY:  Good morning.

16                  CROSS-EXAMINATION

17   BY MR. BAEZ:

18   Q.   Good morning, sir.

19   A.   Good morning.

20   Q.   Mr. Cong, my name is Jose Baez.  We've never met,

21   have we?

22   A.   We have not.

23   Q.   We have never spoken directly or indirectly?

24   A.   That's correct.

25   Q.   And aside from the other day when you were

1    testifying, this is the first time we have ever seen

2    each other.

3    A.    Correct.

4    Q.    You've met with the government multiple times?

5    A.    Correct.

6    Q.    And in fact, the very first time you met them was

7    back in 2015, April 15, 2015?

8    A.    I didn't recall that, but thank you for reminding

9    me.

10    Q.    Tax day.  Does that ring a bell?

11    A.    I don't recall.  It was many years ago.

12    Q.    Many years ago.  But speaking of that, that was a

13    meeting that you had at the SEC, correct?

14    A.    It was downtown Wall Street.  I think that's right.

15    I forget whose office it was.

16    Q.    Pretty scary day, right?

17    A.    It was another experience.  I don't know if I would

18    call it scary, but it was a day.

19    Q.    Let's see how scary it was.  Did you have a lawyer

20    present?

21    A.    I did, yes.

22    Q.    You had a lawyer there to protect your interests?

23    A.    I wasn't clear whether it's my interest or more

24    Marathon Asset Management's.

25    Q.    You had a lawyer representing you by the name of

1   Zachary Rosenbaum, correct?

2   A.   Yes, correct.

3   Q.   And not only did you have one lawyer, you had two

4   lawyers present to protect your interests, right?

5           MR. FRANCIS:  Objection.  Building in a fact

6   that he --

7           THE COURT:  I'm sorry.  I didn't hear the

8   objection.

9           MR. FRANCIS:  Objection.  He's building in a

10  fact that's not been established, the "protect your

11  interest" part.

12          THE COURT:  Well, he's asking a question.  He

13  can ask it as a question.

14  BY MR. BAEZ:

15  Q.   You had two lawyers there, right?

16  A.   So I didn't actually recall that, but sounds like

17  you have the --

18  Q.   Sheila Sadighi.  I may be butchering that last

19  name.  I apologize.

20  A.   Sorry, I don't remember, but Zach I do.

21  Q.   And in fact, Zach is with you today?

22  A.   Yes, he is.

23  Q.   Now, you also had general counsel from Marathon

24  present, correct?

25  A.   I believe he was present at that office that day.

1    He was not present for my portion of the proceedings, I

2    guess, if you want to call it that.

3    Q.   Was his name Andrew Rabinowitz?

4    A.   Rabinowitz.

5    Q.   I'm sorry?

6    A.   Rabinowitz.

7    Q.   Okay.  I apologize for butchering that one.

8         Now, I'm going to ask you several questions about

9    that day and that interview.  Would it help refresh your

10   recollection if I had a report handy?

11   A.   Yes.

12   Q.   I don't want you to read from it just yet, only if

13   I need to refresh your recollection, okay?

14   A.   What is that report, may I ask?

15   Q.   This would be an agent's report --

16        MR. FRANCIS:  Your Honor, I have an objection

17   to this process of refreshing.

18        THE COURT:  We'll wait and establish he needs

19   his recollection refreshed first, and then you can show

20   him a document.

21        MR. BAEZ:  Yes, sir.  I just want to save us

22   time.

23        THE COURT:  You'll walk at some point and you

24   can walk later.

25        MR. BAEZ:  Very well.

1    BY MR. BAEZ:

2    Q.   Do you recall whether he was present or not?

3    A.   Mr. Rabinowitz?

4    Q.   Yes.

5    A.   I don't think I recall him being in the room at the

6    time with me.

7    Q.   If I showed you a report from one of the agents

8    that listed who was present at that meeting, would that

9    refresh your recollection, sir?

10   A.   It may.

11           MR. BAEZ:  May I approach the witness?

12           THE COURT:  You may.

13           How much do you want him to review?

14   BY MR. BAEZ:

15   Q.   Does that refresh your recollection, sir, of who

16   was there?

17   A.   Just in the first paragraph, yes.

18   Q.   Yes.  Do you see Andrew's name there?

19   A.   I do not.

20   Q.   Third sentence down, Present with Goldberg was --

21       I'm sorry.  I have the wrong -- my mistake.  I

22   apologize, sir.  I handed you the wrong document.

23           MR. BAEZ:  May I approach?

24           THE COURT:  You may.

25

1    BY MR. BAEZ:

2    Q.   Sorry about that, Mr. Cong.  A lot of paper in this

3    case.

4            MR. BAEZ:  I actually did hand him the right

5    document.

6            MR. FRANCIS:  Maybe we can avoid -- can I see

7    what counsel is showing to the witness?  Maybe we can

8    avoid this sort of thing.

9    BY MR. BAEZ:

10   Q.   I was reading from the wrong one.  I apologize.

11       It shows you had two lawyers there, right?

12   A.   Correct.

13           MR. FRANCIS:  I'm sorry, Your Honor.  This

14   isn't refreshment.  He just can't ask about the

15   document.

16           THE COURT:  Sustained.

17   BY MR. BAEZ:

18   Q.   Do you recall now that you had two lawyers present

19   at that meeting representing you, sir?

20   A.   I see it on this document.  I don't have the

21   visualization of that.

22   Q.   Do you have any reason to doubt that you had two

23   lawyers when you were called down to speak to federal

24   agents at the SEC?

25   A.   Given this, I do not.

1    Q.   How often does that happen in your life --
2    A.   Never.
3    Q.   -- federal agents call you down to talk?
4    A.   Never.
5    Q.   Never?
6    A.   Never.  This would have been the first time.
7    Q.   Okay.  So you know now that the government's come
8    calling and they want to talk to you about a criminal
9    matter, right?
10   A.   I did not know -- I don't think I knew that it was
11   a criminal matter at the time, but I did know that they
12   wanted to talk to me, yes.
13   Q.   And on top of that, at that meeting there was
14   Special Agent O'Connor.  Do you recall meeting him
15   there?
16   A.   I do, roughly, yes.
17   Q.   And he works for SIGTARP, right?
18   A.   I wasn't -- that's not entirely clear to me, but I
19   think --
20   Q.   You didn't know what he was doing there?
21   A.   I knew he was an investigator.
22   Q.   And they had -- Mr. Marston was there?
23   A.   Correct.
24   Q.   And there was another, I guess another attorney
25   from the SEC there?

1    A.    That I just don't recall.

2    Q.    Now, sir, you knew that they wanted to speak to you

3    about these trades, right?

4    A.    I believe I did, yes.

5    Q.    But you didn't have any recollection about these

6    trades, did you, sir?  You couldn't independently

7    remember any of these trades, could you, sir?

8    A.    I don't know what I remembered at that time, but I

9    did do many trades.

10   Q.    Now, since you don't remember, if I showed you in

11   this report where it says they discussed that with you,

12   would that refresh your recollection as to whether you

13   had any independent knowledge or memory of these trades?

14   A.    It would help.

15              THE COURT:  You may.

16              MR. BAEZ:  I'm sorry.  May I approach?

17              THE COURT:  You may.

18   BY MR. BAEZ:

19   Q.    I'm referring you to Paragraph 2, sentence 2, right

20   there (indicating).

21        You didn't have any independent memory of these

22   trades, did you, sir?

23   A.    That's what this says.

24   Q.    And -- but now you do?

25   A.    I didn't say that.

1   Q.   So you really today, as you testified today and

2   Monday to the ladies and gentlemen of this jury, you

3   really have no independent recollection of what was

4   going on that day, who was sitting next to you while you

5   were at the terminal, conversations you had with your

6   partners or conversations you had with David Demos.

7        You're nodding your head correct, right?

8   A.   So specifically I have recollection around the way

9   I operated and traded in the market at the time, but

10   specific details I do need help to recollect.

11   Q.   So I just wanted to establish that.  So as it

12   relates to your memory, you know how you operate

13   because, as you sit here today, your testimony is that

14   you believe how you operated then is consistent with

15   your memory today, right?

16   A.   I did do many trades at that time so there was a

17   body of evidence, call it lot of large numbers in the

18   way that I operated, so that's what I'm drawing upon.

19   Q.   And so the answer to my question is yes, right?

20   A.   Can you repeat your question specifically.

21   Q.   Yes, sir.

22        So basically what you're testifying to today and on

23   Monday are your memory as you sit here today as to how

24   you believe you operated back then?

25   A.   How I believe and how I highly likely operated back

1    then.

2    Q.   And everything that you testified on both days,

3    you're just reading from the chats, correct?

4    A.   There was a lot of that, yes.

5    Q.   But independently, you couldn't recall typing that

6    stuff, you don't recall what you were thinking at the

7    time, you don't recall the conversations you had with

8    David at the time, right?

9    A.   I think maybe you could be more specific than that.

10   Q.   I'll repeat it.  I don't know if I can be any more

11   specific than that.

12        What you testified to just now, you said that you

13   don't have an independent memory of what happened back

14   then, but all you can say today is, "Yeah, that's a

15   chat, it says me, and I'm reading the chats," correct?

16   A.   Again, I think that there is a large body of work

17   and trades behind what I've testified to.  I don't

18   really know how to address your comment as to not

19   remembering specific details.

20   Q.   I'll sum it up:  You don't have any independent

21   recollection of those trades.  All you have are these

22   documents that are handed to you and you're using that

23   based on the way you trade?

24   A.   Exactly.

25   Q.   You mentioned during direct examination on Monday

1    that PPIP was one of your investors?

2    A.    Yes.

3    Q.    That is the government, right?

4    A.    It was a government program, yes.

5    Q.    And Agent O'Connor here is SIGTARP from the PPIP,

6    right?

7    A.    I don't know the exact relationship between SIGTARP

8    and PPIP, but they were involved, yes.

9    Q.    Back in 2015, when you had no independent memory of

10   this, was this meeting recorded?  Did anybody press a

11   tape recorder?

12   A.    I don't recall.  I don't think so.

13   Q.    Do you think police have any tape recorders?  Did

14   they ask you to record it?

15   A.    Do police have tape recorders?

16   Q.    Yeah.  Did Agent O'Connor say, "I'd like to record

17   you," and you said, "No, I don't want to?"

18   A.    I don't recall us having a conversation about that.

19   Q.    So they could have recorded it if they wanted to?

20   A.    I mean, can they?  I don't know legally what they

21   can do.

22   Q.    And so basically what happened at that meeting

23   where you had the two lawyers and the government on the

24   other side and they're calling you in to discuss things,

25   they refreshed your recollection, right?

1   A.   We went through Bloomberg chats about the trades,

2   yes.

3   Q.   And there's no recording or anything so these

4   ladies and gentlemen of the jury can see exactly what

5   was spoken at that first meeting, correct?

6   A.   I'm not really sure I'm the person to ask about

7   whether there was a recording in the room.  I don't know

8   actually.  I would have been fine with a recording.

9   Q.   You would have been fine with that, right?

10  A.   But -- yeah.

11  Q.   You would have been fine with them recording you,

12  right?

13  A.   Sure.

14  Q.   You would agree, if they had recorded you, if

15  there's any dispute as to what you said, that would be

16  the best evidence of what you actually said, not some

17  report that you can look at, right?

18  A.   I suppose, yeah.

19  Q.   You'd rather the jury interpret your words, not the

20  words of an agent saying you said, right?

21  A.   My words are my words.

22  Q.   And you want the jury to know your words, not his

23  interpretation of your words, right?  Would you agree

24  with that?

25  A.   Yes.

1    Q.   You're aware, sir, that this -- that PPIP has its

2    own, I guess, police force that is investigating any

3    potential fraud in the PPIP fund; is that correct?

4    A.   Actually, I do not know that.  I don't know the

5    structure of that.

6    Q.   Let me take that one step down.

7         You know, sir, that if you take money from the

8    government, they've got government agents, right?

9    A.   I assumed that there was government oversight.

10   Q.   You don't have any other investors with that kind

11   of muscle, do you, sir?

12   A.   You mean financial muscle?

13   Q.   No, I'm not talking about financial muscle.  I'm

14   talking about police force.

15   A.   No.  I don't know that.  Maybe some of our

16   investors have something like that.  I hope not.

17   Q.   They came in here and they wanted to talk to you

18   about their fund and you have certain specific

19   requirements, reporting requirements?

20   A.   Yes.

21   Q.   That report, can you look at it and see if it says

22   anything about what time the interview --

23              MR. FRANCIS:  Objection.

24              THE COURT:  Sustained.

25              MR. BAEZ:  Let me rephrase it.

1    BY MR. BAEZ:

2    Q.   Do you know what time this interview started?

3    A.   I do not.

4    Q.   Do you know what time it finished?

5    A.   I don't recall.

6    Q.   Do you know how long they spoke to you?

7    A.   Not specifically, no.

8    Q.   Do you think it might refresh your recollection if

9    you looked at that document and saw if they indicate

10   that?

11   A.   In terms of timing, yes.

12   Q.   Go ahead and take a quick look and see if it says

13   anything like that.

14   A.   I see just time stamps around the chats.

15   Q.   That's it, right?  So we have no idea how long this

16   interview lasted.

17   A.   Is there anything in here about that?

18   Q.   I can't answer that.  You're the one that's

19   testifying, sir.

20   A.   That's what I see is just the chat time stamps.

21   Q.   All right.  And there's no -- let me ask you

22   something else.

23        Those two lawyers that represent you, they also

24   represent Stu Goldberg, correct?

25   A.   Correct.

1    Q.   And Stu Goldberg, for everybody's recollection, is

2    your boss at Marathon?

3    A.   I'm actually not clear exactly who is being

4    represented, if it's Marathon or us individually.

5    Q.   So you don't know if it's protecting your interests

6    or Marathon's interests.

7    A.   I think it's Marathon, Marathon's interests.

8    Q.   They're the ones that paid for these lawyers?

9    A.   I believe so, though I'm not sure exactly what the

10   arrangement is.

11   Q.   And so when they're advising you, they're giving

12   you advice to protect Marathon's interests, not yours.

13   A.   I'd have to think about how those two are

14   different.

15   Q.   Let me pose this for you:  You know there's a

16   criminal investigation because they've got federal

17   agents, right?

18   A.   Okay.

19   Q.   Okay.  And there may be a distinction by what you

20   do versus what Stuart Goldberg does and what Marathon

21   does as well, correct, as a company?

22   A.   I'm just really not familiar with this relationship

23   so I'm not comfortable answering that question.  I'm

24   sorry.

25   Q.   You can't make the distinction between your

1    interests and Marathon's interests?

2    A.   I haven't really kind of thought that through.

3    Q.   Okay.  Well, think it through.  Could there be a

4    distinction about what your interests might be to

5    protect you from criminal charges versus Marathon?

6    A.   I'm not sure.  I'd have to think about that longer.

7    Q.   All right.  Now, sir, you're well aware how this

8    market works, right?

9         Yes?

10        RMBS.

11   A.   I've done many trades in this market.

12   Q.   And you're aware, sir, that when you -- for

13   example, you have a fiduciary duty to your clients,

14   correct, to your investors?

15   A.   Is that a legal question, fiduciary?

16   Q.   That's not a legal -- well, you have a duty to your

17   investors.  You testified during direct examination to

18   that, correct?  Remember that?

19   A.   As far as I know, our duty to our investors is to

20   generate them the highest rate of return with

21   transparency and integrity.

22   Q.   And you realize that it's a fiduciary duty, right?

23   You have to put their interests before yours.

24   A.   I don't know -- I know the "fiduciary" word is a

25   legal definition now that's been thrown around.  I don't

1    know that there's a legal and binding connection -- I

2    actually don't know, there may be -- between the

3    investment management team and our investors.

4    Q.   So you've been trading in this market all this time

5    and you have no idea whether you have a fiduciary duty

6    to your investors?

7    A.   Around that word, "fiduciary," we operate as if we

8    do.

9    Q.   So you do have a fiduciary duty to your investors.

10   A.   We operate as if we do.

11   Q.   But you don't necessarily believe that?

12   A.   I do believe it.  I just don't know the legal --

13   Q.   I'm not asking you anything further than that.

14   A.   Sure.

15   Q.   And that would include you have a duty to the PPIP

16   fund, right?

17   A.   I would extend the same comments to the PPIP fund.

18   Q.   Now, as I said earlier, you're aware that when you

19   speak to -- when you're doing a trade with David, he

20   doesn't -- you don't have a fiduciary duty to him,

21   right?

22   A.   I don't believe so.

23   Q.   And he doesn't have a duty to you, right?

24   A.   Legally correct.

25   Q.   So you guys are negotiating on opposite sides of

1    the table, right?

2    A.   In what --

3    Q.   Let me take it a little step further and add to

4    that question.

5         As it relates to the five counts in this case, why

6    you're here today, I guess today you testified the only

7    trade that you talked about was Count Two, right?

8    A.   Which is -- is that the AMSI?

9    Q.   The AMSI trade.

10   A.   Yes.

11   Q.   So in that context David didn't have a duty to you,

12   did he?

13   A.   I don't believe David had a legal duty to us.

14   Q.   And you didn't have a legal fiduciary duty to

15   David.

16   A.   I believe that's correct.

17   Q.   So when you're negotiating these bonds, you're

18   aware that you're negotiating, right?

19   A.   As we discussed yesterday, there are different

20   circumstances and types of negotiations.

21   Q.   I'm going to specifically limit it to the AMSI

22   bond.  Okay?

23   A.   Sure.

24   Q.   I'm sorry, sir.  Your first initial, what is it?

25   A.   E.

1    Q.   B?

2    A.   E as in Ed.

3    Q.   Sorry.  I know you have a middle name.  I thought

4    of that.

5         Now, you two don't have a duty together, you and

6    David, correct?

7              MR. FRANCIS:  I'm sorry, Judge.  I'm not sure

8    that the witness can see.

9              THE COURT:  Actually, usually when people are

10   using this they put it right over here in that corner

11   and then the jury can see it, the witness can see it,

12   everybody can see it.

13             MR. BAEZ:  May I move it over there?

14             THE COURT:  Sure.

15             MR. BAEZ:  Can everyone see that?

16             THE COURT:  Maybe a little more this way.  I'm

17   not sure the witness can see it now.

18   BY MR. BAEZ:

19   Q.   Can you see that?

20   A.   Yes.

21             MR. BAEZ:  Can you see that, sir?

22             JUROR:  Yeah.

23   BY MR. BAEZ:

24   Q.   As I mentioned, the two of you don't have a duty to

25   each other, right?

1          Correct?

2     A.   Correct.

3     Q.   Now, when you bought the AMSI bond, he bought it

4     from somebody else, right?

5          Correct?

6     A.   Yes, he did.

7     Q.   He didn't have that in stock, right?

8     A.   That appears to be the case.

9     Q.   David Demos is a dealer of these bonds, correct?

10    A.   Yes.

11    Q.   Now, David also doesn't have a fiduciary duty to

12    the seller either, does he?

13    A.   I don't believe so.

14    Q.   So nobody has any legal obligations to one another,

15    right?

16         Is that a yes?  You're nodding your head.  You have

17    to answer yes.

18    A.   So what I would say is that nobody has any legal

19    obligations as I know them.  I don't know what the

20    obligations of a broker-dealer are to the buyer and

21    seller legally.

22    Q.   But you've been trading in this market for how many

23    years?

24    A.   I have been at Marathon for 12 years.

25    Q.   And in those 12 years, sir, prior to January 28,

1    2013, you had never heard of anyone getting arrested for

2    any of this, right?

3    A.   Arrested, no.

4    Q.   Okay.  So back when you were making this AMSI

5    trade, you had no idea that -- you had no knowledge that

6    anyone had ever been arrested for making

7    misrepresentations on price, right?

8    A.   I believe that's correct, yes.

9    Q.   Now, since neither one of you have any duties to

10   one another, you start off with a bid, right?

11   A.   So --

12   Q.   On the AMSI bond.  We're still talking about the

13   AMSI bond.

14   A.   Yeah.

15   Q.   You start off with a bid, right?

16   A.   I recall -- we did start off with a bid.  I don't

17   know if there was an offer potentially before that,

18   verbally potentially, what have you, but the chats

19   started with a bid that we reviewed.

20   Q.   You testified on Monday about having your models,

21   correct?  Your computer models?

22   A.   Yes.

23   Q.   And your analytics?

24   A.   Correct.

25   Q.   And when you talk about these analytics, that is

1    what separates Marathon apart from other hedge funds,

2    right?

3    A.   We put a lot of care and pride into building our

4    models.  I'm not one to generally comment that it

5    separates us from other people.  I usually let objective

6    third parties do that.  We do have many investors.

7    Q.   It's one of the things -- that's one of things that

8    you use to tell investors that they should invest in

9    Marathon, right?  Because of your analytics, right?

10   A.   It is one of the things we discuss in investor

11   meetings, yes.

12   Q.   And in fact, you recalled for the agents that you

13   remember being called in to do a dog and pony show,

14   right?

15   A.   Demonstration, yes.  I'm not sure I called that --

16   Q.   So you've done this dog and pony show -- you did

17   the dog and pony show for the government or for other

18   investors?

19   A.   Again, I was not involved in the application and

20   front-facing part of the government application, but for

21   other investors I was, yes.

22   Q.   And part of the dog and pony show is to basically

23   show and talk about your analytics, how complex they

24   are, right?

25   A.   I actually -- we don't necessarily harp on the

1    complexity.  What we do is we try to demonstrate our

2    investment process and try to explain it in as a

3    digestible way as possible.

4    Q.   In the RMBS market, in the RMBS market, you have

5    three analysts dedicated just to that, right?

6    A.   For a long time we've had at least two.  Now we

7    have three.

8    Q.   So you have three people whose only job is to enter

9    in all of this data and try and determine which bonds

10   you decide you want to invest in.

11   A.   That's not their only job, but that was a big part

12   of their job, yes.

13   Q.   And in addition to that, you look at it, right?

14   A.   Sure.  I did provide some input and feedback into

15   the model.  Yes.

16   Q.   I'll write up here AMSI so we know we're still

17   talking about that.

18        In addition to that, you also have Stu Goldberg

19   that looks into these -- that discusses these analytics,

20   correct?

21   A.   I mean, we discussed and he was somewhat involved.

22   Q.   And Stu sits right next to you at the office.

23   A.   He no longer does.

24   Q.   He used to.

25   A.   He did, yes.  Right behind me.

1    Q.   At this time he sat next to you.

2    A.   Right behind me.

3    Q.   At the time you guys purchased this bond, he sat

4    right next to you, right?

5    A.   I actually don't remember, to be honest with you.

6    I think he did.  I think he was actually -- he was

7    definitely near me.

8    Q.   And you had to run things by him, right, before you

9    made a decision?

10   A.   That wasn't always the case.  He was one of the

11   head portfolio managers.  He absolutely set the

12   investment themes and subsector investment profiles for

13   the portfolio, asset allocation.  To the extent

14   something kind of met that profile, I did have

15   discretion to invest.

16   Q.   When you guys focus in on a bond and you say,

17   "Okay, we want to look at this bond a little bit

18   closer," you run everything through your models, right,

19   all the numbers?

20   A.   In most cases, yes.  In some cases the information

21   was not available and we had to --

22   Q.   I'm sorry.  I didn't mean to cut you off.

23   A.   In some cases the information that we needed to

24   feed the model was not available.  We had to make some

25   assumptions, simplify assumptions.

1    Q.   Within those models, once you have that, it gives

2    you an idea of the price that you want to pay for these

3    bonds, right?

4    A.   The models are much more about -- the output of the

5    model is, again, it puts out a profile of the

6    investment, the cash flows that we were discussing on

7    Monday.  And yes, we would take that and put it side by

8    side with the prices and we would get a return profile,

9    investment return profile across different economic

10   scenarios.

11   Q.   And it gives you a range as to where you may want

12   to start negotiating for these bonds, right?

13   A.   The model does nothing with respect to price.

14   Q.   You decide -- once you have these figures, you then

15   decide a range of where you want to start negotiating

16   within these bonds?

17   A.   The model, that would be an input from our side,

18   based on kind of where the market is kind of framed, but

19   prices are put together with the model outputs.

20        Does that answer your question?

21   Q.   And you have a range, right, of where you want to

22   discuss price?

23   A.   Right.  But the model is not setting that range.

24   Q.   I'm aware of that.  You get all the figures, you

25   look at the bond and then you determine a range of where

1    you want to negotiate and purchase a bond.

2    A.    Correct.  We determine a range, yes.

3    Q.    And once you have this range, sir, you don't tell

4    David the very top of that range, do you?

5    A.    We would not tell David that, correct.

6    Q.    You start at the bottom of that range, right?

7    A.    That's not always the case, but we start somewhere

8    in the range.

9    Q.    Okay.  You start somewhere in the range but not the

10   top level, right?

11   A.    That's actually not always true.

12   Q.    Well, you start somewhere in the range, as you

13   testified, right?

14   A.    Yeah.

15   Q.    So with the AMSI bond, where were you in that range

16   with your first bid?

17   A.    I don't know.

18   Q.    You have no recollection, right?

19   A.    I don't recall.

20   Q.    So you can't testify to that, but you know you

21   eventually went up, right?

22   A.    We did go up, yes.

23   Q.    Now, if a bond's price is higher than what you're

24   willing to pay for it, you don't pay for it, right?

25   A.    Can you repeat the question.

1    Q.   If bond price costs too much.  I'll break it down

2    as simple as you want.

3    A.   Yeah, yeah.

4    Q.   If a bond price is too much, you won't pay for it,

5    right?

6    A.   Right.  If there's --

7    Q.   Because you have a duty to your investors.

8    A.   We have a threshold above which we will not go.

9    Q.   As relates to the AMSI bond, Count Two, you started

10   lower, not at the top of your range, right?

11   A.   I don't recall what the range was.

12   Q.   You went up --

13   A.   We did.

14   Q.   Do you recall reading on Monday how you went up in

15   price?

16   A.   Right.  But you were talking about the top.  I

17   don't know where it was in the range.  It was just in

18   the range.

19   Q.   My point is, you didn't start at the top, right?

20   A.   I guess not.

21   Q.   So you made a representation to David that was

22   below what you were willing to pay for it, right?

23   A.   Sorry.  Can you repeat the question.

24   Q.   You represented to David that you wanted to pay a

25   certain price that was below the top price that you

1    would pay.

2    A.    What do you mean by "represented to David"?

3    Q.    You placed a bid.  You talked to David.  You

4    chatted with David.  You told David.  Phone call, chat,

5    e-mail or smoke signal.  You indicated to David in one

6    shape or form a price that was less than what you were

7    willing to pay, right?

8    A.    We made a bid on a bond just like any other bid.

9    Q.    So the answer to my question is yes, right?

10   A.    We just made -- you said a lot of words.  We bid

11   for a bond, to buy a bond.

12   Q.    Sir, I'll break this down as simple as you like.

13   A.    Okay.  Please.

14   Q.    Your offer to David for that bond, for the AMSI

15   bond, was less than what you were willing to pay, right?

16   A.    Yes.

17   Q.    Now, sir, you didn't have a duty to tell David the

18   truth of how much you were willing to pay, did you?

19   A.    No.

20   Q.    And in fact, you didn't disclose that to David,

21   "This is the most that I want to pay for this bond?"

22   A.    We did not disclose to David our range, correct.

23   Q.    So you made a representation to David that omitted

24   something, right?

25   A.    I feel like "representation" is a strong word.

1    Q.    You don't like the word "representation?"

2    A.    I don't like the word.

3    Q.    Okay.  You made a bid to David that omitted the

4    fact that you were willing to pay more.

5    A.    That's correct.

6    Q.    And you did so because you don't have a duty to

7    tell David the truth about where -- what your ceiling

8    is, right?

9    A.    That's fair.

10   Q.    And David doesn't have that duty to you, right?

11         We went over this.  It should be easy to answer.

12   A.    Right.

13   Q.    And David doesn't have that duty to him, the

14   seller, him or her?

15   A.    Right.  As I understand it.  And again, that's as I

16   understand it between Marathon and --

17   Q.    And by the way, I forgot to ask you this:  The RMBS

18   market is fairly small, the community, right?  The

19   investment community?

20   A.    What do you mean by "small"?

21   Q.    Not a lot of people trade RMBS mezzanine-level

22   bonds, right?

23   A.    You have to frame that.  What do you mean?

24   Q.    How many people, sir, would you say trade in the

25   RMBS mezzanine-level of bonds?

1    A.    I don't know the answer to that.

2    Q.    How many people have you dealt with that you know?

3    A.    I mean, there are dozens of investors in this

4    sector.

5    Q.    Dozens.  We're not talking about thousands, right?

6    A.    Probably not thousands of large investors, correct.

7    Q.    That's why on January 28, 2013, when a trader was

8    arrested, you recall that, right, because you had never

9    heard of such a thing before?

10   A.    I don't recall that moment, but that happened.

11   Q.    Now, sir, you know that sort of negotiation stuff

12   goes on, right?  In fact, you're doing it with the AMSI

13   bond, right?

14   A.    Negotiation does happen.

15   Q.    And part of the negotiation process is not showing

16   your cards, right?

17   A.    I guess that's a way to put it.

18   Q.    Now, sir, you came in to testify not about

19   Count One, not about Count Two, the very first bond you

20   testified to was the Harborview bond, right?

21   A.    Yes.

22   Q.    That's an uncharged trade in this case, right?

23   A.    I believe that's the case.

24   Q.    Do you recall going over all those chats on Monday

25   with Mr. Francis?

1    A.    On Monday, yes.

2    Q.    Now, as it relates to information, you know that

3    David, when he trades bonds, he thrives in secrecy,

4    right?

5    A.    That's a question for David.  I don't know that.

6    Q.    You don't know that?

7    A.    I don't.

8    Q.    Okay.  Now, but you know that -- well, let me -- I

9    should preface it all by asking you this:  Sir, the

10   reason there are dealers is because they're necessary in

11   the RMBS market, correct, to buy and sell these bonds?

12   A.    I think that dealers may be necessary in any

13   over-the-counter market.

14   Q.    And the reason they are is because you don't want

15   other hedge funds knowing what investments you're

16   making, right?  You like to keep that information to

17   yourselves, right?

18   A.    Well, I mean, I would start with, I mean, I think

19   dealers are there to serve a transaction purpose.  We

20   have to clear bonds through dealers.

21   Q.    And the dealers buy these bonds, right?

22   A.    The dealers, I guess, technically buy and sell

23   these bonds.

24   Q.    Let's talk technically since you want to qualify

25   that answer.

1    A.    Sure.

2    Q.    If you decide within that three-day settlement

3    period not to buy it, the dealer is stuck with the bond,

4    right?

5    A.    That's theoretically possible.  I never thought to

6    break a trade.

7    Q.    But that's the way it works.  I don't want to talk

8    about theories or speculation or hypotheticals.  That's

9    the way it works, right, sir?  If you don't pay, they're

10   stuck with the bond.

11   A.    I believe that's the case.  I don't know exactly

12   because I've never done that.

13   Q.    In fact, dealers also have their own bonds that

14   they've already previously purchased, right?

15   A.    They do have their own balance sheet, yes.

16   Q.    I guess the term "dealer" accurately reflects them,

17   correct?  They buy these things; they deal in them; they

18   sell them, buy them, that sort of thing, right?

19   A.    They also broker them.

20             THE COURT:  Mr. Baez, let me know when you're

21   at a convenient transition point and we'll take our

22   break.

23             MR. BAEZ:  Yes, sir.

24   BY MR. BAEZ:

25   Q.    What we're talking about within these five charged

1    counts, right now you're talking about AMSI.

2    A.   Yes.

3    Q.   He's dealing this bond to you, right?

4         You guys are at opposite ends of the table.  He's

5    not brokering anything for you?

6    A.   Can you just define what you mean by "dealer."

7    Q.   You don't know what the term "dealer" means, sir?

8    A.   Versus broker.

9    Q.   Right.  As it relates to David Demos with the AMSI

10   bonds, sir, he was acting in the capacity of a dealer to

11   you, correct?  This was a principal-to-principal

12   purchase.

13   A.   That is not how I viewed it.

14   Q.   So you were unaware that -- you were unaware that

15   this was a principal-to-principle transaction?

16   A.   So from my perspective, as I had mentioned, I have

17   not ever broken a trade in the T-plus-three settlement

18   period.  In my mind it was an investment or transaction

19   between myself and the seller and it was a riskless

20   transaction for Cantor Fitzgerald.

21   Q.   I don't want to talk about what's in your mind.  I

22   want to know what actually happened.

23        You know this transaction, do you not, sir?  You

24   know you bought this bond from Cantor Fitzgerald, right?

25   A.   That's -- so that is what the trade ticket said,

 1    yes.

 2    Q.    That's what the transaction is, right?

 3          There's no ambiguity as to the actual trade ticket,

 4    the transaction, everything that has do with the buying

 5    and selling of the AMSI bond from Cantor Fitzgerald to

 6    Marathon.  There's no ambiguity.  You bought that,

 7    Marathon bought that from Cantor Fitzgerald, right?

 8    A.    So from a settlement perspective, we did.  The

 9    mechanics are that we purchased it from Cantor

10    Fitzgerald.

11    Q.    Where he got that bond is irrelevant in that trade

12    ticket, in that contract that you settled between Cantor

13    Fitzgerald and Marathon, right?  It's not mentioned at

14    all, right?

15    A.    This part is a little bit unclear for me because,

16    as you saw in the chats, the negotiations were framed as

17    between buyer and seller.

18    Q.    I understand that.  But you just talked about --

19    you just testified that you omitted things in your

20    negotiations, and you have no duty to David and David

21    has no duty to you.

22          Stands to reason he omitted some things too, right?

23    A.    Sorry.  Can you repeat the question.

24    Q.    It stands to reason -- sir, you know that dealers

25    don't always share all the information with buyers,

1    correct?

2    A.    In what specific situations are you referring to?

3    Q.    In this AMSI trade, sir.  You're sophisticated

4    enough to know, sir, that when you're buying a bond in

5    this market, specifically in this transaction, that

6    there may be things, since he doesn't have a duty to

7    you, that he's withholding from you, right?

8    A.    I can just speak to the way I believe I viewed

9    it --

10   Q.    That's not my question.

11              THE COURT:  We're going to take our break.

12              MR. BAEZ:  Yes, sir.

13              THE COURT:  We'll pick up with this when we

14   come back.

15              (Whereupon, a recess followed.)

16

17              THE COURT:  We'll bring in the jury.

18              I'll ask our witness to retake the stand, if

19   you would, sir.

20              MR. FRANCIS:  Your Honor, I'll just flag that

21   all the demonstratives, some of them aren't based on

22   anything that's actually in evidence yet, I think

23   potentially with one exception.  We're trying to match

24   them up.  We asked defense counsel if they could tell us

25   if any of their exhibits are duplicates of ours and they

1    said no.

2              MR. BAEZ:  So who did you speak to?

3              MR. FRANCIS:  Well, I spoke to you, I spoke to

4    Mr. Spiro.

5              MR. BAEZ:  You asked me to do what?

6              THE COURT:  I believe the question was:  Are

7    any of the defense exhibits duplicates of government

8    exhibits.

9              MR. BAEZ:  I would imagine that there are

10   many.

11             THE COURT:  No.  On the demonstratives here.

12             Mr. Francis I think is raising a concern that

13   you're about to show things on the demonstratives that

14   are not in evidence.

15             We'll do it this way:  If there's going to be

16   a use of something that's a demonstrative, it will first

17   have to be shown that it's in evidence.

18             We'll bring the jury in.

19             And I'll repeat:  And so the jury is not

20   confused, we'll have to use the number of the exhibit

21   that is in evidence.

22             MR. BAEZ:  If not, we'll move them into

23   evidence.

24             THE COURT:  You can do that too.

25             MR. BAEZ:  Yes, sir.

1           (Pause.)

2               (Whereupon, the jury entered the

3       courtroom.)

4               THE COURT:  Please be seated, everyone.

5               Okay.  Whenever you're ready, Mr. Baez.

6               MR. BAEZ:  If it please the Court.

7       BY MR. BAEZ:

8       Q.   Mr. Cong --

9       A.   Yes, sir.

10      Q.   -- you recall when we testified about the AMSI bond

11      and how you entered in the lower bid and you omitted the

12      top price that you would have paid for it.

13          Do you recall that testimony?

14      A.   Yes.

15      Q.   When you met with the government, did they tell

16      you, you were committing a federal crime by omitting

17      something in the RMBS market?

18      A.   They did not tell me that.

19      Q.   And you had no knowledge that by omitting something

20      in the connection of a trade, that that would be a

21      federal crime, right?

22      A.   Can you repeat the question, please.

23      Q.   You had no knowledge, sir, that if you omit

24      something in the connection of an RMBS trade of a

25      security, that would be security fraud.  You had no

 1    knowledge of that?

 2    A.   Omit something at all?

 3    Q.   Omit information that you would -- as it relates to

 4    the price.

 5          MR. FRANCIS:  Objection, Your Honor.  I think

 6    Mr. Baez is either mischaracterizing evidence or trying

 7    to instruct --

 8          MR. BAEZ:  I object to the speaking objection,

 9    Judge.

10          MR. FRANCIS:  -- or instructing on a matter of

11    law.

12          THE COURT:  Sustained.  I think we are getting

13    into a matter of law.

14    BY MR. BAEZ:

15    Q.   They didn't discuss with you any potential crimes

16    in the negotiation process of this bond, did they?

17    A.   I don't recall.

18    Q.   Now, you mentioned your lawyer's here today?

19    A.   Yes.

11:22:55:22  20    Q.   During my first part of my cross-examination, did

21    you see him standing up and making any gestures to you?

11:23:04:12  22    A.   I did not.

11:23:05:22  23    Q.   Was he standing up at any time?

11:23:09:07  24    A.   I don't recall.

11:23:11:12  25    Q.   Now, sir, I want to get back into what we were

1    discussing, where we left off beforehand.  We were

2    discuss the Harborview trade.

11:23:24:28        Do you remember that?  That's the uncharged --

11:23:28:07   A.   I didn't recall we were done with AMSI.

11:23:32:22   Q.   That's the uncharged trade that you first testified

6    to on Monday, right?

11:23:36:25   A.   Correct.

11:23:38:04   Q.   Now, remember we're talking about not posting

9    information.  That's the topic we were talking about,

10   how you don't always want the prices that you're buying

11   these bonds out there, correct?

11:23:59:12   A.   I don't recall that we were having that

13   conversation actually.

11:24:02:01   Q.   Well, I'm asking you now:  When you buy a bond from

15   a dealer, you don't always want the price that you're

16   buying that bond out there, do you, sir?

11:24:14:05   A.   We may not.

11:24:15:28   Q.   And sometimes when you sell a bond, you don't want

19   the price that you sold it for out there either, right?

11:24:25:12   A.   We may not either.

11:24:27:12   Q.   So having a dealer where you don't know how much

22   they're buying and selling sometimes plays into your

23   investment strategies, right?

11:24:39:12   A.   Can you repeat the question, please.

11:24:42:12   Q.   Sometimes -- having a dealer where you can decide

1    when and when not to post information about how much you

2    buy or sell bonds for, it's helpful for your investment

3    strategies, right?

11:24:54:03  4    A.   So I wouldn't say that that is something that I

5    think about with respect to broker-dealers.

11:25:03:15  6    Q.   I'm not referring to broker-dealers.  I'm talking

7    in terms of you.

11:25:08:09  8    A.   In terms of our investment strategy, that is not

9    something that I think that much about.

11:25:12:12  10   Q.   Okay.  Let's see how much you were thinking about

11   it on the first trade, the Harborview trade.

11:25:25:01  12        MR. BAEZ:  I'm referring to Defense

13   Exhibit 471, which has already been admitted into

14   evidence.

11:25:30:07  15        MR. FRANCIS:  No, it is not.

11:25:31:16  16        THE COURT:  I don't believe --

11:25:32:10  17        MR. BAEZ:  The government entered it and I

18   don't have their --

11:25:35:10  19        THE COURT:  What you want to do is you want to

20   enter a defense exhibit, right?

11:25:40:12  21        MR. BAEZ:  Yes, sir.

11:25:41:28  22        THE COURT:  This is the same as a government

23   exhibit?

11:25:45:01  24        MR. FRANCIS:  I don't believe so.

11:25:47:15  25        MR. BAEZ:  It's the Harborview chat.  It's an

        1    excerpt from that.  I would refer to time stamps --

11:25:55:22      MR. FRANCIS:  It's not.  I'm sorry.  I think

        3    it's a different date.

11:26:02:07      MR. BAEZ:  3/22/12, 15:11:30.

11:26:08:08      MR. FRANCIS:  The HVMLT trade we went over,

        6    Your Honor, was December 6, 2011, four months earlier.

11:26:25:07      MR. BAEZ:  This might be helpful:  We would

        8    move Defense Exhibit 471 into evidence, Your Honor.

11:26:32:12      MR. FRANCIS:  Government objects.  It's

        10   hearsay, not being offered for a proper purpose.  Also

        11   not sure as to its relevance.

11:26:41:01      THE COURT:  Objection sustained.

11:26:42:01      MR. BAEZ:  Your Honor, this is not hearsay.

        14   It's specifically a statement made by Mr. Cong.

11:26:49:15      THE COURT:  He's not a party.

11:26:51:00      MR. BAEZ:  I understand that, but I'll be

        17   asking him a statement as it relates to it.

11:26:56:12      THE COURT:  I understand.

11:26:57:06      MR. BAEZ:  I'll rephrase it.

11:26:58:12  BY MR. BAEZ:

11:26:59:00  Q.   Mr. Cong, do you ever mention in the -- do you ever

        22   mention that sometimes you don't want anchor points

        23   floating around?

11:27:10:02      MR. FRANCIS:  Objection.  It's a vague

        25   question without a time frame.

11:27:13:09    1                    THE COURT:  Let me just ask the witness:  Do

        2        you understand the question, sir?

11:27:20:19    3                    THE WITNESS:  Could you repeat that question.

11:27:22:25    4                    MR. BAEZ:  Sure.

11:27:23:22    5        BY MR. BAEZ:

11:27:23:22    6        Q.   In March of 2012, as you were buying and selling

        7        RMBS bonds, would you have made the statement or would

        8        you make a statement that you don't want anchor points

        9        floating around?

11:27:41:01   10        A.   I don't know that I would make a statement

       11        specifically with those words.

11:27:46:01   12        Q.   If I showed you your statement of where you made

       13        that statement, would that refresh your recollection?

11:27:51:05   14                    MR. FRANCIS:  Objection.  He didn't testify he

       15        didn't recall.  He just disagreed.

11:27:55:21   16                    THE COURT:  Why don't you clarify his

       17        position, Mr. Baez.

11:27:59:21   18                    MR. BAEZ:  Sure.

11:28:00:05   19        BY MR. BAEZ:

11:28:00:05   20        Q.   If I showed you a document where you said that in a

       21        chat, would that refresh your recollection as to whether

       22        you said it or not, sir?

11:28:08:02   23                    MR. FRANCIS:  That's the same objection,

       24        Judge.  He didn't clarify.

11:28:11:22   25                    THE COURT:  Why don't you establish that he

1      has no recollection and refreshing would be helpful.

11:28:18:00  2          MR. BAEZ:  Sure.

11:28:27:21  3      BY MR. BAEZ:

11:28:27:21  4      Q.  Sir, I'm going to show you a chat for which --

11:28:33:06  5          MR. BAEZ:  May I approach the witness?

11:28:35:09  6          MR. FRANCIS:  I object.

11:28:41:15  7          THE COURT:  Why don't you confront him with

8      what you want to confront him with, see if he recalls it

9      or not, and then you'll be able to refresh his

10     recollection.

11:28:53:06  11     BY MR. BAEZ:

11:28:53:06  12     Q.  Sir, do you recall making a statement on March 22,

13     2012, at 15:11 in the afternoon in reference to a

14     question by David Demos as to whether he wants you to

15     post information and you made the statement, How about

16     just trades --

11:29:10:28  17         MR. FRANCIS:  Objection, Your Honor.

11:29:10:28  18     BY MR. BAEZ:

11:29:10:28  19     Q.  -- we don't want anchor points floating around?

11:29:14:28  20         MR. FRANCIS:  Objection.  He's publishing.

11:29:17:12  21         THE COURT:  No.  I'll allow this one.

11:29:20:22  22     A.  I don't recall making that statement.

11:29:22:02  23     BY MR. BAEZ:

11:29:22:02  24     Q.  If I showed you this statement, would that refresh

25     your recollection, sir?

11:29:27:01   A.   It may.

11:29:28:22        MR. BAEZ:  May I approach?

11:29:29:28        THE COURT:  You may.

11:29:31:01   BY MR. BAEZ:

11:29:31:05   Q.   The question is on this page and then your answer

is on the following.

11:29:42:29        MR. FRANCIS:  I'm sorry.  And the pending

question is whether reading that refreshes his

recollection?

11:29:47:29        THE COURT:  Yes.

11:29:49:05   BY MR. BAEZ:

11:29:50:11   Q.   After reading that, does that refresh your

recollection, sir, that you made that statement?

11:29:57:11   A.   Just about these specific statements.

11:29:59:20   Q.   Okay.

11:30:01:26        MR. BAEZ:  May I publish to the jury this

statement, Your Honor?

11:30:06:08        THE COURT:  No.  It's not in evidence.

11:30:08:05   BY MR. BAEZ:

11:30:08:12   Q.   Now, what do you mean, sir, about you don't want

anchor points floating around?

11:30:17:02   A.   I wouldn't recall in that situation.

11:30:20:24   Q.   Okay.

11:30:21:06   A.   I can speculate.

11:30:22:22   Q.   Anchor points, when you make that statement it

1      means that you don't want other people knowing what you

2      paid for that bond; is that correct?

11:30:32:18   3      A.   Or it could possibly have meant that we were

4      embarrassed by paying too much.

11:30:40:06   5      Q.   Again --

11:30:41:18   6      A.   It's possible.

11:30:42:12   7      Q.   -- it means you don't want people knowing how much

8      you paid for a bond, right?

11:30:47:18   9      A.   Yes, generally that's correct.

11:30:49:11   10     Q.   So as it relates to this, sir, there are times

11     where you want secrecy, right?

11:31:15:11   12     A.   If you classify this as secrecy, I suppose.

11:31:18:22   13         MR. FRANCIS:  Your Honor, Mr. Baez is showing

14     the jury his demonstratives.

11:31:33:21   15         MR. BAEZ:  I haven't published anything.  I'm

16     about to show counsel.

11:31:42:01   17     BY MR. BAEZ:

11:31:44:01   18     Q.   Now, sir, you're quite aware that broker-dealers

19     thrive on uncertainty, correct?

11:31:54:22   20     A.   I think that's a general statement so I'm not

21     comfortable answering that.

11:32:01:05   22     Q.   When I asked you about this earlier, you mentioned

23     that that's not a statement you would have made, right?

11:32:10:05   24     A.   That's right.

11:32:16:05   25     Q.   Do you recall on October 3, 2012, sir, making the

1    statement to David, No post at all.  If you want me to

2    post something broadly, can do.  Figure you thrive in

3    uncertainty?

11:32:31:18    4    MR. FRANCIS:  Objection, Your Honor.  It's

5    misleading.  He only read part of it.  He didn't read

6    what Mr. Demos requested.

11:32:38:24    7    THE COURT:  That would be left for redirect.

11:32:42:24    8    A.    I don't recall that.

11:32:44:03    9    BY MR. BAEZ:

11:32:44:01    10    Q.    If I showed you your statement, would that refresh

11    your recollection as to whether you said that or not?

11:32:50:27    12    A.    In the same way, yes.

11:32:56:21    13    MR. BAEZ:  I'm sorry.  May I approach?

11:32:58:27    14    THE COURT:  You may.

11:33:00:06    15    BY MR. BAEZ:

11:33:00:06    16    Q.    I'll give you the time exactly, 13:20:45.

11:33:05:11    17    Do you remember making that statement, sir?

11:33:22:01    18    A.    I do not, but it's here.

11:33:24:04    19    Q.    So what does "posting" mean?  Tell the ladies and

20    gentlemen of the jury what "posting" means?

11:33:30:12    21    A.    Posting means to disseminate information about the

22    trading price of a security, or possibly a cover.  Just

23    some sort of information about that.

11:33:39:22    24    Q.    So in this conversation David is asking you, "Do

25    you want me to post the information of the trade," and

1    you're saying, "No, I think you -- because I know you

2    strive in uncertainty," right?

11:33:52:23          THE COURT:  Yes?

11:33:53:05          MR. FRANCIS:  Objection.  He's asking

5    questions about the document.  It's not in evidence.  If

6    he's asking for the recollection, I think he should, in

7    fairness, give the witness a copy so he can refresh

8    himself with it.

11:34:03:23          MR. BAEZ:  I've done that.

11:34:04:23          MR. FRANCIS:  And then he took it away.  And

11   he said it didn't refresh him.

11:34:08:22          MR. BAEZ:  It doesn't matter.

11:34:10:02          THE WITNESS:

11:34:10:01   A.   I'm going to have to read this just to understand

15   the situation.

11:34:13:17   BY MR. BAEZ:

11:34:13:17   Q.   Go right ahead.

11:34:52:00   A.   What was your question, Mr. Baez?

11:34:54:00   Q.   My question to you, sir, is -- well, I'll go back.

11:34:57:12        Tell the ladies and gentlemen of the jury what

21   "posting" means, "no posting."

11:35:01:02   A.   Posting means to disseminate some level of

23   information about the price, potentially the second-best

24   price in a market.

11:35:10:22   Q.   And here you're telling David not to post the

```
 1    information as to what you paid for it because you know
 2    that he thrives in uncertainty, right?
11:35:20:03           MR. FRANCIS:  Objection.
11:35:22:00    BY MR. BAEZ:
11:35:22:00    Q.   Those are your words --
11:35:23:21           MR. FRANCIS:  Objection.
11:35:23:21           THE COURT:  Just so we're clear, what's your
 8    basis?
11:35:27:19           MR. FRANCIS:  This document is not in
10    evidence.
11:35:29:11           THE COURT:  Sustained.
11:35:30:12    BY MR. BAEZ:
11:35:30:27    Q.   Sir, when you made that statement you were
14    referring to him thriving in uncertainty, correct?
11:35:35:16           MR. FRANCIS:  Objection.  Mr. Baez has not
16    established this statement was made.  He asked to
17    refresh --
11:35:39:16           MR. BAEZ:  He has --
11:35:39:16           THE COURT:  Just complete your statement,
20    please, Mr. Francis.
11:35:43:12           MR. FRANCIS:  He asked the witness to refresh
22    his recollection and he answered no.
11:35:48:12           THE COURT:  That's correct, he did.  Objection
24    sustained.
25
```

11:35:50:221    BY MR. BAEZ:

11:35:51:072    Q.   Sir, do you recall making those statements?  Are

3    those your statements?

11:35:55:264         MR. FRANCIS:  Objection.  Compound question.

11:35:57:235         MR. BAEZ:  I'll strike.

11:35:58:266    BY MR. BAEZ:

11:35:59:117    Q.   Sir, are those your statements -- is that your

8    statement?

11:36:02:239         MR. FRANCIS:  Objection.  I'm sorry.

11:36:04:050         THE COURT:  The question is does he recall

11    making the statement, correct?

11:36:08:172         MR. FRANCIS:  Well, I don't think that was his

13    question, but I think that's an appropriate question,

14    Judge.

11:36:12:185         THE COURT:  Well, that's what I was trying to

16    get us to.

11:36:15:067    BY MR. BAEZ:

11:36:15:218    Q.   Is that your statement, sir?

11:36:18:069         MR. FRANCIS:  That's what I'm objecting to.

11:36:20:180         THE COURT:  That's the question to which I'm

21    sustaining the objection.

11:36:23:092    BY MR. BAEZ:

11:36:23:183    Q.   You don't recall making that statement, do you,

24    sir?

11:36:25:275    A.   I do not.

11:36:27:24  1    Q.  And, sir, even after you've read your own chat, you

2    still don't remember, right?

11:36:35:00  3    A.  I mean, I see what's on the chat.  It appears I did

4    make the statement.

11:36:40:21  5    Q.  So since it appears you made the statement, can you

6    tell the ladies and gentlemen of the jury what you mean

7    when you say, "No post, I know you thrive in

8    uncertainty" to David Demos?

11:36:55:00  9          MR. FRANCIS:  Objection.  Calls for

10    speculation.  He established conclusively he doesn't

11    recall it.

11:37:01:09  12          MR. BAEZ:  He also established he made the

13    statement.

11:37:03:24  14          THE COURT:  Sustained.

11:37:04:11  15    BY MR. BAEZ:

11:37:05:16  16    Q.  Sir, hypothetically, what would it mean when you

17    say, "I know you thrive in uncertainty"?

11:37:11:01  18          MR. FRANCIS:  Objection.

11:37:12:22  19          THE COURT:  I think what the question is, is

20    he testified he read the chats, he remembers what he

21    does in the course of his trading.  So if that's where

22    you're going, that's allowable.

11:37:28:02  23    BY MR. BAEZ:

11:37:28:02  24    Q.  In the course of your trading, sir, when you say,

25    "No post, I know you thrive in uncertainty," what do you

1   mean?

11:37:39:10   2   MR. FRANCIS:  I'm sorry, Judge, objection.  I

3   just don't think that's what you --

11:37:42:22   4   MR. BAEZ:  I think the Court's ruled.

11:37:46:01   5   THE COURT:  It's close enough.

11:37:48:07   6   THE WITNESS:  Give me one second.  I have to

7   think about it.

11:37:51:22   8   THE COURT:  You don't need to look at the

9   document.  That's not the purpose here.

11:37:55:26   10   BY MR. BAEZ:

11:37:55:26   11   Q.   In the context of that, what do you mean by that?

12   Tell us.

11:38:03:08   13   A.   I suppose it could mean a number of things.

11:38:07:01   14   Q.   Okay.  Now --

11:38:08:11   15   MR. FRANCIS:  I'm sorry.  I don't think the

16   witness was done with the answer.

11:38:12:14   17   BY MR. BAEZ:

11:38:13:20   18   Q.   Were you finished?

11:38:14:21   19   A.   Am I allowed to continue?

11:38:15:22   20   THE COURT:  Yes, you can.  You can finish your

21   answer.

11:38:18:02   22   BY MR. BAEZ:

11:38:18:02   23   Q.   I thought you were finished, sir.

11:38:19:26   24   A.   It could be that, for example, Mr. Demos has his

25   own balance sheet.  It could be that he can buy and sell

1      transactions and broker them and profit from that.

11:38:36:11    2    Q.   It means he can profit in the uncertainty, right?

3      That's what you just said, right?

11:38:44:14    4    A.   I suppose, yeah.

11:38:45:08    5    Q.   And you know he profits in uncertainty, correct?

11:38:53:12    6    A.   I don't know that he profits in uncertainty, but

7      that may have been what I was thinking when I wrote

8      this.

11:39:00:25    9    Q.   I'm not asking you what you were thinking.  I'm

10      asking you about your experience in trading in the RMBS

11      market.

11:39:07:21    12      You just stated that you know he thrives in

13      uncertainty, meaning he makes money in uncertainty,

14      right?

11:39:14:21    15            MR. FRANCIS:  Objection.  Facts not in

16      evidence.

11:39:17:14    17            THE COURT:  He can say if that's what he said

18      or not.

11:39:21:01    19    A.   You know, "uncertainty" can mean many things.

20      Mr. Demos, he's smart and he was a specialist, and in

21      times of uncertainty, someone who knows a product is

22      important.

11:39:35:12    23    BY MR. BAEZ:

11:39:35:12    24    Q.   And when you say "no post," you're specifically

25      referring to a trade that you made with David, right?

11:39:43:23 1          If you need to refresh your recollection --

11:39:49:05 2     A.   That could be the case.  There's probably a lot of

3     lead-up that goes into this trade.  I don't have it.

4     Maybe you can tell me what this --

11:39:55:26 5     Q.   You would agree it's a trade, right?

11:39:58:02 6     A.   It appears to be a trade, yes.

11:40:00:08 7     Q.   And if you don't want posts based on a trade you

8     made, and you're making the statement that he thrives in

9     uncertainty, you're basically saying to him that you

10    know he's going to make money when people don't know how

11    much a bond is being sold or purchased for, correct?

12    You're being general?

11:40:25:06 13    A.   I don't know if that's what I was thinking.

11:40:27:01 14    Q.   But you would agree with that statement, right?

11:40:29:00 15    A.   Can you repeat that statement, please.

11:40:30:24 16    Q.   That David Demos would make money by thriving in

17    uncertainty.

11:40:37:00 18    A.   Right.  But uncertainty in what sense?

11:40:40:24 19    Q.   In how much bonds are being sold and bought for,

20    sir.

11:40:44:22 21    A.   Right.  But there's uncertainty in the macro

22    markets and in structural uncertainty, investment

23    profiles, things of that nature.

11:40:53:12 24    Q.   When you're buying -- follow my question, if you

25    can.  I'll try and break it down as simple as possible.

11:40:59:21    When you're buying and selling a bond --

11:41:02:12    A.   Right.

11:41:02:18    Q.   -- as David Demos does, okay, and if he sells you a

4    bond and asks you, "Do you want me to post the price

5    that you bought the bond for," and you answer, "No,

6    because I don't want anchor points floating around

7    because I know you thrive in uncertainty," that means

8    that you understand he thrives in uncertainty, right?

11:41:29:28    MR. FRANCIS:  Objection.  There's two

10    questions.  It's misstating the document that isn't even

11    in evidence.

11:41:35:02    THE COURT:  It's not based on the document.

11:41:36:23    MR. BAEZ:  It's not based on the document.

11:41:38:13    THE COURT:  I'll allow it.

11:41:39:21    BY MR. BAEZ:

11:41:39:21    Q.   Sir?

11:41:43:07    A.   I'm not sure that was the connection I was making,

18    but it's here on the chat.  And he does go on to say,

19    "No, no," as well.

11:41:51:28    Q.   So we've established that you two don't have a duty

21    to one another, right?  We talked about that?

11:41:57:22    A.   Yes.

11:41:58:13    Q.   And we've established that in the situation here,

24    you know he thrives in uncertainty.  We talked about

25    that, right, or have you forgotten that already?

11:42:11:28 1        I'm recapping for my next question.

11:42:15:16 2    A.   I'm not sure we're in complete agreement on that.

11:42:19:25 3    Q.   You know -- well, you recall making the statement.

         4    You said you didn't --

11:42:24:23 5    A.   The statement was there.

11:42:26:26 6    Q.   Okay.  Now, since you know -- well, let me ask you

         7    this:  You testified specifically yesterday and today

         8    about the AMSI bond and the Harborview, but that's not

         9    the first trade that you made in these five counts,

        10    right, with David Demos?

11:42:49:12 11    A.   What was the other trade?

11:42:51:11 12    Q.   There was another bond that you traded that

        13    happened before in time that the government has not

        14    asked you about, right?  The LXS bond?

11:42:59:27 15    A.   I did not trade that bond, as I recall.

11:43:04:18 16    Q.   You work for Marathon?

11:43:06:01 17    A.   I work for Marathon, yes.

11:43:07:21 18    Q.   Do you work with Stu Goldberg?

11:43:10:27 19    A.   At that time I did work with Stu, yes.

11:43:13:12 20    Q.   And you're familiar with the LXS bond, right?

11:43:18:24 21    A.   I know of it, yes.

11:43:21:22 22    Q.   In fact, you remember it was a significant bond, do

        23    you not?  Significant size?

11:43:29:12 24    A.   Yes, that I recall, yes.

11:43:31:12 25    Q.   $230 million?

11:43:34:24  1   A.   That was not the actual size of the bond, but it

2   was large.

11:43:38:16  3   Q.   What was the size of the bond, sir?

11:43:41:04  4   A.   I don't remember the factor, the factor, but you

5   probably have it.

11:43:49:01  6   Q.   It was a large bond compared to all of these other

7   ones, right?

11:43:53:13  8   A.   Yes, it was.

11:43:55:01  9   Q.   And now, sir, when you bought this bond, after you

10   bought this bond you realized that there was a problem

11   in the deal documents, correct?

11:44:08:19  12   A.   So firstly, I don't think -- I could be wrong -- I

13   don't think I actually transacted on this one myself.  I

14   also don't recall if the deal document issue happened

15   before or after our purchase.

11:44:25:01  16   Q.   Do you recall when you had the bond there was an

17   issue with the bond, right, and the deal documents?

11:44:31:13  18   A.   Yes, there was an issue, yes.

11:44:33:13  19   Q.   And you realized it was a risky bond.

11:44:40:22  20   A.   I don't know that it was more or less risky than --

21   I don't recall if it was more or less risky than any

22   other bond.

11:44:48:26  23   Q.   Sir, you wanted to get rid of this bond, right?

11:44:55:02  24   A.   So that, that I don't recall.

11:44:59:08  25   Q.   You don't recall selling it to David Demos, or a

1    portion of it?

11:45:03:14   2   A.   I know Mr. Demos was involved in the sale of the

3    bond.

11:45:06:14   4   Q.   So when you don't want a bond you sell it, right?

11:45:10:05   5   A.   Yes.  Yes.

11:45:12:20   6   Q.   You'll give me that?

11:45:13:26   7   A.   Yes.

11:45:14:14   8   Q.   Thank you.

11:45:16:06   9        So -- and this was after you discovered it was a

10   risky -- or there were problems with the deal documents,

11   right?

11:45:26:01   12  A.   I don't actually -- I don't recall that.  I think

13   that actually the structural issue that was negative

14   actually happened after we bought it, so we didn't know

15   about that, and that's why we did a lot more work on it,

16   but I could be wrong.

11:45:45:24   17  Q.   Let me see if I understand what you're saying, sir.

18   You're saying that after you got the bond, you realized

19   there was a problem with the deal documents and then you

20   wanted to sell it after that.

11:46:01:12   21  A.   I actually don't recall exactly.  I'm going off

22   memory, and I'm not sure this is the case, but I think

23   that the structure of the security was changed after we

24   bought it.  I don't know what was behind that change.

11:46:19:28   25  Q.   Do you remember identifying that there was an issue

1      with the bond and writing to the trustee?

11:46:27:25    2    A.   I don't recall that.

11:46:29:04    3    Q.   Do you recall being included in an e-mail string

4      that identified the issue?

11:46:33:04    5    A.   So I didn't, but I have recently seen documents

6      along those lines, yes.

11:46:44:10    7    Q.   Who showed you those documents?

11:46:47:13    8    A.   The government.

11:46:48:04    9    Q.   So the government -- let me clarify that.

11:46:50:11    10        When you say "the government," are you referring to

11     the prosecutors or are you referring to the government

12     because they invested in this bond?

11:46:58:05    13   A.   The prosecutors.

11:46:59:23    14   Q.   Okay.  Now, when you became an investor for -- I'm

15     sorry.  When you accepted money from the government in

16     the PPIP fund, one of the goals that you laid out in

17     your application was that the strategy was to buy and

18     hold these bonds, correct?

11:47:17:29    19   A.   One second actually.  I don't actually recall if it

20     was the government or our lawyers that showed us those

21     documents.  I need to pause.

11:47:36:22    22   Q.   You want to take back your answer?

11:47:39:02    23   A.   I actually forgot.  Sorry.

11:47:41:05    24   Q.   So you don't know the difference between your

25     lawyer and the prosecutors?

11:47:44:11    A.   I mean, I do.  There are a lot of documents.

11:47:47:00    Q.   So you don't know specifically who showed you

3    those -- that information and told you that this was

4    going to be an issue in this case?

11:47:57:00    A.   I don't remember specifically.  I think you're

6    referring to a very specific e-mail and I don't recall

7    who showed me that.

11:48:09:03    Q.   But you recall seeing the e-mail where you are

9    copied in the e-mail --

11:48:15:01    A.   Yeah.

11:48:15:15    Q.   -- and it says that you guys have identified an

12   issue with the deal documents of this bond, correct?

11:48:20:27    A.   I recall an e-mail like that, yes.

11:48:22:24    Q.   And that led to the decision that this is a bond

15   you guys want to get rid of, right?

11:48:31:00    A.   That may have factored into a decision along those

17   lines, yes.

11:48:36:00    Q.   And you're also involved in the chats as it relates

19   to specifically the sale of this bond, correct?  The LXS

20   bond?

11:48:48:21    A.   I may have been, yeah.

11:48:51:12    Q.   Now, if there's a problem with the deal documents,

23   sir, that may affect how much money you make, right, or

24   your investors make?

11:49:03:25    A.   So potentially, yeah.

11:49:11:00 1    Q.   It could be the difference of millions and millions

2    of dollars, right?

11:49:16:07 3    A.   Again, potentially.  But just to be clear, the deal

4    documents generally, in everything that we've been

5    talking about with respect to models and structure,

6    everything is on a forward-looking basis, and everything

7    is also based on publicly available information.

11:49:33:01 8    Q.   I understand that.

11:49:33:13 9         So my point to you, sir, is that when you realize

10   that a bond is risky, you want to sell it, right?

11:49:43:01 11   A.   That's one reason where we might want to sell it.

11:49:46:19 12   Q.   And in this particular bond, you knew that this

13   bond, one, had problems with the deal documents, and,

14   two, was risky, right?

11:49:55:11 15   A.   Like I said earlier, I don't know that it was

16   riskier -- any more or less risky than other securities.

17   It may have been.

11:50:04:28 18        And also the deal documents, there is no final

19   arbiter on who was correct on the deal documents.  If we

20   had a directional view on documents, that would be our

21   interpretation.

11:50:17:29 22   Q.   But you knew you wanted to sell it and you did so,

23   right?

11:50:20:20 24   A.   We sold it.

11:50:21:23 25   Q.   And this was contrary to the buy-and-hold strategy

1    that you originally wanted to make with the government

2    in the PPIP fund, right?

11:50:30:23    3    A.   I'm not comfortable saying that that was the buy

4    and hold, that the strategy was buy and hold.

11:50:37:11    5    Q.   You bought it in February and you sold it -- let me

6    double-check the date -- you sold it a couple months

7    later.  You didn't hold it for a year, two years?

11:50:53:06    8    A.   I don't recall the dates, but it could be the case.

11:50:56:12    9    Q.   You sold it on May 11 -- sorry -- May 14, 2012,

10    correct?  Does that sound about right to you?

11:51:05:18    11    A.   Marathon sold it.

11:51:07:24    12    Q.   So you bought it in February and a month later you

13    wrote to the trustee.

11:51:16:18    14    A.   I did not write to the trustee.

11:51:18:12    15    Q.   You were copied in an e-mail knowing that there was

16    a problem with this bond and you wrote to the trustee.

11:51:23:01    17    And just for everyone's -- the trustee is the

18    person who issues the money from the bond, right, the

19    mortgage payments and pays it to you guys?  Or they're

20    in charge of that.  The distribution, I should say.

11:51:36:09    21    A.   The trustee interprets the underlying deal

22    documents and they do ultimately receive and dispense

23    the cash, but the servicer does most of the borrower

24    collections.

11:51:49:12    25    Q.   The person with the checkbook, right?

11:51:51:19  1     A.   They determine the distribution of the funds.  They

2     are not paying the money out themselves, right.

11:51:58:16  3     Q.   They decide --

11:51:59:01  4     A.   They're directing, yes.

11:52:01:28  5     Q.   So a month after buying this bond, you write to

6     them and say, "Hey, there's a problem here."  Two months

7     later you're selling it, right?  I'm sorry, May, the

8     next month you sell it, right?

11:52:15:13  9     A.   So I guess those two things are there.  I wouldn't

10     say that that's the only reason we would be selling the

11     bond.

11:52:23:04  12     Q.   Now, sir, did you, in the chats, while selling this

13     LXS bond, disclose to David that this bond had problems

14     with the deal documents?

11:52:40:11  15     A.   So I have seen a chat from March where we did

16     discuss the structural issue with David.

11:52:51:26  17     Q.   And you told -- do you recall what you said

18     specifically?

11:52:57:24  19     A.   Something about an interaction between Intex, who's

20     the structural agent, and the trustee and the structure

21     kind of in flux.

11:53:11:22  22     Q.   Do you recall David saying that the documents were

23     foggy?

11:53:18:02  24     A.   I don't, but there was a general -- I think there

25     was some general sense of uncertainty.

11:53:23:27  1   Q.   And do you recall making the representation that

2   the documents weren't foggy to you guys?

11:53:33:03  3   A.   I don't recall that.

11:53:36:16  4   Q.   Do you recall making any -- either you or Stu,

5   within your chats -- making any assertions that the bond

6   was okay, that you liked the bond?

11:53:46:13  7   A.   I don't, no.

11:53:47:13  8   Q.   I'm sorry?

11:53:48:04  9   A.   I do not.

11:53:48:25  10   Q.   You don't recall saying that?

11:53:50:16  11   A.   No.

11:53:51:04  12   Q.   Or you don't recall reading that in the chats?

11:53:54:13  13   A.   I don't recall that, no.

11:53:55:13  14   Q.   If I showed you the chat, would that refresh your

15   recollection?

11:54:01:01  16   A.   Perhaps.

11:54:16:13  17       MR. FRANCIS:  Your Honor, just because there's

18   been some confusion, could you please instruct the

19   witness on how refreshment works and that he shouldn't

20   comment on what's in the document unless it's actually

21   admitted first?

11:54:25:22  22       THE COURT:  That is the way refreshment works.

11:54:28:12  23       And I assume we're asking the witness, we're

24   going to see if the witness's recollection is refreshed

25   as to something that he said?

11:54:36:07   1          MR. BAEZ:  He's in the chat.

11:54:37:13   2          THE COURT:  That he said, though; not that's

            3   in a document that he's reviewed?

11:54:42:01   4          MR. BAEZ:  Well, I believe -- no, it's not his

            5   specific statement, but he was involved in the chat.

11:54:47:14   6          THE COURT:  In that case the objection is

            7   sustained.

11:54:50:26   8          MR. BAEZ:  I can refresh his recollection with

            9   a document, can't I?

11:54:54:26   10          THE COURT:  As to what he said, yes.  But he

           11   can't testify basically as to what's in a document

           12   that's not in evidence.

11:55:02:14   13   BY MR. BAEZ:

11:55:08:17   14   Q.   Sir, you don't recall any statements that you,

           15   during that chat, that you actually liked the bond; is

           16   that correct?  Is that your testimony?

11:55:14:20   17          MR. FRANCIS:  Just to clarify, is the question

           18   about documents he reviewed recently or at the time back

           19   in 2012?

11:55:21:02   20   BY MR. BAEZ:

11:55:21:22   21   Q.   Sir, when you were selling this bond to David Demos

           22   back in 2012, did Marathon, either by way of you or

           23   Stuart, make any assertions that you liked the bond?

11:55:36:22   24   A.   I don't recall making any assertion.

11:55:40:23   25   Q.   If I showed you a statement within that chat that

1    specifically addresses that issue, would that refresh

2    your recollection?

11:55:54:27   3    A.   Perhaps, yes.

11:55:56:27   4          MR. BAEZ:  May I approach the witness?

11:55:58:06   5          THE COURT:  Yes.

11:56:00:00   6          MR. FRANCIS:  I object to the extent he's

7    trying to refresh about something someone else said.

11:56:06:09   8          MR. BAEZ:  May I approach?

11:56:07:18   9          THE COURT:  Yes.

11:56:20:24   10         MR. FRANCIS:  So then, Judge, I think the next

11   question should be, "Does that refresh your recollection

12   as to whether or not you said that?"

11:56:27:11   13         MR. BAEZ:  May I?

11:56:29:01   14         THE COURT:  Yes, within those limits.

11:56:31:11   15   BY MR. BAEZ:

11:56:32:01   16   Q.   Does that refresh your recollection as to whether

17   Marathon made that representation to David Demos?

11:56:39:27   18         MR. FRANCIS:  Objection.

11:56:40:27   19         THE COURT:  Sustained.

11:56:41:12   20   BY MR. BAEZ:

11:56:41:22   21   Q.   Does that refresh your recollection about that

22   transaction?

11:56:49:12   23   A.   Yeah.  I mean, it gives -- I see the line here.

11:56:57:12   24   Q.   Now, sir, if you have a bond that's risky and it's

25   mismodeled, is that a bond you like?

11:57:12:25 1    A.    It depends on how much the mismodeling matters.

11:57:16:22 2    Q.    Is that a bond you like is my question, if it's

3    risky and if it's mismodeled?

11:57:26:10 4    A.    It could be if it's at the right price.

11:57:28:29 5    Q.    If you sold that bond, do you think that that is

6    something that you would make completely known?  Is that

7    a fact that you think you should let the other party

8    know?

11:57:38:08 9    A.    There were many ways -- several ways, actually,

10    where structural issues like this were disseminated,

11    including by the trustee via notices to bondholders as

12    well as Intex itself.

11:58:12:00 13    MR. BAEZ:  If I can have just a moment, Judge.

11:58:14:00 14    THE COURT:  You may.

11:59:06:11 15    BY MR. BAEZ:

11:59:06:25 16    Q.    I want to reference an exhibit number.

11:59:48:11 17    Sir, I'm going to show you a portion of

18    Exhibit 207, which is a disclaimer specifically --

11:59:57:05 19    THE COURT:  Just so the record is clear, we

20    mean Government's Exhibit 2?

12:00:01:12 21    MR. BAEZ:  Yes, sir.

12:00:01:22 22    BY MR. BAEZ:

12:00:01:22 23    Q.    Government's Exhibit 207 that I'd like for you to

24    look at.  Can you see that on your screen or not?

12:00:43:02 25    A.    Yes, I can.

| | |
|---|---|
| 12:00:46:03 | 1    MR. BAEZ:  May I publish this? |
| 12:00:47:21 | 2    MR. FRANCIS:  Your Honor, they've got the |
| 3 | wrong exhibit.  I think they mean 207. |
| 12:00:51:12 | 4    THE COURT:  That's what he said was 207. |
| 12:00:53:15 | 5    MR. FRANCIS:  But the one on the screen is |
| 6 | different. |
| 12:00:55:18 | 7    THE COURT:  This is not 207? |
| 12:00:59:27 | 8    MR. BAEZ:  It's the same exact wording, Your |
| 9 | Honor. |
| 12:01:01:11 | 10    MR. FRANCIS:  I don't have any way of knowing. |
| 12:01:02:03 | 11    THE COURT:  Is Defense Exhibit 332 the same as |
| 12 | Government's Exhibit 207? |
| 12:01:09:27 | 13    MR. BAEZ:  It's the exact disclaimer that's on |
| 14 | all of these chats. |
| 12:01:12:15 | 15    THE COURT:  You did refer to it as |
| 16 | Government's Exhibit 207. |
| 12:01:14:25 | 17    MR. BAEZ:  Yes, sir. |
| 12:01:17:11 | 18  BY MR. BAEZ: |
| 12:01:17:25 | 19  Q.    I'm showing you a disclaimer, sir.  Now, |
| 20 | yesterday -- I keep saying yesterday -- Monday you went |
| 21 | into all of these chats and some today, right? |
| 12:01:29:12 | 22  A.    Yes. |
| 12:01:30:02 | 23  Q.    Do you recall that? |
| 12:01:30:22 | 24  A.    Uh-huh. |
| 12:01:31:12 | 25  Q.    Do you recall every time somebody from Cantor comes |

1         into the chat room that this pops up?

12:01:41:01  A.   That is would pop up in a Bloomberg chat?

12:01:45:13  Q.   Yes.

12:01:46:01  A.   I don't recall that this would come up.

12:01:47:10  Q.   You saw this in the chats that you were reading to

6         the ladies and gentlemen of the jury, right?

12:01:56:20  A.   I didn't actually pay attention to it, but it may

8         have been there.

12:02:01:20  Q.   Do you have any cause to doubt me, that that's a

10        disclaimer?

12:02:05:21  A.   No.

12:02:06:29  Q.   Now, in the disclaimer, sir, can you read to the

13        ladies and gentlemen of the jury the first sentence.

12:02:13:23  A.   "Disclaimer:  Prepared by sales/trading staff of

15        Cantor Fitzgerald and Co. (Cantor) and is for

16        informational purposes only."

12:02:25:20  Q.   And the second?

12:02:27:11  A.   "Prices provided on customer inventories for which

19        no specific transaction is being negotiated are

20        indicative and not executable."

12:02:36:02  Q.   That's putting you on notice of something, correct?

12:02:42:12  Is that correct?  You're nodding your head.

12:02:46:02  A.   I believe so.  It's not clear to me what "customer

24        inventories" means here in this context.

12:02:52:12  Q.   Let's go on.  Continue reading, sir.

12:02:55:15 1    A.   "Not an offer, solicitation or confirmation of

2    terms."

12:03:00:06 3    Q.   Okay.  And then continue.

12:03:02:15 4    A.   "Information provided is believed reliable."

12:03:08:06 5    Q.   Go on.

12:03:08:24 6    A.   "Out (sic) Cantor does not warrant the" --

12:03:16:00 7          THE COURT:  Actually, I think there's a little

8    glitch in what's on the screen.  I'm looking at the

9    actual document.  It does say, "but."

12:03:25:10 10          THE WITNESS:  I think it's "but."

12:03:27:11 11    BY MR. BAEZ:

12:03:27:11 12    Q.   It's not an offer.  Where are you stuck?

12:03:36:00 13    A.   "But Cantor does not warrant its accuracy."

12:03:40:23 14    Q.   Cantor does not warrant its accuracy.

12:03:44:25 15        Okay.  Go ahead.

12:03:47:07 16    A.   "Cantor may have positions in financial instruments

17    mentioned, may have acquired such positions at prices no

18    longer available, and may have interests different or

19    adverse to your interests."

12:04:00:12 20    Q.   Let's stop there.

12:04:01:08 21        That's letting you know that Cantor may have an

22    interest in this transaction, right?

12:04:09:12 23    A.   Yes.

12:04:09:22 24    Q.   And that's letting you know whatever is in that

25    chat, it's giving you a disclaimer that they're not

1    making any warranties as to the prices in there,

2    correct?

12:04:26:26    A.    One second.  I'm just reading it again.

12:04:37:15    Yes, that appears to be the case.

12:04:39:15    Q.    So before you go into the chat room, it's plastered

6    to you that not to rely on these representations, right?

12:04:51:18    A.    It is not plastered.  It's not actually --

12:04:55:06    Q.    It's mentioned every time someone from Cantor

9    enters into the chat room, right?

12:05:01:24    A.    I don't believe that's the case.

12:05:03:00    Q.    But you've seen it.  You've seen it throughout all

12    of these chats, right?  Did you ever take the time to

13    read it, sir?

12:05:11:11    A.    So these transcripts, I don't know how they comport

15    in terms of actual second-by-second refreshing and

16    recording, but when we open up a chat in Bloomberg now,

17    right now, we don't see a disclaimer.

12:05:32:27    Q.    How long have you been trading bonds, sir?

12:05:37:01    A.    I've been at Marathon for 12 years.

12:05:39:02    Q.    And how long have you traded with Cantor

21    Fitzgerald?

12:05:45:02    A.    I don't recall that.

12:05:46:23    Q.    Less than five years?  More than five years?

12:05:50:12    A.    A few years at least.

12:05:52:02    Q.    You're not testifying to this jury that you have

1    never read that disclaimer, are you?

12:05:58:04    A.   It may have been in Bloomberg messages.  It's not

3    something -- I'm just saying that it's not something

4    that came across often in the chat.  I see it on the

5    transcript of course.

12:06:11:23    Q.   So the answer to my question is no, that's not what

7    you're telling this jury, that you've never read this

8    disclaimer that tells you not to rely on these prices

9    and that their position may be adverse to yours?

12:06:23:15    A.   So the disclaimers that I generally recall reading

11    are in Bloomberg messages, not the chats.

12:06:32:24    Q.   My question is:  You're not telling this jury that

13    you've never read this disclaimer before, based on that,

14    right?

12:06:41:15    A.   I have not read this in the context of a Bloomberg

16    chat.

12:06:45:13    Q.   Ever?

12:06:48:01    A.   Again, what's posted in Bloomberg chats are -- I

19    mean, you kind of see how it -- not a transcript of how

20    it works as it's happening realtime.

12:07:15:12    Q.   On Monday, when you went through all of these

22    chats -- remember, we sat here all afternoon, you went

23    line by line, right?  You and Mr. Francis.

12:07:24:13    Do you remember that?

12:07:25:12    A.   Oh, okay.  I'm sorry.  I thought it was --

| | |
|---|---|
| 12:07:27:25 | Q.   How many times did you see that in there -- |
| 12:07:29:13 | A.   Okay. |
| 12:07:30:25 | Q.   -- half a dozen?  A dozen times? |
| 12:07:33:01 | A.   Yes, this was generally in there.  I was perhaps |
| 5 | answering a different question.  On realtime, as we are |
| 6 | interacting in Bloomberg chats, this is not something |
| 7 | that is kind of flying in your face.  I actually don't |
| 8 | know where -- |
| 12:07:48:05 | Q.   It's not flying in your face, but it's in the |
| 10 | chats, right? |
| 12:07:53:11 | A.   I don't recall where it is in the chats actually, |
| 12 | but it is here. |
| 12:07:57:14 | Q.   So you're not going to tell this jury that that |
| 14 | disclaimer that tells you, you shouldn't rely on these |
| 15 | prices and that Cantor Fitzgerald may have positions |
| 16 | adverse to you is not in these -- |
| 12:08:13:27 | A.   They are on the transcripts, yes. |
| 12:08:16:17 | Q.   So when you traded the AMSI bond, that disclaimer |
| 19 | was in there, right? |
| 12:08:22:12 | A.   I don't recall the -- I don't recall that. |
| 12:08:28:02 | Q.   Do you recall as far back as Monday?  I know you |
| 22 | don't recall back in 2012, but do you recall back on |
| 23 | Monday where you read to the ladies and gentlemen of |
| 24 | this jury all the statements that were being made for |
| 25 | which you now say you have no memory of, do you recall |

1      seeing those -- that disclaimer multiple times in that

2      chat?

12:08:48:27  3      A.   So I think that's a little bit of a

4      mischaracterization.  I do recall reading the chats.

12:08:55:18  5      Q.   I don't want to mischaracterize anything.

12:08:59:00  6           So you recall seeing it in those chats, right?

12:09:01:21  7      A.   This was in the chat transcripts.

12:09:04:00  8      Q.   Multiple times, right?

12:09:06:10  9      A.   I believe so.

12:09:08:25  10     Q.   So it's constantly in there.

12:09:10:19  11          Let's finish reading the rest of this disclaimer.

12:09:15:10  12          Where were you at?  You were at --

12:09:18:04  13     A.   I think the last --

12:09:19:21  14     Q.   They may have acquired positions at prices no

15     longer available and may have interests different or

16     adverse to your interests, right?

12:09:30:16  17          What's after that?

12:09:31:01  18     A.   "No liability is accepted by Cantor for any loss

19     that may arise from any use of the information contained

20     herein or derived herefrom."

12:09:44:12  21     Q.   They're telling you right there, multiple times,

22     that you should not rely on this, they may have

23     positions contrary to yours, and that they're not liable

24     for any losses that you sustain based on the information

25     that's derived from here, correct?

12:10:03:05 1   A.   That appears to be what this statement says.

12:10:05:26 2   Q.   And you're put on notice.  It's kind of like you're

3   walking into a field and there's signs, no trespassing,

4   no trespassing, no trespassing, right?  And you're there

5   and you're like, "I didn't know that I shouldn't be

6   trespassing, I was trespassing."

12:10:24:21 7   A.   The only thing I do want to say is just in terms of

8   back in 2012 realtime, seeing this, I just don't recall

9   that.

12:10:31:27 10  Q.   You don't recall anything from what happened in

11  2012, do you, sir?

12:10:37:13 12  A.   I have problems with my memory sometimes, yes.

12:10:40:11 13  Q.   You have problems with your memory sometimes?

12:10:43:25 14       You're a smart guy.  You went to Princeton, right?

12:10:46:20 15  A.   I did.

12:10:47:01 16  Q.   You're in charge of billions of dollars of money,

17  right?

12:10:52:01 18       Is that a yes?

12:10:52:28 19  A.   Yes.

12:10:53:28 20  Q.   You're taking money from the government, billions

21  of dollars, right?

12:10:59:12 22  A.   I didn't say I remember, you know --

12:11:03:25 23  Q.   My question to you is, you're taking money from the

24  government, billions of dollars from the government,

25  right?

```
12:11:08:28  1    A.   I do remember a lot.  I'm just saying that --

12:11:12:10  2    Q.   That's my question, right?

12:11:14:13  3    A.   Yes.

12:11:15:11  4    Q.   And you're investing it for them, right?  But you

             5    have trouble with your memory?

12:11:22:11  6    A.   I can't remember everything that happened.

12:11:24:17  7    Q.   You can't remember Monday, right?

12:11:26:02  8    A.   No.  I told you I remember reading the lines.

12:11:28:20  9    Q.   But you can't remember -- but you know it was

            10    multiple times, right?

12:11:33:27 11    A.   Yes.

12:11:34:12 12    Q.   So you're aware of all of your duties, that you

            13    don't have duties to anybody when you're making this

            14    trade from Count Two, right?

12:11:45:01 15         We went over that?

12:11:46:21 16    A.   Yes.

12:11:47:09 17    Q.   And you're also aware of this disclaimer that tells

            18    you those three main points:

12:11:56:24 19         Don't rely on the prices, right?

12:12:00:22 20         Is that a yes?

12:12:01:22 21    A.   Yes.

12:12:04:06 22    Q.   Okay.  That Cantor Fitzgerald may have positions

            23    adverse to yours, right?

12:12:08:22 24    A.   These are things that are in the disclaimer, yes.

12:12:12:12 25    Q.   And they're not responsible for any losses you may
```

1     incur based on the information contained herein,

2     correct?

12:12:20:19  3     A.    That's what this disclaimer reads.

12:12:22:24  4     Q.    And those are all the disclaimers that the

5     government has introduced into evidence in this case

6     based on Count Two, the AMSI bond, right?

12:12:36:13  7     A.    Sorry.

12:12:37:16  8     Q.    That same disclaimer is in all of that, right, as

9     well as --

12:12:40:25  10          I'm sorry, you have to answer.  Yes?

12:12:44:10  11     A.    I don't know that they're all in there.

12:12:47:07  12     Q.    Are you testifying that you don't know whether this

13     disclaimer is in the AMSI bond chats that you read into

14     evidence to this jury on Monday, or is that a problem

15     with your memory too?

12:13:01:11  16     A.    I don't know specifically if this -- if this

17     specific disclaimer was in there, but it's likely that

18     it was.

12:13:10:25  19     Q.    And what about Harborview, the uncharged trade that

20     you read in, you recall seeing it in there too, right?

12:13:19:12  21     A.    I was directed to read certain lines of the chat.

22     In some cases we didn't start at the beginning.  Again,

23     it's likely it was there.

12:13:29:07  24     Q.    Let me see if I can get those for you.

12:13:37:28  25          MR. BAEZ:  I'm going to show the witness

1    Defense Exhibit 332, which is a duplicate of the AMSI

2    bond chat.

12:14:16:23  3    BY MR. BAEZ:

12:14:16:23  4    Q.   I'm going to show you the chat, sir --

12:14:20:05  5    A.   Thank you.

12:14:20:20  6    Q.   -- and then I'd like for you to go -- this is

7    what's been admitted into evidence, what you talked to

8    this jury about, and I want you to count for me the

9    times that you see the disclaimer in this chat, okay?

12:14:32:00  10         THE COURT:  So the record is clear, what

11   government exhibit are we dealing with?

12:14:36:24  12         MR. FRANCIS:  207.

12:14:36:24  13         MR. LEONTIRE:  207.

12:14:38:11  14         THE COURT:  Thank you.

12:14:39:11  15   BY MR. BAEZ:

12:14:40:01  16   Q.   Flip through all the pages and tell me.

12:15:19:13  17   A.   Thirteen.

12:15:20:19  18   Q.   Thirteen times.  I know you said you had troubles

19   with your memory, sir, but how many times do you need to

20   read something before you remember?

12:15:30:28  21   A.   Again, I was guided towards certain lines.

12:15:35:12  22   Q.   You would agree 13 times is enough for a smart guy

23   like you, right?

12:15:40:12  24   A.   Yes.  Although --

12:15:41:22  25   Q.   Even a smart guy who has problems with their

1    memory.

12:15:46:12        Is that a yes?

12:15:46:29   A.    Yes.

12:15:49:05   Q.    Now I'm going to show you the uncharged trade and

5    we'll see how many times you've reviewed that or that's

6    out there.

12:16:43:29        MR. BAEZ:  I'm to going to show him a portion.

8    It's Exhibit 703, government's exhibit.

12:16:50:05        THE COURT:  Okay.

12:16:50:20        MR. FRANCIS:  We can give him a copy of the

11   actual 703, because I'm not sure what he's showing.

12:16:58:02        THE COURT:  Let's do that, please.

12:17:01:17        MR. FRANCIS:  Actually, we gave them a binder

14   set, Judge, so we can grab it out of theirs.

12:17:08:24        MR. BAEZ:  I can do that.

12:17:22:01        May I approach?

12:17:22:21        THE COURT:  You may.

12:17:33:06   BY MR. BAEZ:

12:17:34:09   Q.    I'm just showing you that page.  You see the

20   disclaimer there?

12:17:38:12   A.    Yes.

12:17:41:02   Q.    So you would agree, sir, that the disclaimer is

23   also in the uncharged trade that you testified to as the

24   first thing you talked about on Monday.

12:17:57:12   A.    The disclaimer is in the Bloomberg transcripts,

1      yes.

12:18:02    2      MR. BAEZ:  Your Honor, before I go into

3      another area, I think this might be a good part for the

4      break, or should I continue?

12:18:10    5      THE COURT:  Go to 12:30.

12:18:13    6      MR. BAEZ:  Okay.

12:18:25    7      MR. FRANCIS:  Judge, the screens are on.

12:18:37    8      MR. BAEZ:  This may take a minute.  That's why

9      I thought it might be a good time to break.

12:18:42    10      THE COURT:  Okay.  We'll take our lunch break

11      early then.

12:18:45    12      We'll take our lunch break early, ladies and

13      gentlemen.

12:18:49    14      (Whereupon, the jury left the courtroom.)

15      (Whereupon, a recess followed.)

16

17      THE COURT:  Before we bring the jury in, let

18      me just ask:  I did get copies of the redactions.  Are

19      we getting to those documents during this segment?

13:25:18    20      MR. SULLIVAN:  Not with this witness is my

21      understanding.

13:25:21    22      MR. FRANCIS:  We don't think so.

13:25:22    23      THE COURT:  We'll bring the jury in and have

24      our witness retake the stand.

13:25:26    25      (Whereupon, the jury entered the

```
 1    courtroom.)
13:26:58:27   2         THE COURT:  Please be seated everyone.
13:27:07:09   3         Whenever you're ready, Mr. Baez.
13:27:09:24   4         MR. BAEZ:  May it please the Court,
 5    Mr. Francis, and Ms. Cherry.
13:27:14:12   6         Good afternoon, ladies and gentlemen.
13:27:16:00   7         THE JURY:  Good afternoon.
13:27:17:03   8    BY MR. BAEZ:
13:27:17:18   9    Q.   Good afternoon, sir.
13:27:18:27   10   A.   Good afternoon.
13:27:20:11   11   Q.   Got a full stomach, ready to roll?
13:27:23:27   12   A.   Yeah.  You?
13:27:25:01   13   Q.   Oh, yeah.  Let's do this.
13:27:27:21   14        Now, sir, we left off talking about the
 15   disclaimers, right?
13:27:33:01   16   A.   Correct.
13:27:34:01   17   Q.   Now, even in the disclaimer -- we already talked
 18   about the significance of the disclaimers and somehow
 19   how you shouldn't reply and they are not liable and they
 20   might have adverse positions to you.  But even in some
 21   of your chats with David, he tells you not to take
 22   things -- to take his information with a grain of salt,
 23   right?
13:28:04:23   24   A.   Could I see the chat?
13:28:06:22   25   Q.   Sure.  I'm going to show you
```

1   Government's Exhibit 102.

13:28:09:03  2     For counsel, to help counsel out, 5/11 12:14:43.

13:28:22:13  3     This is a document admitted into evidence, sir.

4   Read the part that I have there in brackets.

13:28:27:05  5       MR. FRANCIS:  Your Honor, I don't think it's

6   in evidence yet.

13:28:32:07  7       MR. BAEZ:  It is.

13:28:34:01  8       MR. FRANCIS:  102?  Is it?

13:28:34:25  9       Our mistake, sorry.

13:28:37:16  10      We have no objection.

13:28:40:04  11      THE COURT:  102 is in, Linda?

13:28:47:04  12      THE CLERK:  Yes.

13:28:48:07  13  BY MR. BAEZ:

13:28:49:04  14  Q.   Here you guys are discussing, you guys are trying

15   to buy a bond from someone, and David is communicating

16   with the other seller, correct?

13:29:16:27  17  A.   You're saying he's communicating with the other

18   seller?

13:29:22:01  19  Q.   Not in that specific -- he's talking to you, right?

13:29:24:28  20  A.   Yeah.

13:29:25:02  21  Q.   Now, read to the ladies and gentlemen the first

22   part I have in brackets.

13:29:28:28  23  A.   This is a bad trifecta.  I'm tell them RAAC

24   liquidity drying up, three bidders last time, all 10A.

13:29:39:28  25  Q.   When he says this is a bad trifecta, he's talking

| | |
|---|---|
| 1 | about the fact that you guys have been trying to buy |
| 2 | three bonds and you haven't been able to buy them, |
| 3 | right? |
| 13:29:51:05 4 | A.   I don't know if that's the case. |
| 13:29:53:20 5 | Q.   What does he tell you next? |
| 13:29:56:02 6 | A.   He says, Please take with grain of salt.  Not |
| 7 | necessarily the most accurate piece of info. |
| 13:30:04:14 8 | Q.   So he's telling you in this chat take what I'm |
| 9 | saying with a grain of salt, correct? |
| 13:30:12:11 10 | A.   With respect to this specific situation, this bond? |
| 13:30:16:14 11 | Q.   Yes. |
| 13:30:17:01 12 | A.   That's what he said. |
| 13:30:18:20 13 | Q.   And then what does he say after that? |
| 13:30:21:29 14 | A.   Again, I talk you up, ha, ha. |
| 13:30:26:21 15 | Q.   What do you understand that to mean? |
| 13:30:37:18 16 | Let me rephrase the question. |
| 13:30:39:06 17 | A.   I'm not sure. |
| 13:30:40:06 18 | Q.   Let me rephrase the question. |
| 13:30:41:24 19 | He's saying take the information -- he's admitting |
| 20 | to you that he's lying to the other side, right? |
| 13:30:54:22 21 | If you need to look up ahead of that bracket, go |
| 22 | ahead, and review it. |
| 13:31:12:12 23 | A.   He is telling -- it appears he's telling the seller |
| 24 | that the last three bidders he had were ten area.  I |
| 25 | don't know if we were one of the last three bidders, so |

```
 1            I don't know that he was completely --

13:31:25:06   2    Q.   And then he says, This is not exactly the most

 3       accurate information, take it with a grain of salt,

 4       right?

13:31:33:09   5    A.   Sure, that's what he says.

13:31:35:00   6    Q.   And then he says, But as it relates to you guys, he

 7       talks you up, ha, ha, ha, ha.  Meaning he wouldn't do

 8       that to you guys, though, right?

13:31:48:01   9            Is that how you interpret that?  Or that he talks

 10      up your bid?

13:31:53:01  11    A.   I'm not sure.  It could be either one of those.

13:31:56:01  12    Q.   But you understand, sir, that this is part of

 13      negotiations, right?

13:32:03:11  14    A.   So this sort of discussion I would say is not

 15      surprising in part of negotiation.

13:32:13:01  16    Q.   Let me take that back from you.

13:32:16:11  17            All right, sir, so these chat rooms, when you're

 18      exchanging and buying these millions of dollars worth of

 19      bonds, you never have one single meeting with David,

 20      right, in person?

13:32:30:28  21    A.   That's generally correct, yes.

13:32:33:04  22    Q.   And you don't -- when you're buying these millions

 23      of dollars of bonds, there's not a bunch of lawyers

 24      around you at some meeting, right?

13:32:44:04  25    A.   That is correct.
```

13:32:44:13  1   Q.   And in fact, a lot of this chatter, sometimes you

         2   guys joke?

13:32:52:14  3   A.   Sometimes jokes interlaced, yes.

13:32:55:26  4   Q.   And you already know, they're not making any

         5   representations about it, right?

13:33:03:02  6   A.   According to the disclaimer you mean?

13:33:07:14  7   Q.   Yes.

13:33:21:05  8   A.   The disclaimer was there if that's what you mean.

13:33:24:11  9   Q.   Do you want to count how many times that was

         10   written in here or would you accept my word that it's at

         11   least half a dozen times when David comes into the chat?

13:33:33:21  12   A.   It is in there.

13:33:34:06  13       I do want to make the distinction that that is not

         14   how I recollect the actual chat to be.

13:33:42:09  15   Q.   So you're telling this jury that they shouldn't

         16   rely on this then; is that correct?

13:33:48:01  17   A.   No.

13:33:49:01  18   Q.   Don't rely on what's in here then?

13:33:51:01  19   A.   That is a piece of evidence.  It is a document.

13:33:56:12  20   Q.   Yeah, so they shouldn't rely on it, right?

13:34:00:12  21   A.   Right.  But I just want to make clear the

         22   connection between a transcript of a chat and what's

         23   happening realtime, that's all.

13:34:09:06  24   Q.   So what you're saying to this jury is that this

         25   evidence that the government has admitted doesn't

1    accurately reflect what's happening in realtime.  I just

2    regurgitated what you just said.

13:34:23:00 3    A.   What I'm saying is if you follow those lines of the

4    chat and when a chat begins, it's just not clear to me

5    the disclaimer is there as soon as the chat begins.

13:34:36:21 6         It's in the transcript.  I'm just saying originally

7    in realtime --

13:34:43:24 8    Q.   I'm sorry?

13:34:44:15 9    A.   I'm saying realtime.

13:34:46:09 10   Q.   In realtime?

13:34:47:15 11   A.   Yeah.

13:34:50:11 12   Q.   That's based on your memory, right?

13:34:52:25 13   A.   That is based on my memory.

13:34:55:01 14   Q.   2012.  You're remembering back to 2012.

13:34:57:25 15        My question:  You're going to tell this jury you

16   remember back in 2012 when these chats were happening

17   you didn't see the disclaimer?

13:35:05:25 18        Is that what you're saying?

13:35:07:13 19        Or you may have, you just don't recall?

13:35:10:22 20   A.   What I'm saying is that is not how they appear

21   currently.  They may have changed over time.

13:35:19:07 22   Q.   You can't tell this jury you didn't see this back

23   in 2012?

13:35:23:12 24   A.   Yeah, I can't recall that.

13:35:25:12 25   Q.   Sir, these were hot bonds, were they not, these

1        RMBS bonds?

13:35:31:28   A.    What do you mean by "hot bonds"?

13:35:35:01   Q.    The market was extremely strong and it was a

4        grab-a-thon, was it not?

13:35:41:10   A.    That's not how I would describe it, no.

13:35:44:16   Q.    Sir, on July 5, 2012, in these chat rooms, you were

7        in a chat room with Andy Springer, Stuart Goldberg, Bill

8        Biggart and David Demos.  You in fact made the

9        statement, Wow, market strong, no supply.  Odd lot

10       grab-a-thon.

13:36:14:01           You made that statement, right?

13:36:16:08   A.    May I see that?

13:36:18:02   Q.    Sure.

13:36:18:20           MR. BAEZ:  May I approach?

13:36:20:11           THE COURT:  You may.

13:36:21:23   BY MR. BAEZ:

13:36:22:02   Q.    I put an arrow on it.

13:36:31:11           You made that statement, right?

13:36:32:23   A.    I did.

13:36:33:22   Q.    Those are your words, are they not?

13:36:36:05   A.    In the transcript, yes.

13:36:40:29   Q.    I didn't put them in your mouth back in 2012?

13:36:44:22   A.    No, you did not.

13:36:47:08   Q.    Now, since it's a grab-a-thon, let me ask you a

25       question:

13:36:52:05  1          On Count Two, for which you've testified, AMSI,

2      David gave you a final price and you don't have any

3      specific information, either before, after, all the way

4      onto infinity, that could tell you that David would sell

5      you that bond for anything less than what he

6      specifically told you he was going to sell it to you

7      for?

13:37:27:18  8  A.    Could I just mention one thing about the last

9      discussion?

13:37:32:00  10  Q.    You want to go back to the last question I had

11      before?

13:37:35:01  12  A.    I want to clarify something.

13:37:37:01  13  Q.    First answer my question.

13:37:38:21  14  A.    Please repeat the question.

13:37:40:00  15  Q.    My question to you, sir, is:  I believe when you

16      were testifying with Mr. Francis, he said that David put

17      "own" and the price, right?

13:37:57:15  18          You're nodding your head yes?

13:37:59:15  19  A.    Yes.

13:37:59:22  20  Q.    He said "own" and then he gave a price.

13:38:03:12  21          There's nothing that you have in all your data,

22      computer models and everything, all that stuff, from

23      back in 2012 and to today and even beyond in infinity,

24      that would tell you that David would have sold you that

25      bond for anything less than what he sold it to you for?

13:38:25:00 1    A.    That is correct.  We trusted that he owned the bond

2    at 66 and 14.

13:38:28:25 3    Q.    That's not my question to you, sir.

13:38:30:19 4         My question to you is not what he bought it at.

5    It's that would he have -- you can't say that he would

6    have sold it to you for anything less, can you, sir?

13:38:43:16 7    A.    Given what we knew at the time?

13:38:46:04 8    Q.    Given what you knew at the time, given what you

9    know now, given what you think you might know in the

10    future.  I'm giving you the full range here.  There's

11    nothing that you can say, sir, that would tell you that

12    he would have sold it to you for anything less than what

13    he actually sold it to you for?

13:39:07:11 14    A.    That was the decision that David Demos made, so

15    that would be correct.

13:39:11:11 16    Q.    Correct.  So if I said I'm going to sell you this

17    pen for a dollar and you buy that pen for a dollar,

18    there's nothing that's going to tell you that I'll sell

19    it to you for 75 cents, right?  If I say it's a dollar,

20    that's what it costs, right?

13:39:30:29 21         I'm free to make that choice, right?

13:39:34:02 22         You can answer.

13:39:36:23 23         Why are you thinking, sir?

13:39:38:12 24         MR. FRANCIS:  Your Honor, there's like four

25    questions pending.

13:39:41:18  1            THE COURT:  Just ask one question and then

2     pause to let him answer that one.

13:39:46:06  3     BY MR. BAEZ:

13:39:47:03  4     Q.   Do you have an answer for me?

13:39:48:06  5            THE COURT:  What's the question?

13:39:49:24  6     BY MR. BAEZ:

13:39:49:24  7     Q.   Is there anything that you -- any evidence that you

8     would have that I would sell that to you for 75 cents if

9     I'm telling you the price is a dollar?

13:40:11:00  10    A.   If this is a comparison to a bond negotiation --

13:40:14:03  11    Q.   I'm asking you a specific questions, sir.

13:40:16:24  12    A.   Right.

13:40:17:18  13    Q.   I'm telling you the price of that pen is a dollar.

14     Do you have any evidence that I'll sell it to you for

15     anything else?

13:40:24:21  16           MR. FRANCIS:  Your Honor, I think the witness

17     is trying to establish some relevance of a pen because

18     it's not a case about pen fraud, so I think he should be

19     entitled to answer.

13:40:37:12  20           THE COURT:  Sustained.

13:40:38:28  21           MR. BAEZ:  I'll go back to the bond.

13:40:40:12  22           MR. FRANCIS:  Sorry, Judge.  I thought the

23     witness should get to finish his answer was my

24     objection.

25

13:40:46:251    BY MR. BAEZ:

13:40:46:252    Q.    Go ahead and finish your answer, sir.

13:40:49:133    A.    I guess I would assess if I've offered to pay you

4    75 cents what you said.

13:40:56:195    Q.    We're talking about the final price.

13:40:59:136        In the AMSI bond, you bought it for how much; 66

7    and 20?

13:41:06:288    A.    Correct.

13:41:11:199    Q.    And he gave you -- he told you, own 66 and 14,

10    right?

13:41:22:041    A.    Yes.

13:41:24:282    Q.    You don't have any evidence that he would have sold

13    it to you for anything less than 66 and 14, do you, sir?

13:41:31:104    A.    We did not know anything, yes.

13:41:33:255    Q.    So you have -- so David owns that bond once he buys

16    it, right?  Just like I own my pen.

13:41:49:227    A.    So technically -- my understanding of the situation

18    was that it was a riskless transaction between the

19    seller and the buyer, which was us.

13:42:14:120    Q.    We covered risk already, sir.  Answer my question,

21    okay?  We covered that.

13:42:21:202        Seller sells to David and David sells to you,

23    right?  That's how the market works, right?  Right?

13:42:35:264        Sir, I need you to answer my questions.

13:42:40:295    A.    That is how this transaction worked.

13:42:43:29  Q.   So then David gave you a price, right?

13:42:50:11       Was that a yes?

13:42:51:17  A.   He did.

13:42:52:14  Q.   And when David gave you a price, you don't have

5    anything, any evidence whatsoever, that tells you that

6    David would have sold it to you for anything less than

7    what he sold it to you for?

13:43:09:20  A.   That's fair.

13:43:10:14  Q.   Okay.  Now that we have those facts straight, when

10   Mr. Francis came up to you with that nifty calculator --

11   let's use my phone.  You don't have to go in.  Trust me,

12   you don't want to see it.

13:43:32:09       I'm not bribing you there.  That's my wallet there,

14   too.

13:43:38:12       That little exercise you did with the calculator,

16   that's a hypothetical, right?

13:43:49:17  A.   That was based on the understanding of how the

18   trade was working.

13:43:53:01  Q.   And that's based on whether David would have sold

20   you that bond for that price, anything less, correct?

13:44:01:02  A.   Yeah, that was based on us trusting David on that

22   front.

13:44:04:12  Q.   No, no, no, that's not what I'm saying.  That's not

24   my question.  Don't insert words into the question.

13:44:09:02       My question to you, sir, is that assumes that David

1     would have sold it to you at the price you calculated it

2     for.

13:44:17:06     3          MR. FRANCIS:  Objection, Your Honor, move to

4     strike.

13:44:18:27     5          THE COURT:  Sustained, motion granted.

13:44:20:27     6     BY MR. BAEZ:

13:44:21:12     7     Q.   My question to you, sir, is when you did the

8     calculation exercise when you came up with 40 thousand

9     dollars, something like that?

13:44:28:11     10    A.   $43,000.

13:44:29:24     11    Q.   That's assuming that David sells it to you at that

12    price.

13:44:33:11     13         MR. FRANCIS:  Objection, asked and answered.

13:44:35:01     14         THE COURT:  I struck the last exchange, so you

15    can answer that, sir.

13:44:39:01     16    A.   Can you repeat?  Sorry.

13:44:42:21     17    BY MR. BAEZ:

13:44:42:21     18    Q.   The exercise you did with the calculator,

19    Mr. Francis came up here and you had this moment where

20    you did the whole calculation, all that's assuming that

21    David sells you the bond at that price, right?  At the

22    lower price.

13:45:02:22     23    A.   That was an assumption.  We were trusting that we

24    were negotiating in good faith.

13:45:07:02     25    Q.   No, no, no.  That is assuming, sir.  I'm not asking

```
1        if you trust David, okay?

13:45:12:29   2        By the way, you'd only seen David once or twice in

3        your life, right?

13:45:19:23   4   A.   That may be the case.  I don't recall.

13:45:21:11   5   Q.   He's not your boy, you guys aren't buddies, right?

13:45:25:17   6   A.   We were professional.

13:45:26:17   7   Q.   You didn't come to his baby's baptism, right?

13:45:31:11   8   A.   That is correct.

13:45:31:23   9   Q.   You didn't go to his wedding with his wife?

13:45:34:11  10   A.   No.

13:45:35:11  11   Q.   You didn't get any of them invites?

13:45:37:02  12        You didn't get any invite for dinner?

13:45:39:05  13   A.   No.

13:45:39:20  14   Q.   So this whole thing about trust, you trust people

15        you know, right?

13:45:46:21  16   A.   When we were operating in business negotiations,

17        e-mails --

13:45:52:02  18   Q.   My question to you is:  You trust people you know,

19        correct?

13:45:57:02  20        That's a simple yes or no answer.

13:46:01:12  21   A.   We trusted prices that were stated in official

22        communications.  That's what we trusted.

13:46:07:12  23   Q.   Sir, my question to you is you trust people that

24        you know, right?  You don't trust people you don't know.

13:46:13:22  25   A.   I think that's just a generalization.
```

13:46:17:12  1    Q.   I know you don't like the question, but answer it,

2    please.

13:46:20:06  3         You trust people you know, correct?

13:46:24:21  4    A.   I suppose the people I trust would be the people I

5    know, yes.

13:46:31:06  6    Q.   So when this hypothetical -- we already covered

7    that -- excuse me for a second.  I want to make sure I

8    cover something else.

13:46:43:15  9         To follow up on that:  Now that we've established

10   you don't have any evidence that David would have sold

11   you the bond for that lower price, we've also

12   established that it was a grab-a-thon.  So he could have

13   sold it to anybody else, right?

13:46:58:11  14   A.   That's what I wanted to just quickly clarify about

15   that, because the mention of odd lot, which is small

16   sizes, I think these bonds would qualify as larger than

17   odd lot.

13:47:14:15  18   Q.   What I'm saying is these bonds were quite popular,

19   right, sir?  Are you going to say they're not?

13:47:20:24  20        You're buying them at a cheap price, right?

13:47:24:12  21   A.   So that piece of chat that I read referenced that.

22   It's hard to remember.

13:47:32:12  23   Q.   I'm not asking you about that.  I'm talking about

24   the RMBS bonds were selling quite often.  That's a fair

25   general statement, right?

13:47:40:13       Is that a yes?

13:47:42:10   A.   Yes.

13:47:42:22   Q.   And you were taking advantage of the housing

4   market, right?  You thought it was going to rebound,

5   right?

13:47:50:19       Is that a yes?

13:47:51:13   A.   That was one of the premises, yes.

13:47:53:07   Q.   And David had other people that he sold bonds to,

9   right?

13:47:59:28   A.   Absolutely.

13:48:01:11   Q.   So we've already established that you have to –- to

12   come up with the loss, you have to assume he would have

13   sold it to you.  My question to you, sir, is:

13:48:14:01       David has free will and he can sell this bond to

15   another hedge fund, correct?  He doesn't have

16   exclusivity with you, right?

13:48:36:26   A.   It's not clear that he would be in the position of

18   owning this bond if it weren't for Marathon's bid.

13:48:43:26   Q.   That's not my question to you, sir.  My question to

20   you is:

13:48:46:08       David can purchase bonds without your permission,

22   right?

13:48:50:08   A.   Of course.

13:48:51:26   Q.   And he can sell bonds without your permission?

13:48:54:22   A.   Of course.

13:48:56:05 1    Q.   So if he doesn't sell it to you, the AMSI bond, he

2    could sell it to another hedge fund, correct?

13:49:06:11 3        There is nothing that precludes him from selling

4    this bond to somebody else other than you?

13:49:15:18 5    A.   Right, that is technically correct.

13:49:18:09 6    Q.   Okay.

13:49:18:09 7    A.   It would have been highly unusual in this situation

8    for him to sell it to someone else.

13:49:24:24 9    Q.   We're not about technically.  I'm asking you a

10   straight up, black and white question; and that is that

11   he doesn't have exclusivity to you and he could sell

12   this bond to anyone else, period.

13:49:37:00 13   A.   That is true.

13:49:54:09 14   Q.   And let me --

13:49:59:09 15       MR. BAEZ:  If I can have the Court's

16   indulgence for a moment, Judge?

13:50:03:15 17       THE COURT:  You may.

13:50:04:06 18           (Pause.)

13:50:24:04 19   BY MR. BAEZ:

13:50:24:12 20   Q.   I want to go back to something before I forget.

13:50:28:02 21       You remember when we were talking about the bond in

22   Count One, the LXS bond?

13:50:33:12 23   A.   Sure.

13:50:34:22 24   Q.   And I have a couple lead up questions before I ask

25   you this.

13:50:41:19   1        In that bond, we discussed previously before the

          2   lunch break that it was a mismodeled bond, correct?

13:50:49:04   3   A.   There was a modeling issue with that bond.

13:50:52:04   4   Q.   And that you guys wanted to sell it, right?

13:50:58:16   5   A.   For probably numerous reasons we wanted to sell it.

13:51:04:01   6   Q.   It's possible it was risky, right?  That's one of

          7   the factors?

13:51:08:25   8   A.   The assessment of the risk would be part of the

          9   sell decision, the risk factors.

13:51:14:11   10   Q.   So the answer is yes?

13:51:15:11   11   A.   It's a possibility.

13:51:17:21   12   Q.   Okay.  I'm going to show you again

          13   Government's Exhibit 102.  I'd like you to read date

          14   5/11/12 at 13:28.  I'll put an asterisk next to it for

          15   you.

13:51:38:01   16        Can you read that to the ladies and gentlemen of

          17   the jury?

13:51:40:19   18        Whose saying that?

13:51:42:11   19   A.   This is Stuart Goldberg.

13:51:44:12   20   Q.   He works for Marathon?

13:51:45:12   21   A.   He did at the time.

13:51:47:21   22   Q.   He did, right.  You said he sat next to you at that

          23   time?

13:51:52:22   24   A.   Nearby, yeah.

13:51:54:02   25   Q.   And you ran things by him when you made these

```
        1     trades back then, right?

13:51:58:08   2     A.   Like I said, some discretion was allowed, so not

        3     always.

13:52:03:26   4     Q.   Okay.  Read to the ladies and gentlemen of the jury

        5     what he says.

13:52:08:23   6     A.   I think Alex has to be forgotten for now.  We like

        7     the bond.  Not in a rush.  Let's move on from that for

        8     now.

13:52:18:11   9     Q.   He says "we" like this bond, right?

13:52:22:20   10    A.   That's what it says.

13:52:24:29   11    Q.   That would include you, right?

13:52:29:14   12    A.   It could.

13:52:32:17   13    Q.   You really wanted to sell the bond, correct?

13:52:37:29   14    A.   I mean, again, I had mentioned that I'm not sure

        15    that was the case.

13:52:42:11   16    Q.   Well, you sold it four hours later, right?

13:52:45:11   17    A.   We sold it.  I suppose we achieved the price that

        18    we were looking for.

13:52:51:05   19    Q.   And he's basically posturing, right?  He's lying.

        20    He's saying you guys like the bond when you're trying to

        21    sell it, right?

13:53:01:08   22             MR. FRANCIS:  Objection.  Compound question.

13:53:02:20   23             THE COURT:  Sustained.  Rephrase.

13:53:04:12   24    BY MR. BAEZ:

13:53:04:12   25    Q.   He's saying you like the bond when you're trying to
```

```
            1   sell it?
13:53:08:02     2   A.   That's not clear from this statement.
13:53:09:29     3   Q.   He's saying "we like this bond," right?
13:53:14:20     4   A.   It could have demonstrated a high yield in the
            5   model.  I don't want to speak for him.
13:53:20:08     6   Q.   The way this works, sir, is I ask the questions and
            7   you give the answer.  I asked a you a very specific
            8   question.
13:53:27:02     9       He said, "We like this bond," right?
13:53:30:18    10   A.   Yes.
13:53:31:00    11   Q.   And you sold it four hours later, right?
13:53:35:00    12   A.   Okay.  Those are facts.
13:53:36:18    13   Q.   Now, if this is a false statement, that would be a
            14   lie, right?
13:53:42:18    15       If it's a false statement, that would be a lie?
13:53:47:24    16       That's my question.
13:53:49:12    17   A.   I'm trying to make that connection because it's not
            18   always clear.  We don't know the reasoning behind this
            19   statement.
13:54:05:22    20       MR. FRANCIS:  I'm going to object to the
            21   witness testifying and speculating about what
            22   Mr. Goldberg means when he's writing that.
13:54:12:12    23       THE COURT:  Sustained.
13:54:13:00    24       MR. BAEZ:  I'm asking a general question.
13:54:15:22    25       THE COURT:  Sustained, 403.
```

13:54:17:09 | BY MR. BAEZ:

13:54:17:27 | Q.   Sir, it's a common sales tactic to act like you're really not that interested in something when you want to buy it, right?

13:54:25:27 | You have negotiated million dollars deals before, right?

13:54:30:27 | A.   That can happen.

13:54:31:21 | Q.   And that is an act you're putting on, right?

13:54:36:27 | A.   I would say that's part of the negotiation process sometimes.

13:54:41:00 | Q.   And negotiations sometimes require misrepresentations, right?

13:54:50:01 | A.   So I don't know if that's the case.

13:54:52:01 | Q.   You don't know, right?

13:54:53:11 | A.   No.

13:54:54:11 | Q.   And in fact --

13:54:55:21 | A.   Generalizations, perhaps.

13:54:57:01 | Q.   It's a generalization.

13:54:58:11 | And when you negotiate, you make misrepresentations, right, like you talked about earlier?

13:55:08:12 | A.   To say that we start with a bid in the range, around the lower range, I don't view that as a misrepresentation.

13:55:19:22 | I think we went down that path, you know,

1       representation, misrepresentation, I'm not comfortable

2       with that.

13:55:26:12   3   Q.   We talked about omissions, correct?  That's what we

4       specifically talked about.

13:55:29:18   5        My point is:  During negotiations, that is a common

6       occurrence, right?

13:55:34:04   7   A.   Generalizations.

13:55:44:07   8   Q.   And you guys are the sellers at this point, right?

13:55:47:07   9   A.   For that transaction, yes.

13:55:48:11   10  Q.   What Stu is talking about, you guys are on the

11      other side, you're selling, and you're acting like, we

12      really don't want to sell this that much.  That's what

13      he's saying?  We like the bond?

13:55:58:01   14       MR. FRANCIS:  Objection.

13:55:59:11   15       THE COURT:  Sustained.

13:56:02:01   16  BY MR. BAEZ:

13:56:02:13   17  Q.   Let me clarify that.

13:56:04:11   18       Stu was referring to a bond you guys were selling,

19      correct?

13:56:08:02   20       MR. FRANCIS:  Objection.  Asked and answered.

13:56:09:28   21       THE COURT:  We can close it up and move on.

13:56:11:25   22  BY MR. BAEZ:

13:56:12:23   23  Q.   You can answer.

13:56:15:12   24  A.   That was a bond that Marathon was selling.

13:56:22:02   25  Q.   Now, sir, I'm going to show you what's listed as

1          Defense Exhibit 381.

13:56:38:12            THE COURT:  Is it admitted yet?

13:56:40:03            MR. BAEZ:  No, sir.

13:56:40:23            THE COURT:  Is it admitted under another

5          number or are you going to admit it under that number?

13:56:47:16            MR. BAEZ:  Under this number.

13:56:47:17            THE COURT:  And that's agreed to?

13:56:48:20            MR. FRANCIS:  No objection.

13:56:49:08            THE COURT:  So Defendant's Exhibit 381 is

10         admitted.

13:56:56:21            MR. BAEZ:  May I approach?

13:56:58:17            THE COURT:  You may.

13:56:59:05    BY MR. BAEZ:

13:57:00:01    Q.   Sir, this is an internal document from Marathon,

15         right?

13:57:09:02    A.   These appear to be from our -- yes.

13:57:12:20    Q.   And this is referring to the AMSI bond, the charge

18         to Count Two?

13:57:20:01    A.   Yes, this one on the left.

13:57:21:22    Q.   And who does it say the counterparty is to your

21         transaction?

13:57:29:02            MR. FRANCIS:  I'm sorry, Your Honor, can I

23         have a second?

13:57:31:12            I'm not sure their exhibit numbers didn't

25         change.  We might be looking at the wrong one.

13:57:37:05 1          THE COURT:  Why don't you just take a look at

2     it first.

13:57:40:29 3          MR. FRANCIS:  Yeah, that's what I'm asking.

4     Thank you.

13:57:41:08 5                    (Pause)

13:57:49:14 6          So this is actually just a part of it, Judge?

13:57:58:11 7          We need to remark it, because I think the

8     original was more, but it's fine.  The document is fine

9     to be admitted.  I just don't know what we're calling

10    it.

13:58:07:11 11         THE COURT:  Why don't we call it 381, and if

12    we have to work with something else, we will call it

13    381-A.

13:58:14:11 14         MR. BAEZ:  Thank you.

13:58:14:20 15         May I proceed, Your Honor?

13:58:16:24 16         THE COURT:  You may.

13:58:17:11 17         MR. BAEZ:  Thank you.

13:58:17:20 18    BY MR. BAEZ:

13:58:20:00 19    Q.    Tell the ladies and gentlemen of the jury who, in

20    your own internal documents, shows is the counterparty

21    to this AMSI bond on Count Two?

13:58:32:02 22    A.    So you're referring to line two?

13:58:36:22 23    Q.    Yeah.

13:58:37:12 24    A.    So we did a trade in the previous year, April 2011,

25    where we purchased another part of this bond from

1         Seaport at 74 and a half.

13:58:56:18   2    Q.   And then, who did you sell --

13:58:58:00   3    A.   We purchased another piece.  This was I think the

4         one trade in question.

13:59:04:06   5    Q.   Yes.  This is the trade in question, Count Two for

6         which you've testified all day on Monday.

13:59:10:18   7    A.   Yes.

13:59:11:06   8    Q.   Who does it say is the counterparty to Count Two?

13:59:15:09   9    A.   Cantor Fitzgerald.

13:59:16:01   10   Q.   So in your own documents it says the person sitting

11        across the table is Cantor Fitzgerald?

13:59:23:18   12   A.   That is who the counterparty listed is.

13:59:26:15   13        MR. FRANCIS:  I'm sorry, Your Honor.

13:59:27:15   14        In fairness to the witness, could Mr. Baez

15        give him a little room?

13:59:31:24   16        I'm not sure he needs to be in his lap to ask

17        the question.

13:59:37:01   18   BY MR. BAEZ:

13:59:37:01   19   Q.   Sir, am I giving you a lap dance or something, sir?

13:59:43:02   20        THE COURT:  That's not going to be a problem

21        because you can show the documents from back there --

13:59:47:02   22        MR. BAEZ:  All right.

13:59:47:12   23        THE COURT:  -- and it won't be an issue.

13:59:55:12   24        MR. BAEZ:  I need to look at it too.

13:59:58:02   25        THE COURT:  Why aren't we using the display?

14:00:00:28  1               MR. BAEZ:  I have another copy, Judge.  I

          2  apologize.

14:00:04:16  3  BY MR. BAEZ:

14:00:05:16  4  Q.   Sir, it also shows in here the purchase price,

          5  right, that you bought it from Cantor Fitzgerald?

14:00:12:01  6  A.   Yes.

14:00:13:16  7  Q.   And then you later on sold this bond, correct?

14:00:17:28  8  A.   Yes.  In 2016, March 2016.

14:00:22:01  9  Q.   So you bought it for 66.62 -- 66 and change, right?

14:00:29:01  10  A.   Yes.

14:00:29:21  11  Q.   And you sold it for 87 and change?

14:00:33:19  12  A.   We did.  But we also bought it at 74 and a half

         13  before.  The bond depreciated in price from 2012 as

         14  well.

14:00:43:01  15  Q.   But in this bond, you made millions of dollars, did

         16  you not, sir?

14:00:47:21  17  A.   That's likely the case, yes.

14:00:50:28  18  Q.   So if it weren't for David Demos selling you this

         19  AMSI bond on Count Two, you wouldn't have made those

         20  millions of dollars, right, off that bond?

14:01:03:02  21  A.   We did make millions of dollars off this bond, yes.

14:01:06:23  22  Q.   The question is:  If he hadn't sold it to you, you

         23  wouldn't have made those millions from that bond?

14:01:14:12  24  A.   From that bond, right.  We could have bought

         25  another bond and made millions too.

14:01:21:14      Q.   But on that bond.

14:01:22:29      A.   Yes.

14:01:24:29              MR. BAEZ:  If I can have just a moment, Judge?

14:01:27:02              THE COURT:  Certainly.

14:01:27:23                  (Pause.)

14:01:46:17              MR. BAEZ:  I may have some follow-up questions

                    for you later but not right now.

14:01:51:15              Thank you.

14:01:51:24              I have no further questions right now.

14:01:58:21              THE COURT:  Thank you.

14:01:58:24              Any redirect?

14:02:01:01              MR. FRANCIS:  Yes, please, Your Honor.

14:02:02:15              May I have a minute or two to set up?

14:02:04:24              THE COURT:  Certainly.

14:02:05:01                  (Pause)

14:03:30:16              MR. FRANCIS:  May I?

14:03:32:01              THE COURT:  You may.

14:03:32:11              MR. FRANCIS:  Thank you, Your Honor.

14:03:32:11

14:03:32:12                     REDIRECT EXAMINATION

14:03:34:12      BY MR. FRANCIS:

14:03:35:12      Q.   Good afternoon.

14:03:38:25              I want to ask you some follow-up questions based on

                    the things you were talking about with Mr. Baez, okay?

14:03:43:25      A.   Sure.

14:03:46:16   1   Q.   Over on this chart, Mr. Baez is asking you

2   questions about whether you had a duty to Mr. Demos and

3   whether Mr. Demos had a duty to you.  Do you remember

4   that?

14:03:56:17   5   A.   Yes.

14:03:56:23   6   Q.   Okay.  Now, explain for us, did you believe that

7   you had a duty to Mr. Demos?

14:04:02:29   8   A.   Legally, no.

14:04:05:20   9   Q.   Did you believe that Mr. Demos had a duty to you?

14:04:10:14   10   A.   Legally I do not think he did.

14:04:12:17   11   Q.   Okay.  Did you think the fact that you didn't have

12   a duty to Mr. Demos made it okay for you to lie to him?

14:04:21:11   13   A.   Sorry?

14:04:22:05   14   Q.   The fact that you didn't think you had a duty to

15   Mr. Demos, do you believe that meant it was okay for you

16   to lie to him?

14:04:29:17   17   A.   So, in general, I was lying -- you know, lying was,

18   I wouldn't say part of our, or my, investment process.

19   So --

14:04:43:22   20   Q.   Did you lie to Mr. Demos?

14:04:47:12   21   A.   I don't believe that I did.

14:04:50:02   22   Q.   Because Mr. Demos didn't have a duty to you, did

23   you think that made it okay for him to lie to you?

14:05:00:12   24   A.   So in the context of --

14:05:07:02   25        MR. BAEZ:  Objection, Judge.  Calls for

1    speculation.

14:05:10:02        THE COURT:  Overruled.

14:05:13:18    A.    In the context of an official communication or

4    transaction and discussion around price, that is not

5    something that I expected to happen.

14:05:27:06    BY MR. FRANCIS:

14:05:27:06    Q.    When you say that's not something --

14:05:30:27    A.    That I expected to happen.

14:05:32:06    Q.    What didn't you expect to happen?

14:05:33:20    A.    Lying or misrepresentation.

14:05:37:01    Q.    Okay.  And did Mr. Demos lie to you?

14:05:43:09    A.    I believe so.

14:05:48:01    Q.    You were asked some questions by Mr. Baez about the

14    difference between -- that three-day settlement period;

15    do you remember those?

14:05:55:10    A.    Yes.

14:05:55:22    Q.    Just generally.  I'm not going to ask you exactly

18    the question.

14:06:00:11        You, in one of your answers, you were explaining

20    the way it works, I believe.

14:06:05:02        Can you explain to the jury what happens, the way

22    it works, if Marathon breaks a trade during that

23    three-day settlement period?

14:06:18:22    A.    So my understanding would be that the break of a

25    trade in that three-day settlement period would be a

1          major breach of trading protocol.

14:06:29:01   2   Q.   And has Marathon ever done that, to your knowledge?

14:06:34:07   3   A.   I have not done that, to my knowledge.

14:06:37:10   4   Q.   You personally have not done that?

14:06:39:07   5   A.   I have not.

14:06:40:10   6   Q.   Have you seen Marathon do that?

14:06:43:19   7   A.   I have not.   Though I can't speak for Marathon as a

8          whole.

14:06:57:16   9   Q.   So Mr. Baez asked you some questions about in the

10         AMSI trade the fact that you omitted to tell Mr. Demos

11         the highest price Marathon was going to pay.   Do you

12         remember that?

14:07:13:20   13   A.   Yes.

14:07:14:19   14   Q.   And there was that whole thing about

15         representing -- whether you were misrepresenting

16         something or representing something falsely.

14:07:23:01   17   A.   Right.

14:07:24:20   18   Q.   So when Mr. -- well, let meet ask this first:

14:07:36:01   19        Marathon -- the highest price Marathon is willing

20         to pay, is that a fact or an opinion?

14:07:53:12   21   A.   A fact in an objective sense?

14:07:56:12   22        In some cases there could be a number where it's

23         the highest price.   That could be an output of a lot of

24         opinions, but --

14:08:06:22   25   Q.   Let me come at it from a different direction.

14:08:10:08   1          In the AMSI trade, who did you think you were

2      negotiating against?

14:08:15:20   3      A.   So we thought we were negotiating against the

4      seller.

14:08:20:09   5      Q.   Why did you think that you weren't negotiating

6      against Mr. Demos?

14:08:34:00   7      A.   I suppose it was just the way I understood the kind

8      of trade negotiation process to work.

14:08:47:24   9      Q.   What is that based on, that expectation?

14:08:52:00  10      A.   It's based on my own experiences doing many trades.

14:08:58:06  11      Q.   I want to come back to this omitting to tell

12      Mr. Demos Marathon's highest purchase price.

14:09:05:00  13          Did you affirmatively lie to Mr. Demos about what

14      the highest price Marathon was willing to pay for that

15      bond was?

14:09:14:27  16      A.   I don't believe so.

14:09:20:12  17      Q.   Did you hold something back?

14:09:28:11  18      A.   We weren't sharing with him our model outputs, if

19      that's what you mean.

14:09:36:22  20      Q.   Is that common when negotiating for a bond, not to

21      tell someone like Mr. Demos everything you think about

22      the bond?

14:09:47:02  23      A.   I believe that is common, yes.

14:09:50:02  24      Q.   Is it common to tell someone like Mr. Demos

25      everything that Marathon thinks, including the highest

1    price it would ever pay?

14:10:00:18    2    A.    I believe it's not.

14:10:04:09    3    Q.    So tell the jury, what is –– in Marathon's

4    calculation of its price ceiling, the highest price it's

5    willing to pay, what is that based on?

14:10:16:04    6    A.    It's based on our assessment of the quantitative

7    characteristics of a bond through our model as well as

8    the general investment condition of the economy and the

9    RMBS market at that point in time.

14:10:32:20    10    Q.    When you say "we," that's Marathon?

14:10:35:25    11    A.    Yeah.  Marathon, structured credit team at

12    Marathon.

14:10:43:01    13    Q.    Your group?

14:10:45:23    14    A.    Right.

14:10:46:25    15    Q.    Does everyone in the market agree with your group

16    at Marathon about bonds?

14:10:53:28    17    A.    No.

14:10:57:01    18    Q.    And so I'll return to my earlier question:

14:11:04:22    19    Is Marathon's –– the highest price, the price

20    ceiling that you arrived at, does that –– can that

21    change in the course of a negotiation?

14:11:16:28    22    A.    It's possible.

14:11:18:08    23    Q.    Is it something that you write down somewhere and

24    share within the group?

14:11:26:12    25    A.    That is also possible in certain cases.

14:11:29:23 1   Q.   Is it something you write down and share with the

2   rest of the market?

14:11:36:05 3   A.   Generally almost never.

14:11:38:14 4   Q.   Why is that?

14:11:44:11 5   A.   I suppose it's just not something that, in my

6   experience, was something that was commonly shared.

7   It's a result of our own analysis.

14:11:55:15 8   Q.   Would that be good for Marathon's investors if the

9   rest of the market knew this is Marathon's –– the

10   highest price it's willing to go to buy a bond?

14:12:07:09 11   A.   That would not be great information to have

12   disseminated.

14:12:12:18 13   Q.   Why not?

14:12:18:11 14   A.   We have to continuously try to achieve the best

15   returns for our investors and that would be –– buying a

16   bond at a higher price would be counter to that.

14:12:29:12 17   Q.   And if you shared your price ceiling, would that

18   help you get bonds at lower prices?

14:12:35:00 19   A.   It would not.

14:12:37:02 20   Q.   When –– in the AMSI trade, when Mr. Demos told you

21   that Cantor was buying it at 66 and 14, was he holding

22   something back about the price?

14:12:48:22 23          MR. BAEZ:  Objection, Judge.  Assumes facts

24   not in evidence.  The chat says, "own 66-14."

14:12:56:12 25          MR. FRANCIS:  I'll pull it up, Your Honor.

14:13:29:28 | BY MR. FRANCIS:

14:13:29:28 | Q.   So Mr. Cong, I have up on the screen these two

3 | documents we were looking at before.  On the top is

4 | Government's Exhibit 202 and on the bottom is 208.

14:13:39:07 | Do you see the "own" reference that Mr. Baez is

6 | making in the top document, 202?

14:13:47:01 | A.   Yes.

14:13:48:19 | Q.   Was Mr. Demos saying that to you?

14:13:53:16 | A.   The top document?

14:13:55:13 | Q.   Yeah.

14:13:56:10 | A.   In the top document, I was not in that chat.

14:13:59:11 | Q.   So who is Mr. Demos talking to there?

14:14:04:01 | A.   Another Cantor employee.

14:14:06:25 | Q.   So now let's look at the bottom document where

15 | Mr. Demos is talking to you.

14:14:10:11 | What price did Mr. Demos say that Cantor was paying

17 | for this bond?

14:14:18:07 | A.   Sixty-six and 14.

14:14:22:25 | Q.   Okay.  So when Mr. Demos told you that Cantor was

20 | paying this price of 66 and 14, was he holding something

21 | back about the purchase price?

14:14:35:28 | A.   Based on this, yes.

14:14:38:02 | Q.   What was he holding back?

14:14:41:02 | A.   The actual purchase price.

14:14:47:22 | Q.   How is that different than Marathon not telling the

1    world or the market what its price ceiling is?

14:14:59:29    A.    This is a specific transaction price.

14:15:07:17    Q.    Is that the sort of information that you expected

4    to be accurately represented to Marathon?

14:15:15:02    A.    We -- or I did expect that.

14:15:21:17    Q.    Let's move on.

14:15:27:26    Mr. Baez asked you a number of questions about this

8    LXS trade, do you recall that?

14:15:33:05    A.    Yes.

14:15:35:11    Q.    So I'm not sure that we ever got sort of the story

11    of that.

14:15:42:23    First, what was your role in the LXS trade?

14:15:49:05    A.    I believe it was on the analysis side.

14:15:53:20    Q.    Who was the person who was actually negotiating

15    that trade at Marathon?

14:16:00:11    A.    Based on what we've seen, Stuart Goldberg.

14:16:05:11    Q.    Now, explain for us who's buying and selling that

18    bond?  What is Marathon doing with the LXS bond?  Sort

19    of walk us through that.

14:16:16:12    A.    In terms of selling?  Or what do you mean?

14:16:21:12    Q.    As I understood it from the questions being posted

22    to you, Marathon owned the LXS bond?

14:16:27:02    A.    We did own it, yes.

14:16:28:27    Q.    And then at some point Marathon was selling; is

25    that right?

14:16:34:06    A.    Correct.

14:16:41:00    Q.    There were some questions, and I think you may have

agreed with some and disagreed with others, about issues

in the deal documents having to do with this bond?

14:16:48:03    A.    Correct.

14:16:49:15    Q.    Can you explain to the jury, to the best of your

recollection, what that situation was?  In layman's

terms, please.

14:17:00:21    A.    So the -- oftentimes the cash that's collected from

borrowers -- as we mentioned, there's a trustee who

distributes these cash flows based on a set of governing

documents.  And sometimes particularly, you know, an

issue where there were high losses, you know, it may

have been triggered by what happened with the housing

market -- some of the documents were not so well

prepared, you know, in anticipating such high losses.

14:17:38:21    And there were things -- there were something

called triggers in these deals.  When they were

breached, it would cause cash flows to be redirected in

certain ways.

14:17:54:02    And the issue with the LXS revolved around one of

these triggers.

14:17:59:12    Q.    So the deal documents for a bond, like LXS, is that

something like Marathon has alone?

14:18:06:22    A.    No, those are public documents.

14:18:09:22 1    Q.   So was the issue with the deal documents we're

2    talking about, was that a fact or was that Marathon's

3    interpretation?

14:18:26:10 4    A.   The reading and the ultimate effect on the cash

5    flows and the structure, that was our interpretation.

14:18:37:02 6    Q.   Okay.  Did you disclose, did you share your

7    interpretation with people not at Marathon after you

8    owned the bond?

14:18:46:08 9    A.   We did have dialogue with both Intex and the

10   trustee, I believe, based on e-mails.

14:18:53:02 11   Q.   So you made a reference to Intex during your

12   examination.  Can you just explain:  What does Intex

13   have to do with anything in this?

14:19:00:23 14   A.   So Intex is -- we've been talking a lot about the

15   model.  So Intex is, in a lot of cases, Intex is kind of

16   the main tool for modeling.

14:19:16:05 17        So we put in our assumptions and Intex has

18   something called the cash flow engine that kind of has

19   these governing documents reengineered, reverse

20   engineered.  And those -- Intex provides that output

21   based on our inputs.

14:19:38:02 22   Q.   Why was Marathon having dialogue, talking with

23   Intex about the LXS bond and the triggers issue?

14:19:46:03 24   A.   So generally we were trying to probably get Intex

25   to, I guess, interpret the documents as we thought they

1          should be interpreted.

14:20:08:15  2   Q.   And if Intex agreed with you, and they interpreted

3          the documents that way, what would happen when people

4          other than Marathon ran the LXS bond through their

5          models?

14:20:20:24  6          MR. BAEZ:   Objection, Judge.   Calls for

7          speculation.

14:20:24:12  8          THE COURT:   Overruled.   Ask him if he knows.

14:20:27:24  9   BY MR. FRANCIS:

14:20:30:01  10  Q.   Let meet ask it a little differently.

14:20:31:27  11       What was Marathon hoping to achieve by talking to

12         Intex?

14:20:36:09  13  A.   So if Intex agrees with that change, they will

14         change the model and they will post it on their website.

14:20:49:11  15  Q.   And is that website like a secure website that only

16         Marathon can read?

14:20:54:24  17  A.   So that is a website that is available, as I know

18         it, to people who subscribed to Intex, to this specific

19         RMBS portion of Intex.

14:21:05:22  20  Q.   Do other market participant, aside from Marathon,

21         make use of Intex and its cash flow engine?

14:21:13:07  22  A.   Yes.

14:21:14:12  23  Q.   Is it sort of industry standard?

14:21:17:13  24  A.   I would call it that, yes.

14:21:19:02  25  Q.   So if Intex agreed with Marathon's interpretation

```
 1    of the triggers and these deal documents, what effects
 2    would that have had on the Intex cash flow engine?
 3    A.   They just would have changed the wiring and the
 4    rules of that engine and they would have put out a
 5    notice.
 6    Q.   So then when the market ran the LXS bond, would it
 7    be more valuable or less valuable?
 8    A.   So I don't recall how it would have looked on a
 9    forward looking basis.
10         I think that likely –– it's likely that in certain
11    adverse scenarios that the LXS would have looked better,
12    not in a base case.
13    Q.   Did Marathon want the market to know and agree with
14    it about its interpretation of this sort of trigger in
15    the deal documents on the LXS bond?
16    A.   Yes, in this case.
17    Q.   Explain to the jury why Marathon wanted the market
18    to know about this problem with the deal documents.
19    A.   In certain adverse scenarios where the trigger was
20    tripped, it would have been beneficial to that security.
21    Q.   What does that mean for Marathon when it tries to
22    sell the bond to someone else in the market?
23    A.   It would have been a higher price potentially.
24    Q.   Was this a bad bond?
25         Let me ask it differently.
```

14:23:12:29 1          MR. BAEZ:  Objection, Judge.  I'd like to hear

2      his answer.

14:23:16:14 3          MR. FRANCIS:  I was quoting Mr. Baez.  I

4      didn't think he'd want me to, but I can.

14:23:21:05 5      A.   I would answer it the same way.

14:23:22:15 6          There are so many other factors about this bond

7      besides the structure.  I don't know how to label it at

8      this point.

14:23:31:03 9      BY MR. FRANCIS:

14:23:31:03 10     Q.   Was there some secret flaw in the LXS bond that

11     only Marathon knew about and it wanted to sell before

12     everyone else found out?

14:23:41:27 13     A.   That does not appear to be the case.

14:23:44:09 14     Q.   Is it the opposite of that?

14:23:51:09 15     A.   It may be.

14:23:53:01 16     Q.   So what's your hesitation?  Why "may"?

14:23:57:21 17     A.   Even now, it was a very complicated issue and, you

18     know, given that we were talking openly with the trustee

19     and Intex, I believe that that is the conclusion to

20     draw, but I'm not completely sure.  There was a lot of

21     back and forth.

14:24:18:02 22     Q.   Was there someone at Marathon who maybe would know

23     more about the LXS bonds and Marathon's views and what

24     it was trying to achieve?

14:24:29:12 25     A.   Perhaps Stu.  He was transacting on this security.

14:24:32:28     1    Q.    What's Stu's last name?

14:24:34:19     2    A.    Goldberg.

14:24:41:01     3    Q.    Okay, so moving on.

14:24:44:22     4          Mr. Baez asked you a number of questions about the

                5    disclaimer in Government's Exhibit 207.  So I'll put it

                6    up on the screen.

14:25:02:14     7          Is this what Bloomberg chats look like when you're

                8    using -- when you're at your computer working?

14:25:14:20     9    A.    That's what I was saying.  On a realtime basis this

                10   is not something that shows up when we enter a chat now.

14:25:25:26     11   Q.    Let me just ask differently.

14:25:27:11     12         Aside from -- I'll take that down, I don't want it

                13   to distract you.

14:25:31:20     14         Look at this piece of paper, the image on your

                15   screen.  Is this how Bloomberg chats look when you're at

                16   work?

14:25:40:21     17   A.    It is not.

14:25:43:06     18   Q.    How do they look different?

14:25:48:09     19   A.    So it's kind of -- very much like a regular -- it's

                20   just a chat box.  If you can imagine, kind of like an

                21   instant messaging sort of box.

14:25:59:12     22         The participants -- there's no -- for example,

                23   there's nothing that says number of participants, I

                24   don't believe.  The participants are kind of lined up

                25   across the top.  In some cases they're summarized.

```
 1      Depends on how you -- I think, how you have it set up.
14:26:22:16  2   Q.   Is all that stuff I highlighted, do you see that
 3      when you're in a chat?  The top portion of the document?
14:26:30:07  4   A.   So definitely not in this form.  There are some
 5      pieces of information that are there.
14:26:34:19  6   Q.   Do you see this Room ID?  Is that a part of your
 7      work?
14:26:42:04  8   A.   No.
14:26:46:25  9   Q.   And when you log in, do you see the -- or when you
10      are in the room, do you see the disclaimer at all?
14:26:56:16  11   A.   So I don't recall five years ago, they may have
12      changed, but today you do not see this disclaimer.
14:27:08:10  13   Q.   And here's the disclaimer.  I believe -- sorry, let
14      me fix what I did there.
14:27:24:20  15      We went through the actual talking.  We didn't go
16      through this part.
14:27:30:02  17      If I scroll down, do you see any part where
18      Marathon or you or Mr. Goldberg or Mr. Springer agreed
19      to the language that's in the disclaimer?
14:27:52:08  20   A.   Not with an affirmative chat message.
14:27:56:20  21   Q.   So when you go into -- you have been on websites
22      where you have to accept terms of services, like click
23      something and say you agree and maybe you haven't even
24      read the thing.  Have you had that experience?
14:28:09:23  25   A.   Yeah, sure.
```

14:28:10:26  1    Q.   So do you have to agree with the disclaimer before

2    you get into the chat?

14:28:20:23  3    A.   I don't see that here.

14:28:22:02  4    Q.   So before you came to court today, do you have a

5    recollection of ever reading this language?

14:28:31:26  6    A.   I don't.

14:28:36:05  7    Q.   Is it your understanding that, for instance, in

8    this case Mr. Demos -- I highlighted the part at

9    12:02:13 -- is it your understanding that he typed that

10   out?

14:28:47:29  11   A.   You know, I don't think he did, but --

14:29:01:01  12   Q.   As long as we are talking about the disclaimers,

13   the one Mr. Baez showed you was in your chat.  I'm going

14   to show you Government's Exhibit 202.

14:29:09:21  15        Remember, this is the internal Cantor chat we went

16   through, right?

14:29:15:00  17   A.   Right.

14:29:21:21  18   Q.   Did the disclaimer show up even in the internal

19   Cantor Fitzgerald chats?

14:29:28:22  20   A.   It's showing up in this one, yes.

14:29:32:28  21   Q.   I won't do the thing where I go through and make

22   you count them all, but there's more than one just even

23   on the screen of the first page of

24   Government's Exhibit 202, right?

14:29:42:02  25   A.   Yes.

14:30:11:19 1   Q.   So I've highlighted or I've blown up the one from

2   11:53:47, for the record, in Government's Exhibit 202.

3   This is the disclaimer that Mr. Demos's name is attached

4   to.  This is from the internal Cantor chat.

14:30:33:14 5      But to be fair, I'm going to pull up the one from

6   207.  That was the one you were looking at with

7   Mr. Baez.

14:30:40:14 8      So there's Mr. Demos's disclaimer, the one his name

9   attached to.

14:30:48:11 10      Is there in there about how the defendant is going

11   to lie to you?

14:31:11:01 12   A.   Doesn't mention that circumstance specifically.

14:31:14:18 13   Q.   Does it alert you to the fact that Mr. Demos may

14   lie to you about price information?

14:31:43:00 15   A.   Again, not in that -- not in those terms.

14:31:48:12 16   Q.   Does the word "lie" appear in there?

14:31:50:27 17   A.   No.

14:31:51:01 18   Q.   "Misrepresent"?

14:31:57:00 19   A.   No.

14:31:57:22 20   Q.   "Fraud"?

14:32:05:02 21   A.   No.

14:32:07:24 22   Q.   In fact, what did I just highlight in the

23   disclaimer language?

14:32:19:25 24   A.   "Information provided is believed reliable."

14:32:36:12 25   Q.   And in the AMSI trade, 70 seconds after Mr. Demos

1    learned the actual purchase price, he told you -- then

2    when he told you the purchase price was 66 and 14, was

3    that information reliable?

14:32:55:07    4        MR. BAEZ:  Objection.

14:32:56:10    5        THE COURT:  Overruled.

14:32:58:22    6        MR. BAEZ:  Assumes facts not in evidence.  It

7    doesn't say that.

14:33:02:16    8        THE COURT:  You can cover it on the recross.

9    Overruled.

14:33:07:19    10    A.   Could you repeat the question, sir?

14:33:09:02    11    BY MR. FRANCIS:

14:33:09:02    12    Q.   Yeah.  It was long.

14:33:11:20    13        When Mr. Demos told Marathon that Cantor -- we own

14    66-14, 70 second after Mr. Demos was told, you buy

15    65-24, was the information that Mr. Demos gave to

16    Marathon reliable?

14:33:40:01    17    A.   In my view, given these two chat messages, no.

14:33:56:26    18    Q.   So Mr. Baez had some questions about the

19    calculations with the calculator, asked you to do -- and

20    he found a bigger calculator, sorry, I had you use that

21    small one.  Do you remember those questions?

14:34:11:02    22    A.   Yes.

14:34:11:24    23    Q.   Do you remember that topic, I should ask?

14:34:14:12    24    A.   Uh-huh.

14:34:15:06    25    Q.   When I was asking you to do stuff with the

1      calculator, did I ask you to assume anything?

14:34:23:15  A.   I don't recall.

14:34:24:24  Q.   Did I ask you to calculate loss?

14:34:33:03  A.   I don't recall if it was phrased in that way.  I

5      don't think so.

14:34:36:03  Q.   Is what I did ask you to calculate the difference

7      between one price, the real price and the price that

8      Mr. Demos told you?

14:34:47:21  A.   I believe that was the framing of it, yes.

14:34:52:00  Q.   So when you were telling the jury the results of

11     those calculations, tens of thousands of dollars, were

12     you calculating anything other than the dollar value

13     difference between the lie and the truth in those

14     trades?

14:35:08:04  A.   I was calculating the dollar difference between

16     these two prices.

14:35:13:25  Q.   So Mr. Baez had some questions for you about --

14:35:27:02        MR. FRANCIS:  I'm sorry, Your Honor.  May I

19     get a time from --

14:35:30:22        THE COURT:  Sure.

14:35:31:05        (Pause.)

14:35:52:12        MR. FRANCIS:  I'm sorry, Judge.  Let me ask

23     Mr. Baez.

14:35:56:12        (Pause.)

14:36:05:12        MR. FRANCIS:  Sorry, Judge, my note is wrong.

14:36:34:23                THE COURT:  What exhibit are we looking at?

14:36:37:26                MR. FRANCIS:  Government's Exhibit 102.

14:36:39:23                THE COURT:  Are you looking for 14:43:42?

14:36:45:26                MR. FRANCIS:  I believe I am, Judge.

14:36:57:24    BY MR. FRANCIS:

14:36:57:24    Q.   You were asked some questions about this document,

7    102?

14:37:00:24    A.   Right.

14:37:04:09    Q.   And the language that Mr. Baez focused on was,

10    Please take with grain of salt, not necessarily the most

11    accurate piece of info.

14:37:17:11         Who typed those words?

14:37:20:01    A.   Mr. Demos.

14:37:21:11    Q.   And what -- sitting here today, what do you

15    understand Mr. Demos to have been telling you when he

16    said, Take with grain of salt, not necessarily the most

17    accurate piece of info?

14:37:40:01    A.   Probably basically that phrase quite literally for,

19    you know, what he had been referencing previously.

14:37:49:12    Q.   So taking something with a grain of salt sort of

21    means the same thing as saying it's not necessarily the

22    most accurate piece of info?

14:38:02:02    A.   Yeah.  Just consider that.

14:38:09:12           MR. FRANCIS:  Your Honor, I'm putting up

25    Government's Exhibit 703 in evidence.

14:38:13:07 1    BY MR. FRANCIS:

14:38:13:07 2    Q.   In the HVMLT trade, when Mr. Demos told you, Bought

3    it at 21-24, did he say anything about grain of salt in

4    that chat?

14:38:41:11 5    A.   No, there's nothing on that here.

14:38:45:23 6    Q.   We went through this.  Cantor really bought it at

7    21, right?

14:38:51:08 8    A.   Correct.

14:38:52:05 9    Q.   And in this Government's Exhibit 703, did Mr. Demos

10    warn you when he wrote, Bought it at 21-24, not

11    necessarily the most accurate piece of info?

14:39:10:01 12    A.   It's not mentioned here.

14:39:17:21 13    Q.   And for the trade charged in Count Two, when

14    Mr. Demos wrote to you, AMSI, we own 66-14, did he warn

15    you that that information was not necessarily the most

16    accurate piece of info?

14:39:45:27 17    A.   He did not.

14:39:47:01 18    Q.   Did he tell you, you should take this with a grain

19    of salt?

14:39:54:02 20    A.   No.

14:39:56:22 21    Q.   Did you think at the time that was accurate

22    information he was providing to you?

14:40:04:12 23    A.   Based on the way I transacted it, yes.  I was

24    under, probably under the assumption, that 66 and 14 was

25    where he bought it.

14:40:18:16 1   Q.   So Mr. Baez asked you some questions about the AMSI

2   bond.  There was also some follow up about a pen, about

3   whether or not you knew that you could say definitely

4   that Mr. Demos would have agreed to sell that bond at a

5   cheaper price than the 66 and 14 plus the six tick

6   compensation.

14:40:41:17 7       Do you remember those questions?

14:40:42:14 8   A.   Yes.

14:40:45:02 9   Q.   Why don't you know whether or not Mr. Demos would

10   have agreed to sell it at a cheaper price?

14:40:55:06 11   A.   I wasn't in his mind, so I don't know.  Maybe he

12   wasn't willing to.

14:41:01:27 13   Q.   Did the negotiation continue after Mr. Demos --

14   after you agreed to pay six ticks more than the price

15   Mr. Demos told you he was paying for the bond?

14:41:16:11 16   A.   No, except for setting the commission on top.

14:41:22:01 17   Q.   Did you get a chance to --

14:41:26:21 18       MR. BAEZ:  Object to the last statement.  Move

19   to strike based on pretrial order.

14:41:32:12 20       THE COURT:  Why don't you just clarify what is

21   meant when the witness said "a commission."

14:41:38:02 22       MR. FRANCIS:  I'm sorry.

14:41:39:02 23   BY MR. FRANCIS:

14:41:39:02 24   Q.   When you say that, is that a reference to the six

25   ticks that was added on top?

14:41:44:19   1   A.   Yes.

14:41:49:13   2   Q.   Did you ever get a chance to find out if Mr. Demos

3   would sell it to you at the real purchase price plus six

4   ticks?

14:42:02:10   5   A.   We did not.

14:42:03:10   6   Q.   Why not?

14:42:06:13   7   A.   We didn't know what the other purchase price was.

14:42:10:25   8   Q.   Why didn't you know what the real purchase price

9   was?

14:42:16:01   10   A.   That was a transaction between the seller and

11   Cantor.

14:42:21:28   12   Q.   Did you think you knew what the purchase price was?

14:42:27:25   13   A.   Yeah.  We thought it was 66 and 14.

14:42:31:01   14   Q.   Why did you think that?

14:42:36:01   15   A.   When we -- when it came down to prices and in chats

16   and e-mails in Bloomberg, I believe that they were true.

14:42:48:01   17   Q.   So let me ask the question a little bit more

18   pointedly.

14:42:50:11   19        Who told you that the purchase price was 66 and 14

20   rather than 65 and 24?

14:42:59:12   21   A.   Mr. Demos.

14:43:15:09   22   Q.   Mr. Baez asked you questions about you meeting with

23   the government.  We have met before, right?

14:43:20:06   24   A.   Yes, we have.

14:43:21:12   25   Q.   In our meetings, did the government tell you

1          there's one rule to testifying in court?

14:43:28:12  2  A.   Yes.  Tell the truth.

14:43:31:09  3          MR. FRANCIS:  Thank you, Your Honor.  No

4          further questions.

14:44:10:10  5          MR. BAEZ:  May it please the Court?

14:44:13:13  6          THE COURT:  Please.

14:44:13:19  7

14:44:13:19  8                    RECROSS-EXAMINATION

14:44:15:01  9  BY MR. BAEZ:

14:44:15:25  10  Q.   Sir, I want to clear up one last thing about the

11          disclaimer.

14:44:20:22  12          MR. BAEZ:  May I approach the witness?

14:44:21:23  13          THE COURT:  You may.

14:44:22:16  14  BY MR. BAEZ:

14:44:23:04  15  Q.   Can you look at the very first thing right before

16          the disclaimer?

14:44:27:19  17          MR. FRANCIS:  I'm sorry Your Honor, is that

18          207?

14:44:30:07  19          MR. BAEZ:  Yes, I'm sorry.  102.  Pardon me.

14:44:36:22  20  BY MR. BAEZ:

14:44:37:07  21  Q.   There's no difference -- from all the documents

22          you've seen, they are all the same disclaimer, right?

14:44:46:02  23  A.   I think.

14:44:50:02  24  Q.   It states the date and time of that disclaimer,

25          right?

14:44:57:16    A.   Yes.

14:44:58:07    Q.   And it states a date in 2012, correct?

14:45:03:01    A.   Correct.

14:45:04:04    Q.   So this isn't something that's making -- this

5    disclaimer doesn't represent to be the disclaimer today.

6    It makes -- it says 2012, right?

14:45:16:23    A.   Yes.

14:45:19:05    Q.   Now, it's your testimony, sir, that in 2012 you

9    were in charge of billions of dollars of money and you

10    never read the disclaimer with the only contact that you

11    have with a counterparty?  Is that your testimony?

14:45:39:01        MR. FRANCIS:  Your Honor, I think this; has

13    been asked and answered.  I think we should be limiting

14    this to new things.

14:45:45:00        THE COURT:  I'll allow it.

14:45:47:21    A.   Again, I was mentioning in these chats, today, and

17    it may have been 2012, I don't remember exactly, that

18    when we entered into the chat, the format is different

19    than the chat transcript.

14:46:04:02    BY MR. BAEZ:

14:46:04:02    Q.   But that's not the question I'm asking you, sir.

14:46:06:21        I'm asking you:  Back in 2012 you're in charge of

23    billions of dollars of money.  Even the government has

24    put you in charge of their money.  And you have a

25    fiduciary duty, as you've testified to, to these

1      investors.  Are you telling this jury that the only

2      contact that you have with the other party in these

3      chats, you don't even read the disclaimer?

14:46:34:08  4      A.    When the disclaimer was, as I recall, present for

5      example in Bloomberg e-mails, not chats, obviously my

6      eyes passed over them and there's a recognition of that,

7      that they were there.

14:46:51:03  8          In these chats, again, I just don't recall where

9      the disclaimers were present.  So I'm not sure about

10      that.

14:47:00:15  11      Q.    That's kind of like brushing over the fine print,

12      is that what you're saying?

14:47:05:03  13      A.    Well, I mean, I'm sure you can read pretty fast.

14:47:10:24  14      Q.    That would be a fair assessment of what you're

15      saying, right?

14:47:14:16  16      A.    Well, I mean -- everybody --

14:47:16:27  17      Q.    That even though you're in charge of billions of

18      dollars of money, that every time someone comes into the

19      chat room, there's a disclaimer and you never read it,

20      even today.

14:47:30:12  21          Even today, today in 2018, you can't say, back in

22      2012 when I was trading all this millions of dollars of

23      money, including government money, I didn't read the

24      disclaimer before going into the chat room?

14:47:46:22  25      A.    I think I've mentioned to you that I'm not sure

1    that the disclaimer is actually there in the chats.

14:47:58:04    Q.   As you see here today, it says 2012 on each one of

3    these, right?

14:48:02:13    A.   Yes.

14:48:03:01    Q.   You're not saying that I somehow coerced the

6    government into introducing evidence that says that this

7    disclaimer was issued in 2012 and somehow we're trying

8    to pull a fast one here, right?  You're not making that

9    statement?

14:48:19:02    A.   I am not.  But what I am saying is the transcript

11    may be different than how I viewed the Bloomberg chats

12    at the time.

14:48:27:17    Q.   I understand how you're qualifying your answer.

14    But that's the statement you're making, right, for the

15    hypothetical I just gave you?

14:48:34:01        MR. FRANCIS:  Your Honor --

14:48:34:21        THE COURT:  Sustained.

14:48:35:20    BY MR. BAEZ:

14:48:35:20    Q.   And this grain of salt -- so you got the disclaimer

20    and then you got the statement by David telling you this

21    is not exactly the most accurate information, take that

22    with a grain of salt.  That happened -- that statement

23    was given to you before you made any of these trades,

24    right?

14:48:52:02        Let me rephrase that.

14:48:54:08      Before you made the LXS trade and the AMSI trade,

2      the ones that are charged in this case.

14:49:00:17    A.   Can you refresh my memory on the dates on that?

14:49:06:29    Q.   Sure.

14:49:20:29         MR. BAEZ:   May I approach the witness to just

6      show him?

14:49:23:20         THE COURT:   You may.

14:49:24:20         MR. BAEZ:   Okay.

14:49:25:05    BY MR. BAEZ:

14:49:34:17    Q.   So before you traded Count One of this case,

11    David's telling you, Not exactly the most accurate

12    information, take it with a grain of salt, right?  On

13    that date.

14:49:53:01    A.   He said take it with a grain of salt for that

15    specific piece of information on that date.

14:49:57:11    Q.   So you know that he's lying about information,

17    right?

14:50:05:11         He's even telling you.  Maybe not to you, but he's

19    telling that, hey, take it with a grain of salt.  I'm

20    wheeling and dealing here.

14:50:13:08         I've got a rudimentary paraphrase there.

14:50:16:22         MR. FRANCIS:   I'm going to object because of a

23    compound question.  I'm not sure what question he's

24    answering.

14:50:22:12         THE COURT:   Let's just make it one.

14:50:23:21  BY MR. BAEZ:

14:50:24:03  Q.   You're nodding your head yes; you agree?

14:50:27:21          MR. BAEZ:  I'll rephrase.

14:50:28:21          MR. FRANCIS:  I'm not sure Mr. Baez's

         5   interpretation of Mr. Cong's body language --

14:50:35:03          THE COURT:  Make it one question.

14:50:36:06  BY MR. BAEZ:

14:50:36:21  Q.   Sir, on May 11, 2012, he's telling you, take this

         9   information with a grain of salt, right?

14:50:45:01  A.   This information specifically, what was mentioned

        11   above, with a grain of salt, yes.

14:50:50:21  Q.   So you got David telling you one thing and you also

        13   have the disclaimer there, correct, for which you can't

        14   remember whether you read or not, right?

14:50:59:21  A.   That disclaimer is in the Bloomberg transcript,

        16   yes.

14:51:05:01  Q.   So you're seeing it in black and white two times,

        18   right?

14:51:11:11  A.   I don't think I ever confirmed that I saw that.  I

        20   want to make that clear.

14:51:15:21          THE COURT:  I don't think we're going to

        22   finish this in the next couple minutes, so why don't we

        23   take our break.

14:51:20:21          MR. FRANCIS:  Your Honor, may I?

14:51:21:12          We've been going a long time.  I know this

1    witness has travel plans.  If Mr. Baez is almost done,

2    because I don't think we're doing anything new, I'm not

3    sure holding him over --

14:51:32:14    THE COURT:  How long are you going to be,

5    Mr. Baez?

14:51:34:16    MR. BAEZ:  I think I've -- I received warnings

7    about saying "brief," but I think maybe five, ten

8    minutes.  Ten minutes tops.

14:51:41:20    (Discussion off the record)

14:51:57:00    THE COURT:  We'll take our recess.

14:52:01:05    (Whereupon, a recess followed.)

15:13:51:12    THE COURT:  Please be seated everyone.

15:13:52:19    We'll bring in the jury and have our witness

14    retake the stand.

15:13:56:11    (Whereupon, the jury entered the

16    courtroom.)

15:15:02:07    THE COURT:  Please be seated everyone.

15:15:14:23    Looks like we're ready to proceed.

15:15:17:08    MR. BAEZ:  May it please the Court.

15:15:19:12    BY MR. BAEZ:

15:15:19:22    Q.   Mr. Cong, I want to get past this last area of

22    questioning.  The only points that I want to make on

23    this issue is both the "grain of salt" conversation and

24    the disclaimer, based on everything you've seen,

25    appeared to have happened prior to you ever trading the

1    LXS bond, which is Count One, and the AMSI bond, which

2    is Count Two, correct?

15:15:50   3    A.   I know so for sure the AMSI bond, that was July 6.

4    The LXS trade, was that after May 11?

15:16:01   5    Q.   May 14.

15:16:05   6    A.   Okay.

7    Q.   So you would agree that you were, in one form or

8    another, given both the disclaimer and the statement of

9    the grain of salt before you ever made a trade involving

10   the charged counts in this case?

15:16:25   11   A.   The grain of salt comment was definitely there.  We

12   all saw it.

15:16:29   13       Again, the disclaimer is there in the Bloomberg

14   transcripts.

15:16:33   15       I just want to make that clear.  It's in the

16   Bloomberg transcript.

15:16:37   17   Q.   So is that a yes?

15:16:38   18   A.   It is in the Bloomberg transcript, yes.

15:16:41   19   Q.   Let me see if I can couch it for you so we can get

20   this directly from you.

15:16:47   21       The evidence in this case, which has been admitted

22   with these chats, show that you were given both the

23   disclaimer and the grain of salt conversation before you

24   ever made a trade in Count One and trade in Count Two?

15:17:06   25   A.   So I will agree with that as long as you know

1   there's a note that I'm not sure that the Bloomberg

2   chats, as I saw them, looked like that transcript.

15:17:17:13   Q.   Because you can't recall.

15:17:18:02   But my question to you is:  Based on the evidence

5   that's submitted in this case, what we have given you in

6   Government's Exhibit 102 --

15:17:26:14   A.   Right.

15:17:26:20   Q.   -- these were given to you before you ever made a

9   trade with David that is charged in this case?

15:17:35:10   A.   I'm also telling you that in realtime, the chats

11   today do not show a disclaimer when we accept.

15:17:41:12   Q.   I understand you're qualifying your answer, but I'm

13   qualifying the question.  You got it?

15:17:46:04   You had both of these bits of information before

15   you ever made these trades?

15:17:54:06   A.   So I'm saying I'm not sure that I can answer that

17   in the affirmative.

15:17:58:08   Q.   Based on the evidence?

15:18:02:11   A.   But again, that's not --

15:18:06:12   Q.   All right, let me move on.

15:18:13:06   Sir, you mentioned with Mr. Francis just a moment

22   ago that this wasn't trading protocol, right?

15:18:25:03   A.   I recall referencing trading protocol.

15:18:28:27   Q.   And you also said, in general, lying is not part of

25   our investment process, right?

| | |
|---|---|
| 15:18:35:00 | 1 |

A.   Yes, I did say that.

| 15:18:36:09 | 2 |

Q.   You like to make qualifications with your answers,

do you not, sir?

| 15:18:41:24 | 4 |

You're nodding your head yes.

| 15:18:44:12 | 5 |

A.   I like to make sure the answers are correctly

interpreted.

| 15:18:47:21 | 7 |

Q.   So, in fact, you have been doing that all day,

right?  Qualifying some of your answers?

| 15:18:55:21 | 9 |

A.   I've just been making sure.

| 15:18:57:11 | 10 |

MR. FRANCIS:  I'm sorry, I object.  I think

it's mischaracterizing a couple things and --

| 15:19:03:06 | 12 |

THE COURT:  Sustained, sustained.

| 15:19:04:15 | 13 |

MR. BAEZ:  I'll rephrase it.

| 15:19:05:11 | 14 |

BY MR. BAEZ:

| 15:19:05:25 | 15 |

Q.   You like to explain yourself in great detail; is

that fair?

| 15:19:13:28 | 17 |

A.   I just want to make sure that everything is

characterized properly.

| 15:19:18:01 | 19 |

Q.   I characterized your statement correctly, right?

In general, lying is not part of our investment process,

right?

| 15:19:26:02 | 22 |

A.   I believe I said that, yes.

| 15:19:27:12 | 23 |

Q.   And you put the words "in general," right?

| 15:19:30:08 | 24 |

You never said we always or we never lie in the

process of, right?

15:19:36:02 1    A.   I couldn't possibly remember all the transactions

2    and discussions.

15:19:40:26 3    Q.   My question to you, sir, is you never said we never

4    lie, right?

15:19:45:20 5    A.   I did not say we never -- I did not say we never

6    lie because I don't recall everything.

15:19:52:21 7    Q.   Okay, good.

15:19:53:24 8         Now, as it relates to trading protocol and

9    protocol, you're talking about business, right?

15:20:01:01 10   A.   That is a business, yes, sir.

15:20:02:24 11   Q.   You realize you're in a federal criminal courtroom,

12   right?

15:20:08:01 13   A.   Yes, we are.

15:20:08:27 14   Q.   I would venture to guess this is the first time

15   you've ever been in one in your whole life, right?

15:20:14:21 16   A.   Also correct, yes.

15:20:16:11 17   Q.   And you know that we're not talking about business,

18   we're talking about someone's life that hangs in the

19   balance, right?

15:20:25:02 20   A.   Fair.

15:20:30:12 21   Q.   As it relates to protocol and stuff like that, you

22   have ways of dealing with that within the industry,

23   right?  If somebody breaks business protocol with you,

24   you deal with them certain ways?

15:20:41:22 25   A.   Yeah, for example, changing the price slip, right.

15:20:44:15    Q.   I'm going to get to that.

15:20:45:27         What did you say?  Change the price slip?

15:20:49:12    A.   Yeah, you know, like we were discussing if we had

               known, right?

15:20:52:09    Q.   I'll address that.

15:20:53:12    A.   Sure.

15:20:53:24    Q.   Now, sir, you could say, I want the price adjusted,

               right?

15:20:59:18         You said that to Mr. Francis's question, and you

               just mentioned it now, right?

15:21:04:24    A.   Right.

15:21:05:09    Q.   Now, that doesn't mean David has to say, okay.  In

               fact, David can say, you want to break the trade, fine,

               let's break the trade, right?

15:21:16:24    A.   So I suppose that would be within his -- that is

               correct.  Again, we're talking business.

15:21:23:24    Q.   Exactly.

15:21:23:24         And those millions of dollars that you made on that

               bond would have never happened, right?

15:21:31:12    A.   On this bond, yes.

15:21:34:24    Q.   So if you come back -- so that's, again, you're

               speculating?

15:21:39:02    A.   On which part?

15:21:40:12    Q.   That's a speculation, that if you -- that you would

               have done this, and you're automatically speculating

1    that David would have accepted that and sold it or made

2    the adjustment, right?

15:21:50:27   3    A.    I'm making an estimation based on my experience

4    with trading protocol and business, yes.

15:21:56:07   5    Q.    So there's that aspect.

15:21:57:25   6          Then we also have the aspect, sir, of you have

7    other things that you do when you have business

8    disputes, right?  Like you don't deal with that person

9    again?

15:22:11:01   10   A.    Yeah, it can contribute to that.

15:22:14:28   11   Q.    If David does something you don't like in the

12   course of a business transaction, like break business

13   protocol, you go down the street and go to another

14   dealer, right?

15:22:23:20   15         You can do that?

15:22:25:28   16   A.    Yes, we could.

15:22:26:28   17   Q.    And you could choose who you do business with and

18   who you don't, right?

15:22:31:23   19   A.    Yes, it is our choice, yes.

15:22:34:05   20   Q.    So you have that option to you as well?

15:22:37:12   21   A.    Yes, that's our option.

15:22:39:12   22   Q.    In addition, there's even an industry term that's

23   called "put in the box," right?

15:22:44:23   24   A.    I've heard of that term.

15:22:46:12   25   Q.    And what that means so the ladies and gentlemen of

1       the jury know, you're kind of making a hockey reference,

2       right?  You put them in the penalty box?

15:22:54:23    3    A.    I guess that could be the reference.

15:22:59:23    4    Q.    So in hockey or in putting somebody in the box,

5       that means that you're going to punish them by not doing

6       business with them for a little while, right?

15:23:10:17    7    A.    I think generally that was what people viewed that

8       term as, yes.

15:23:17:20    9    Q.    So that's a way that you traders self govern each

10      other, right?

15:23:27:08    11   A.    That is one way.

15:23:29:08    12   Q.    So you have that.  You have the fact that you can

13      go down the street with someone else.  And you also know

14      that at the time these two trades are done, no one has

15      ever gotten arrested for this -- for making

16      misrepresentations during price negotiations, correct?

17      As far as you know.

15:23:51:14    18   A.    At that the point in time of these trades?

15:23:54:17    19   Q.    Correct.

15:23:55:28    20   A.    Yeah.  So the Litvak was 2013.  So, yes, that would

21      be the case.  That would be the case then, yes.

15:24:04:12    22   Q.    That was after these two.

15:24:06:24    23         So again, sir, we're talking about something

24      completely different here today than business protocols,

25      wouldn't you agree?

15:24:15:09 1    A.   I think there are –– there are different ways to

2    think about it.

15:24:23:12 3    Q.   And at the end of the day, sir, these dealers don't

4    have to tell you what they paid for these bonds, do they

5    sir?  There's no obligation for that, right?

15:24:36:18 6    A.   So legally I don't think there is an obligation.

7    It was my understanding.

15:24:44:03 8    Q.   They don't have to tell you what they paid for

9    them.  You make your decision, do we buy them at the

10    price we want or we don't, right?

15:24:53:09 11    A.   That is our decision ultimately, yes.

15:24:55:12 12    Q.   And as a reasonable investor like yourself, sir,

13    you would never pay a price for a bond that you didn't

14    want to, right?

15:25:10:11 15    A.   Yes, that is correct.  Because you have an

16    obligation to your investors, right.

17    Q.   So at the end of day, sir, for Count One, the bond

18    in Count One and the bond in Count Two, you got the

19    price you wanted, right?

15:25:30:04 20    A.   We got a price at which we were happy with the

21    investment decision.

15:25:33:22 22    Q.   So you were happy with that investment decision and

23    that decision paid off for you with millions of dollars,

24    did it not, sir?

15:25:41:12 25    A.   On the AMSI trade, yes.

15:25:43:05   Q.   And also for the LXS as well, right?

15:25:46:20   A.   I believe, yes, I believe so.

15:25:52:20       MR. BAEZ:  Thank you, sir.

15:25:56:20       MR. FRANCIS:  May I have one moment, Judge?

15:25:58:20       THE COURT:  You may.

15:25:59:29           (Pause.)

15:26:16:11

15:26:16:11           FURTHER REDIRECT EXAMINATION

15:26:17:11   BY MR. FRANCIS:

15:26:18:00   Q.   Mr. Cong --

15:26:19:02   A.   Yes?

15:26:19:11   Q.   You said you were happy with your investment

         13   decision in the trades in Counts One and Two; is that

         14   right?

15:26:27:06   A.   Yes.  At the time.

15:26:28:09   Q.   Would you have been happier paying lower prices for

         17   those bonds?

15:26:31:24   A.   Yes.

15:26:34:11       MR. FRANCIS:  Nothing further.  Thank you.

15:26:38:00       THE COURT:  Thank you, sir.  You may step

         21   down.

15:26:41:22           (Whereupon, the witness was excused.)

15:26:49:22       THE COURT:  We're ready for our next witness.

15:26:52:07       MS. CHERRY:  Yes, Your Honor.  The government

         25   calls Stuart Goldberg.

15:26:56:00  1                    STUART GOLDBERG,

15:26:56:00  2            called as a witness, having been first duly

15:26:56:00  3            sworn or affirmed, was examined and testified

15:26:56:00  4            as follows:

15:26:56:00  5

15:26:56:15  6            THE CLERK:  Please state your name and spell

         7    your last name for the record.

15:27:50:06  8            THE WITNESS:  Stuart Goldberg,

         9    G-O-L-D-B-E-R-G.

15:27:53:22 10            THE CLERK:  And indicate the town and state in

        11    which you live or work.

15:27:57:13 12            THE WITNESS:  Englewood, New Jersey.

15:28:00:01 13            THE COURT:  Maybe you should spell your first

        14    name too since there is different ways to spell it.

15:28:03:11 15            THE WITNESS:  S-T-U-A-R-T.

15:28:04:22 16

15:28:04:22 17                    DIRECT EXAMINATION

15:28:07:07 18  BY MS. CHERRY:

15:29:02:11 19  Q.   Good afternoon, Mr. Goldberg.

15:29:04:02 20  A.   Good afternoon.

15:29:08:22 21  Q.   Mr. Goldberg are you familiar with Marathon Asset

        22    Management?

15:29:11:07 23  A.   Yes.

15:29:12:22 24  Q.   Could you tell the jury how you're familiar with

        25    Marathon?

15:29:14:29  A.   Yes.  I was a partner there for 12 years.

15:29:18:02  Q.   And when were you a partner?  What was the time

frame?

15:29:21:08  A.   Well, I worked there for 12 years.  I was a partner

from 2011 till recently.  I left in April 13, 2018.  And

I started there March of 2006.

15:29:33:09  Q.   So you just left Marathon?

15:29:34:19  A.   Yes.

15:29:34:28  Q.   And you left amicably?

15:29:36:25  A.   Yes.

15:29:39:28  Q.   What did you do at Marathon?

15:29:41:19  A.   I was a portfolio manager and cohead of the

structured products area.

15:29:47:27  Q.   So what's a portfolio manager?

15:29:50:18  A.   Portfolio manager is a person who's charged with

investing, managing the risk, divesting of assets that

fall under the structured product title.  Those would be

RMBS, CMBS, ABS bonds.

15:30:10:22  Q.   And you worked in the structured credit group in

2011 to 2013.

15:30:20:05  A.   Yes.

15:30:20:23  Q.   Again, what was your title during that time period?

15:30:23:20  A.   Managing director, senior portfolio manager.

15:30:29:02  Q.   Do you know Mr. Cong?

15:30:30:02  A.   Yes.  He worked for me.

15:30:31:16 Q.   He worked for you?

15:30:32:13 A.   Yes.

15:30:32:22 Q.   And before you worked at Marathon, what did you do?

15:30:36:23 A.   Traded bonds for different Wall Street dealers.

15:30:41:20     Right before Marathon, I was at Citigroup Global

Markets for six years.

15:30:46:23 Q.   And in that job, did you need to be licensed.

15:30:52:14 A.   Yes.

15:30:52:26 Q.   What kind of licenses did you have?

15:30:54:11 A.   I believe I had the Series 3, the Series 7, Series

24 and Series 63.

15:31:00:01 Q.   How do you get those licenses?

15:31:01:29 A.   You take a test.

15:31:03:11 Q.   Like what kind of test?

15:31:04:26 A.   It's a written test, multiple choice answers.  Has

to do with regulation.  Could deal with different types

of securities.

15:31:21:27 Q.   So you said you were in the structured credit

group?

15:31:24:12 A.   Uh-huh.  Yes.

15:31:26:12 Q.   Was there particular funds that you managed?

15:31:30:15 A.   Yes, there were.

15:31:31:22 Q.   So who invests in these funds?

15:31:35:06 A.   It's a wide range of investors from life insurance

companies, institutional investors, family offices.

15:31:46:26    Q.    Does employees –– do employees of Marathon invest

2    in these funds?

15:31:51:02    A.    Yes.

15:31:51:23    Q.    Did you personally invest in these funds?

15:31:54:05    A.    Yes.

15:31:54:26    Q.    And at one point did the United States Treasury

7    invest in these funds?

15:31:59:29    A.    In a specific fund that was set up for the

9    treasury.

15:32:02:27    Q.    What was that fund?

15:32:04:09    A.    That was the public private investment partnership;

12    PPIP it was called.

15:32:10:06    Q.    When did PPIP start?

15:32:12:03    A.    I believe it started in 2010.

15:32:20:17    Q.    And so Marathon was a PPIP manager, is that what

16    it's called?

15:32:23:29    A.    Yes.

15:32:24:20    Q.    How did Marathon become a PPIP manager?

15:32:30:03    A.    Through an application process.  There was a

20    request for proposal that the U.S. Treasury put out

21    amongst the marketplace, if you will.  I believe there

22    was over 140 applicants for that role.  And there were

23    different milestones, whether it was just an application

24    at first that you had to fill out.  Then it was meetings

25    with treasury officials, follow up meetings at your

1    offices, interviews, et cetera, until you were awarded

2    the mandate.

15:33:02:13    Q.    Would you consider it a competitive process?

15:33:05:06    A.    Yes.

15:33:05:21    Q.    And how many applicants did you say there were?

15:33:08:27    A.    I believe there were over 140.  Certainly over 100.

7    Maybe I'm mistaken about the exact number.

15:33:15:08    Q.    And ultimately how many PPIP managers were there?

15:33:21:29    A.    Originally there were eight, and then I believe one

10    manager dropped out, so seven.

15:33:29:21    Q.    And the mandate of PPIP, could you only invest in

12    certain securities?

15:33:36:24    A.    Yes.  It was a narrow focus of what was originally

14    Triple A rated bonds that were RMBS or CMBS bonds.

15:33:46:11    Q.    Were there special reporting requirements to the

16    treasury?

15:33:49:01    A.    Yes, I believe there were.

15:33:50:12    Q.    What kind of reporting requirements?

15:33:53:12    A.    They had -- we had monthly calls with U.S. Treasury

20    officials to go over the allocation of capital.  We had

21    to update them writing in what was purchased and sold

22    over the course of that reporting period, how much cash

23    was on hand in the fund, how the fund was performing.

15:34:15:12    Q.    When you say how the fund was performing, can you

25    tell the jury, what do you mean by that?

15:34:19:19    1    A.    What the total return of the fund was.  So how it

2    was going up or down in value.

15:34:26:02    3    Q.    Total return, is that like how much money you made?

15:34:29:08    4    A.    Yes.

15:34:31:14    5    Q.    How was -- was Marathon compensated for being a

6    PPIP manager?

15:34:36:02    7    A.    Yes.

15:34:36:20    8    Q.    How was Marathon compensated?

15:34:39:09    9    A.    I believe, I don't know exact amounts, but we were

10    given a management fee to manage the money; and then

11    based upon the performance at the end of the fund's life

12    after all the investors, the U.S. Treasury and private

13    investors received their money back with a preferred

14    return, there was an incentive compensation.

15:34:59:21    15    Q.    Is the program still ongoing?

15:35:01:01    16    A.    No.

15:35:02:23    17    Q.    Was Marathon considered a successful PPIP manager?

15:35:06:11    18    A.    Yes.

15:35:07:01    19    Q.    Why do you say that?

15:35:09:02    20    A.    Our total returns were the highest amongst the

21    seven managers.

15:35:35:08    22    Q.    Does Marathon use models, modeling, in sort of

23    their analytical process of analyzing bonds?

15:35:41:02    24    A.    Yes.

15:35:41:22    25    Q.    Can you tell the jury a little bit about Marathon's

```
            1    model and process?
15:35:46:05 2    A.   There's several models that Marathon has for
            3    different sectors of the market.
15:35:50:09 4         So as a residential mortgage backed security, we
            5    have -- or Marathon has a model to determine the yield
            6    at a certain price that you're looking at investing in
            7    or looking at selling, and commercial mortgage backed
            8    security there's also a separate model that goes into
            9    determining the value of the bonds in commercial
           10    mortgages.
15:36:15:25 11   Q.   We can just talk about the RMBS model.
15:36:17:28 12   A.   Okay.
15:36:18:16 13   Q.   So maybe you can describe a little bit in more
           14    detail, hopefully in layman's terms, about how the model
           15    works.  What are the inputs?
15:36:26:14 16   A.   Generally what the model aims to do is determine
           17    the default rate that will occur in different housing
           18    price regimes.
15:36:36:07 19        So back in 2010, we were coming out of a major
           20    calamity in the housing market.  We were seeing high
           21    default rates amongst different regions of the country
           22    and we were able to use that information to use
           23    projections going forward about default rates.  So those
           24    default rates govern how much cash flow will be to the
           25    bond.
```

15:37:01:10   1        And different housing regimes -- when I say housing

        2    regimes, I mean housing price appreciation or lack

        3    thereof -- you could put in to the model and that would

        4    tell you what the default rate would be on the bond and

        5    then that would change the cash flows to the bond.

15:37:17:27   6        So if you thought housing prices were going up

        7    20 percent in five years, you would have a certain set

        8    of cash flows.  If you thought housing prices would be

        9    flat, you would have another set of cash flows.

15:37:29:03  10        So that was just on a high level how it worked.

15:37:31:12  11    Q.   You said cash flows.  What are the cash flows?

        12   What happens to them?

15:37:36:01  13    A.   Again, the bonds are backed by pools of various

        14   home loans.  Those home loans are located in different

        15   geographies.  Some could be in the northeast, some on

        16   the west coast, some anywhere in the country.

15:37:49:11  17        And based upon your forecast for housing prices,

        18   that would either increase or decrease the borrower's

        19   loan to value.  And that loan to value would govern the

        20   probability of default on the bonds.  And the higher the

        21   probability of default, the less cash flow those bonds

        22   will see.  The lower the probability of default, and

        23   again the default would come down theoretically if

        24   housing prices were rising, and that would create more

        25   cash flow to the bond in the high level, and that would

1    be a better bond then, or a better investment, I should

2    say.

15:38:23:24    Q.    And who gets the cash flows?

15:38:25:18    A.    Depends on what -- the bonds you're looking at, but

5    the bond holder gets the cash flows.

15:38:31:12    Q.    And so this model that you're talking about, you

7    said -- I think you talked about price yield.

15:38:41:13    So how does the model determine price and yield?

15:38:45:01    A.    Again, it's a bunch of decision trees that go into

10    exactly how it goes.  But just in a high level, if you

11    put in a price on a bond and you put in a housing price

12    forecast, that's going to tell you how many defaults

13    will occur on the bond.  The less defaults, the more

14    cash you're going to receive.

15:39:05:01    So if I have a bond that I'm looking at buying at

16    80 cents on the dollar and I put in some variable for

17    housing prices and that tells me the bond gets 100 cents

18    on the dollar back, then what's determined is the yield

19    would be 100 cents on the dollar, that's the numerator,

20    that's how much I'm getting back in total.  I'm paying

21    80 cents for the bond.  So now the question is just how

22    much time is it going to take me to get that money back

23    and that would be the yield.

15:39:36:02    Q.    Does the model tell you what you could sell the

25    bond for in the future?

15:39:40:27   A.   No.

15:39:41:06   Q.   Does the model tell you what price you can buy the
              bond for in the marketplace?

15:39:45:01   A.   No.

15:39:46:07   Q.   So how do you use the model when you're thinking
              about buying the bond in the market?

15:39:53:13   A.   When you're looking at a different bond in the
              marketplace and you have parameters, let's say the range
              is 50 to 60 cents on the dollar for the bond, you can
              put in a certain price within those parameters, run your
              housing price forecast and that will tell you the yield
              that you should be getting on the bond.  It doesn't tell
              you how much you're going to make on the bond.  It just
              tells you what the yield would be.

15:40:20:01   Q.   What does that mean, the yield?  How do you use the
              yield?

15:40:24:11   A.   How much future cash flow you're going to get back
              over what period of time versus what you're paying for
              it in present value terms.  That will give you your
              yield.

15:40:34:26        That won't tell you if it's necessarily going to
              make money or not.  That's just going to tell you that
              this is the yield at that type of housing price
              assumption.

15:40:43:22   Q.   And that assumes that to the end of the life of the

1        bond?

15:40:48:00  2   A.    Yes.

15:40:59:27  3   Q.    So if you want to buy a bond in the marketplace,

4        you have your model, then what do you do?

15:41:08:18  5   A.    You're constantly looking for investments that are

6        worthy of putting your capital to work.  You're

7        evaluating the bonds that are trading in the

8        marketplace.  You're comparing them to what bonds you

9        might own in your own portfolio at the time.  You're

10       looking at interest rates that are happening -- excuse

11       me -- that are moving in the market place.  You're

12       looking at a whole myriad of things to determine if

13       that's a worthy investment.

15:41:36:01  14  Q.    And how do you know what bonds are trading in the

15       marketplace?

15:41:40:28  16  A.    Usually you're getting runs from brokers, you're on

17       the phone with different brokers, your analysts are

18       getting color from the Wall Street dealers.

15:41:53:02  19  Q.    What does that mean, getting runs from brokers?

15:41:56:12  20  A.    Bonds that were being auctioned off.  People

21       typically give price talk of where they'll trade.

15:42:03:22  22  Q.    Can you tell the jury, what's price talk?

15:42:06:02  23  A.    Price talk is where on an auction that's about to

24       occur, could be in two hours, could be the next day, a

25       list of bonds that are being auctioned off, very often

1    the brokers would come up with their estimate of where

2    these bonds will trade for.

15:42:20:26   3         Sometimes it was very specific with an actual

4    dollar price and sometimes it was a range.  Could be low

5    20s.  That would be 20 cents on the dollar.  Could be

6    25.  That would be 25 cents on the dollar.

15:42:34:12   7    Q.   And you said you get this information from

8    broker-dealers?

15:42:38:18   9    A.   Yes.

15:42:40:00   10   Q.   How many broker-dealers did you work with in 2011,

11   2013 at Marathon?

15:42:47:19   12   A.   Back then I would guess we might have talked to 15

13   broker-dealers.

15:42:52:24   14   Q.   And how did you decide what broker-dealers to talk

15   to?

15:42:58:15   16   A.   It depended on the type of security, the type of

17   bond that was trading.

15:43:02:21   18        Some broker-dealers had better -- they had more

19   activity, they traded more of a certain type of bond

20   than other broker-dealers did.

15:43:14:12   21        And so depending on what we were looking at

22   investing in at the time, you know, we would sort of

23   migrate to specific dealers for those types of

24   securities.

15:43:22:02   25   Q.   During that time frame, did you work with Cantor

1   Fitzgerald?

15:43:26:10   2   A.   Yes.

15:43:26:22   3   Q.   And who did you work with at Cantor Fitzgerald.

15:43:30:16   4   A.   We worked with Dave Demos.

15:43:32:01   5   Q.   And why did you work with Mr. Demos?

15:43:36:02   6   A.   Dave was a good trader in the market.  He knew the

7   markets and he understood the bonds we were looking to

8   invest in.

15:43:43:18   9   Q.   Was there a particular type of bond?

15:43:44:24   10   A.   Not particular, but some of the higher yielding

11   bonds.

15:43:50:21   12   Q.   Are those sometimes considered MEZZ bonds?

15:43:54:15   13   A.   Sometimes they're MEZZ bonds, which are not

14   necessarily the first senior bond to get paid in a deal,

15   but they could be junior to another bond.  Very often

16   that was the case, but not always.

15:44:13:17   17   Q.   Mr. Goldberg are you familiar with the term "best

18   execution"?

15:44:16:20   19   A.   Yes.

15:44:17:12   20   Q.   Can you tell the jury, what does best execution

21   mean?

15:44:20:18   22   A.   Best execution as an investor means buying at the

23   lowest price possible and selling at the highest price

24   possible.

15:44:30:12   25   Q.   Why does price matter to Marathon?

15:44:34:07

1    A.    We're an investor and we are charged with making

2    the most amount of money that we can for our investors.

15:44:43:20

3         So price matters, because if you're buying them at

4    the best price you can and you're selling at the best

5    price you can, then you're maximizing the proceeds on

6    that investment.

15:45:04:16

7    Q.    Can you tell the jury, what's an auction process?

8    What's a BWIC?

15:45:09:25

9         Sorry, strike that.

15:45:11:25

10        What's a BWIC?

15:45:15:19

11   A.    BWIC stands for bid wanted in comp.

15:45:18:26

12        That means an investor is going to put out a swath

13   of bonds from their portfolio and they're going to

14   auction them off at a specific time.  They're going to

15   go to certain Wall Street dealers to effectuate that

16   auction for them knowing that the Wall Street dealers

17   have a distribution outlet of investors that they can

18   actually show those bonds to before the auction and try

19   to garner prices from those investors so they can give

20   those bids to the seller, and hopefully they can create

21   a transaction.

15:45:52:02

22   Q.    And are there other ways for Marathon to buy bonds

23   other than this auction process?

15:45:58:08

24   A.    Sure, there were.

15:45:59:22

25   Q.    How else?

15:46:00:11 1    A.   We could buy bonds just from a broker-dealer's

2    inventory.  We didn't have to necessarily source them

3    through auctions.

15:46:12:02 4    Q.   Were there other ways?

15:46:13:05 5    A.   Inventories, auctions.  That would be about it.

15:46:17:08 6    Q.   Could another third party just be selling a one-off

7    bond?

15:46:21:02 8    A.   Third party, you mean another investor?

15:46:24:05 9    Q.   Uh-huh.

15:46:24:23 10   A.   They could, but I don't think that was typical.

15:46:29:06 11   Q.   When you bought bonds or sold bonds, did you do it

12   through a broker-dealer?

15:46:34:27 13   A.   Yes.

15:46:35:11 14   Q.   Why?

15:46:36:15 15   A.   As I mentioned, that's typically the way that

16   investors would execute transactions through the

17   marketplace.

15:46:44:01 18   Q.   When you were buying bonds let's say on an auction,

19   did you know who the seller was?

15:46:48:22 20   A.   No.

15:46:50:24 21   Q.   And when you were selling bonds, did you know who

22   the buyer was?

15:46:55:02 23   A.   No.  Sometimes they would say large west coast

24   money manager or something like that.  But it was

25   pretty -- it was a pretty common practice that

1    broker-dealers would not give out the names of their

2    investors to other investors.

15:47:13:24    3    Q.    Why?

15:47:14:21    4    A.    Just because they felt that that could somehow harm

5    their bid, the BWIC.  They could somehow not go off as

6    well as they liked.

15:47:26:18    7    Q.    What do you mean by that?

15:47:27:21    8    A.    If people knew that a different type of investor

9    was selling a bond versus another one, maybe people

10    thought that the, you know, bids could be lower or not

11    as firm, not as competitive, if you will, as another

12    one.

15:47:51:13    13    Q.    When you were trying to buy a bond in the

14    marketplace, what terms were you negotiating?

15:48:00:10    15    A.    Price.

15:48:01:14    16    Q.    Anything else?

15:48:04:15    17    A.    Typically it was price.

15:48:05:18    18          There could be a situation in negotiating a

19    transaction that you were negotiating the settlement

20    date.  Settlement date is the date that the funds are

21    actually due to the seller.  That would be very rare.

15:48:22:22    22    Q.    But price was --

15:48:25:02    23    A.    Price.

15:48:25:12    24    Q.    Okay.

15:48:27:02    25          So sometimes you like a bond but you couldn't get a

```
            1    trade done?
15:48:34:13      A.    Yes.
15:48:35:01      Q.    Why would that be?
15:48:36:18      A.    The price that the seller was willing to part with
            5    was higher than what you were willing to buy them.
15:48:53:22      Q.    So I'm going to move on now to the bond in Count
            7    One, the LXS bond.  The jury has heard a little about
            8    it.
15:49:05:16            You're familiar with this LXS bond?
15:49:11:05      A.    Yes.
15:49:11:20      Q.    Do you remember your investment strategy around
           12    this LXS bond?
15:49:15:14      A.    Pretty much.
15:49:16:11      Q.    Can you describe to the jury that investment
           15    strategy?
15:49:21:24      A.    Well, it's like any other investment strategy in
           17    that we were trying to buy bonds that we thought had a
           18    lot of value.  A lot of intrinsic value is not
           19    necessarily something that everybody shared, meaning the
           20    virtues of the bond might not have been apparent to
           21    everybody.  And that was what our, sort of our
           22    investment strategy was, was to buy assets that had deep
           23    intrinsic value at below that level.
15:49:49:14      Q.    What do you mean by "intrinsic value"?
15:49:52:05      A.    The total cash flow that the bond should receive
```

1     based upon our viewpoint and projections for housing,

2     for interest rates, for a whole sort of things, was

3     going to be -- was going to be much larger than the

4     present value it cost us to buy the bond.

15:50:11:10  5     Q.   Did you have a particular point of view on the LXS

6     bond?

15:50:14:10  7     A.   It fit those parameters at the time.

15:50:18:14  8     Q.   Was there something funky about the LXS bond?  If

9     that's the right word.

15:50:25:08  10    A.   What do you mean by funky?

15:50:27:15  11    Q.   Did you have a view on the cash flows of the LXS

12    bond?

15:50:30:21  13    A.   We did have a view on the cash flows.

15:50:33:06  14    Q.   What were they?

15:50:33:24  15    A.   Again, that those cash flows were more robust and

16    stronger than the cost of buying them at the time.

15:50:51:27  17    Q.   Had you looked into how the cash flows would be

18    paid out to investors in the LXS bond?

15:51:00:12  19    A.   Yes, we did.  We always do.

15:51:02:08  20         We double check our work versus what -- I don't

21    know if you're familiar with the modeling company Intex.

22    Intex is a cash flow analyzer that's used by market

23    participants to evaluate the default rates and the cash

24    flow total return on a bond.  And so we always double

25    checked our analysis of what the prospectus or indenture

1    said versus what Intex displayed.

15:51:34:16    2    Q.   What was your view on the indenture or the

3    documents versus Intex?

15:51:43:02    4    A.   Our view, to my recollection, was that there was a

5    discrepancy between the two.

15:51:49:05    6        Our interpretation had it that this particular bond

7    was due more money than Intex was actually presently

8    running, which was not an unusual thing.  That happened

9    a lot in the market.

15:52:02:09    10    Q.   Do you remember if you thought this before you

11    bought the bond?

15:52:07:11    12    A.   Yes.

15:52:08:11    13    Q.   Yes, you remember?

15:52:09:01    14    A.   Yes, I remember.

15:52:09:21    15        And we bought it before -- we bought it based upon

16    what we interpreted the documents to say about the cash

17    flows.

15:52:17:29    18    Q.   And did you discuss your view on the cash flows

19    with other people outside of Marathon?

15:52:30:22    20    A.   Not before buying it I don't believe.

15:52:32:22    21    Q.   What about after buying it?

15:52:34:08    22    A.   After buying it, Ed Cong, who you've met, I believe

23    he was talking about it with the trustee and with Intex

24    themselves.

15:52:42:22    25    Q.   And why would he be talking about it with the

1          trustee and Intex?

15:52:48:09  2    A.    Because at the end of the day, the sponsorship for

3          the bond, the number of investors that will rely upon

4          Intex, is much greater than the number of investors that

5          probably will read through a 500-page document and

6          determine if there's a discrepancy.

15:53:07:01  7         So we were pretty sure that the way that we were

8          looking at the bonds were correct, but we wanted to get

9          the opinion of Intex to see why they didn't see it that

10         way as well.

15:53:18:17  11   Q.    So these documents, they were publicly available

12         documents?

15:53:22:02  13   A.    Yes.

15:53:22:11  14   Q.    And other investors could have discovered what you

15         discovered?

15:53:28:04  16   A.    Yes.

15:53:28:16  17   Q.    But at the time, some investors didn't?

15:53:30:26  18   A.    Some investors didn't.

15:53:32:08  19   Q.    And Intex didn't?

15:53:33:22  20   A.    Correct.

15:53:36:12  21   Q.    So you were talking to Intex to try to get them to

22         change their model?

15:53:41:12  23   A.    It wasn't necessary to get them to change it, I

24         don't believe.  I believe I think it was also to

25         understand why they were interpreting differently, just

1    because we were pretty sure that the way we viewed it

2    was correct.

15:53:53:19  3    Q.    And why did you talk to the trustees?

15:53:56:20  4    A.    Another set of I think eyes that -- the trustee is

5    typically a trust bank, and when they get the

6    collections from the servicer on a monthly basis, they

7    follow a waterfall that is governed by the indenture or

8    the prospectus of the deal and they pay out -- they pay

9    out bondholders in priority based upon that.

15:54:19:20  10    So the trustee is the entity actually that's going

11    to remit the payments based upon the document.

15:54:44:11  12    Q.    Would it have been beneficial to Marathon after you

13    bought the -- after you bought the bond, would it have

14    been beneficial to Marathon for people to have sort of

15    found out about this discrepancy?

15:54:57:20  16    A.    Beneficial to Marathon in that more investors would

17    be interested in the bond, possibly.  But just

18    beneficial in the sense of accuracy.

15:55:08:11  19    Q.    And if more investors are interested in the bond,

20    what does that mean for Marathon?

15:55:15:07  21    A.    More ability -- higher prices.

15:55:18:28  22    Q.    The bond could go up in value?

15:55:21:12  23    A.    The bond could get closer to its intrinsic value.

15:55:26:13  24    MS. CHERRY:  I'm going to pull up -- I'm going

25    to offer Government's Exhibit 100 and 101.

15:56:10:21             MR. BAEZ:  No objection.

15:56:11:24             THE COURT:  Government's Exhibit 100 and

3   Government's Exhibit 101 are admitted.

15:56:15:24   BY MS. CHERRY:

15:56:15:24   Q.   Do you see this document, Mr. Goldberg?

15:56:53:03      Hold on one second.  Sorry.  I thought it blew up.

15:56:59:21      Sorry, one minute, Your Honor.

15:57:12:04      Do you see this document, Government's Exhibit 100?

15:57:15:10   A.   Yes.

15:57:16:01   Q.   Can you tell the jury what this is?

15:57:18:11   A.   This is a Bloomberg trade ticket.  It's a buy

12   ticket.

15:57:25:04   Q.   And can you tell the jury what bond this Bloomberg

14   trade ticket is for.

15:57:32:22   A.   Yes.  That's the LXS 2005-5N3A2.

15:57:39:20   Q.   Is that the LXS bond that we were just talking

17   about?

15:57:43:05   A.   Yes.

15:57:45:11   Q.   And who's the -- if this is Cantor's buy ticket,

20   who's selling the bond to Cantor?

15:57:53:22   A.   Marathon Asset Management.

15:57:55:08   Q.   And that's you?

15:57:56:12   A.   That's us.  That's me.

15:57:59:02   Q.   And what is the price that Marathon sold this bond

25   for?

15:58:08:11   A.   The price is 41 and 24/32nds at 41.75 percent of

2   par.

15:58:20:05   Q.   And what is the size of this bond?

15:58:22:23   A.   Size is 100 million original face.

15:58:26:17   Q.   What does that mean, 100 million original face?

15:58:29:29   A.   So in mortgage backed securities, as the bond

7   either takes principal losses or takes principal

8   payments from homeowners that pay their monthly

9   principal and interest, there's a factor.  So the bond

10   goes down from a factor of one, which represents the

11   original face value.  And then over the life of the

12   bond, the factor will come down.

15:58:55:11   Q.   And what's the trade date for this bond?

15:59:02:01   A.   May 11, 2012.

15:59:11:11   Q.   You said there was the original face and then the

16   factor and if you multiply the original face by the

17   factor, you get the current face?

15:59:21:11   A.   That's correct.

15:59:21:25   Q.   Is the current face on this document?

15:59:23:12   A.   Yes.

15:59:25:02   Q.   Is this it here?  Right here?  (Indicating)

15:59:28:04   A.   That's right, $26,559,012.

15:59:53:05   Q.   I'll put this to the side here and put up

24   Government's Exhibit 101.

15:59:57:28        Can you see that document?

15:59:59:14    1    A.    Yes.

16:00:00:26    2    Q.    Can you tell the jury what that document is?

16:00:02:26    3    A.    That's a Bloomberg sell ticket.

16:00:07:02    4    Q.    And if Cantor is the seller, then who's the buyer

               5    of this bond?

16:00:14:11    6    A.    It says Farallon Capital Management.

16:00:19:11    7    Q.    I'm sorry, what bond is this?

16:00:20:17    8    A.    I'm sorry, that's the LXS '05 5N382.

16:00:25:14    9    Q.    What size is it?

16:00:26:26   10    A.    100 million original.

16:00:29:02   11    Q.    What's the trade date?

16:00:30:21   12    A.    May 11, 2012.

16:00:32:09   13    Q.    Is that the same bond as the trade ticket we just

              14    looked at?

16:00:35:24   15    A.    Yes.

16:00:36:09   16    Q.    And what's the price that Cantor sold the bond for?

16:00:40:27   17    A.    Forty-four and 16/32 or 44.5.

16:00:46:03   18          MS. CHERRY:  I'm going to go now to

              19    Government's Exhibit 102, which I believe has already

              20    been admitted.

16:01:09:02   21    BY MS. CHERRY:

16:01:37:12   22    Q.    Can you see that, Mr. Goldberg?

16:01:41:02   23    A.    Yes.

16:01:42:02   24    Q.    Do you know what this document is?

16:01:45:22   25    A.    Generally that's a chat room.

16:01:48:13    Q.    What do you mean by a chat room.

16:01:49:16    A.    Bloomberg, the same entity that you saw the buy and

3              sell tickets, also allowed multiple people from

4              different firms to basically have a chat room, an

5              ability to kind of converse about the market and about

6              bonds and about auctions.

16:02:18:05    Q.    And can you tell who's in the chat room?

16:02:20:14    A.    Yes.

16:02:20:20    Q.    So the participants.  So let's go through that.

16:02:23:00    Who's Andy Springer?

16:02:25:03    A.    Andy Springer was my partner and cohead of the

12             department.

16:02:28:27    Q.    And you said before you worked with -- or Ed Cong

14             worked for you?

16:02:34:03    A.    Yes.

16:02:36:01    Q.    That's you, Stuart Goldberg.

16:02:36:21    Do you know who Bill Biggart is?

16:02:40:16    A.    Bill Biggart was a salesman at Cantor.

16:02:47:21    Q.    And Mr. Demos?

16:02:48:22    A.    Yes.

16:02:48:25    Q.    Do you see at top there's a conversation start

22             time?  It says May 10, 2012?

16:02:53:02    A.    Yes.

16:02:53:12    Q.    What's the end time of this document?

16:02:57:02    A.    May 14, 2012.

16:03:29:25    Q.    I'll move to the second page of the document.

16:03:57:17          Do you see on May 10, 2012, at 21:20:54, Mr. Demos

3    says:  So you know, Stu, Andy, I'm working tirelessly

4    for you LXT, OOMLT, and slash surf; do you see that?

16:04:15:08    A.    Yes.

16:04:16:05    Q.    Then Mr. Demos writes with LXS and an asterisk?

16:04:26:17    A.    Yes.

16:04:26:17    Q.    How do you respond?

16:04:26:17    A.    We know Dave.

16:04:30:20    Q.    Keep going, page 5 of this document.  Do you see at

11    13:26:56, Mr. Demos says something?

16:04:58:18    A.    Yes.

16:04:59:27    Q.    Let me step back for a second.

16:05:01:11          What's the date of this line that I just pointed

15    out?

16:05:05:09    A.    May 11, 2012.

16:05:07:15    Q.    That's the next day from the chat we were just

18    looking at?

16:05:10:21    A.    Yes.

16:05:11:12    Q.    And so at 13:26:56, Mr. Demos says LXS and OOMLT

21    are on the top of the list for today.  Do you see that?

16:05:22:25    A.    Yes.

16:05:23:12    Q.    So LXS, that's the bond we just looked at the

24    tickets for?

16:05:26:15    A.    Yes.

16:05:26:28   Q.   What is OOMLT?

16:05:28:19   A.   That was another deal, option one mortgage loan

3   trust.

16:05:32:25   Q.   And then Mr. Demos continues at 13:27:43, I've been

5   working them in overdrive to two PPL, people.  Can you

6   see that?

16:05:52:26   A.   Yes.

16:05:53:17   Q.   If we scroll down to the next page, 13:27:46,

9   Mr. Demos continues, Overdrive.

16:06:17:20      And then what do you respond at 13:28:19?

16:06:20:29   A.   I wrote, I think the LXS has to be forgotten for

12   now.  We like the bond.  Not in a rush.  Let's move on

13   from that for now.

16:06:31:02   Q.   Can you tell the jury what you meant by that?

16:06:32:11   A.   I meant that, you know, don't focus too hard on the

16   LXS bond as something that we're rushing to get out of.

17   We like the bond.  Let's focus on other bonds in the

18   market.

16:06:44:11   Q.   Why weren't you rushing to get out of it?

16:06:47:02   A.   We liked the bond.  We thought the bond would

21   continue to go up in price.  There would be more cash

22   flow coming into the bond on a monthly basis than the

23   market had been witnessing or thought it would be

24   getting; and therefore, we liked it.

16:07:03:02   Q.   So if you liked it, why would you sell it?

16:07:07:16  1   A.   We were always evaluating what's the best use of

2   the capital.  If it was a good trade to sell it and we

3   could reinvest the capital in other bonds.  It all

4   depended on what our mindset was about the bond and the

5   marketplace and the portfolio.

16:07:24:16  6   Q.   Sorry.  What do you mean by best use of capital?

7   What's capital?

16:07:28:22  8   A.   Capital is the dollars that you have to invest.

16:07:31:28  9   In the PPIP program, for example, the government

10   gave us $450 million.  We raised $450 million from

11   private investors.  And then the government lent another

12   900 million.  So we had $1.8 billion to invest.

16:07:48:04  13   The capital wasn't infinite in nature.  There was a

14   certain amount and you always had to make sure the

15   portfolio -- and that's why I think we performed as well

16   as we did -- was always invested in the highest and best

17   use of that capital.

16:08:03:26  18   That changed on a daily, weekly, monthly basis.

16:08:07:02  19   Q.   So there might be alternatives, better

20   alternatives, to holding the LXS?

16:08:12:23  21   A.   Correct.

16:08:13:02  22   Q.   You had to evaluate that as they came in?

16:08:15:22  23   A.   Correct.

16:08:19:26  24   Q.   Mr. Demos at 13:28:25 continues:  Need to redeem.

25   Feeling behind.

16:08:28:21     1      You say 13:28:34, Get us the CWL?

16:08:34:06     2   A.    Yes.

16:08:34:12     3   Q.    What's that?

16:08:35:15     4   A.    Countrywide.  Countrywide was another mortgage

            5   shelf and CWL must have been on a bid list, a BWIC, as

            6   you said, and so we were trying focus on buying that

            7   bond.

16:08:48:27     8   Q.    Why would you be focusing on buying that bond?

16:08:51:09     9   A.    Again, for reasons that we liked the LXS, it was a

           10   bond that, you know, when we ran it through our models

           11   and looked at it and discussed it internally, we thought

           12   that bond, based upon the price talk on the auction, was

           13   a very good investment for us.

16:09:05:00    14   Q.    When you're buying and selling bonds, what's your

           15   primary goal?

16:09:10:15    16   A.    Primary goal is to make a high rate of return, to

           17   make money.

16:09:14:24    18   Q.    Who are you making money for?

16:09:16:01    19   A.    Our investors.

16:09:20:06    20   Q.    Mr. Demos continues at 13:28:44, Okay.  Both

           21   getting back today so we can wit.

16:09:29:02    22      Then he continues, Wait for THT on the LXS.

16:09:34:27    23      And at 13:29:09, he says, Give me till EOD and then

           24   we table.

16:09:44:02    25      Do you see that?

16:09:45:00 1    A.   Yes.

16:09:45:18 2    Q.   What's your understanding of what Mr. Demos was

3    telling you there?

16:09:49:27 4    A.   That he had interest in trading the LXS bond and

5    give him until the end of the day before he doesn't work

6    on it anymore.

16:10:01:21 7    Q.   Is that something that happens?  Give somebody to

8    the end of the day?

16:10:04:15 9    A.   Sure.

16:10:05:03 10   Q.   Why?

16:10:06:11 11   A.   Accounts are located in different regions of the

12   world.  There could be accounts that are located in

13   Asia, the Middle East, different time frames.  People

14   are out.

16:10:20:04 15   Q.   I'm going to move on to page 11 of this exhibit.

16:10:55:29 16       On May 11, 2012, the same date we were just talking

17   about, right?

16:11:00:26 18       At 18:54:58 UTC, Mr. Demos asks if you're still

19   there.  Stu, you there?

16:11:08:22 20       Do you see that?

16:11:09:29 21   A.   Yes.

16:11:10:08 22   Q.   And then he says 100MM, LXS 2005-5N3A2.  Is that

23   the bond we were just talking about?

16:11:18:23 24   A.   Yes.

16:11:19:02 25   Q.   And then how do you respond?

16:11:21:12    A.    I write, What's up?

16:11:24:18    Q.    Is that the SUP?

16:11:25:24    A.    What's up, yep.

16:11:28:09    Q.    What does Mr. Demos tell you?

16:11:30:09    A.    He says, I have a bid.  I'm so sick of falling on

         face.

16:11:36:04    Q.    So we're going to pause right there.

16:11:39:07          You remember Mr. Demos telling you he has a bid at

         18:56:05.  And we're going to move to a different

         document.  We're going to move to

         Government's Exhibit --

16:11:52:01          MS. CHERRY:  I'd like to offer

         Government's Exhibit 103, Your Honor.

16:12:09:16          It will be redacted as requested.

16:12:13:11          MR. BAEZ:  We have no objection subject to

         redactions.

16:12:22:01          THE COURT:  I have a question about them, but

         we'll talk about it at the end of the day.

16:12:27:01          Government's Exhibit 103 is admitted.

16:12:29:12    BY MS. CHERRY:

16:12:54:12    Q.    It's a little hard to tell from the first couple

         pages, but does this look like a transcript of a

         Bloomberg chat?

16:13:02:29    A.    Yes.

16:13:03:28    Q.    I'm going to go to the first page.  What's the

|  |  |
|---|---|
| 1 | conversation start time of this chat? |
| 16:13:15:23 | A.   4:24. |
| 16:13:17:26 | Q.   What's the date?  Sorry. |
| 16:13:20:02 | A.   May 10. |
| 16:13:21:02 | Q.   And what's the end time?  What's the date of the |
| 6 | end time? |
| 16:13:24:02 | A.   May 11. |
| 16:13:27:23 | Q.   Does that cover the time period we were just |
| 9 | looking at for the previous chat? |
| 16:13:32:01 | A.   Yes. |
| 16:13:33:05 | Q.   And the participants.  Do you know who Randy Paston |
| 12 | is? |
| 16:13:39:02 | A.   No. |
| 16:13:40:01 | Q.   Kiran Manda? |
| 16:13:40:21 | A.   No. |
| 16:13:42:00 | Q.   Do you know Sheila Raju? |
| 16:13:46:00 | A.   No. |
| 16:13:46:11 | Q.   Do you know Mr. Demos? |
| 16:13:47:09 | A.   Yes. |
| 16:13:48:02 | Q.   If I go up to the top, can you tell from the |
| 21 | document where Ms. Paston works? |
| 16:13:55:02 | A.   Cantor Fitzgerald. |
| 16:13:56:02 | Q.   What about Mr. Manda? |
| 16:13:58:02 | A.   Cantor Fitzgerald. |
| 16:13:59:02 | Q.   And what about Ms. Raju? |

16:14:02:27    A.   Cantor Fitzgerald.

16:14:45:06    Q.   I highlighted a portion.

16:14:46:18         Do you see on May 11, 18:51:01, Ms. Raju says, He

               has a 43.75 bid.  He has a little bit of room.

16:14:57:21         Do you see that?

16:15:00:06    A.   Yes.

16:15:00:18    Q.   And how does Mr. Demos respond?

16:15:03:15    A.   Okay, cool.  Be right back.

16:15:05:27    Q.   And then Ms. Raju says, 100 million, LXS 2005-N3A2;

               is that the bond we've been talking about?

16:15:17:10    A.   Yes.

16:15:17:21    Q.   I'm going to try to show you this document and the

               document that you were in, the chat you were in.

16:15:51:16         You can see that?  It worked?

16:16:02:21         We can see at the bottom, like we said, Ms. Raju

               says, He has a 43.75 bid.  And at the top, Mr. Demos

               tells you at 18:56:05 that he has a bid on the LXS bond,

               right?  That's where we are?

16:16:21:29    A.   Yes.

16:16:22:20    Q.   Thank you.

16:16:22:23         So let's scroll down in the chat that you were

               having with Mr. Demos.

16:16:49:27         Do you see at 18:57:17, what does Mr. Demos tell

               you?

16:16:57:21    A.   Forty and 16/32nd bid for your 100 million.

16:17:05:03   Q.   And then he continues at 18:57:29.  What does he

2   say?

16:17:09:27   A.   Please don't hurt me more.

16:17:11:24   Q.   Then at 18:57:57, what did he say?

16:17:17:09   A.   I told him no room.  You really didn't want to

6   move.

16:17:21:07   Q.   And then Mr. Demos says, But I'm thrilled to give

8   you the bid anyway.  Do you see that?

16:17:26:16   A.   Yes.

16:17:33:01   Q.   What was your understanding of what the bid for the

11   LXS bond was?

16:17:36:22   A.   Forty and a half.  Forty and 16/32.

16:17:41:23   Q.   From Mr. Demos, from this chat, who did you think

14   was placing that bid?

16:17:47:26   A.   A third party investor.

16:17:50:06   Q.   Why did you think that?

16:17:52:26   A.   Because prior to that he had said that he's working

18   on the bond with two people.

16:17:58:11   Q.   And at 18:57 when he says, I told him, No room,

20   who's "him"?

16:18:05:12   A.   The third party investor.

16:18:07:02   Q.   So you didn't think Mr. Demos was bidding on the

23   bond, did you?

16:18:10:23   A.   No.

16:18:11:02   Q.   Did you believe Mr. Demos when he told you the bid

1       from the third party was 40 and 16?

16:18:25:29  2    A.    Yes.

16:18:26:14  3    Q.    Why did you believe him.

16:18:27:23  4    A.    I had no reason not to believe him.

16:18:37:02  5    Q.    Looking at the chat below, now seeing it, was the

6       bid from the third party 40 and a half?

16:18:46:11  7    A.    Looking at the chat below, no.

16:18:48:14  8    Q.    What was the actual bid?

16:18:50:08  9    A.    The bid was 43 and 3/4.  43.75.

16:19:04:15  10   Q.    Are you able to calculate a dollar value between

11      what Mr. Demos knew the bid to be and what he told you

12      the bid to be?

16:19:15:11  13   A.    The 40-16 versus the 40 and 3/4?  Yes.

16:19:27:09  14   Q.    Do you have a calculator?

16:19:28:24  15   A.    There's one right here.

16:19:31:00  16   Q.    How would you go about doing that.  If you could

17      tell the jury how do you calculate the difference

18      between the lie and the truth.

16:19:37:00  19   A.    The difference between 43 and 3/4 and 40 and a

20      half?

16:19:40:24  21   Q.    Yes.

16:19:41:03  22   A.    You subtract the two.  So 43.75 minus 40.5 is 3 1/4

23      points.

16:19:51:00  24   Q.    If you wanted to put a dollar value on that?

16:19:54:02  25   A.    You would multiply that by the current face value

1          of the bonds.

16:20:00:06   2   Q.   So?

16:20:01:15   3   A.   That was 26 and change million.

16:20:03:21   4   Q.   So approximately how much is the dollar value?

16:20:06:28   5   A.   Twenty-six times .0325.  It's about $845,000

6          difference.

16:20:23:16   7   Q.   If we keep going in your chat with Mr. Demos, at

8          18:58:15, Mr. Demos says, I think we 100 percent have a

9          trade to do.

16:20:47:28   10         Do you see that?

16:20:48:11   11   A.   Yes.

16:20:49:11   12   Q.   There is a trade to do, right?

16:20:51:03   13   A.   Yes.

16:20:52:01   14   Q.   Why do you say that?

16:20:54:21   15   A.   Well, I mean, his 40 and a half bid, he's

16         suggesting that he can move up from there.

16:21:06:11   17   Q.   I'm sorry.  Say that again.

16:21:09:09   18   A.   By him saying I think we 100 percent have a trade

19         to do, I'm surmising he's telling me he can move up from

20         there.  He can get the client to improve their bid from

21         that 40 and a half.

16:21:21:11   22   Q.   Let me re-ask that question.  Knowing what you know

23         now, looking at the bottom chat, there is a trade to do,

24         right?

16:21:28:02   25   A.   Oh, yes.

16:21:30:12    1    Q.    Why do you say that?

16:21:31:06    2    A.    43 and 3/4 I would have sold the bonds at, yes.

16:21:46:27    3    Q.    Mr. Demos continues at 19:08:24, He's barely

               4    getting to 41.  Still pushing.

16:21:55:06    5          Do you see that?

16:21:55:21    6    A.    Yes.

16:21:56:03    7    Q.    And when he says he's barely getting to 41, what do

               8    you understand that to mean?

16:22:02:06    9    A.    It looks like exactly what it sounds like.  The

               10   third party investor is at 41 but barely getting there.

               11   So Dave is, with his sales force or himself, he's trying

               12   to encourage the person interested in the bond to

               13   improve their bid from 40 and a half to 41.

16:22:21:23    14   Q.    Just to be clear, who's the "he" in that sentence?

16:22:24:26    15   A.    The third party investor.

16:22:31:01    16   Q.    When Mr. Demos said he's barely getting a 41, did

               17   you believe?

16:22:38:11    18   A.    Yes.

16:22:38:21    19   Q.    Why did you believe him?

16:22:40:12    20   A.    Again, I had no reason not to believe him.

16:22:42:12    21   Q.    If there's already a bid for 43.75, is he barely

               22   getting to 41?

16:22:48:12    23   A.    No.

16:22:49:02    24   Q.    Why not?

16:22:49:12    25   A.    Because the third party investor already has a 43

1      and 3/4 bid.

16:22:56:24   2   Q.   And then you respond, Let's get something done,

3      Dave.  Net us 42 on a hundred million.

16:23:05:27   4        Do you see that?

16:23:06:15   5   A.   Yes.

16:23:07:12   6   Q.   What do you mean there?

16:23:08:18   7   A.   I'm basically telling Dave that, responding to his

8      he's barely getting to 41, still pushing, still trying

9      to encourage the investor on the other side to improve

10     your bid.  And I'm telling him, if you can get me,

11     Marathon, 42 net on the 100 million we'll sell you the

12     bonds.

16:23:32:27   13        So basically there's a one-point bid offer spread

14     there is what I'm telling him.

16:23:47:21   15   Q.   If you had known that Mr. Demos already had a 43.75

16     bid instead of barely getting to 41, would that have

17     been important information?

16:23:57:11   18   A.   Yes.

16:23:58:11   19   Q.   Why is that?

16:24:00:02   20   A.   Well, then I would have known that I could sell the

21     bonds higher than 41.

16:24:05:02   22   Q.   And whose money is at stake?

16:24:07:22   23   A.   At stake is the profit on the trade.

16:24:10:08   24   Q.   And what does that mean?  Ultimately whose money?

16:24:14:02   25   A.   The investors that we're managing money for.

16:24:20:17    1    Q.   Let's go back to the bottom chat that Mr. Demos is

           2    having with Ms. Raju.  Keep scrolling down.

16:24:28:02    3      Do you see at 19:09:26, Ms. Raju tells Mr. Demos,

           4    44.125 bid from Farallon.  Do you see it?

16:24:46:23    5    A.   Yes.

16:24:47:11    6    Q.   When we looked at the trade tickets, do you

           7    remember who the ultimate buyer of the bond was?

16:24:53:02    8    A.   Yes.  It was Farallon.

16:24:55:08    9    Q.   Mr. Demos didn't tell you about this 44.125 bid?

16:25:00:01   10    A.   No.

16:25:00:24   11    Q.   Mr. Demos says, That to us or POT.

16:25:04:15   12      Do you know what POT is?

16:25:06:00   13    A.   Yes.  It's a slang or acronym for pay on top.

16:25:09:11   14    Q.   What does that mean, pay on top?

16:25:14:01   15    A.   That the investor who's executing the trade through

         16    the broker-dealer will pay commission on top of the

         17    actual price that the trade occurred at.

16:25:26:29   18    Q.   And Ms. Raju responds, That's to us.

16:25:30:21   19      Mr. Demos says -- sorry about that.

16:25:54:22   20      Ms. Raju says, That's to us.

16:25:56:26   21      Mr. Demos responds, Oh, okay.

16:25:59:02   22      And then Ms. Raju says, All in.

16:26:01:29   23      And Mr. Demos responds, Damn, okay.

16:26:06:05   24      What does "all in" mean?

16:26:07:12   25    A.   That's the maximum including any commission that

1        they're going to pay for the bond.

16:26:26:03   2   Q.   Ms. Raju continues at 19:11:10, They prob could get

3        to 44.25.

16:26:38:03   4        Then she says, I showed them a 45.

16:26:56:27   5        Then if we go up top to your chat, you told

6        Mr. Demos, Net us 42 and then you say, And you're done.

16:27:10:04   7        Do you see that?

16:27:11:01   8   A.   Yes.

16:27:16:13   9   Q.   Mr. Demos says at 19:14:49, Calling.  Oh, man.

16:27:23:25   10        Then at 19:19:44 Mr. Demos says, I'll get him up.

11        If not, I'll take the risk in the middle, 41-24.  Call

12        me.  Done.

16:27:41:11   13        What's your understanding of what Mr. Demos is

14        telling you there?

16:27:43:26   15   A.   Basically he's telling me that when I said to him

16        get us 42 and you're done, he's still negotiating with

17        the buyer on the other side and he's telling me I'll get

18        him up, but if not, I'll take the risk in the middle at

19        41 and 3/4.  Basically you're not going to do worse than

20        41 and 3/4 on this bond.

16:28:08:05   21   Q.   Knowing what you know now, seeing the bottom chat,

22        is Mr. Demos taking risk?

16:28:12:26   23   A.   The bottom chat on this page?

16:28:14:12   24   Q.   Yes.

16:28:19:08   25   A.   No, he's not.

16:28:21:02    Q.    Why do you say that?

16:28:21:29    A.    He's got a 44 1/4 bid.

16:28:29:13    Q.    What was your offer?

16:28:32:09    A.    Forty-two.

16:28:47:12    Q.    If we keep going down in your chat, 19:21:24,
Mr. Demos says, Stu, it worked.  You're scaring me.
Come back to me.  Don't want either of you mad at me.

16:29:06:07         What's your understanding of what Mr. Demos is
saying there?

16:29:09:16    A.    I'm not really sure.

16:29:11:13    Q.    Okay.  Then he continues, The best bids are three
in front.  You're the man.  Let's go.

16:29:20:25         What about there?  Do you have an understanding of
what that means?

16:29:24:10    A.    Yes.

16:29:24:21    Q.    Can you tell the jury?

16:29:26:13    A.    What I understand that to mean is that other
investors in the marketplace weren't willing to pay
anything more than anything in the 30s.  Three in front.

16:29:38:12    Q.    Did you believe him?

16:29:39:12    A.    Yes.

16:29:39:25    Q.    Why did you believe him?

16:29:41:02    A.    Again, I have no reason not to believe him.

16:29:43:22    Q.    Is it unusual that there would be a wide variety of
prices in the market for a particular bond?

16:29:49:26 | A.    Yes.

16:29:51:05 | Q.    Is that unusual?

16:29:52:08 | A.    No, it is usual.

16:29:53:23 |          MR. BAEZ:  I'm going to object to this line.

5 | Counsel is not showing other conversations with other

6 | bidders.

16:30:02:11 |          THE COURT:  Overruled.

16:30:03:05 |          MR. BAEZ:  I would say it's speculation, Your

9 | Honor.

16:30:05:23 |          THE COURT:  Overruled.

16:30:06:17 |          It's almost 4:30.  Well, it is 4:30 so let me

12 | know when you're at a good point.

16:30:14:26 |          MS. CHERRY:  I probably have five or ten

14 | minutes.

16:30:17:08 |          THE COURT:  Not five or ten minutes.  A good

16 | point means like 30 seconds to a minute.

16:30:23:11 |          MS. CHERRY:  Why don't we just end there.

18 | Thank you, Your Honor.

16:30:27:23 |          THE COURT:  I'll be more precise next time.

16:30:31:02 |          You can step down, sir.

16:30:32:29 |          I just want to give the jurors a few

22 | reminders.  We talked about this a couple of days ago so

23 | I do want to emphasize how important it is that you keep

24 | an open mind throughout the trial and that you reach

25 | decisions only during deliberations after all the

1    evidence is in, you've heard the closing arguments and

2    my instructions to you on the law and you've had a

3    chance to have an exchange of views with the other

4    members of the jury.

16:31:02:12    5    Second, I want to remind you that you're not

6    to discuss the case either amongst yourselves or with

7    anyone else, and you should not permit anyone to discuss

8    it in your presence.  If that happens you should report

9    it to the courtroom deputy.

16:31:17:27    10    Third, you're not to have any contact with the

11    parties, attorneys, or witnesses in the case, or anyone

12    associated with them.

16:31:27:00    13    And finally, it is essential that the verdict

14    in this case be based solely on the evidence admitted

15    here in the courtroom.  Therefore, you must not read,

16    watch or listen to anything in the media or anywhere

17    else about this case or any similar matter or anyone

18    who's involved in this case.

16:31:48:21    19    Other than that, I'd just like to thank you

20    for your hard work today and we'll see you tomorrow

21    morning at 9:30.

16:31:55:22    22    (Whereupon, the jury left the courtroom.)

16:32:27:12    23    THE COURT:  Please be seated everyone.

16:32:36:17    24    I just wanted to follow up briefly on the

25    documents with respect to redactions.  It sounds as

```
 1    though you all have come it an agreement on

 2    Government's Exhibit 103.

16:32:53:21    3         MR. SULLIVAN:  103, 105 and 606, Your Honor.

16:32:57:06    4         THE COURT:  Okay.

16:33:00:12    5         MR. SULLIVAN:  Only Government 1 is

 6    outstanding.

16:33:09:03    7         THE COURT:  Can I ask what you agreed to on

 8    606?  Do you have that, the final version?

16:33:20:03    9         MS. CHERRY:  I can pull up what I believe is

10    the agreement, Your Honor, on the screen because we've

11    already loaded it.

16:33:34:27   12         THE COURT:  I got an e-mail, or my law clerk

13    got an e-mail from the defense.  I want to know, were

14    those the finals?

16:33:43:00   15         MR. SULLIVAN:  Yes, Your Honor.  The

16    government was on that e-mail as well.  I have it.

16:33:50:07   17         606 excludes the charge that's not relevant.

16:33:56:11   18         THE COURT:  I can just look at it.

16:33:58:25   19         MS. CHERRY:  I'm sorry.  606.  Is that what

20    you asked, Your Honor?  606?

16:34:03:12   21         THE COURT:  Yes, please.

16:34:05:12   22         MS. CHERRY:  Sorry.  I was putting in the

23    wrong number.

16:34:16:18   24         THE COURT:  I assume we can make it little

25    bigger.
```

16:34:19:28  1                    I guess what I have just has the line that's

           2       under -- I assume it's 103?

16:34:29:25  3                    MS. CHERRY:  This is it, Your Honor.  I will

           4       blow it up so you can see it.

16:34:41:13  5                    I don't know how to blow it up anymore.

16:34:44:14  6                    THE COURT:  That's it.  Okay.

16:34:46:05  7                    And there's only one line that's redacted.

16:34:49:26  8                    MS. CHERRY:  That is what we thought the

           9       defense requested, Your Honor.  D2.

16:34:53:23  10                   THE COURT:  And then on 105 there's only one

          11       line that's in there, correct?

16:34:58:20  12                   MR. SULLIVAN:  Yes.

16:35:00:05  13                   THE COURT:  So the only -- I just want to make

          14       sure I have the finals.

16:35:04:02  15                   And then the area where there's not agreement

          16       is Government's Exhibit 1; is that correct?

16:35:11:26  17                   MR. SULLIVAN:  Government's 1, Your Honor.

16:35:13:20  18                   THE COURT:  And I think I understand where the

          19       defense is starting, so why don't I hear from the

          20       government first and then I'll come back to the defense.

16:35:25:02  21                   MS. CHERRY:  I mean, Your Honor, we think it's

          22       a relevant document.  It talks about the terms of

          23       Mr. Demos's employment while he was at Cantor which

          24       covers the time frame of the indictment.  These are the

          25       terms that he agreed to.  There are other terms in the

 1    document that we were going to refer to when we went

 2    through the document.

16:35:41:18  3         THE COURT:  Okay.  So what other terms in the

 4    document was the government going to refer to?

16:35:48:24  5         MS. CHERRY:  Specifically Section 6, I think,

 6    Your Honor.  It's the warranty section.

16:35:54:21  7         THE COURT:  Okay.

16:36:17:12  8         Did you all have a chance to talk about this?

16:36:20:03  9         MR. SULLIVAN:  We did, Your Honor, and I can

10    make representation here I asked just your question,

11    what's the relevance and they said warranty.  I said no

12    objection on that.  But other things I didn't get a

13    clear answer as to why the government wanted to use it.

16:36:37:01 14         THE COURT:  So why don't we just get the other

15    sections and then we'll talk about them.

16:36:41:11 16         What's the list of additional sections the

17    government would like left in.

16:36:44:25 18         MS. CHERRY:  We weren't necessarily going to

19    discuss any others, but we thought the document as a

20    whole for context should come in.  If Your Honor prefer

21    we can certainly just keep the compensation section and

22    the warranty section.

16:36:57:12 23         THE COURT:  I don't have a preference.

16:36:59:02 24         MS. CHERRY:  I think our argument was we

25    thought the document as a whole, just for context,

1        should come in.  It was the terms that he agreed to.

16:37:05:22        2        THE COURT:  Mr. Sullivan?

16:37:06:23        3        MR. SULLIVAN:  I just didn't see other parts

4        as relevant, Your Honor.  I have no objection to any

5        relevant part of the document that the government wants

6        to admit.

16:37:14:05        7        THE COURT:  So your objection is relevance?

16:37:17:14        8        MR. SULLIVAN:  The objection is relevance,

9        yes.

16:37:19:01        10        THE COURT:  If it's not relevant then we'll

11        leave the other parts redacted then.  So we'll leave in

12        Section 6 and if there are other sections the government

13        decides you want to refer to, let everybody know.

16:37:32:14        14        MS. CHERRY:  Okay, Your Honor.  Thank you.

16:37:35:00        15        MR. SULLIVAN:  Very well.

16:37:35:18        16        THE COURT:  And do we have the witnesses for

17        tomorrow?  I know we didn't get through today's, but

18        what's the -- who's on deck?

16:37:45:27        19        MS. CHERRY:  I think it will be Mr. Goldberg,

20        Mr. Bayer will follow.  He's from Cantor.  Mr. Carocci

21        is from FINRA.  And then if we needed another witness it

22        would be Mr. Marks from Ellington.

16:38:09:02        23        MR. FRANCIS:  Your Honor, if I may.

16:38:09:24        24        Mr. Carocci will be a short witness from the

25        government's perspective.  We'll talk to the defense if

    1    this becomes necessary, but I'm just trying to be

    2    sensitive to people traveling from out of state.  If we

    3    have to swap anyone, I can imagine it being Mr. Carocci

    4    because he is so short.  We might put him later in the

    5    order.  But we'll tell the defense if we find out that

    6    someone can't be here.

16:38:33:18   7         THE COURT:  Do we have exhibits that will be

    8    used with respect to those witnesses?

16:38:36:25   9         MR. FRANCIS:  We do.  We can e-mail them.

    10   That's no problem.

16:38:39:25   11        THE COURT:  Okay.  Great.  Anybody foresee any

    12   issues that we need to resolve in the morning?

16:38:47:04   13        MR. FRANCIS:  I think Government's Exhibit 20

    14   was objected to and I don't think we resolved that.  I

    15   think that's a Mr. Bayer document.

16:39:06:04   16        THE COURT:  That one I think the objection was

    17   that --

16:39:12:04   18        MR. SULLIVAN:  We discussed that, Your Honor.

    19   Your Honor ruled.

16:39:15:02   20        MR. FRANCIS:  I'm sorry.  I might be mistaken.

16:39:18:02   21        THE COURT:  Okay.  So sounds like we're all

    22   set then.

16:39:22:29   23        MR. FRANCIS:  There's just one modification

    24   we'd ask.  We had a deal with the defense where we would

    25   tell them our witnesses and give them our documents and

1    then they would tell us their documents.  That has not

2    been working.  So it can't be that they have done no

3    preparation.  We understand they might want to add more

4    documents, but we'd like to know.  We'll e-mail our

5    documents and then we'd like to know within an hour what

6    documents they're going to use so we can figure out if

7    there's anything we have to bring up to Your Honor.  On

8    Monday it took more 24 hours, which in part led to this

9    morning being a little more hectic than necessary

10    situation.

16:44:18:09   11          THE COURT:  Well, we also had the list of all

12    the objections exchanged so I assume that contributed to

13    it too.

16:44:26:16   14          Is the defense able to --

16:44:28:20   15          MR. SULLIVAN:  We're able to provide the

16    documents that we know that we're going to use, the

17    numbers that we know we're going to use, yes, sir.

16:44:37:14   18          THE COURT:  Okay.  I thought there was a list

19    that I got for today in sequential order.  We didn't

20    anticipate using --

16:44:51:25   21          (Interruption.)

16:44:51:25   22          THE COURT:  If it's not going to pick up, I

23    think we're all set.

16:45:14:12   24                **(Proceedings adjourned at 4:46 PM.)**

16:45:14:12   25

1                   C E R T I F I C A T E

2

3               UNITED STATES V DAVID DEMOS

4                  3:16CR00220(AWT)

5

6

7        I, Corinna F. Thompson, RPR, Official Court

8 Reporter for the United States District Court for the

9 District of Connecticut, do hereby certify that the

10 foregoing pages, pages 189 – 425, are a true and

11 accurate transcription of my shorthand notes taken in

12 the aforementioned matter on April, 25, 2018, to the

13 best of my skill and ability.

14

15

16

17

18        /s/_____

19         CORINNA F. THOMPSON, RPR
         Official Court Reporter

20        450 Main Street, Room #225
       Hartford, Connecticut 06103

21          (860) 547-0580

22

23

24

25