UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


– – – – – – – – – – – – – – – – x

UNITED STATES OF AMERICA          3:16CR00220(AWT)

       vs.

DAVID DEMOS
                     HARTFORD, CONNECTICUT
           Defendant     APRIL 27, 2018

– – – – – – – – – – – – – – – – x


**JURY TRIAL**

**VOLUME IV**


BEFORE:

      HON. ALVIN W. THOMPSON, U.S.D.J.

         and a Jury of Twelve


Corinna F. Thompson, RPR
Official Court Reporter

1    APPEARANCES:

2

3        FOR THE GOVERNMENT:

4            OFFICE OF THE UNITED STATES ATTORNEY
             915 Lafayette Boulevard,  Room 309
             Bridgeport,  Connecticut 06604
5            BY:  HEATHER CHERRY, AUSA

6            OFFICE OF THE UNITED STATES ATTORNEY
             157 Church Street
7            New Haven, Connecticut  06510
             BY:  JONATHAN N. FRANCIS, AUSA

8

9        FOR THE DEFENDANT:

             THE BAEZ LAW FIRM
10           40 SW 13th Street
             Suite 901
11           Miami, Florida  33130
             BY:  JOSE BAEZ, ESQ.

12
             LEONTIRE & ASSOCIATES
13           66 North Second Street
             New Bedford, Massachusetts  02108
14           BY:  GEORGE J. LEONTIRE, ESQ.

15
             HARVARD LAW SCHOOL CRIMINAL JUSTICE INSTITUTE
16           6 Everett Street
             Suite 5116
17           Cambridge, Massachusetts  02138
             BY:  RONALD S. SULLIVAN, JR., ESQ.

18
             QUINN, EMANUEL, URQUHART & SULLIVAN
19           51 Madison Avenue
             22nd floor
20           New York, New York  10010
             BY:  ALEX SPIRO, ESQ.

21
             LAW OFFICE OF MICHAEL CHAMBERS, JR.
22           100 Wells Street    Suite 2C
             Hartford, Connecticut  06103
23           BY:  MICHAEL LINCOLN CHAMBERS, JR., ESQ.

24

25

1                            **TABLE OF CONTENTS**

2        WITNESS              DIRECT     CROSS     REDIRECT     RECROSS

3        ERIC MARKS

4          BY MR. SPIRO:                 671

5          BY MR. FRANCIS:                         693

6          BY MR. SPIRO:                 721

7          BY MR. FRANCIS:                         724

8        BENJAMIN MELNICKI

9          BY MS. CHERRY:     730                   789

10         BY MR. SPIRO:                 760

11       THOMAS CAROCCI

12         BY MR. SULLIVAN:              809                     814

13         BY MR. FRANCIS:                         812

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              9:01 A.M.

3

4              THE COURT:  Good morning.

5              I understand there were some discussions going

6     on with respect to certain exhibits.  Have the questions

7     with respect to those exhibits all been resolved?

8              MR. FRANCIS:  They have not.

9              THE COURT:  Okay.  And I understand there's

10    one other issue with respect to -- that's not with

11    respect to an exhibit.

12             MR. FRANCIS:  That's right.

13             THE COURT:  Which one would you like me to

14    take up first?

15             MR. FRANCIS:  I think the second one is the

16    more urgent, and so I would suggest that one.

17             So the defense, in its opening and through

18    cross-examination of witnesses, has raised -- introduced

19    evidence, and I suppose to some extent indicated in

20    argument, that there's some significance to the fact

21    that no one was arrested for committing this crime

22    before January 28, 2013.  I think that is being offered

23    for purposes of showing a lack of criminal intent.

24             There are three aspects of criminal intent:

25             Knowledge.  There is know dispute that

1    Mr. Demos accidentally hit -- like, fell on his keyboard

2    or something.

3              Intent to deceive.  I don't think there's any

4    relevance.  He didn't inadvertently deceive the victims.

5              And willfulness.

6              So I think there's two possibilities that this

7    evidence is being offered for that goes to willfulness.

8    Either it's being offered to show that Mr. Demos didn't

9    know it was illegal or he didn't know it was wrongful.

10             If it's the former, it's being offered to show

11   he didn't know it was illegal, then that's why we keep

12   pressing for the jury instruction under Kaiser, that

13   knowledge of illegality -- rather knowledge of

14   illegality is not required, only knowledge of

15   wrongfulness.

16             If it's being offered to show that Mr. Demos

17   didn't know it was wrong to act this way, then that

18   raises the issue about the proffer statements.

19             So before the government rests, because the

20   defense may not put on a case and we may not have an

21   opportunity to call rebuttal witnesses, we need

22   clarification as to why they are introducing this

23   evidence so that we know whether or not we need to call

24   an SEC or -- an SEC witness or an agent to testify to

25   the proffer statements.

1          And the reason I think it's urgent is because

2     they've raised it with the prior two victim witnesses,

3     and so I was anticipating it was going to come up in the

4     first 10 or 15 minutes this morning with Mr. Marks's

5     cross.

6               THE COURT:  Mr. Spiro?

7               MR. SPIRO:  Sure, Judge.

8          Unlawful is the proper instruction.  Unlawful

9     is the word, knowing that one's conduct is unlawful.  It

10    goes for the counterparties and what they understand

11    they're allowed to do in their negotiations as well.  So

12    there's nothing improper about bringing this up, of

13    course.

14         And this whole proffer agreement threat at

15    every juncture when you're trying to defend somebody is

16    not proper in my view.  And I haven't been heard on the

17    proffer statement, but I will tell the Court that I

18    don't even think it's a close question.  And the notion

19    that without a direct statement where somebody says, the

20    car is red, they proffer a car is black.  Proffer

21    statements are afforded a certain amount of protection

22    and are encouraged generally.  And this is taken

23    completely out of context.

24         He was going in --

25              THE COURT:  Well, I don't think we need to get

1    to that.  I wasn't struck that those questions opened

2    the door with respect to the proffer statement.  I mean,

3    I certainly, I assumed, that they were coming in to show

4    how people in the market viewed things.

5              MR. SPIRO:  Correct.

6              THE COURT:  Because you don't have to know

7    your conduct is illegal, a crime.  So I assume they were

8    come in for --

9              I mean, I guess this is sort of an unusual

10   situation.  If there had been an objection on the

11   grounds of relevance at the time the question was asked,

12   then I would have turned to the questioner and said,

13   what's the relevance?  And then I would have heard

14   second element, or whatever.

15             MR. FRANCIS:  We don't want to keep them from

16   eliciting the evidence, Judge.  We don't want to buy an

17   appellate issue that we don't need.  And in fact, we're

18   happy not to put in the proffer statements.  But then we

19   need clarification.

20             The point they're trying to make is that

21   Mr. Demos didn't know his conduct was illegal.  This is

22   relevant because it tends to show that the people in the

23   market, the market that Mr. Demos was in, didn't

24   recognize this conduct to be illegal.

25             That's -- it's a fine piece of evidence for

1    them to put on.  I don't think it raises the proffer

2    statement issue.  But it does raise our Kaiser issue.

3            I think they have to pick a path.  We are fine

4    with either path, and we are not asking to preclude

5    anything.

6            THE COURT:  Right.  I guess frequently --

7    well, sometimes in this kind of situation, I give a

8    limiting instruction.  Sometimes I put something in the

9    jury charge that covers it.

10            MR. FRANCIS:  And we don't want to force their

11    hands and have to make an snap decision right now about

12    a limiting instruction.  I think the right way to

13    address this -- I understood, I think Mr. Baez sort of

14    flirted with it -- but I understood his argument, or

15    statements, in opening statements, and what I assume

16    they're going to tie up in closing to be Mr. Demos

17    didn't know this to be illegal, which is an perfectly

18    permissible argument.  We're not even going to stand up

19    ask to reopen the evidence, because I don't think it

20    implicates the proffer statements.  It's fine.  But it

21    does require, I think, it requires instruction to the

22    jury that that's not a requirement of the crime.

23            THE COURT:  Yes.  I assume that will be in the

24    instructions.

25            MR. FRANCIS:  Thank you.  That's all I had on

1    this first issue then.

2              MR. SPIRO:  Just one moment.

3                    (Off the record.)

4              THE COURT:  We're finished with that issue.

5    Let's talk about the exhibits.

6              MR. FRANCIS:  Great.

7              I'm just -- I'm handing Mr. Spiro the exhibit

8    that I told him about.  It's something we're adding for

9    redirect of Mr. Marks.  He's probably, in fairness,

10   going to get a chance to look at it.

11             We do have some issues with the exhibits they

12   sent us late last night.

13             MR. SPIRO:  Just as to this, we object.  This

14   is not admissible.

15             THE COURT:  Is this on the exhibit list?

16             MR. FRANCIS:  No, Your Honor.  It's new.  I

17   can hand up a copy.

18             I don't believe we sent it to the law clerk.

19             THE COURT:  Let me have a second to look at

20   it.

21                    (Pause)

22             THE COURT:  So it's a chat.

23             MR. FRANCIS:  It is, Your Honor.

24             THE COURT:  What's the objection, Mr. Spiro?

25             MR. SPIRO:  Well, there is lots, Judge.

1            But just some historical context in this case.

2            As the Court will remember, the government put

3    on a grand jury presentation, called "No Victims,"

4    secured an indictment, indictment is pending, they meet

5    with their witness weeks before trial.  The witness

6    tells them, in substance, I wasn't really a victim.

7            That's this person, Mr. Senapaty.

8            They dismissed a count in this case based on

9    that statement.  We got the 302, the next day, count

10   dismissed.

11           Now they seek on redirect of a different

12   witness to put in a conversation out of context between

13   that person, who they've elected not to call, and

14   Mr. Demos.  It's a snippet.  It's out of context.  They

15   have a continuing relationship.  It's misleading.  It

16   violates his confrontation clause rights.  It's

17   improper.  And we object.

18           THE COURT:  What's the nexus between this

19   witness or his testimony and this exhibit?

20           MR. FRANCIS:  Mr. Spiro chose to cross

21   Mr. Marks about the riskiness of trades.  He asked a

22   number of questions about the comparative risk, or the

23   fact that Mr. Demos and Cantor had real risk.  It's been

24   a continuing theme of the defense.

25           And here we're not offering Mr. Senapaty's

1    statement for the truth.  We're offering Mr. Demos's

2    admissions.  And the reason we redact the things is

3    because it discussed trades and we didn't want to get

4    into a 404(b) issue.

5            We just want Mr. Demos's admissions from the

6    second page that in 2013, February 2013, he's

7    contrasting the risk he is facing now that would require

8    him to need diapers, to not like the riskless stuff last

9    year.  "Was easy last year to make some and pass

10   through."

11           THE COURT:  Let me just read it.

12               (Pause.)

13           THE COURT:  I'm going to sustain the objection

14   under 403.  I don't think there's sufficient context.

15           MR. FRANCIS:  Then all that's left, Judge, is

16   the list they sent us last night.  The ones we flagged

17   for the law clerk, if we just go down the list --

18           THE COURT:  Sure.

19           MR. FRANCIS:  304 we understand not to be an

20   issue because it's only going to be used -- Defense

21   Exhibit 304 -- it's only going to be used for

22   impeachment if the witness denies something that's in

23   that document.  And I think basically that's the fact

24   that he has access to chats at some level.

25           Defense Exhibit 93.  There are a series of

1    these large price reports, which is the sort of bottom

2    portion of this document.  None of the trades that are

3    in here are trades in the case.  You can't tell from the

4    document whether or not they're even Mr. Demos's trades.

5    I don't think there's anything in the document that

6    shows that they're even MEZZ book trades.

7              THE COURT:  Your objection is relevance?

8              MR. FRANCIS:  Our objection is relevance, 403

9    and also hearsay because some of them have -- for

10   instance 93, they are e-mails sending that around, many

11   of which relate to who's going to be the supervisor

12   responsible for reviewing the large price reports.

13             THE COURT:  So is the defense offering this --

14   who's doing that cross?

15             MR. SPIRO:  I am, Judge.

16             THE COURT:  Is the defense offering this as a

17   full exhibit or just using it during the examination?

18             MR. SPIRO:  I would intend to probably offer

19   it as full exhibit.

20             And maybe if we can take a step back, I can

21   give the Court some context.

22             THE COURT:  Why don't you give me a very short

23   statement.  Relevance and grounds for nonhearsay.

24             MR. SPIRO:  I think I'm usually short, but

25   it's relevant because -- just so the Court is aware,

1    this is a compliance officer who's going to testify

2    about procedures that they use, what they were aware of,

3    what they weren't aware of, how they screen chats.  He's

4    on all of these emails, the witness.

5                THE COURT:  Okay.

6                MR. SPIRO:  And it is actually readily

7    identifiable as trades involving Mr. Demos because of

8    the tranche and the type of bond.  So this is not

9    someone else's.

10                That's the simple, direct answer.

11                THE COURT:  And nonhearsay grounds?

12                MR. SPIRO:  It goes to the witness's state of

13    mind and what he knew at the time.  And it's a fact of

14    the procedure that they --

15                THE COURT:  The witness's state of mind?

16    What's the relevance of the witness's state of mind.

17                MR. SPIRO:  Because it depends on what the

18    witness says.

19                THE COURT:  Okay.  So we'll have to wait and

20    see what the witness says then.

21                MR. SPIRO:  If he were to testify -- that's

22    why I was going to give the Court a little bit of

23    background.

24                THE COURT:  No, we don't --

25                MR. SPIRO:  You get the gist, okay.

1          MR. FRANCIS:  So I think 90 is just a snippet

2     of 93, so we can probably skip that, same theory.

3          THE COURT:  Okay.

4          MR. FRANCIS:  Defense 101.  This is just

5     e-mails about Mr. Demos and who's going to be the

6     supervisor.  I don't really think there's any dispute as

7     to who his actual supervisor was.  These e-mails.

8          THE COURT:  Is the objection relevance?

9          MR. FRANCIS:  Relevance, 403.

10         There was apparently some confusion in the

11    system as to who was getting Mr. Demos's review.

12         THE COURT:  So relevance, hearsay.

13         MR. FRANCIS:  Relevance, hearsay 801.

14         I'm sorry, it's 403, Judge.

15         Pardon me.

16         MR. SPIRO:  The individuals who reviewed his

17    chats is a relevant fact when a compliance officer's

18    testified as to who was reviewing and what the

19    procedures are with reviews.

20         So if he says, yes, these e-mails were

21    circulated and, yes, lots of people were on these

22    e-mails and, yes, we had access to his chats and, yes,

23    we reviewed his chats, I may not need to put the actual

24    document into evidence.

25         THE COURT:  We'll see if there's a grounds for

1    getting it in.

2                MR. FRANCIS:  That's fine.

3                THE COURT:  Is that what we have for all of

4    these?  The ones on the list are all of the same nature?

5                MR. SPIRO:  I think so, and then there's going

6    to be a natural divide right around the time of the

7    Litvak arrest in terms of -- I think it's easiest for

8    the Court to understand the reasoning behind the

9    exhibits and how to rule.

10               MR. FRANCIS:  I agree.

11               I think the rest, 121, 228, 244 and 299, all

12   post date the Litvak arrest and some several of them

13   post date Mr. Demos's employment at Cantor.  If they're

14   going to offer them, I can't imagine any reason other

15   than impeachment in which they could come in.

16               THE COURT:  I think I can.

17               MR. SPIRO:  I can too.

18               THE COURT:  But I'm not going to put in my two

19   cents worth.

20               MR. SPIRO:  I'm sure Your Honor realizes that

21   what's relevant is the lack of training before shows

22   that no one in the market realized that this was a

23   crime.  And then after Litvak when they realized that

24   it's a crime, according to this U.S. Attorney's office,

25   they begin to train them in ways in which you wouldn't

1    need to do if you had already trained them.  You

2    wouldn't need to do if you had already realized it.

3            THE COURT:  So I understand.

4            I guess as to the admissibility of the

5    documents, I'll just have to take that up as a comes.

6            MR. SPIRO:  Okay.

7            MR. FRANCIS:  That's fine.

8            I would just say, I'm not sure the documents

9    have anything do with what Mr. Spiro was saying, but

10   we'll just wait and see.

11           THE COURT:  I'm happy to do that too.

12           MR. SPIRO:  This should be interesting.

13           The other sort of macro issue that I wanted to

14   bring to the Court's attention and I kind of got –- I

15   wasn't sure the Court wanted to hear, but I do want to

16   say it:  I would object generally to this witness's

17   testimony.  I don't understand "the compliance officer

18   reads the compliance manual into evidence bit" that they

19   do.  Doesn't make any sense to me.  I don't understand

20   the relevance of it.

21           They can't show that Mr. Demos read that book.

22   I don't think they can show that anyone in the history

23   of any bank ever read that book.

24           And so it's just a book and they read sections

25   from it, and they take them out of context, and it has

1    nothing to do with a federal criminal trial, and they

2    just read them for an hour.  I don't understand the

3    relevance of it.

4         The second issue I have is I don't understand

5    in his limited 302, he, meaning the soon-to-be witness,

6    makes comments about what he thinks the law is, I guess,

7    or whether he thinks something violates a rule.  He's

8    not an expert.  He's not an expert, just period, and

9    he's not an expert witness.

10        So for them to just kind of read through the

11   manual and go, it says you should aspire to be

12   reasonable and honest, and then say, isn't that what the

13   manual says?  And that's not what Mr. Demos did.  And

14   that violated the manual and he knew it violated the

15   manual.

16        That is not in my view relevant, it's not

17   proper testimony, shouldn't come in this trial.  The

18   witnesses should testify about their perceptions and the

19   Court should give the instruction on the law.

20        So I have an objection to the entire witness.

21        And if he goes into legal, I'm going to have

22   louder objections.

23        THE COURT:  I assume so.

24        The objection is on the record.  Thank you.

25        MR. FRANCIS:  Judge --

1          THE COURT:  Anything else?

2          MR. FRANCIS:  With respect to

3   Government's Exhibit 25, the one I handed up, so I

4   understand we're not going to try and use it on redirect

5   yet.  It may be that Mr. Spiro, if he does more with

6   this risk, I may seek to revisit that, and it may be

7   later in the case we might.

8          THE COURT:  Okay, that's fine.

9          People want to stretch their legs for a few

10  minutes?  We'll take a short break.

11         I'll be back in at 9:28 and bring the jury in

12  at 9:30.

13              (Whereupon, a recess followed.)

14         THE COURT:  Ready for the jury?  Is our

15  witness here?

16         MR. SPIRO:  Ready, Judge.

17         THE COURT:  We'll bring the jury in.

18         MR. SULLIVAN:  One moment?

19         MR. FRANCIS:  Your Honor, I don't know if it

20  was moved in, the Defense Exhibit 379, and we don't have

21  an objection.

22         THE COURT:  I'll mention it when the courtroom

23  deputy comes back.

24              (Whereupon, the jury entered the

25  courtroom.)

1          THE COURT:  Good morning, ladies and

2    gentlemen.

3          THE JURY:  Good morning.

4          THE COURT:  Please be seated everyone.

5          THE CLERK:  Please restate your name for the

6    record.

7          THE WITNESS:  Eric Marks.

8          THE CLERK:  And you're reminded that you're

9    still under oath.

10                    ERIC MARKS,

11          called as a witness, having been reminded of

12          his oath, was examined and testified

13          as follows:

14

15          MR. SPIRO:  May I, Your Honor?

16          THE COURT:  Please do.

17

18            CROSS-EXAMINATION (Continued)

19    BY MR. SPIRO:

20    Q.   Good morning, sir.

21    A.   Good morning.

22    Q.   When we left off, we were talking about the ways

23    that you negotiate.  Do you recall that?

24    A.   Yes.

25    Q.   You recall we talked about some of the moves and

1    the tactics that you used?

2    A.    Yes.

3    Q.    And we talked about the moves and tactics that

4    other people might have used?

5    A.    Yes.

6    Q.    Now, when you're negotiating -- withdrawn.

7          When you run the bond through your model, you save

8    the information from that run into a folder, correct?

9    A.    When we purchase or sell a security, we save that

10   information, yes.

11   Q.    And you have access to that information?

12   A.    Yes.

13   Q.    And when you're negotiating, you already know,

14   generally, what scenarios lead to what yields and what

15   rank you would be in as a potential buyer?

16   A.    Generally, yes.

17   Q.    And even though you know, generally, that you might

18   be more than willing to pay more, you don't tell your

19   counterparty what that range is, of course, right?

20   A.    Correct.

21   Q.    In fact, you might say something like, listen, I've

22   stretched my scenarios and my modeling as far as I can

23   go, it can't get any higher, right?

24   A.    Yes.

25   Q.    When really you know that not only would you pay

1    the price that it's being offered to you at, you'd

2    probably pay more, right?

3    A.   It's possible.

4    Q.   Now, during the negotiation, you're getting

5    information, correct?

6    A.   Yes.

7    Q.   And I think I understood you on direct to say sort

8    of that all information is good to have, right?

9    A.   More information, the better.

10   Q.   In everything pretty much, right?

11   A.   Pretty much.

12   Q.   So because in retrospect, right, sitting here now,

13   six, seven years later, in retrospect if you had the

14   information then, you might have done something

15   differently, right?

16   A.   Correct.

17   Q.   By the way, Eric, Mr. Marks, you didn't decide to

18   have the trial in this matter seven years later, right?

19   That wasn't your decision?

20   A.   Correct.

21   Q.   And fair to say your memory would have been better

22   seven years ago about all of this than it is seven years

23   later, right?

24   A.   Yes.

25   Q.   But information can be useful, right?

1    A.    Yes.

2    Q.    But the information we're talking about here, it's

3    not essential information, correct?

4    A.    It depends on the situation.

5    Q.    Well, I think we talked about yesterday that in

6    terms of the acquisition price of a counterparty, you

7    make bond purchases all the time without that

8    information, right?

9    A.    Right.

10   Q.    In fact, more likely than not you don't have that

11   information, right?

12   A.    Yes.

13   Q.    So you'd agree with me it's not essential

14   information?

15   A.    I would still say it depends on the situation

16   because there are times when I could use that to guide

17   what I think they'll sell it for.  It might not matter

18   what I think the bond is worth.  It might matter what I

19   think I can buy it for and what I can sell it for.

20        So there are certain circumstances where it is more

21   essential than others.

22   Q.    Right.  But because -- I mean, you don't remember

23   any of these transactions?  You can't put yourself in

24   your mind that day, can you?

25   A.    Correct, I cannot put myself in my mind that day.

1    Q.    So I guess it's possible that it would have been

2    necessary or essential information, it's possible it

3    wouldn't have been, right?

4    A.    Correct.

5    Q.    And, I mean, there's all sorts of other useful

6    information that you could have had at the time that you

7    didn't, right?

8    A.    Yes.

9    Q.    Useful information could be the counterparty, it's

10   at the end of a quarter and they want to bring down

11   risk, and so they need to sell bonds.  If you were in

12   their meetings and you learned that, wouldn't that be

13   useful information?

14   A.    Yes.

15   Q.    Do you have any reason to think that you'd ever be

16   in those meetings?

17   A.    No.

18   Q.    Did you ever have any reason to think you would

19   ever on planet earth have access to e-mails from your

20   counterparties that the government showed you?

21   A.    No.

22   Q.    So you would never actually have any of this

23   information, at least as to the e-mails of other people,

24   right?

25   A.    Right.

1    Q.   I mean, it would be useful to know, for example, if

2    a seller of a bond had this really risky bond that's

3    really risky and he really needs to get rid of it and

4    he's worried about it and he's worried about it.  It's a

5    buyer sale.  He needs to get rid it of.

6        If you knew that at the time, that's useful

7    information?

8    A.   Yes, that would be very useful to know.

9    Q.   Very useful.

10       If you had the most recent report on the collateral

11   of the bond, the most very recent one, that would be

12   useful?

13   A.   Yes.

14   Q.   It would be useful to know the history of similar

15   bonds, right?

16   A.   Yes.

17   Q.   It would be useful to know what the counterparty's

18   bottom line is, right?

19   A.   Yes.

20   Q.   And when the government tells you this one piece of

21   new information that you didn't have seven years ago,

22   they don't tell you all these other pieces of

23   information, right?

24   A.   Right.

25   Q.   So you don't know what impact all those other

1     pieces of information would have on this one piece of

2     information to understand your mind seven years ago

3     about something you don't remember?

4     A.   Can you rephrase that question?  I'm not sure what

5     you're asking.

6     Q.   The government, in their hypothetical to you, they

7     add one piece of information, right?

8     A.   Yes.

9     Q.   They say if we knocked on your door and told you

10    something, just one piece of information, would it have

11    had any impact on what you did next, right?

12    A.   Yes.

13    Q.   But they don't include every other piece of

14    information that could have existed at the time; they

15    only give you one, right?

16    A.   There is potentially other information out there

17    that could have impacted my decision at the time.

18    Q.   Right.  You don't know, for example, what

19    conversations were happening between David and sales

20    people in his firm that day, right?

21    A.   Correct.

22    Q.   Or David and counterparties on the phone that day?

23    A.   Correct.

24    Q.   And speaking of the one piece of information they

25    now give you, when a dealer says to you, okay, I bought

1    the bond at 40, you don't in your mind think about

2    consciously whether or not that statement is true.  What

3    you're telling this jury is you take that statement to

4    give you a floor upon which to negotiate, correct?

5    A.    Correct.  It frames the negotiation.

6    Q.    That's why it has an impact, right?  Because it

7    tells you the floor, right?

8    A.    Right.  It doesn't give me -- it guides my next

9    move.

10   Q.    And you talked with the government about a couple

11   of trades.  Count Four and Five was the CNF.

12         Do you recall that testimony?

13   A.    I don't recall the specific counts; but, yes, I

14   recall the trades.

15   Q.    The CNF trades?

16   A.    The CNF trades, yes.

17   Q.    I left you, in case you need to refresh your

18   recollection, the trade demonstrative summaries in front

19   of you in that folder.

20         But you've reviewed this trade many times before

21   coming to court, correct?

22   A.    Yes.

23   Q.    Met with the government many times?

24   A.    Yes.

25   Q.    I'm going to move sort of quickly, but if have you

1    any questions or need to refresh your memory, please

2    just let me know.

3    A.    Okay.

4    Q.    Fair to say, in a negotiation, early on you're

5    feeling each other out, right?

6    A.    Yes.

7    Q.    So in this negotiation, you're talking about how --

8    you say something like you're pretty sure you're higher

9    than 27 in the beginning, right?

10   A.    Yes.

11   Q.    You had already purchased the bond before at 28,

12   right?

13   A.    Can you repeat the question?

14   Q.    You had already purchased part of the bond before

15   at 28?

16   A.    Before $28 price?

17   Q.    Do you recall that?

18   A.    I don't recall.

19   Q.    But you quickly say, basically, Moving forward, I

20   have to get comfortable in the low 30s, right?

21   A.    Yes.

22   Q.    And then -- and this is important -- Mr. Demos says

23   to you, no, no, we're safe, I'm going to walk it up,

24   right?

25   A.    Yes.

1   Q.   And "walking it up" means he's not going to reveal

2   to his counterparty what your maximum price is, right?

3   A.   Right.

4   Q.   And you don't expect, in the other direction, for

5   Mr. Demos to reveal to you what his other counterparty's

6   minimum price is, right?

7   A.   It's not my expectation.

8   Q.   And then a couple of times in this negotiation you

9   say you got to run your model, Excel crashed, references

10  to the model, right?

11  A.   Yes.

12  Q.   Because you always have your model, right?

13  A.   I do typically use my model.

14  Q.   And as the negotiation continues -- and by the way,

15  how many of these -- how many trades do you do a year,

16  approximately, in 2012?

17  A.   A few hundred or so would be my best guess.

18  Q.   Sometimes many in a day?

19  A.   Sometimes many in a day, yes.

20  Q.   And there's many, many more bonds that you look at

21  and don't buy?

22  A.   Yes, there are many more that I don't buy than I do

23  buy.

24  Q.   And you've got all these instant messenger chat

25  rooms up on your computer screen during the course of

1    the day?

2    A.   Yes.

3    Q.   You might be talking to how many different people

4    at the same time?

5    A.   Like many, a large number of people.

6    Q.   Like more than a dozen?

7    A.   Probably.

8    Q.   And in these chat rooms, there's people that are

9    joking, right?

10   A.   Yes.

11   Q.   Sending pictures to each other?

12   A.   Yes.

13   Q.   You're laughing, because in this chat you sent a

14   picture?

15   A.   Yes.

16   Q.   By the way, speaking of the passage of time, I take

17   your sort of response -- do you think today you'd send

18   the picture?

19   A.   No.

20   Q.   Because things change over time, don't they,

21   Mr. Marks?

22   A.   Yes, they do.

23   Q.   You wouldn't want some compliance officer to come

24   here and arrest you for sending a picture, would you?

25   A.   No, I would not.

1    Q.   Can you show me with your hands how big the

2    compliance manual is at Ellington?

3    A.   I usually review it electronically, so I don't have

4    a good sense, but if I had to guess, it would be

5    something like that maybe (indicating).

6    Q.   Maybe that's an inch and a half?

7            THE COURT:   We'll ask the witness.

8    BY MR. SPIRO:

9    Q.   An inch and a half?

10   A.   Sounds fair.

11   Q.   And you then tell Mr. Demos to keep grinding.

12   A.   Yes.

13   Q.   And that basically means use negotiation tactics

14   and push down the other side?

15   A.   Yes.

16   Q.   Ultimately -- and during when he's grinding, he's

17   also sort of giving you sales talk.  Says things like,

18   I'll try to get another eight ticks.

19   A.   He does say that, yes.

20   Q.   And eventually you agree to an all-in price of

21   32-20, correct?

22   A.   Yes.

23   Q.   Mr. Demos says something about six ticks, then four

24   ticks; but fair to say that when dealers tell you

25   they're making four ticks, you don't necessarily believe

1    them?

2    A.    It depends on the situation.

3    Q.    In this situation?

4    A.    In this situation earlier he had suggested six

5    ticks, and I didn't disagree, so I essentially agreed to

6    that.

7          So by the end when he said, I'll just make four

8    ticks, I did not find that to be very believable.

9    Q.    So 32-20 all in, right?

10   A.    Yes.

11   Q.    He says he's making four ticks, you don't find it

12   very believable, right?

13   A.    Correct.

14   Q.    So at the moment you say "done," at the moment the

15   trade is being consummated, you don't believe his cost

16   basis?

17   A.    I am skeptical of his cost basis.

18   Q.    This whole case is about his cost basis; and you

19   make the transaction not even believing him seven years

20   ago about his cost basis, right?

21   A.    I was skeptical, but I executed the transaction

22   anyway.

23   Q.    My handwriting is much better than it was seven

24   years ago.

25         The value of an asset is not determined by the

1    historical cost basis.  You would agree with that?

2    A.   Yes.  That is a phrase I often use, typically when

3    I'm negotiating as well.

4    Q.   And that basically means, just in very simple

5    terms:  I could have gotten a great deal when I bought

6    this marker, I could have gotten a terrible deal when I

7    bought this marker.

8         The value of the marker isn't determined by what I

9    bought it for, right?

10   A.   A marker is a different example.

11        But in these bonds, the value to maturity is

12   determined by the cash flows that you're expected to

13   receive.

14   Q.   Right.

15   A.   Whereas the cost basis could affect what people are

16   willing to pay you if they're hesitant to give you a

17   large markup.

18        But if you hold it to maturity, the value is the

19   sum of your future cash flows.

20   Q.   And on this bond, if you could look at the screen

21   in front of you -- and you see it broken down in terms

22   of the buying of the bond.

23             THE COURT:  Can we just have the record

24   reflect what exhibit this is.

25             MR. SPIRO:  379.  I apologize, Judge, I

1    thought Mr. Francis had done that for me.

2              THE COURT:  The jury wasn't here.

3    BY MR. SPIRO:

4    Q.   Can you tell us what the difference is between the

5    price you bought it for and the price you sold it for?

6    A.   On which security?

7    Q.   We'll use the bigger piece.  The $6,500,000 piece?

8    A.   Yes.

9    Q.   What did you buy it for?

10   A.   32.625.

11   Q.   And what did you sell it for?

12   A.   82.3125.

13   Q.   So you made almost 50 points, right?

14   A.   Yes.

15   Q.   Now, the government gives you these scenarios and

16   hypotheticals, but what if Mr. Demos had just said,

17   listen, I'm not selling it below 33-20, period?  32-20,

18   excuse me.

19        What if he just said that?  Drop dead price.  Fill

20   or kill.

21        Your model would still indicate to you that it was

22   a good purchase for your portfolio, correct?

23   A.   I would have to -- given that we bought it there, I

24   think it was a safe assumption that our model thought it

25   was a good purchase as well.  So I could answer that

1    yes.

2    Q.   And you cannot tell me that it's not possible that

3    if Mr. Demos says, I'm sick of chatting in 75 chat rooms

4    at the same time, this is the price to you, 32-20, take

5    it or leave it, you can't tell this jury you wouldn't

6    have taken it?

7    A.   It's possible I would have taken it.

8    Q.   And even if he had told you more truths or you had

9    more facts, more hypothetical information, whatever, if

10   you didn't see a path to paying less than 32-20.  You

11   very well may have transacted at 32-20 regardless.

12   A.   Correct.

13             (Pause.)

14   Q.   In imaginary land, if someone had knocked on the

15   wall of your office or cubicle at this very moment and

16   said to you, by the way, you know, the counterparty was

17   out late last night.  These are new facts.  The

18   counterparty needs to sell.  These are new facts.

19   Whatever new fact we could imagine.  It's quite possible

20   that if then the offer to you is just 32-20, take it or

21   leave it, you're still going to buy it, right?

22   A.   It's possible.

23   Q.   And then there was one more trade that you

24   discussed with the government, and that trade you buy

25   and you say I'll buy at CSFB 98-12, right?

1    A.    Yes.

2    Q.    And that is the CSFB trade, right?

3    A.    Yes.

4    Q.    You liked the bond at 98-12 or you wouldn't have

5    bought it, right?

6    A.    Correct.

7    Q.    And David told you the all-in price was 98-12 and

8    you bought it at 98-12?

9    A.    Yes.

10   Q.    And in that trade, you would agree with me, there's

11   not as much back and forth, correct?

12   A.    Correct.

13   Q.    Now, when you're negotiating in the RMBS market,

14   there are reasons why you don't always push back in a

15   negotiation that may not be perfectly obvious to the

16   jury.

17        One reason to not push back in a negotiation is you

18   could push back and it could be a cheap bond and

19   somebody else could buy it, right?

20   A.    It's possible.  If it's a bond I really want to

21   buy, I might try to move faster on it.

22   Q.    It could be that you're dealing with a counterparty

23   that is not reasonable in your mind, or it doesn't want

24   to negotiate further in your mind, and you just think

25   negotiating with this person is going to be a waste of

1     time.  You like the bond at the price, you buy it,

2     right?

3     A.    If I think that negotiation would not get me

4     further, then it's possible.

5     Q.    And we talked about all these different chat rooms.

6         A lot of times dealers are showing you bonds and

7     interacting with you and you don't actually buy, right?

8     A.    Right.

9     Q.    They're serving a function, right, in the

10    marketplace?  Do you agree with that?

11    A.    Yes.

12    Q.    And when they do that, you don't compensate them

13    for that part, right?

14    A.    Right.

15    Q.    And, in fact, the government asked you, sitting

16    here today, seven years later, what goes into deciding

17    which dealers you want to use, what dealers you want to

18    use moving forward.

19        Do you remember those questions?

20    A.    No.

21    Q.    Do you remember anything about deciding on which

22    dealers to use or not use?

23    A.    Do I remember anything about what my factors are in

24    deciding?

25    Q.    Yes.

1    A.    Yes.

2    Q.    Isn't it the case that at the time, seven years

3    ago, Ellington actually kept track of what they called

4    dealer votes?

5    A.    I believe we were doing that seven years ago?

6    Q.    What that was was just an internal way for you to

7    keep track of what dealers were giving you good value

8    and what dealers weren't, right?

9    A.    Yes.

10   Q.    And you looked at activity level?

11   A.    Yes.

12   Q.    You looked at what products that they trade?

13   A.    Yes.

14   Q.    David's activity level was high, right?

15   A.    I don't recall how high it was.

16   Q.    It was higher than some?

17   A.    Yes.

18   Q.    He had a product that you liked?

19   A.    Yes.

20   Q.    In those contemporaneous dealer votes, no where

21   within that do you consider the markup or the

22   acquisition price of the dealer.  There's no category

23   for that.

24   A.    There is no category for their markup, no.

25   Q.    I'm almost done.

1          The total price you paid for these bonds met your

2     yield bogey.

3     A.    We didn't really have set yield bogeys or yield

4     targets.  Instead we tried to source the best available

5     assets in the marketplace at that time.

6     Q.    So you were able to, using your independent

7     judgment, buy the bond at these prices?

8     A.    Yes.

9     Q.    And You did that through your internal analytics

10    that got you that comfort level?

11    A.    Along with our market knowledge.

12    Q.    At any point you have the right to walk away,

13    right?

14    A.    Yes.

15    Q.    You have the right to ask other dealers?

16    A.    We could ask them for their opinions on the bond.

17    Q.    You've done those things, right?

18    A.    Sometimes.

19    Q.    You could leave the negotiation and buy a different

20    bond.

21    A.    Yes.

22    Q.    And I want to ask you:  Is there any document or

23    anything in the model we looked at that can show the

24    jury what the maximum price you would have paid for the

25    bonds that day was?

1    A.    I don't believe so.

2    Q.    So we have no way of knowing today whether if David

3    had said, forget 32-20, this bond one day is going to be

4    worth 80, how about you can take it or leave it at 40,

5    we don't even know whether or not you would have taken

6    it?

7    A.    That cannot be determined from the documents.

8    Q.    And maybe the most important question of all is:

9    Even knowing everything that you now know, if I said to

10   you, Eric, that I would rip up the trade ticket and we

11   could undo this trade, would you?

12   A.    Well, I would undo it to avoid this situation we're

13   currently in.

14   Q.    So wait.  So would I --

15   A.    But I believe that it was the right decision for my

16   investors to purchase these securities.  I think it

17   added value for the portfolio.

18   Q.    You testified at the beginning that folks at your

19   firm were familiar and comfortable in the RMBS market

20   and were around during its formation in the 1980s,

21   right?

22   A.    Yes.

23   Q.    And in the 1980s and in the 1990s and in the 2000s,

24   all the way up to over 30 years later in 2013, to your

25   knowledge, no one had ever been arrested based on

1    anything they said between a qualified institutional

2    buyer and a qualified institutional seller in the RMBS

3    market, correct?

4    A.   To my knowledge, no one had been arrested in that

5    time period.

6    Q.   Now, my final question is:  And the government −−

7    and the government sort of danced around this a little

8    bit −− but if somehow Mr. Demos was somehow able to

9    survive this ordeal and was back trading in the RMBS

10   market and showed you a bond tomorrow, would you trade

11   with him again?

12   A.   If he was on my approved dealer list, which is

13   determined by heads of my firm, then I would be willing

14   to trade with him if the right situation arose.

15   Q.   But you'd always only be willing to.  I'm not

16   asking you to, like, do him a solid.  I'm saying:  If

17   everybody allows it and he survives and he comes to you

18   to negotiate about a bond you want −− not a lemon, a

19   bond you want −− you would still trade with him

20   tomorrow?

21   A.   Yes.

22           MR. SPIRO:  No further questions.

23           MR. FRANCIS:  If I may please have one moment,

24   Your Honor?

25           THE COURT:  You may.

1                    (Pause)

2              MR. FRANCIS:  Good morning, everyone.

3              THE JURY:  Good morning.

4              MR. FRANCIS:  Thanks for bearing with me.

5              Mr. Marks.

6

7                 REDIRECT EXAMINATION

8    BY MR. FRANCIS:

9    Q.   Mr. Marks, let's start with where Mr. Spiro left

10   off.

11        Deal with Mr. Demos tomorrow?

12   A.   Under those circumstances, yes.

13   Q.   How would you deal differently with him, knowing

14   what you know now?

15   A.   Well, I mean a lot has happened, so it would be a

16   lot to think about.  I don't know.

17   Q.   What do you mean "a lot to think about"?

18   A.   Like after getting a speeding ticket are you less

19   likely to speed?  Probably.

20        So maybe he will be -- hold himself to a higher

21   standard potentially, or maybe I would have to be more

22   cautious. It could go either way.

23   Q.   When you say hold himself to a higher standard,

24   what do you mean by that?

25   A.   Just being very forthcoming with information and

1    not trying to mislead or misdirect.

2    Q.    Mislead or misdirect who?

3    A.    Potential counterparties.  Myself included.

4    Q.    Mr. Spiro asked you whether or not, to your

5    knowledge, had anybody been arrested, going back to the

6    '80s, for the crime Mr. Demos is charged with.

7          Do you remember that?

8               MR. SPIRO:  Objection.  Mischaracterized what

9    I asked.

10              MR. FRANCIS:  I can rephrase, Your Honor.

11   BY MR. FRANCIS:

12   Q.    The topic of people being arrested previously going

13   back to the 1980s, do you recall that topic?

14   A.    I recall his question.

15   Q.    In the 1980s, were people using Bloomberg chats?

16   A.    No.

17   Q.    Do people use Bloomberg chats now?

18   A.    Yes.

19   Q.    So Mr. Spiro asked you some questions yesterday

20   afternoon about chats too, right?

21   A.    Yes.

22   Q.    And I believe he asked you whether or not the

23   information about a trade was memorialized anywhere

24   other than a ticket.  I think you said it's in the

25   chats.

1    A.   Yes.

2    Q.   And how is having that information memorialized in

3    the chats useful to you in your business?

4    A.    In case there's a misunderstanding later on, we can

5    look back at the chat to see exactly what was said.

6    Q.   Okay.  So that's for you.  Let's talk about for us.

7         Would we be able to reconstruct this trade in

8    detail if we didn't have the chats?

9    A.   No.

10   Q.   If you were doing this trade on the phone with

11   Mr. Demos, would we be able to figure out who said what

12   at what exact moment?

13   A.   Probably not.

14   Q.   Would we know the defendant's exact words that he

15   said to you if we didn't have chats?

16   A.   I believe dealer phones are recorded.

17   Q.   Do you know that Mr. Demos's phone was recorded?

18   A.   I don't know for a fact.

19   Q.   So other than a recorded phone line, would you have

20   remembered the exact words that Mr. Demos said to you?

21   A.   No.

22   Q.   So Mr. Spiro yesterday had some questions for you

23   about all-in price and it's relation to your P&L.  Do

24   you remember that?

25   A.   Yes.

1    Q.   And when the price goes up when you buy a bond,

2    what happens to profit and loss?

3    A.   We would expect the profit to be lower the higher

4    we pay for a bond.

5    Q.   And what we're looking at in these three trades did

6    Mr. Demos's misrepresentations cause you to pay a lower

7    price or a higher price?

8    A.   Well, the misrepresentations caused me to follow a

9    certain negotiating path.  I don't know what would have

10   happened had I known the true facts.

11   Q.   Why don't we know that?

12   A.   Because I did not have that information at the

13   time.

14   Q.   Why didn't you have that information at the time?

15   A.   That information was not relayed to me.

16   Q.   Who misrepresented that information to you?

17   A.   Mr. Demos.

18   Q.   So did Mr. Demos lie to you that prices were

19   actually, the offering prices were actually lower than

20   the seller was offering?

21   A.   No.

22   Q.   By lying, did Mr. Demos save Ellington money?

23   A.   No.

24   Q.   So there's -- if you could have bought these three

25   bonds at a lower price, would you?

1   A.   Most likely.

2   Q.   And what would that have done to the value of your

3   portfolio?

4   A.   It would have increased our expected returns.

5   Q.   Well, I mean, at the time it would have increased

6   your expected returns, right?

7   A.   Yes.  And now it would have increased our actual

8   returns.

9   Q.   So now we have the benefit of knowing what actually

10  happened, right?

11  A.   Yes.

12  Q.   So more money or less money for Ellington's

13  investors?

14  A.   More money.

15  Q.   And at the time you did these trades, did you

16  know -- strike that.  I'm going to come back to that.

17       Mr. Spiro started off early in his questioning

18  asking you about acquisition price.  Dealers usually

19  keep that a secret.  Do you remember talking about that?

20  A.   Yes.

21  Q.   And I think you agree that dealers have no

22  obligation to disclose that to you?

23  A.   Correct.

24  Q.   Is that what Mr. Demos did until -- let's just take

25  an example.

1        This is from the two CNF trades.  Do you remember

2   looking at these two documents?

3   A.   Yes.

4   Q.   So 403, Mr. Demos's e-mails with the seller on top,

5   and Government's 404, your chat with him is on the

6   bottom.

7        Do you see that?

8   A.   Yes.

9   Q.   Is that what Mr. Demos did in the CNF trades?  Did

10  he keep his acquisition price a secret?

11  A.   No.

12  Q.   What did he do?

13  A.   He stated what his acquisition price would be.

14  Q.   Did he state that information truthfully?

15  A.   No.

16  Q.   And even though Mr. Demos didn't have an obligation

17  to disclose his acquisition price, did he do that here?

18  A.   Yes.

19  Q.   Did you force him to?

20  A.   No.

21  Q.   Did he voluntarily disclose information to you

22  about his acquisition price?

23  A.   Yes.

24  Q.   And did he disclose –– did he voluntarily disclose

25  accurate information to you about his acquisition price?

1    A.   No.

2    Q.   So yesterday Mr. Spiro asked you questions about

3    how Mr. Demos didn't lie to you about the fundamentals

4    of a bond.  Do you remember that?

5    A.   Vaguely.

6    Q.   So I just want to make sure we're on the same page.

7         Fundamentals of the bond, those are the things you

8    were talking about like loan to value ratio?

9    A.   Yes.

10   Q.   And I think you said FICO scores or credit scores

11   of borrowers?

12   A.   Yes.

13   Q.   Default rates of borrowers?

14   A.   Yes.

15   Q.   Zip codes of borrowers?

16   A.   Yes.

17   Q.   That's like where these houses are located?

18   A.   Yes.

19   Q.   How about historical losses on the bond?  Is that

20   the fundamentals?

21   A.   Yes.

22   Q.   How about the deal documents, like the underlying

23   documents of how the bond was made, is that fundamental?

24   A.   Yes, because it relates to the structure.

25   Q.   So is that all public information?

1    A.    Some of it is information you have to pay to

2    acquire.

3    Q.    Is that information that's available to any

4    investor in the RMBS market who wants it?

5    A.    If they want it and are willing to pay for it, they

6    can acquire much of that information.

7    Q.    Like some of the things like, maybe zip codes, you

8    have to pay a subscription service to get some of that

9    information?

10   A.    It depends on how much data you want -- how

11   detailed you want the data to be.

12        The zip codes you could probably get from -- any

13   dealer would send you a loan tape, giving loan detail,

14   like basic loan details.

15   Q.    What's the stuff you've got to pay for?

16   A.    There are matching services that match loan tapes

17   to the actual property address.

18   Q.    That's even more detailed.  That's not just zip

19   code, but that's sort of actually where the house is?

20   A.    Yes.

21   Q.    So how about things like loan to value ratio,

22   credit scores?  Is that stuff that everyone can get and

23   get the same information no matter where you get it

24   from?

25   A.    There are probably different data providers that

1    could give you different, slightly different, numbers.

2    Q.   How so?

3    A.   The credit score thing, we know the exact credit

4    score at origination of the loan, according to the loan

5    documents, but that credit score can change over time.

6    Q.   I see.

7    A.   And the LTVs can change over time as well.

8         The actual value of the property is just an

9    estimate.

10   Q.   And so how about the deal documents, do those

11   change over time?

12   A.   No.

13   Q.   Do you have to pay for those?

14   A.   No.

15   Q.   If Mr. Demos lied to you about the fundamentals of

16   the bond, is that information you'd be able to figure

17   out on your own?

18   A.   Probably.

19   Q.   Would you need the government to come show you

20   chats with Deer Park, between Mr. Demos and Deer Park,

21   to know whether or not Mr. Demos was lying to you about

22   fundamentals of a bond?

23   A.   No.

24   Q.   Would Mr. Demos run a higher risk of being caught

25   by people like you if he was lying about fundamentals of

1    a bond?

2    A.    Yes.

3    Q.    Because that's information that people other than

4    he have access to?

5    A.    Yes.

6    Q.    How about acquisition price that Cantor is paying?

7    Does anyone else have access to that information other

8    than the seller and Mr. Demos?

9    A.    Not that I'm aware of.

10   Q.    So you couldn't pay -- I'm sorry -- who could you

11   pay to share with you that information?  Is there a

12   subscription service?

13   A.    No.

14   Q.    Is there a publicly available document you could go

15   to look at?

16   A.    No.

17   Q.    You talked about -- I think you talked about, with

18   me and with Mr. Spiro, information and how much

19   information you want to have.  Just tell the jury:

20   What's your preference on information?

21   A.    The more information, the better.

22   Q.    And Mr. Spiro asked you whether or not certain

23   information was essential, and you said it sort of

24   depends on the situation?

25   A.    Yes.

1    Q.   And there's all kinds of useful information to you?

2    A.   Yes.

3    Q.   Is the information that Mr. Demos misrepresented,

4    was that useful information to you?

5    A.   Yes.

6    Q.   When you're negotiating to buy a bond, what is the

7    most important term under negotiation?

8    A.   The price.

9    Q.   And what information did Mr. Demos misrepresent to

10   you in these three trades?

11   A.   His acquisition price.

12   Q.   So Mr. Spiro wrote something up on the board that

13   you said is something you say; is that right?

14   A.   Correct.

15   Q.   The value of an asset is not determined by the

16   historical cost basis.  You agree with that?

17   A.   Yes.

18   Q.   Is the cost basis relevant -- sorry.

19        Mr. Spiro asked you some questions about yield

20   targets.

21   A.   Yes.

22   Q.   So explain to the jury -- I'm not sure I got

23   this -- what do you mean by yield target?

24   A.   So let's say you need to earn 10 percent return on

25   your portfolio every year, your yield target would be

1    10 percent.  Every asset you buy has to hit that return.

2    Q.   It's a goal for how much money you're going to get

3    if you buy a bond and hold it; is that right?

4    A.   Yes.

5    Q.   So the value of an asset is not determined by the

6    historical cost bases, that means the total value to

7    Ellington isn't determined by how much you paid for it;

8    is that right?

9    A.   So the value of the future cash flows you expect to

10   receive does not change based on what you paid for it.

11   So I would most often use that phrase if I'm trying to

12   sell a bond for a lot more than what I paid for it, and

13   people might have a general sense of where I bought it.

14   Q.   So why would, would that -- explain:  What does

15   that have to do with anything?

16   A.   So if I bought a bond that I thought was really

17   cheap, I could try to sell it a lot higher and say, look

18   at the future crash flows, look at the yield you can get

19   at this higher price, it still looks cheap at that

20   higher price.

21   Q.   So that's something you say to other people to

22   explain the value of the bond to them; is that right?

23   A.   Yes.

24   Q.   Because if they own it, then they get the cash

25   flows?

1   A.   Yes.

2   Q.   How about the value of the bond to Ellington, the

3   seller, in that situation.  The price that it paid for

4   it, it does affect the value of it, right?

5        MR. SPIRO:  Objection.  Leading, every

6   question.

7        THE COURT:  Sustained.

8   BY MR. FRANCIS:

9   Q.   To what extent is the price -- the historical cost

10  basis that Ellington paid for that bond -- does it

11  affect the value of that investment if Ellington then

12  sells it?

13  A.   Our cost basis affects the amount of money we make

14  on the trade.  When we do sell the bond, we realize the

15  difference between our cost and our sales price.

16  Q.   So what effect does buying the bond at a lower

17  price have on yield for that investment?

18  A.   It would increase the yield to buy at a lower

19  price.

20  Q.   And if you later sell that bond, say you don't hold

21  it to maturity, you don't hold it until the end, until

22  it expires, but you choose to sell it at some point,

23  what affect on the value of that investment does buying

24  the bond at a lower price have?

25  A.   It makes the investment more valuable.

1    Q.   What is Ellington's goal with respect to the value

2    of its investments?

3    A.   To maximize the return for our investors.

4    Q.   Mr. Spiro asked you some questions about the CNF

5    trades that I have up on the screen, at least documents

6    from.

7         I think he asked you about whether or not you

8    believed Mr. Demos was really making four ticks or six

9    ticks.

10        Can you explain why you thought Mr. Demos might not

11   be making four ticks, but might be making six?

12   A.   I didn't know how much he was making, but I

13   assumed, since he said he would work for six ticks, then

14   he said, you know what, let's just make it four ticks.

15        On a trade like this, I would expect him to make a

16   decent amount more than four ticks, so that's why I was

17   suspicious that he was willing to lower the commission.

18   Q.   So you thought there was a possibility of how much,

19   kind of, play in the joints?  How many ticks?

20   A.   I have no way of knowing.

21   Q.   Did you think he was making not two ticks more than

22   you thought but 62 ticks more than you thought?

23   A.   I don't remember exactly what I thought at the

24   time, but I would not have assumed that he was making

25   that much.

1    Q.   I heard you agree with Mr. Spiro that it's

2    possible -- strike that.  I'm not sure whether or not

3    you agreed with him.

4         I heard you say it's possible you would have bought

5    the bond at the same price of 32 and 20 even if Mr.

6    Demos said to you, you know what, here's your price,

7    32-20; is that right?

8    A.   It's possible, yes.

9    Q.   Why do you say it's possible?  How come you're not

10   sure?

11   A.   We would have to go back in time and replay the

12   scenario under different circumstances.

13   Q.   So can we go back in time?

14   A.   No.

15   Q.   So will we ever know for sure how this trade would

16   have played out if you had had truthful information?

17   A.   No.

18   Q.   Why don't we know that?

19   A.   I did not have truthful information.

20   Q.   Why not?

21   A.   That was not the information that was relayed to

22   me.

23   Q.   What was the information that was relayed to you?

24   A.   That his acquisition price would be 32 and 1/2.

25   Q.   And who was the one doing the relaying there?

1    A.    Mr. Demos.

2    Q.    You were asked yesterday by Mr. Spiro some

3    questions about the risk of Ellington and risk to

4    Cantor.  Do you remember that?

5    A.    Yes.

6    Q.    Do you need a drink of water?

7    A.    I'm okay.

8    Q.    If you need a break, just let me know.

9          I asked you some questions about breaking a trade.

10   And then Mr. Spiro used the word "fading."

11         Do you remember him asking a question about fading?

12   A.    Vaguely.

13   Q.    Are you familiar with -- I know it seems like a

14   long time ago -- are you familiar with the expression

15   when someone puts in a bid for a bond but before the

16   transaction is completed they pull their bid?

17   A.    Yes.

18   Q.    What is that referred to?

19   A.    That is fading your bid.

20   Q.    How is that different than agreeing to a trade,

21   saying something like "done," and then before the trade

22   settles, backing out?

23   A.    Well, in one example the trade is considered to be

24   done or executed.

25   Q.    In which?

1    A.    In your second example.

2    Q.    And how about in the first when someone fades their

3    bid?

4    A.    There is no trade done in that example.

5    Q.    Is that the sort of thing that leads it to be

6    escalated to senior management?

7    A.    No.

8    Q.    Does that lead to lawsuits?

9    A.    No.

10   Q.    Is that part of the negotiation process?

11   A.    It's poor form, but it happens.

12   Q.    So is that -- did you fade any of your bids in the

13   three trades we looked at?

14   A.    No.

15   Q.    If Ellington were known for fading its bids or

16   withdrawing bids after it made them, what would be the

17   effect of that poor form?

18   A.    We would likely have reduced liquidity and a bad

19   reputation.

20   Q.    Bad reputation I understand.  Explain to us what it

21   means that Ellington would have reduced liquidity.

22   A.    Counterparties might not want to work with us or

23   show us opportunities.

24   Q.    Just because you changed your mind and decided to

25   pull a bid?

1    A.    We make their job harder in those examples.

2    Q.    It's possible, you feel, that people might not work

3    with Ellington just for pulling bids?

4    A.    They would look at us differently:

5    Q.    Mr. Spiro asked you questions talking about risk to

6    Cantor, about the price fluctuation or the possibility

7    the price might change between the time that Mr. Demos

8    agreed to buy a bond and the time he was able to sell

9    it.  I'm going to ask you some follow up on that.

10        Are you familiar with the stock market at all?

11   A.    Yes.

12   Q.    I know you know a lot about RMBS, but you know

13   about the stock market?

14            MR. SPIRO:  Objection, leading, every

15   question.  This is redirect.

16            MR. FRANCIS:  I'm just setting up.

17            THE COURT:  That's allowable.

18   BY MR. FRANCIS:

19   Q.    Can you explain to the jury how the volatility of

20   prices -- first of all, what's price volatility, for

21   instance with the stock market?

22            MR. SPIRO:  Objection, relevance to the stock

23   market's current volatility or anything related to this.

24            THE COURT:  Overruled.  I think I know where

25   he's going.

1    A.   The stock volatility is how much the price can move

2    around.

3    BY MR. FRANCIS:

4    Q.   And let's take -- what's a stock that you think of

5    as being popular or everyone would kind of know of?

6    A.   Apple.

7    Q.   Apple.  Can the price of Apple stock change minute

8    to minute?

9    A.   Yes.

10   Q.   Are you familiar with day trading in stocks?

11   A.   Yes.

12   Q.   Explain to the jury, what's a stock day trader do?

13              MR. SPIRO:  Standing objection to this.

14              THE COURT:  It's noted.

15   A.   They would try to buy a stock and sell it higher on

16   the same day, since the price swings around a lot on a

17   day-to-day basis.

18   BY MR. FRANCIS:

19   Q.   So can you explain to the jury how price volatility

20   in the RMBS market is different than in the stock

21   market?

22   A.   In the RMBS market, the securities are complex and

23   take a long time to analyze.  So the prices don't really

24   move around very quickly.  And the bid/ask spread is a

25   lot wider.

1      Where you could instantaneously sell a bond versus

2  buy it, there is a large difference, where the stock

3  market, it's one penny, and everyone know where it's

4  trading.

5      These trades take a lot longer in the RMBS market.

6  Q.   Do people day trade RMBS bonds?

7  A.   No.

8  Q.   Why not?

9  A.   These bonds take a long time to analyze; and for a

10  seller and buyer to come together, it might be the

11  course of days to agree on a price.

12  Q.   So how much -- how likely is it that the -- let me

13  withdraw that.

14      Let's take the CSFB bond in Count Six.

15      Can you explain for the jury how often a bond --

16  that bond would trade?

17  A.   So we bought the whole tranche of that bond.  So

18  after we bought it, that bond would not trade again

19  until we decide to sell it.

20  Q.   Was there possibility that the price of the CSFB

21  bond was going to drop in the time between when Cantor

22  bought it and he sold it to you?

23  A.   No.  The price of the bond would not move around.

24  Q.   How about the CNF bonds in Counts Four and Five; do

25  those trade rapidly?

1    A.    No.

2    Q.    How many times do they trade in a minute?

3    A.    They don't trade on minutes.

4    Q.    How about in a day?  Does it trade more than once a

5    day?

6    A.    Potentially you could see a couple trades in a day

7    on a name.

8    Q.    How likely is it that Mr. Demos, or rather Cantor,

9    was at risk of the price dropping in the time in between

10   it bought those two bonds and it sold them to you?

11   A.    I do not believe they had risk in the price moving

12   around.

13   Q.    I'm going to pull up -- I think Mr. Spiro asked you

14   some questions.  Let me set this up.

15        Mr. Spiro asked you questions about how you made

16   Ellington -- Ellington made more profit on this trade

17   than Cantor.  Do you remember that yesterday?

18   A.    I don't recall the specific question.

19   Q.    How is Cantor's risk in these three bonds different

20   than Ellington's risk?

21   A.    Their risk was primarily counterparty risk.

22   Q.    I heard you say that.  Explain to the jury what

23   counterparty risk means.

24   A.    So if I, as the buyer, fail to pay for the bond,

25   Cantor could be stuck buying these bonds without a place

1    to sell them.

2    Q.   And under what circumstances would you and

3    Ellington fail to pay for the bond?

4    A.   If I had made a mistake and bid the wrong bond,

5    then I might try to break the trade with them.

6    Q.   Did you make a mistake and bid the wrong bond?

7    A.   No.

8    Q.   How often does that happen?

9    A.   Rarely.

10   Q.   And what would be the impact on Ellington if it

11   broke trades because it got the wrong bonds?

12   A.   It would give us a bad reputation.

13   Q.   And what would that mean for Ellington's business

14   going forward?

15   A.   It would hurt our business.

16   Q.   Now, how is that counterparty risk different than

17   the risk that Ellington was taking in buy these bonds?

18   A.   So we were taking market risk on the bonds, since

19   the price could go up or down.

20   Q.   So market risk is the change in price?

21   A.   Yes.

22   Q.   Did Cantor have that risk of change in price?

23   A.   No.

24   Q.   So let's look at, since I have it on the screen,

25   what time, in military time, did Mr. Demos get the

1    seller to agree to sell the two bonds?

2              MR. SPIRO:  Objection.  Outside the scope.

3              THE COURT:  Want to just tie it to a question

4    asked?

5              MR. FRANCIS:  Sure.

6    BY MR. FRANCIS:

7    Q.   Let me pin down the difference in risk between

8    Ellington was taking and Cantor was taking.  And now I'm

9    setting up the difference in time.

10             THE COURT:  Correct.

11   BY MR. FRANCIS:

12   Q.   What time in military time did Mr. Demos agree to

13   buy the two CNF bonds?

14   A.   15:51.

15   Q.   And what time in military time did you agree to buy

16   them?

17   A.   16:08.

18   Q.   So I don't want to put you on the spot, how much

19   time had elapsed there?

20   A.   Sixteen minutes.

21   Q.   And so that was the duration of Cantor's –– what

22   kind of risk?

23   A.   Counterparty risk.

24   Q.   Let me pull up Defendant's 379.  This was on the

25   screen this morning.

1       Do you see the --

2   A.   I would like to add one thing to that last answer,

3   if that's possible.

4   Q.   Of course.

5   A.   The counterparty risk lasts until settlement date.

6   Q.   So if Ellington --

7   A.   So it is three business days after the trade date.

8   Q.   Because that's the amount of time that Ellington

9   could break the trade?

10  A.   Well, the settlement date is when the money

11  actually changes hands and the bonds change hands.

12  Q.   So if Ellington backed out during that time?

13  A.   Right.  There could be the potential to have a

14  broken trade in that time.

15  Q.   Okay.  I believe we talked about this:  How many

16  times have you broken trades?

17  A.   It's come up on occasion, but it's pretty rare.

18  Q.   So under what circumstances did you break trades?

19  A.   If I had a typo in a bid or made some sort of

20  mistake.

21  Q.   Did you ever do it because you just changed your

22  mind?

23  A.   No.

24  Q.   You thought better of it the next day?

25  A.   No.

1    Q.   And how's Ellington's reputation?

2    A.   I believe we have a good reputation.

3    Q.   Do people refuse to do business with you because

4    you broke trades?

5    A.   No.

6    Q.   Why not?

7    A.   We do not do it frequently.

8    Q.   How frequently do you do it?

9         MR. SPIRO:  Objection.  Now asked and answered

10   several times.

11        THE COURT:  I'll allow it.

12   A.   It's happened a couple times over my career.  I'm

13   not sure exactly how many.

14   BY MR. FRANCIS:

15   Q.   Like more or less than five?

16   A.   Less than ten.

17   Q.   Less than ten.  How long has your career been?

18   A.   Around 12 years.

19   Q.   Was every single one of those less than ten times

20   because of a mistake?

21   A.   Yes, some sort of mistake.

22   Q.   Were any of those times because Ellington just

23   changed its mind?

24   A.   No.

25   Q.   So looking at Defense 379, do you see there's a

1    little small -- can you guys read it now or do you want

2    me to make it bigger?

3        Can you see it, Mr. Marks?

4    A.   Yes.

5    Q.   Great.

6        The top two lines are Ellington buying the CNF

7    bonds; is that right?

8    A.   Yes.

9    Q.   So that's the -- this reflects the trades we went

10   through yesterday?

11   A.   Yes.

12   Q.   And then what we didn't go through, that's the

13   second and third from the bottom two lines; is that

14   right?

15   A.   Correct.

16   Q.   So we didn't talk about this:  What happened to

17   Ellington -- what happened to these bonds after

18   Ellington bought them?

19   A.   The prices went higher.

20   Q.   What did Ellington do as a result?

21   A.   We sold them.

22   Q.   And when was that?

23   A.   February 19, 2014 and July 9, 2014.

24   Q.   So that's, for the CNF, one bond, that's a year and

25   four months later.

1    A.   Roughly, yes.

2    Q.   It's a little more than that, I think.  I'm

3    rounding down.

4         And for the CNF, two bonds, that's a year and nine

5    months later?

6    A.   Yes.

7    Q.   And did Ellington know the price was going to go up

8    on those bonds?

9    A.   No.

10   Q.   Did you know you were going to make -- what is

11   that?  It's a little less than eight points, it's like 7

12   and 1/2 points on the CNF 1 bond in price appreciation?

13   A.   We did not know that.

14   Q.   Did you know you were going to make a little less

15   than 50 -- so let's say call it 50 -- 50 points on CNF

16   2?

17   A.   No.

18   Q.   Could you have made less money?

19   A.   Possibly, yes.

20   Q.   Could you have made no money?

21   A.   Possibly, yes.

22   Q.   Could you have lost money?

23   A.   It's possible.

24   Q.   And so how does that impact the price that

25   Ellington wants to pay on these bonds?

1    A.    The less we pay, the more cushion we have for

2    adverse market conditions.

3    Q.    Now, the last thing I want to cover, Mr. Spiro

4    asked you questions about where you learned, or where

5    you didn't learn to negotiate.  I think he asked whether

6    or not you learned to negotiate from a FINRA test.  Do

7    you remember?

8    A.    Yes.

9    Q.    I think you said you didn't; is that right?

10   A.    Correct.

11   Q.    Are you licensed by FINRA?

12   A.    No.

13   Q.    Are you regulated by FINRA?

14   A.    I'm not, but my firm is, and I'm a representative

15   of my firm.

16   Q.    Let's explain, with that established, explain for

17   us:  What is FINRA?

18   A.    They are the regulatory agency.

19   Q.    For what?

20   A.    For finance.

21   Q.    Did you have to take any exams to trade bonds?

22   A.    No.

23   Q.    Are you familiar with the Series 7 exam?

24   A.    I'm somewhat familiar.

25   Q.    Did you have to take that?

1    A.    No.

2    Q.    Who's the Series 7 for?

3    A.    I'm not sure.

4    Q.    Are you familiar with the Series 63 exam?

5    A.    I've heard of it.

6    Q.    Did you have to take that?

7    A.    No.

8    Q.    Do you have continuing education requirements

9    imposed on you by FINRA to maintain licensing?

10   A.    No.

11         MR. FRANCIS:  May I have one moment, Your

12   Honor?

13         THE COURT:  You may.

14              (Pause.)

15         MR. FRANCIS:  Thank you, Mr. Marks, Your

16   Honor.  No further questions.

17         THE COURT:  Recross Mr. Spiro?

18         MR. SPIRO:  Very quickly.

19

20                 RECROSS-EXAMINATION

21   BY MR. SPIRO:

22   Q.    Mr. Marks, this notion that government lawyers give

23   you that if they work back in time and gave you truthful

24   information, it could have Affected what you do next,

25   right?

1      You understand that notion, right?

2  A.   Yes.

3  Q.   We talked about how no one was arrested, as far as

4  you know, for negotiating in the RMBS market in this

5  manner for 30 years, right?

6  A.   Correct.

7  Q.   And no one's ever been arrested, by the way,

8  anywhere else other than by these lawyers in this

9  district, right?

10 A.   I'm not aware.

11 Q.   But you're not aware of anyone else in New York

12 City where all these financial institutions, of any New

13 York city lawyers having anybody arrested for this,

14 right?

15 A.   In the RMBS markets, I'm not familiar of anyone

16 being arrested in New York City.

17 Q.   It's just these lawyers?

18 A.   Just in Connecticut, as far as I know.

19 Q.   And since those arrests, you've continued to trade

20 in the market, right?

21 A.   Yes.

22 Q.   And people now are very careful when they're

23 negotiating and making representations comparatively?

24 A.   Yes, I think people are much more careful with what

25 they say.

1    Q.   Okay.  And because of that, it's not that they just

2    tell you the truth about everything, they just don't say

3    anything comparatively, right?

4    A.   Comparatively, yes.

5    Q.   So the alternative universe that's actually

6    happening on planet earth is once you start arresting

7    people for these things, rather than just telling you

8    the truth about everything, they just don't say

9    anything, right?

10   A.   That is one way things happen.

11   Q.   But that's –– you have actually observed that

12   change generally in the marketplace?

13   A.   The market has changed where people will either be

14   reluctant to give you information or they will give you

15   information, and I would now assume it to be true.

16   Q.   And none of the information that you learn post

17   facto, now, has any change on the value of those three

18   bonds you purchased today, right?

19   A.   It does not change the cash flows that come in on

20   the bonds.

21            MR. SPIRO:  I have no further questions.

22            THE COURT:  All set.

23            MR. FRANCIS:  I think I may have two.

24            THE COURT:  Okay.

25

1                    FURTHER REDIRECT EXAMINATION

2       BY MR. FRANCIS:

3       Q.    So explain how it's different now when someone like

4       Mr. Demos gives you information about price, how are

5       things different now?

6       A.    I would assume it to be true now.

7       Q.    Why would you assume it to be true?

8       A.    Because everyone knows that if they make

9       misstatements, they will get in trouble for it.

10      Q.    And you finished off there by saying the

11      information that Mr. Demos gave you didn't affect the

12      cash flows.  What did it affect?

13      A.    It affected the price I paid potentially.

14      Q.    And what effect did that have on Ellington's

15      investors in the end?

16      A.    It potentially affected the amount of money they

17      received on their investments.

18      Q.    That was at the time.  How about now, looking back.

19      Now that we know how much Ellington sold it for, what

20      impact did it have that Mr. Demos gave you false

21      information about price -- strike that.

22            What information did it have on Ellington's

23      investment in the end that you weren't able to buy it at

24      lower prices?

25                  MR. SPIRO:  Objection.  He's

1    mischaracterizing.  He says he doesn't know if he ever

2    could have bought it at a lower price.

3              THE COURT:  Why don't you restate that,

4    Mr. Francis.

5              MR. FRANCIS:  Sure.

6    BY MR. FRANCIS:

7    Q.   What impact does buying bonds at a higher price,

8    these three bonds, have on an investment for Ellington's

9    investors?

10   A.   Can you repeat the question?

11   Q.   Yeah.  What is the impact for Ellington's

12   investors?  What does it mean for them if you buy bonds

13   at a higher price and then sell them?

14   A.   They would make less money.

15             MR. FRANCIS:  Thank you.  That's it.

16             THE COURT:  Thank you.

17             MR. SPIRO:  Nothing, Judge.  Thank you.

18             THE COURT:  Thank you, sir.  You may step

19   down.

20                  (Whereupon, the witness was excused.)

21             THE COURT:  I think we'll go ahead and take

22   our morning break now.

23                  (Whereupon, the jury left the courtroom.)

24                  (Whereupon, a recess followed.)

25             THE COURT:  Ready for the jury?

1           MR. FRANCIS:  Thank you.

2           An issue came up over the break with the next

3     witness.

4           THE COURT:  That's what happens when I leave?

5           MR. FRANCIS:  You have to stay there, Judge.

6           Ms. Cherry is handling the examination, but I

7     was the one having the conversation with Mr. Spiro, so I

8     will address it.

9           Mr. Melnicki is not being called as an expert.

10    He's a compliance officer, or was a compliance officer,

11    at Cantor.  We're not going to ask him any of his

12    opinions.

13          However, as a factual matter, we had intended

14    to ask him the sort of line of questions:  "If you had

15    known that Mr. Demos was lying, what would you have

16    done?"

17          I think Mr. Spiro feels that opens the door

18    then to all the other people at Cantor who also were

19    lying, for all this evidence.

20          And the government's position is that does not

21    actually impeach anything.  The fact that other people

22    were lying and this witness was unaware of it doesn't

23    impeach any of his testimony.

24          But we want to get this clarified because this

25    will have a radical impact on the length of the

1    examination.

2                THE COURT:  Sure.  Mr. Spiro.

3                MR. SPIRO:  In the first instance, Judge, and

4    I know this is the case of the hypothetical question,

5    but that question is permissible, as the Court has

6    ruled, as to a potential victim in a fraud case.  It's

7    not for every single other witness of, if now, seven

8    years later, I tell you this, you would have done this,

9    because it calls for speculation.

10               So they can't ask him that question.  It's an

11   improper question.  I don't think this witness is even a

12   proper witness, as I stated earlier.  But to compound

13   that by allowing him to give this self-serving, oh, of

14   course if I had known I would have.  It's not the way

15   it's supposed to work.

16               He could say, I didn't know.  Okay, you didn't

17   know.  If he wants to stick with the "I didn't know"

18   story, he can stick with the "I didn't know" story.  So

19   that's my position on the question.

20               If the Court were inclined to allow that

21   question, then of course I'm allowed to cross-examine

22   him on anything else, anything else that could have

23   affected his state of knowledge at the time as to the

24   question of if he had known.

25               THE COURT:  I agree with you.  And I agree

1    with the government that they can ask the question.

2         MR. SPIRO:  And the Court would agree every

3    report he reviewed, everyone else that was lying, every

4    other salesperson that was lying, that they've now

5    pulled documents that he's aware of that shows that this

6    was rampant conduct at Cantor before Mr. Demos started,

7    after Mr. Demos left, all of that comes in.

8         THE COURT:  If he's asked:  If you had known

9    about Mr. Demos, what would you have done, then it seems

10   to me that opens the door to the context for that

11   response.

12        MR. SPIRO:  Okay.

13        MR. FRANCIS:  And just to clarify, if we

14   simply ask him, did you know Mr. Demos was lying, that

15   then would not open the door to all the things he

16   doesn't know, because by that logic, everything is

17   impeachment.

18        THE COURT:  Correct.  I didn't take Mr. Spiro

19   to be disagreeing with you on that.

20        MR. SPIRO:  No, I think that's exactly where

21   the line is.

22        MR. FRANCIS:  Okay.  Could we have two more

23   minutes just to adjust our outline?

24        THE COURT:  Sure.  We saved some time, it

25   looks like, so --

1          MR. FRANCIS:  Thank you.

2              (Pause.)

3          THE COURT:  We're all set?

4          MR. SPIRO:  We're all set, Judge.  Thank you.

5          MR. FRANCIS:  Thank you, Your Honor.

6              (Pause.)

7          MR. FRANCIS:  Your Honor, I think we're all

8    set.  One final point of clarification to make sure we

9    know where the lines are.

10          We're going to ask the hypothetical "if you

11   had known, what would you have done."  We're not going

12   to open the door to this.  I think it's implicit, but I

13   want to make it explicit that the defense can't open the

14   door to this by asking Mr. Melnicki that question,

15   eliciting his hypothetical response and then we spend

16   the rest, like, two weeks going over every bad act at

17   Cantor.

18          THE COURT:  It's explicit now.

19          MR. FRANCIS:  Thank you.

20          MR. SPIRO:  It would take longer than two

21   weeks.

22          THE COURT:  Are we ready for the jury?

23          MS. CHERRY:  Yes, Your Honor.

24              (Whereupon, the jury entered the

25   courtroom.)

1           THE COURT:  Please be seated everyone.

2           We're ready for our next witness.

3           MS. CHERRY:  Yes, Your Honor.  The government

4    calls Benjamin Melnicki.

5

6               BENJAMIN MELNICKI,

7           called as a witness, having been first duly

8           sworn or affirmed, was examined and testified

9           as follows:

10

11          THE CLERK:  Please state your name and spell

12   your last name for the record.

13          THE WITNESS:  Benjamin Melnicki,

14   M-E-L-N-I-C-K-I.

15          THE CLERK:  And indicate the town and state in

16   which you live or work.

17          THE WITNESS:  I live in Glen Rock, New Jersey.

18          THE CLERK:  Thank you.

19

20               DIRECT EXAMINATION

21   BY MS. CHERRY:

22   Q.   Good afternoon -- good morning, Mr. Melnicki.

23   A.   Good morning.

24   Q.   If you can, tell the jury where you currently work.

25   A.   I currently work at a financial technology startup

1    by the name of Noble Markets.

2    Q.    And what is your role at Noble Markets?

3    A.    Chief compliance officer and regulatory counsel.

4    Q.    And what does that mean?

5    A.    I am responsible for oversight of the entire

6    compliance program.  So ensuring that the company and

7    its employees comply with all applicable laws, rules and

8    regulations.

9    Q.    Before you were at Noble, where were you?  Where

10   did you work?

11   A.    Bank of America Corporation.

12   Q.    Also in compliance?

13   A.    Yes.

14   Q.    And before that, were you at Cantor Fitzgerald?

15   A.    Yes.

16   Q.    And when were you at Cantor Fitzgerald?

17   A.    May 2011 through May 2016.

18   Q.    And what was your role there?

19   A.    I had several roles there over time throughout the

20   duration of my employment.  I was generally acting in a

21   compliance capacity.  The majority was fixed income

22   compliance officer.

23   Q.    In 2011, 2013, were you the fixed income compliance

24   officer?

25   A.    Yes.

1    Q.   And in order to be -- do you hold any licenses?

2    A.   Can you elaborate?

3    Q.   In order to be a fixed income compliance officer,

4    do you have to hold any licenses?

5    A.   You do not.

6    Q.   Do you hold any FINRA licenses?

7    A.   Yes.

8    Q.   Can you tell the jury, what's FINRA?

9    A.   FINRA stands or the Financial Industry Regulatory

10   Authority.  It's F-I-N-R-A.  It's the primary self

11   regulatory organization for financial services, for

12   broker-dealers.

13        Think of it as the SEC, and then FINRA enforces

14   polices the industry itself.

15   Q.   What licenses, what FINRA licenses, do you hold?

16   A.   I hold a Series 7, 24, 63, 53 and 99.

17   Q.   Series 7, what is that license for?

18   A.   A Series 7 is a general securities representative

19   license.

20        Generally it's the most commonly held license.  It

21   allows one to transact business with clients in the

22   marketplace.

23   Q.   And how did you get that license?

24   A.   How did I?  I studied and took a test.

25   Q.   Like what kind of things are on the test?

1    A.    The precise nature of the content is sketchy, but

2    on a high level, it's generally broken into two

3    categories of material.

4         First would be general behavior and conduct that's

5    expected of those in the industry.  And then it's

6    specifics around products and the actual individual

7    mechanics of how the industry works relating to those

8    specific products.

9    Q.    So you said back in -- I think the Series 63.  You

10   said you had that too?

11   A.    Yes.

12   Q.    What's a Series 63?

13   A.    A Series 63, I believe, is what's commonly called

14   the blue sky law exam.

15        So each state has their own requirements for you to

16   conduct business with a customer in its state.

17        There is an organization, I think it's the National

18   Association of Securities Administrators, coalesced

19   around a uniform standard, so you would be able to take

20   one test and each of the states would honor that

21   registration.

22        But it's generally to conduct business in one -- in

23   a particular state.

24   Q.    But in order to get that license, you took a test?

25   A.    Yes.

1    Q.   Let's come back to your time at Cantor.

2         You said you were a fixed income compliance

3    officer.  What were your responsibilities?

4    A.   My responsibilities were generally twofold:

5         As compliance officer, generally I break the

6    responsibilities into two different sections, one would

7    be, call it, advisory services and the other would be

8    surveillance.

9    Q.   And sort of, generally, what was the purpose of

10   fixed income compliance at Cantor?

11   A.   I'm sorry?

12   Q.   Why was there compliance?

13   A.   Every financial services organization has to have a

14   compliance program in place and dedicated individuals to

15   carry out and implement that compliance program.

16   Q.   You said you had control and surveillance; is that

17   right?

18   A.   Advisory and surveillance.

19   Q.   Advisory and surveillance.

20        What's advisory?

21   A.   Advisory is generally –– it's the –– the roll is

22   business people, whether you're in a sales or trading

23   capacity, asking for advice pre-transaction, before an

24   action occurs.  Can I do this trade?  Should I –– what

25   should I do in this case?  Can I send this material to

1    someone?

2         It's advising the business people, the business

3    person, on whatever his or her request is at the time.

4    Q.   So traders would come and ask you questions about

5    how they can do trades?

6    A.   Yes.

7    Q.   Did any traders ever come up to you and ask you if

8    they could lie to their customers?

9    A.   No.

10   Q.   And then you said the second part was surveillance;

11   is that right?

12   A.   Yes.

13   Q.   Can you describe to the jury, what's surveillance?

14   A.   Certainly.

15        Surveillance is after the fact.  So you look at --

16   as a compliance officer, you have to look at activity

17   that already occurred.  That could -- what that does is

18   allow you to identify potentially problematic behavior,

19   either on an individual level or that's affecting the

20   firm as a whole.

21   Q.   What were the types of surveillance that Cantor

22   Fitzgerald did?

23   A.   We looked -- as a compliance officer, I would look

24   at surveillance reports, we look at several systems, you

25   would review communications on occasion.  There were

1    various different data points that you would look at

2    after the transaction had already occurred or the matter

3    had already occurred.

4    Q.   You mentioned surveillance reports.  So can you

5    tell the jury:  What are surveillance reports?

6    A.   Sure.  Surveillance reports are -- it's a broad

7    term.  There could be many different forms of them.

8         Generally, a report that's designed to be provided

9    to supervisors and/or compliance officers, to

10   individuals that identifies activity.

11        They could be predetermined.  They could have

12   predetermined parameters.  They could be raw files, an

13   e-mail or through a system.

14   Q.   Are large price difference reports, are those

15   surveillance reports?

16   A.   It was one -- it was one report, yes.

17   Q.   What kind of report is that?

18   A.   A large price difference report was a report that

19   was distributed via e-mail.  I don't recall whether it

20   was at the end of the day, end of a trading day or the

21   beginning of the next trading day, which was designed to

22   identify certain transactions that exceeded

23   predetermined parameters.

24   Q.   And you said it came out daily?

25   A.   Yes.

1    Q.    This type of report, it's been around for a while?

2          Was it an in existence before you started at

3    Cantor?

4    A.    Yes.

5    Q.    How do you use it?

6    A.    I'm sorry?

7    Q.    How did you use the large price difference report?

8    A.    I reviewed it, and I would conduct follow up.

9          It was a starting point.  It contained data, like a

10   transaction, the associated parties with it, so it

11   provided data for relevant transactions.

12         So I used it as a starting point on whether further

13   investigation was needed.

14   Q.    So the information in that large price difference

15   report, was that enough to tell you if someone was lying

16   to their customers?

17   A.    No.

18   Q.    You said also there was an electronic communication

19   review system?

20   A.    Yes.

21   Q.    Can you tell the jury what kind of system there

22   was?

23   A.    Sure.  A broker-dealer in this case as a registered

24   entity has an obligation to review certain

25   communications, whether they're in electronic mail or

1    they're chats.  The firm, a lot of firms retain a

2    vendor, they use software, which is designed to aid in

3    the process as opposed to just looking through e-mails

4    randomly.

5         There were two different levels of review.  One was

6    key word based, if I'm correct.  Like certain key words

7    were designed into the system.  And then it was also

8    designed to capture a specific percentage of

9    communications.

10   Q.   What can you talk a little more about, what's the

11   key word search?  How does that work?

12   A.   The firm, the customer of the vendor, would enter

13   certain terms that would warrant the communication --

14   the system to flag the communication automatically.

15   Things like "steal," "fraud," some curse words.  In all

16   honesty things that were buzz words that would warrant

17   someone to actually say, hey, let's pause and look at

18   this.

19   Q.   So if communications had some of these sort of key

20   words in, they would be flagged?

21   A.   The system was designed to do that.

22   Q.   Then what happens from there?

23   A.   The communications would be, depending on the

24   individual whose communication it was, the author, or

25   the recipient, in both cases, was assigned -- had a

1    supervisor.  So there were different groupings of

2    people.

3        Like, for example, depending on who your manager

4    was, your communications would be in one particular

5    bucket, and that supervisor was expected to, he or she

6    was expected to review those communications for all

7    employees under his or her control.

8    Q.   And then you said a percentage of communications

9    were checked or flagged?

10   A.   Yes.

11   Q.   So what does that mean?

12   A.   I don't remember the precise number, but it was --

13   by that I meant no matter what the content of it, it

14   would look at the -- the system was designed to capture

15   automatically a certain percentage of communications

16   regardless of content.  Random sampling.

17       So if I did 100 e-mails, I sent and received 100

18   e-mails or chats in one day, it was designed to capture

19   whatever that X percentage was automatically and flag

20   them for the reviewing.

21   Q.   You said "it was a random sampling of all the chats

22   I was in that day"?

23   A.   Chats and communications, and electronic -- and

24   e-mails, yes.

25   Q.   Telephone calls for the fixed income group, were

1    telephone calls monitored?

2    A.    No.

3    Q.    They weren't recorded?

4    A.    No.

5            MS. CHERRY:  Your Honor, at this time I'd like

6    to offer Government's Exhibit 4.

7            THE COURT:  Government's Exhibit 4 is

8    admitted.

9            MR. SPIRO:  Judge, the defense has the same

10   relevance objection to all of this.

11           THE COURT:  Objection noted.

12   BY MS. CHERRY:

13   Q.    Do you see this exhibit, Mr. Melnicki?

14   A.    Yes.

15   Q.    What is it?

16   A.    It's Cantor Fitzgerald, an e-Speed Employee

17   Handbook.  The arbitration agreement and policy,

18   confidentiality and intellectual property.

19   Q.    And you're familiar with this handbook?

20   A.    I've seen it before, yes.

21   Q.    And what's the purpose of the employee handbook?

22   A.    Employee handbook, the purpose of it would be to

23   provide employees of the firm's -- certain of the firm's

24   policies and procedures and as well as practices and

25   conduct that's expected of them.

1    Q.   What's the date of this particular employee

2    handbook?

3    A.   May, 2006.

4    Q.   There's an acknowledgment of this May 2006

5    handbook.  Do you see that?

6    A.   Yes.

7    Q.   So employees were required to acknowledge that they

8    had received and read it?

9    A.   Yes.

10        MS. CHERRY:  At this point, Your Honor, I'd

11   like to offer Government's Exhibit 5.

12        THE COURT:  I assume the objection was to 4

13   through 9?

14        MR. SPIRO:  Relevance to all of this.

15        THE COURT:  Fine.  Government's Exhibit 5 is

16   admitted.

17   BY MS. CHERRY:

18   Q.   Do you see this acknowledgment, Mr. Melnicki?

19   A.   Yes.

20   Q.   Can you just read what I highlighted, please?

21   A.    By signing your name below, you acknowledge that

22   you received and read the employee handbook for Cantor

23   Fitzgerald, dated May 2006 (the handbook).

24   Q.   Can you read the sentence I just highlighted as

25   well?

1    A.    Finally, you acknowledge that you understand the

2    purpose of the handbook and agree to abide by all

3    policies, guidelines and other provisions contained or

4    referred to by the handbook.

5    Q.    And can you tell who signed this acknowledgment?

6    A.    Yes.

7    Q.    Can you tell the jury who signed it?

8    A.    David Demos.

9    Q.    And what's the date?

10   A.    November 29, 2011.

11   Q.    So let's go back to the actual handbook now that we

12   know it's been acknowledged by Mr. Demos.

13         Let's go to page 16.

14         You see I've blown up a section, Mr. Melnicki?

15   A.    Yes.

16   Q.    It's the Conduct/Compliance manuals section.

17   A.    Yes.

18   Q.    Can you read the highlighted part?

19   A.    Cantor Fitzgerald operates in a heavily–regulated

20   industry.  To comply with it's obligation as an employer

21   in such an industry and to otherwise promote its

22   successful and ethical operation and provide a positive

23   working environment for employees, Cantor Fitzgerald

24   from time to time issues conduct/compliance manuals.

25              MS. CHERRY:  Your Honor, at this time I'd like

1    to offer Government's Exhibit 6.

2              THE COURT:  Government's Exhibit 6 is admitted

3    over objection.

4    BY MS. CHERRY:

5    Q.   Mr. Melnicki, do you see this document?

6    A.   Yes, I do.

7    Q.   What is this, written supervisory procedures?

8    A.   Written supervisory procedures are a document

9    that's required for a broker-dealer to have by FINRA

10   rule.

11   Q.   So FINRA requires this document?

12   A.   Yes.

13   Q.   And what's the date of this document?

14   A.   October 2011.

15             MS. CHERRY:  Your Honor, at this time I want

16   to offer Government's Exhibit 7.

17             THE COURT:  Government's Exhibit 7 is admitted

18   over objection.

19   BY MS. CHERRY:

20   Q.   Do you see this exhibit, Mr. Melnicki?

21   A.   Yes.

22   Q.   Can you tell the jury, what is this?

23   A.   This is a certification by an employee that -- they

24   have to certify annually to test to certain information

25   from a regulatory perspective.

1    Q.    Who certified this?

2    A.    It says a name, David Demos.

3    Q.    What is the date of the certification?

4    A.    There's a signature date.

5    Q.    What's that?

6    A.    January 3, 2012.

7    Q.    If we go to the next page.

8          If you look all the way at the bottom first, who

9    does it say it's certified by?

10   A.    David Demos.

11   Q.    Can you read that top part that I highlighted?

12   A.    Please note that each of the firm's employees has

13   the obligation to be knowledgeable of and conform to the

14   processes which allow the firm to comply with securities

15   law and regulation.  To that end, the firm has made

16   available to its employees the firm's anti-money

17   laundering program, the firm's prohibition against

18   insider trading within the firm's written supervisory

19   procedures, and the firm's written supervisory

20   procedures generally.

21   Q.    Let's go back to Government's Exhibit 6.  These are

22   written supervisory procedures?

23   A.    The cover says that.

24   Q.    I'm going to go to the introduction.  I'll blow

25   this up.

1        Can you read that first paragraph to the jury,

2   please?

3   A.    Yes.

4        Cantor Fitzgerald (Cantor) will conduct its

5   business consistent with the highest standards of

6   commercial honor and just and equitable principles of

7   trade.  Keeping our customer's interest foremost is key

8   to Cantor's success.  The trust of our customers and

9   Cantor's reputation are of paramount importance.

10  Effective supervision is an integral part of achieving

11  our goals and serving our customers.

12  Q.    Can you read that paragraph, please?

13  A.    Yes.

14       This manual does not attempt to set forth all of

15  the rules and regulations with which employees must be

16  familiar, nor does it attempt to deal with all

17  situations involving unusual circumstances.  When

18  questions arise, refer them to Compliance for

19  assistance.

20  Q.    Is that like the advisory services you were talking

21  about before?

22  A.    Yes, that's fair.

23  Q.    Let's keep moving through this document.

24       You see 2.1, Standards of Conduct?

25  A.    Yes.

1    Q.   Can you read that first sentence for me?

2    A.   It is the firm's policy and mandate to its

3    employees to conduct the firm's business under the high

4    standards and principles of the rules governing our

5    industry.  Employees are expected to deal with customers

6    in a fair and honest way, with the customer's interest

7    of primary concern.

8    Q.   And if we keep moving down this page, you see

9    there's a section called "Business Conduct of Cantor

10   Fitzgerald Registered Representatives"?

11   A.   Yes.

12   Q.   To be a trader, do you have to be a registered

13   representative?

14   A.   You would have to be licensed.  In order to be a

15   registered representative, you need to be licensed; so

16   yes.

17   Q.   So all the traders in the fixed income department

18   were registered reps?

19   A.   Yes.

20   Q.   Mr. Demos, would he have been a registered

21   representative.

22   A.   I believe so.  I can't --

23   Q.   Could he have traded fixed income or mezzanine

24   bonds at Cantor if he wasn't a registered rep?

25   A.   No.

1    Q.   We're going to go to Number 13 on this list.  Can

2    you read that for the jury?

3    A.   It's numbered 13.

4         I will not, for the purpose of inducing the

5    purchase or sale of a security, make any statement which

6    was at the time and in the light of the circumstances

7    under which it was made, false or misleading with

8    respect to any material fact, and which I knew or had

9    reasonable ground to believe was false or misleading.

10   Q.   Let's keep going through this document.

11        You see there was an electronic communications

12   policy?

13   A.   Yes.

14   Q.   Can you just read who this policy governs?

15   A.   This policy governs the use of electronic

16   communications by personnel of the firm.  This policy

17   also extends to off-hours usage of electronic

18   communication systems.

19   Q.   Are Bloomberg chats, are those electronic

20   communications?

21   A.   Yes.

22   Q.   I'll blow up Section 2.16.4.2.

23        Can you just read that for the jury?

24   A.   Users of our electronic communications systems are

25   expected to follow appropriate business communication

1  standards.

2  Q.   For Section 2.16.4.3, you see "Electronic

3  communications are business communications and should be

4  treated as such"?

5  A.   I do.

6  Q.   What's that first bullet point, please.

7  A.   You want me to read it out loud?

8  Q.   Yes, thank you.

9  A.   Electronic communications sent should contain the

10  most recent valid information available.

11  Q.   Let's keep moving through the document.

12       You see the section called "Training and

13  Education"?

14  A.   If you could increase it a little bit; but, yes, I

15  see it.

16  Q.   Is that any better?

17  A.   Yes, thank you.

18  Q.   Section 3.1, what does this say?

19  A.   Annual compliance meeting.

20  Q.   And you see section 3.2 at the bottom, what does

21  that say?

22  A.   Continuing education.

23  Q.   So there were two types of compliance meetings?

24  A.   Yes.  Generally, yes.

25  Q.   So what was the annual compliance meeting?

1    A.   So an annual compliance meeting is -- again, this

2    is a requirement for each broker-dealer under FINRA

3    rules to conduct an annual compliance meeting with their

4    registered representatives where you would be

5    required -- to which each employee would be required to

6    attend.

7    Q.   Were they sometimes held electronically?

8    A.   They could be held electronically, yes.

9    Q.   At Cantor, what kind of topics did they cover?

10   A.   They generally covered general securities,

11   principles and practices, expected behavior, and they

12   would also cover, possibly, as I recall, if there were

13   new regulatory developments, new rules that employees

14   needed to be apprized of, that sort of content.

15   Q.   And the second part, the continuing education,

16   what's that?

17   A.   Continuing education is a term that refers to each

18   registered representative.

19        As I mentioned earlier, you have to pass an exam in

20   order to maintain that license, the privilege to conduct

21   securities business, you have to complete continuing

22   educational.  And there are generally two forms of

23   continuing education that registered reps are expected

24   to complete.

25   Q.   Just so I understand it, you hold a Series 7, you

1    have to complete continuing education?

2    A.   Yes.

3    Q.   Every year?

4    A.   I don't recall.  I believe one of the elements was

5    every year and one was not.  I don't recall the precise

6    timing, but you would be expected to complete it or you

7    would not be able to continue to conduct securities

8    business.

9    Q.   You said there were two different types?

10   A.   Yes.

11   Q.   Can you tell the jury what are the two different

12   types?

13   A.   Sure.

14        One is the regulatory element, which the registered

15   rep, you have to actually go to a location and take a

16   test.  It would be a computer in front of you, like the

17   screen I have now in front of myself, and you have to go

18   to that location and you have to be signed up for and

19   you have to actually sit through the videos, tutorials,

20   on both general practices and rules and you'd have to

21   complete the module itself.

22        You literally, you get a printout you completed it.

23   So it was an offsite third-party vendor who conducted

24   the common way in which the regulatory element was

25   provided.

1        Did you want me to describe the other one too?

2    Q.   Sure I was going to just ask you that.

3    A.   Sorry.

4        The firm element is the second element of

5    continuing education the firm, in this case Cantor

6    Fitzgerald, is required to administer itself.  So that

7    again could be similar to the annual compliance meeting.

8    It could be in-person training or it could be

9    electronically by a WebEx or some sort of presentation.

10        But the distinction is that one is administered by

11   where you actually physically have to go to another

12   location and take -- you complete questions after.

13   Whereas the firm element is administered by the firm

14   locally at the offices and you're given time in which to

15   complete it, usually a window.

16              MS. CHERRY:  I have a moment, Your Honor?

17              THE COURT:  You may.

18                  (Pause)

19   BY MS. CHERRY:

20   Q.   I pulled this up on the screen and didn't ask you

21   to read this last sentence.

22        Can you read that for the jury?

23   A.   No employee shall effect any transaction in, or

24   induce the purchase or sale of, any security by means of

25   any manipulative, deceptive or other fraudulent device

1    or contrivance.

2    Q.    Are there periodic updates of this WSP, this

3    supervisory procedures book?

4    A.    Yes.

5    Q.    Like why would there be periodic updates?

6    A.    Why?  Several reasons.

7         The firm has an obligation, first, to update it

8    regularly.  It's not a static document.  It has to

9    change according to whether the company's policy changes

10   or there's a new rule; or just general maintenance in

11   the everyday course of running a business are some

12   examples that come to mind.

13             MS. CHERRY:  I'm going to offer

14   Government's Exhibit 8, Your Honor.

15             THE COURT:  Government's Exhibit 8 is admitted

16   over objection.

17   BY MS. CHERRY:

18   Q.    Do you see this document, Mr. Melnicki?

19   A.    I see it, yes.

20   Q.    And it's written supervisory procedures?

21   A.    That's what the page says.

22   Q.    I'll flip through it.

23         That's what it appears to be?

24   A.    Okay.

25   Q.    And what's the date of this document?

1    A.    August 2012.

2              MS. CHERRY:  At this time, Your Honor, I'd

3    like to offer Government's Exhibit 9.

4              THE COURT:  Government's Exhibit 9 is admitted

5    over objection.

6    BY MS. CHERRY:

7    Q.    Can you tell the jury what this document is?

8    A.    Can you blow up -- increase it just a little bit?

9    Q.    Make it bigger?

10   A.    Just the top.

11         Would you be able to show me the rest of it?

12   Q.    Sure.

13         If I'm scrolling too quickly --

14   A.    You're fine.

15   Q.    Do you know what the document is?

16   A.    Yes, I do.

17   Q.    Can you tell the jury what the document is?

18   A.    It's an annual compliance certification.

19         Again, there are certain rules and disclosures

20   actually that registered reps have to make with respect

21   to carrying their license, some of which are listed

22   here.  The criminal background, residential history.

23   You have to keep certain information fresh and up to

24   date.  Whether you have outside business activities.  By

25   that I mean if you have businesses or other sources of

1    revenue away from your job.  If you've made certain

2    political contributions.  You have to disclose that

3    annually.

4         That's what this document appears to me to be.

5    Q.   And it's filled out?  The questions are answered?

6    A.   The ones I could see it appears so.

7    Q.   Who -- what's the employee name in this document?

8    A.   David Demos.

9    Q.   And when was -- what's the completed date?

10   A.   September 21, 2012.

11   Q.   Can you read the highlighted sentence?

12   A.   All officers and employees are required to be aware

13   of and abide by firm policies and procedures designed to

14   achieve compliance with applicable securities laws and

15   regulations.

16   Q.   Can you just read that highlighted part?

17   A.   The firm has made available to all employees the

18   firm's written supervisory procedures.

19   Q.   That's that manual we just went through?

20   A.   Correct.

21   Q.   Are you able to, sort of, access these online?

22   A.   It was my -- as I recall, I believe, yes; and

23   they're also delivered via electronic mail, I think,

24   where there were updates made on occasion.

25   Q.   Can you highlight that third -- I mean, can you

1    read, please, the third paragraph that I just

2    highlighted?

3    A.    Yes.

4          You understand that you are required to read,

5    understand and comply with the following firm policies

6    and procedures which are accessible on the firm's

7    intranet website located at:

8    Q.    And that includes this compliance and supervisory

9    manual?

10   A.    That's what the document says, yes.

11   Q.    So let's go back to Government's Exhibit 8.

12         Can you read the highlighted part?

13   A.    Cantor Fitzgerald and Company.  (CF & Co. or

14   Cantor) will conduct its business consistent with the

15   highest standards of commercial honor and just and

16   equitable principles of trade.  Keeping our customer's

17   interest foremost is key to CF & Co.'s success.  The

18   trust of our customers and CF & Co.'s reputation are of

19   paramount importance.  Effective supervision is an

20   integral part of achieving our goals in serving our

21   customers.

22   Q.    And can you read the next paragraph that I

23   highlighted?

24   A.    Yes.

25         This manual does not attempt to set forth all of

1    the rules and regulations with which employees must be

2    familiar, nor does it attempt to deal with all

3    situations involving unusual circumstances.  When

4    questions arise, refer them to Compliance for

5    assistance.

6    Q.   Go to the next page.  See the code of ethics?

7         Do you see this section, code of ethics?

8    A.   Yes.

9    Q.   Can you read that section that I've just

10   highlighted?

11   A.   Yes.

12        The code of ethics is intended to govern the

13   actions and working relationships of employees with

14   current or potential customers, consumers, other firm

15   employees, competitors, suppliers, government

16   representatives, the media, and anyone else with whom

17   the firm has contact.  In these relationships, employees

18   must observe the highest standards of ethical conduct.

19   The success of CF & Co. as a provider of financial

20   services is built upon the trust and confidential

21   relationships maintained between CF & Co. and its

22   customers.  Therefore, each employee is expected in all

23   business matters to place CF & Co.'s and its customer's

24   interest above his or her own self interest and to

25   discuss with Compliance any proposed transaction or

1    relationship that reasonably could be expected to give

2    rise to a conflict of interest.

3    Q.   Can you read that last sentence that I just

4    highlighted?

5    A.   Yes.

6         Employees must resolve any doubt as to the meaning

7    of the code in favor of good, ethical judgment.  It is

8    the responsibility of each employee to avoid even

9    appearance of impropriety.

10   Q.   Can you read that sentence, please?

11   A.   Yes.

12        The reputation and integrity of the firm are

13   valuable assets that are vital to our success.  Each

14   employee is responsible for conducting the company's

15   business in a manner that adheres to the highest ethical

16   standards.

17   Q.   What about this right here?  Can you read that,

18   please?

19   A.   Yes.

20        Implicit in the code of ethics is CF & Co.'s policy

21   that both CF & Co. and its employee comply with the law.

22   The law prescribes a minimum standard of conduct.

23   Q.   If you keep going to the end of sentence?

24   A.   Sorry.

25        The code of ethics prescribes conduct that often

1    exceeds the legal standard.

2    Q.   Do you see the standards of conduct section?

3    A.   Yes.

4    Q.   I'm not going to have you read it again, but there

5    was also a standards of conduct section in the last WSP

6    that we looked through?

7    A.   Yes.

8    Q.   There's one in this one as well?

9    A.   Yes, that's what it appears.

10   Q.   If we keep scrolling.  Can you read that Number 13

11   again?

12   A.   It's Numbered 13:  I will not, for the purpose of

13   inducing the purchase or sale of a security, make any

14   statement which was at the time and in the light of the

15   circumstances under which it was made, false or

16   misleading with respect to any material fact, and which

17   I knew or had reasonable ground to believe was false or

18   misleading.

19        MS. CHERRY:  Can I have a moment, Your Honor?

20        THE COURT:  You may.

21             (Pause.)

22   BY MS. CHERRY:

23   Q.   I'm going to turn to page 418 of the document.  You

24   see it says "Fixed Income Trading and Sales General

25   Practices?

1    A.    Yes.

2    Q.    Do you know, is fixed income, does that include

3    residential mortgage backed securities?

4    A.    Yes.

5    Q.    That's where Mr. Demos was sitting, trading

6    residential mortgage backed securities?

7    A.    I believe so.

8    Q.    Mr. Melnicki, during your time as a compliance

9    officer, 2011, 2013, did you know if Mr. Demos was lying

10   to customers about prices?

11   A.    No.

12   Q.    We had talked about early on when we first started

13   surveillance of electronic communications.  Do you

14   remember that?

15   A.    Yes.

16   Q.    Was any of the surveillance designed -- strike

17   that, please.

18         You said to the jury there were two kinds of

19   surveillance, the key words and the percentage of

20   electronic communications, the random sampling?

21   A.    Of the electronic communications, yes.  Not

22   surveillance generally.

23   Q.    Yes, sorry.  Of the electronic communications, just

24   to be clear, there were key words and then there was a

25   random sampling; is that right?

1    A.    Correct.

2    Q.    Was any of the surveillance designed to pull or to

3    review both sides of a trade, all the information around

4    both sides of a trade, the buy and the sell?

5    A.    Can you elaborate a little more?

6    Q.    Any documents related to a particular purchase and

7    sale of a bond.  Was there any surveillance that would

8    pull all the electronic communications and the trade

9    tickets and all the documents surrounding a buy of that

10   bond, and then if it was sold that same day, a sale of

11   that bond?

12   A.    No.

13   Q.    Nothing to see if there was lies going on?

14   A.    No.  No.

15            MS. CHERRY:  Nothing further, Your Honor.

16            THE COURT:  So we'll go till about 12:30.

17            MR. SPIRO:  Sure, Judge.

18

19                     CROSS-EXAMINATION

20   BY MR. SPIRO:

21   Q.    Mr. Melnicki, you're aware that this process here

22   today is not a compliance hearing but a federal criminal

23   trial, correct?

24   A.    Yes, I'm aware.

25   Q.    I had a difficult time following the different

1    documents, so I may ask you for a little bit of time or

2    clarification.  So bear with me if it takes me a little

3    bit longer.

4         You're a lawyer, sir, correct?

5    A.   Yes.

6    Q.   And a compliance officer?

7    A.   Yes.

8    Q.   And now a chief compliance officer?

9    A.   Yes.

10   Q.   You went to law school?

11   A.   Yes.

12   Q.   And graduated law school?

13   A.   Yes.

14   Q.   And you passed the bar exam?

15   A.   Yes.

16   Q.   And the assistant general counsel of a major

17   financial institution, correct?

18   A.   Yes.

19   Q.   David Demos isn't any of those things, right, as

20   far as you know?

21   A.   As far as I know.

22   Q.   Now, I think you started off by talking about the

23   function of compliance at financial institutions and I

24   think I want to follow up a little bit on that.

25        I think one of the things you said was that people

1    can come and ask you questions from time to time, right?

2    A.   Correct.

3    Q.   You don't remember every question from seven years

4    ago, right?

5    A.   No.

6    Q.   You actually paused and said, "I believe so" when

7    the government asked you whether or not David Demos

8    traded fixed income, right?

9    A.   I don't believe that's what the question was.  I

10   believe it was whether he traded residential mortgage

11   backed securities.

12   Q.   So that was the question that you paused on and

13   said "I believe so"?

14   A.   Yes.

15   Q.   That's a pretty basic sort of question, right; what

16   he traded, right?

17   A.   Not necessarily, no.

18   Q.   And another function is surveillance and review?

19   A.   Yes.

20   Q.   Those were the two functions that you testified

21   about, right?

22   A.   Yes.

23   Q.   Now, people who come to work at banks and financial

24   institutions, prior to coming, might not necessarily

25   have legal training, right?

1    A.    Correct.

2    Q.    Or compliance training, right?

3    A.    Yes.

4    Q.    In fact, a lot of these folks who come to work at

5    financial institutions –– traders, salespeople –– they

6    come out of college, they come to the bank and they kind

7    of just learn on the job, right?

8    A.    At some institutions, yes.

9    Q.    At lots of institutions, right?

10   A.    Yes.

11   Q.    If you walk around Midtown Manhattan, there are all

12   these young people walking into these banks all the

13   time, right?  Working at these banks?

14   A.    Yes.

15   Q.    And those young people, well, they have to rely on

16   their supervisors, right?

17   A.    That's fair, yes.

18   Q.    And compliance, right?

19   A.    Yes.

20   Q.    And just because the jury's had like a small

21   snapshot here of Cantor Fitzgerald at the relevant time

22   period, there were lots of other people trading and

23   selling products, not just David, right?

24   A.    Yes.

25   Q.    Even in the residential mortgage backed security

1  product, right?

2  A.   Yes.  I believe so, yes.

3  Q.   And in the trades and the chats, there's often, as

4  you know being a compliance officers, other people cc'd,

5  like salespeople and traders, right?

6  A.   I would have to see the chats you're referring to.

7  Q.   Not every chat, but that's happens, right?

8  A.   Can you repeat the question?

9  Q.   Sure.

10     When traders and salespeople are trading and

11  selling RMBS securities, there's often multiple people

12  in a chat room?

13  A.   Correct.

14  Q.   And some of the folks that were trading and in the

15  sales group there started before David Demos, right?

16  A.   Yes.

17  Q.   He wasn't the first Cantor employee, right?

18  A.   No.

19  Q.   He came from somewhere else, right?

20  A.   I assume so, yes.

21  Q.   And I guess -- this is the part that's going to

22  take some back and forth probably because I don't

23  understand.

24     When he starts, is it that he gets this book,

25  this -- is this the -- is this it?

1        MS. CHERRY:  No.

2        MR. FRANCIS:  Which one would you like?

3        MR. SPIRO:  The compliance manual we're

4    reading from.

5    BY MR. SPIRO:

6    Q.   Does he get a binder that has all of these things

7    you were reading from?

8    A.   No.

9    Q.   He doesn't even get that?

10   A.   No.  He gets –– employee would receive –– they

11   don't receive a hard copy.  They receive an electronic

12   copy.

13   Q.   Okay.  So it's e-mailed to him, you think?

14   A.   That's how I recall employees –– I can't recall

15   Mr. Demos specifically –– but employees would receive it

16   electronically.

17   Q.   He didn't start with like a big class or anything,

18   right?  He just started like separately.  He didn't

19   start –– he didn't come in with a September 1 group,

20   right?

21   A.   I don't recall how he started.

22   Q.   But you don't even know that he ever got this?

23   A.   I don't recall.

24   Q.   You never saw him read the document, right?

25   A.   No.

1    Q.   Did you ever see anybody read it?

2    A.   Yes.

3    Q.   You saw lots of people reading it?

4    A.   Certainly.

5    Q.   Okay.  On their computers?

6    A.   Yes.

7    Q.   You've read all of it?

8    A.   I don't purport to remember it all, but I've read

9    it over time.

10   Q.   I don't know what that means.

11        Have you read the thing cover to cover?

12   A.   Yes.

13   Q.   There are sections -- there are sections about

14   you're not supposed to play games.  Do you remember

15   those sections?

16   A.   I don't.

17   Q.   You're not supposed to make certain kinds of jokes.

18   Do you remember that section?

19   A.   No, I don't.

20   Q.   Did you make any jokes while you worked at Cantor?

21   A.   I'm certain that I did.

22   Q.   Good.  Good.

23        And there's stuff in there about like the kinds of

24   aspirational views about the ways employees should

25   dress.

1    Do you remember the section on how you're supposed

2    to dress?

3    A.   I don't recall that, no.

4    Q.   Do you remember that it actually says that

5    Cantor -- and it uses examples -- likes khakis.  It sets

6    an example of khakis?

7    A.   No, I don't remember that.

8    Q.   And you read a bunch of sections from it, which I

9    will not ask you to read again, about commercial honor.

10   Do you remember that section?  Commercial honor.  Do you

11   remember that phrase?

12   A.   That I do remember.

13   Q.   Me too.

14        Paramount importance of the highest standards.  Do

15   you remember this kind of language?

16   A.   Yes.

17   Q.   These are aspirational principles, right?

18   A.   No.

19   Q.   These are things that people put in these big

20   compliance manuals that that's like we hold ourselves

21   out to be of the highest ethical -- every compliance

22   manual in New York has that, right?

23   A.   I don't know what every compliance manual in New

24   York has.  I know that sections of that are actually

25   rules, rule requirements under FINRA rules.

1    Q.   Right.  To write that into the manual.

2    A.   No.

3    Q.   What about the customer's interest is always a

4    primary concern.  Do you remember that one?

5    A.   I do.

6    Q.   Does that mean that you sell a bond for zero just

7    because that would be best for the customer?

8         That's not what that section means, right?

9    A.   That's not what the intent of that section is.

10   Q.   Now, the first time that you met with the

11   government to discuss this manual was March of this

12   year, right?

13   A.   I'm sorry, could you repeat the question?

14   Q.   Sure.  The first time you ever met with the

15   government to discuss this manual was March of this

16   year?

17   A.   I didn't meet with the government to discuss the

18   manual in particular.

19   Q.   The first time you met with the government to

20   discuss your testimony was March of this year?

21   A.   I believe that's correct.  I don't recall the exact

22   date.

23   Q.   March 29, 2018?

24   A.   Yes.

25   Q.   Just a few weeks before the trial, right?

1    A.    Yes.

2    Q.    First time, right?

3    A.    Yes.

4    Q.    And you know that the notes from that interview

5    were provided to the defense?

6    A.    I don't know.

7    Q.    In that meeting, they walked you through the

8    compliance manual and showed you sections from there and

9    asked you questions about it, correct?

10   A.    Not -- that's not how I would characterize it.

11   Q.    They didn't show you sections and point them out to

12   you?

13   A.    They did.  But they didn't use the term "walk

14   through."  I mean, we reviewed sections.  They asked me

15   questions, what does this mean?  To be analogous to what

16   we just went through, repeat a section out loud, read

17   it.

18   Q.    Right, but they also asked you about sections and

19   pointed out sections that you said don't apply, right?

20   A.    I don't recall.  Perhaps.

21   Q.    You don't recall, but you have no reason to think

22   that that didn't happen either, right?

23   A.    Correct.

24   Q.    And they actually walked you through it.

25         You don't like "walking through it."

1      They actually pointed out sections to you during

2   part of that interview process where they went in order,

3   which may not be particularly surprising, of the book.

4      So they asked you about page 87, then they asked

5   you about page 96 and then they asked you about page

6   106.

7      Do you remember that?

8   A.   Yes.

9   Q.   And they point to sections and say, what about this

10  one?  Does this one apply?  And sometimes you would say

11  no.

12  A.   Yes.

13  Q.   Now, and there's a book that's incorporated by

14  reference into this book.  Is that how these two books

15  work together?  Did I understand that properly?

16  A.   Can you clarify which books we're talking about?

17  I'm not following you.

18  Q.   There's the compliance manual, the written

19  supervisory procedures, and they are sort of

20  incorporated by reference into each other?

21      They work together?

22  A.   You'd have to show me where it says that.

23  Q.   I'm asking.  I have no idea.

24      I'm asking you:  Is that how it works?

25  A.   Written supervisory procedures were a stand-alone

1    manual.  Whether it was in hard print format or

2    electronic, it was a stand-alone manual.

3         I don't know what you're referring to with

4    incorporation by reference.  The document typically,

5    both at Cantor and other firms, would naturally

6    incorporate by reference other materials.

7    Q.   I'm not trying to be confusing.  If it's something

8    in the manual and also in the other supervisory

9    procedures, they inform one another.

10        You might have to look at both.  They might relate

11   back to each other.  There might be a term in both

12   that's the same?

13   A.   It's possible.

14             THE COURT:  Why don't we pick up with that

15   after lunch.

16             MR. SPIRO:  Sure.  We'll take our lunch break,

17   ladies and gentlemen.

18                  (Whereupon, the jury left the courtroom.)

19                  (Whereupon, a recess followed.)

20

21             THE COURT:  Please be seated, everyone.

22             You had one thing you wanted to mention,

23   Mr. Francis.

24             MR. FRANCIS:  Actually, pardon me.  I had two

25   things.

1          One, after this witness, the government

2     expects it will have one more witness, Mr. Carocci, and

3     then we likely will rest.  So I think that brings up two

4     things:

5          One is just staging.  If we could get a

6     five-minute break after Mr. Carocci's testimony, I don't

7     think it would be an issue, but in case we want to make

8     an application regarding the proffer statements, I

9     wouldn't want to be in a situation where we are

10    indicating to Your Honor that we need a sidebar or

11    something.

12         THE COURT:  That's fine.

13         MR. FRANCIS:  And the second thing is, at an

14    appropriate time, if Your Honor would be willing, for

15    you to instruct the defendant on his right to testify in

16    his own defense.

17         THE COURT:  I'll ask defense counsel when that

18    would be most appropriate.

19         Okay.  We'll bring the jury in.

20              (Whereupon, the jury entered the

21    courtroom.)

22         THE COURT:  Please be seated, everyone.

23         Whenever you're ready, Mr. Spiro.

24         MR. SPIRO:  Thank you, Judge.

25

1    BY MR. SPIRO:

2    Q.   Mr. Melnicki, many of the sections in the manuals

3    that we're discussing don't apply uniformly to every

4    single type of marketplace, correct?

5    A.   There are separate sections for specific products,

6    correct.

7    Q.   So the rules in equities, they don't always apply

8    to the rules in RMBS and vice versa, right?

9    A.   Not entirely, no.

10   Q.   Just to streamline this --

11   A.   Not entirely, no, as in some do apply across the

12   board, just to clarify.

13   Q.   And some don't?

14   A.   Correct.

15   Q.   I have Government 6, which is a massive document,

16   and I have page 305, Section 19 up, which is the Best

17   Execution section, NASD Rule 2320.

18        Do you see that, sir?

19   A.   Yes.

20   Q.   And I'm going to flip the page and go down to the

21   asset-backed securities, which includes mortgage-backed

22   securities, right?

23   A.   Yes.

24   Q.   Am I following this correctly?

25   A.   Yes.

1    Q.   If I'm not, tell me, please, because it's a little

2    confusing.

3    A.   You're following it correctly.

4    Q.   And that would also include RMBS, correct?  Right?

5    A.   Can you go back to the previous page?

6    Q.   Sure.

7    A.   I believe "mortgage-backed securities" is meant as

8    a generalized term and could include residential

9    mortgage-backed securities as well as other products.

10   Q.   So now that we're there, and we go to the next

11   page, now we'll go live.  So we're Best Execution.  We

12   followed the manual to mortgage-backed securities,

13   including ABS, which includes ABS there, and then we're

14   going to go to ABS, okay, and we're going to go to

15   Section 4, talking about best execution.

16        Can you read Section 4, please.

17   A.   "The character of the ABS market," numbered four,

18   "Given the unique nature of each ABS security issued,

19   price discovery in ABS occurs through unique pricing

20   models used by buyers and sellers in ABS.  Each market

21   participant (broker-dealers and customers) utilizes

22   different models with differing valuation conventions

23   and data to determine price, and conversely value or the

24   richness or cheapness of ABS.  As each ABS market

25   participant determines prices for ABS with unique

1    models, for the same ABS, two participants may arrive at

2    substantially different prices.  Purchases and sales in

3    ABS are marked by ABS market participants finding

4    richness or cheapness in ABS based on their models

5    versus the models of other ABS buyers or sellers, and

6    buying or selling particular issues of ABS accordingly.

7    As a result of the use of unique models, broker-dealer

8    bids or offers for ABS are the proprietary data of each

9    broker-dealer and is rarely shared with each other.

10   Further, in comparison to the other security types

11   listed above, the ABS marketplace has relatively few

12   participants.  As such, customers ascertain the best

13   market for ABS by contacting dealers directly."

14       Would you like me --

15   Q.   And then let's read Section 3 on the next page, the

16   bullet starting with "Given."

17   A.   "Given the sophistication of the customer, the

18   complexity of ABS and its price modeling convention,

19   buyers and sellers of ABS have priorities of certainty

20   and timeliness rather than the highest offer or lowest

21   bid."

22   Q.   This is the most specific section on best execution

23   in the ABS market in this whole group of manuals and

24   updates and supervisory procedures, as far as you know?

25   A.   I don't know the answer to that question.

1    Q.   As far as you know, sitting here now, do you know

2    of a more specific section than this on how this works?

3    A.   I don't know.  I would have to see the entire

4    manual.

5    Q.   So the answer is no, you don't know?

6    A.   The answer is I don't know if it's the most

7    specific section.

8    Q.   Can you tell me if you know of, right now, a more

9    specific section?

10   A.   I'm trying to answer your question.  I cannot tell

11   you right now without looking at the entire manual

12   whether I would or would not, whether there would be a

13   more specific --

14   Q.   But you as the compliance officer don't know of any

15   section more specific than this, as you sit there now,

16   without having to review it.

17   A.   Again, I think I'm trying to answer your question.

18   Without looking at the entire manual, I wouldn't be able

19   to say whether this is the most specific section or not.

20   Q.   Is there a section in the manual -- I'm going to

21   use the term "manual" to encompass the primary document,

22   the WSP incorporated document and any updates that

23   you've discussed with the government, okay?

24   A.   Okay.

25   Q.   So when I say "manual," you can assume it means all

1   of that.

2       Is there any section in there that describes how

3   somebody should negotiate specifically in the RMBS

4   market?

5   A.   I would have to see -- I don't know the answer to

6   that question without looking at the entire manual.

7   Q.   The government didn't ask you any questions about

8   the section I just put up, did they, in your direct

9   examination?

10  A.   I don't recall.  I believe we talked -- I believe I

11  did read that section, yes.

12  Q.   You read the last point that I just had --

13  A.   No.  I read a section on best execution.

14  Q.   But not the section specifically on RMBS and ABS

15  that I just had you read, right?

16  A.   I don't recall that.  I don't recall whether I did

17  or not.

18  Q.   You don't recall?

19  A.   I don't.  I don't recall if that particular text

20  that you provided in front of me was something that I

21  reviewed with them.

22  Q.   You have lawyers here today, sir?

23  A.   Yes.

24  Q.   Three?

25  A.   I have counsel representing me here.

1    Q.    Three lawyers?

2    A.    Four.

3    Q.    Four lawyers.  Four lawyers.

4          Two different law firms?

5    A.    Yes.

6    Q.    Is there anything I can look at in this compliance

7    manual that says that if I'm negotiating the buy or sell

8    of an RMBS bond, that you know of sitting here today --

9    that's the question.

10         The question is, as you sit here today at a federal

11   criminal trial, do you know of a section that would tell

12   me whether, if I have a risky bond, I can say to a

13   person, even though I really, really want to sell the

14   bond, "Forget about the bond for now, I don't want to

15   sell the bond."

16         Is there a section in this manual that tells me

17   whether or not I can say that?

18   A.    Can you repeat the question?

19   Q.    Sure.  Is there a section in this manual that tells

20   me whether or not, if I'm holding a risky bond and I

21   want to sell the bond, if I'm allowed to say during a

22   negotiation, "You know what, I really don't want to sell

23   the bond," even though I do want to sell the bond?

24         Is there a section in here that can explain that to

25   me?

1    A.   I don't understand what's a risky bond.

2    Q.   Sir, you were the compliance officer, right, that

3    people were supposed to come to with questions, correct?

4    A.   Correct.

5    Q.   I'm coming to you with a question, sir.  I'm asking

6    you, if I ask you that question, can you point me to a

7    section?  If you can't, you can't.

8    A.   You have to define "risky."  I don't recall using

9    that precise term.  I'm not aware that there's a

10   section.  You're using the term "risky."  If you can

11   define that, I think I could answer your question in a

12   different way perhaps.

13   Q.   Okay.  The lawyers are from two of the biggest law

14   firms in the world, right, that you have with you here

15   today?

16   A.   Listen, that's subjective.  They are large-sized

17   law firms, yes.

18   Q.   I didn't hear that word.  Subjective or objective?

19   A.   It's subjective.  What's the largest law firm?

20   They're my counsel.  I don't see what the size of it

21   matters.

22   Q.   Nothing on -- you have more FINRA licenses than

23   David, as far as you know, right?

24   A.   I don't know what licenses Mr. Demos holds.

25   Q.   You have five FINRA licenses, right?

1    A.    Yes.

2    Q.    There aren't questions on FINRA exams that tell you

3    whether somebody can say "no post" in a chat in an RMBS

4    negotiation, is there?

5    A.    No.

6    Q.    Just so the jury understands the layout of a

7    trading floor, you sat on the same floor as the traders,

8    right?

9    A.    Yes.

10   Q.    And you're allowed to walk up to them and their

11   computers, right?

12   A.    Yes.  It's a freely accessible floor.

13   Q.    And they have these desks with these big monitors,

14   right?

15   A.    They are large-sized monitors, yes.

16   Q.    Well, you already told the jury you were able to

17   see everybody reading all these compliance manuals all

18   the time, so you can see the computers.

19   A.    I don't believe that's what I said.

20   Q.    When they signed these forms that you showed the

21   jury, they are told that your communications are being

22   monitored, correct?

23   A.    I don't recall if it was in that attestation, if

24   that's what you're referring to.

25   Q.    Do you recall whether in the manuals it says,

1    "Electronic communications are recorded"?

2    A.   I believe it does.

3    Q.   And you had the ability to monitor that, right?

4    A.   I had the ability, yes.  As the compliance officer,

5    I would have had the ability, yes.  But direct --

6    Q.   Sir --

7    A.   Go ahead.

8    Q.   -- there's not a question yet.

9         There was software that you had that flagged

10   certain keywords, you testified, correct?

11   A.   Yes.

12   Q.   Like words like "cheap," and words like "lie," and

13   words like "fraud," right?

14   A.   Yes, I believe those are words that would have been

15   flagged.

16   Q.   And probably some other words that you don't

17   remember seven years later?

18   A.   Absolutely.

19   Q.   Probably lots of other words you don't remember

20   seven years later?

21   A.   Correct.

22   Q.   And whenever one of those words would come up, I

23   guess theoretically the trade, the conversation could

24   get flagged and you had the ability to pull the

25   conversation, right?

1    A.   Yes.

2    Q.   And in addition to that, there was random reviews

3    of these conversations, right?

4    A.   On occasion there could have been random reviews.

5    Q.   That's a yes?

6    A.   Yes.

7    Q.   And there were these high margin reports that would

8    come to you when trades –– when the buy and the sell of

9    a trade was over a certain threshold, right?

10   A.   I'm not familiar with the term "high margin."

11   Q.   Large price–difference reports ––

12   A.   Yes.

13   Q.   –– is that what you call them?

14   A.   Yes, that's what they were called.

15   Q.   And they would flag trades that were over 3 percent

16   between the buyer and the seller, right?

17   A.   I don't recall the precise percentage.

18   Q.   You didn't review before testifying in a federal

19   criminal trial what the percentage was?

20   A.   I didn't say that.  I said I don't recall right now

21   what the percentage of the report was.  I can explain

22   the mechanics of it, but I don't recall the percentage

23   of what it was flagged at.

24   Q.   But trades where the spread, the markup, was larger

25   than whatever the threshold you can't remember was,

1    would get flagged.

2    A.   Yes.  That's one way of describing it.  It was a

3    little more complicated, but yes.

4    Q.   Okay.  And all of these different surveillance

5    functions, I think is how you put it, the supervisor is

6    actually the first line of compliance, right?  Not you?

7    A.   Yes, that's correct.

8    Q.   So that would have been George Smith at the time,

9    right?

10   A.   With respect to which -- if you're referring to

11   Mr. Demos's activity, yes, it would have been.

12   Q.   So George Smith, in the first instance, would have

13   reviewed those documents.

14   A.   I recall he was Mr. Demos's supervisor.

15   Q.   And on those large price-difference reports, when

16   the price was higher than the threshold there would be a

17   mark where you could put the reason for why the price

18   was higher than the threshold, right?

19   A.   Yes, correct.

20   Q.   And one of the reasons used was the notation QIB,

21   right?

22   A.   Yes.

23   Q.   And one of the notations had to do with them being

24   non-investment-grade bonds, right?

25   A.   That was a common notation, yes.

1    Q.   And so the supervisor would look at it and

2    essentially, I guess, based on this best execution

3    policy, look at it and say, "Qualified institutional

4    buyer, sophisticated, models, non-investment-grade

5    security," and they would go thumbs up or thumbs down

6    basically, right?

7    A.   I wouldn't -- no.

8    Q.   Not basically?  That's not basically what happened?

9    A.   No, it's not.

10   Q.   You don't know what conversations that David had

11   with any of the other traders about those high-margin

12   reports, do you?

13   A.   No.

14   Q.   Or between David and any of the salespeople, do

15   you?

16   A.   No.

17   Q.   Or David and his supervisors, do you?

18   A.   No.

19   Q.   But you would agree with me that the reports do

20   highlight the trades in which Cantor made more money

21   comparatively to other trades, right?

22   A.   Can you repeat the question?

23   Q.   They indicate, all things equal, the trades in

24   which Cantor made more money compared to other trades in

25   terms of spread, markup.

1    A.    No, I don't think that's accurate.

2    Q.    Why is that not accurate, sir?

3    A.    Because the report was designed to capture a trade

4    where the spread, as you said, the buy and sell, were in

5    excess of X percentage, buy from the sell, one side

6    versus the other.  It was a percentage-based measure.

7    It didn't look at hard dollars.

8         So all factors being considered, it's possible a

9    trade based on the size of the actual trade could be

10   greater and not have hit the report.

11   Q.    You don't think generally that gives you some

12   indication percentage-wise about which trades have

13   higher percentage spreads than other trades?

14   A.    You're asking me now generally.  Yes.  I believe

15   that's not what you asked me initially.

16   Q.    You don't think I said the word "generally"

17   originally?  That's your gripe with the last question,

18   the word "generally"?

19   A.    I believe I answered your question.

20   Q.    It's true that one of the unique features of the

21   RMBS market is that it's a negotiated market, correct?

22   A.    Yes.

23   Q.    And you know that there's a lot of banter and sales

24   talk and back-and-forth in a negotiated market, right?

25   A.    I know there's a lot of discussion.  I don't know

1    how you would define "banter" and "back-and-forth."

2    There's open conversation, ongoing dialogue.

3    Q.    What about negotiation tactics?

4    A.    Are you asking me a question?

5    Q.    Yeah.  Do you think negotiation tactics happen in

6    the RMBS market, or at least are you prepared to say so

7    in this courtroom?

8    A.    Can you define "negotiation tactics."

9    Q.    "I can't really go any lower," when really you

10   could go lower, something like that.  Do you think that

11   that happens in the RMBS market?

12   A.    Yes.

13   Q.    During this time period we're talking about today,

14   up until the point of the end, after all the trades in

15   this case, in 2013, to your knowledge no one had ever

16   been arrested in the RMBS market based on something they

17   said in the course of a negotiation between a qualified

18   institutional buyer and seller, ever.

19   A.    Can you define -- you said, "during this time."

20   What's the time --

21   Q.    From 2011 up until the point of 2013, at the end of

22   January.

23   A.    Okay.  Now can you ask me the question again,

24   please.

25   Q.    Sure.  During that time period no one, to your

1    knowledge, had ever been arrested, criminally

2    prosecuted, for something they said in a negotiation in

3    the RMBS market.

4    A.   I'm not aware of any.  Yes, correct.

5              MR. SPIRO:  I'm going to be offering DX 299.

6              MS. CHERRY:  One moment, Your Honor.

7              Your Honor, we're going to object.  401.

8              THE COURT:  Could you give me a general area

9    to which this relates?

10             MR. SPIRO:  If they had ever told anybody

11   before, they wouldn't have had to tell anybody then.

12             THE COURT:  401?

13             MR. SPIRO:  DX 299.

14             THE COURT:  Defendant's Exhibit 299 is

15   admitted.

16   BY MR. SPIRO:

17   Q.   I asked you before, sir, about that arrest where,

18   for the first time, someone was arrested for this

19   conduct in the RMBS market.

20        Do you recall that after that point in time an

21   important message went out to all employees at Cantor?

22   A.   You'd have to show me something.

23   Q.   It's in evidence, DX 299.

24   A.   That's what's on the screen?

25   Q.   Yes.

1      Do you remember that message?

2   A.   Yes.

3          MR. SPIRO:  I see everybody reading so I'm

4   giving everybody a moment.

5              (Pause.)

6   BY MR. SPIRO:

7   Q.   And this message went out to all employees, right?

8   A.   I believe that's what it said.

9   Q.   And it went out after the events that you've

10  testified today about here, between 2011 and

11  January 2013, right?

12  A.   What's the event?  I'm not --

13  Q.   This message happened after everything you've

14  testified between 2011 and 2013, right?

15  A.   I don't understand the question.  Everything that

16  I've testified?  I'm not understanding the question.

17       There was a date on the memo and it went out on

18  that date.  I'm not following.

19  Q.   Sir, you seem very nervous so I'm going to try to

20  ask it a different way.

21       This memo came out after 2013, correct?

22  A.   Yes.

23  Q.   Is there anything else that you want to point me to

24  in any of these manuals that indicates this message

25  before 2013?

1  A.    I believe the compliance manuals prior to this memo

2  that you had just showed me spoke about a markup policy

3  and being fair and --

4          MR. SPIRO:  I have no further questions.

5

6                    REDIRECT EXAMINATION

7  BY MS. CHERRY:

8  Q.    Mr. Melnicki, you were just asked a question about

9  this memo that Mr. Spiro put up and he had asked you to

10  talk about it, this information was in the manuals.

11         Can you just finish what you were saying?

12  A.    Yes.  What I was about to say, some of the

13  terminology, specifically in the bullet points, were

14  implicit in other sections of the manual, I believe,

15  about fair and accurate representations to clients and

16  general conduct.

17  Q.    And when this memo came out, does that mean that

18  the policy changed, you couldn't make

19  misrepresentations?

20          MR. SPIRO:  Objection.  Leading.

21  BY MS. CHERRY:

22  Q.    Did the policy change when this memo came out?

23  A.    No, I don't believe so.

24  Q.    Everything on this memo was part of the policy

25  prior to this memo?

1    A.    Yes.

2    Q.    Let's just look at it.

3          Prior to this memo coming out, was Cantor's

4    business based on providing superior service to their

5    clients and demonstrating the highest level of

6    integrity?

7    A.    Yes.

8    Q.    Prior to this memo coming out, there was a firm

9    code of ethics, right?

10   A.    Yes.

11   Q.    We went through it before?

12   A.    Yes.

13   Q.    And it requires employees to act with integrity and

14   honesty at all times?

15   A.    Yes.

16   Q.    That was Cantor's policy before this memo, right?

17   A.    Correct.

18   Q.    Prior to this memo coming out, could traders lie to

19   clients about misrepresentations under the manual?

20   A.    No.

21   Q.    Let's go back to the manual because Mr. Spiro was

22   saying some sections apply to some people and some

23   products and didn't apply to other products.  Let me

24   pull up one of the manuals that we looked at.

25         This Standards of Conduct section, do you see that?

1    A.   Yes.

2    Q.   It says, Employees are expected to deal with

3    customers in a fair and honest way.

4         Do you see that?

5    A.   Yes.

6    Q.   Did that apply to all of Cantor?

7    A.   Yes.

8    Q.   All Cantor's employees?

9    A.   Yes.

10   Q.   It didn't matter if you were in equities or if you

11   were in fixed income?

12   A.   Correct.  It would not discriminate.

13   Q.   Right.

14        No employee shall effect any transaction in, or

15   induce the purchase or sale of, any security by any

16   means of any manipulative, deceptive or other fraudulent

17   device.

18        Did that apply to all Cantor employees?

19   A.   Yes.

20   Q.   So it didn't matter if you were in equities or in

21   fixed income, right?

22   A.   Correct.

23   Q.   Was there a section in this manual which permitted

24   lying about material facts to induce customers to pay

25   higher prices for bonds?

1   A.   No.   That would have been unheard of.

2   Q.   So that wasn't in this manual?

3   A.   No.

4   Q.   Mr. Spiro wanted to talk about the best execution

5   policy relating to asset-backed securities.

6        Do you remember you went through that with

7   Mr. Spiro?

8   A.   Yes.

9   Q.   Does it say that bond traders can lie to customers

10  about bond prices?

11  A.   No.

12  Q.   Even if they're qualified institutional investors?

13  A.   I'm -- do you mean qualified --

14  Q.   Yes, QIB.

15  A.   I'm sorry.  Can you repeat the question, please?

16  Q.   Is there something in there that says if your

17  customer is a QIB, you can go ahead and lie to them?

18  A.   No.

19  Q.   You were talking about -- Mr. Spiro was asking you

20  some questions about where you sat in relation to the

21  traders and could you look over their shoulder.

22       Was it Compliance's job to sort of read over

23  people's shoulder and sort of look at their monitors,

24  review all aspects of a trade that way?

25  A.   No.   The compliance officer is not a policeman

1    shadowing 24 hours a day, no.

2    Q.   Mr. Spiro also asked you a bunch questions about

3    these large price differential spreadsheets or forms

4    that you put together.

5    A.   Do you mean large price difference reports?

6    Q.   Yes.  Thank you.

7    A.   Yes.

8    Q.   Do you remember those questions?

9    A.   I do.

10   Q.   And I think you said sometimes they put QIB or

11   sometimes they put -- what was the other thing?  Sorry?

12   A.   I believe he said "not investment grade."

13   Q.   Thank you.  Non-investment-grade.  QIB,

14   non-investment-grade.  Those were some of the comments.

15        Did anyone ever say, "I got that price because I

16   lied to the customer"?

17   A.   No.

18             MS. CHERRY:  No further questions, Your Honor.

19             THE COURT:  Any further questions for this

20   witness?

21             MR. SPIRO:  Nothing further, Judge.

22             THE COURT:  Thank you, sir.  You may step

23   down.

24             THE WITNESS:  Thank you, Your Honor.

25                  (Whereupon, the witness was excused.)

1        THE COURT:  I think we're ready for our next

2   witness.

3        MR. FRANCIS:  Your Honor, the government calls

4   Thomas Carocci.

5                    THOMAS CAROCCI,

6              called as a witness, having been first duly

7              sworn or affirmed, was examined and testified

8              as follows:

9

10       THE CLERK:  Please state your name and spell

11  your last name for the record.

12       THE WITNESS:  Thomas Carocci, C–A–R–O–C–C–I.

13       THE CLERK:  And indicate the town and state in

14  which you live or work.

15       THE WITNESS:  I work in New York City,

16  New York, New York.

17       THE CLERK:  Thank you.

18       MR. FRANCIS:  Good afternoon, everyone.

19       THE JURY:  Good afternoon.

20

21                  DIRECT EXAMINATION

22  BY MR. FRANCIS:

23  Q.   Mr. Carocci, good afternoon.

24  A.   Good afternoon.

25  Q.   Please tell the jury where you work.

1    A.    I work for FINRA, F-I-N-R-A.  It's the Financial

2    Industry Regulatory Authority.

3    Q.    So please tell us, what does FINRA do?

4    A.    We regulate the securities industry, so we regulate

5    the firms that sell stocks and bonds and other

6    securities to the investing public, as well as the

7    employees that work for them and sell or execute

8    transactions on behalf of the investing public.

9    Q.    We'll come back to FINRA.  Tell us a little about

10   you.  Tell us about your educational history.

11   A.    Right.  I have an undergraduate degree in finance

12   and economics, and I have a law agree from Duquesne

13   University in Pittsburgh, Pennsylvania.

14   Q.    And how about your employment history?

15   A.    Yes.  I've been at FINRA for approximately 18 years

16   in two different stints.  In 2007, I left for a year and

17   worked at Goldman Sachs.  But I started with FINRA in

18   1999, in their Corporate Finance department, and then

19   moved on to the Criminal Prosecution Assistance group.

20   Q.    Tell us about your current position at FINRA in the

21   Criminal Prosecutions group.

22   A.    So I'm assistant general counsel for the Criminal

23   Prosecution Assistance group.  There I assist federal,

24   state and local prosecutors with their white-collar

25   criminal investigations and trials.

1    Q.   Just so we understand, what's FINRA's relationship

2    to the RMBS industry?

3    A.   Well, I mean, we regulate firms that would buy and

4    sell those products on behalf of investors, and the

5    individuals as well.

6    Q.   So I think there may have been some reference

7    earlier in the trial to the Securities and Exchange

8    Commission, or SEC.

9         Are you familiar with that?

10   A.   Yes.

11   Q.   Explain to the jury what the Securities and

12   Exchange Commission is.

13   A.   So the Securities and Exchange Commission is the

14   federal government agency/commission that regulates the

15   securities industry.  So they also regulate the

16   securities industry and they also regulate FINRA.

17        We are not the government.  We are private, what's

18   called a self-regulatory organization.  So we're not

19   funded by the taxpayers.  We're actually funded by the

20   member firms, firms such as E-Trade or Goldman Sachs.

21   Those firms, they are required under federal law to be

22   members of FINRA.  They fund us.

23        We have a rule book and they agree to abide by the

24   rules and their employees do as well, their registered

25   employees do as well.  And then we enforce our rules

1    with enforcement actions, conduct examinations of member

2    firms to make sure they're keeping the appropriate books

3    and records, that type of stuff.

4         And the SEC, the federal government agency,

5    oversees –– they approve all of our rules and

6    regulations.  So they oversee us and they audit us to

7    make sure that we're functioning properly.

8    Q.   So you answered like my next five questions.

9    A.   Sorry.

10   Q.   That's fine.  It was very efficient.

11   A.   I'm sorry.

12   Q.   So member firms of FINRA, I heard you refer to

13   that.

14   A.   Yes.

15   Q.   Is Cantor Fitzgerald a member firm of FINRA?

16   A.   Yes, they are.

17   Q.   So what does –– what does it take to be a member

18   firm of FINRA?

19   A.   Well, you know, a firm would apply saying they want

20   to sell certain securities to the investing public.

21   They go through an application process and then become

22   registered with FINRA and be allowed to do that.

23   Q.   So a broker-dealer firm like Cantor Fitzgerald can

24   be a FINRA member?

25   A.   Correct.

1    Q.   So you made reference to registered firms and

2    registered representatives.

3    A.   Yes.

4    Q.   First, let's just do registered firms.  Is that the

5    same thing at member firms?

6    A.   Yes.  They would be registered with FINRA and also

7    the SEC, but with FINRA for my purposes, yes.

8    Q.   Is Cantor a registered firm with FINRA?

9    A.   Yes, they are.

10   Q.   And then you made reference to registered

11   representatives.  I'm not sure we've heard that term

12   yet.  Can you define it for us?

13   A.   That would be the individual that works for a

14   registered firm.  There would be an individual that

15   would pass examinations and be allowed to assist

16   investors with the purchase and sale of securities.  So

17   that would be an individual that works for a registered

18   firm.

19   Q.   What were you asked to do in this case?

20   A.   To check the FINRA database to see if Mr. David

21   Demos was registered with FINRA.

22   Q.   Were you involved in investigating the facts of

23   this case?

24   A.   I was not.

25   Q.   Were you -- are you involved in prosecuting this

1    case?

2    A.    No.

3    Q.    Does FINRA prosecute criminal cases?

4    A.    No, we don't prosecute criminal cases.  We bring

5    regulatory enforcement actions.

6    Q.    Have you read the indictment in this case?

7    A.    I have not.

8    Q.    So you checked FINRA's records; is that right?

9    A.    Yes.

10   Q.    About Mr. Demos?

11   A.    Correct.

12   Q.    So tell us about the recordkeeping system that

13   FINRA maintains for people in the industry.

14   A.    So FINRA maintains what's called a central

15   registration depository database.  That's a database

16   that has all of the registered firms that I mentioned

17   earlier, as well as all of their employees that are

18   registered.  This is how we keep track of which firms

19   are registered, who's working for those firms and kind

20   of what they are doing at those firms, that type of

21   nature as the regulator.

22   Q.    Where does the information that goes into this

23   database come from?

24   A.    It comes from three basic sources.

25         It would come from what's called a Form U4.  That

1    would be information provided to us by the individual

2    that's working for the firm, such as educational

3    history, maybe prior employment, stuff of that nature.

4    They provide that information.

5         Then there is a Form U5.  That's filed by the firm,

6    the member firm.  That would have information such as

7    what office an individual works at, what -- if the

8    person is still working there or has left, what time

9    frames they worked there.  That's again how we keep

10   track who's in the industry.

11        And then there is a Form U6, and that would be any

12   information that we as regulators have or the SEC has.

13        Those are the three main sources of the -- that

14   are -- information that is put into this database.

15   Q.   I'm going to pull up on your screen

16   Government's Exhibit 16 for identification.

17        Do you need me to blow that up?

18   A.   A little bit.

19        That's good.  Thank you.

20   Q.   Are you familiar with documents like this?

21   A.   Yes.

22   Q.   Can you tell us what it is?

23   A.   This is a CRD report, the individual snapshot

24   report.

25   Q.   And if I scroll, is this -- which individual does

1    this relate to?

2    A.   David Salem Demos.

3         MR. FRANCIS:  Your Honor, I move to admit

4    Government's Exhibit 16.

5         MR. SULLIVAN:  Without objection.

6         THE COURT:  Government's Exhibit 16 is

7    admitted.

8    BY MR. FRANCIS:

9    Q.   So on page 2 of this document -- shall I call it

10   "snapshot?"  Is that --

11   A.   You can call it a CRD report.

12   Q.   CRD report.  Okay.

13        On page 2, what is this individual CRD number?

14   A.    That is Mr. Demos's CRD number.  So FINRA assigns a

15   number to each individual who's registered.  It's kind

16   of like their FINRA Social Security number, except it's

17   not their Social Security number.  It's a number we

18   assign and that's how we keep track of who's in the

19   industry, one of the ways.

20   Q.   Does that tie out to what's on page 3 up at the

21   top?

22   A.   Yes, the same number, 5408277.

23   Q.   If I scroll down, does page 3 of the CRD report

24   reflect Mr. Demos's employment at Cantor Fitzgerald?

25   A.   Yes, it does.

1    Q.    What I highlighted there?

2    A.    Yes.  It says he was employed at Cantor Fitzgerald

3    from November 29, 2011 to February 12 of 2013.

4    Q.    Okay.  Now, what's in this column all the way on

5    the left under "regulator"?

6    A.    That would be some -- the entities that he was

7    registered with while he was at Cantor.  So FINRA is

8    there, my regulator, as well as the state of New York,

9    NY.

10   Q.    What's NQX?

11   A.    That's a NASDAQ exchange.

12   Q.    And before Mr. Demos was at Cantor Fitzgerald, he

13   was at MF Global Inc.; is that right?

14   A.    Correct.  That's another FINRA firm, yes.

15   Q.    Is that a broker-dealer firm?

16   A.    Yes.

17   Q.    And while he was there, the column on the left, was

18   he covered by these regulators?

19   A.    These regulators and these states.  You'll see a

20   lot of them are state abbreviations, so registered with

21   those states as well.

22   Q.    Okay.  And then before that he was at Credit Suisse

23   Securities(USA), LLC?

24   A.    Yes.

25   Q.    Is that a broker-dealer firm?

1   A.   Yes.

2   Q.   And he was covered by regulators there too?

3   A.   Yes.

4   Q.   And before that, Houlihan, Lokey, Howard & Zukin,

5   Z-U-K-I-N, Capital.

6        Is that a FINRA firm?

7   A.   Yes, it is.

8   Q.   He's covered by regulators there?

9   A.   Yes.

10  Q.   And before that, Cohen & Company Securities, LLC?

11  A.   Yes.

12  Q.   And is that a FINRA firm?

13  A.   Yes.  You see the firm CRD number.  Just like

14  individuals have their own CRD number, firms do as well,

15  and that's the number in parentheses.

16  Q.   That's the 104002?

17  A.   Yes.

18  Q.   So that takes us to page 6.

19       Look at page 7.  This is under employment history.

20       Where is this information coming from in the CRD

21  report?

22  A.   Well, it would be coming from the Form U5s that the

23  firms have to file.  Basically, when an individual

24  starts with a firm, they have to file a Form U -- the

25  individual files a Form U4.  The firm files a U5.  After

1    they leave the firm, they are required to file that

2    within 30 days saying the individual has left the firm

3    and why.

4    Q.   The time period we've been focusing on in this

5    case, from 2011 to 2013, where was Mr. Demos employed?

6    A.   He was employed at Cantor Fitzgerald, New York,

7    New York, as a managing director.

8            MR. FRANCIS:  Your Honor, I'd just like to

9    read the parties' stipulation concerning employment.

10           THE COURT:  Certainly.

11           MR. FRANCIS:  "The defendant was employed at

12   Cantor Fitzgerald from December 1, 2011 until

13   February 12, 2013.  The defendant left Cantor Fitzgerald

14   for reasons unrelated to the government's allegations in

15   this case."

16           I can hand up a copy to the clerk.

17           Mark this as Joint Exhibit 3, please.

18           Thank you.

19   BY MR. FRANCIS:

20   Q.   So Mr. Carocci, I'm going to just skip to page 8.

21   At the bottom of page 8 -- before I do that, what is the

22   section I'm sort of in right now, midway through page 8?

23   A.   It's the office of employment history.  So the

24   firms are required to tell us, FINRA, where their main

25   office is.  It doesn't mean they show up there every

1    day, but where their main office is, where they're

2    supposed to be working, and we try and keep track of

3    that so we know where individuals are located.

4    Q.   Let's look at the Cantor Fitzgerald entry.

5         Where was -- what city and state was Mr. Demos

6    working at there?

7    A.   New York, New York.

8    Q.   And there's a "type of office located at" entry,

9    and then the address, New York, New York.

10   A.   Yes.

11   Q.   Now, explain; does that mean that that's where --

12   the only place that Mr. Demos is allowed to work from?

13   A.   No.  Like I said, people travel, people work in

14   offices, they have different offices, but FINRA just

15   kind of has a rule you have to let us kind of know where

16   their main office is.

17   Q.   So if Cantor has an office in Darien, it's not

18   against FINRA's rules for Mr. Demos to be there?

19   A.   No.  That's right.

20   Q.   I'm going to scroll down to page 10.

21        After we get through the employment, the office of

22   employment history section, you see this section on exam

23   history?

24   A.   Yes.

25   Q.   In the exam column, what is S7 in a CRD report?

1    A.    S7 stands for the Series 7 examination.

2    Q.    So tell us what is covered, Series -- first, who

3    administers the Series 7 examination?

4    A.    FINRA administers the Series 7 examination.

5    Q.    And why do you need the Series 7 examination?

6    A.    Well, you're required to pass the examination to

7    sell securities, stocks, bonds and other securities to

8    the investing public.  So it's to ensure that anybody

9    doing that has a kind of a base level of knowledge of

10   the rules, regulations, laws and products that they're

11   selling.

12   Q.    If you look at the top line, Mr. Demos passed the

13   Series 7 examination?

14   A.    Yes.  Our records indicate he passed the

15   examination on June 8, 2009.

16   Q.    And what's S63?

17   A.    The Series 63 exam is another exam you'd have to

18   pass to sell securities.  This is called the Uniform

19   Securities Agent exam.  Basically it's administered by

20   FINRA but put together by the state's securities

21   regulator.  So instead of an individual being required

22   to take 50 different state exams to sell securities,

23   they've created one exam administered by FINRA.

24        This exam is very heavily tested on prohibited and

25   fraudulent activity.  That's about 45 percent of the

1     exam.  So it's a lot of state law and securities laws.

2     Q.   And does the CRD report we're looking at indicate

3     that Mr. Demos passed the Series 63 exam?

4     A.   Yes.  It indicates he passed the exam on July 18,

5     2009 with a score of 81.

6     Q.   So you pass the exam, what do you get?

7     A.   Then you're basically allowed to sell securities to

8     the investing public, work for a firm in that capacity.

9     Q.   Is that a license, a Series 7 license or a

10    63 license?

11    A.   We call it a registration because we're not a

12    government entity.  We call it a registration.

13    Q.   Series 7 exam, you said, covers FINRA rules and

14    regulations?

15    A.   FINRA rules, regulations, as well as federal

16    securities laws.

17    Q.   Let's talk about the FINRA rules and regulations

18    first.

19         Does FINRA have any rules concerning fraud?

20    A.   Yes.

21    Q.   Tell us some of those.

22    A.   We have Rule 2010, which says that you must conduct

23    yourself with high standards of commercial honor and

24    just and equitable principles of trade.  So that's the

25    language from the rule.  That's kind of --

1          MR. SULLIVAN:  Objection to anything beyond

2     the language.  701, 702.

3          THE COURT:  Why don't we ask a new question.

4          MR. FRANCIS:  Sure.

5     BY MR. FRANCIS:

6     Q.   Is that the only rule or regulation at FINRA about

7     fraud?

8     A.   No.  There's Rule 2020, which states that in the

9     purchase or sale of a security, to induce the purchase

10    or sale of a security, a registered rep cannot use

11    manipulative, deceptive or fraudulent devices in the

12    purchase or sale of a security or to induce the purchase

13    or sale of a security.

14    Q.   Does the Series 63 exam cover any rules and

15    regulations about fraud?

16    A.   Yes.

17    Q.   What would those be?

18    A.   It would cover the Securities Exchange Act of 1934,

19    Rule 10b-5, which basically states you can't make

20    material misrepresentations or omit material facts in

21    the purchase or sale of a security.

22    Q.   You said it was the 1934 Securities Exchange Act?

23    A.   Yes.

24    Q.   What's 1934 about there?

25    A.   That's the year.  There's obviously been amendments

1    to it since then.

2    Q.   And then underneath the exam section there's

3    several references to CE.

4        What is CE in the CRD report?

5    A.   CE stands for continuing education.  So individuals

6    that are registered with FINRA are required to take

7    continuing education after they pass their examinations.

8    Q.   And does this CRD report reflect that Mr. Demos

9    took his —— satisfied his continuing education

10   requirements while he was employed at Cantor Fitzgerald?

11   A.   He did.  Looks like on September 29 of 2011, he

12   completed his continuing education, which would be

13   additional training on products and rules, regulations.

14           MR. FRANCIS:  No further questions, Your

15   Honor.

16                    CROSS—EXAMINATION

17   BY MR. SULLIVAN:

18   Q.   So picking up where you left off, so FINRA, in

19   addition to the things you described —— Series 7,

20   Series 63 exams and so forth —— FINRA writes rules?

21   A.   Yes.

22   Q.   And those are the rules that are tested on these

23   exams that you testified about?

24   A.   Yes.

25   Q.   And these are the rules that govern the securities

1   industry?

2   A.   Well, they are the FINRA rules.

3   Q.   The FINRA rules that govern the securities

4   industry.  You all have an enforcement mechanism as

5   well?

6   A.   We have an Enforcement department, yes.

7   Q.   You can fine individuals?

8   A.   Yes.

9   Q.   You can fine companies?

10  A.   Well, broker-dealers.

11  Q.   Broker-dealer companies?

12  A.   Not publicly traded companies.  Not like an Apple.

13  A Cantor, but not like an Apple.

14  Q.   And you can suspend or bar individuals who are

15  operating in this FINRA space, right?

16  A.   That are registered with FINRA.  We only have

17  jurisdiction over firms and individuals that are

18  registered with FINRA.

19  Q.   What FINRA cannot do, though, is find somebody

20  guilty of a federal crime, right?

21  A.   We're not the government.  We're a private

22  regulator.

23  Q.   Right.  And FINRA can't put anybody in jail?

24  A.   That's right.

25  Q.   You do understand that FINRA rules are different

1    from the federal criminal law, right?

2    A.    Correct.

3    Q.    And you understand yourself -- let me put it like

4    this:  You do not understand yourself to be here

5    testifying at a federal FINRA rule violation trial,

6    right?

7    A.    I'm here testifying in a criminal trial.

8    Q.    In a federal criminal trial --

9    A.    Right.

10   Q.    -- with different rules, right?

11   A.    What rules?

12   Q.    Well, FINRA is a private organization.

13   A.    Yes.

14   Q.    And the private organization writes its rules,

15   correct?

16   A.    Yes.

17   Q.    The federal criminal code, on the other hand, is

18   written by the United States Congress, right?

19   A.    Correct.

20   Q.    The first is different from the second.

21   A.    Correct.

22   Q.    So you understand yourself not to be here on some

23   sort of FINRA hearing, right?

24   A.    Yes.

25   Q.    You're here on a federal criminal trial, right?

1    A.    Yes.

2    Q.    You do not understand yourself to be here on a

3    Cantor Fitzgerald compliance manual violation hearing,

4    right?

5    A.    Right.

6    Q.    No, of course not.  That would be silly, right?

7          Right?

8    A.    Yes.

9    Q.    You understand yourself to be here for a federal

10   criminal trial, right?

11   A.    Yes.

12               MR. SULLIVAN:  Thank you very much.

13               No further questions, Your Honor.

14

15                    REDIRECT EXAMINATION

16   BY MR. FRANCIS:

17   Q.    So I agree --

18               MR. SULLIVAN:  Objection on commenting, Your

19   Honor.

20               THE COURT:  Sustained.

21   BY MR. FRANCIS:

22   Q.    I have a question, but it's not about where you're

23   located.

24         My question is:  Do you believe, or do you

25   understand that Rule 10b–5 under the Securities Exchange

1    Act is part of the federal code that Mr. Sullivan was

2    just asking you about?

3              MR. SULLIVAN:  701, 702, Your Honor.

4              THE COURT:  Sustained.

5              MR. FRANCIS:  Your Honor, he opened the door

6    to what he understood.

7    BY MR. FRANCIS:

8    Q.   Do FINRA rules follow or pick up on the federal

9    criminal rules?

10             MR. SULLIVAN:  Same objection, Your Honor.

11             THE COURT:  I'll allow that one.

12   A.   I think 2020, FINRA Rule 2020 that talks about an

13   individual not being able to induce the purchase or sale

14   of a security without -- with manipulative, deceptive or

15   fraudulent devices, I think that's very similar to

16   Rule 10b-5 under the federal Securities Exchange Act

17   that says that to make a material misrepresentation or

18   to omit a material fact in the purchase of a security.

19   I think they are very similar.

20   BY MR. FRANCIS:

21   Q.   And those rules apply to registered

22   representatives?

23             MR. SULLIVAN:  Objection.  Clarity on which

24   rules.  I object to testifying about securities law.

25             MR. FRANCIS:  I can clarify.

1    BY MR. FRANCIS:

2    Q.   Those two rules you just mentioned, Rule 2020 and

3    Rule 10b-5, apply to registered representatives?

4              MR. SULLIVAN:  Objection, with respect to --

5    701, 702 with respect to 10b-5.

6              THE COURT:  Just limit it to the FINRA rule.

7    BY MR. FRANCIS:

8    Q.   FINRA Rule 2020 governs registered representatives.

9    A.   Yes.

10   Q.   Like Mr. Demos?

11   A.   Yes.

12             MR. FRANCIS:  Nothing further, Your Honor.

13             THE COURT:  Okay.

14                    RECROSS-EXAMINATION

15   BY MR. SULLIVAN:

16   Q.   And 2020 is not a federal law, correct?

17   A.   Correct.

18             MR. SULLIVAN:  That's all, Your Honor.

19             THE COURT:  Thank you, sir.  You may step

20   down.

21             THE WITNESS:  Thank you, Your Honor.

22                 (Whereupon, the witness was excused.)

23             THE COURT:  We're going to take our break a

24   few minutes early, ladies and gentlemen, so we'll let

25   you take that now.

1              (Whereupon, the jury left the courtroom.)

2              THE COURT:  Please be seated, everyone.

3              So is the government ready to rest?

4              Do you want a few minutes to confer?

5              MR. FRANCIS:  A few minutes to confer, yes,

6        please.

7              I heard Your Honor before, about advising the

8        defendant on his right, that you were content to rely on

9        the defense --

10             THE COURT:  Well, I think by 4:30 today,

11       presumably, I will know whether I should be doing the

12       canvass first thing in the morning or today, unless I'm

13       told that the decision will be -- there will be other

14       witnesses on Monday.  I can't speak for what the defense

15       is going to do, so I'm waiting to be informed.

16             MR. FRANCIS:  That's fine.  I'm not asking you

17       to canvass him.  I want to be clear, I don't want to be

18       in the position where the government is unsure whether

19       we will be closing on Monday, for instance, or whether

20       we should be preparing for witnesses.

21             THE COURT:  I sort of will need to know that

22       too because I'll need to know what time to tell the jury

23       to come in.

24             So why don't we take a break and we'll come

25       back and I'll see what people have to tell me.

1          MR. FRANCIS:  Thank you.

2               (Whereupon, a recess followed.)

3          THE COURT:  Please be seated, everyone.

4          So where are we?

5          MR. FRANCIS:  So the government is prepared to

6     rest its case.

7          THE COURT:  Okay.

8          MR. FRANCIS:  And at the risk of being a pest,

9     Your Honor, I have a concern about the record and the

10    defendant.  The government is concerned that at 4:30,

11    the defense will notify the Court and us that they don't

12    intend to put on a case, for instance.  We worry then

13    that the record would read that the defendant had not

14    been warned that it was his decision and it's an

15    important one and he had the right to testify and he

16    should make it in consultation with counsel before he

17    made that decision.

18          Alternatively, we're concerned he will

19    announce that he does intend to testify, and the record

20    perhaps next week will read that he did not have -- he

21    was not aware of all his rights, for instance, that he

22    didn't need to.

23          I'm not sure this really matters, but I think

24    caution is called for.

25          So we're happy to stick around until 4:30.  We

1    could come back.  We don't want to rush them.

2             THE COURT:  Let me just find out.

3             Has the defense made a decision yet as to what

4    it's going to do?

5             MR. BAEZ:  No.

6             THE COURT:  In that case, I will just make

7    sure that Mr. Demos understands his right to testify,

8    and if it's appropriate I'll repeat it later.

9             How's that?

10            MR. BAEZ:  That's fine.

11            MR. FRANCIS:  Excellent.  Thank you.

12            THE COURT:  That way we'll have all the bases

13    covered.

14            MR. BAEZ:  I can advise the Court, if this

15    makes things easier, this is not about posturing or

16    anything like that, but we will be prepared to close on

17    Monday.  We are anticipating if we do call a witness, it

18    will be one witness other than Mr. Demos.

19            So I think -- I think that's as much as I can

20    say right now, given the conversations that we've had.

21            We will be fully ready and prepared to close

22    on Monday.

23            THE COURT:  Okay.  I am still intending to do

24    the charge before the closings.

25            How much time are you all seeking for

1    closings?

2              Does the government have a request or an idea,

3    at least preliminarily?

4              MR. FRANCIS:  I can tell you what we did in

5    other cases like this.  I believe it was 90 minutes,

6    something like that, and we divided it up an hour and

7    then 30.  I could be wrong.  It may have been --

8              THE COURT:  If that's -- I want to know what

9    your request is.

10             MR. FRANCIS:  We don't really have a request.

11   We'll work with whatever --

12             THE COURT:  Let me see what the defense has.

13             MR. BAEZ:  We would be fine with that.

14             THE COURT:  I've been looking at the guts of

15   the charge, I'll say, and there are some significant

16   differences between the two.  I don't see any benefit to

17   rushing through getting the charge done, and I have

18   other commitments this weekend.  So my inclination would

19   be to have the charge conference Monday morning, give

20   the charge Monday afternoon, and do the closings Tuesday

21   morning.

22             MR. FRANCIS:  That sounds fine to us.

23             MR. BAEZ:  Can I have moment?

24             (Off the record.)

25             MR. LEONTIRE:  Your Honor, while they are

 1    discussing, may I ask a question?

 2              THE COURT:  Yes.

 3              MR. LEONTIRE:  On the jury instructions we

 4    submitted, would you like it all in one document?  Would

 5    you like me to break it up so each instruction is a

 6    separate page?

 7              THE COURT:  No.  I've already got most of the

 8    charge done.  I'm just going through now on the elements

 9    of the offense.  I just copied sections of the two

10    submissions.  I have it all set.

11              MR. LEONTIRE:  Thank you.

12              THE COURT:  I'm about to start marking that up

13    now.

14                   (Off the record.)

15              MR. BAEZ:  Judge, I can make the

16    representation that we don't expect our one witness on

17    Monday to take a long time.  So if that helps the Court

18    in its scheduling decisions, great.  If not --

19              THE COURT:  No.  I think I can't commit to

20    exactly when I'll get the charge to you.  I'm making

21    sure you understand how I'm going to proceed.

22              I'm going to send you all a draft of the

23    charge.  You're going to then have time to review it.

24    Then we'll have a charge conference and talk about any

25    requests for changes.  Then I'll make any changes.  Then

 1    I'll be ready to give the charge to the jury.

 2            You'll certainly have the charge by 6:00 or

 3    7:00 a.m. on Monday, at the latest, but I will endeavor

 4    to get it to you earlier than that.  It's nothing

 5    magical.  You've seen this a lot, but there are some

 6    differences in your requests.  And I think if we had the

 7    charge conference relatively early on Monday, then you

 8    could have your witness.

 9            I guess there is a wild card though.  I don't

10    think there would be any rebuttal, but who knows.  But I

11    think that makes the most sense.

12            When you said a short witness, I assumed that

13    would give us time to get that done.

14            MR. BAEZ:  Okay.

15            THE COURT:  I have to decide what time to have

16    the jurors come in.  That's all.

17                (Off the record.)

18            THE COURT:  If I were to assume that the

19    testimony would take no more than an hour for direct and

20    cross -- I won't ask the government because they don't

21    know what it is -- but that's probably a safe

22    assumption?

23            MR. BAEZ:  Yes, sir.

24            THE COURT:  So we'll take that as an operating

25    assumption.  Maybe I'll ask the jurors to come in at

1    11:30.  Then we'll have the lunch-break time to sort of

2    play with in terms of if I have to make adjustments.

3            Then we can have the charge conference at --

4    we'll start the charge conference at 9:00.  I'll tell

5    the jury to come in at 11:30 and I'll play it by ear as

6    to what time I bring them in for the charge.

7            And that's all I will do on Monday afternoon.

8    And at 9:30 on Tuesday we'll start with the closings.

9            I will be breaking -- there are sort of three

10   parts to the charge.  The last part will be saved until

11   after the closings as the instructions for

12   deliberations.

13           Maybe what we'll do before we leave today,

14   because you may be thinking about your closings over the

15   weekend, I'll just mention a couple things to you, and

16   I'll also cover the colloquy.

17           But we'll excuse the jury first.

18           We'll bring the jury in, the government will

19   rest, and then I'll excuse the jury.

20           MR. FRANCIS:  Yes, Your Honor.

21               (Whereupon, the jury entered the

22   courtroom.)

23           THE COURT:  Please be seated, everyone.

24           Mr. Francis.

25           MR. FRANCIS:  Thank you, Your Honor.

1           The government rests its case.

2           THE COURT:  Thank you.

3           At this time, ladies and gentlemen, I'm going

4    to let you leave for the day.  I'll be discussing some

5    legal questions with counsel.  We'll also be -- well,

6    we'll be working on a number of things and I think, as a

7    result, I will have you report at 11:30 on Monday and

8    then we'll pick up with our schedule from there.

9           I do want to remind you about the instructions

10   I've been giving you about keeping an open mind

11   throughout the trial, not reaching any decision until

12   after you've heard all the evidence and the closing

13   arguments of counsel and my instructions to you on the

14   law.

15          Also, not discussing the case with anyone and

16   not permitting anyone to discuss it in your presence.

17          In addition, not having any contact with the

18   parties, attorneys or witnesses in the case or anyone

19   associated with them.

20          And then finally, I want to emphasize again

21   how important it is that your verdict be based solely on

22   the evidence admitted here in the courtroom so it's

23   essential that you not be exposed in the media or

24   anywhere else to anything about this case, any similar

25   matter, or anyone or any entity that's involved in the

1    case.

2         Other than that, I'd just like to thank you

3    for your hard work, and we'll have you come in at

4    11:30 on Monday.

5         Have a good weekend.

6              (Whereupon, the jury left the courtroom.)

7         THE COURT:  Please be seated, everyone.

8         Mr. Demos, I do want to make sure that you

9    understand that you have the right to testify in this

10   trial.

11        Do you understand that you do have the right

12   to testify, sir?

13             THE DEFENDANT:  Yes, Your Honor.

14        THE COURT:  And you understand that the

15   decision as to whether to testify is ultimately your

16   decision, and that it is a decision which is to be made

17   by you only after you've had a full consultation with

18   your attorneys, but it is a decision that you must make.

19        Do you understand that, sir?

20             THE DEFENDANT:  Yes, Your Honor.

21        THE COURT:  So full consultation with your

22   attorneys, but it's your decision.

23        You understand that?

24             THE DEFENDANT:  I do.

25        THE COURT:  Okay.  Let me ask you at this

1    time, do you believe that you've had the opportunity at

2    this time to have had a full consultation with your

3    attorneys as to what is in your best interests in terms

4    of testifying or not testifying?

5             THE DEFENDANT:  No, Your Honor, not at this

6    point, no, I have not.

7             THE COURT:  So I then take it that you have

8    not yet concluded whether or not it's in your best

9    interest as to whether you testify, so we'll talk about

10   that on Monday.

11            THE DEFENDANT:  Certainly.

12            THE COURT:  And just so you are prepared, I

13   will tell you on Monday, if you tell me that you have

14   decided it is in your best interest not to testify, that

15   if at any time before the defense rests you decide you

16   want to testify, you have the right to do so and you

17   should make that fact known.  Okay?

18            I have had situations where defendants are

19   wavering and I like to make sure that they know that

20   even if I canvass them and they say, "I've decided not

21   to testify," that until we say the magic words "defense

22   rests," which is the equivalent of "done," you can

23   always change your mind by telling me.

24            THE DEFENDANT:  I'd like to make that

25   affirmative decision, but I'd appreciate the ability to

1    wait.

2              THE COURT:  Great.  We're all on the same page

3    then.  Great.

4              Please be seated, sir.

5              I do just want to mention a few things, if I

6    have my list here.

7              You'll get a draft charge from me.  A lot of

8    it is sort of my standard charge, so it's what I'm

9    comfortable with and I don't get lost or confused.

10             I frequently get requests to add language that

11   has been requested or not, and I insert language from

12   statutes and opinions of the Court of Appeals.  I don't

13   make changes that I deem to be sort of marshaling the

14   evidence for one side or the other.

15             I do want to say that, because I will be

16   giving the charge before you do your arguments, you'll

17   have a copy of the charge when you do your arguments.

18   You can put language up on the screen, on big boards,

19   whatever you want to do, except one thing:  Just don't

20   say, "As the Judge told you," because I don't like to be

21   used as a -- I don't like to have the appearance given

22   I've endorsed one side or the other's position or being

23   used as a prop --

24             MR. SULLIVAN:  My favorite line.  That's my

25   favorite line.

1        THE COURT:  -- so that is not allowed.  And in

2    addition to being uncomfortable with it, I have had

3    situations where counsel, before I imposed this rule,

4    they said -- this is where I was doing the charge

5    after -- "The Judge is going to tell you," and that

6    wasn't what I was going to tell them.

7        So you can just state, "the law is," "the

8    government is required to," or, "this isn't sufficient,"

9    whatever, but just don't refer to the judge.

10       And then I also ask counsel not to use the

11   verdict form during their closings.  I view that as

12   between me and the jury.

13       I think you'll see that the charge will go

14   into the jury room.  I let the jurors know that if they

15   want extra copies of the charge they can get it.  I

16   think I mentioned that the indictment will not go into

17   the jury room.

18       And everyone should, either later today or

19   first thing Monday morning, discuss with the courtroom

20   deputy the exhibits that are admitted so that we're not

21   keeping the jury waiting once we finish the arguments

22   and the last part of the charge.

23       I think that's all that I wanted to just share

24   with you all about my preferences.

25       Any questions?

1          MR. FRANCIS:  I just have one question.

2          I understand Your Honor's ruling about the

3    indictment.  Are you going to -- is there going to be a

4    portion of the charge that will state what the --

5          THE COURT:  In the introduction section of the

6    elements of the offense -- and I have decided on the

7    multiplicity question.  I am going to combine those two

8    counts.  I'm not going to strike one.  I'm simply going

9    to say we have charges relating to four trades.

10          And when I do the verdict form it's going to

11   say Charge Number 1, Charge Number 2, Charge Number 3,

12   Charge Number 4.  One charge will have two securities.

13   So I know that you all have, at times during your

14   questioning, referred to counts.  So I'm visualizing it

15   as Charge Number 1, Count One; Charge Number 2,

16   Count Two; Charge Number 3, Counts Four and Five; Charge

17   Number 4, Count Six.  And then opposite each one of

18   those will be a column that says the security, or

19   securities, and the trade date.

20          MR. FRANCIS:  Excellent.

21          My only other question is, do you give a copy

22   of the charge to the jurors to take into the

23   deliberations?

24          THE COURT:  Yes.

25          MR. FRANCIS:  Thank you.

```
 1                THE COURT:  Any other questions?
 2                MR. LEONTIRE:  In our proposed jury
 3     instructions we cite the statute and request an
 4     instruction -- not an instruction, but a summation of
 5     the defendant's case in the instructions.
 6                THE COURT:  You mean you have a theory of
 7     defense?
 8                MR. LEONTIRE:  Yes.
 9                THE COURT:  I'll have to look for that because
10     I flipped through and I didn't notice that.
11                MR. LEONTIRE:  We haven't given you a theory
12     yet, but we reserve the right to give you.
13                THE COURT:  Oh.  When am I going to get that?
14                MR. LEONTIRE:  Over the weekend, Your Honor.
15                THE COURT:  Okay.  So I'll add in a section
16     for theory of the defense.
17                MR. LEONTIRE:  Thank you.
18                THE COURT:  I'm thinking about where -- I
19     think I know where I'll put that.
20                MR. FRANCIS:  Your Honor, obviously, before
21     you decide to insert it in the charge, we have no idea
22     what this is going to be.  I hope we can have a chance
23     to be heard on it.
24                THE COURT:  I may just put it in the draft so
25     we have it to discuss.
```

1          MR. FRANCIS:  That's fine.

2          THE COURT:  I mean, the point of the charge

3  conference is so you all can weigh in on the draft.  But

4  of course, when you get that, I'm assuming I'll get

5  comments before the charge conference, assuming I don't

6  get it to you at 7:00 a.m. on Monday morning.

7          Anything else?

8          MR. SULLIVAN:  I guess we have a motion

9  briefly, Your Honor.

10          THE COURT:  Yes.

11          MR. SULLIVAN:  Mr. Spiro.

12          MR. SPIRO:  Yes, Judge.

13          We would make our Rule 29 motion.

14          THE COURT:  Why don't you do it from the

15  podium.

16          MR. SPIRO:  Sure.

17          We don't believe that the government has

18  sustained its burden, and I want to point the Court to a

19  couple of things that have come out.

20          Specifically on the issue -- I know Your Honor

21  is aware of the line of cases regarding value.

22  Mr. Marks testified specifically as to value and that he

23  got the benefit of his bargain.  So as to the counts

24  that relate to Mr. Marks, we'd have a secondary request

25  that those not proceed to the jury based on that

1    separate legal theory, as it were.

2            In addition, I understand Your Honor's

3    decision to combine, I think as you put it, Counts Four

4    and Five into a singular count to attempt or to, in the

5    Court's mind, cure the issue of multiplicity.  I don't

6    believe that it cures it.

7            THE COURT:  I'm not combining it into -- well,

8    when I say "charge," if it becomes relevant post verdict

9    I will do something, but there would only be one charge.

10           MR. SPIRO:  Right.  But I don't think that

11   that, based on the testimony at this trial, cures the

12   evils of multiplicity.  There are several reasons for

13   that.

14           We alerted the Court and the government to

15   this concern before.  The government continued with

16   their theory in the face of that.  They were really

17   talking about what I believe that the Court, I'm

18   gleaning from the Court, the Court views as one trade,

19   one bargain, one benefit, and that's how the Court is

20   viewing it now.

21           But in essence, that's then -- that's not

22   really what happened.  The defense put in an exhibit

23   that showed that one piece of that bond had gone up

24   50 points.  So the jury isn't able to determine what

25   misrepresentation, if any, affected which part of any

1    bargain.  And the government didn't tease that out and

2    we elected not to cross-examine on that issue.

3              But they can't combine the sale of one house

4    into the sale of a house and the fence on the house and

5    do it in this way because it doesn't enable the defense

6    to cross-examine on:  Did the misrepresentation affect

7    each piece of that or not; did it just affect one part

8    of the bond transaction and not the other; would

9    Mr. Marks, if he were called back to testify in another

10   parallel trial that wasn't improperly charged, as I

11   submit this was, and it was just one bond, would he say,

12   Well, the bond that went up 50 points, it did not matter

13   because that piece of the bond went up 50 points?

14             We don't know.  It's that danger that leads to

15   repugnant verdicts and that danger that is the danger

16   that multiplicity concerns.

17             In addition, there is another reason that the

18   Court should not allow that count to proceed, which is

19   that Mr. Marks testified unequivocally that at the time

20   he made that transaction he believed that he was being

21   lied to.  So there's no -- this is Escobar, and this is

22   the notion that if you know you're being lied to, you're

23   not being defrauded.  He said it plain as day and

24   there's nothing in the record that suggests otherwise.

25             So that count for that fourth independent

1     reason can't, in my judgment, go back to the jury.

2           So those are the reasons -- I guess as to all

3     of the counts, we don't believe the government has

4     sustained its burden, and in particular as to that count

5     or counts, as it were, we don't believe it can go back

6     to the jury.

7           THE COURT:  Thank you.

8           Mr. Francis.

9           MR. FRANCIS:  So I'll take these in order.

10          With respect to the defendant's argument

11    regarding value and benefit of the bargain, so that's

12    not a get-out-of-jail-free card.  That's a determination

13    of materiality under the Second Circuit case law.  The

14    lie has to go to, or cannot be insignificant to the

15    benefit of the bargain or the heart of the matter.

16          And I think Mr. Spiro's advocacy

17    notwithstanding, I'm not sure that -- it is not the case

18    that Mr. Mark said this lie had no significance to the

19    bargain being negotiated.  I would point to -- I suppose

20    the related argument is -- I think he said fourth, but I

21    counted it as the third argument; that Mr. Marks said he

22    knew he was being lied to.  What Mr. Marks said was he

23    expected that there was a possibility that it wasn't

24    actually a four-tick commission he was paying, to use

25    his words, but a six-tick amount of compensation.  He

1    agreed he did not think it was 62 ticks.

2              So a reasonable juror, a rational juror could

3    clearly find these lies to be material.

4              It's also an objective standard.  So it is

5    possible the jury could find Mr. Marks to be

6    unreasonable and, based on all the evidence, find that

7    an objectively reasonable investor would think this lie

8    was material.

9              In addition, I think Mr. Spiro's view of the

10   charge is too narrow.  Half-truths as well as

11   affirmative misrepresentations can constitute a scheme

12   to defraud or a violation of the securities fraud

13   statute.  And here, in many instances what Mr. Demos was

14   doing was combining affirmative misrepresentations,

15   half-truths that supported that, and then omissions to

16   correct those and allowed people to negotiate as if the

17   facts were as he left them.  So he passed up the

18   opportunity to correct his omissions.

19             Those can all constitute a misrepresentation

20   or a scheme to defraud under the -- what I believe Your

21   Honor is calling the first element of securities fraud.

22             I think the harder argument here is the

23   multiplicity issue.  I understand, Your Honor, why you

24   want to combine them into one charge.  I have a little

25   bit of heartburn.  I haven't thought this all the way

1    through, but the reason we didn't charge it that way in

2    one count was because we knew we would get either a

3    duplicity argument on one hand or a multiplicity

4    argument on the other.

5             I think, frankly, the safer course here --

6    although I understand why Your Honor said what you

7    said -- is to leave it charged in five counts, and then

8    if Mr. Demos is convicted on both Counts Four and Five,

9    I don't know that the government would have any

10   objection to dismissing one or the other.

11            That clearly is allowable.

12            THE COURT:  I mean, in light of the argument

13   that Mr. Spiro just made, I'm inclined to agree with

14   you.  When the parties briefed this issue, the question

15   came down to whether it was one transaction or two

16   transactions, and the defense, in its papers, did a

17   whole litany of reasons why it was one transaction.  The

18   government asserted it was two, but I didn't get a

19   litany of reasons.

20            The defense also cited to cases that pointed

21   out that it was -- you had to consider not only

22   safeguarding against being punished twice, but also

23   undue prejudice.  That's why I took as -- I think when I

24   did the ruling I said, I'll be making a determination

25   based on whether it's one transaction.  I thought that

1    was the universe of arguments I had to consider.

2              Now that Mr. Spiro has made an additional

3    argument, I'll go back and leave it the way it is.

4              MR. SPIRO:  Judge, my argument isn't --

5              THE COURT:  I understand your argument, but

6    you made the argument and I'm going to react to it in

7    the way I think is most prudent given the circumstances.

8              MR. SPIRO:  Okay.

9              MR. FRANCIS:  I don't want to leave unsaid or

10   un-responded to one of Mr. Spiro's arguments.  That was

11   all I had written down.  If there's one I'm missing,

12   clearly the government does not concede it.

13             There is more than enough evidence for a

14   rational juror to find beyond a reasonable doubt on each

15   of the five counts that Mr. Demos satisfied, or the

16   government's evidence satisfied each of the elements,

17   whether you count them as three or four.

18             So to the extent that there's written papers,

19   obviously we'll respond to those as well.

20             THE COURT:  Thank you.  I'll reserve ruling

21   and I'll get working on the charge.

22             Thank you all.

23             MR. FRANCIS:  Thank you, Your Honor.

24                  (Proceedings adjourned at 3:42 PM)

25

1                    C E R T I F I C A T E

2

3              UNITED STATES V DAVID DEMOS

4                    3:16CR00220(AWT)

5

6

7         I, Corinna F. Thompson, RPR, Official Court

8   Reporter for the United States District Court for the

9   District of Connecticut, do hereby certify that the

10  foregoing pages, pages 653 - 836, are a true and

11  accurate transcription of my shorthand notes taken in

12  the aforementioned matter on April 27, 2018, to the best

13  of my skill and ability.

14

15

16

17

18              /s/_____

19              CORINNA F. THOMPSON, RPR
                 Official Court Reporter
                450 Main Street, Room #225
20              Hartford, Connecticut 06103
                    (860) 547-0580

21

22

23

24

25